# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CLERK'S CERTIFICATE AND APPEALS COVER SHEET

### ABBREVIATED ELECTRONIC RECORD

Case Caption: National Parks Conservation Association et al v. Department of the Interior et al

District Court Number: 1:26-cv-10877-AK

Fee:    Paid?   Yes _____   No _____   Government filer _X_   *In Forma Pauperis* Yes _____   No _X__

Motions Pending    Yes _X_ No _____          Sealed documents    Yes _____ No _X__
*If yes, document #*    44              *If yes, document #*    _____

*Ex parte* documents    Yes _____ No _X_          Transcripts    Yes _____ No _X__
*If yes, document #*    _____          *If yes, document #*    _____

Notice of Appeal filed by: Plaintiff/Petitioner _X_    Defendant/Respondent _____    Other: _____

Appeal from:

 NOTICE OF APPEAL as to 37 Memorandum & ORDER, 41 Memorandum & ORDER
Other information:

 I, Robert M. Farrell, Clerk of the United States District Court for the District of Massachusetts, do hereby certify that the annexed electronic documents:

 Dkt 41, Dkt 43
with the electronic docket sheet, constitute the abbreviated record on appeal in the above entitled case for the Notice of Appeal # _43_ filed on _6/15/2026_.

 In testimony whereof, I hereunto set my hand and affix the seal of this Court on _____.

**ROBERT M. FARRELL**
Clerk of Court

 /s/ Courtney Horvath
Deputy Clerk

COURT OF APPEALS DOCKET NUMBER ASSIGNED: _____

**PLEASE RETURN TO THE USDC CLERK'S OFFICE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:26-CV-10877-AK |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR 5 U.S.C. § 705 STAY OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

**ANGEL KELLEY, D.J.**

*"The parks do not belong to one State or to one section . . . ; they are national properties in which every citizen has a vested interest; they belong as much to the man"—and I would add, woman—"of Massachusetts, of Michigan, of Florida as they do to the people of California, of Wyoming, and of Arizona."*

*Those words are a powerful reminder in this era of political division and disagreement: national parks are national.  They cut across party lines and geographic boundaries.  They enjoy broad support, and they bring people together—something we seem to need now more than ever.*

— U.S. Representative Nicola Tsongas, original co-sponsor of the National Park

Service Centennial Act of 2016 (quoting Stephen Mather, first Director of the National Park Service)[1]

In 1872, Congress established Yellowstone National Park as the world's first national park, setting in motion the principle that natural wonders, historical sites, and cultural memory belong to and serve the public. With over 433 park sites across the United States today, the National Park system hosts millions of visitors each year seeking to enjoy the parks' iconic views, monuments to our Nation's history, and memorials recognizing the sacrifice of many. Beyond the scenic grandeur, the National Park system also serves as a cornerstone of public learning, providing rich and informative signs, exhibits, and interpretive waysides on topics ranging from civil rights to environmentalism. From the echoes of abolition in John Brown's Fort in Harpers Ferry, to the genesis of the modern LGBTQ+ civil rights movement at the Stonewall National Monument, to the retreating ice of Glacier National Park in Montana, the National Parks preserve the multifaceted and multi-layered history of our Nation, including the good, the bad, and the ugly. Often referred to as "America's largest classroom," National Parks serve in that spirit by telling the stories both of those who write history and those who go unheard. The beauty of history is the unvarnished storytelling of a time gone by and the delivery of undeniable truths. The Government's stewardship of these park sites thus carries a responsibility to present history in full rather than in favored fragments.

Unfortunately, the Government has disregarded these principles. Under the guise of promoting American dignity, this Administration seeks to share a limited history by ordering the removal of all signs, displays, and interpretive exhibits at National Parks that do not align with its preferred narrative, thereby telling half-truths. In recent months, the Government has torn down exhibits in Philadelphia's Independence National Historical Park memorializing the legacy

---

[1] 162 Cong. Rec. H7207 (daily ed. Dec. 6, 2016).

2

of people enslaved by the country's first President;[2] removed signage detailing climate threats at

Fort Sumter in South Carolina, one of the most environmentally endangered sites in the country;

and wiped away descriptions of history and science at countless National Parks across the United

States. Not only does this undermine the integrity of the National Parks; it sets a dangerous

precedent of censorship and sanitization. The National Park Service Organic Act, the National

Park Service Centennial Act, and the National Parks Omnibus Management Act, as well as the

Administrative Procedure Act do not authorize such arbitrary and capricious action. The Court

thus **GRANTS** Plaintiffs' Motion for a Stay Pursuant to 5 U.S.C. § 705.

## I.    BACKGROUND

### A.    The National Parks

Unless stated otherwise, all facts are drawn from Plaintiffs' Amended Complaint and the

exhibits attached to the parties' briefing on Plaintiffs' Motion for a Stay. In establishing

Yellowstone as the country's first National Park, Congress declared unequivocally that it was

"for the benefit and enjoyment of the people." 16 U.S.C. § 21. In the years that followed, the

federal government authorized the designation of hundreds of additional parks, monuments,

memorials, and recreation areas (collectively, "park sites"). Today, National Parks comprise

more than 400 areas covering more than 84 million acres in the United States, which house

natural wonders, battlefields, sacred Indigenous grounds, and sites memorializing and

commemorating this country's history of slavery and the Civil Rights movement. See *Quick*

*History of the National Park Service*, Nat'l Park Serv. (Aug. 24, 2022),

https://www.nps.gov/articles/quick-nps-history.htm. Each National Park is created by an Act of

---

[2] These exhibits were ordered to be reinstalled pursuant to a preliminary injunction in a parallel action in the U.S. District Court for the Eastern District of Pennsylvania. See City of Philadelphia v. Burgum, 820 F. Supp. 3d. 313 (E.D. Pa. 2026) (Rufe, J.).

Congress or a presidential proclamation pursuant to the Antiquities Act of 1906, and has an implementation plan that defines the sites' purpose and significance. *Foundation Documents*, Nat'l Park Serv. (Apr. 24, 2025), https://www.nps.gov/subjects/parkplanning/foundation-documents.htm.

From their inception, National Parks have occupied a dual role in both preserving places of extraordinary beauty and serving as "America's largest classroom" for visitors of all backgrounds. As far back as 1886, U.S. Army infantrymen deployed in Yellowstone answered visitors' questions in what became known as "ranger talks." Thirty years later, in 1903, in dedicating an arch marking the entrance of Yellowstone, President Theodore Roosevelt recognized the parks' crucial role in educating the Nation, stating:

> I cannot too often repeat that the essential feature in the present management of the Yellowstone Park, as in all similar places, is its essential democracy—it is the preservation of the scenery, of the forests, of the wilderness life and the wilderness game for the people as a whole, instead of leaving the enjoyment thereof to be confined to the very rich who can control private reserves.

Another thirty years later, President Franklin D. Roosevelt reiterated the sentiment, noting: "There is nothing so American as our national parks . . . . The fundamental idea behind the parks . . . is that the country belongs to the people, that it is in the process of making for the enrichment of the lives of all of us."

To oversee the National Parks and further their ability to provide for public learning, Congress established the National Park Service ("NPS") through the National Park Service Organic Act of 1916 ("Organic Act"), as a bureau within the Department of Interior. Congress entrusted the NPS with a statutory mandate to "conserve the scenery, the natural and historic objects, and wild life [in National Park sites] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

Pursuant to this mandate, the NPS has long honored its duty to ensure that the parks serve as a shared, natural, and cultural resource for all visitors. In 1917, the first Director of the NPS, Stephen Mather, acknowledged that "one of the chief functions of the national parks and monuments is to serve educational purposes." He established the National Parks Education Committee to "further the view of the national parks as classrooms and museums of nature." By 1929, the NPS created "simple, understandable interpretation[s] of the major features of each park to the public by means of field trips, lectures, exhibits, and literature." Congress then codified the NPS' educational role with the 1935 Historic Sites Act, which directs the NPS to develop "an educational program and service for the purpose of making available to the public facts and information pertaining to American historic and archeologic sites, buildings, and properties of national significance." See An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, Pub. L. No. 74-292, § 2(j), 49 Stat. 666, 667 (1935) (amended and recodified at 54 U.S.C. § 320102(k)). In 1970, Congress adopted the National Park Service General Authorities Act of 1970, which emphasized that the National Park system is a "cumulative expression[] of a single national heritage" and that each individual site "derive[s] increased national dignity" by being included in a system that is "managed for the benefit and inspiration of all the people of the United States." See An Act to improve the administration of the national park system by the Secretary of the Interior, and to clarify the authorities applicable to the system, and for other purposes, Pub. L. No. 91-383, § 1, 84 Stat. 825, 825 (1970) (amended and recodified at 54 U.S.C. § 100101(b)(1)).

Today, the NPS enlists approximately 13,000 permanent employees and thousands of temporary and seasonal employees, who work across the 433 park sites to serve 332 million

visitors each year. The agency has continued to provide rich educational and interpretive information with specific context for each park site, including exhibits, interpretive waysides, bookstores, booklets, brochures, and other publications. The process for creating these materials, governed by established review and approval procedures, often takes months to years—requiring collaboration and comprehensive evaluation by NPS professionals, historians, scientists, subject-matter experts, community advocates, educators, interpretive specialists, experiential graphic designers, and accessibility experts. Moreover, Plaintiffs report that the NPS constantly iterates and updates the materials to ensure that they reflect multiple viewpoints and the most current information and scientific research.

The NPS has recognized that "[h]istory has typically been presented from the perspective of the dominant group in power and can, intentionally or not, exclude details that tell a more holistic story," and the agency has affirmed its role in "expand[ing] ideas about power, science, gender, race, and more." *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://www.nps.gov/articles/history-under-construction.htm. In its efforts to enhance the parks' ability to allow visitors of all backgrounds to connect with park sites, the NPS "strives to tell the stories of all Americans," including "the historical experiences of those who have been underrepresented in traditional histories." *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), http://nps.gov/articles/publications-diverse.htm. In this manner, the NPS ensures that parks welcome all visitors and that narratives are not misrepresented through the omission of marginalized voices.

**B.    Statutory and Regulatory Framework**

**1.    Organic Act**

In addition to the previously described statutes, the NPS and the National Park system are

governed by a series of statutory and regulatory authorities.  As explained, the Organic Act of

1916 is the foundational statute establishing the NPS.  Signed into law by President Wilson, it

centralizes the management of the National Park system under the NPS.  The statute provides:

> The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the [National Park] System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a).  It further sets forth Congress' express intention for the parks, initially

declared in 1970 and reaffirmed in 1978 through the Redwood Amendments:

> **1970 declarations.** — Congress declares that (A) the National Park System, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States and its territories and possessions; (B) these areas, though distinct in character, are united through their interrelated purposes and resources into one National Park System as cumulative expressions of a single national heritage; (C) individually and collectively, these areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one System preserved and managed for the benefit and inspiration of all the people of the United States; and (D) it is the purpose of this division to include all these areas in the [National Park] System and to clarify the authorities applicable to the [National Park] System.

> **1978 reaffirmation.** — Congress reaffirms, declares, and directs that the promotion and regulation of the various [National Park] System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States.  The authorization of activities shall be construed and the protection, management, and administration of the [National Park] System units shall be conducted in light of the high public value and integrity of the [National Park] System and shall not be exercised in derogation of the values and purposes for which the [National Park] System units have been established, except as directly and specifically provided by Congress.

Id. § 100101(b).

### 2.    Omnibus Management Act

In 1998, Congress promulgated the National Parks Omnibus Management Act ("Omnibus Management Act").  The Act reformed the management of National Parks, refocusing the agency on scientific research and improving employee training.  It provides:

> Recognizing the ever increasing societal pressures being placed upon America's unique natural and cultural resources contained in the [National Park] System, the Secretary shall continually improve the ability of the Service to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the [National Park] System.

54 U.S.C. § 100701.  It further specifies that "[t]he Secretary shall ensure that management of [National Park] System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." Id. § 100702.

### 3.    Centennial Act

In 2016, Congress passed the National Park Service Centennial Act ("Centennial Act") to prepare the NPS for its second century of operations.  It sought to improve visitor facilities and support conservation efforts.  Under the statute, the Secretary is required to "ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802.  "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the [National Park] System." Id. § 100801(1)(A). "Education" means "enhancing public awareness, understanding, and appreciation of the resources of the [National Park] System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2)).

The Centennial Act also authorizes the Secretary to regularly update the education and

interpretation program based on four criteria:

> The Secretary may undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the [National Park] System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis.

Id. § 100803.

### 4. NPS Directives System

To implement its statutory mandates, the NPS has established a Directives System, a triple-tiered, agency-wide set of policies, practices, and procedures. See *The NPS Directives System*, Nat'l Park Serv. (Aug. 29, 2023), https://www.nps.gov/subjects/policy/directives-system.htm. The highest level is the NPS' Management Policies, which set forth the agency's management and operations policies and provides the NPS' official interpretation of its statutory mandates. Id. The Policies articulate the agency's objectives and establish standards governing park system planning, land protection, natural and cultural resource management, wilderness preservation and management, implementation of the agency's interpretation and education program, public use of the parks and park facilities, and the operation of commercial visitor centers.

As relevant here, the Management Policies establish a process and structure for the agency's interpretation and education program. The agency, in partnership with individual park sites and public and private stakeholders such as historical societies and conservation groups, must create both a "general management plan" ("GMP") and "comprehensive interpretive plans" ("CIPs") to "serve as the backbone of interpretive and educational program planning and direction." Management Policies, Nat'l Park Serv. (2006), § 7.2 (hereinafter "Management

9

Policies"). A GMP is a broad policy document that establishes the long-term vision for a park's resource conditions and visitor use. Id. § 2.2. The CIPs are focused, short-term implementation plans that dictate how the park will tell its stories and connect visitors to its resources. Id. § 2.3. The Management Policies emphasize that "[a]ll interpretive and educational services . . . will be based on and coordinated with the comprehensive interpretive plan." Id. § 7.2 (emphasis added). Park staff are to utilize the CIPs to determine "which stories to tell, how to tell them, and how to reach specific audiences." Id. The Policies further explain that NPS' "interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners." Id. § 7.4.

The second level of the NPS' Directives System is Director's Orders. These interpret the Management Policies, outline requirements for NPS functions, programs, and activities, delegate specific authorities and responsibilities to subordinate staff, and articulate new or revised policies between updates of the Management Policies. See *Director's Orders and Related Guidance*, Nat'l Park Serv. (May 12, 2026), https://www.nps.gov/subjects/policy/directors-orders.htm. As relevant here, National Parks Director's Order #6, titled "Interpretation and Education," supplements the Management Policies' directives regarding the NPS' interpretation and education program. See Director's Order #6: Interpretation and Education, Nat'l Park Serv. (Mar. 3, 2025) (hereinafter "Director's Order #6"). It articulates park staff's roles and responsibilities, the content and mission of educational programming, interpretive planning requirements, and reporting requirements. See id.

Finally, the third level of the NPS Directives System is policy memoranda and related guidance. These documents address time-sensitive issues and interim policy needs, and thus are

10

often narrow-in-scope. See *Policy Memoranda and Related Guidance,* Nat'l Park Serv. (Apr. 30,

2026), https://www.nps.gov/subjects/policy/policy-memos.htm.

### C.    Executive Order and Secretary's Order

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring

Truth and Sanity to American History."  The Executive Order directed the Secretary of the

Interior to review all "public monuments, memorials, statues, markers, or similar properties"

(collectively, "interpretive materials") at park sites and remove any that met certain

characteristics.  Specifically, the Executive Order states:

> Over the past decade, Americans have witnessed a concerted and widespread
> effort to rewrite our Nation's history, replacing objective facts with a distorted
> narrative driven by ideology rather than truth.  This revisionist movement seeks to
> undermine the remarkable achievements of the United States by casting its
> founding principles and historical milestones in a negative light.  Under this
> historical revision, our Nation's unparalleled legacy of advancing liberty,
> individual rights, and human happiness is reconstructed as inherently racist,
> sexist, oppressive, or otherwise irredeemably flawed.  Rather than fostering unity
> and a deeper understanding of our shared past, the widespread effort to rewrite
> history deepens societal divides and fosters a sense of national shame,
> disregarding the progress America has made and the ideals that continue to inspire
> millions around the globe.

Exec. Order. No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

To effectuate this mission, the Executive Order directed the Secretary of the Interior to

take three actions:

> (i) determine whether, since January 1, 2020, public monuments, memorials,
> statues, markers, or similar properties within the Department of the Interior's
> jurisdiction have been removed or changed to perpetuate a false reconstruction of
> American history, inappropriately minimize the value of certain historical events
> or figures, or include any other improper partisan ideology;
>
> (ii) take action to reinstate the pre-existing monuments, memorials, statues,
> markers, or similar properties, as appropriate and consistent with 43 U.S.C.
> § 1451 *et seq.*, 54 U.S.C. § 100101 *et seq.*, and other applicable law; and
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that
> all public monuments, memorials, statues, markers, or similar properties within

the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Id. § 4.

Two months later, on May 20, 2025, the Secretary of the Interior implemented these directives by issuing Secretary Order 3431, likewise titled "Restoring Truth and Sanity to American History" ("Secretary's Order").  The Order announced an objective of implementing the Executive Order:

> **Purpose.**  This Order implements provisions of President Trump's March 27, 2025, Executive Order (EO) 14253, titled "Restoring Truth and Sanity to American History."  EO 14253 directs the Secretary of the Interior (Secretary) to provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park and to complete such improvements by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence.  It also directs the Secretary to review public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's (Department) jurisdiction and to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

Restoring Truth and Sanity to American History, Order No. 3431, Doug Burgum, Sec. of the Interior, U.S. Dep't of the Interior (May 20, 2025).

Two sections of the Secretary's Order are relevant to this case.  First, Section 5 directed NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, "Land Management Bureaus") to conduct the reviews mandated by the Executive Order.  It established a two-step review plan.  During the initial thirty-day phase, the Land Management Bureaus were to review and remove any interpretive materials that had been "removed or changed to perpetuate a false reconstruction of

12

American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology" since January 1, 2020. During the next phase, the scope of review broadened to all park sites, with the agencies directed to review and remove any interpretive material that "inappropriately disparages Americans past or living . . . or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature" or is otherwise "inconsistent with the purpose of" the Executive Order. This phase was to be completed within 120 days.

In addition to the review process set out in Section 5, Section 6 of the Secretary's Order directed the Land Management Bureaus to post quick response ("QR") codes at park sites soliciting help from visitors in identifying content that allegedly violated the Executive Order. The QR codes were to accompany the following language:

> (Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features.

NPS staff were provided with a template sign, including a QR code, and instructed that it should be posted "by the order of the Secretary of the Interior," in support of the Restoring Truth and Sanity Executive Order at all park sites by June 13, 2025. Signs containing the mandated language and QR code were posted in National Parks throughout the country. No notice was published in the *Federal Register*, nor was public input solicited, and the posted signs did not display an Office of Management and Budget control number. NPS compiled a database of public comments submitted through the QR codes.

### D. Timeline of Removals

In Summer 2025, in compliance with the Secretary's Order, NPS staff began removing

material.  Defendants also instituted various internal efforts to speed up removals, leading to a

significant escalation in early 2026.  For example, in August and September 2025, Director of

the Secretary of the Interior Jessica Bowron sent letters to park sites that allegedly failed to

remove signs as a notice of their "non-compliance," and in November 2025, Bowron issued a

separate order to expand the scope of review to include retail items.

As a result of these efforts, by early 2026, NPS had removed or identified for removal

hundreds of interpretive materials from park sites.  By the date of the filing of this action,

Defendants had removed dozens of signs related to climate change, civil rights, and diverse

communities.  The potpourri of items removed include those on environmental degradation, such

as:

- Signs at Acadia National Park in Maine discussing the impact of climate change on the

  surrounding environment and its costs to the park's natural resources.

- An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area

  in New York concerning climate change.

- Interpretive displays at Fort Sumter in South Carolina, describing how the historic island

  fortress that sparked the beginning of the Civil War may be underwater by the end of the

  century due to climate change.  The display was the product of extensive research by the

  NPS and West Carolina University showing the effects of sea level rise, coastal erosion,

  flooding, and storm surge on the park.

- Multiple interpretive materials at Glacier National Park in Montana, including signs

  providing information about the effect of carbon dioxide emissions and climate change

  on glaciers; a sign attributing the sharp increase in wildlife in the American West to

  "hotter and drier conditions"; a sign describing the "controversy" regarding wolf hunting;

and a placard titled "Blame It on the Grain," which "describes the construction of a dam that created a reservoir in the eastern part of the park to support farming."  Moreover, a season of the official podcast of Glacier National Park, "Headwaters," has been taken down, and a film about the park shown to visitors has been ordered to be stopped.

In addition, Defendants have removed multiple signs involving slavery, abolition, immigration, labor, women's suffrage, and civil rights, including:

- A "History Under Construction" exhibit at Muir Woods in Golden Gate National Park in California, which annotated an existing sign with content on Indigenous history, the role of women in the Muir Woods conservation movement, and the historical role of NPS staff in eugenics movements.

- Signs at Rock Creek Park in Washington, D.C., describing the legacy of Francis G. Newlands, a congressman and senator from 1893 to 1917, including details about his white supremacist views.

- Exhibits at the President's House Site in Independence National Historical Park in Philadelphia that "examin[ed] the paradox between slavery and freedom in the founding of the nation" and described the critical role that enslaved people played in the operation of the home during President Washington's presidency.  One of the removed signs discussed Ona Judge, a woman the NPS described as "a talented seamstress" who "became Martha Washington's personal maid as a teenager" and who escaped enslavement and evaded recapture.

- Films on labor history at Lowell National Historical Park in Massachusetts.

- An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York describing women's rights and liberty, as well as a quote stating that there

are components of the country's history "we hope never to repeat—like slavery, massacres of Indians, or holding Japanese Americans in wartime camps."

- A sign at Sunset Crater Volcano National Monument in Arizona describing basalt bubbles because the sign included an image of a visitor holding a Pride flag.

Defendants have also removed multiple interpretive materials dedicated to Native Tribes and describing the atrocities committed to their communities, such as:

- A sign at Grand Teton National Park in Wyoming explaining the complicated history of Gustavus Cheyney Doane, a key member of an early Yellowstone expedition who had participated in a massacre of Native Americans.

- Signs at Acadia National Park in Maine describing the importance of Cadillac Mountain to the Wabanaki people to their culture and heritage.

- Portions of displays at Grand Canyon National Park in Arizona characterizing settlers, cattle ranchers, and tourists as negatively impacting the land for their own benefit and describing how the federal government claimed Tribal land to establish the park.

In addition to materials that have already been removed, hundreds of others have been flagged for removal. These include exhibits about slavery and civil rights, such as:

- A sign at Fort Pulaski National Park in Georgia reproducing "The Scourged Back," an 1863 image of Peter Gordon, a man who was enslaved in Louisiana, with heavy scars covering his back from whippings received in slavery.

- Over thirty signs at Harpers Ferry National Historic Park in West Virginia, where abolitionist John Brown led a raid seeking to arm enslaved people for a revolt in 1859.

- A sign at Bent's Old Fort National Historic Site in Colorado describing a family's "ownership" of enslaved people.

16

- Signs at the Bunker Hill Monument in Massachusetts regarding suffrage, abolition, immigration, and anti-war movements. These signs include quotes from an 1875 letter in the Archdiocese of Boston's newspaper stating, "citizens of foreign birth take no second place"; a 1925 statement from civil rights activist and newspaper editor William Monroe Trotter stating, "[c]olored Americans were here that day fighting with other patriots, our own ancestors, of whom we are justly proud and on whom we base our claim for full liberty and equality as citizens"; and an 1889 statement from abolitionist and suffragist Lucy Stone in the *Women's Journal* stating, "[t]he woman sufferance battle is like that of Bunker Hill—not won today, but sure to be later. Meantime, Bunker Hill Monument is our monument." See Katie Cole & Artemisia Luk, *National Park Service to Remove Quotes About Slavery, Immigration, and Suffrage from Bunker Hill Site*, W. Bos. Univ. Radio (June 5, 2026), https://www.wbur.org/news/2026/06/05/nps-bunker-hill-monument-boston-quote-removal.

- An exhibit at the Kingsley Plantation in the Timucuan Ecological and Historic Preserve in Florida titled "Freedom Seekers of Timucuan Preserve" that describes stories of enslaved people who "illustrated the perseverance of the human spirit" as they navigated "sites of bondage and of escape."

- A plaque at Virgin Islands National Park commemorating the "slave rebellion that began on St. John on November 23, 1733."

- Exhibits at Cane River Creole National Historic Park in Louisiana about enslaved people who tried to escape but were captured and publicly whipped.

- A sign at Manassas National Battlefield in Virginia that criticized post-Civil War "Lost Cause" ideology, which denied the central role slavery played in the war.

17

- Exhibits at Emmett Till and Mamie Till-Mobley National Monument in Sumner and Glendora, Mississippi and Chicago, Illinois, that "tell[] the story of Emmett Till and his mother" and were created "in collaboration between the Emmett Till and Mamie Till-Mobley Institute, the Emmett Till Interpretive Center (ETIC), the Till family, and The Children's Museum of Indianapolis."

- Approximately eighty items at the Selma to Montgomery National Historic Trail in Alabama that mark the historic 1965 Voting Rights March from Selma to Montgomery.

- A permanent exhibit at Brown v. Board of Education National Historical Park in Kansas because it mentions "equity."

The NPS has also flagged interpretive materials reporting on the stories of Indigenous communities, including:

- A brochure and sign at Glacier National Park in Montana describing the mass slaughter of the Piegan Blackfeet people.

- A sign at Bent's Old Fort National Historic Site in Colorado describing the forced removal of a Native Tribe.

- A display at Sitka National Historical Park in Alaska referencing the mistreatment of Alaskan Natives by missionaries.

- An exhibit at Little Bighorn Battlefield National Monument in Montana describing the United States being "hungry for gold and land" and breaking promises to Indigenous groups.

- Signs at Castillo de San Marcos National Monument in Florida about the imprisonment of Indigenous groups inside the Spanish stone fortress. In reporting these signs, NPS staff emphasized that these signs were "developed in collaboration with the Cheyenne

18

and Arapaho Tribes."

- A panel at Hubbell Trading Post National Historic Site in Arizona discussing Ganado Mucho, a Navajo leader known for settling disputes with ranchers.

- A sign at Fort Laramie National Historic Site in Wyoming that references the persecution of Native Americans.

- An exhibit at Death Valley National Park in Nevada requested by the Timbisha Soshone Tribe with the phrases "these are our homelands" and "we are still here" to commemorate the twenty-fifth anniversary of the Homeland Act, which transferred nearly 7,800 acres of land to the Tribe. Timbisha Shoshone Homeland Act, Pub. L. No. 106-423, 114 Stat. 1875 (2000).

Likewise, signage and exhibits providing scientific information at parks across the country have also been targeted, including:

- A plaque at Great Smoky Mountains National Park in North Carolina and Tennessee explaining how fossil fuels cause air pollution.

- A sign at Cape Hatteras National Seashore titled "The Air We Breathe" discussing the importance of clean air.

- Signs at Everglades National Park in Florida describing industrialization's impact on the wetland ecosystem.

- Signs at Organ Pipe Cactus National Monument in Arizona describing destructive grazing practices and the accelerating rate of global warming since 1850, as well as a booklet that talks about endangered turtles and Sonoran pronghorn.

According to an internal NPS database leaked by anonymous civil servants on March 2, 2026, over five hundred items have been identified for review.

### E.     Procedural History

The Secretary's Order and the removals it authorized gave rise to the present action. Plaintiffs National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks ("Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS") filed this action against Defendants Department of the Interior (the "Department"), Secretary of the Interior Doug Burgum (the "Secretary"), the NPS, and Director of the Secretary of the Interior Jessica Bowron on February 17, 2026, arguing that Defendants' actions are arbitrary and capricious, contrary to law, and in excess of statutory authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and seeking declaratory and injunctive relief.  Plaintiffs filed an Amended Complaint on March 18, 2026.  Plaintiffs bring their claims pursuant to five statutes: the Centennial Act, 54 U.S.C. §§ 100801-100803, the Organic Act, 54 U.S.C. § 100801, the Omnibus Management Act, 54 U.S.C. §§ 100701-100702, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*

On March 18, 2026, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction, pursuant to the Organic Act, the Omnibus Management Act, and the Centennial Act.  On April 8, 2026, Defendants filed a consolidated Opposition and Motion to Dismiss, asserting that Plaintiffs lack standing, the claims are not ripe, venue is improper, the claims are not judicially reviewable under the APA, and that Plaintiffs fail to state a claim.  The Court held a Status Conference with the parties on May 12, 2026.  After conferring with the parties, the Court decided to address the Motion to Dismiss on the papers and without oral argument.

On June 4, 2026, the Court denied Defendants' Motion to Dismiss. On the same day, following discussion with the parties, the Court determined to decide Plaintiffs' Motion for a Stay on the papers and without oral argument due to scheduling challenges. Plaintiffs subsequently filed a Notice detailing Defendants' removals of signage from Bunker Hill National Monument in Massachusetts on June 4, 2026.

## II.      LEGAL STANDARD

Plaintiffs seek a stay of the Secretary's Order under the APA, 5 U.S.C. § 705, or a preliminary injunction. Section 705 of the APA authorizes a court reviewing agency action to stay "all necessary and appropriate process" and postpone the effective date of agency action or preserve the status quo pending judicial review "on such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Although a stay under the APA is distinct from a preliminary injunction, the same standard governs both forms of relief. See Nken v. Holder, 556 U.S. 418, 434 (2009). Specifically, the moving party must demonstrate four elements: (1) likelihood of success on the merits; (2) a likelihood of irreparable harm if injunctive relief is not granted; (3) a balance of the equities tips in the movant's favor; and (4) injunctive relief is in the public interest. Id. The most important of the four elements is the likelihood of success on the merits. Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020) (quoting New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). In general, preliminary injunctive relief is an "extraordinary and drastic" remedy that is granted sparingly. Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).

At the preliminary injunction stage, a court accepts as true well-pleaded allegations in the complaint and uncontroverted affidavits. Rohm & Haas Elec. Materials, LLC v. Elec. Circuits

Supplies, Inc., 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010) (citing Elrod v. Burns, 427 U.S.

347, 350 n.1 (1976)). The court may also rely upon otherwise inadmissible evidence, Howe v.

U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT, 440 F. Supp. 3d 99, 102 (D.

Mass. 2020) (citing Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986)), and may

take judicial notice of information on official government websites, see Gent v. CUNA Mut. Ins.

Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (relying on the contents on government agency's

website).

## III.    DISCUSSION

Plaintiffs contend that they are likely to succeed on the merits of their claims that the

Secretary's Order is arbitrary and capricious, contrary to law, and in excess of statutory

authority. They move pursuant to three of the five statutes cited in the Amended Complaint—the

Centennial Act, the Organic Act, and the Omnibus Management Act.[3] They seek a stay or

preliminary injunction directing Defendants to restore all park sites to how they existed prior to

the issuance of the Secretary's Order, as well as prohibiting Defendants from making any further

alterations to interpretive materials pending the litigation of this matter. As explained below, the

Court finds that Plaintiffs have demonstrated a likelihood of success in their claims that the

Secretary's Order and Defendants' subsequent implementation actions are contrary to law and

arbitrary and capricious, that relief is necessary to prevent irreparable harm, and that the balance

of the equities and public interest weigh in favor of relief.

### A.    Jurisdiction

As a threshold matter, Plaintiffs must establish a sufficient likelihood of success that the

---

[3] Plaintiffs do not include their FLPMA and Paperwork Reduction Act claims in their Motion, so the Court does not include those statutes in its analysis.

Court has jurisdiction to issue preliminary relief. Defendants raised objections related to standing, venue, ripeness, and reviewability under the APA in a consolidated filing that both opposed Plaintiffs' motion for preliminary injunctive relief and moved for dismissal. The Court addressed those arguments at length in its prior Order denying Defendants' Motion to Dismiss. Under the law of the case, the Court must apply its prior legal holdings to the extent issues were resolved in its prior Order. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) ("[W]hen a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." (quoting Arizona v. California, 460 U.S. 605, 618 (1983))); Ellis v. United States, 313 F.3d 636, 646-48 (1st Cir. 2002). The parties have not submitted any additional briefing since Defendants' consolidated filing, and the factual record bearing on jurisdiction has changed only marginally. The only new materials beyond the Complaint that are before the Court are the Exhibits attached to Defendants' Opposition and Reply, which the Court could not consider at the motion to dismiss stage but can at the preliminary injunction stage, and an additional news article submitted by Plaintiffs regarding Defendants' order to remove three quotes regarding suffrage, abolition, immigration, and anti-war movements from the Bunker Hill Monument in Massachusetts. These additional filings do not materially alter the Court's prior analysis.[4] Accordingly, the Court finds that Plaintiffs have demonstrated a sufficient likelihood of success on the jurisdictional issues at this stage. The

---

[4] Defendants' Exhibits contain screenshots from Plaintiffs' website advertising merchandise opposing the Secretary's Order, which Defendants provide to support their argument that any injury suffered by Plaintiffs is self-inflicted and therefore insufficient to establish causation. The Court previously considered and rejected that argument, concluding that the alleged injuries were not so self-inflicted as to break the causal chain for purposes of standing. As for Plaintiffs' additional filing, the article described therein provides another example reinforcing the Court's conclusions that Defendants' removals of interpretive materials are imminent, actual, and ongoing.

Court therefore proceeds to the merits.

### B.      Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, a plaintiff must show "more than mere possibility of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato P.R. de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Me. PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).  The court need not conclusively determine the merits of the movant's claim but should evaluate the likelihood that the movant will prevail on the merits. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).  Courts place "particular emphasis" on this factor because, if the moving party cannot demonstrate they are likely to succeed, "the remaining factors become matters of idle curiosity." Get in Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 198 (D. Mass. 2016) (quoting New Comm. Wireless, 287 F.3d at 9).  The court need only determine the "probable outcome[]" of the underlying claims; it need not resolve the issues presented with certainty. See id. (citing Me. Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 158 (1st Cir. 2012)).  Plaintiffs bring two challenges to the Secretary's Order under the APA: that the Order is arbitrary and capricious, and that it is contrary to law/in excess of statutory authority.  The Court addresses each in turn.

### 1.      Arbitrary or Capricious

In Count 1, Plaintiffs argue that the Secretary's Order is arbitrary and capricious. Specifically, they contend that the Order lacks a reasoned explanation, is an unexplained departure from prior practice, and is unsupported by the evidentiary record/contrary to existing evidence.  At this stage, the Court finds that Plaintiffs have made a preliminary showing that they are likely to succeed on the merits of each of these theories.

### a. Lack of Reasoned Explanation

Plaintiffs have shown a likelihood of success on the merits that the Secretary's Order is "not 'reasonable or reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). To meet this standard, an agency must "set forth its reasons for decision" in a manner that demonstrates a "rational connection between the facts found and the choice made." Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277 (D. Mass. 2025) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Amerijet Int'l Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014)), aff'd, 164 F.4th 1 (1st Cir. 2026). Merely pointing to a source of authority is not itself an explanation of the agency's reasoning; agencies must both cite a source of authority and explain their decisions. See New York v. Trump, 811 F. Supp. 3d 215, 237-40 (D. Mass. 2025). Likewise, "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" Amerijet, 753 F.3d at 1350 (quoting Butte County. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)) (emphasis in original). "[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222 (2016) (citing 5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 42-43).

Here, the Secretary's Order fails to provide any reasoned justification for its directive to review and remove interpretive material. The sole explanation on the face of the Order is to "implement[] provisions" of the Executive Order. The Order then summarizes the content of the Executive Order but does not provide any commentary or explanation for its decision based on facts or on the Land Management Bureaus' statutory mandates. Defendants' briefing offers little more, merely stating in a conclusory fashion that the Order "implement[s] the EO." Reasoned

25

decisionmaking requires an agency to "both exhibit sufficient consideration of the relevant factors and pertinent aspects of the problem and demonstrate a rational connection between the facts and choice that was made." Nat'l Insts. of Health, 770 F. Supp. 3d at 305.  The Order fundamentally fails at the first step of even identifying the relevant factual or legal context that it seeks to disrupt.

First, the Order does not grapple with the relevant legal authority or statutory frameworks that bind the Land Management Bureaus.  The Order mentions the Organic Act and the FLPMA as "Authority" but does not explain its relationship to those statutes, such as how the removal of interpretive materials comports with the Organic Act's mandate to "conserve" and to "provide for the enjoyment" of park resources. 54 U.S.C. § 100101(a).  The Order does not mention the Centennial Act or the Omnibus Management Act at all, much less any explanation regarding how the Order complies with, or why it departs from, the requirements of those statutes.  The Centennial Act, for instance, requires the Secretary to ensure the "availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802.  The Order fails to explain how its expedited removal of interpretive materials affects the "availability and use" of the Centennial Act's mandated interpretation and education program at park sites.  These mandates to conserve park resources, provide for the public's enjoyment, and ensure the use of a broad and high-quality interpretation and education program are binding on Defendants, but the Order fails to engage meaningfully with these authorities or provide any explanation. Cf. Rhode Island v. Trump, 810 F. Supp. 3d 283, 306 (D.R.I. 2025) (finding agency's elimination of "non-statutory components and functions" was arbitrary and capricious because agency failed to actually analyze or explain "which agency components and functions were statutorily required and which were not").

Second, the Order fails to provide any indication that Defendants considered relevant facts and evidence.  For example, National Parks were established to serve the public, yet the Order does not point to any evidence regarding the public's reaction to signage at National Parks—let alone evidence that the public reacts negatively to representing diverse viewpoints and marginalized voices, or that existing interpretive materials are disfavored.  Instead, tens of thousands of public comments submitted through QR codes at park sites have criticized Defendants' actions, demonstrating that these materials instead promote the public's ability to form stronger connections with park resources.  Indeed, Plaintiffs provide a 2026 Pew Research Center survey reporting that sixty-six percent of all U.S. adults believe it is "extremely or very important to publicly discuss [both] the country's historical successes and strengths" as well as "the country's historical failures and flaws." See Andy Cerda, *Majorities of Americans Say It's Important to Talk About the Country's Historical Successes and Failures*, Pew Rsch. Ctr. (Jan. 26, 2026), https://www.pewresearch.org/short-reads/2026/01/26/majorities-of-americans-say-its-important-to-talk-about-the-countrys-historical-successes-and-failures (hereinafter "Pew Research Study").  This opinion cuts across race, age, and educational background, with the majority of each demographic group surveyed supporting the presentation of an unbiased history. See id.  Plaintiffs report that another 2021 study by the American Historical Association, as well as a 2025 study by the American Alliance of Museums, further support that the public overwhelmingly prefers to "receiv[e] historical knowledge of others" and "history that challenges, rather than reinforces, their existing historical knowledge."  Another 2022 study succinctly summarized: "Americans of all political orientations want their children to learn a history that celebrates our strengths and also examines our failures.  Americans overwhelmingly agree that the experiences of minority groups are an important part of that history."  The Order

27

entirely fails to grapple with this existing information, and its anemic contents are devoid of any countervailing data collected by the agency or other independent explanation. This is "grossly insufficient and falls far short of reasoned analysis." Widakuswara v. Lake, 773 F. Supp. 3d 46, 55 (S.D.N.Y. 2025).

The Order also identifies no expert reports or analyses reporting any deficiencies in the materials being targeted, such as that they are historically inaccurate or inconsistent with statutory obligations. The record instead reflects a structured, deliberate, meticulous process for creating factually accurate interpretive and educational materials, which the Order now seeks to unwind. The signs, films, and educational curricula targeted by the Order were developed over decades through GMPs and CIPs set forth at each individual park site. Management Policies §§ 2.2, 7.2. As part of these plans, public and private stakeholders—including subject matter experts, interpretive specialists, local community leaders, scientists, and professional historians—provided multiple rounds of feedback on which topics to include and how best to present them to the public, a process that can take up to years. Indeed, Plaintiffs report that "public historians . . . generate the historical research that informs" interpretive materials, that experiential designers "engaged in extensive vetting of content that ultimately was shared in the parks to ensure it was as accurate as possible based on available high quality academic and scientific research," and that the NPS' process "involve[s] writers, historians, scientists, and curators, among others, all working toward the shared goal of design excellence and producing materials that are accessible and captivating for the audience." Significant resources were invested to ensure that the quality of these materials is high and that the content therein is historically accurate and holistic, so much so that professional societies dedicated to producing academic and scientific research have long-used NPS' interpretive materials as "leading

28

examples" and "exemplars" of "how interpretive signage and exhibits can responsibly connect visitors to history, science, and cultural significance of place." Taken together, it is clear that NPS previously implemented a thoughtful and deliberative process for creating high quality and factually accurate interpretive materials. The Secretary's Order fails to explain why it believes that process is deficient, or how it resulted in interpretive materials that are "inappropriate[]," a "false reconstruction of American history," or "improper partisan ideology."

Third, the Order fails to rationally connect any facts to the action taken. It claims that the removals will "restore Federal sites . . . to solemn and uplifting public monuments that remind Americans of our extraordinary heritage." However, the Order fails to explain how unearthing and displaying the historical contributions of marginalized groups detracts from celebrating "our extraordinary heritage." Indeed, the NPS' purpose in installing these materials in the first instance was to attract new audiences to National Parks by celebrating diverse experiences. See *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://www.nps.gov/articles/publications-diverse.htm (listing NPS publications "touching on the historical experiences of those who have been underrepresented in traditional histories" as "part of an effort to provide an inclusive and honest look at American history"). This mission extends not only to interpretive displays—entire park sites have been established with the purpose of promoting inclusivity, such as the Stonewall National Monument honoring LGBTQ+ history; the Emmett Till and Mamie Till-Mobley National Monument memorializing the life of fourteen-year-old Emmett Till; the Birmingham Civil Rights National Monument and Medgar and Myrlie Evers Home National Monument honoring the history of the Civil Rights movement and its leaders; the Selma to Montgomery National Historic Trail commemorating the journey of the historic 1965 Voting Rights March in Alabama; and the Belmont-Paul Women's

29

Equality National Monument honoring the history of women's suffrage. These park sites and materials celebrate the Nation's heritage by commemorating the contributions of all members of the public, including those who have traditionally been excluded. The Secretary's Order is entirely silent as to how removing these materials fosters greater appreciation for and connection to park resources, or which groups are detrimentally impacted by their continued display. The Order's lack of any explanation connecting the facts to its directed action is insufficient to constitute reasoned decisionmaking.

The Court is not persuaded by Defendant's insistence that they may not simply disregard the President's directive. Agencies are duty-bound to presidential directives only "to the extent allowed by law." Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 32-33 (D.C. Cir. 2002). As the District of Columbia recently explained, "furthering the President's wishes cannot be a blank check for [an agency] to do as it pleases." Nat'l Council of Nonprofits, 763 F. Supp. 3d 36, 55 (D.D.C. 2025); see also Orr v. Trump, 778 F. Supp. 3d 394, 424 (D. Mass. 2025) (rejecting argument that following Executive Order is sufficient to satisfy reasoned decisionmaking requirement under APA), opinion vacated, appeal dismissed, No. 25-1579, 2026 WL 1642666 (1st Cir. June 5, 2026) (vacating preliminary injunction only because both parties requested vacatur); New York v. Trump, 811 F. Supp. 3d at 238 ("Insulating an agency action from arbitrary-and-capricious review [because the action implements an Executive Order] would undermine the APA and 'shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen.'") (quoting Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024)).

For the reasons explained above, the Secretary's Order's cursory and conclusory citation to the Executive Order is not, without more, sufficient to satisfy the APA's requirement of

30

"reasoned decisionmaking." Regents, 591 U.S. at 16 (quoting Michigan v. EPA, 576 U.S. 743, 750 (2015)).  The Court must hold Defendants "accountable to the public."  Franklin v. Massachusetts, 505 U.S. 788, 796 (1992).  A unilateral, unreasoned, and lawless Executive Order of a President cannot be the sole justification for an agency's actions, lest the country be prepared to entrust its future to the whims of a single individual.

### b.    Substantial Reliance Interests

Second, Plaintiffs have shown that they are likely to succeed in their claim that the Secretary's Order was an arbitrary and capricious departure from prior practice.  Under the "change-in-position" doctrine, agencies may change their existing policies, but only "as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." Doe v. Noem, 152 F.4th 272, 289 (1st Cir. 2025) (quoting FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 568 (2025)).  To satisfy this requirement, the agency must show that the new policy "is permissible under the [governing] statute, that there are good reasons for it, and that the agency believes it to be better" than its old policy. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).  Moreover, the agency "must consider the impact the policy change will have on any 'serious reliance interests,'" including "weigh[ing] any such interests against competing policy concerns." Doe v. Noem, 152 F.4th at 290 (quoting Wages & White Lion Invs., 604 U.S. at 568; Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020)).

Here, the Secretary's Order is an arbitrary and capricious departure from prior practice, jettisoning decades of efforts by advocates, community members, institutions, historians, and scientists without explanation.  Pursuant to its statutory mandate to preserve history and educate the public, the NPS has historically embraced a mission to "tell a more holistic story," which

31

includes not "judg[ing] what history is worth telling." *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://www.nps.gov/articles/history-under-construction.htm. The agency acknowledged the need to "share an accurate and comprehensive history," even when that history extends to "the good, the bad, the ugly, and everything in between." Id. Telling history in this way, according to the NPS, was the appropriate way to share "the stories of all Americans." *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://www.nps.gov/articles/publications-diverse.htm. Indeed, sharing our collective history grounded in undeniable truths is an honest portrayal of our shared history. Putting this philosophy into practice, the NPS has documented and preserved, for example, the incarceration of Japanese-Americans at the Manzanar National Historical Park, the enslavement of Black Americans at the plantations in Cane River Creole National Park, the killing of Indigenous peoples at the Sand Creek Massacre National Historic Site, and countless other instances of discrimination and marginalization throughout American history. See id. The NPS has also published "National Historic Landmarks Theme Studies" touching on "[d]iverse and [i]nclusive [h]istory," including the history of Asian American, Native Hawaiian, Desi American, Pacific Islander, Hispanic, Latino, Black, Indigenous, and LGBTQ+ communities. See id. Numerous NPS resources have also been dedicated to documenting climate change, environmental degradation, and the effects of industrialization and societal development on natural resources. See *Engaging with the Environment Featured Places*, Nat'l Park Serv. (May 6, 2021), https://www.nps.gov/subjects/tellingallamericansstories/transformingplaces.htm; see also *Climate Change and Your National Parks*, Nat'l Park Serv. (Jan. 13, 2025), http://nps.gov/subjects/climatechange/index.htm. Thus, the NPS has both in policy and in

conduct engaged in a prior practice of telling a whole history.[5]

The Secretary's Order directs the abandonment of these longstanding NPS practices without any reasoned justification.  Under the Order, the NPS must review and reverse the installation of interpretive materials that the agency previously deemed relevant, accurate, useful, and informative, marking a shift from the NPS' prior approach of retaining and incorporating such content.  As explained at length above, the Order provides no explanation for this change in policy.  It does not acknowledge existing studies and polls documenting overwhelming, bipartisan support for telling the whole, unbiased history of this Nation.  See, e.g., Pew Research Study.  It does not explain whether public sentiment has changed such that certain interpretive materials or topics are now unpopular.  It does not explain whether there is new evidence demonstrating that the research behind the interpretive materials is inaccurate.  It does not explain whether the CIP and GMP process for creating interpretive materials is unsound.  It does not provide or explain any other rational basis for removal.

Beyond failing to explain the departure, the Order fails to recognize or consider substantial reliance interests in the continued availability of interpretive materials at park sites.  These interests are held by institutions and individuals; historians who chose to partner with the

---

[5] Defendants argue that there is no formal written policy that is inconsistent with the Order, and thus, there has been no departure from prior practice.  However, an agency's actions may be established through any "past decisions," both formal and informal. Mich. Consol. Gas Co. v. FERC, 883 F.2d 117, 122 (D.C. Cir. 1989) (quoting Cross-Sound Ferry Servs., Inc. v. ICC, 873 F.2d 395, 398 (D.C. Cir. 1989)); see FCC v. Fox Television Stations, Inc., 556 U.S. 502, 517 (2009) (considering inconsistent "prior Commission and staff action").  Under this broad definition, previous decisions by the NPS to install interpretive materials on topics reflecting diverse viewpoints is sufficient to establish a prior agency practice. Cf. New York v. Trump, 811 F. Supp. 3d 215, 240 (D. Mass. 2025) (finding departure from prior practice where Department of Interior issued order to sub-agencies suspending permit issuance for wind energy projects); Washington v. U.S. Dep't of Homeland Sec., 614 F. Supp. 3d 863, 879-80 (W.D. Wash. 2020) (finding that Immigration and Customs Enforcement directive to detain people at courthouses was departure from prior practice of not doing so).

NPS with the understanding that they would be supported by grant funding and project opportunities; students and young adults who rely on park sites to learn about their and others' communities; professional designers and specialists whose careers and prior work will be upended as a result of Defendants' removal campaign; and millions of parents, educators, park visitors, and community groups who rely on the parks as a critical resource to learn and teach the most complete and accurate history and science possible.

To name just a few examples, NPCA alleges they rely on the materials for site visits, programs, and events that they regularly organize at park sites focusing on topics such as marginalized groups and civil rights. These include an annual trip for young adults to Alabama, Mississippi, and Tennessee to the Birmingham Civil Rights National Monument, the Medgar and Myrlie Evers Home, and the Emmett Till and Mamie Till-Mobley National Monument. NPCA's investment of resources in these trips, coupled with the expectation that they will be able to continue in the future, has been curtailed by Defendants' removal of relevant interpretive materials.

Similarly, NPCA member Jennifer Goepfert asserts that the Secretary's Order jeopardizes her ability to continue using park sites to educate her two home-schooled children on topics such as science and history. Goepfert alleges that she has visited dozens of park sites and that the NPS' interpretive materials are a key part of that learning. She poignantly explains:

> [I]t's important for my girls to hear the voices that are usually missing in traditional classrooms, despite our teachers doing their best. For the past five years, the national parks were essential to telling those narratives and educating my daughters. However, because of the recent orders by the administration, the national parks are no longer a reliable resource for educating my daughters.

Goepfert thus has invested resources into planning future visits and has structured her daughters' early education around the expectation that interpretive materials would continue to exist at park sites, which the Order disrupts. See Regents, 591 U.S. at 31 (holding agency failed to consider

34

individuals' reliance interests in Deferred Action for Childhood Arrivals program, noting that recipients, among other things, "enrolled in degree programs" in reliance on the program).

Moreover, the Order's effects extend beyond the physical removal of signs; the Order communicates that topics such as climate science and unbiased history are no longer fields approved internally by the agency. It thus signals a substantive shift in NPS' priorities that carries consequences for organizations that have structured their conduct in reliance on the agency's longstanding engagement with those topics, including for scientific expertise, technical guidance, and partnerships. For example, AASLH has relied on NPS staff as a key partner for dozens of prior collaborations, including to speak at summits and annual conferences involving environmental care and telling a complete history; to write articles in AASLH's magazine describing a display of the African American Civilian Conservation Corps at Appomattox Court House National Historic Park; to speak at a conference involving "enabl[ing] history organizations to dedicate financial resources to address marginalized communities, preservation efforts, community engagement, social justice, reinterpretation, and [diversity, equity, and inclusion] training"; to participate in panels on topics including #MeToo and #BlackLivesMatter; to serve on AASLH committees, including their climate and sustainability committee, women's history affinity committee, and more; and to contribute to AASLH's blog posts on topics such as LGBTQ+ communities in the United States and slavery at the Ulysses S. Grant National Historic Site. These examples illustrate the depth of the collaboration between the two entities and how, in reliance on this partnership, AASLH has invested substantial time and resources in developing a working relationship that would be costly and disruptive to replace. See Rhode Island v. Trump, 781 F. Supp. 3d 25, 47 (D.R.I. 2025) (finding substantial reliance interests where, among other things, state relied on mediation services provided by agency and would "not be able to

35

replace those services in the near or medium term").

UCS has similarly invested significant resources into building a relationship with the NPS and has long relied on NPS staff for invaluable input to their research projects. As UCS describes, NPS staff "serve[] as external reviewers who provide[] independent, expert scrutiny of UCS's methods, evidence, interpretations, conclusions, and recommendations." Similarly, NPS "scientists and experts have historically contributed to [UCS] studies," including those that "help inform interpretive materials at park sites," and have provided input on "how scientific phenomena affect American ecosystems and cultural sites, including those that are managed by [the NPS]." The Order directly undermines this relationship by casting doubt on the NPS' continued commitment to climate-related work.

Beyond organizations, thousands of individual historians, curators, educators, archivists, and historic preservationists rely in significant part on partnership with and funding from federal government agencies, including the NPS. For example, AASLH member Donna Graves claims that the Secretary's Order has jeopardized her career as a research historian specializing in, among other things, marginalized communities and climate change. Graves dedicated decades of her career to fields now disfavored by the Order, including through installing dozens of projects on these topics at National Parks such as the Rosie the Riveter World War II Home Front National Historic Park in California. In this manner, she structured major life decisions around the expectation of continued grant funding and support from the NPS. Indeed, according to Graves, this funding comprises forty to eighty percent of her annual income. The Order disrupts those longstanding expectations, not only undermining her portfolio and reputation but also threatening her livelihood. See Regents, 591 U.S. at 31 (finding substantial reliance interest where individuals "embarked on careers" in reliance on programs).

Defendants provide no indication that they weighed any of these substantial reliance interests in promulgating or implementing the Secretary's Order. The Order does not account for its broader impact on the park sites' ability to serve as public educational tools, nor does it contemplate the NPS' decades-long partnerships with private and public organizations who look to the agency for resources regarding inclusive history. It also fails to contemplate the lives, careers, and advancement that will be lost as entire fields of science and history are indiscriminately deemed "inappropriate."

The Court is not persuaded by Defendants' bare insistence that these alleged harms are insufficient to constitute reliance interests. As explained by the Supreme Court in Regents, there are no "such features automatically preclud[ing] reliance interests"; instead, consideration of the significance and seriousness of reliance interests "must be undertaken by the agency in the first instance, subject to normal APA review." 591 U.S. at 31. Here, the Secretary's Order fails to mention Plaintiffs' reliance interests at all, much less consider their significance or weigh their gravity against countervailing considerations.

In sum, an "unexplained change . . . that does not take account of legitimate reliance on prior interpretation may be 'arbitrary, capricious [or] an abuse of discretion.'" Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742 (1996) (quoting 5 U.S.C. § 706(2)(A)) (citing State Farm, 463 U.S. at 46-57; United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 670-75 (1973); NLRB v. Bell Aerospace Co., 416 U.S. 267, 295 (1974)). The Secretary's Order was issued without any indication of consideration of the substantial reliance interests at stake and is thus arbitrary and capricious.

> **c.    Failure to Consider Important Aspects of the Problem/Counter to Evidence**

Finally, Plaintiffs have demonstrated a likelihood of success in their claim that

Defendants failed to consider important aspects of the problem and acted counter to the evidence before them. Agency action may be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Melone v. Coit, 100 F.4th 21, 29 (1st Cir. 2024); see Regents, 591 U.S. at 16. Courts assess agency determinations "in light of the information [the agency] confronted." Bradley v. Weinberger, 483 F.2d 410, 415 (1st Cir. 1973).

Here, the Secretary's Order failed to consider the interests of the public before ordering the removals. The NPS' statutory mandate is to manage park sites in a manner that serves the public. See 54 U.S.C. § 100101(a) (directing the NPS to "promote and regulate the use of the National Park System by means and measures that . . . provide for the enjoyment of the scenery, natural and historic objects, and wild life" therein), (b)(1)(C) (mandating that park sites be managed "for the benefit and inspiration of all the people of the United States"); see also 16 U.S.C. § 21 (declaring that the purpose of Yellowstone, the country's first National Park, is "for the benefit and enjoyment of the people"). As such, the public's response to the Order is an important consideration that the federal government cannot unilaterally override without explanation. Cf. Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1460 (9th Cir. 1996) (concluding, based on statutory language that park be operated in a manner that "provide[s] for recreational and educational opportunities," that "failure by the NPS to address recreational concerns could be a basis for invalidating agency action" (quoting 16 U.S.C § 460bb)). Plaintiffs have provided evidence that the Secretary's Order is broadly unpopular with the public, alleging that the overwhelming majority of responses to the QR codes at park sites—numbering in the tens of thousands—denounces the Order, viewing it as an attempt to whitewash and erase

38

important aspects of this country's history.  Moreover, as previously explained in detail, numerous recent studies and polls have demonstrated that the majority of Americans prefer that National Parks display a full and accurate history, including on the topics that have now been indiscriminately removed under the Order.  See, e.g., Pew Research Study.  Defendants provide no evidence that they meaningfully engaged with public sentiment about the interpretive materials prior to ordering their removal, nor do they explain why they continued with this course of action despite evidence that it is unpopular with the public.  Congress specifically established the NPS and National Parks to serve the people, and the Government may not ignore that congressional directive by arbitrarily erasing, removing, and hiding historical truths in a manner that overrides the interests, experience, and use by the public.

Similarly, the Order acted counter to existing evidence that the interpretive materials are accurate and high quality.  Plaintiffs provide evidence that the now-removed interpretive materials reflect thorough, peer-reviewed academic and scientific research, carefully developed over years of thought and care.  As explained, the process for creating interpretive materials is carefully structured and designed to uphold rigorous academic standards.  It involves a multitude of stakeholders, painstaking planning through GMPs and CIPs, years of iterative review, and the investment of substantial resources, both tangible and intangible.  The Order provides no facts supporting its suggestion that the interpretive materials were created to promote a "false reconstruction of American history," such as evidence of a systemic breakdown in the planning process. Cf. Kravitz v. United States Dep't of Com., 366 F. Supp. 3d 681, 744 (D. Md. 2019) (finding agency acted counter to evidence in concluding that including a citizenship question in annual census survey would not "materially decrease response rates" because agency's own internal expert evidence showed opposite conclusion).  Indeed, Defendants do not even attempt

39

to contend that any of the removed materials were historically inaccurate, in any sense.  Thus, the overwhelming evidence supports that the interpretive materials and the processes for creating them are sound, and Defendants may not simply ignore such facts.  As such, the Secretary's Order and Defendants' subsequent removal of interpretive materials are arbitrary and capricious.

### 2.    Contrary to Law/Exceeds Statutory Authority

In Counts 2 through 4, Plaintiffs argue that the Secretary's Order is contrary to statutory directives in the Organic Act, Centennial Act, and the Omnibus Management Act.  Under the APA, courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).  This is because an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." FEC v. Cruz, 596 U.S. 289, 301 (2022).  While "contrary to law" and "in excess of statutory authority" are two separate provisions in the APA, courts have found they contain a "linguistic distinction without a practical difference." Victim Rts. L. Ctr. v. Cardona, 552 F. Supp. 3d 104, 127 (D. Mass. 2021).  Thus, the Court assesses both provisions concurrently.

As a threshold matter, the parties dispute the applicable legal standard for Plaintiffs' claim.  Defendants contend that, because Plaintiffs bring a facial challenge to the Secretary's Order, they must show that "no set of circumstances" exist such that the application of the Order would be lawful.  Plaintiffs argue that the "no set of circumstances" test applies only to hypothetical applications of a challenged action, whereas here, the Secretary's Order has already been implemented.  The Court agrees with Plaintiffs and concludes that the "no set of circumstances" test does not apply to this action.

The "no set of circumstances" rule that Defendants invoke originates in United States v.

40

Salerno, 481 U.S. 739 (1987). In that case, the Supreme Court held that a plaintiff bringing a facial—as opposed to an as-applied—challenge to a law must demonstrate that "no set of circumstances exists under which the [law] would be valid." Salerno, 481 U.S. at 745. Despite the seemingly broad language of Salerno's holding, courts have not extended the case beyond its narrow factual context, where the plaintiffs brought a constitutional challenge to a federal statute that had yet to be implemented at all. See Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 15 (D.D.C. 2009) (holding that Salerno did not apply to agency pattern-and-practice claim); Ohio Coal Ass'n v. Perez, 192 F. Supp. 3d 882, 903-04 (S.D. Ohio 2016) (collecting cases); e.g., Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 619 (1991); Sherley v. Sebelius, 644 F.3d 388, 397 (D.C. Cir. 2011); Reno v. Flores, 507 U.S. 292, 292 (1993); Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp., 613 F.3d 206, 213 (D.C. Cir. 2010). Indeed, courts have expressly declined to apply Salerno to APA claims, see Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 39-40 (D.D.C. 2003) (explaining that "neither the Supreme Court nor the D.C. Circuit has consistently utilized the Salerno standard to review statutory challenges to administrative rules."); Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin., 711 F.3d 662, 667 (6th Cir. 2013) (applying APA, not Salerno, to facial challenge to agency regulation), or to challenges involving existing applications of a law, as opposed to "hypothetical applications," Gen. Elec. Co., 595 F. Supp. 2d at 15.

In the absence of binding First Circuit case law, and because other persuasive authorities repeatedly decline to extend Salerno to similar claims, the Court concludes that Plaintiffs' claims are not governed by Salerno's no-set-of-circumstances test. Plaintiffs do not mount a constitutional challenge to a federal statute, instead challenging an agency action under the APA. See Mineral Policy Ctr., 292 F. Supp. 2d at 40; Nat'l Truck Equip. Ass'n, 771 F.3d at 667.

41

Moreover, Plaintiffs' claims do not involve speculative hypothetical applications; instead, Plaintiffs allege dozens of existing removals pursuant to the Secretary's Order. Thus, <u>Salerno</u> is not applicable, and Plaintiffs need not demonstrate that all applications of the Order are contrary to law.

Having concluded that <u>Salerno</u> does not apply, the Court turns to the merits of whether the Secretary's Order is contrary to the Organic Act, Centennial Act, and Omnibus Management Act under the APA. The analysis begins with "[a]n examination of the relevant statutes." <u>New York v. Kennedy</u>, 789 F. Supp. 3d 174, 210 (D.R.I. 2025) (citing <u>West Virginia v. EPA</u>, 597 U.S. 697, 721 (2022)), <u>appeal dismissed</u>, No. 25-1780, 2025 WL 4665781 (1st Cir. Oct. 30, 2025). Courts "exercise their independent judgment" and need not "defer to an agency interpretation of the law." <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369, 412-13 (2024). At the preliminary injunction stage, the court's construction of the statutory language is "only to determine [the plaintiff's] likelihood of success on the merits"; the court "do[es] not purpose to resolve the issue definitively." <u>Akebia Therapeutics, Inc. v. Azar</u>, 976 F.3d 86, 93 (1st Cir. 2020) (citing <u>Ross-Simons</u>, 102 F.3d at 16); <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d 4, 6 (1st Cir. 1991) (cautioning that, at preliminary injunction stage, decisions "are to be understood as statements of probable outcomes" only). The Court proceeds with the Organic Act, the Centennial Act, and the Omnibus Management Act in turn.

### a.     Organic Act

Plaintiffs first contend that they are likely to succeed in their claim that the Secretary's Order contravenes the Organic Act. The Act requires the Department to "promote and regulate the use of the National Park System" in a manner that effects the "fundamental purpose" of park sites. 54 U.S.C. § 100101(a). That "fundamental purpose" is to "conserve the scenery, natural

and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Id. According to Plaintiffs, the Secretary's Order undermines this conservation mandate by directing the removal of interpretive materials related to environmental degradation.

The Court agrees and finds that Plaintiffs are likely to succeed on the merits of this claim. The Act contains an express and unambiguous directive that the NPS prioritize conservation of the environment. See Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 909 (D.D.C. 1986) ("In the Organic Act[,] Congress speaks of but a single purpose, namely, conservation."); Bluewater Network v. Salazar, 721 F. Supp. 2d 7, 21 (D.D.C. 2010) (highlighting that "the overriding aim" of the Act "is to conserve the natural wonders of our nation's parks for future generations"). The NPS has recognized this mandate in its Management Policies, which provides the agency's official interpretation of the Organic Act. See Management Policies § 1.4.1; Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior, No. CV 20-3706, 2024 WL 1344450 (D.D.C. Mar. 29, 2024), appeal dismissed, No. 24-5147, 2024 WL 4294879 (D.C. Cir. Sept. 25, 2024). The Policies provide that, consistent with the Act's conservation directive, the NPS "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."[6] Management Policies § 1.4.3. Moreover, the

---

[6] Defendants observe in a footnote that the Management Policies are guidance only and are thus not judicially enforceable. But Plaintiffs do not seek to enforce the Policies as independent sources of law. Rather, the Policies are relevant insofar as they provide evidence of the agency's own interpretation of the Organic Act and as context for interpreting the statutory text. See Alaska Wildlife All. v. Haaland, 632 F. Supp. 3d 974 (D. Alaska 2022), vacated on other grounds, No. 22-36001, 2024 WL 4890996 (9th Cir. Nov. 22, 2024); Greater Yellowstone, 577 F. Supp. 2d at 190 n.1 (noting the Policies are "enforceable" because they "serve[] as NPS's official interpretation of the Organic Act").

conservation mandate is binding on the agency.  In 1978, Congress enacted the Redwood

Amendment to the Organic Act, which provides that the "management" and "administration" of

park sites "shall not be exercised in derogation of the values and purposes for which the

[National Park] System units have been established, except as directly and specifically provided

by Congress." 54 U.S.C. § 100101(b)(2); see Act of Mar. 27, 1978, Pub. L. No. 95-250,

§ 101(b), 92 Stat. 163, 166, codified at 54 U.S.C. § 100101(b)(2); Wash. Area Bicyclist Ass'n,

Inc. v. Burgum, No. CV 26-0988, 2026 WL 1078218 (D.D.C. Apr. 21, 2026).  Taken together,

the statutory text, subsequent amendments, and the NPS' own interpretation leave little doubt

that Congress intended that the NPS prioritize environmental conservation.

Moreover, the meaning of "conservation" is sufficiently clear and well-established.  The

Management Policies repeatedly emphasize that "conservation" includes the avoidance of

conduct that promotes or results in detrimental impacts to the environment, including climate

change, pollution, and other forms of degradation.  For example, in discussing resource

management, the Policies explain that "Earth's climate has changed throughout history.

Although national parks are intended to be naturally evolving places that conserve our natural

and cultural heritage for generations to come, accelerated climate change may significantly alter

park ecosystems." Management Policies § 4.7.2.  Elsewhere, the Policies emphasize that park

sites must educate visitors about "the influence of global climate change." Id. § 7.5.1.  And in a

separate section on air pollution, the Policies state that the NPS must "actively promote and

pursue measures to protect these values from the adverse impacts of air pollution.  In cases of

doubt as to the impacts of existing or potential air pollution on park resources, the Service will

err on the side of protecting air quality and related values for future generations." Id. § 4.7.1.

Taken together, these statements reflect the NPS' understanding that the Organic Act prohibits

44

the agency from taking actions that actively undermine the prevention of environmental degradation.

The Secretary's Order directly conflicts with this conservation mandate. Pursuant to the Order's directive to remove interpretive materials that purportedly reflect "improper partisan ideology" or "inappropriately disparage[] Americans," Defendants have removed dozens of signs explaining, for example, climate change, glacial melt, and air pollution and how humans contribute to those effects. These climate-related interpretive materials further the Organic Act's conservation mandate by fostering public awareness and informing visitors about environmental degradation and the threats facing protected ecosystems, landscapes, and other park resources. Indeed, Plaintiffs describe the NPS as "a key partner in . . . provid[ing] accurate scientific information and increas[ing] scientific literacy and access." The Order nevertheless directs the removal of these materials without identifying any conservation-related justification. The Order thus ignores and defies the NPS' core duty to protect and conserve the Nation's natural resources.

Even in their briefing, Defendants offer no persuasive explanation as to how the Secretary's Order advances any countervailing conservation purpose. Defendants argue only that the Department has broad discretion on how to implement the Act. However, such discretion "is bounded by the terms of the Organic Act itself." Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 193 (D.D.C. 2008). Without adhering to statutory guardrails, executive discretion is ripe for abuse of authority. Defendants have only the powers delegated by Congress and no more. In failing to comply with the Organic Act's conservation mandate, the Order has exceeded the bounds of any discretion conferred by the statute.

Defendants also contend that the Management Policies require NPS to "contribut[e] to

45

the national dignity," and the Secretary's Order aligns with that directive because it directs the removal of materials that "disparage[] Americans." Management Policies § 1.4.6. Even if the Court were to adopt Defendants' questionable conception of "national dignity," the *sine qua non* of the Organic Act is conservation; any incidental objective of contributing to the Nation's "dignity" cannot supersede that core statutory purpose. Accordingly, Plaintiffs have shown a likelihood of success in their claim that the Secretary's Order contravenes the Organic Act.

b. **Centennial Act**

Plaintiffs next contend that they are likely to succeed on the merits of their claim that the Secretary's Order contravenes the Centennial Act. That statute directs the Secretary to "ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the system." Id. § 100801(1)(A). "Education," in turn, is defined as "enhancing public awareness, understanding, and appreciation of the resources of the [National Park] System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2). According to Plaintiffs, the Secretary's Order violates Defendants' duty to implement a program of the "highest quality education and interpretation," because such a program must include the topics now disfavored by the Order. Defendants contend that the phrase "highest quality education and interpretation" is ambiguous and, therefore, left to agency discretion. The Court agrees with Plaintiffs.

First, the Centennial Act unambiguously requires the NPS to incorporate diverse viewpoints into its interpretation and education program. Section 100802 mandates that the

46

program be "of the highest quality."  Congress then provided clear instructions for what qualifies

as "highest quality."  Section 100803 of the Act explains that the Secretary may undertake a

program of regular evaluation "to ensure that [interpretation and education programs] . . . reflect

different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs."[7] 54

U.S.C. § 100803(2).  Consistent with this directive, the Management Policies explain that the

program will accommodate an "increasingly multiracial, multiethnic, and multicultural society to

ensure that the national park system remains high among societal concerns and relevant to future

generations." Management Policies § 7.3.4; see also id. § 7.5.1 (explaining that the program

should "provide opportunities for facilitation of civic dialogue to engage Americans in

understanding past and current issues of importance on a local-to-global basis").  The

Department's Director's Order #6, which supplements the Management Policies, likewise

provides that, "[i]n a democratic society such as ours, it is important to understand the journey of

liberty and justice, together with the economic, social, religious, and other forces that barred or

opened the ways for our ancestors, and the distances yet to be covered. . . .  The Park Service

must ensure that the American story is told *faithfully, completely, and accurately*." Director's

Order #6 at 1-2 n.2 (quoting Rethinking the National Parks for the 21st Century, Nat'l Park

---

[7] Defendants argue that Section 100803 is written in permissive language and therefore contains no enforceable duties.  However, Plaintiffs do not seek to enforce Section 100803 as an independent obligation.  Rather, Section 100803 provides Congress' direction on the meaning of the phrase "highest quality" in Section 100802.  Statutes "should not be read as a series of unrelated and isolated provisions," and courts understand that "identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995) (quoting Dep't of Rev. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994).  Here, both provisions use the same terms of "interpretation" and "education" program, address the same subject matter, and are located within the same title.  Section 100803 thus provides persuasive evidence of how Congress understood the phrase "highest quality" with respect to the NPS' interpretation and education program—that is, Section 100803's four specific, enumerated statutory criteria.

System Advisory Bd. (2001)).  The Director's Order further specifies that the program must

"reflect and embrace different cultural backgrounds, ages, languages, abilities, and needs," and

that "[t]he content of interpretive and educational services must be accurate, respect multiple

points of view and be free of cultural, ethnic, and personal biases." Id.  These sources reflect that

the NPS' interpretation and education program must incorporate marginalized voices in telling a

full history.  In this manner, the National Parks fulfill their duty to unearth untold stories that

have historically been missing in traditional classrooms.

The Centennial Act's legislative history reinforces this interpretation.  While legislative

history is not determinative, it can nevertheless be consulted in providing additional support for

interpreting statutory language. See Strickland v. Comm'r, Maine Dep't of Hum. Servs., 48 F.3d

12, 17, 19 (1st Cir. 1995).  During congressional debates over the Centennial Act, Massachusetts

Representative Niki Tsongas, one of the bill's original co-sponsors and ranking member of the

U.S. House of Representatives Natural Resources Subcommittee on Federal Lands, provided

opening statements.  Quoting Stephen Mather, the first Director of the NPS, she remarked that:

> "The parks do not belong to one State or to one section . . . ; they are national
> properties in which every citizen has a vested interest; they belong as much to the
> man"—and I would add, woman—"of Massachusetts, of Michigan, of Florida as
> they do to the people of California, of Wyoming, and of Arizona."
>
> Those words are a powerful reminder in this era of political division and
> disagreement: national parks are national.  They cut across party lines and
> geographic boundaries.  They enjoy broad support, and they bring people
> together—something we seem to need now more than ever.

162 Cong. Rec. H7207 (daily ed. Dec. 6, 2016) (statement of Rep. Nicola Tsongas).  California

Representative Tom McClintock, the chairman of the Federal Lands Subcommittee, reflected

similar sentiments in his comments that followed, stating that the country's "most beautiful and

historic lands should be set aside for the 'use, resort, and recreation' of the American people." Id.

at H7208 (statement of Rep. Tom McClintock).  Arizona Representative Adelita Grijalva, the

48

bill's original sponsor, provided the final comments of the debates. She further echoed the view that the purpose of the Centennial Act was to expand public access, stating: "In our democratic society, the park system is uniquely one of the most democratic public institutions because, after all, all Americans own the park system and it is for all Americans . . . ." Id. (statement of Rep. Adelita Grijalva). The bill was then approved by both chambers of Congress, with the Senate summarily adopting it without amendment and by unanimous consent. Id. at S7167. Together, this legislative history reflects an understanding that the Centennial Act requires park sites to serve all visitors. Implicit in this objective is that park sites and their resources must incorporate complete history—unvarnished history—including the views of those historically marginalized.

The Secretary's Order conflicts with this statutory mandate. The Order directs the removal of any "descriptions, depictions, or other content" that "disparage[s] Americans," crafting a narrative of American history that narrowly "focus[es] on the greatness of the achievements and progress of the American people" and the country's efforts to "advanc[e] liberty, prosperity, and human flourishing." By its language, this directive authorizes the suppression of information concerning actions that have undermined "liberty, prosperity, and human flourishing"—a phrase in which Defendants leave little doubt as to its meaning, having removed numerous interpretive materials related to abolition, eugenics, labor history, climate change, LGBTQ+ rights, women's suffrage, and Indigenous history. This erasure of the struggles, lives, and stories of various marginalized communities directly denies the importance of the Centennial Act's mandate that park sites reflect the voices of all Americans. Rather than encourage visitors of all backgrounds to "gain awareness, appreciation, and understanding" with park resources, as the Centennial Act requires, the Order instead, in the stroke of a pen, fosters alienation and disengagement by removing a source of potential connection that diverse

49

communities could form with park resources.

Second, beyond reflecting diverse viewpoints, the Centennial Act also requires the NPS' interpretation and education program to reflect current scientific research. Section 100803 states that the program may be regularly updated to "reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803(4). The Management Policies likewise declare that "[f]actual information presented [at park sites] will be current, accurate, [and] *based on current scholarship and science*." Management Policies at 90 (emphasis added); see also Director's Order #6 §§ 8.4.1 (stressing that "[a]cknowledging multiple points of view does not require interpretive and educational programs to . . . disregard the weight of scientific or historical evidence"), 8.4.2 (explaining that "the best scientific evidence available" is those "found in scholarly sources that have stood the test of scientific peer review and criticism"). The Policies further explain that "current science" includes "topics such as the civic experience of our country; the complex, diverse ecology of our nation and the world; and the influence of global climate change." Management Policies § 7.5.1; see also id. § 7.3.1.1 (specifying that curriculum-based programs should focus on, among other things "the threats to the condition of those resources" within the park sites). Together, this language indicates that a "broad program of the highest quality interpretation and education" includes incorporating topics such as climate change, biodiversity, pollution, and environmental degradation.

For similar reasons that the Order violates the Organic Act's conservation mandate, the Secretary's Order violates this directive from the Centennial Act. The Order's focus on "*human flourishing*" (emphasis added) and its prohibition on materials that "disparage[] Americans" at park sites effectively require Defendants to remove materials that highlight the Nation's historical contributions to environmental degradation. Indeed, Defendants have already taken

50

down signage across multiple park sites relating to glacier melt, carbon dioxide emissions, and climate change. In response, Defendants have provided no explanation—and the Court discerns none—for how the removals promote current scientific or academic research. For example, Defendants provide no evidence that the science reflected in the materials is inaccurate, outdated, or disputed; nor do Defendants provide any evidence that the interpretive materials somehow physically contribute to environmental degradation. Accordingly, Plaintiffs have demonstrated that the Order contravenes the Centennial Act.

In response, Defendants contend that the Centennial Act's only requirement is that a program of "highest quality interpretation and education" exist. They argue that the Management Policies, which set out NPS' framework for an interpretation and educational program, satisfy this requirement. The Court disagrees. The Centennial Act requires both the "availability" *and* "use" of such a program. 54 U.S.C. § 100802. Even if the Policies remain formally in effect, the Secretary's Order substantially undermines their "use." The Policies establish a defined process and structure for designing and implementing the program through GMPs and CIPs. Management Policies § 7.2. The Policies emphasize that "*[a]ll* interpretive and educational services . . . will be based on and coordinated with the comprehensive interpretive plan," and that CIPs must be used to determine "which stories to tell, how to tell them, and how to reach specific audiences." Id. (emphasis added). The Secretary's Order sidesteps this deliberative process and mandates expedited removals pursuant to an agenda that has little, if any, relationship with the priorities set forth in the Centennial Act or the Management Policies. In doing so, the Order effectively overwrites the CIPs, thus contravening the Centennial Act's requirement that the NPS "use" the interpretation and education program. Accordingly, Plaintiffs have demonstrated a likelihood of succeeding on their claim that the Secretary's Order

51

is contrary to the Centennial Act.

### c.    Omnibus Management Act

Plaintiffs next argue that the Secretary's Order is contrary to the Omnibus Management Act.  That statute provides that the Secretary "shall continually improve the ability of the [NPS] to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the [National Park] System." 54 U.S.C. § 100701.  The Act also states that the Secretary "shall ensure that management of [National Park] System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." Id. § 100702.

For substantially similar reasons that the Order is contrary to the Centennial Act, Plaintiffs have demonstrated a likelihood of success in this claim.  The Omnibus Management Act's directive to the NPS to implement a "broad program" of the "highest quality science and information," and to provide "state-of-the-art . . . interpretation of" park resources, closely tracks the language used in the Centennial Act. Id. §§ 100701-100702.  Moreover, like the Centennial Act, the Management Policies implement the Omnibus Management Act. Management Policies § 4.1 ("[I]n accordance with requirements of the National Parks Omnibus Management Act of 1998, the Service will use the findings of science and the analyses of scientifically trained resource specialists in decisionmaking."); see also id. ("The Service manages the natural resources of parks to maintain them in an unimpaired condition for present and future generations in accordance with NPS specific statutes, including . . . the National Parks Omnibus Management Act of 1998.").  Thus, the Court's analysis of the terms "interpretation" and "education" in the Centennial Act informs interpretation of the Omnibus Management Act's corollary terms.  Without repeating its analysis in full, the Court finds that the Omnibus

Management Act directs the NPS to incorporate contemporary scientific research into interpretive materials at park sites, including on climate change and environmental degradation. The Secretary's Order contravenes these requirements by mandating the removal of such topics. Thus, Plaintiffs have demonstrated a likelihood of success in their claims that the Secretary's Order is contrary to the statutory standards in the Organic Act, Centennial Act, and Omnibus Management Act. See State Farm, 463 U.S. at 59 n.* (Rehnquist, J., concurring in part and dissenting in part) ("[A] new administration may not . . . ignore statutory standards in carrying out its regulatory functions."). And more broadly, Plaintiffs have overwhelmingly demonstrated a likelihood of success on their claims that the Secretary's Order is both arbitrary and capricious and contrary to law.

The great irony of this case is that Defendants, and the Executive Order they purport to faithfully execute, decry the existing interpretive materials at National Parks as a "concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth." Yet, the Government's actions do exactly what they profess to counteract, dismantling objective historic truths and permanently damaging public memory. Behind the incendiary rhetoric lies little substance, lacking even a remote amount of scientific rigor, facts, legal authority, or discernible reasoning. Our democracy and system of governance demand more from the Executive. Agencies must grapple with important facts and considerations, respect the limits of statutory authority, provide reasoned justifications for their actions, and, above all else, follow the law. That was not done here.

### C.     Irreparable Harm

The second requirement for a plaintiff to obtain a preliminary injunction is to show that he "is likely to suffer irreparable harm in the absence of preliminary relief." Winter v. Nat. Res.

53

Def. Council, Inc., 555 U.S. 7, 20 (2008).  To demonstrate irreparable harm, a plaintiff must show "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, 102 F.3d at 19; Kmart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989) ("The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.").  Courts consider this factor in conjunction with likelihood of success on the merits, using a "sliding scale . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010).  When "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (quoting E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 738, 743-44 (1st Cir. 1996)).  Importantly, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Kmart, 875 F.2d at 915 (quoting Wagner v. Taylor, 836 F.2d 566, 575-76 (D.C. Cir. 1987)).

Plaintiffs have demonstrated that the risk of harm to them and their individual members as research institutions, historians, conservationists, and park visitors is immediate and irreparable.  Many of Plaintiffs' alleged aesthetic, recreational, and informational harms are nonquantifiable by nature. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) ("Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." (internal quotation marks and citation omitted)), abrogated in part on other grounds, Winter, 555 U.S. 7.  For example, NPCA member Jennifer Goepfert alleges that she uses interpretive materials at park sites as a primary

54

source of educational material for her school-aged children, including on topics such as civil rights, climate change, and slavery. Without the interpretive materials, Goepfert can no longer rely on the park sites for their pedagogical value. Indeed, courts have recognized loss of educational opportunity for children as incommensurable and immeasurable harm. See New York v. McMahon, 784 F. Supp. 3d 311, 362-63 (D. Mass. 2025) (finding schools were irreparably harmed by threats to their ability to educate children). The same is true for Plaintiffs' millions of other members and supporters who "regularly visit, study, work, photograph, or recreate" at park sites, who now, because of the Secretary's Order, no longer have access to the removed interpretive materials. Cf. City of Philadelphia v. Burgum, 820 F. Supp. 3d. 313, 342 (E.D. Pa. 2026) (granting preliminary injunction and finding irreparable harm in action challenging application of the Secretary's Order, noting that "[e]ach person who visits the President's House and does not learn of the realities of founding-era slavery receives a false account of this country's history").

Even if the harms could be quantified, the APA does not provide for monetary damages. Under 5 U.S.C. § 702, the APA provides for judicial review only for an "action in a Court of the United States seeking relief *other than money damages*." (emphasis added). Thus, for the claims Plaintiffs bring here, monetary damages would not be available, supporting the conclusion that any harm is irreparable, as the Court could not provide traditional legal remedies. See California v. Kennedy, 802 F. Supp. 3d 273, 283 (D. Mass. 2025) (citing Kentucky v. Biden, 23 F.4th 585, 611 (6th Cir. 2022)) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Defendants contend that the harm is not irreparable, highlighting that Plaintiffs did not move for preliminary injunctive relief for several months. Specifically, the Secretary's Order

55

was promulgated on May 20, 2025, whereas Plaintiffs initiated the suit on February 17, 2026, and moved for preliminary injunctive relief on March 18, 2026. Thus, since the issuance of the Order, Plaintiffs waited approximately nine months to file a complaint, and ten months to move for relief. Defendants argue that this delay undercuts Plaintiffs' argument that the harm is irreparable. Defendants are correct that in some circumstances, delay counsels against a finding of irreparable harm. See, e.g., Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004). However, courts in this district have nevertheless found irreparable harm in cases involving delays of comparable length or longer. See, e.g., Baillargeon v. CSX Transp. Corp., 463 F. Supp. 3d 76, 85 (D. Mass. 2020) (two-year delay); Boustany v. Bos. Dental Grp., Inc., 42 F. Supp. 2d 100, 112 (D. Mass. 1999) (eight-month delay); Whoop, Inc. v. Shenzhen Lexqi Elec. Tech. Co., 818 F. Supp. 3d 207, 223 (D. Mass. 2026) (eight-month delay). On the facts before it, the Court finds that Plaintiffs—while not acting with particular haste—were not unduly dilatory. Defendants significantly expanded removal efforts in early 2026, increasing both the magnitude of harm and urgency for relief. Moreover, the Order identifies "July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence" as a key upcoming milestone, which is mere weeks away. In any event, the touchstone of irreparable harm is that the injury is "not easily measured or fully compensable in damages," which, as explained, Plaintiffs have demonstrated. Ross-Simons, 102 F.3d at 18-19.

The weight of this harm bears emphasizing. These park sites are deeply meaningful for many people for multifaceted reasons. The now-removed materials were the product of years of care, stewardship, community collaboration, and public engagement. They commemorate the people who have lived, worked, and died in this Nation; serve as a tribute to their contributions to the ideals of freedom, democracy, and equity; and represent an enduring reminder of the

inherent contradictions in our Nation's history. See City of Philadelphia, 820 F. Supp. 3d. at 341-42. Their removal constitutes government-sanctioned erasure and rejection of their histories. It strips the sites of the context that gives them meaning. It degrades the public's trust in the government, as the Executive Order ignores congressional directives and carelessly razes decades of efforts in the pursuit of its unilateral agenda. These harms are, in all senses of the word, irreparable.

### D.     Balance of the Equities/Public Interest

Finally, the Court must balance the parties' relative hardships and consider the public interest. See Winter, 555 U.S. at 20. These last two factors "merge when the Government is the opposing party." Nken, 556 U.S. at 435. The relevant inquiry is whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Grant v. Trial Ct., 784 F. Supp. 3d 475, 490 (D. Mass. 2025) (quoting Dataphase Sys., Inc. v. C L Sys., Inc. 640 F.2d 109, 113 (8th Cir. 1981)). The court "explore[s] the relative harms to applicant and respondent, as well as the interests of the public at large" in the context of "the exigencies of that particular case." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (citing Barnes v. E-Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991)). Like the irreparable harm factor, the balance of hardships factor is weighed in light of the likelihood of success on the merits. Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612-13 (1st Cir. 1988).

Here, the balance of equities and public interest weigh in favor of an injunction. As explained above, Plaintiffs have demonstrated that the Secretary's Order likely contravenes the Organic Act, Centennial Act, and Omnibus Management Act. The public has a strong interest in ensuring the Government acts lawfully. As the Supreme Court explained, "our system does not

permit agencies to act unlawfully even in pursuit of desirable ends." Ala. Ass'n of Realtors v.

Dep't Health & Hum. Servs., 594 U.S. 758, 766 (2021).  Indeed, "[t]here is generally no public

interest in the perpetuation of unlawful agency action," League of Women Voters of U.S. v.

Newby, 838 F.3d 1, 12 (D.C. Cir. 2016), and the Government "cannot suffer harm from an

injunction that merely ends an unlawful practice." Rodriguez v. Robbins, 715 F.3d 1127, 1145

(9th Cir. 2013).  As such, preliminary injunctive relief would serve the public interest by forcing

Defendants to abide by their existing statutory duties.

It bears emphasizing that the public ultimately bears the brunt of Defendants' actions.

Everyday park visitors—young, old, and from all backgrounds—look to the National Park

system to learn and enhance their understanding of history, science, and this Nation.

Defendants' continued censorship of interpretive materials disfavored by this Administration

diminishes the public's collective ability to engage critically and thoughtfully with these topics.

Cf. City of Philadelphia, 820 F. Supp. 3d. at 343 ("[T]here is a public interest in the preservation

and exhibition of . . . history.").  By its terms, the Order erases the history of countless people;

alienates communities from public spaces; limits the availability of scientific information

relevant to ensuring the long-term preservation of the parks themselves; and impairs the mission

of the NPS to preserve the parks "for the enjoyment, education, and inspiration of this and future

generations."  The Executive Order, in fact, tarnishes the legacy of this great Nation by

attempting to remove these items in time for, and in honor of, the 250th anniversary of our

Nation's creation.  The gravamen of these public interests cannot be overstated.

On the other side of the ledger, Defendants contend that, as a practical matter, the

requested relief would impose administrative burdens on the Government by preventing the

implementation of routine updates to park sites.  However, the requested relief would not

58

prohibit Defendants from making all changes to the park sites; it would only prevent the implementation of Secretary Order 3431. The relief would not affect Defendants' ability to, for example, conduct repairs on park resources or prevent dilapidation.

Defendants also invoke a separation-of-powers argument, contending that injunctive relief would burden the President's interest in managing the Executive Branch, thereby undermining interbranch comity and democratic principles. However, the Constitution does not envision unyielding judicial deference to the President's will in the name of interbranch comity. Rather, separation of powers is paired with a system of checks and balances, and courts have never hesitated to assume their duty of constraining executive overreach when necessary. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582 (1952).

In sum, the Court finds that the balance of the equities and the public interest weigh in favor of Plaintiffs. Accordingly, Plaintiffs have met all the required factors for preliminary injunctive relief.

### E.　Scope of Remedy

Having concluded that Plaintiffs have met their burden of demonstrating the necessity of relief, the Court must now determine the appropriate scope of the remedy. The parties raise three disputes. First, Defendants argue that a stay under Section 705 is not an available remedy and that Plaintiffs' sole avenue for relief, if any, is a preliminary injunction. Second, Defendants argue that Section 5 should be severed from the remainder of the Secretary's Order, and that relief should apply only to that provision. Third, the parties dispute the date to which any restorative relief should relate back. The Court addresses each in turn.

As to the vehicle for relief, the Court finds that a stay pursuant to Section 705 is appropriate. Defendants' sole argument to the contrary is that the Secretary's Order has already

been implemented. However, "courts 'routinely stay already-effective agency action under

Section 705.'" Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 182 (D. Mass. 2025)

(quoting Haitian Evangelical Clergy Ass'n v. Trump, 789 F. Supp. 3d 255, 274 (E.D.N.Y.

2025)). Accordingly, because Plaintiffs have met the standard for a stay under Section 705, the

Court grants one here.[8]

As to severability, the Court agrees that injunctive relief should be limited to Section 5,

the only portion of the Secretary's Order materially disputed in this case. Entire agency actions

should not be vacated if unchallenged portions can "function sensibly without the stricken

provision." Sorenson Commc'ns Inc. v. FCC, 755 F.3d 702, 710 (D.C. Cir. 2014) (quoting

MD/DC/DE Broad. Ass'n v. FCC, 236 F.3d 13, 22 (D.C. Cir. 2001)). Here, the remaining

sections of the Secretary's Order do not materially affect Plaintiffs' claims and can function

without Section 5. Sections 1 to 3 provide background on the Order's purpose, authority, and

context, and do not authorize any specific agency action. Section 4 directs the NPS to identify

infrastructure improvements and funding for the restoration of Independence Hall in

Philadelphia, PA. Plaintiffs do not allege that the restoration of that site caused any of their

injuries. Section 6 directs the Land Management Bureaus to post QR codes at park sites, and

---

[8] The Court declines to require that Plaintiffs post a bond to secure a stay. Unlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not require the movant to post a bond. See 5 U.S.C. § 705; Woonasquatucket River Watershed Council v. Dep't of Agric., 778 F. Supp. 3d 440, 477 (D.R.I. 2025) (noting district courts have "broad discretion . . . to determine the appropriate amount" of a bond for a stay, "including the discretion to require no bond at all"); see also Seafreeze Shoreside, Inc. v. DOI, No. 22-CV-11091, 2023 WL 3660689 (D. Mass. May 25, 2023). In "suits to enforce important federal rights or 'public interests,'" courts generally do "not require posting of a substantial bond." Maine v. Dep't of Agric., No. 25-CV-00131, 2025 WL 1088946, at *30 (D. Me. Apr. 11, 2025). As this case involves the NPS' statutory authority as a federal agency and the public's interest in National Park sites, the Court finds a bond is not appropriate. Defendants do not dispute this in their briefing.

Plaintiffs' Motion for Stay does not include their Paperwork Reduction Act claim, which is the only claim directly applicable to Section 6. Finally, Section 5's directive applies not only to the NPS but also to the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation. Plaintiffs move only pursuant to statutes that govern the NPS, and so any injunctive relief does not extend to these other agencies.

Finally, the parties dispute the date from which Defendants must restore the park sites. Plaintiffs request that Defendants restore the sites as they existed prior to the Order's issuance (i.e., May 20, 2025). Defendants contend that the appropriate date is when Plaintiffs' initial complaint was filed (i.e., February 17, 2026). The Court agrees with Plaintiffs and finds that restoring park sites to their state prior to the issuance of the Secretary's Order is the proper course of action to minimize injury. As the First Circuit has explained:

> If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, . . . by the issuance of a mandatory injunction, . . . or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. *The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo*.

Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers, 679 F.2d 978, 995-96 (1st Cir. 1982) (emphasis added) (quoting Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974)), rev'd on other grounds, 467 U.S. 526 (1984). As explained, by the time Plaintiffs initiated this action, Defendants had already removed dozens of interpretive materials across the country, thus causing concrete and irreparable injury to Plaintiffs even before the complaint was filed. Restoration of the sites is the only course of action that can remedy these existing injuries and prevent further harm.

IV.    CONCLUSION

Plaintiffs have demonstrated a likelihood that Defendants' efforts, ostensibly taken in the name of restoring dignity, instead seek to rewrite the Nation's history with a white-out pen. History cannot be faithfully told while excluding the experiences of communities whose contributions, struggles, and achievements form an important part of our Nation's story.  Indeed, at a time of facts and alternative facts, the only thing we must be able to rely on as undeniable truth is history.  And telling the full truths of our shared story helps our Nation heal from past wrongs, rather than prolonging us.

Because Defendants deemed it important to strip the parks of these undeniable truths in anticipation of the 250th Anniversary of our great Nation, it is equally important that our shared history be honestly told and fully restored by the 250th Anniversary to properly honor the remarkable achievements of the United States.  Accordingly, it is hereby **ORDERED**:

1.    Plaintiffs' Motion to Stay Under 5 U.S.C. § 705 is **GRANTED** forthwith.

2.    Defendants are **ENJOINED** from taking any further action to implement Section 5 of Secretary's Order 3431, "Restoring Truth and Sanity to American History," at park sites managed by the NPS pending further litigation in this matter.

3.    Defendants are **ORDERED** to take all necessary steps **<u>forthwith</u>** to restore and reinstall all interpretive materials at park sites managed by the NPS that, pursuant to the Secretary's Order, have been altered, removed, or damaged in the process of such removal since May 20, 2025, to be completed within **twenty-one (21) calendar days** of this Order.  Defendants are further **ENJOINED** from making any further alterations to interpretive materials at NPS park sites pursuant to the Secretary's Order.

4.    Within **five (5) calendar days** of this Order, and every **seven (7) calendar days**

62

thereafter until otherwise ordered by the Court, Defendants shall file a status report describing all steps they have taken to comply with the Court's Order, including a list of all interpretive materials that have been restored to their prior state as of May 19, 2025.

     **SO ORDERED.**

Dated: June 12, 2026
/s/ Angel Kelley<br>Hon. Angel Kelley<br>United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION
ASSOCIATION; AMERICAN ASSOCIATION FOR
STATE AND LOCAL HISTORY; ASSOCIATION
OF NATIONAL PARK RANGERS; COALITION
TO PROTECT AMERICA'S NATIONAL PARKS;
SOCIETY FOR EXPERIENTIAL GRAPHIC
DESIGN; UNION OF CONCERNED SCIENTISTS,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF THE INTERIOR; DOUG
BURGUM, in his official capacity as Secretary of the
Interior; NATIONAL PARK SERVICE; JESSICA
BOWRON, in her official capacity as the Official
Exercising the Delegated Authority of the Director,

*Defendants*.

Civil Action No. 1:26-cv-10877-AK

## NOTICE OF APPEAL

Notice is hereby given that Defendants appeal the Court's June 12, 2026 Memorandum and Order on Plaintiffs' Motion for 5 U.S.C. § 705 Stay or, in the Alternative, Preliminary Injunction (ECF No. 41), and June 4, 2026 Memorandum and Order on Defendants' Motion to Dismiss (ECF No. 37). This appeal is taken to the United States Court of Appeals for the First Circuit.

Dated: June 15, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

1

/s/ Romney S. Philpott
Romney Philpott
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice

2

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above document was served upon Plaintiffs' counsel by the

Electronic Case Filing system on June 15, 2026.

/s/ Romney S. Philpott
Romney S. Philpott

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:26-cv-10877-AK

| | |
|---|---|
| National Parks Conservation Association et al v. Department of the Interior et al<br>Assigned to: District Judge Angel Kelley<br>Cause: 05:551 Administrative Procedure Act | Date Filed: 02/17/2026<br>Jury Demand: None<br>Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision<br>Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **National Parks Conservation Association** | represented by | **Robin F. Thurston**<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>202-455-9060<br>Email: rthurston@democracyforward.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Steven Y. Bressler**<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>202-982-1569<br>Email: sbressler@democracyforward.org<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Brooke Menschel**<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC 20043<br>202-448-9090<br>Fax: 202-796-4426<br>Email: bmenschel@democracyforward.org<br>*ATTORNEY TO BE NOTICED*<br><br>**Mark Samburg**<br>Democracy Forward Foundation<br>PO Box 34553<br>Washington, DC 20043<br>202-448-9090<br>Email: msamburg@democracyforward.org |

*ATTORNEY TO BE NOTICED*

**Michael Torcello**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: mtorcello@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Pablo Moraga**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: pmoraga@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **American Association for State and Local History** | represented by | **Robin F. Thurston**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Steven Y. Bressler**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brooke Menschel**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Mark Samburg**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Torcello**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Pablo Moraga**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Association of National Park Rangers** | represented by | **Robin F. Thurston**<br>(See above for address)<br>*LEAD ATTORNEY* |

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Torcello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pablo Moraga**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Coalition to Protect America's National Parks**

represented by

**Robin F. Thurston**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Torcello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pablo Moraga**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Society for Experiential Graphic Design**    represented by    **Robin F. Thurston**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Torcello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pablo Moraga**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Union of Concerned Scientists**    represented by    **Robin F. Thurston**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Michael Torcello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pablo Moraga**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Department of the Interior**     represented by   **Ian Swenson**
DOJ-Enrd
950 Pennsylvania Avenue NW
Washington, DC 20530
202-532-5139
Email: ian.swenson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Romney Philpott**
DOJ-Enrd
999 18th St.
Suite 6000 North Terrace
Denver, CO 80202
202-532-5077
Email: romney.philpott@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Doug Burgum**     represented by   **Ian Swenson**
*in his official capacity as Secretary of the*     (See above for address)
*Interior*     *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Romney Philpott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Park Service**     represented by   **Ian Swenson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Romney Philpott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Jessica Bowron** | represented by | **Ian Swenson** |
| *in her official capacity as the Official* | | (See above for address) |
| *Exercising the Delegated Authority of the* | | *LEAD ATTORNEY* |
| *Director* | | *ATTORNEY TO BE NOTICED* |

**Romney Philpott**
(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2026 | 1 | COMPLAINT against Department of the Interior, National Park Service, Doug Burgum, Jessica Bowron Filing fee: $ 405, receipt number AMADC-11552572 (Fee Status: Filing Fee paid), filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 2 | MOTION for Leave to Appear Pro Hac Vice for admission of Brooke Menschel Filing fee: $ 125, receipt number AMADC-11552983 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Brooke Menschel)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 3 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael J. Torcello Filing fee: $ 125, receipt number AMADC-11553070 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Michael J. Torcello)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 4 | MOTION for Leave to Appear Pro Hac Vice for admission of Pablo A. Moraga Filing fee: $ 125, receipt number AMADC-11553090 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Pablo A. Moraga)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Steven Y. Bressler Filing fee: $ 125, receipt number AMADC-11553113 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Steven Y. Bressler)(Samburg, Mark) |

| | | (Entered: 02/17/2026) |
|---|---|---|
| 02/17/2026 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Robin F. Thurston Filing fee: $ 125, receipt number AMADC-11553126 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Robin F. Thurston)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 7 | ELECTRONIC NOTICE of Case Assignment. District Judge Angel Kelley assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 8 | District Judge Angel Kelley: ORDER entered. Standing Order Regarding Motion Practice. (CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 9 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 2 Motion for Leave to Appear Pro Hac Vice Added Brooke Menschel.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 10 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 3 Motion for Leave to Appear Pro Hac Vice Added Michael J. Torcello.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/17/2026) |

| 02/17/2026 | 11 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 4 Motion for Leave to Appear Pro Hac Vice Added Pablo A. Moraga. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (CEH) (Entered: 02/17/2026) |
|---|---|---|
| 02/17/2026 | 12 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 5 Motion for Leave to Appear Pro Hac Vice Added Steven Y. Bressler. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 13 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 6 Motion for Leave to Appear Pro Hac Vice Added Robin F. Thurston. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 14 | NOTICE of Appearance by Steven Y. Bressler on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Bressler, Steven) (Entered: 02/17/2026) |
| 02/17/2026 | 15 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for** |

| | | |
|---|---|---|
| | | **completion of service.** (MAL) (Entered: 02/17/2026) |
| 02/19/2026 | 16 | NOTICE of Appearance by Brooke Menschel on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Menschel, Brooke) (Entered: 02/19/2026) |
| 02/19/2026 | 17 | NOTICE of Appearance by Robin F. Thurston on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Thurston, Robin) (Entered: 02/19/2026) |
| 02/19/2026 | 18 | NOTICE of Appearance by Pablo Moraga on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Moraga, Pablo) (Entered: 02/19/2026) |
| 02/19/2026 | 19 | NOTICE of Appearance by Michael Torcello on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Torcello, Michael) (Entered: 02/19/2026) |
| 03/03/2026 | 20 | SUMMONS Returned Executed as to US Attorney by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. All Defendants. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 21 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 22 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 23 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 24 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |

| | | |
|---|---|---|
| 03/03/2026 | 25 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/09/2026 | 26 | NOTICE of Appearance by Ian Swenson on behalf of Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service (Swenson, Ian) (Entered: 03/09/2026) |
| 03/18/2026 | 27 | Joint MOTION for Leave to File Excess Pages *and for Briefing Schedule* by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Text of Proposed Order)(Menschel, Brooke) (Entered: 03/18/2026) |
| 03/18/2026 | 28 | AMENDED COMPLAINT against Department of the Interior, National Park Service, Doug Burgum, Jessica Bowron, filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists.(Menschel, Brooke) (Entered: 03/18/2026) |
| 03/18/2026 | 29 | MOTION for Preliminary Injunction *and Stay pursuant to 5 U.S.C. 705* by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit 1 (Management Policies), # 4 Exhibit 2 (Director's Order #6), # 5 Exhibit 3 (Declaration of Alan Spears), # 6 Exhibit 4 (Declaration of Cybelle Jones), # 7 Exhibit 5 (Declaration of Donna Graves), # 8 Exhibit 6 (Declaration of Jennifer Goepfert), # 9 Exhibit 7 (Declaration of John Dichtl), # 10 Exhibit 8 (Declaration of Bill Wade), # 11 Exhibit 9 (Declaration of Emily Thompson), # 12 Exhibit 10 (Declaration of Julian Jon Reyes))(Menschel, Brooke) (Entered: 03/18/2026) |
| 03/19/2026 | 30 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** the Parties' 27 Joint MOTION for Leave to File Excess Pages and for Briefing Schedule. The Court **ADOPTS** the Parties' proposed page limits and briefing schedule, with minor modifications, as follows:<br><br>-Plaintiffs' motion for a stay pursuant to 5 U.S.C. § 705 or preliminary injunction shall not exceed 35 pages;<br><br>-Defendants' combined opposition to Plaintiffs' motion, and their motion to dismiss, shall not exceed 35 pages, and shall be filed no later than 21 days after the filing of Plaintiffs' motion;<br><br>-Plaintiffs' combined reply in support of their motion and opposition to Defendants' motion shall not exceed 20 pages and shall be filed no later than 14 days after the filing of Defendants opposition; and |

| | | |
|---|---|---|
| | | -Defendants' reply in support of their motion shall not exceed 20 pages and shall be filed no later than 14 days after the filing of Plaintiffs' reply.<br><br>(CEH) (Entered: 03/19/2026) |
| 04/08/2026 | 31 | First MOTION to Dismiss *Amended Complaint* by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Motion to Dismiss, # 2 Proposed Order, # 3 Bowron Declaration, # 4 Executive Order 14253, # 5 Secretary's Order 3431, # 6 SEGD 2025 Strategic Plan)(Swenson, Ian) (Entered: 04/08/2026) |
| 04/13/2026 | 32 | ELECTRONIC NOTICE of Hearing. A Status Conference has been set for 5/12/2026 03:00 PM in Courtroom 8 (Remote only) before District Judge Angel Kelley.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(MS) (Entered: 04/13/2026) |
| 04/22/2026 | 33 | REPLY to Response to 29 MOTION for Preliminary Injunction *and Stay pursuant to 5 U.S.C. 705*, 31 First MOTION to Dismiss *Amended Complaint* filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Torcello, Michael) (Entered: 04/22/2026) |
| 05/06/2026 | 34 | REPLY to Response to 31 First MOTION to Dismiss *Amended Complaint* filed by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Swenson, Ian) (Entered: 05/06/2026) |
| 05/12/2026 | 35 | Electronic Clerk's Notes for proceedings held before District Judge Angel Kelley: Status Conference held on 5/12/2026 by video conference.<br><br>The Court discussed next steps with the parties and set a tentative motion hearing date for June 26, 2026.<br><br>Motion Hearing set for 6/26/2026 11:00 AM in Courtroom 8 (In person only) before District Judge Angel Kelley.<br><br>(Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Swenson, Menschel) (MAL) (Entered: 05/12/2026) |

| | | |
|---|---|---|
| 05/13/2026 | 36 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>Having conferred with the Parties during a Status Conference on May 12, 2026, the Court has determined to decide Defendants' Motion to Dismiss Dkt. 31 on the papers. The Motion is hereby **TAKEN UNDER ADVISEMENT**. Should a future hearing on Plaintiffs' Motion for Preliminary Injunction and Stay Dkt. 29 be necessary, the Court will proceed on the currently scheduled hearing date of June 26, 2026, at 11:00 AM. [See Dkt. 35].<br><br>(CEH) (Entered: 05/13/2026) |
| 06/04/2026 | 37 | District Judge Angel Kelley: ORDER entered. MEMORANDUM AND ORDER. For the foregoing reasons, Defendants' Dkt. 31 Motion to Dismiss is **DENIED.** (CEH) (Entered: 06/04/2026) |
| 06/04/2026 | 38 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>The Court, having reviewed and become familiar with the facts and legal arguments presented in this action following its disposition of Defendants' Motion to Dismiss [Dkt. 37], and having conferred with the parties, who have indicated no objection, has determined to decide Plaintiffs' Motion for Stay, or, in the Alternative, Preliminary Injunction [Dkt. 29] on the papers, in the interest of expeditious resolution. The motion hearing currently set for June 26, 2026, is **CANCELLED**, and the Motion is **TAKEN UNDER ADVISEMENT**.<br><br>(CEH) (Entered: 06/04/2026) |
| 06/04/2026 | 39 | **ELECTRONIC NOTICE CANCELLING HEARING.**<br><br>Motion Hearing set for 6/26/2026 11:00 AM in Courtroom 8 (In person only) before District Judge Angel Kelley is **CANCELLED.** (CEH) (Entered: 06/04/2026) |
| 06/04/2026 | 40 | NOTICE by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists *of Factual Development* (Menschel, Brooke) (Entered: 06/04/2026) |
| 06/12/2026 | 41 | District Judge Angel Kelley: ORDER entered. MEMORANDUM AND ORDER.<br><br>Plaintiffs' 29 MOTION for Preliminary Injunction and Stay pursuant to 5 U.S.C. 705 is **GRANTED. (CEH)** (Main Document 41 replaced on 6/15/2026) (CEH).<br><br>Modified on 6/15/2026 to replace PDF. NEF regenerated to all parties. This corrected Memorandum and Order supersedes the Court's Memorandum and Order entered on June 12, 2026, which contained minor typographical errors. Specifically, on page 2, a sentence has been corrected to identify the location of Glacier National Park as Montana instead of Alaska (the Park's location was correctly noted as Montana elsewhere in the Order), and on page 10, an erroneous double period at the end of a citation has been corrected to a single period. The Court's Order otherwise remains unchanged, pursuant to Federal Rules of Civil Procedure 60(a), which allows a court to correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or |

| | | | |
|---|---|---|---|
| | | | other part of the record. (CEH). (Entered: 06/12/2026) |
| 06/15/2026 | | 42 | NOTICE of Appearance by Romney Philpott on behalf of Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service (Philpott, Romney) (Entered: 06/15/2026) |
| 06/15/2026 | | 43 | NOTICE OF APPEAL as to 37 Memorandum & ORDER, 41 Memorandum & ORDER,,,, by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. Fee Status: US Government. <br><br> NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 7/6/2026. (Philpott, Romney) (Entered: 06/15/2026) |
| 06/15/2026 | | 44 | MOTION to Stay *Pending Appeal on Expedited Basis* by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Memorandum in Support of Motion, # 2 Exhibit Exhibit 1: 2d Bowron Decl) (Philpott, Romney) (Entered: 06/15/2026) |
| 06/16/2026 | | 45 | District Judge Angel Kelley: ELECTRONIC ORDER entered. Before the Court is Defendants' Expedited Motion for Stay Pending Appeal. [Dkt. 44]. If Plaintiffs intend to file a response to the Motion, they are directed to do so by June 17, 2026, at 10:00 AM EST.(CEH) (Entered: 06/16/2026) |
| 06/16/2026 | | 46 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 43 Notice of Appeal (CEH) (Entered: 06/16/2026) |