No. 26-1714

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS,
*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director,
*Defendants-Appellants*

Appeal from the United States District Court for the District of Massachusetts
No. 1:26-cv-10877 (Hon. Angel Kelley)

# FEDERAL APPELLANTS' OPENING BRIEF

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
CHRISTOPHER C. HAIR
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9583
christopher.hair@usdoj.gov

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... i

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 3

STATEMENT OF THE ISSUES ..... 4

PERTINENT STATUTES AND REGULATIONS ..... 4

STATEMENT OF THE CASE ..... 5

A. Statutory and regulatory background ..... 5

B. The Park Service's review of interpretive materials ..... 6

C. Proceedings below ..... 8

SUMMARY OF ARGUMENT ..... 10

STANDARD OF REVIEW ..... 12

ARGUMENT ..... 12

I. Plaintiffs have no chance of success on the merits. ..... 12

A. Plaintiffs lack standing. ..... 13

B. The Secretary's Memo is not final agency action. ..... 22

C. What the government says to the public in national parks about America is committed to agency discretion by law. ..... 34

D. The Secretary's Memo is lawful. ..... 42

II. Plaintiffs have not shown irreparable harm. ..... 44

III. The remaining injunction factors favor the government............................. 48

CONCLUSION ........................................................................................ 51

## TABLE OF AUTHORITIES

### Cases

*Allen v. Milligan*,
146 S. Ct. 1377 (2026)....................47

*Am. Hosp. Ass' v. NLRB*,
499 U.S. 606 (1991)....................42

*Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977)....................17

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015)....................16

*Becker v. FEC*,
230 F.3d 381 (1st Cir. 2000)....................21

*Benisek v. Lamone*,
585 U.S. 155 (2018)....................46

*Bennett v. Spear*,
520 U.S. 154 (1997)....................23, 24, 27, 30

*Biden v. Texas*,
597 U.S. 785 (2022)....................28, 30

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002)....................26

*Board of Regents of the Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000)....................37

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024)....................41

*Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004)....................45

*City of New York v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) ....................................................................33

*City of Philadelphia v. Burgum*,
820 F. Supp. 3d 313 (E.D. Pa 2026)............................................................18

*City of Philadelphia v. Secretary, U.S. Dep't of Interior*,
179 F.4th 169 (3d Cir. 2026) .......................... 2, 11, 17, 23, 29, 32, 33, 34, 36

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...............................................................................16, 19

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984)......................................................................................35

*Clark v. Sweeney*,
607 U.S. 7 (2025)..........................................................................................50

*Courtemanche v. Noble*,
177 F.4th 60 (1st Cir. 2026) ........................................................................19

*Ctr. for Biological Diversity v. Interior*,
144 F.4th 296 (D.C. Cir. 2025)....................................................................19

*Dalton v. Specter*,
511 U.S. 462 (1994)......................................................................................28

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000)...............................................................38, 39

*Deep South Ctr. for Env't Justice v. EPA*,
138 F.4th 310 (1st Cir. 2025) ......................................................................19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)......................................................................................35

*District 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*,
18 F.4th 38 (1st Cir. 2021) ..........................................................................48

*Doe v. Noem*,
152 F.4th 272 (1st Cir. 2025) ....................................................................44

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) ......................................................................21

*Dubin v. United States*,
599 U.S. 110 (2023)...................................................................................32

*Ecology Center v. U.S. Forest Serv.*,
192 F.3d 922 (9th Cir. 1999) ......................................................................32

*Equal Means Equal v. Ferriero*,
3 F.4th 24 (1st Cir. 2021) ....................................................................17, 19

*First Med. Health Plan v. Vega-Ramos*,
479 F.3d 46 (1st Cir. 2007)..................................................................4, 12, 34

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024)................................................ 13, 14, 18, 19, 21, 45, 47

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)...................................................................................28

*FTC* v. *Standard Oil Co.*,
449 U.S. 232 (1980)...................................................................................24

*Fund for Animals v. BLM*,
460 F.3d 13 (D.C. Cir. 2006)......................................................25, 28, 31, 32

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)...................................................................................17

*Heckler v. Chaney*,
470 U.S. 821 (1985)....................................................... 35, 37, 38, 39, 40, 41

*ICC v. Brotherhood of Locomotive Eng'rs*,
482 U.S. 270 (1987)...............................................................................30, 37

*In re Murray Energy Corp.*,
788 F.3d 330 (D.C. Cir. 2015)......................................................................25

*In re Rare Coin Galleries of Am., Inc.*,
862 F.2d 896 (1st Cir. 1988)....................................................................45

*Independent Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004)..................................................25, 29, 31, 32

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993).........................................................................48

*Janus v. AFSCME*,
585 U.S. 878 (2018)......................................................................37, 39

*Johnson v. Mayor, City of Jacksonville*,
178 F.4th 1240 (11th Cir. 2026).............................................................15

*Kolackovsky v. Town of Rockport*,
165 F.4th 114 (1st Cir. 2026) ...............................................................16

*Lincoln v. Vigil*,
508 U.S. 182 (1993)...............................................................34, 35, 37, 39

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...............................................................13, 15, 19, 21

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990)......................................................................25, 30, 32

*Margolin v. National Ass'n of Immigr. Judges*,
146 S. Ct. 1285 (2026).......................................................................50

*Maryland v. King*,
567 U.S. 1301 (2012).........................................................................49

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
367 F.3d 68 (1st Cir. 2004)...................................................................44

*Mullin v. Doe*,
146 S. Ct. 2121 (2026)..................................................................21, 22

*Murthy v. Missouri*,
603 U.S. 43 (2024)......................................................................15, 21

*Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census*,
945 F.3d 183 (4th Cir. 2019) ....................................................................33

*Nat'l Min. Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014)....................................................................29

*Nat'l Park Conservation Ass'n v. Dep't of Interior*,
180 F.4th 348 (1st Cir. 2026) ...............................................10, 15, 20, 45, 48

*Nat'l Park Serv. v. Nat'l Trust for Historic Pres. in the U.S.*,
609 U.S. __, 2026 WL 2564318 (Aug. 31, 2026) ...................1, 12, 14, 15, 18

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*,
837 F. Supp. 3d 169 (D. Mass. 2026)..........................................................34

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024)......................................................................................36

*New Jersey v. Trump*,
131 F.4th 27 (1st Cir. 2025) ........................................................................13

*Nken v. Holder*,
556 U.S. 418 (2009)......................................................................................48

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)..................................................................22, 32, 36

*Nunez Colon v. Toledo-Davila*,
648 F.3d 15 (1st Cir. 2011)..........................................................................12

*Ohio Forestry Ass'n* v. *Sierra Club*,
523 U.S. 726 (1998)..............................................................................23, 24

*Organized Fishermen v. Hodel*,
775 F.2d 1544 (11th Cir. 1985) ....................................................................39

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)..............................................................................37, 40

*Ramírez v. Sánchez Ramos*,
438 F.3d 92 (1st Cir. 2006)....22

*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....44

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996)....44

*Sea Shore Corp. v. Sullivan*,
158 F.3d 51 (1st Cir. 1998)....14, 17

*Shurtleff v. City of Bos.*,
596 U.S. 243 (2022)....36

*Sierra Club v. Morton,*
405 U.S. 727 (1972)....17

*Sierra Club v. Peterson*,
228 F.3d 559 (5th Cir. 2000)....32

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....16

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....13

*Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*,
704 F.3d 44 (1st Cir. 2013)....12

*Together Emps. v. Mass Gen. Brigham Inc.*,
32 F.4th 82 (1st Cir. 2022)....44

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....13, 20

*Trump v. CASA*,
606 U.S. 831 (2025)....49

*Trump v. Orr*,
146 S. Ct. 44 (2025)....................................................................................49

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020)....................................................................................50

*Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982)....................................................................................15

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) ......................................................................31

*Webster v. Doe*,
486 U.S. 592 (1988)...............................................................................35, 38

*West v. Lynch*,
845 F.3d 1228 (D.C. Cir. 2017)....................................................................21

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)....................................................................................19

*Wilderness Society v. Norton*,
434 F.3d 584 (D.C. Cir. 2006)...................................................29, 30, 36, 40

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008).................................................................................44, 46, 47

*WorldCom, Inc. v. FCC*,
238 F.3d 449 (D.C. Cir. 2001).....................................................................43

**Statutes**

U.S. Const., Art. II, § 2, Cl. 2 .......................................................................29

5 U.S.C. § 551(4) ...........................................................................................31

5 U.S.C. § 551(6) ...........................................................................................31

5 U.S.C. § 551(13) .........................................................................................31

5 U.S.C. § 701 .......... 8

5 U.S.C. 701(a)(2) .......... 11, 34, 36

5 U.S.C. § 704 .......... 22

5 U.S.C. § 705 .......... 8, 44

28 U.S.C. § 1292(a)(1) .......... 4

28 U.S.C. § 1331 .......... 3

28 U.S.C. § 2107(b) .......... 3

54 U.S.C. § 100101(a) .......... 5, 38, 39

54 U.S.C. 100701 .......... 41

54 U.S.C. § 100702 .......... 41

54 U.S.C. §§ 100801(1) .......... 40

54 U.S.C. §§ 100801(2) .......... 40

54 U.S.C. § 100802 .......... 40

54 U.S.C. § 100803 .......... 41

Pub. L. No. 93-431, 88 Stat 1184 (1974) .......... 6

Pub. L. No. 102-488, 106 Stat. 3135 (1991) .......... 6

**Rules**

Fed. R. App. P. 4(a)(1)(B) .......... 3

Fed. R. Civ. P. 65 .......... 50

**Other Authorities**

Exec. Order No. 14253 (Mar. 27, 2025) .......... 6, 7, 26

90 Fed. Reg. 14563 (Mar. 27, 2025)........................................................................26

## INTRODUCTION

The district court issued a sweeping and novel preliminary injunction requiring that informational speech by the National Park Service must now promote the prior administration's ideological views about the shortcomings of our Nation's history and current policy controversies. For more than a century, the National Park Service has exercised broad, discretionary authority to manage national parks, including by developing and revising educational and interpretive materials for park visitors. In March 2025, President Trump issued an Executive Order announcing a policy of restoring the national parks to their traditional role as solemn and uplifting monuments celebrating this country's extraordinary achievements and natural beauty. In May 2025, the Secretary of the Interior issued a Memorandum directing employees to begin implementing that policy (hereafter the "Memo"). The Memo directed the National Park Service to commence an ongoing case-by-case process to review and, where feasible, replace inappropriate signs and other materials across the National Park System.

This Court has already stayed the district court's deeply flawed injunction, and it should now both reverse the district court with instructions to dismiss the case. First, Plaintiffs lack Article III standing. They identify no concrete or imminent injury in fact; rather, their concerns boil down to "mere offense, disagreement, or distaste" with the Memo and its guidance and are insufficient to show standing. *Nat'l Park Serv. v. Nat'l Trust for Historic Pres. in the U.S.*, 609 U.S. __, 2026 WL 2564318, at *2 (Aug. 31, 2026).

Second, the challenged conduct is not final agency action: It does not consummate the agency's decision-making process. It merely starts an individualized multi-step process in which National Park Service staff exercise discretion in determining whether the Memo's criteria warrant changes to particular materials. And it also does not alter rights or result in legal consequences because an internal directive about how to manage government speech on government property does not affect the rights of private parties. *See City of Philadelphia v. Secretary, U.S. Dep't of Interior*, 179 F.4th 169, 183-86 (3d Cir. 2026) (similarly holding that injunction in related case must be vacated for lack of final agency action). Indeed, for some of the same reasons, the Secretary's Memo is simply not the type of "agency action" reviewable under the APA.

Third, the challenged conduct is committed to agency discretion because Congress provided the Park Service with broad discretion to make the kinds of day-to-day management decisions required by the Secretary's Memo. And those decisions concern the content of government speech, which affords utmost discretion for decisions about what the government chooses to say and not to say.

Fourth, the Secretary's Memo is lawful under the Centennial Act, the Omnibus Management Act, and the National Park Service Organic Act. Those laws delegate significant discretion to the agency and none dictate the substance of any interpretive materials (much less bar the Secretary from starting a thoughtful review process for those materials).

As to the equitable factors that Plaintiffs must establish for a preliminary injunction, Plaintiffs failed to demonstrate irreparable harm. They waited nine months before seeking any relief. And their alleged harm is insignificant—they would like to see different signs when they visit national parks pending the final resolution of this case. But they identified no materials at any park they have visited (or plan to) that harm them. In fact, they disavow any challenge to the National Park Service's actions regarding any particular materials, so their alleged harm is entirely disconnected from the National Park Service's actions.

Finally, the district court abused its discretion in finding that the preliminary injunction serves the public interest and balances the equities. The injunction has a direct and irreparable impact on government speech. Without the existing stay, the government would face the incredible burden of undoing approximately a year of actions in a mere 21 days. If the government were forced to comply, the injunction will siphon resources from essential Park Service programming and services.

The Court should reverse the district court's injunction and remand with instructions to dismiss.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. The district court denied the government's motion to dismiss on June 4, 2026 (JA233), and entered the preliminary injunction on June 12, 2026 (JA266). The government filed a timely notice of appeal on June 15, 2026, (JA12); *see also* Fed. R. App. P. 4(a)(1)(B); 28

U.S.C. § 2107(b). This Court has jurisdiction over the appeal from the preliminary injunction under 28 U.S.C. § 1292(a)(1). The Court has jurisdiction over the appeal from the motion to dismiss because it is "part of an interlocutory appeal from the grant of a preliminary injunction" and "the underlying facts are undisputed, the parties have had a fair opportunity to brief the legal issues, and the court of appeals can resolve the case as a matter of law." *First Med. Health Plan v. Vega-Ramos*, 479 F.3d 46, 50 (1st Cir. 2007) (citations omitted).

## STATEMENT OF THE ISSUES

1. As to the merits, whether the district court erred in concluding that (a) Plaintiffs have standing, (b) the Secretary's Memo is final agency action, (c) the challenged conduct is not committed to agency discretion by law, and (d) the Secretary's Memo is otherwise unlawful.

2. Whether the district court erred in finding that Plaintiffs satisfied their burden to show they would be irreparably harmed absent an injunction.

3. Whether the district court abused its discretion in determining that the balance of harms favors Plaintiffs and that the public interest supports an injunction.

## PERTINENT STATUTES AND REGULATIONS

All relevant statutes and regulations are included in an Addendum to Federal Appellants' brief.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

The National Park Service (NPS or Park Service) is the subcomponent within the U.S. Department of the Interior that oversees the National Park System. Bowron Decl. ¶¶ 1, 3, 5 (JA110-11). The System comprises 433 units located throughout the country. *Id.* ¶ 4. These units are staggeringly different, ranging from massive national parks like Yellowstone to historic sites like the Minute Man National Historical Park in Concord, Massachusetts.

The Organic Act of 1916, the National Parks Omnibus Management Act, and the National Park Service Centennial Act all govern the Park Service. Their relevant provisions establish only high-level direction, leaving the agency with significant discretion to manage its 433 units. The Organic Act directs the Secretary to "promote and regulate the use of the National Park System . . . to conserve the scenery, natural and historic objects, and wild life . . . and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). The 1998 Omnibus Management Act requires the Secretary to "ensure that management of System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." *Id.* § 100702.

The 2016 Centennial Act further requires the Secretary to "ensure that management of [National Park] System units and related areas is enhanced by the

availability and use of a broad program of the highest quality interpretation and education." *Id.* § 100802. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the [National Park] System." *Id.* § 100801(1)(A). "Education" means "enhancing public awareness, understanding, and appreciation of [Park resources] through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." *Id.* § 100801(2).[1]

The Park Service accordingly offers "educational and interpretive information" to visitors. Bowron Decl. ¶ 6 (JA112). As of 2025, the Park Service manages over 700 visitor centers and exhibits, over 1,500 audio/visual exhibits, and over 8,000 interpretive waysides. *Id.* ¶ 10. The Park Service produced around 3,100 publications last year and distributed around 26,300,000 copies. *Id.* The Park Service regularly updates its educational and interpretive information to ensure that it remains accurate, relevant, and useable. *Id.* ¶ 11.

### B. The Park Service's review of interpretive materials

On March 27, 2025, President Trump issued Executive Order 14253 (EO), directing the Secretary to determine whether "public monuments, memorials, statues,

---

[1] Individual Park units are also managed under specific statutes. *See, e.g.*, Minute Man National Historical Park Amendments Act, Pub. L. 102-488, 106 Stat. 3135 (1991); Boston National Historical Park Act, Pub. L. 93-431, 88 Stat. 1184 (1974). Plaintiffs disavow any challenge to specific management of any particular unit.

markers, or similar properties" had been improperly altered since January 2020 and to restore any such properties. *Id.* § 4. The Secretary would also ensure that these properties do not "inappropriately disparage Americans past or living." *Id.* The EO explains that this administration's policy is to, consistent with applicable law, use federal sites to "remind Americans of our extraordinary heritage." *Id.* § 1.

On May 20, 2025, the Secretary issued a memorandum entitled "Restoring Truth and Sanity to American History," which "implements provisions of" the EO. The Secretary's Memo directs the reviews and restoration called for in the EO before the Nation's 250th Anniversary. The Memo also explains that it is designed to improve "the internal management" of the agency and creates no legally enforceable rights.

In June 2025, Park Service leadership instructed all units to conduct reviews and to post signage consistent with the Memo. Bowron Decl. ¶¶ 17-18 (JA115). A review team started such work in July 2025. *Id.* ¶ 20. Case-by-case review "tak[es] into account the context of the submission, the mission and interpretive purpose of the [National Park] Unit or specified exhibit, and any relevant legal or policy considerations." *Id.* The Park Service has acted on interpretive materials as part of both its review and its ordinary maintenance and has found that many materials conform with the Memo. *Id.* ¶¶ 20-26 (JA115-17). After the Park Service identifies content that it wants to change, it may revise the content, temporarily cover or remove it, or permanently remove it. *Id.* ¶ 24. Permanent removal is generally due to multiple factors, such as the planned

retirement date of the material. *Id.* And because the Park Service's review of interpretive content never ends, a "permanent" removal is not truly permanent.

As of June 2026, the Park Service had completed approximately 100 revision projects in the thirteen months since the Secretary's Memo. 2d Bowron Decl. ¶ 8 (JA331-32). The process remains ongoing "on a rolling basis" as the review team "continues to receive" submissions from system units and the public, and it "will continue for the foreseeable future as part of the [Park Service's] overall interpretive strategy." Bowron Decl. ¶ 23 (JA116).

### C. Proceedings below

Plaintiffs are advocacy organizations interested in the National Park System. Plaintiffs waited until February 2026—nine months after the Memo issued—before suing under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, and five other statutes. A month later, Plaintiffs amended their complaint and moved for a 5 U.S.C. § 705 stay of the Memo or a preliminary injunction on three of their claims against the Park Service under the Centennial Act, the Organic Act, and the Omnibus Management Act. They asked the court to order the government to restore all park sites to how they existed before the Memo and to prohibit further alterations pending this litigation. The government opposed and moved to dismiss the complaint both for lack of standing and because the Secretary's Memo is not judicially reviewable.

The district court denied the motion to dismiss on June 4, 2026. Dismissal Order at 30 (JA262). First, the court found that Plaintiffs demonstrated both organizational

and associational standing. *Id.* at 8-18 (JA240-50). Next, the court determined that the Memo is reviewable final agency action because it articulates the agency's policy and imposes legal obligations on staff to review interpretive materials. *Id.* at 20-21 (JA252-53). The court also determined that the challenged conduct is not committed to agency discretion both because the statutes provide meaningful standards for judicial review and because the memo expressly intends to shape the public's experience. *Id.* at 23-25 (JA255-57).

The court issued a sweeping preliminary injunction on June 12, 2026. *See generally* Prelim. Inj. (JA327-28). In the court's view, the Memo "seek[s] to rewrite the Nation's history with a white-out pen." Prelim. Inj. at 62 (JA327-28). The court opined that "telling the full truths of our shared story helps our Nation heal from past wrongs." Prelim. Inj. at 62 (JA327). The court cited the removal of signs at Acadia National Park in Maine discussing climate change, *id.* at 14, as well as signs in Rock Creek Park in Washington, D.C., providing details about a former congressman and senator's white supremacist views. *Id.* at 15 (JA279-80). Finding it "equally important that our shared history be honestly told and fully restored by the 250th Anniversary to properly honor the remarkable achievements of the United States," the court ordered the agency to restore within 21 days all interpretive materials that were altered or removed under the Memo. *Id.* at 62 (JA327).

This appeal followed. The government moved to stay the injunction pending appeal. The district court denied the request. JA353. But this Court granted a stay on

July 2, 2026. *See Nat'l Park Conservation Ass'n v. Dep't of Interior*, 180 F.4th 348 (1st Cir. 2026). This Court credited the government's "strong showing that it is likely to succeed on the merits on appeal because the district court erred in determining that the plaintiffs likely would suffer irreparable harm[.]" *Id.* at 351. The Court further noted that the Park Service made no changes to the parks Plaintiffs intended to visit and, otherwise, none of Plaintiffs' alleged harms were "sufficiently connected to" or "traceable" to the Memo. *Id.* at 352-53.

## SUMMARY OF ARGUMENT

1. Plaintiffs have no likelihood of success on the merits. They lack standing because Plaintiffs fail to establish any concrete or imminent injury in fact based on their generalized concerns about what *might* happen to particular interpretive materials based on the Secretary's Memo. Nor do Plaintiffs establish any connective tissue between their alleged aesthetic harms and the Memo. They are not subject to the Memo itself and they disavow any claim challenging specific actions by the Park Service. Plaintiffs therefore fail to establish that their alleged harms are traceable to the Memo and are otherwise redressable by a favorable decision.

The Secretary's Memo is also unreviewable under the APA because it is not final agency action. The Memo does not consummate any decision-making process by the National Park Service because it has merely begun a multi-step, case-by-case process in which the agency's staff have (and will) exercise critical discretion in determining whether the Memo's criteria warrant changes to particular materials. Nor does the

Memo alter any rights, obligations, or legal consequences, because an internal directive to agency staff about how to manage their own government speech on government property does not affect the rights of private parties. *See Philadelphia*, 179 F.4th at 186 (similarly holding that injunction in related case must be vacated for lack of final agency action).

The Memo is doubly unreviewable because it is committed to agency discretion by law, 5 U.S.C. 701(a)(2). The Memo addresses "internal management," which is traditionally committed to agency discretion. The relevant statutes provide broad discretion to the agency to manage interpretive content. And the Park Service has historically exercised substantial discretion over its interpretive content. The statutory requirement to create educational programs provides no workable standard for the courts to review the agency's content decisions.

The Memo also falls comfortably within the significant discretion afforded by the Centennial Act, the Omnibus Management Act, and the National Park Service Organic Act regarding the Secretary's authority. The Secretary also reasonably explained his rationale for beginning a review process of interpretative materials and providing guidance for that review—thus, the Memo is not arbitrary and capricious.

2. For the same reasons they lack standing, Plaintiffs fail to show irreparable harm. Their assertions of aesthetic and informational harms are speculative. And those assertions are disconnected from any discrete agency action. Their alleged harms are

also otherwise belied by Plaintiffs' unjustified delay of nearly a year before requesting injunctive relief, which itself provides sufficient ground to vacate the injunction.

3. The equitable factors also weigh heavily in favor of the government. The injunction inflicts extraordinary harm. It commandeers government speech and property to perpetuate the prior administration's preferred narratives. The court's sua sponte imposition of a three-week deadline to undo a year's changes across 433 park sites would also impose enormous administrative burdens and severely disrupt agency operations.

## STANDARD OF REVIEW

This Court reviews an appeal from the grant of a preliminary injunction for abuse of discretion: it reviews issues of law de novo and reviews findings of fact for clear error. *Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 48 (1st Cir. 2013). This Court may also review an interlocutory order denying a motion to dismiss in an appeal from the grant of a preliminary injunction, *see First Med. Health Plan*, 479 F.3d at 50, which it reviews de novo. *Nunez Colon v. Toledo-Davila*, 648 F.3d 15, 19 (1st Cir. 2011).

## ARGUMENT

### I. Plaintiffs have no chance of success on the merits.

Plaintiffs lack a personal stake in this case and therefore cannot show standing. Their disagreement over potential changes to interpretive materials is precisely the type of injury that the Supreme Court has consistently rejected as insufficiently concrete and particularized. *See Nat'l Trust for Historic Pres.*, 609 U.S. ___, 2026 WL 2564318, at *2. And

their "legal, moral, ideological, or policy objection[s]" to the Memo are categorically insufficient for standing. *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Even if Plaintiffs could show standing (they cannot), their APA claims fail because they identify no final agency action. Rather, Plaintiffs challenge an internal memorandum that *begins* a process for deciding which interpretive materials to display, a matter committed to agency discretion by law. Moreover, no law limits the Park Service's ability to engage in government speech or requires it to display certain materials (much less materials that are false, inappropriate, or improper). Therefore, the Court should both reverse the injunction and remand with instructions to dismiss.

### A. Plaintiffs lack standing.

To secure standing, a plaintiff must establish that it suffered an "injury in fact"—that is, the "invasion of a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). Its injury must be both concrete and particularized and actual or imminent. *Id.* A plaintiff must also establish that the injury was "likely caused by the defendant"; and that it would "likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560-61). A plaintiff must make a "clear showing that it is likely to establish each element of standing." *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025).

Organizations like Plaintiffs may establish standing as an organization or on behalf of its members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To have associational standing on behalf of its members,

it must show that "at least one of its members possesses standing to sue." *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998). An organization bringing claims in its own right "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Alliance*, 602 U.S. at 393-94. Plaintiffs fail to demonstrate standing either way.

### 1. Plaintiffs lack associational standing based on their members.

Plaintiffs' associational standing on behalf of their members is foreclosed by the Supreme Court's recent decision in *National Trust for Historic Preservation*, which reiterated the Court's long-held view that mere offense, disagreement, or distaste does not qualify as concrete and particularized injury. 2026 WL 2564318, at *2; *Alliance*, 602 U.S. at 390, n.3. Plaintiffs' members fail to articulate any qualifying injury. For example, one individual feels "angry and sad." Goepfert Decl. ¶ 33 (JA182). Another feels "entirely at odds" with the alleged "ideologically-motivated system of historical interpretation[.]" Graves Decl. ¶¶ 28, 35 (JA166, 168). These harms amount to nothing more than offense over the Memo.

The intensity of Plaintiffs' feelings does not convert their offense into Article III injury. *Alliance*, 602 U.S. at 394. One of Plaintiffs' members fears potential "disheartening" changes to materials she worked on that allegedly threaten her legacy. Graves Decl. ¶ 32 (JA167). But, as the Eleventh Circuit recently explained in holding that a slave's descendant lacked standing to challenge Confederate memorials, it is not

enough to be "deeply repulsed" or "disheartened" by a given display. *Johnson v. Mayor, City of Jacksonville*, 178 F.4th 1240, 1246 (11th Cir. 2026). Standing "is not measured by the intensity of the litigant's interest," *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982). And while Graves may possess a "special interest in the subject" of interpretive materials, *Lujan*, 504 U.S. at 563 (cleaned up), the Supreme Court has rejected any "special carveout" for standing on that basis. *Nat'l Trust for Historic Pres.*, 2026 WL 2564318, at *3.

Plaintiffs also fail to show an "imminent future injury" as required for the "forward-looking relief" they seek. *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). For example, one of Plaintiffs' members (Ms. Goepfert) intends to visit three NPS sites: *Brown v. Board of Education* National Historical Park, Hot Springs National Park, and Little Rock Central High School. Goepfert Decl. ¶ 32 (JA182). But, as this Court has already found, Plaintiffs "do not allege that any material has yet been removed from the parks that the member identifies as the ones that [Goepfert] has specific plans to visit this summer." *Nat'l Parks Conservation Ass'n*, 180 F.4th at 352.

As for Goepfert's vague plans to visit parks "down the line," (Goepfert Decl. ¶ 33 (JA182)), those "some day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that" Article III requires. *Lujan*, 504 U.S. at 564.

Plaintiffs' alleged reputational harms are also insufficient. One member (Ms. Graves) claims the Memo "delegitimizes [her] work" and "damages [her] professional

reputation by removing or threatening to remove the work that comprises [her] portfolio." Graves Decl. ¶ 34 (JA168). But Graves is not subject to the Memo and has no right to display of her work. Though she is "concerned" that one of the exhibits she worked on might be "removed," *id.* ¶ 31, Plaintiffs fail to allege that the agency has done that. Thus, any reputational harm is "conjectural or hypothetical," not "imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

Her alleged reputation harms also fail because they are conclusory and unfounded. *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 120 (1st Cir. 2026). Graves may not force the display of her work into perpetuity. The Park Service owns the displays and has discretion to change them. Also, that Graves may have retired because of the Memo, *see* Graves Decl. ¶ 33 (JA168), amounts to a self-inflicted injury insufficient to "manufacture standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Plaintiffs also fail to satisfy the traceability or redressability prongs of standing. None of their members are subject to the Memo and they otherwise specify no harms based on changes to parks they intend to visit (much less any changes required under the ongoing review process). At best, Plaintiffs are concerned about the potential for future harm that may (or may not) emanate from the Memo. But that harm is entirely speculative. Because Plaintiffs' traceability and redressability depend on a "chain of contingencies," *Clapper*, 568 U.S. at 410, they lack standing. Plaintiffs cannot rely on

"predictions of future events" to support their standing. *See Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).

Because none of Plaintiffs' members has standing, Plaintiffs fail to establish associational standing on their behalf. *Sea Shore Corp.*, 158 F.3d at 55.

### 2. Plaintiffs lack organizational standing.

Plaintiffs assert their own advocacy interests are frustrated, but an advocacy group cannot show standing merely by pointing to injury to its advocacy interests. *See Sierra Club v. Morton,* 405 U.S. 727, 739 (1972); *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021). Instead, an organization must show "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources" that is "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). Plaintiffs fail to meet this burden.

This Court need look no further than the Third Circuit's *Philadelphia* decision, which the district court below acknowledged as a "parallel action," *see* Prelim. Inj. at 3, n.2 (JA268). The plaintiffs in *Philadelphia* obtained a preliminary injunction to undo the Park Service's removal of certain materials from the President's House at Independence National Historical Park, under another, site-specific portion of the same Executive Order and the same Memo at issue here. 179 F.4th at 176. But the Third Circuit vacated that injunction and remanded with instructions to dismiss the claims at issue. *Id.* at 186.

The court rejected as insufficient the City's allegation that the removal of displays affected its ability to honestly and accurately tell the story of its own history. *Philadelphia*, 179 F.4th at 179, n.7; *City of Philadelphia v. Burgum*, 820 F. Supp. 3d 313, 342 (E.D. Pa 2026).

This reasoning applies with equal force here. *See also Alliance*, 602 U.S. at 386; *Nat'l Trust for Historic Pres.*, 2026 WL 2564318, at *3. Plaintiffs assert the Memo "moves the park system in the opposite direction" of their vision. Spears Decl. ¶ 34 (JA138). They claim that the Memo "undermine[s]" their efforts to make materials "more inclusive and intuitive[.]" Jones Decl. ¶ 28 (JA152). They also say the Memo frustrates their efforts to "increase scientific literacy", Reyes Decl. ¶ 7 (JA224), and to "tell a more complete and honest history[.]" Dichtl Decl. ¶ 21 (JA197). As in *Philadelphia*, these injuries reflect only abstract opposition, not Article III injury. Nor are they particularized because they do not impact the Plaintiffs any more than they would impact a concerned bystander. *See also Alliance*, 602 U.S. at 381-82.

Plaintiffs' voluntary decision to divert resources from other programs to address the Memo's effects also does not supply Article III injury. They mention "tracking sign removals, educating members of Congress and other policy-makers and partners" about the Memo, writing articles about the Memo, and "working to build awareness and transparency" around the Memo and its implementation. Spears Decl. ¶ 41 (JA140); *see* Jones Decl. ¶ 30 (JA153) (alleging diversion of resources to address member concerns);

*accord* Dichtl Decl. ¶ 25 (JA198); Wade Decl. ¶ 25 (JA212); Thompson Decl. ¶ 15 (JA219); Reyes Decl. ¶¶ 16-17 (JA230).

But any such changes to their business activities were self-imposed (and certainly not required by the Memo, which was not directed towards Plaintiffs). *Alliance*, 602 U.S. at 395; *Lujan*, 504 U.S. at 562 (collecting cases). Plaintiffs cannot "manufacture" standing "by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394; *see also Equal Means Equal*, 3 F. 4th at 31, n.5 (collecting cases). And any alleged past expenditures, Spears Decl. ¶ 22 (JA134), "do not suffice to create cognizable injuries" to support organizational standing. *Deep South Ctr. for Env't Justice v. EPA*, 138 F.4th 310, 318 (1st Cir. 2025); *see also Ctr. for Biological Diversity v. Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (actions requiring an organization to "work harder" are insufficient). If standing could be based on resource diversion alone, "all the organizations in America would have standing to challenge almost every federal policy that they dislike" at the cost of a "single dollar." *Alliance*, 602 U.S. at 395.

Plaintiffs' alleged harms are also insufficiently imminent. *See Courtemanche v. Noble*, 177 F.4th 60, 65 (1st Cir. 2026). Plaintiffs' allegations that the Memo has chilled expression and undermined professions and professional reputations, *see, e.g.*, Dichtl Decl. ¶ 31(JA200-01), rest on inferences without reference to any specific provisions in the Memo. These claims are simply too speculative. *See Whitmore v. Arkansas*, 495 U.S. at 149, 155 (1990). Similarly, Plaintiffs speculate that they have seen reduced membership because members fear being perceived as opposing current policies. This

again is "speculation about the unfettered choices made by independent actors." *Alliance*, 602 U.S. at 383 (quoting *Clapper*, 568 U.S. at 414 n.5). And Plaintiffs fail to connect this speculation to the Memo itself. *Accord Nat'l Parks Conservation Ass'n*, 180 F.4th at 353 (staying the preliminary injunction on similar grounds).

The district court found standing because Plaintiffs' "core activities"—i.e., hosting site visits to parks, attending conferences, and developing reference guides—are harmed by "the removal of interpretive materials related to these topics[.]" Dismissal Order at 9 (JA241). But the court erred for two related reasons. First, Plaintiffs do not challenge any specific removal of interpretive materials. *See, e.g.*, Pls.' Opp'n to Mot. for Stay Pending Appeal at 5 (Dkt. 48) ("Plaintiffs do not challenge an individual sign removal[.]"). Instead, they challenge the Memo itself. Plaintiffs make no attempt to show that the Memo *itself* caused them harm. This failure defeats rather than supports standing because they "must demonstrate standing for each claim that they press[,]" *TransUnion*, 594 U.S. at 431, not for claims they *declined* to make. Second, Plaintiffs neither plead nor prove that the agency removed or altered any material that was used in any so-called "core activities."

For related reasons, Plaintiffs' alleged harms are not traceable to the Memo, nor are they redressable by a favorable decision. As this Court already found while assessing Plaintiffs' claimed irreparable harm, Plaintiffs "do not explain how their claims of mission frustration, diversion of resources from core functions, and postponement of long-term projects are linked to specific directives in the Secretary's Memo or specific

actions taken to implement it." *Nat'l Parks Conservation Ass'n*, 180 F.4th at 353. These failures apply with equal force to their ability to show standing. Again, Plaintiffs point to no aspect of the review process required under the Memo that directly harms them. And Plaintiffs similarly cannot show that a favorable decision will redress their alleged harms where the Memo is "at best an indirect or contributing cause" of potential injuries. *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017).

In sum, Plaintiffs fail to show any organizational harms that are concrete or imminent, traceable to the Memo, or redressable by a favorable decision. Plaintiffs therefore lack organizational standing. *Alliance*, 602 U.S. at 393-94.

**3. This Court should dismiss the complaint for lack of standing.**

Given Plaintiffs' lack of standing, the district court lacked jurisdiction to consider their claims and this case should be dismissed. Plaintiffs prefer to kick the can down the road. *See, e.g.*, Pls.' Reply in Support of Mot. for Abeyance at 1-2. But that is not how standing works. A plaintiff must establish standing *as of the time she brought the lawsuit* and maintain it thereafter and must support each element of standing with the manner and degree of evidence required at the successive stages of the litigation. *Murthy*, 603 U.S. at 57.

To be sure, this Court's precedent states that "the plaintiffs need only make a clear showing that they are likely to succeed in establishing Article III standing" at this time. *Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025); *see also Mullin v. Doe*, 146 S. Ct. 2121,

2137 (2026). But standing is a fixed question, "to be assessed under the facts existing when the complaint is filed." *Lujan*, 504 U.S.at 569 n.4; *see also Becker v. FEC*, 230 F.3d 381, 386 n.3 (1st Cir. 2000). Accordingly, "an inquiry into standing must be based on the facts as they existed when the action was commenced[,]" *Ramírez v. Sánchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006), not later when Plaintiffs may wish to shore up jurisdiction.

Plaintiffs had to support their standing at the *outset* of this lawsuit and Plaintiffs' forthcoming summary judgment evidence can only *support* their standing, not create it in the first instance. There is therefore no reason to delay this Court's review of Plaintiffs' standing, especially considering the breathtaking scope of the preliminary injunction issued here and the "cardinal rule that a federal court may not usually consider the merits of a claim without first making a firm determination that it has jurisdiction." *Mullin*, 146 S. Ct. at 2137 (citation omitted).

### B. The Secretary's Memo is not final agency action.

Plaintiffs APA claims fail for another threshold reason. The APA authorizes judicial review only of "final agency action." 5 U.S.C. § 704. This limitation "protect[s] agencies from undue judicial interference with their lawful discretion" and "avoid[s] judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). The district court's censorial editing of the government's informational speech flouts this requirement.

To be final agency action, an agency decision (a) "must mark the 'consummation' of the agency's decisionmaking process" and (b) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997). Plaintiffs cannot satisfy either of these independent requirements, as confirmed by the Third Circuit in *Philadelphia*, 179 F.4th at 184-86.

#### 1. The Secretary's Memo does not consummate any decision-making process by the Park Service.

Far from "consummat[ing]" the agency's decision-making process, *Bennett*, 520 U.S. at 178, the Memo merely *started* a multi-step intra-agency process to review, assess, and, where appropriate and consistent with law, revise or replace interpretive materials—all as part of the Park Service's continuous, century-old ongoing process of developing and updating information for visitors. Although the Memo sets general "goals," it "does not itself authorize" the removal or replacement of any specific material. *Ohio Forestry Ass'n* v. *Sierra Club*, 523 U.S. 726, 729 (1998). Instead, it directs the Park Service to review all recently altered materials; to report the results of that review; and then to take such actions "as are necessary" to remove and replace materials that the Park Service finds meet the criteria provided by therein. JA124-25.

That review process remains ongoing on a "rolling," "case-by-case basis," with discretionary decisions made regarding particular materials based on input from the Park Service review team, the 433 individual units of the agency's "decentralized

structure," and "case- or category-specific policy clarification from [Interior] leadership." JA116. And the process "will continue for the foreseeable future as part of the [Park Service's] overall interpretive strategy" in managing the 433 sites. *Id.* There is "considerable legal distance between the adoption of the [order] and the moment when" particular materials may be replaced, making this case an '"abstract disagreement[] over administrative policies"' that is "not justiciable." *Ohio Forestry Ass'n*, 523 U.S. at 730, 732, 736; *see also Bennett*, 520 U.S. at 178. Indeed, because the Park Service's updates to interpretive content never really end, a "final" replacement or removal is never truly final.

The Third Circuit's parallel *Philadelphia* decision confirms that conclusion. Among other things, the court there found that the Park Service's extensive subsequent work to replace the removed materials showed that the challenged exhibit removal was not the agency's "last word on the matter" and therefore did not meet *Bennett*'s first finality requirement. *Id.* This case is even easier: If the later step of removing an exhibit is not the consummation of the agency's decision-making process, then the much earlier step of the Secretary's Memo initiating review, as challenged here, is not the agency's last word either—it is more like the agency's *first*. *Id.*

The district court believed the Memo to consummate the agency's decision-making process because it "was issued by the Secretary, the highest-ranking official at the Department, rather than by subordinate staff," '"speaks for the Department, articulating the agency's overall policy and approach,"' and "direct[s]" subordinates to

take further steps. Dismissal Order at 20 (JA252). But the same is true of many things that are "not 'final agency action,'" such as an agency's filing of a complaint, *FTC* v. *Standard Oil Co.*, 449 U.S. 232, 239 (1980), or a decision to publish a notice of proposed rulemaking in the Federal Register, neither of which are final decisions. *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) ("Proposed rules meet neither of the two requirements for final agency action").

Nor is it true that anytime an agency official "directs" an employee to do something, that direction constitutes a "final" action. If it were a final agency action every time the director of the Park Service instructed employees about how to do their jobs, courts could review countless aspects of "day-to-day operations" for which "general judicial review" is barred. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Instead, a directive is not final where it simply identifies a general policy and instructs employees to undertake some downstream and iterative review. *See Fund for Animals v. BLM*, 460 F.3d 13, 19-22 (D.C. Cir. 2006) (BLM's approved budget request outlining its wild-horse management goals and strategy was neither final nor agency action).

The district court's logic would implausibly suggest that final agency action exists whenever a Secretary gives a policy speech to his subordinates (or when he instead writes down his policy aims, as here) and expects them to carry it out. In adopting a theory that implies the availability of "'judicial review over everything done by an administrative agency'" (or by an agency head), the district court contravened "common sense, basic precepts of administrative law, and the Administrative Procedure Act

itself." *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (brackets omitted) (EPA letter responding to trade association's letter that EPA did not concur in an association's interpretation of the law is neither agency action nor final agency action).

The district court further believed that finality was satisfied because Park Service staff have "commenc[ed] implement[ing]" the Memo. Dismissal Order at 22 (JA254). But this just underscores that the Memo did not equate to a decision on a specific sign, none of which Plaintiffs challenge. Plaintiffs instead bring a facial challenge to the Memo, and the court issued a similarly sweeping injunction against "any" implementing act. Prelim. Inj. at 62 (JA327). Worse, as discussed below, even the implementing acts on which the court relied cannot satisfy *Bennett*'s second requirement for finality.

The district court's error is even clearer because the criteria in the Memo itself are consistent with governing law—i.e., no one could argue that the governing statutes require "false," "inappropriate[]," or "improper" materials in national parks. Memo at 3 (JA124). The court essentially reasoned that "implementation[s]" by agency staff did not in fact involve those things. Dismissal Order at 22 (JA254). But that suggests, at most, discrete claims that staff misapplied the Memo—especially given that the document, like the underlying Executive Order, directs changes only "as appropriate and consistent with applicable law," 90 Fed. Reg. 14563, 14564. If an internal document includes such an "instruction," the "mere possibility" of improper applications "does not justify an injunction against enforcement of" the document itself. *Bldg. & Constr.*

*Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). That is exactly what Plaintiffs sought and obtained—an injunction of the ongoing implementation of the Memo based on the mere *possibility* of an improper application.

**2. No legal consequences flow from the Memo.**

The Memo also does not satisfy *Bennett*'s requirement that the challenged action "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" 520 U.S. at 178. Rather, like the underlying Executive Order, the Memo "and any resulting reports or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person." Memo at 5 (JA126).

The Memo does not address any rights or obligations of parties outside the agency at all. In fact, it states that it "is intended to improve the internal management of the Department" and provides that any resulting reports and recommendations "are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." Memo at 5 (JA126). The Memo is thus unlike, for example, the Fish and Wildlife Service's biological opinion in *Bennett*, which "authoriz[ed]" another party to take an endangered species under specified terms (enforced by "substantial civil and criminal penalties") and thus had the "direct and appreciable legal consequences" of "alter[ing] the legal regime to which the [other party] is subject." 520 U.S. at 170, 178. And it is unlike the immediate

"termination" of the program in *Biden v. Texas*, 597 U.S. 785, 791 (2022) "requir[ing] some aliens" to return to Mexico, *id.* at 804.

In these circumstances, when an internal directive does not lead to legal consequences on anyone outside the agency, it is not final agency action. *Fund for Animals*, 460 F.3d at 21-22. A plaintiff cannot bootstrap final agency action by pointing to the bare "legal consequence" that agency employees must follow the directions of a supervising official. Plaintiffs cite no case to the contrary, and each example of final agency action involves legal consequences flowing outside the agency. Even the agency report in *Franklin*, which the Supreme Court held was not final because it "ha[d] no direct effect" by itself, eventually lead to legal consequences for the census. *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992); *see also Dalton v. Specter*, 511 U.S. 462 (1994) (reports recommending military-base closures were not final because the reports carried no direct consequences). Here, the Memo merely instructs further review and adjustment of interpretive materials as a matter of the agency's "internal management" of its own speech. Memo at 5 (JA126).

Nor would any subsequent implementation of the Memo affect the legal rights or obligations of Plaintiffs (or indeed any private parties), just the government's speech on its own property. The Memo and its subsequent implementation "is very unlike a substantive rule that, as a practical matter, requires the parties affected to adjust their conduct as soon as the rule is issued." *Fund for Animals*, 460 F.3d at 20. No legal consequences flow from the Memo. Plaintiffs here "do[] not have any statutory,

property, or contractual rights that empower [them] to curate the exhibits in" national parks, so this case "does not involve [their] legal rights or obligations." *Philadelphia*, 179 F.4th at 186. And like the Park Service's management policies in *Philadelphia*, the Memo "is not a source of judicially enforceable rights" because it is "'not intended to, and do[es] not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States.'" *Philadelphia*, 179 F.4th at 186 (citing *Wilderness Society v. Norton*, 434 F.3d 584, 594-596 (D.C. Cir. 2006)); *see also* Memo at 5 (JA126).

The district court nevertheless found the Memo satisfied the second *Bennett* prong because it had legal consequence for agency "personnel, who must review interpretive materials at park sites, post QR codes, and remove purportedly violative materials." Dismissal Order at 21 (JA253). But this Court has never held that an agency's imposing obligations on *its own subordinate personnel* alone suffices to establish final agency action. *Every* order of every cabinet Secretary binds his subordinates—that is what it means that they are "Heads of Departments," U.S. Const., Art. II, § 2, Cl. 2. Yet it remains blackletter law that courts cannot "exercise 'judicial review over everything done by'" an agency head. *Independent Equip. Dealers*, 372 F.3d at 427 (brackets omitted). As explained above, final agency action requires more: "actual legal effect" on the rights or obligations of "regulated parties" outside the agency, *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-252 (D.C. Cir. 2014) (Kavanaugh, J.), such as the entity seeking the "permit" to take endangered species in *Bennett*, 520 U.S. at 170, or the

aliens required to return to Mexico in *Texas*, 597 U.S. at 806-807. No such effect exists here.

As the D.C. Circuit explained in a related context, treating the Park Service's "internal directives" to its own personnel as "judicially enforceable at the behest of members of the public who question the agency's management . . . would not only be contrary to [the] case law, but it would chill efforts by top agency officials to gain control over their bureaucratic charges through internal directives," as agency heads have every right to do. *Wilderness Society*, 434 F.3d at 596. The district court's erroneous ruling thus invites precisely the unworkable "general judicial review of [agencies'] day-to-day operations" that the APA and precedent forbid. *Nat'l Wildlife Fed'n*, 497 U.S. at 899.

Put differently, the court's approach absurdly suggests that, although there concededly would be no review if Park Service staff unilaterally chose to comply with the policy in the President's Executive Order, or if the President had directly ordered them to comply (as there would then be no *agency* action altering any rights, obligations, or legal consequences), there *is* final agency action here simply because the *Secretary* directed them to comply with the Executive Order. That makes no sense. Unreviewable actions by agency subordinates do not somehow "become[] reviewable" if the Secretary provides supervision about how their discretion is exercised. *Cf. ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) (rejecting the "fals[e]" proposition "that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable").

### 3. The Secretary's Memo is not agency action.

For largely the same reasons the Memo is not "final" under the second prong of *Bennett*, it is also not "agency action" under 5 U.S.C. § 551(13), and is thus not reviewable under 5 U.S.C. § 704. The Memo lacks legal consequences and is merely an internal directive targeted at internal agency operations and the agency's own speech. It is thus not the type of agency regulatory conduct that constitutes "agency action" reviewable under the APA.

Agency action is defined as a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Among this list, the only conceivable arguments are that the Memo is an "order" or "rule," but those arguments fail. Order "means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making[.]" 5 U.S.C. § 551(6). A rule is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency[.]" 5 U.S.C. § 551(4). These definitions are not broad enough to authorize review over every generalized statement with potential future effect. *Indep. Equip. Dealers*, 372 F.3d at 428; *Fund for Animals*, 460 F.3d at 19.

"[T]he APA's definition of agency action focuses on an agency's determination of rights and obligations." *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (citation omitted). That is, whether the challenged conduct has

a legal effect on third parties or "requires the parties affected to adjust their conduct as soon as the rule is issued." *Fund for Animals*, 460 F.3d at 19. All the identified actions in subsection 551(13) have a legal effect on regulated parties or property, and the words "order" and "rule" should be understood in the same light. *Dubin v. United States*, 599 U.S. 110, 124 (2023) ("a word is known by the company it keeps") (citation omitted). Moreover, each term is limited to "circumscribed, discrete agency actions." *Norton*, 542 U.S. at 62. By contrast, the APA excludes from review actions (like the Memo) that are "legally insignificant," *Indep. Equip. Dealers*, 372 F.3d at 427, "outline the goals or methods of an administrative program," or "involve the common business of managing government programs." *Fund for Animals*, 460 F.3d at 19.

Here, the Secretary's announcement of editorial sideboards on interpretive materials is legally insignificant—and thus not an order or a rule—for two independent reasons. First, Plaintiffs have no rights to specific interpretive materials. *Philadelphia*, 179 F.4th at 186. An interpretive sign's presence or absence therefore has no legal impact on Plaintiffs. Second, adjustments to interpretive materials are the types of day-to-day operational decisions that are excluded from APA review. *See supra p.* 25; *see also Lujan*, 497 U.S. at 899; *Ecology Center v. U.S. Forest Serv.*, 192 F.3d 922, 924-25 (9th Cir. 1999) (monitoring operations required by Forest Plan are unreviewable day-to-day operations); *Sierra Club v. Peterson*, 228 F.3d 559, 565-70 (5th Cir. 2000) (en banc) (holding plaintiffs cannot demand general review of day-to-day agency operations such as the management of national forests and must instead target identifiable actions that

complete a decision-making process); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431-33 (4th Cir. 2019) (manner and means agency circulates information is not agency action nor final agency action under the APA); *Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census*, 945 F.3d 183, 190-92 (4th Cir. 2019) (Census Bureau's census plan (its means and methods) was not final agency action subject to judicial review under the APA).

Under these guideposts, the Memo was no more an order or a rule than an agency official's directive to an employee to hang and maintain recycling signs all around the agency's buildings. That sort of internal directive to agency staff has no relevant legal effect that would make it a rule or order, it fails the "discreteness" requirement, and it is not a "final disposition" of a "matter" in any relevant sense. As in the parallel *Philadelphia* case, "NPS's actions here do not fall within the APA's definition of 'agency action.'" 179 F.4th at 184. *See also supra* pp. 27-30.

*   *   *

If this Court does not order dismissal based on a lack of standing, the lawsuit should end here on lack of final agency action. Absent final agency action, Plaintiffs lack a cause of action under the APA and this Court should remand with instructions to dismiss. Plaintiffs concede this Court has the discretion to review the district court dismissal order on an interlocutory basis, *see* Pls.' Reply in Support of Mot. for Abeyance at 2. Indeed, "[a]ppellate review of the denial of a motion to dismiss as part of an interlocutory appeal from the grant of a preliminary injunction is permissible where the

underlying facts are undisputed, the parties have had a fair opportunity to brief the legal issues, and the court of appeals can resolve the case as a matter of law." *First Med. Health Plan*, 479 F.3d at 50 (citations omitted). All those requirements are met here. The underlying agency action (the Secretary's Memo) is undisputed in its contents. The parties had a full and fair opportunity to brief the government's motion to dismiss, which raised threshold issues about the justiciability of Plaintiffs' APA claims. And the court incorporated its ruling on those threshold issues into its order granting Plaintiffs' preliminary injunction, *see Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 837 F. Supp. 3d 169, 192 (D. Mass. 2026) (JA288). Last, Plaintiffs' APA claims can be resolved as a matter of law. This Court should therefore adopt the Third Circuit's approach in *Philadelphia*, *see* 179 F.4th at 186, and remand with instructions to dismiss.

### C. What the government says to the public in national parks about America is committed to agency discretion by law.

There is more. Plaintiffs' claims also fail because the government conduct that they challenge is "committed to agency discretion by law" and therefore judicially unreviewable under the APA, 5 U.S.C. 701(a)(2). That provision "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). As the district court correctly acknowledged, those categories traditionally encompass "internal agency operations and management decisions," Dismissal Order at 21 (JA253)—for example, the "allocation of funds from a lump-sum appropriation," *Vigil*,

508 U.S. at 192, or "a decision by the Director of Central Intelligence to terminate an employee in the interests of national security," *id.* (citing *Webster v. Doe*, 486 U.S. 592, 599-601 (1988)). These and other matters "ha[ve] traditionally been 'committed to agency discretion'" for "good reasons," including that such decision-making "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities" in policy areas long recognized as "unsuitab[le]" for judicial review. *Id.* at 831-32.

#### 1. The Secretary's Memo concerns only the internal management of the Park Service.

The Secretary's Memo addresses the Park Service's "internal management," Memo at 5 (JA126), and thus involves matters traditionally committed to agency discretion. The Park Service "has traditionally exercised substantial discretion over its interpretive content" since its inception in 1916. Bowron Decl. ¶ 25 (JA117). And courts generally have not "entertained . . . challenges" to the Park Service's internal management. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). To the contrary, the Supreme Court has recognized that the law does not "assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." *Clark v. Cmty. for Creative Non-Violence*,

468 U.S. 288, 299 (1984). The APA does "not contemplate[]" judicial review of claims that "the Secretary had failed . . . to manage the New Orleans Jazz National Historical Park in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz." *Norton*, 542 U.S. at 67 (brackets and quotation marks omitted); *see also Philadelphia*, 179 F.4th at 186 (holding that courts "cannot hear" claims similar to Plaintiffs'); *Wilderness Society*, 434 F.3d at 596 (holding that the Park Service's "internal directives" are not "judicially enforceable at the behest of members of the public who question the agency's management"). The district court even acknowledged the dearth of prior "cases that involve similar facts," Dismissal Order at 24 (JA256), which underscores that courts traditionally have not considered such claims.

This case in particular falls in the heartland of Section 701(a)(2)'s review bar because Plaintiffs' challenges to the Park Service's internal management specifically concern the content of government speech, a related (and overlapping) category long committed to agency discretion. "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. That must be true for government to work." *Shurtleff v. City of Bos.*, 596 U.S. 243, 251 (2022) (citation omitted); *see Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024) ("[T]he government could barely function otherwise.").

As particularly relevant here, "[g]overnments have long used monuments to speak to the public," including "throughout our Nation's history," and the Supreme Court has emphasized "the obvious proposition that a monument that is commissioned

and financed by a government body for placement on public land constitutes government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470-471 (2009). That history and tradition underscores that the proper remedy for Plaintiffs' "object[ions]" to Park Service speech lies with "the electorate and the political process," not the judiciary. *Id.* at 468-69 (quoting *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)). But the district court's contrary ruling defied that history and bizarrely mislabeled as "censorship," Prelim. Inj. at 3 (JA268), the government's traditional and essential discretion over its *own* (not private) speech—including its prerogative *not* to speak on "sensitive" and "controversial subjects such as climate change," *Janus v. AFSCME*, 585 U.S. 878, 913 (2018). That improper judicial intrusion into executive discretion "broke with tradition, case law, and sound reasoning." *Chaney*, 470 U.S. at 831.

**2. No meaningful standards govern judicial review of the Secretary's Memo.**

The Memo is also unreviewable because no statute supplies an "adequate standard of review for such agency action," *Vigil*, 508 U.S. at 191-192, which is another factor "confirm[ing]" its commitment to agency discretion, *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 282. The Park Service routinely develops, revises, and replaces innumerable signs, plaques, exhibits, and publications as part of the ordinary business of managing the Nation's hundreds of units of the national park system, as it has for more than a century. Subjecting each of those discretionary decisions to APA review

would grind park management to a halt. While Plaintiffs would demand the installation of, *e.g.*, signs at Little Bighorn negatively "describing the United States being 'hungry for gold and land,'" Prelim. Inj. at 18 (JA283), other plaintiffs of different ideological stripes would demand those signs' removal with equal fervor. Because there is "no basis on which a reviewing court could properly assess" such competing value judgments, *Webster*, 486 U.S. at 600, the law traditionally and sensibly entrusts those public-policy choices to the politically accountable Executive Branch, not to the courts at the behest of private plaintiffs.

Nor has Congress "indicated otherwise" by "suppl[ying] sufficient standards to rebut the presumption of unreviewability" over Plaintiffs' claims challenging the Park Service's traditional discretion to manage its own speech. *Chaney*, 470 U.S. at 833, 838. As courts have long recognized, the Park Service's "Organic Act is silent as to the specifics of park management" and grants the Secretary "especially broad discretion on how to implement his statutory mandate." *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000).

The first provision of the Organic Act on which Plaintiffs rely, 54 U.S.C. 100101(a), merely directs the Secretary "[i]n general" to "promote and regulate the use of the National Park System" in conformity with its "purpose" to "conserve the scenery, natural and historic objects, and wild life." *Id.* (capitalization omitted). That provision is "not addressed to" government speech and thus is "simply irrelevant to the agency's discretion" in this traditionally unreviewable area. *Chaney*, 470 U.S. at 836-37.

Section 100101(a)'s "conservation mandate" cannot plausibly be read to require browbeating visitors to national parks about "climate change," *contra* Prelim. Inj. at 43, 46 (JA308, 311), and other "sensitive political topics" having nothing to do with their own use of the parks, *Janus*, 585 U.S. at 914.

And insofar as the court went even further and suggested that the conservation mandate has anything to do with the President's policies to promote the "dignity" of American "history"—the key focus of Plaintiffs' claims, Prelim. Inj. at 2 (JA267)—that distorts the statute beyond all recognition. *See Latschar*, 202 F.3d at 365; *Organized Fishermen v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985) ("The task of weighing the competing uses of federal property has been delegated by Congress to the Secretary of the Interior."). The handful of statutory provisions invoked by Plaintiffs which either fail to "mention" the Park Service's government speech or do so "only in general terms," *Vigil*, 508 U.S. at 194, are not to the contrary: None of them could be read to constrain the Secretary from ordering removal of "false," "inappropriate[]," and "improper" materials in national parks. Memo at 2 (JA123); Prelim. Inj. at 45-46 (JA45-46).

The district court also erroneously inferred constraints from the agency's own nonbinding "guidance" documents. Prelim. Inj. at 43, n.6; *id.* at 43-52 (JA308-17). That contravenes *Chaney*'s rejection of similar documents as "singularly unhelpful" for these purposes, where the relevant inquiry is whether "Congress has provided [courts] with 'law to apply.'" 470 U.S. at 834, 836; *see id.* at 834 (the decision whether to "withdr[a]w

discretion from the agency" is "in the first instance for Congress"). As the Supreme Court explained, an agency's guidance document cannot "plausibly be read to override the agency's express assertion of unreviewable discretion" where, as here, it merely "describ[es] agency policy"—even "leaving to one side" the more fundamental question whether *any* agency document (even a "properly adopted agency rule") could ever "provide courts with adequate guidelines for informed judicial review." *Id.* at 836. Regardless, "even under the policy statement[s] cited by" the district court, it remains "clear that [the Park Service] has wide discretion" in this area. *Wilderness Society*, 434 F.3d at 593.

The district court further erred in holding that "the Centennial Act unambiguously requires the Park Service to incorporate diverse viewpoints into its interpretation and education program." Prelim. Inj. at 46 (JA311). That Act's operative provision merely directs the Secretary to ensure that national parks use the "highest quality" interpretation and education. 54 U.S.C. § 100802. Neither that provision nor the accompanying definition section so much as mentions diverse viewpoints, *see* 54 U.S.C. §§ 100801(1) and (2)—let alone purports to curtail the Park Service's traditional "right to 'speak for itself,'" *Summum*, 555 U.S. at 467. This "quality" mandate simply does not speak to the subjects of Plaintiffs' claims: The prior administration thought it was high-quality to expose visitors to diverse views and "marginalized voices," *see* Prelim. Inj. at 6 (JA238); the current Administration thinks it is inadvisable to burden visitors with ideological topics unrelated to the primary purpose of park sites; and the

statute provides courts no standard to referee that policy disagreement. Moreover, even leaving aside disputes over diversity, nothing in the statute can plausibly be read to compel government speech about climate change.

The district court also misread 54 U.S.C. § 100803, a neighboring provision in the Centennial Act, which provides only that the Secretary "may" undertake a program to "reflect different cultural backgrounds," among other considerations. Because that provision "is written in permissive language" and undisputedly "contains no enforceable duties," it *enhances*—not constrains—the Park Service's traditional discretionary authority in this area. Prelim. Inj. at 47, n.7 (JA312); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) ("As this Court has repeatedly observed, the word 'may' *clearly* connotes discretion.") (brackets and quotation marks omitted). As the Supreme Court explained in *Chaney*, a provision that "provides only that 'the Secretary is *authorized*'" to exercise certain powers entrusts "complete discretion to the Secretary to decide how and when they should be exercised." 470 U.S. at 835 (brackets omitted).

"For substantially similar reasons," the district court erred in concluding that the Omnibus Management Act relevantly constrains the Park Service's discretion over the subject of Plaintiffs' claims. Prelim. Inj. at 52 (JA317). That Act simply encourages the Secretary to use "state-of-the-art management," 54 U.S.C. 100701, and "the highest quality science and information," 54 U.S.C. § 100702. Again, nothing in those general directives purports to curtail the agency's discretion by imposing the viewpoint-based mandates on government speech that Plaintiffs seek. The court's contrary interpretation

of this statute merely "repeat[ed]" its erroneous analysis of the partially analogous Centennial Act. Prelim. Inj. at 52 (JA317). In sum, the district court's strained reading of the statutes governing the Park Service did not justify its usurpation of that agency's traditional discretion over its own government speech. The agency's choices here are policy judgments committed to the democratically elected Executive, not the stuff of federal lawsuits. The district court lost sight of that fundamental principle.

**D. The Secretary's Memo is lawful.**

Even assuming the Memo is reviewable, the government is still likely to succeed on appeal because the Memo is neither contrary to law nor arbitrary and capricious.

The Memo is not contrary to law. Because Plaintiffs challenge the facial validity of the Memo —and not a specific application of it—they must show that the Memo is contrary to law "in all its applications." *Am. Hosp. Ass' v. NLRB*, 499 U.S. 606, 619 (1991). The court ignored this framework, in part, because the Memo has been implemented and "Plaintiffs allege dozens of existing removals" under the Memo. Prelim. Inj. at 42 (JA309). But Plaintiffs did not challenge any of those individual removals. Having chosen to frame their complaint as a facial challenge to the Memo, they must show that the Memo is facially invalid.

It is not. As explained above, all three statutes—the Centennial Act, the Omnibus Management Act, and the National Park Service Organic Act—delegate significant discretion to the agency. None dictate the substance of any interpretive materials. None bar the Secretary from starting a process to review interpretive

materials and providing guidance for that review. The district court's decision is essentially grounded in subjective disagreement over the content of government speech, not clear statutory violations:

> "These climate-related interpretive materials further the Organic Act's conservation mandate by fostering public awareness and informing visitors about environmental degradation and the threats facing protected ecosystems, landscapes, and other park resources." *Id.* at 45 (JA310).
>
> "NPS' interpretation and education program must incorporate marginalized voices in telling a full history." *Id.* at 48 (JA313).
>
> The Memo "fosters alienation and disengagement by removing a source of potential connection that diverse communities could form with park resources." *Id.* at 49-50 (JA314-15).
>
> "[T]he Government's actions do exactly what they profess to counteract, dismantling objective historic truths and permanently damaging public memory." *Id.* at 53 (JA318).

These are policy judgments about government speech; these statements do not establish any inconsistency with the broad directions set forth in the laws governing the Park Service.

The government is also likely to prevail on the merits of Plaintiffs' laundry list of APA claims because the Memo reflects a policy choice concerning government speech that is not arbitrary and capricious. Among other things, Plaintiffs identified no meaningful standard for the court to apply, *see supra* at pp. 37-42, and they do not show that the Secretary ignored any important consideration. Their primary objections are to the premise of the Memo, but Plaintiffs' disagreement with the President's "policy

judgment" is not a basis to invalidate the Memo as arbitrary and capricious. *WorldCom, Inc. v. FCC*, 238 F.3d 449, 458 (D.C. Cir. 2001).

Plaintiffs also alleged that the government should have accounted for their reliance interest. While an agency must usually "consider serious reliance interests" when changing existing policies, *see Doe v. Noem*, 152 F.4th 272, 289 (1st Cir. 2025) (quotation omitted), Plaintiffs cite nothing to support the premise that they have a reliance interest in particular government speech. And they fail to show any such interests or how they would suffer a hardship such that that they can no longer rely on the Park Service. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31 (2020). The Memo reflects policy judgment and starts a process; it makes no factual findings that would be subject to challenge. Nor have Plaintiffs shown a prior policy document inconsistent with the Memo—there was accordingly no need for the government to explain any change in position.

## II. Plaintiffs have not shown irreparable harm.

The district court clearly erred in determining that Plaintiffs likely would suffer irreparable harm absent the preliminary relief at issue. *See Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85-86 (1st Cir. 2022). Irreparable harm is a prerequisite for preliminary injunctive relief of the sort that the plaintiffs sought from the district court. *See id.*; *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004); *see also* 5 U.S.C. § 705 (authorizing postponement of agency action "to prevent irreparable injury").

The plaintiffs had the "burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm squarely upon [them]," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996), and that "irreparable injury is likely in the absence of an injunction," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (citing *In re Rare Coin Galleries of Am., Inc.*, 862 F.2d 896, 902 (1st Cir. 1988)).

Plaintiffs have failed to establish irreparable harm warranting a preliminary injunction. This Court has already found that the district court likely erred in finding that the Park Service's removal of interpretive materials "constitutes government erasure and rejection of [people's] histories" because that finding "is not sufficiently connected to any specific harms likely to be experienced by the plaintiffs" caused by the Memo. *Nat'l Parks Conservation Ass'n*, 180 F.4th at 353. Only one of Plaintiffs' members alleges any plans to visit specific parks, and the Park Service's declaration showed that no changes have been made to the interpretive materials at those parks. *Id.*; *see* Bowron Decl. ¶ 27 (JA118). Plaintiffs also "do not explain how their claims of mission frustration, diversion of resources from core functions, and postponement of long-term projects are linked to" the Memo's "specific directives" or any "specific actions taken to implement it." *Id.* at 353. And their claims of "chilled expression and undermined professions and professional reputations rest on inferences and extrapolations without reference to the specific provisions" that allegedly caused such harms. *Id.* Finally, their claims of "reduced membership or participation" due to an

alleged fear of association with their opposition to Administration policies "amount to 'speculation about the unfettered choices made by independent actors'" with no evidence tying these choices to the challenged Memo. *Id.* (quoting *Alliance*, 602 U.S. at 383).

In addition, Plaintiffs' unexplained failure to seek preliminary injunctive relief for nine months after the Secretary's Memo fatally undercuts the district court's conclusion that Plaintiffs harm is irreparable. Prelim. Inj. at 56 (JA321). The "party requesting a preliminary injunction must generally show reasonable diligence," and Plaintiffs' "unnecessary . . . delay in asking for preliminary injunctive relief" may independently foreclose that relief "[e]ven if" their claims are "likely to succeed on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158-60 (2018) (per curiam). Plaintiffs' proven ability to live with the Memo for many months, while they failed to "act[] with particular haste" to seek relief, strongly "counsels against a finding of irreparable harm" to Plaintiffs at this late date. *Id.; cf. Winter.*, 555 U.S. at 23 (holding that the equitable factors "alone require[] denial of the requested injunctive relief").

The district court dismissed Plaintiffs' delay due to "expanded removal efforts in early 2026," which supposedly provided new impetus for Plaintiffs to sue. Prelim. Inj. at 56 (JA321). But the record undisputedly shows that "no interpretive materials have been removed from" the park sites that Plaintiffs' declarant identified as the source of her injuries based on her plans to visit those sites. Dismissal Order at 14 (JA246); *see also supra* p. 15 (explaining that Plaintiffs lack standing for the same reasons). The court also erroneously discounted Plaintiffs' delay because the Memo "identifies 'July 4, 2026,

the 250th anniversary of the signing of the Declaration of Independence' as a key upcoming milestone." Prelim. Inj. at 56 (JA321). But that date has no relevance to the provisions of the Secretary's Memo on which Plaintiffs' claims rest; it pertains only to a separate, site-specific portion of the Order directing improvements by July 4 to "Independence National Historical Park" in Philadelphia. Memo at 1-3 (JA122-24).

Delay aside, Plaintiffs' ethereal asserted injuries do not amount to the kind of "strong showing of irreparable harm" supporting extraordinary equitable relief. *Cf. Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026) (per curiam). Plaintiffs primarily allege "aesthetic, recreational, and informational harms" that are admittedly "nonquantifiable," such as putative threats to one of their members' use of "interpretive materials at park sites as a primary source of educational material for her school-aged children." Prelim. Inj. at 54-55 (JA319-20). But again, no material has been removed from the sites that member plans to visit, *see* Dismissal Order at 14-15 (JA246-47), and regardless, Plaintiffs (and anyone else) remain free to visit any national park and teach their children whatever they wish. Plaintiffs also assert that they have "diverted resources to respond to member concerns about the impact of the Secretary's Order," *id.* at 11—even though the Supreme Court recently held that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance*, 602 U.S. at 394. Whether Plaintiffs can establish Article III standing (they cannot), their weak record evidence and questionable theories of

abstract harm cannot carry their heavy burden to justify the "extraordinary" relief of a preliminary injunction, *Winter*, 555 U.S. at 24, let alone overcome the serious irreparable harms to the government warranting a stay pending appeal.

## III. The remaining injunction factors favor the government.

The district court also abused its discretion in finding that the remaining preliminary injunction factors favor Plaintiffs—i.e., "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies[,]" *see Nken v. Holder*, 556 U.S. 418, 426 (2009). As this Court noted in granting a stay, "the entry of an unsupported order staying the enforcement and enjoining implementation of the challenged agency directive constitutes a form of irreparable injury." *See Nat'l Parks Conservation Ass'n*, 180 F.4th at 354 (citing *District 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021)). "And the injunction further directs the [Park Service] to undertake a burdensome reinstallation and restoration project in short order." *Id.*

Absent the existing stay, the government will be irreparably harmed by the district court's injunction. The injunction blocks and commandeers the Executive Branch's traditional, congressionally sanctioned prerogatives of government speech on its own property nationwide, compelling the Park Service to parrot Plaintiffs' preferred policy messaging at the expense of the democratically elected political branches. That is a textbook example of an "improper intrusion by a federal court into the workings

of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

Any time the government is enjoined from carrying out its responsibilities under "statutes enacted by representatives of [the] people, it suffers a form of irreparable injury." *Trump v. CASA*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). And that injury is particularly acute where, as here, a court improperly countermands government speech by "enjoin[ing] enforcement of an Executive Branch policy . . . concerning a Government document" (here, numerous documents) communicating on behalf of the government. *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (granting stay of preliminary injunction rewriting passport information). But the district court gave short shrift to those weighty separation-of-powers harms, dismissing them in a conclusory three-sentence paragraph failing to address (or even acknowledge) the key issues. Prelim. Inj. at 59 (JA324).

The district court compounded those harms by imposing enormous and unjustified administrative burdens on the government. After the nine months Plaintiffs took to seek injunctive relief, and the additional three months before the court's ruling, the court imposed a 21-day fire-drill deadline for Plaintiffs to undo more than a year's worth of policy changes across 433 park sites nationwide. That deadline would have been "exceedingly burdensome" for the Park Service, taxing its "limited" resources in many respects that the district court did not account for. 2d Bowron Decl. ¶¶ 6-20. Moreover, the court's intrusive micromanagement of the Park Service's compliance,

including demands for frequent status reports down to the level of individual "poster[s]" disrupts the agency's "continual efforts to review and update interpretive materials" and interferes with administrative operations more broadly. *Id.* ¶ 20. Finally, the injunction's 21-day deadline was particularly inequitable because Plaintiffs never asked for it. Rather, the district court invented it sua sponte on plainly improper grounds, contravening "the principle of party presentation." *Margolin v. National Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) (citing *Clark v. Sweeney*, 607 U.S. 7, 9-10 (2025) (per curiam)).

That judicial "takeover" of the parties' dispute is reversible error, *United States v. Sineneng-Smith*, 590 U.S. 371, 379 (2020), particularly in the context of a preliminary injunction requiring notice and an opportunity to be heard, *see* Fed. R. Civ. P. 65. And the district court's desire to use this case to respond to the Administration's political messaging is not even a legitimate ground for judicial decision, much less a justification to depart from party presentation.

* * *

## CONCLUSION

For all these reasons, the Court should reverse and remand with instructions to dismiss Plaintiffs' claims.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

/s/ *Christopher C. Hair*
ROBERT J. LUNDMAN
CHRISTOPHER C. HAIR
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9583
christopher.hair@usdoj.gov

DJ 90-1-4-18118
October 23, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,896 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

/s/ *Christopher C. Hair*
Christopher C. Hair

Counsel for Federal Appellants

October 23, 2026

# ADDENDUM


June 4, 2026, Memorandum and Order (Dkt. 37) .......... 1

June 12, 2026, Memorandum and Order (Dkt. 41) .......... 31

5 U.S.C. § 551 .......... 94

5 U.S.C. §§ 704-706 .......... 94

52 U.S.C. § 100101 .......... 96

54 U.S.C. §§ 100701-100702 .......... 96

54 U.S.C. §§ 100802-100802 .......... 97

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director,

Defendants.

Civil Action No. 1:26-CV-10877-AK

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**ANGEL KELLEY, D.J.**

Six plaintiff organizations—National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks ("Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS")—filed this action under the Administrative Procedure Act ("APA") against Defendants Department of the Interior, Secretary of the Interior Doug Burgum, the National Park Service ("NPS"), and Director

of the Secretary of the Interior Jessica Bowron, claiming that Defendants' removal of certain displays at National Park sites is arbitrary and capricious, contrary to law, and in excess of statutory authority. Plaintiffs move for a stay under Section 705 of the APA or, in the alternative, a preliminary injunction to restore the sites as they existed prior to Defendants' actions. Defendants filed a consolidated Opposition and Motion to Dismiss, asserting challenges to standing, venue, ripeness, and APA reviewability, and arguing that Plaintiffs fail to state a claim. For the following reasons, Defendants' Motion to Dismiss is **DENIED**.

As for Plaintiffs' Motion for a Stay, the Court notes that motions to dismiss and for preliminary injunctive relief present distinct legal standards and involve different factual and equitable considerations. Accordingly, the Court will address the Motion for a Stay in a separate Order to ensure the application of the proper standard for each Motion.

## I. BACKGROUND

Unless stated otherwise, all facts are drawn from Plaintiffs' Amended Complaint. Along with their Motion to Stay, Plaintiffs submitted various declarations and exhibits, including standing affidavits from their individual members. Defendants do not contest the veracity or authenticity of Plaintiffs' attachments, and so the Court considers them merged into the pleadings for purposes of this Motion. See Watterson v. Page, 987 F.2d 1, 4 (1st Cir. 1993).

Established in 1916, NPS is a bureau within the Department of Interior that oversees the National Park system. Congress created NPS through the National Park Service Organic Act ("Organic Act"), with a statutory mandate to "conserve the scenery, the natural and historic objects, and wild life [in National Park sites] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Pursuant to this

mandate, NPS manages hundreds of parks, monuments, memorials, and recreation areas (collectively, "park sites") across the United States, which collectively host hundreds of millions of visitors each year. To enrich visitors' experience, the agency provides various educational and interpretive information providing details and context for each park site, including exhibits, interpretive waysides, bookstores, booklets, brochures, and other publications. The history, quality, and scale of these educational materials have established the National Parks system's reputation as "America's largest classroom."

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring Truth and Sanity to American History." The Executive Order directed the Secretary of the Interior to review all "public monuments, memorials, statues, markers, or similar properties" (collectively, "interpretive materials") at park sites and remove any that met certain characteristics. Specifically, the Executive Order states:

> Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light. Under this historical revision, our Nation's unparalleled legacy of advancing liberty, individual rights, and human happiness is reconstructed as inherently racist, sexist, oppressive, or otherwise irredeemably flawed. Rather than fostering unity and a deeper understanding of our shared past, the widespread effort to rewrite history deepens societal divides and fosters a sense of national shame, disregarding the progress America has made and the ideals that continue to inspire millions around the globe.

Exec. Order. No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

To effectuate this mission, the Executive Order directed the Secretary of the Interior to take three actions:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;

> (ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. § 1451 *et seq.*, 54 U.S.C. § 100101 *et seq.*, and other applicable law; and
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Id. § 4.

Two months later, on May 20, 2025, the Secretary of the Interior implemented these directives by issuing Secretary Order 3431, likewise titled "Restoring Truth and Sanity to American History" ("Secretary's Order"). Two sections of the Secretary's Order are relevant to this case. First, Section 5 directed NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, "Land Management Bureaus") to conduct the reviews mandated by the Executive Order. It established a two-step review plan. During the initial thirty-day phase, the Land Management Bureaus were to review and remove any interpretive materials that had been "removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology" since January 1, 2020. During the next phase, the scope of review broadened to all park sites, with the agencies directed to review and remove any interpretive material that "inappropriately disparages Americans past or living . . . or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature" or is otherwise "inconsistent with the purpose of" the Executive Order. This phase was to be completed within 120 days. In addition to the review process set out in Section 5, Section 6 of the Secretary's Order directed the Land Management Bureaus to post quick response ("QR")

codes at park sites soliciting help from visitors in identifying content that allegedly violated the Executive Order. NPS compiled a database of public comments submitted through the QR codes.

In Summer 2025, in compliance with the Secretary's Order, NPS staff began removing material. Defendants also instituted various internal efforts to speed up removals, leading to a significant escalation in early 2026. For example, in August and September 2025, Bowron sent letters to park sites that allegedly failed to remove signs as a notice of their "non-compliance," and in November 2025, Bowron issued a separate order to expand the scope of review to include retail items.

These efforts proved fruitful. By early 2026, NPS had removed or identified for removal hundreds of interpretive materials from park sites. By the date of the filing of this action, removed material included, *inter alia*, exhibits at California Golden Gate National Park describing NPS' historical role in eugenics movements and Indigenous history; exhibits at the New York Gateway National Recreation Area concerning climate change, women's rights, slavery, and Japanese internment during World War II; signs from Independence National Historical Park in Philadelphia explaining enslaved people's role in operating the house during George Washington's presidency; films on labor history at Lowell National Historical Park in Massachusetts; signs describing climate change and its impact on glaciers at Glacier National Park in Montana; and an image at Sunset Crater Volcano National Monument in Arizona of a visitor holding a Pride flag. In addition to materials that have already been removed, hundreds of others have been flagged for removal. This includes, *inter alia*, civil rights-related exhibits at the Emmett Till and Mamie Till-Mobley National Monument; over thirty plaques and signs at Harpers Ferry National Historic Park detailing the history of slavery and abolitionism;

interpretive materials across the country describing the mistreatment of Indigenous groups; and signs providing scientific information about air pollution, the effects of industrialization on wetlands, global warming, the dangers of grazing, and endangered species. According to an internal NPS database leaked by anonymous civil servants on March 2, 2026, over five hundred items have been identified for review.

Plaintiffs filed this action on February 17, 2026, arguing that Defendants' actions are arbitrary and capricious, contrary to law, and in excess of statutory authority under the APA, 5 U.S.C. § 706, and seeking declaratory and injunctive relief. For their APA claims, Plaintiffs allege violations of five statutes: the National Park Service Centennial Act ("Centennial Act"), 54 U.S.C. §§ 100801-100803, the Organic Act, 54 U.S.C. § 100801, the National Parks Omnibus Management Act ("Omnibus Management Act"), 54 U.S.C. §§ 100701-100702, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.* On March 18, 2026, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. On April 8, 2026, Defendants filed a consolidated Opposition and Motion to Dismiss, asserting that Plaintiffs lack standing, the claims are not ripe, venue is improper, the claims are not judicially reviewable under the APA, and that Plaintiffs fail to state a claim. The Court held a Status Conference with the parties on May 12, 2026. After conferring with the parties, the Court determined to decide the Motion to Dismiss on the papers and without oral argument.

## II. LEGAL STANDARD

Defendants bring both jurisdictional challenges to Plaintiffs' claims, which the Court construes as brought pursuant to Federal Rules of Civil Procedure 12(b)(1), and plausibility challenges under Rule 12(b)(6). "When faced with motions to dismiss under both 12(b)(1) and

12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) aff'd, 672 F.3d 64 (1st Cir. 2012). Whether evaluating a motion brought under Rule 12(b)(1) or 12(b)(6), the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2008)). A complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (internal citation omitted). A court may not disregard properly pleaded factual allegations even if "actual proof of those facts is improbable." Ocasio-Hernandez, 640 F.3d at 12 (quoting Twombly, 550 U.S. at 556). Rather, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Id. at 13. In making that determination, a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein, and facts susceptible to judicial notice. Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

## III. DISCUSSION

Defendants raise several threshold jurisdictional challenges, contending that: (1) Plaintiffs lack standing to bring their claims, (2) the claims are not ripe for review, (3) the Secretary's Order is not subject to judicial review under the APA because it is not a final agency

action and because it is committed to agency discretion, and (4) all non-Massachusetts-based Plaintiffs should be dismissed for improper venue. In addition, Defendants argue that Plaintiffs fail to state a claim under Rule 12(b)(6). The Court addresses each argument in turn, beginning with the jurisdictional challenges.

**A. Article III Standing**

At the outset, Defendants contend that Plaintiffs have not established standing. To plead standing, a plaintiff must demonstrate (1) he has suffered "injury in fact," (2) the injury is "fairly traceable" to the actions of the defendant, and (3) the injury will likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). A plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 434 (2017). In a multi-plaintiff suit, only one plaintiff needs to meet the standing requirements for the case to proceed. Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Rumsfeld v. Forum for Acad. & Institutional Rts., Inc., 547 U.S. 47, 52, n.2 (2006)). An organization (as opposed to an individual) can establish standing in two ways: first, an organization can sue for harm to its own interests under a theory of organizational standing; and second, an organization may sue in a representative capacity for harm impacting its individual members under a theory of associational standing. See Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). Here, Plaintiffs assert they have standing under both theories.

**1. Organizational Standing**

The standard for organizational standing is the same as "the usual standards for injury in fact, causation, and redressability that apply to individuals." FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 393-94 (2024). Defendants argue that Plaintiffs have failed to

demonstrate the first element of injury-in-fact because their only alleged harm is resource diversion, and, according to Defendants, the Supreme Court in Alliance for Hippocratic Medicine held that resource diversion can essentially never constitute injury-in-fact outside of the narrow factual circumstances recognized in Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). This Court disagrees.

For an organization to demonstrate injury-in-fact, the defendant's actions must have caused an injury to the organization's activities that is "more than simply a setback to the organization's abstract social interests." Nat'l Ass'n of Consumer Advocates v. Uejio, 521 F. Supp. 3d 130, 142 (D. Mass. 2021). This is "not a demanding standard," as "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." Id. Theories of harm based on diverting organizational resources to issue advocacy or lobbying activities are insufficient to establish standing. Alliance, 602 U.S. at 393-94; see also Equal Means Equal v. Ferriero, 3 F.4th 24, 30 (1st Cir. 2021).

Here, Plaintiffs allege concrete injuries to their core activities that extend beyond resource diversion. For example, NPCA alleges they have historically hosted site visits, educational programming, and events at park sites that focus on topics such as marginalized groups and civil rights. Because of the removal of interpretive materials related to these topics, it is plausible that NPCA can no longer host these events at the sites without sacrificing the quality of the programming. See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding organizational standing where agency "deprived [the organization] of key information that it relies on to educate the public"). Similarly, SEGD alleges that they use interpretive materials from park sites for internal training materials and as reference guides. As these materials are being removed, SEGD's ability to rely on them for

training is reduced. As another example, ANPR hosts activities and conferences for its members, who are primarily current and former National Park Rangers. ANPR alleges that because of the policies in the Secretary's Order, attendance at these events has decreased, thus also reducing their revenues. See Am. Ass'n of Univ. Professors v. Rubio, 780 F. Supp. 3d 350, 380 (D. Mass. 2025) (finding organizational standing where agency action deterred members from participating in organization's activities). Because these harms involve Plaintiffs' core organizational activities, Plaintiffs have plausibly alleged injury-in-fact.

Even to the extent Plaintiffs cite resource diversion as a basis for standing, their arguments are not foreclosed by Alliance. Defendants' reading—that Alliance essentially precludes *any* form of resource diversion as constituting injury-in-fact—is overly broad. The defect in the plaintiff-organizations' standing theory in Alliance was that the activities solely comprised issue advocacy and lobbying in opposition to the challenged agency action. See 602 U.S. at 394. These activities—including compiling pro-life studies, "drafting citizen petitions," and "engaging in public advocacy and public education" campaigns—arose only after, and directly in response to, the Food and Drug Administration's approval of an abortion medication. Id. The Supreme Court explained that recognizing such expenditures as an injury-in-fact would permit an organization "to challenge almost any federal policy that they dislike, provided they spend a single dollar opposing those policies." Id. at 395.

But the principle that a plaintiff may not "manufacture" standing by voluntarily expending resources opposing a governmental action through lobbying or advocacy does not extend to cases in which a plaintiff is compelled to divert resources to counteract the effects of a government action on its existing operations and members. See id. (discussing Havens Realty, 455 U.S. at 379, in which the Supreme Court found standing where organization diverted

resources to counteract discriminatory steering practices, detracting from their ability to provide affordable housing counseling and referral services). Indeed, other courts in this district assessing organizational standing have rejected the interpretation of Alliance that Defendants urge. See, e.g., Presidents' All. v. Noem, 2026 WL 788185, at *8-9 (quoting Town of Milton v. Fed. Aviation Admin., 87 F.4th 91, 99 (1st Cir. 2023)) (finding standing where organization diverted resources to respond to member questions regarding federal government visa revocations); Am. Acad. of Pediatrics v. Kennedy, 814 F. Supp. 3d 150, 159-60 (D. Mass. 2026) (same for member counseling regarding federal government's changes to COVID vaccine recommendations).

Here, unlike the organizations in Alliance, at least some of Plaintiffs' resource diversion is allegedly intended to address the Order's negative effects on existing activities and members. For example, Plaintiffs allege that they have diverted resources to respond to member concerns about the impact of the Secretary's Order on their careers and ethical standards for historical interpretation. Due to the time and resource investment required to respond to these inquiries, Plaintiffs' ability to pursue other core activities like organizing events, providing member services, and promoting research initiatives and reports has been stymied. Plaintiffs' allegations are thus distinguishable from the advocacy and lobbying activities in Alliance and are sufficient to establish injury-in-fact. See Kennedy, 814 F. Supp. 3d at 159 (holding that organization's "diver[sion of] resources away from its usual tasks and initiatives aimed at children's health" constituted "sufficient injury to [its] core business activities for the purposes of organizational standing").

In addition to their broader injury-in-fact challenges, Defendants independently argue that Plaintiffs' Paperwork Reduction Act claim should be dismissed for failure to demonstrate

injury-in-fact. According to Defendants, Plaintiffs have failed to allege any actual injury resulting from Defendants' purported failure to follow the statute's procedural requirements. However, at least one court has held that the federal government's failure to follow the Paperwork Reduction Act's procedures can cause informational injury. In Doctors for America v. Office of Personnel Management, 766 F. Supp. 3d 39 (D.D.C. 2025), a nonprofit organization representing health care professionals brought claims against the Office of Personnel Management under the Paperwork Reduction Act, contending that the agency failed to follow the statute's notice requirements prior to terminating public webpages hosted by the Centers for Disease Control ("CDC"), which contained certain medical information. Id. at 52. The court granted a preliminary injunction in favor of the plaintiff, finding that the organization's individual members had established standing. Id. at 47-49. Specifically, the court explained that the physician affiants "regularly rel[ied]" on information the CDC publishes and that "alternatives are limited." Id. at 48. As a result, "[t]he denial of 'information' these doctors 'wish[ed] to use in their routine' activities ha[d] 'inhibit[ed] . . . their daily operations' and thereby caused 'an injury both concrete and specific to the work in which they are engaged.'" Id. (quoting People for the Ethical Treatment of Animals, 797 F.3d at 1094).

Here, like the plaintiff in Doctors for America, Plaintiffs have plausibly alleged that Defendants have caused them informational injury by removing the interpretive materials without notice and depriving them of the content therein. As explained, Plaintiffs allege that historically, they regularly relied on interpretive materials at park sites for internal training, events, site visits, and education, and that the removal of these materials has disrupted such activities. Thus, Plaintiffs have adequately alleged injury-in-fact as to their Paperwork Reduction Act claims.

Accordingly, Plaintiffs have pleaded sufficient facts to meet the requirements of organizational standing. And because at least one Plaintiff has demonstrated standing, all Plaintiffs may proceed with the action.

**2. Associational Standing**

Having found that Plaintiffs have demonstrated organizational standing, the Court is not required to address associational standing. See, e.g., President & Fellows of Harvard Coll. v. U.S Dep't of Health & Hum. Servs., 798 F. Supp. 3d 77, 114 (D. Mass. 2025). But "[b]ecause the Plaintiffs' standing theories may affect the relief this Court can offer, this Court proceeds to analyze associational standing as well." Kennedy, 814 F. Supp. 3d at 161 (quoting Rubio, 780 F. Supp. 3d at 379).

Two Plaintiffs—NPCA and AASLH—claim associational standing in addition to organizational standing. To establish associational standing, an organization must demonstrate (1) at least one of its members "would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Council of Ins. Agents & Brokers v. Juarbe-Jimenez, 443 F.3d 103, 108 (1st Cir. 2006) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)). Defendants challenge only the first element, contending that the NPCA's and AASLH's members have failed to establish standing in their own right. As explained below, the Court finds otherwise.

First, NPCA member Jennifer Goepfert asserts that the Secretary's Order jeopardizes her ability to continue using park sites to educate her homeschooled children on topics such as science and history. She describes how she derived aesthetic value from the park sites as they existed before the Order, and that her future uses would be diminished by continued

implementation of the removal plan. Defendants contend that Goepfert has failed to demonstrate injury-in-fact because her alleged harms are insufficiently imminent.

To show injury-in-fact, a plaintiff must show the injury is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Sea Shore Corp. v. Sullivan, 158 F.3d 51, 55 (1st Cir. 1998) (quoting Lujan, 504 U.S. at 560). Defendants do not contest that the alleged harms are concrete and particularized, instead raising arguments primarily as to imminence. To show imminence in a case where equitable or declaratory relief is sought, as is the case here, a plaintiff must show "a real and immediate threat" that he will suffer a future injury; a prior injury will not suffice. Gray v. Cummings, 917 F.3d 1, 19 (1st Cir. 2019); Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (citing Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)). The threatened injury must be "certainly impending," or there must be a "substantial risk" that the alleged injury will occur. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014); see also Berner v. Delahanty, 129 F.3d 20, 24 (1st Cir. 1997) (concluding that plaintiff had standing to pursue injunctive relief where he "face[d] a realistic risk of future exposure to the challenged policy").

Here, Goepfert's alleged injuries are sufficiently imminent to constitute injury-in-fact. She alleges she has visited at least 66 park sites, and that these visits are a regular and significant part of her parenting method and lifestyle. Moreover, she alleges specific plans to take her children to visit various park sites in Summer 2026, including the Brown v. Board of Education National Historical Park, Hot Springs National Park, and Little Rock Central High School—sites where signs have been flagged for removal. While Defendants highlight that no interpretive materials have been removed from these three park sites to date, as implied by the word "imminent," a harm need not have already occurred to constitute injury-in-fact. See Gray, 917

F.3d at 19. It is reasonable to infer that removal could occur soon given these park sites are flagged, and similar materials have already been removed from dozens of other park sites over the past year. See Massachusetts v. HHS, 923 F.3d 209, 225 (1st Cir. 2019) ("[A] plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about'" (citation omitted)); cf. N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 50 (1st Cir. 2021) ("[H]istory of past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (citation omitted)). Thus, Goepfert's alleged injuries are sufficiently imminent to constitute injury-in-fact.

Defendants argue that Goepfert's summer plans are merely a "some day intention[]," citing the Supreme Court's opinion in Lujan. 504 U.S. at 564. However, Goepfert's stated intentions of future travel are a far cry from those found insufficient in Lujan. The Lujan affiant had traveled to Sri Lanka only once and merely "hope[d]" to observe endangered species without any actual or ongoing plans to do so. Id. at 563. By contrast, Goepfert has visited 66 out of 433 park sites and relies on them as a primary source of education for her daughters. See Drewniak v. U.S. Customs & Border Prot., 554 F. Supp. 3d 348, 363 (D.N.H. 2021) (finding standing for "avid outdoorsman who travels to the White Mountains virtually every week of the year to recreate"). She has also identified three specific locations that she plans to visit mere months after the filing of the Amended Complaint. Goepfert's intentions thus are not "vague plans," as Defendants assert. Goepfert has sufficiently demonstrated imminence, and NPCA accordingly has associational standing to sue on her behalf.

Second, AASLH member Donna Graves claims that the Secretary's Order has harmed her career as a research historian specializing in, among other things, marginalized communities and climate change. Graves alleges that dozens of her projects on these topics are installed at

park sites, and she fears that Defendants will remove these materials pursuant to the Secretary's Order, thereby undermining her portfolio and reputation. Moreover, she claims that the Order has "forced [her] into early retirement" because job opportunities and grant funding from NPS, which comprise 40% to 80% of her annual income, have "evaporated." Finally, she contends that the Order damages her professional reputation by labelling her work as "improper partisan ideology" and suggesting that it perpetuates a "false reconstruction of American history." Defendants contend that Graves' alleged harms are insufficiently imminent to constitute injury-in-fact, are not caused by the Secretary's Order, and are not redressable by the Court. The Court addresses each argument in turn.

As to imminence, Defendants argue that Graves has not identified a specific project that she has created that has been removed or flagged for removal. However, given Graves' specialty in marginalized communities and climate change, and the volume of similar works that have already been removed at other park sites, it is reasonable to infer that Graves' works are also at risk of removal. See Massachusetts v. HHS, 923 F.3d at 225 (noting that "recast[ing] the imminence requirement as one of near certainty does not comport with the law"). Indeed, while not installed at a park site, she alleges that one of her projects, an LGBTQ+ theme study, was removed from NPS' website in 2025, overlapping with the promulgation of the Executive Order and the Secretary's Order, thus providing at least some support for her fear that her projects could be removed in the near future.

As to causation, Defendants characterize Graves' retirement as "self-inflicted" rather than caused by the Secretary's Order. According to Defendants, Graves could continue receiving grant funding from NPS by changing specialties. This argument, however, is unpersuasive. Causation requires only that the plaintiff show that her injury is "fairly traceable to the

defendant's conduct, rather than the result of 'independent action' by some other party not before the court." Wiener v. MIB Grp., Inc., 86 F.4th 76, 84 (1st Cir. 2023) (quoting Lyman v. Baker, 954 F.3d 351, 361 (1st Cir. 2020)). The Supreme Court "ha[s] made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." Fed. Election Comm'n v. Cruz, 596 U.S. 289, 297 (2022). Under this broad conception of causation, courts have found lack of standing based on "self-inflicted" injuries only where a plaintiff incurs costs to counteract entirely speculative harms. See Wiener, 86 F.4th at 88 (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 402 (2013) (finding no injury where plaintiff expended resources to protect against fear, with little factual basis, that government will target and surveil him)). Here, Graves' harm is not speculative because she has a substantial number of projects at park sites, and those projects are similar to materials that have already been flagged or removed pursuant to the Secretary's Order. Whether she voluntarily continues to pursue the same type of work is irrelevant. Indeed, taking Defendants' argument to its logical conclusion, *any* plaintiff could change their mission, career, or business model to avoid being negatively affected by an agency action, even if completely counter to the plaintiff's original mission. But causation does not require Graves to pivot her lifelong career before being able to demonstrate harm.

Finally, as to redressability, Defendants argue that Graves' financial and reputational injuries are not redressable by the Court because staying the Secretary's Order will not retract Defendants' past allegedly derogatory statements about her field of work nor require Defendants to provide her with grant funding. However, to establish redressability, Graves need only show that a remedy "will at least lessen [her] injury," not that her "entire injury will be redressed by a

favorable judgment." In re Fin. Oversight & Mgmt. Bd. for P.R., 995 F.3d 18, 22 (1st Cir. 2021). If the Order were stayed or enjoined, NPS could not remove Graves' projects based on the Order's directive. A favorable judgment would thus at least lessen one potential source of injury, which is sufficient at this stage to establish standing.

In sum, both Goepfert and Graves have demonstrated individual standing to sue. Consequently, NPCA and AASLH maintain associational standing to sue in a representative capacity on their behalf.

**B. Reviewability Under the APA**

Defendants argue that the Court does not have jurisdiction to review Plaintiffs' APA claims because the Secretary's Order is not a final agency action and because the Order involves internal agency management, which is committed to agency discretion by law. For the reasons set forth below, the Court rejects both arguments.

**1. Final Agency Action/Ripeness**

First, Defendants argue that the Secretary's Order is not a final agency action, and, relatedly, that the case is not ripe for review. The First Circuit has explained that finality under the APA overlaps substantially with the doctrine of ripeness under Article III. See W.R. Grace & Co. Conn. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992) (citing Abbott Lab'ys v. Gardner, 387 U.S. 136, 149 (1967), abrogated by Califano v. Sanders, 430 U.S. 99 (1977); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990)) ("Under the 'fitness for review' inquiry [of ripeness], we consider whether the issue presented is purely legal, as opposed to factual, and the degree to which any challenged agency action is final."). Because Defendants' arguments under the two doctrines overlap, the Court combines the analyses for efficiency.

The APA provides for judicial review only where there is "final agency action." 5 U.S.C.

§ 704. To qualify as final, the challenged action must (1) "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)). Importantly, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." Abbott Lab'ys, 387 U.S. at 149. Specifically, courts consider whether the action's "impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" Franklin v. Massachusetts, 505 U.S. 788, 796-97 (1992) (quoting Abbott Lab'ys, 387 U.S. at 152).

Plaintiffs have demonstrated that the Secretary's Order is a final agency action. First, the Order is the consummation of a decision-making process, not interlocutory or tentative. As the D.C. Circuit has explained, "[t]he consummation prong of the finality inquiry requires us to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" Nat'l Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting Soundboard Ass'n v. Fed. Trade Comm'n, 888 F.3d 1261, 1267 (D.C. Cir. 2018)). Actions that bind and direct subordinate agency personnel are final, even if what they authorize is an ongoing process.[1] See Biden v. Texas, 597 U.S. 785, 808-09, 793 (2022) (holding

[1] In challenging this conception of finality, Defendants raise a hypothetical example where the Secretary sends an email directing his assistant to schedule a meeting for Tuesday. Defendants argue that, under the proffered rule, such an email would constitute a final agency action, which Defendants imply would be an absurd result. However, this hypothetical is a red herring; the email may not constitute an "agency action" within the meaning of the APA, making finality an

internal memos were final because they "bound DHS staff" and "direct[ed] DHS personnel to take all appropriate actions"); Bowser v. Noem, No. 26-CV-10382, 2026 WL 555624, at *5 (D. Mass. Feb. 27, 2026) ("The issue before the Court is not if the decision regarding the benefits is final; it is if the Policy Memoranda themselves are final."). As a result, orders setting mandatory tasks and deadlines, even those articulating broad policy goals, have been found to be final agency actions. E.g., Drs. for Am. v. Off. of Pers. Mgmt., 793 F. Supp. 3d 112, 139 (D.D.C. 2025) (finding final agency action where agency memorandum was "replete with specific tasks and bolded and underlined deadlines"); Pub. Emps. for Env't Resp. v. Nat'l Park Serv., No. 19-CV-3629, 2021 WL 1198047, at *8-9 (D.D.C. Mar. 30, 2021) (finding final agency action where NPS directive used mandatory language and required park superintendents to take concrete steps).

Here, the Secretary's Order "speaks for the [Department], articulating the agency's overall policy and approach" with respect to interpretive materials at park sites. Id. at *8. It was issued by the Secretary, the highest-ranking official at the Department, rather than by subordinate staff. Id. The Order issues binding—not tentative—directives to the Land Management Bureaus, mandating that they "conduct a review" of interpretive materials at certain park sites, "immediately undertake such actions as are necessary to reinstate" properties altered in a manner disfavored by the Order, and post QR codes to solicit information from the public. It leaves little ambiguity over the type of interpretive materials to remove, targeting those that "inappropriately disparage Americans past or living," "perpetuate a false reconstruction of American history," "inappropriately minimize the value of certain historical events or figures,"

---

irrelevant inquiry. See 5 U.S.C. § 702 (defining "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof").

or "include any other improper partisan ideology." To implement the mandates, the Order sets near-term deadlines on a two-phase schedule for completion. Taken together, these factors indicate that the Order meets the first prong of the finality inquiry, and is not a preliminary step far upstream of any consequences, as Defendants suggest.

Second, the Secretary's Order are actions "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett, 520 U.S. at 178 (quoting Port of Bos., 400 U.S. at 71). The Order imposes legal obligations on Land Management Bureau personnel, who must review interpretive materials at park sites, post QR codes, and remove purportedly violative materials. See Pub. Emps., 2021 WL 1198047, at *9 (finding that directive "created legal consequences and obligations for park superintendents managing individual NPS Parks and for park patrons"); Bennett, 520 U.S. at 178 (finding final agency action where action would "alter the legal regime to which the action agency is subject"). Thus, the Order constitutes a final agency action subject to judicial review.

Defendants argue that Plaintiffs must challenge individual removal decisions rather than the Secretary's Order as a whole. However, multiple circuits, including the First Circuit, have explained that an agency's action in "applying some particular measure across the board . . . [can] of course [still] be challenged under the APA." Hisp. Affs. Project v. Acosta, 901 F.3d 378, 388 (D.C. Cir. 2018) (alteration in original) (quoting Nat'l Wildlife Fed'n, 497 U.S. at 890 n.2); accord New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."); Drs. for Am., 793 F. Supp. 3d at 141 (finding plaintiffs properly challenged "a cohesive directive . . . with a single set of commands for the entire agency"); Biden v. Texas, 597 U.S. at 793, 808 (2022); Pub. Emps., 2021 WL

1198047, at *8 (noting directive was final even though park superintendents retained ability to impose limits or conditions because "they were still required to first impose the overarching NPS policy"). Because the Secretary's Order itself constitutes a final agency action for the reasons explained above, Plaintiffs may challenge the Secretary's Order as a whole and need not pursue piecemeal litigation for each discrete removal.

Defendants also argue that this case is like Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), in which the Supreme Court held that a challenge to a logging plan developed by the U.S. Forest Service was not ripe for review. There, the plan set logging goals, identified areas of the forest suitable for timber production, and determined preferred harvesting methods, but did "not itself authorize the cutting of any trees." Id. at 729. Defendants contend that, like in Ohio Forestry, the Secretary's Order does not itself mandate any specific removal, instead only kickstarting a review plan for interpretive materials at park sites. However, this analogy is inapt. In Ohio Forestry, the Supreme Court emphasized that the agency had not yet begun implementing the challenged policy. 523 U.S. at 735-36. By contrast, here, pursuant to the Secretary's Order, the Land Management Bureaus have already commenced implementation, with dozens of interpretive materials removed to date and hundreds more flagged for removal. See California v. Trump, 786 F. Supp. 3d 359, 378-89 (D. Mass. 2025) (finding ripeness where agency had started implementing Executive Order). Ohio Forestry thus does not dictate dismissal here.

Accordingly, the Secretary's Order is both a final agency action and is ripe for review by this Court.

**2. Committed to Agency Discretion**

Defendants next argue that the Secretary's Order is not subject to judicial review because

it involves internal agency management decisions, which are inherently committed to agency discretion by law. The Court is unpersuaded.

Under APA Section 701(a)(2), a court does not have jurisdiction to review an agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An action is committed to agency discretion when the agency action is of a kind "traditionally regarded as committed to agency discretion," or when the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020) (quoting Lincoln v. Vigil, 508 U.S. 182, 191-92 (1993)). This exception is "quite narrow[]," Weyerhaeuser Co. v. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018), and there is "a strong presumption in favor of review, which is overcome only by 'clear and convincing evidence' that Congress intended to cut off review above the agency level," Hahn v. Gottlieb, 430 F.2d 1243, 1249 (1st Cir. 1970) (quoting Barlow v. Collins, 397 U.S. 159, 167 (1970)).

Here, the Secretary's Order is not committed to agency discretion by law. First, the Secretary's Order is not "of a kind traditionally regarded as committed to agency discretion." Vigil, 508 U.S. at 192. Few actions are recognized as falling under this category. They include "foreign affairs, the military," Dugan v. Ramsay, 727 F.2d 192, 195 (1st Cir. 1984), "decision[s] not to institute enforcement proceedings," and internal agency operations and management decisions, such as allocation of lump-sum appropriations or personnel and hiring decisions. Wheeler, 954 F.3d at 18 (citing Dep't of Com. v. New York, 588 U.S. 752, 771 (2019)); see, e.g., Ward v. Skinner, 943 F.2d 157 (1st Cir. 1991); Webster v. Doe, 486 U.S. 592, 601 (1988); Vigil, 508 U.S. at 193. The Secretary's Order does not clearly fall into any of these categories. It does not involve foreign affairs, military decisions, enforcement actions, financial or budgetary

decisions, or human resources. Nor do Defendants provide any cases that involve similar facts (i.e., the systematic removal of signage at park sites), undercutting their argument that such decisions are "traditionally" regarded as committed to agency discretion. See Wheeler, 954 F.3d at 18 ("[A]s to whether the make-up of agency advisory committees is an area traditionally left to agency discretion, the EPA has pointed us to nary a case that would suggest as much."); Am. Acad. of Pediatrics v. Kennedy, No. 25-CV-11916, 2026 WL 733828, at *9 (D. Mass. Mar. 16, 2026) ("Defendants point the Court to no cases, nor could the Court find any such case, suggesting that the kind of regulatory power at issue in this case has been 'traditionally' recognized as committed to agency discretion."). Instead, Defendants only quote the Order's conclusory statement that it is "intended only to improve the internal management of the Department." This characterization, however, is belied by the Order's directives, which are not merely internal, but instead have the express intention of shaping the public's experience at park sites. Thus, the Order is not of a type traditionally regarded as committed to agency discretion.

Second, the statutes at issue—the Centennial Act, the Organic Act, and the Omnibus Management Act[2]—provide "meaningful standard[s] against which to judge the agency's exercise of discretion." Wheeler, 954 F.3d at 17. "When determining whether a statute falls within [the no-meaningful-standards provision of the APA], 'careful examination of the statute' is required." Cowels v. Fed. Bureau of Investigation, 327 F. Supp. 3d 242, 249 (D. Mass. 2018) (quoting Webster, 486 U.S. at 600). Here, the language of each statute reflects environmental and conservation mandates that provide clear standards against which to assess the Secretary's Order. The Organic Act, for example, requires Defendants to "promote and regulate the use of

[2] Defendants do not expressly challenge Plaintiffs' FLPMA and Paperwork Reduction Act claims on this ground, so the Court does not address those statutes here.

the National Park System" in a manner that "conserve[s]," "provide[s] for the enjoyment of," and leaves "unimpaired for the enjoyment of future generations" the "scenery, natural and historic objects, and wild life" therein.[3] 54 U.S.C. § 100101(a). The Centennial Act, likewise, requires the Department of the Interior to enhance the management of park sites through a program of "the highest quality interpretation and education." Id. § 100802. While Defendants argue that this phrase is vague, the statute defines the terms and provides guiding context. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." Id. § 100801(1)(A). "Education" is defined as "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2). To further elucidate these terms, the Act provides that the educational program may be updated regularly to "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "reflect current scientific and academic research, content, methods, and audience analysis." Id. § 100803. The Omnibus Management Act provides similar directives, requiring the Department of the Interior to provide "state-of-the-art management, protection, and interpretation of, and research on, the resources" in the park site and to utilize "the highest quality science and information." Id. §§ 100701-100702.

This statutory language provides clear and manageable standards for judicial review. The concepts of public education, environmental conservation, intellectual discourse, scientific rigor,

[3] In response to Plaintiffs' Organic Act claim, Defendants cite a single First Circuit case for the proposition that the Act contains "incommensurable values such as safety and aesthetics, and the Judicial Branch is ill-equipped to rework that balance." Shansky v. United States, 164 F.3d 688, 694 (1st Cir. 1999). However, that case involved the discretionary-function exemption to the Federal Torts Claims Act, a different context than here.

and diversity are not foreign to courts and provide an intelligible guidepost for review. Indeed, courts have found meaningful standards where statutes use similarly broad and aspirational language. See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 411 (1971) (finding "prudent" provided meaningful standard); NAACP v. Sec'y of Hous. & Urb. Dev., 817 F.2d 149, 158 (1st Cir. 1987) (drawing standard from statutory requirement that agency administer its programs "in a manner affirmatively to further the policies" of "fair housing"); Kennedy, 2026 WL 733828, at *9-10 (holding that language concerning "prevention and suppression of communicable diseases" and "preservation and improvement of the public health" provided judicially manageable standards). Even if the statutory language contains some amount of ambiguity, that does not foreclose judicial review. See Dugan, 727 F.2d at 195; Wheeler, 954 F.3d at 18-19 (finding that courts can "enforce at least the outer boundaries" of a statutory mandate that an agency apply "fair balance and inappropriate influence"). Thus, the statutes provide meaningful standards for judicial review.

Accordingly, the Secretary's Order is not committed to agency discretion by law.

**C. Venue**

Defendants move the Court to dismiss the five non-Massachusetts-based Plaintiffs for improper venue. For suits against a federal agency, venue is proper "in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Defendants urge the Court to interpret the words "the plaintiff" to require *each* plaintiff to reside in this judicial district rather than *any* plaintiff.

The Court declines to adopt Defendants' reading. While the First Circuit has not yet interpreted how this statutory language applies in multi-plaintiff suits, persuasive authority in other circuits and the statute's legislative history instruct that the venue statute does not require

all plaintiffs to reside in the same district. "For over thirty years federal courts have conclusively and consistently held that the statutory language in 28 U.S.C. § 1391(e)(3) regarding the residency of 'the plaintiff' should be interpreted to mean *any* plaintiff rather than *all* plaintiffs." A.J. Taft Coal Co. v. Barnhart, 291 F. Supp. 2d 1290, 1301 (N.D. Ala. 2003) (emphases in original) (collecting cases). This interpretation makes sense; Defendants' reading would require plaintiffs residing in different districts to file a suit in their own states, resulting in multiple parallel lawsuits, piecemeal litigation for each plaintiff, and "unnecessary multiplicity of litigation." Exxon v. F.T.C., 588 F.2d 895, 898 (3d Cir. 1978), overruled on other grounds by Reifer v. Westport Ins. Corp., 751 F.3d 129 (3d Cir. 2014). Though plaintiffs could alternatively file a consolidated action in the District of Columbia, the purpose of the venue statute was to "make it possible to bring actions against Government officials and agencies in U.S. district courts *outside* the District of Columbia." Sidney Coal Co. v. Soc. Sec. Admin., 427 F.3d 336, 344 (6th Cir. 2005) (emphasis added) (quoting Stafford v. Briggs, 444 U.S. 527, 539-40 (1980)).

In response, Defendants cite no case law in support of their argument, instead merely insisting that all the cases discussed hereto were wrongly decided and contravene the plain text of the statute. However, this Court aligns with the weight of authority in finding that the legislative history and congressional intent point strongly in favor of an expansive interpretation of venue. Thus, the residency requirement of the venue statute is satisfied if at least one plaintiff—here, UCS—resides in Massachusetts. Accordingly, the Court declines to dismiss the non-Massachusetts-based Plaintiffs for improper venue.

**D. Merits**

Having determined that the Court maintains jurisdiction over this action, the Court proceeds with Defendants' 12(b)(6) arguments regarding Plaintiffs' arbitrary-or-capricious and

contrary-to-law claims. Notably, the First Circuit has instructed that the standard 12(b)(6) plausibility analysis "has no place in APA review" because "[t]he relevant inquiry is . . . not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013). The court explained that, in light of the unique procedures outlined in the APA's judicial review provision, APA claims "must proceed on the administrative record" and "involve[] neither discovery nor trial." Id. at 75-76. Accordingly, at the motion to dismiss stage, courts may not assess the factual plausibility of a complaint. Id. At most, courts may determine whether "the underlying premise of the complaint is legally flawed." Id. at 76 n.4. For example, a court can dismiss claims where the plaintiff fails to identify any regulatory or statutory authority with which the government action has allegedly failed to comply. See Roe v. Mayorkas, No. 22-CV-10808, 2023 WL 3466327, at *11 (D. Mass. May 12, 2023); e.g., Zixiang Li v. Kerry, 710 F.3d 995, 1000-01 (9th Cir. 2013) (concluding plaintiffs failed to state APA claim where statutory and regulatory provisions did not actually impose procedural requirements suggested by plaintiffs).

Applying Atieh, at this stage, the Court addresses only those arguments from Defendants that challenge the facial validity of Plaintiffs' legal arguments. Any remaining arguments that contest the plausibility of Plaintiffs' APA claims may not be assessed at the motion to dismiss stage and thus do not require extended analysis here. See Massachusetts v. Trump, 790 F. Supp. 3d 8, 29 (D. Mass. 2025) (applying Atieh and declining to dismiss, or analyze in detail, defendants' challenges to plaintiffs' arbitrary-or-capricious and contrary-to-law claims); Claudio Mendez v. Wolf, No. 20-CV-11598, 2021 WL 877886 (D. Mass. Mar. 9, 2021) (same).

First, Defendants contend that Count 1 (arbitrary or capricious) fails because Plaintiffs do

not cite a specific substantive statute, and the APA does not permit a free-standing arbitrary-or-capricious claim. However, it is sufficiently clear from the Amended Complaint that Plaintiffs' argument is that Defendants acted arbitrarily or capriciously by failing to adhere to the statutes cited in their other claims. Cf. Wheeler, 954 F.3d at 22 (interpreting standalone arbitrary-or-capricious claim as "subsumed" in other substantive statutory claims). Plaintiffs represent as much in their Opposition. The Amended Complaint provides sufficient notice to Defendants of the relevant challenged conduct and statutory standards, and the Court declines to dismiss on this pleading technicality. See Sisbarro v. Warden, 592 F.2d 1, 2 (1st Cir. 1979) ("[A] Rule 12(b)(6) motion to dismiss is not the proper remedy for inartful pleading." (citing Haines v. Kerner, 404 U.S. 519, 520 (1972))).

Next, Defendants contend that Plaintiffs fail to allege a violation of the FLPMA. They argue that Plaintiffs' allegations relate solely to lands managed by NPS, whereas the FLPMA applies to "public lands," which are separately managed by the Bureau of Land Management. 43 U.S.C. § 1702(e). The Court disagrees and finds that Plaintiffs have adequately identified a legal basis for their FLPMA claim. The Secretary's Order directs all Land Management Bureaus, including the Bureau of Land Management, to review interpretive materials for conflict with the Executive Order. Moreover, the Bureau of Land Management is an agency under the Department of Interior, a defendant in this action. Whether Defendants, in fact, removed any materials from public lands—as opposed to only from NPS park sites—is a question of fact to be reviewed at later stages of this action.

On the Court's review, Defendants' remaining arguments involve factual issues or mixed questions of fact and law. Pursuant to Atieh, these arguments may not be resolved on a motion to dismiss. Accordingly, Plaintiffs have sufficiently stated a claim for purposes of Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED**.

**SO ORDERED.**

Dated: June 4, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS, Plaintiffs, v. UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director, Defendants. | Civil Action No. 1:26-CV-10877-AK |

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR 5 U.S.C. § 705 STAY OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

**ANGEL KELLEY, D.J.**

> *"The parks do not belong to one State or to one section . . . ; they are national properties in which every citizen has a vested interest; they belong as much to the man"—and I would add, woman—"of Massachusetts, of Michigan, of Florida as they do to the people of California, of Wyoming, and of Arizona."*
>
> *Those words are a powerful reminder in this era of political division and disagreement: national parks are national. They cut across party lines and geographic boundaries. They enjoy broad support, and they bring people together—something we seem to need now more than ever.*
>
> — U.S. Representative Nicola Tsongas, original co-sponsor of the National Park

Service Centennial Act of 2016 (quoting Stephen Mather, first Director of the National Park Service)[1]

In 1872, Congress established Yellowstone National Park as the world's first national park, setting in motion the principle that natural wonders, historical sites, and cultural memory belong to and serve the public. With over 433 park sites across the United States today, the National Park system hosts millions of visitors each year seeking to enjoy the parks' iconic views, monuments to our Nation's history, and memorials recognizing the sacrifice of many. Beyond the scenic grandeur, the National Park system also serves as a cornerstone of public learning, providing rich and informative signs, exhibits, and interpretive waysides on topics ranging from civil rights to environmentalism. From the echoes of abolition in John Brown's Fort in Harpers Ferry, to the genesis of the modern LGBTQ+ civil rights movement at the Stonewall National Monument, to the retreating ice of Glacier National Park in Alaska, the National Parks preserve the multifaceted and multi-layered history of our Nation, including the good, the bad, and the ugly. Often referred to as "America's largest classroom," National Parks serve in that spirit by telling the stories both of those who write history and those who go unheard. The beauty of history is the unvarnished storytelling of a time gone by and the delivery of undeniable truths. The Government's stewardship of these park sites thus carries a responsibility to present history in full rather than in favored fragments.

Unfortunately, the Government has disregarded these principles. Under the guise of promoting American dignity, this Administration seeks to share a limited history by ordering the removal of all signs, displays, and interpretive exhibits at National Parks that do not align with its preferred narrative, thereby telling half-truths. In recent months, the Government has torn down exhibits in Philadelphia's Independence National Historical Park memorializing the legacy

[1] 162 Cong. Rec. H7207 (daily ed. Dec. 6, 2016).

of people enslaved by the country's first President;[2] removed signage detailing climate threats at Fort Sumter in South Carolina, one of the most environmentally endangered sites in the country; and wiped away descriptions of history and science at countless National Parks across the United States. Not only does this undermine the integrity of the National Parks; it sets a dangerous precedent of censorship and sanitization. The National Park Service Organic Act, the National Park Service Centennial Act, and the National Parks Omnibus Management Act, as well as the Administrative Procedure Act do not authorize such arbitrary and capricious action. The Court thus **GRANTS** Plaintiffs' Motion for a Stay Pursuant to 5 U.S.C. § 705.

## I. BACKGROUND

### A. The National Parks

Unless stated otherwise, all facts are drawn from Plaintiffs' Amended Complaint and the exhibits attached to the parties' briefing on Plaintiffs' Motion for a Stay. In establishing Yellowstone as the country's first National Park, Congress declared unequivocally that it was "for the benefit and enjoyment of the people." 16 U.S.C. § 21. In the years that followed, the federal government authorized the designation of hundreds of additional parks, monuments, memorials, and recreation areas (collectively, "park sites"). Today, National Parks comprise more than 400 areas covering more than 84 million acres in the United States, which house natural wonders, battlefields, sacred Indigenous grounds, and sites memorializing and commemorating this country's history of slavery and the Civil Rights movement. See *Quick History of the National Park Service*, Nat'l Park Serv. (Aug. 24, 2022), https://www.nps.gov/articles/quick-nps-history.htm. Each National Park is created by an Act of

[2] These exhibits were ordered to be reinstalled pursuant to a preliminary injunction in a parallel action in the U.S. District Court for the Eastern District of Pennsylvania. See City of Philadelphia v. Burgum, 820 F. Supp. 3d. 313 (E.D. Pa. 2026) (Rufe, J.).

Congress or a presidential proclamation pursuant to the Antiquities Act of 1906, and has an implementation plan that defines the sites' purpose and significance. *Foundation Documents*, Nat'l Park Serv. (Apr. 24, 2025), https://www.nps.gov/subjects/parkplanning/foundation-documents.htm.

From their inception, National Parks have occupied a dual role in both preserving places of extraordinary beauty and serving as "America's largest classroom" for visitors of all backgrounds. As far back as 1886, U.S. Army infantrymen deployed in Yellowstone answered visitors' questions in what became known as "ranger talks." Thirty years later, in 1903, in dedicating an arch marking the entrance of Yellowstone, President Theodore Roosevelt recognized the parks' crucial role in educating the Nation, stating:

> I cannot too often repeat that the essential feature in the present management of the Yellowstone Park, as in all similar places, is its essential democracy—it is the preservation of the scenery, of the forests, of the wilderness life and the wilderness game for the people as a whole, instead of leaving the enjoyment thereof to be confined to the very rich who can control private reserves.

Another thirty years later, President Franklin D. Roosevelt reiterated the sentiment, noting: "There is nothing so American as our national parks . . . . The fundamental idea behind the parks . . . is that the country belongs to the people, that it is in the process of making for the enrichment of the lives of all of us."

To oversee the National Parks and further their ability to provide for public learning, Congress established the National Park Service ("NPS") through the National Park Service Organic Act of 1916 ("Organic Act"), as a bureau within the Department of Interior. Congress entrusted the NPS with a statutory mandate to "conserve the scenery, the natural and historic objects, and wild life [in National Park sites] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

Pursuant to this mandate, the NPS has long honored its duty to ensure that the parks serve as a shared, natural, and cultural resource for all visitors. In 1917, the first Director of the NPS, Stephen Mather, acknowledged that "one of the chief functions of the national parks and monuments is to serve educational purposes." He established the National Parks Education Committee to "further the view of the national parks as classrooms and museums of nature." By 1929, the NPS created "simple, understandable interpretation[s] of the major features of each park to the public by means of field trips, lectures, exhibits, and literature." Congress then codified the NPS' educational role with the 1935 Historic Sites Act, which directs the NPS to develop "an educational program and service for the purpose of making available to the public facts and information pertaining to American historic and archeologic sites, buildings, and properties of national significance." See An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, Pub. L. No. 74-292, § 2(j), 49 Stat. 666, 667 (1935) (amended and recodified at 54 U.S.C. § 320102(k)). In 1970, Congress adopted the National Park Service General Authorities Act of 1970, which emphasized that the National Park system is a "cumulative expression[] of a single national heritage" and that each individual site "derive[s] increased national dignity" by being included in a system that is "managed for the benefit and inspiration of all the people of the United States." See An Act to improve the administration of the national park system by the Secretary of the Interior, and to clarify the authorities applicable to the system, and for other purposes, Pub. L. No. 91-383, § 1, 84 Stat. 825, 825 (1970) (amended and recodified at 54 U.S.C. § 100101(b)(1)).

Today, the NPS enlists approximately 13,000 permanent employees and thousands of temporary and seasonal employees, who work across the 433 park sites to serve 332 million

visitors each year. The agency has continued to provide rich educational and interpretive information with specific context for each park site, including exhibits, interpretive waysides, bookstores, booklets, brochures, and other publications. The process for creating these materials, governed by established review and approval procedures, often takes months to years—requiring collaboration and comprehensive evaluation by NPS professionals, historians, scientists, subject-matter experts, community advocates, educators, interpretive specialists, experiential graphic designers, and accessibility experts. Moreover, Plaintiffs report that the NPS constantly iterates and updates the materials to ensure that they reflect multiple viewpoints and the most current information and scientific research.

The NPS has recognized that "[h]istory has typically been presented from the perspective of the dominant group in power and can, intentionally or not, exclude details that tell a more holistic story," and the agency has affirmed its role in "expand[ing] ideas about power, science, gender, race, and more." *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://www.nps.gov/articles/history-under-construction.htm. In its efforts to enhance the parks' ability to allow visitors of all backgrounds to connect with park sites, the NPS "strives to tell the stories of all Americans," including "the historical experiences of those who have been underrepresented in traditional histories." *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), http://nps.gov/articles/publications-diverse.htm. In this manner, the NPS ensures that parks welcome all visitors and that narratives are not misrepresented through the omission of marginalized voices.

## B. Statutory and Regulatory Framework

### 1. Organic Act

In addition to the previously described statutes, the NPS and the National Park system are governed by a series of statutory and regulatory authorities. As explained, the Organic Act of 1916 is the foundational statute establishing the NPS. Signed into law by President Wilson, it centralizes the management of the National Park system under the NPS. The statute provides:

> The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the [National Park] System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a). It further sets forth Congress' express intention for the parks, initially declared in 1970 and reaffirmed in 1978 through the Redwood Amendments:

> **1970 declarations.** — Congress declares that (A) the National Park System, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States and its territories and possessions; (B) these areas, though distinct in character, are united through their interrelated purposes and resources into one National Park System as cumulative expressions of a single national heritage; (C) individually and collectively, these areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one System preserved and managed for the benefit and inspiration of all the people of the United States; and (D) it is the purpose of this division to include all these areas in the [National Park] System and to clarify the authorities applicable to the [National Park] System.
>
> **1978 reaffirmation.** — Congress reaffirms, declares, and directs that the promotion and regulation of the various [National Park] System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the [National Park] System units shall be conducted in light of the high public value and integrity of the [National Park] System and shall not be exercised in derogation of the values and purposes for which the [National Park] System units have been established, except as directly and specifically provided by Congress.

Id. § 100101(b).

### 2. Omnibus Management Act

In 1998, Congress promulgated the National Parks Omnibus Management Act ("Omnibus Management Act"). The Act reformed the management of National Parks, refocusing the agency on scientific research and improving employee training. It provides:

> Recognizing the ever increasing societal pressures being placed upon America's unique natural and cultural resources contained in the [National Park] System, the Secretary shall continually improve the ability of the Service to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the [National Park] System.

54 U.S.C. § 100701. It further specifies that "[t]he Secretary shall ensure that management of [National Park] System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." Id. § 100702.

### 3. Centennial Act

In 2016, Congress passed the National Park Service Centennial Act ("Centennial Act") to prepare the NPS for its second century of operations. It sought to improve visitor facilities and support conservation efforts. Under the statute, the Secretary is required to "ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the [National Park] System." Id. § 100801(1)(A). "Education" means "enhancing public awareness, understanding, and appreciation of the resources of the [National Park] System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2)).

The Centennial Act also authorizes the Secretary to regularly update the education and

interpretation program based on four criteria:

> The Secretary may undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the [National Park] System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis.

Id. § 100803.

**4. NPS Directives System**

To implement its statutory mandates, the NPS has established a Directives System, a triple-tiered, agency-wide set of policies, practices, and procedures. See *The NPS Directives System*, Nat'l Park Serv. (Aug. 29, 2023), https://www.nps.gov/subjects/policy/directives-system.htm. The highest level is the NPS' Management Policies, which set forth the agency's management and operations policies and provides the NPS' official interpretation of its statutory mandates. Id. The Policies articulate the agency's objectives and establish standards governing park system planning, land protection, natural and cultural resource management, wilderness preservation and management, implementation of the agency's interpretation and education program, public use of the parks and park facilities, and the operation of commercial visitor centers.

As relevant here, the Management Policies establish a process and structure for the agency's interpretation and education program. The agency, in partnership with individual park sites and public and private stakeholders such as historical societies and conservation groups, must create both a "general management plan" ("GMP") and "comprehensive interpretive plans" ("CIPs") to "serve as the backbone of interpretive and educational program planning and direction." Management Policies, Nat'l Park Serv. (2006), § 7.2 (hereinafter "Management

Policies"). A GMP is a broad policy document that establishes the long-term vision for a park's resource conditions and visitor use. Id. § 2.2. The CIPs are focused, short-term implementation plans that dictate how the park will tell its stories and connect visitors to its resources. Id. § 2.3. The Management Policies emphasize that "[a]ll interpretive and educational services . . . will be based on and coordinated with the comprehensive interpretive plan." Id. § 7.2 (emphasis added). Park staff are to utilize the CIPs to determine "which stories to tell, how to tell them, and how to reach specific audiences." Id.. The Policies further explain that NPS' "interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners." Id. § 7.4.

The second level of the NPS' Directives System is Director's Orders. These interpret the Management Policies, outline requirements for NPS functions, programs, and activities, delegate specific authorities and responsibilities to subordinate staff, and articulate new or revised policies between updates of the Management Policies. See *Director's Orders and Related Guidance*, Nat'l Park Serv. (May 12, 2026), https://www.nps.gov/subjects/policy/directors-orders.htm. As relevant here, National Parks Director's Order #6, titled "Interpretation and Education," supplements the Management Policies' directives regarding the NPS' interpretation and education program. See Director's Order #6: Interpretation and Education, Nat'l Park Serv. (Mar. 3, 2025) (hereinafter "Director's Order #6"). It articulates park staff's roles and responsibilities, the content and mission of educational programming, interpretive planning requirements, and reporting requirements. See id.

Finally, the third level of the NPS Directives System is policy memoranda and related guidance. These documents address time-sensitive issues and interim policy needs, and thus are

often narrow-in-scope. See *Policy Memoranda and Related Guidance*, Nat'l Park Serv. (Apr. 30, 2026), https://www.nps.gov/subjects/policy/policy-memos.htm.

**C. Executive Order and Secretary's Order**

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring Truth and Sanity to American History." The Executive Order directed the Secretary of the Interior to review all "public monuments, memorials, statues, markers, or similar properties" (collectively, "interpretive materials") at park sites and remove any that met certain characteristics. Specifically, the Executive Order states:

> Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light. Under this historical revision, our Nation's unparalleled legacy of advancing liberty, individual rights, and human happiness is reconstructed as inherently racist, sexist, oppressive, or otherwise irredeemably flawed. Rather than fostering unity and a deeper understanding of our shared past, the widespread effort to rewrite history deepens societal divides and fosters a sense of national shame, disregarding the progress America has made and the ideals that continue to inspire millions around the globe.

Exec. Order. No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

To effectuate this mission, the Executive Order directed the Secretary of the Interior to take three actions:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;
>
> (ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. § 1451 *et seq.*, 54 U.S.C. § 100101 *et seq.*, and other applicable law; and
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within

> the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Id. § 4.

Two months later, on May 20, 2025, the Secretary of the Interior implemented these directives by issuing Secretary Order 3431, likewise titled "Restoring Truth and Sanity to American History" ("Secretary's Order"). The Order announced an objective of implementing the Executive Order:

> **Purpose.** This Order implements provisions of President Trump's March 27, 2025, Executive Order (EO) 14253, titled "Restoring Truth and Sanity to American History." EO 14253 directs the Secretary of the Interior (Secretary) to provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park and to complete such improvements by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence. It also directs the Secretary to review public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's (Department) jurisdiction and to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

Restoring Truth and Sanity to American History, Order No. 3431, Doug Burgum, Sec. of the Interior, U.S. Dep't of the Interior (May 20, 2025).

Two sections of the Secretary's Order are relevant to this case. First, Section 5 directed NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, "Land Management Bureaus") to conduct the reviews mandated by the Executive Order. It established a two-step review plan. During the initial thirty-day phase, the Land Management Bureaus were to review and remove any interpretive materials that had been "removed or changed to perpetuate a false reconstruction of

American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology" since January 1, 2020. During the next phase, the scope of review broadened to all park sites, with the agencies directed to review and remove any interpretive material that "inappropriately disparages Americans past or living . . . or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature" or is otherwise "inconsistent with the purpose of" the Executive Order. This phase was to be completed within 120 days.

In addition to the review process set out in Section 5, Section 6 of the Secretary's Order directed the Land Management Bureaus to post quick response ("QR") codes at park sites soliciting help from visitors in identifying content that allegedly violated the Executive Order. The QR codes were to accompany the following language:

> (Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features.

NPS staff were provided with a template sign, including a QR code, and instructed that it should be posted "by the order of the Secretary of the Interior," in support of the Restoring Truth and Sanity Executive Order at all park sites by June 13, 2025. Signs containing the mandated language and QR code were posted in National Parks throughout the country. No notice was published in the *Federal Register*, nor was public input solicited, and the posted signs did not display an Office of Management and Budget control number. NPS compiled a database of public comments submitted through the QR codes.

**D. Timeline of Removals**

In Summer 2025, in compliance with the Secretary's Order, NPS staff began removing

material. Defendants also instituted various internal efforts to speed up removals, leading to a significant escalation in early 2026. For example, in August and September 2025, Director of the Secretary of the Interior Jessica Bowron sent letters to park sites that allegedly failed to remove signs as a notice of their "non-compliance," and in November 2025, Bowron issued a separate order to expand the scope of review to include retail items.

As a result of these efforts, by early 2026, NPS had removed or identified for removal hundreds of interpretive materials from park sites. By the date of the filing of this action, Defendants had removed dozens of signs related to climate change, civil rights, and diverse communities. The potpourri of items removed include those on environmental degradation, such as:

- Signs at Acadia National Park in Maine discussing the impact of climate change on the surrounding environment and its costs to the park's natural resources.
- An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York concerning climate change.
- Interpretive displays at Fort Sumter in South Carolina, describing how the historic island fortress that sparked the beginning of the Civil War may be underwater by the end of the century due to climate change. The display was the product of extensive research by the NPS and West Carolina University showing the effects of sea level rise, coastal erosion, flooding, and storm surge on the park.
- Multiple interpretive materials at Glacier National Park in Montana, including signs providing information about the effect of carbon dioxide emissions and climate change on glaciers; a sign attributing the sharp increase in wildlife in the American West to "hotter and drier conditions"; a sign describing the "controversy" regarding wolf hunting;

and a placard titled "Blame It on the Grain," which "describes the construction of a dam that created a reservoir in the eastern part of the park to support farming." Moreover, a season of the official podcast of Glacier National Park, "Headwaters," has been taken down, and a film about the park shown to visitors has been ordered to be stopped.

In addition, Defendants have removed multiple signs involving slavery, abolition, immigration, labor, women's suffrage, and civil rights, including:

- A "History Under Construction" exhibit at Muir Woods in Golden Gate National Park in California, which annotated an existing sign with content on Indigenous history, the role of women in the Muir Woods conservation movement, and the historical role of NPS staff in eugenics movements.
- Signs at Rock Creek Park in Washington, D.C., describing the legacy of Francis G. Newlands, a congressman and senator from 1893 to 1917, including details about his white supremacist views.
- Exhibits at the President's House Site in Independence National Historical Park in Philadelphia that "examin[ed] the paradox between slavery and freedom in the founding of the nation" and described the critical role that enslaved people played in the operation of the home during President Washington's presidency. One of the removed signs discussed Ona Judge, a woman the NPS described as "a talented seamstress" who "became Martha Washington's personal maid as a teenager" and who escaped enslavement and evaded recapture.
- Films on labor history at Lowell National Historical Park in Massachusetts.
- An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York describing women's rights and liberty, as well as a quote stating that there

are components of the country's history "we hope never to repeat—like slavery, massacres of Indians, or holding Japanese Americans in wartime camps."

- A sign at Sunset Crater Volcano National Monument in Arizona describing basalt bubbles because the sign included an image of a visitor holding a Pride flag.

Defendants have also removed multiple interpretive materials dedicated to Native Tribes and describing the atrocities committed to their communities, such as:

- A sign at Grand Teton National Park in Wyoming explaining the complicated history of Gustavus Cheyney Doane, a key member of an early Yellowstone expedition who had participated in a massacre of Native Americans.
- Signs at Acadia National Park in Maine describing the importance of Cadillac Mountain to the Wabanaki people to their culture and heritage.
- Portions of displays at Grand Canyon National Park in Arizona characterizing settlers, cattle ranchers, and tourists as negatively impacting the land for their own benefit and describing how the federal government claimed Tribal land to establish the park.

In addition to materials that have already been removed, hundreds of others have been flagged for removal. These include exhibits about slavery and civil rights, such as:

- A sign at Fort Pulaski National Park in Georgia reproducing "The Scourged Back," an 1863 image of Peter Gordon, a man who was enslaved in Louisiana, with heavy scars covering his back from whippings received in slavery.
- Over thirty signs at Harpers Ferry National Historic Park in West Virginia, where abolitionist John Brown led a raid seeking to arm enslaved people for a revolt in 1859.
- A sign at Bent's Old Fort National Historic Site in Colorado describing a family's "ownership" of enslaved people.

- Signs at the Bunker Hill Monument in Massachusetts regarding suffrage, abolition, immigration, and anti-war movements. These signs include quotes from an 1875 letter in the Archdiocese of Boston's newspaper stating, "citizens of foreign birth take no second place"; a 1925 statement from civil rights activist and newspaper editor William Monroe Trotter stating, "[c]olored Americans were here that day fighting with other patriots, our own ancestors, of whom we are justly proud and on whom we base our claim for full liberty and equality as citizens"; and an 1889 statement from abolitionist and suffragist Lucy Stone in the *Women's Journal* stating, "[t]he woman sufferance battle is like that of Bunker Hill—not won today, but sure to be later. Meantime, Bunker Hill Monument is our monument." See Katie Cole & Artemisia Luk, *National Park Service to Remove Quotes About Slavery, Immigration, and Suffrage from Bunker Hill Site*, W. Bos. Univ. Radio (June 5, 2026), https://www.wbur.org/news/2026/06/05/nps-bunker-hill-monument-boston-quote-removal.
- An exhibit at the Kingsley Plantation in the Timucuan Ecological and Historic Preserve in Florida titled "Freedom Seekers of Timucuan Preserve" that describes stories of enslaved people who "illustrated the perseverance of the human spirit" as they navigated "sites of bondage and of escape."
- A plaque at Virgin Islands National Park commemorating the "slave rebellion that began on St. John on November 23, 1733."
- Exhibits at Cane River Creole National Historic Park in Louisiana about enslaved people who tried to escape but were captured and publicly whipped.
- A sign at Manassas National Battlefield in Virginia that criticized post-Civil War "Lost Cause" ideology, which denied the central role slavery played in the war.

- Exhibits at Emmett Till and Mamie Till-Mobley National Monument in Sumner and Glendora, Mississippi and Chicago, Illinois, that "tell[] the story of Emmett Till and his mother" and were created "in collaboration between the Emmett Till and Mamie Till-Mobley Institute, the Emmett Till Interpretive Center (ETIC), the Till family, and The Children's Museum of Indianapolis."
- Approximately eighty items at the Selma to Montgomery National Historic Trail in Alabama that mark the historic 1965 Voting Rights March from Selma to Montgomery.
- A permanent exhibit at Brown v. Board of Education National Historical Park in Kansas because it mentions "equity."

The NPS has also flagged interpretive materials reporting on the stories of Indigenous communities, including:

- A brochure and sign at Glacier National Park in Montana describing the mass slaughter of the Piegan Blackfeet people.
- A sign at Bent's Old Fort National Historic Site in Colorado describing the forced removal of a Native Tribe.
- A display at Sitka National Historical Park in Alaska referencing the mistreatment of Alaskan Natives by missionaries.
- An exhibit at Little Bighorn Battlefield National Monument in Montana describing the United States being "hungry for gold and land" and breaking promises to Indigenous groups.
- Signs at Castillo de San Marcos National Monument in Florida about the imprisonment of Indigenous groups inside the Spanish stone fortress. In reporting these signs, NPS staff emphasized that these signs were "developed in collaboration with the Cheyenne

and Arapaho Tribes."

- A panel at Hubbell Trading Post National Historic Site in Arizona discussing Ganado Mucho, a Navajo leader known for settling disputes with ranchers.
- A sign at Fort Laramie National Historic Site in Wyoming that references the persecution of Native Americans.
- An exhibit at Death Valley National Park in Nevada requested by the Timbisha Soshone Tribe with the phrases "these are our homelands" and "we are still here" to commemorate the twenty-fifth anniversary of the Homeland Act, which transferred nearly 7,800 acres of land to the Tribe. Timbisha Shoshone Homeland Act, Pub. L. No. 106-423, 114 Stat. 1875 (2000).

Likewise, signage and exhibits providing scientific information at parks across the country have also been targeted, including:

- A plaque at Great Smoky Mountains National Park in North Carolina and Tennessee explaining how fossil fuels cause air pollution.
- A sign at Cape Hatteras National Seashore titled "The Air We Breathe" discussing the importance of clean air.
- Signs at Everglades National Park in Florida describing industrialization's impact on the wetland ecosystem.
- Signs at Organ Pipe Cactus National Monument in Arizona describing destructive grazing practices and the accelerating rate of global warming since 1850, as well as a booklet that talks about endangered turtles and Sonoran pronghorn.

According to an internal NPS database leaked by anonymous civil servants on March 2, 2026, over five hundred items have been identified for review.

### E. Procedural History

The Secretary's Order and the removals it authorized gave rise to the present action. Plaintiffs National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks ("Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS") filed this action against Defendants Department of the Interior (the "Department"), Secretary of the Interior Doug Burgum (the "Secretary"), the NPS, and Director of the Secretary of the Interior Jessica Bowron on February 17, 2026, arguing that Defendants' actions are arbitrary and capricious, contrary to law, and in excess of statutory authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and seeking declaratory and injunctive relief. Plaintiffs filed an Amended Complaint on March 18, 2026. Plaintiffs bring their claims pursuant to five statutes: the Centennial Act, 54 U.S.C. §§ 100801-100803, the Organic Act, 54 U.S.C. § 100801, the Omnibus Management Act, 54 U.S.C. §§ 100701-100702, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*

On March 18, 2026, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction, pursuant to the Organic Act, the Omnibus Management Act, and the Centennial Act. On April 8, 2026, Defendants filed a consolidated Opposition and Motion to Dismiss, asserting that Plaintiffs lack standing, the claims are not ripe, venue is improper, the claims are not judicially reviewable under the APA, and that Plaintiffs fail to state a claim. The Court held a Status Conference with the parties on May 12, 2026. After conferring with the parties, the Court decided to address the Motion to Dismiss on the papers and without oral argument.

On June 4, 2026, the Court denied Defendants' Motion to Dismiss. On the same day, following discussion with the parties, the Court determined to decide Plaintiffs' Motion for a Stay on the papers and without oral argument due to scheduling challenges. Plaintiffs subsequently filed a Notice detailing Defendants' removals of signage from Bunker Hill National Monument in Massachusetts on June 4, 2026.

## II. LEGAL STANDARD

Plaintiffs seek a stay of the Secretary's Order under the APA, 5 U.S.C. § 705, or a preliminary injunction. Section 705 of the APA authorizes a court reviewing agency action to stay "all necessary and appropriate process" and postpone the effective date of agency action or preserve the status quo pending judicial review "on such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Although a stay under the APA is distinct from a preliminary injunction, the same standard governs both forms of relief. See Nken v. Holder, 556 U.S. 418, 434 (2009). Specifically, the moving party must demonstrate four elements: (1) likelihood of success on the merits; (2) a likelihood of irreparable harm if injunctive relief is not granted; (3) a balance of the equities tips in the movant's favor; and (4) injunctive relief is in the public interest. Id. The most important of the four elements is the likelihood of success on the merits. Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020) (quoting New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). In general, preliminary injunctive relief is an "extraordinary and drastic" remedy that is granted sparingly. Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).

At the preliminary injunction stage, a court accepts as true well-pleaded allegations in the complaint and uncontroverted affidavits. Rohm & Haas Elec. Materials, LLC v. Elec. Circuits

Supplies, Inc., 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010) (citing Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)). The court may also rely upon otherwise inadmissible evidence, Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (citing Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986)), and may take judicial notice of information on official government websites, see Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (relying on the contents on government agency's website).

## III. DISCUSSION

Plaintiffs contend that they are likely to succeed on the merits of their claims that the Secretary's Order is arbitrary and capricious, contrary to law, and in excess of statutory authority. They move pursuant to three of the five statutes cited in the Amended Complaint—the Centennial Act, the Organic Act, and the Omnibus Management Act.[3] They seek a stay or preliminary injunction directing Defendants to restore all park sites to how they existed prior to the issuance of the Secretary's Order, as well as prohibiting Defendants from making any further alterations to interpretive materials pending the litigation of this matter. As explained below, the Court finds that Plaintiffs have demonstrated a likelihood of success in their claims that the Secretary's Order and Defendants' subsequent implementation actions are contrary to law and arbitrary and capricious, that relief is necessary to prevent irreparable harm, and that the balance of the equities and public interest weigh in favor of relief.

### A. Jurisdiction

As a threshold matter, Plaintiffs must establish a sufficient likelihood of success that the

[3] Plaintiffs do not include their FLPMA and Paperwork Reduction Act claims in their Motion, so the Court does not include those statutes in its analysis.

Court has jurisdiction to issue preliminary relief. Defendants raised objections related to standing, venue, ripeness, and reviewability under the APA in a consolidated filing that both opposed Plaintiffs' motion for preliminary injunctive relief and moved for dismissal. The Court addressed those arguments at length in its prior Order denying Defendants' Motion to Dismiss. Under the law of the case, the Court must apply its prior legal holdings to the extent issues were resolved in its prior Order. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) ("[W]hen a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." (quoting Arizona v. California, 460 U.S. 605, 618 (1983))); Ellis v. United States, 313 F.3d 636, 646-48 (1st Cir. 2002). The parties have not submitted any additional briefing since Defendants' consolidated filing, and the factual record bearing on jurisdiction has changed only marginally. The only new materials beyond the Complaint that are before the Court are the Exhibits attached to Defendants' Opposition and Reply, which the Court could not consider at the motion to dismiss stage but can at the preliminary injunction stage, and an additional news article submitted by Plaintiffs regarding Defendants' order to remove three quotes regarding suffrage, abolition, immigration, and anti-war movements from the Bunker Hill Monument in Massachusetts. These additional filings do not materially alter the Court's prior analysis.[4] Accordingly, the Court finds that Plaintiffs have demonstrated a sufficient likelihood of success on the jurisdictional issues at this stage. The

---

[4] Defendants' Exhibits contain screenshots from Plaintiffs' website advertising merchandise opposing the Secretary's Order, which Defendants provide to support their argument that any injury suffered by Plaintiffs is self-inflicted and therefore insufficient to establish causation. The Court previously considered and rejected that argument, concluding that the alleged injuries were not so self-inflicted as to break the causal chain for purposes of standing. As for Plaintiffs' additional filing, the article described therein provides another example reinforcing the Court's conclusions that Defendants' removals of interpretive materials are imminent, actual, and ongoing.

Court therefore proceeds to the merits.

### B. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, a plaintiff must show "more than mere possibility of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato P.R. de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Me. PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)). The court need not conclusively determine the merits of the movant's claim but should evaluate the likelihood that the movant will prevail on the merits. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). Courts place "particular emphasis" on this factor because, if the moving party cannot demonstrate they are likely to succeed, "the remaining factors become matters of idle curiosity." Get in Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 198 (D. Mass. 2016) (quoting New Comm. Wireless, 287 F.3d at 9). The court need only determine the "probable outcome[]" of the underlying claims; it need not resolve the issues presented with certainty. See id. (citing Me. Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 158 (1st Cir. 2012)). Plaintiffs bring two challenges to the Secretary's Order under the APA: that the Order is arbitrary and capricious, and that it is contrary to law/in excess of statutory authority. The Court addresses each in turn.

#### 1. Arbitrary or Capricious

In Count 1, Plaintiffs argue that the Secretary's Order is arbitrary and capricious. Specifically, they contend that the Order lacks a reasoned explanation, is an unexplained departure from prior practice, and is unsupported by the evidentiary record/contrary to existing evidence. At this stage, the Court finds that Plaintiffs have made a preliminary showing that they are likely to succeed on the merits of each of these theories.

### a. Lack of Reasoned Explanation

Plaintiffs have shown a likelihood of success on the merits that the Secretary's Order is "not 'reasonable or reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). To meet this standard, an agency must "set forth its reasons for decision" in a manner that demonstrates a "rational connection between the facts found and the choice made." Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277 (D. Mass. 2025) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Amerijet Int'l Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014)), aff'd, 164 F.4th 1 (1st Cir. 2026). Merely pointing to a source of authority is not itself an explanation of the agency's reasoning; agencies must both cite a source of authority and explain their decisions. See New York v. Trump, 811 F. Supp. 3d 215, 237-40 (D. Mass. 2025). Likewise, "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" Amerijet, 753 F.3d at 1350 (quoting Butte County. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)) (emphasis in original). "[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222 (2016) (citing 5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 42-43).

Here, the Secretary's Order fails to provide any reasoned justification for its directive to review and remove interpretive material. The sole explanation on the face of the Order is to "implement[] provisions" of the Executive Order. The Order then summarizes the content of the Executive Order but does not provide any commentary or explanation for its decision based on facts or on the Land Management Bureaus' statutory mandates. Defendants' briefing offers little more, merely stating in a conclusory fashion that the Order "implement[s] the EO." Reasoned

decisionmaking requires an agency to "both exhibit sufficient consideration of the relevant factors and pertinent aspects of the problem and demonstrate a rational connection between the facts and choice that was made." Nat'l Insts. of Health, 770 F. Supp. 3d at 305. The Order fundamentally fails at the first step of even identifying the relevant factual or legal context that it seeks to disrupt.

First, the Order does not grapple with the relevant legal authority or statutory frameworks that bind the Land Management Bureaus. The Order mentions the Organic Act and the FLPMA as "Authority" but does not explain its relationship to those statutes, such as how the removal of interpretive materials comports with the Organic Act's mandate to "conserve" and to "provide for the enjoyment" of park resources. 54 U.S.C. § 100101(a). The Order does not mention the Centennial Act or the Omnibus Management Act at all, much less any explanation regarding how the Order complies with, or why it departs from, the requirements of those statutes. The Centennial Act, for instance, requires the Secretary to ensure the "availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. The Order fails to explain how its expedited removal of interpretive materials affects the "availability and use" of the Centennial Act's mandated interpretation and education program at park sites. These mandates to conserve park resources, provide for the public's enjoyment, and ensure the use of a broad and high-quality interpretation and education program are binding on Defendants, but the Order fails to engage meaningfully with these authorities or provide any explanation. Cf. Rhode Island v. Trump, 810 F. Supp. 3d 283, 306 (D.R.I. 2025) (finding agency's elimination of "non-statutory components and functions" was arbitrary and capricious because agency failed to actually analyze or explain "which agency components and functions were statutorily required and which were not").

Second, the Order fails to provide any indication that Defendants considered relevant facts and evidence. For example, National Parks were established to serve the public, yet the Order does not point to any evidence regarding the public's reaction to signage at National Parks—let alone evidence that the public reacts negatively to representing diverse viewpoints and marginalized voices, or that existing interpretive materials are disfavored. Instead, tens of thousands of public comments submitted through QR codes at park sites have criticized Defendants' actions, demonstrating that these materials instead promote the public's ability to form stronger connections with park resources. Indeed, Plaintiffs provide a 2026 Pew Research Center survey reporting that sixty-six percent of all U.S. adults believe it is "extremely or very important to publicly discuss [both] the country's historical successes and strengths" as well as "the country's historical failures and flaws." See Andy Cerda, *Majorities of Americans Say It's Important to Talk About the Country's Historical Successes and Failures*, Pew Rsch. Ctr. (Jan. 26, 2026), https://www.pewresearch.org/short-reads/2026/01/26/majorities-of-americans-say-its-important-to-talk-about-the-countrys-historical-successes-and-failures (hereinafter "Pew Research Study"). This opinion cuts across race, age, and educational background, with the majority of each demographic group surveyed supporting the presentation of an unbiased history. See id. Plaintiffs report that another 2021 study by the American Historical Association, as well as a 2025 study by the American Alliance of Museums, further support that the public overwhelmingly prefers to "receiv[e] historical knowledge of others" and "history that challenges, rather than reinforces, their existing historical knowledge." Another 2022 study succinctly summarized: "Americans of all political orientations want their children to learn a history that celebrates our strengths and also examines our failures. Americans overwhelmingly agree that the experiences of minority groups are an important part of that history." The Order

entirely fails to grapple with this existing information, and its anemic contents are devoid of any countervailing data collected by the agency or other independent explanation. This is "grossly insufficient and falls far short of reasoned analysis." Widakuswara v. Lake, 773 F. Supp. 3d 46, 55 (S.D.N.Y. 2025).

The Order also identifies no expert reports or analyses reporting any deficiencies in the materials being targeted, such as that they are historically inaccurate or inconsistent with statutory obligations. The record instead reflects a structured, deliberate, meticulous process for creating factually accurate interpretive and educational materials, which the Order now seeks to unwind. The signs, films, and educational curricula targeted by the Order were developed over decades through GMPs and CIPs set forth at each individual park site. Management Policies §§ 2.2, 7.2. As part of these plans, public and private stakeholders—including subject matter experts, interpretive specialists, local community leaders, scientists, and professional historians—provided multiple rounds of feedback on which topics to include and how best to present them to the public, a process that can take up to years. Indeed, Plaintiffs report that "public historians . . . generate the historical research that informs" interpretive materials, that experiential designers "engaged in extensive vetting of content that ultimately was shared in the parks to ensure it was as accurate as possible based on available high quality academic and scientific research," and that the NPS' process "involve[s] writers, historians, scientists, and curators, among others, all working toward the shared goal of design excellence and producing materials that are accessible and captivating for the audience." Significant resources were invested to ensure that the quality of these materials is high and that the content therein is historically accurate and holistic, so much so that professional societies dedicated to producing academic and scientific research have long-used NPS' interpretive materials as "leading

examples" and "exemplars" of "how interpretive signage and exhibits can responsibly connect visitors to history, science, and cultural significance of place." Taken together, it is clear that NPS previously implemented a thoughtful and deliberative process for creating high quality and factually accurate interpretive materials. The Secretary's Order fails to explain why it believes that process is deficient, or how it resulted in interpretive materials that are "inappropriate[]," a "false reconstruction of American history," or "improper partisan ideology."

Third, the Order fails to rationally connect any facts to the action taken. It claims that the removals will "restore Federal sites . . . to solemn and uplifting public monuments that remind Americans of our extraordinary heritage." However, the Order fails to explain how unearthing and displaying the historical contributions of marginalized groups detracts from celebrating "our extraordinary heritage." Indeed, the NPS' purpose in installing these materials in the first instance was to attract new audiences to National Parks by celebrating diverse experiences. See *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://www.nps.gov/articles/publications-diverse.htm (listing NPS publications "touching on the historical experiences of those who have been underrepresented in traditional histories" as "part of an effort to provide an inclusive and honest look at American history"). This mission extends not only to interpretive displays—entire park sites have been established with the purpose of promoting inclusivity, such as the Stonewall National Monument honoring LGBTQ+ history; the Emmett Till and Mamie Till-Mobley National Monument memorializing the life of fourteen-year-old Emmett Till; the Birmingham Civil Rights National Monument and Medgar and Myrlie Evers Home National Monument honoring the history of the Civil Rights movement and its leaders; the Selma to Montgomery National Historic Trail commemorating the journey of the historic 1965 Voting Rights March in Alabama; and the Belmont-Paul Women's

Equality National Monument honoring the history of women's suffrage. These park sites and materials celebrate the Nation's heritage by commemorating the contributions of all members of the public, including those who have traditionally been excluded. The Secretary's Order is entirely silent as to how removing these materials fosters greater appreciation for and connection to park resources, or which groups are detrimentally impacted by their continued display. The Order's lack of any explanation connecting the facts to its directed action is insufficient to constitute reasoned decisionmaking.

The Court is not persuaded by Defendant's insistence that they may not simply disregard the President's directive. Agencies are duty-bound to presidential directives only "to the extent allowed by law." Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 32-33 (D.C. Cir. 2002). As the District of Columbia recently explained, "furthering the President's wishes cannot be a blank check for [an agency] to do as it pleases." Nat'l Council of Nonprofits, 763 F. Supp. 3d 36, 55 (D.D.C. 2025); see also Orr v. Trump, 778 F. Supp. 3d 394, 424 (D. Mass. 2025) (rejecting argument that following Executive Order is sufficient to satisfy reasoned decisionmaking requirement under APA), opinion vacated, appeal dismissed, No. 25-1579, 2026 WL 1642666 (1st Cir. June 5, 2026) (vacating preliminary injunction only because both parties requested vacatur); New York v. Trump, 811 F. Supp. 3d at 238 ("Insulating an agency action from arbitrary-and-capricious review [because the action implements an Executive Order] would undermine the APA and 'shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen.'") (quoting Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024)).

For the reasons explained above, the Secretary's Order's cursory and conclusory citation to the Executive Order is not, without more, sufficient to satisfy the APA's requirement of

"reasoned decisionmaking." Regents, 591 U.S. at 16 (quoting Michigan v. EPA, 576 U.S. 743, 750 (2015)). The Court must hold Defendants "accountable to the public." Franklin v. Massachusetts, 505 U.S. 788, 796 (1992). A unilateral, unreasoned, and lawless Executive Order of a President cannot be the sole justification for an agency's actions, lest the country be prepared to entrust its future to the whims of a single individual.

**b. Substantial Reliance Interests**

Second, Plaintiffs have shown that they are likely to succeed in their claim that the Secretary's Order was an arbitrary and capricious departure from prior practice. Under the "change-in-position" doctrine, agencies may change their existing policies, but only "as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." Doe v. Noem, 152 F.4th 272, 289 (1st Cir. 2025) (quoting FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 568 (2025)). To satisfy this requirement, the agency must show that the new policy "is permissible under the [governing] statute, that there are good reasons for it, and that the agency believes it to be better" than its old policy. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Moreover, the agency "must consider the impact the policy change will have on any 'serious reliance interests,'" including "weigh[ing] any such interests against competing policy concerns." Doe v. Noem, 152 F.4th at 290 (quoting Wages & White Lion Invs., 604 U.S. at 568; Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020)).

Here, the Secretary's Order is an arbitrary and capricious departure from prior practice, jettisoning decades of efforts by advocates, community members, institutions, historians, and scientists without explanation. Pursuant to its statutory mandate to preserve history and educate the public, the NPS has historically embraced a mission to "tell a more holistic story," which

includes not "judg[ing] what history is worth telling." *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://www.nps.gov/articles/history-under-construction.htm. The agency acknowledged the need to "share an accurate and comprehensive history," even when that history extends to "the good, the bad, the ugly, and everything in between." Id. Telling history in this way, according to the NPS, was the appropriate way to share "the stories of all Americans." *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://www.nps.gov/articles/publications-diverse.htm. Indeed, sharing our collective history grounded in undeniable truths is an honest portrayal of our shared history. Putting this philosophy into practice, the NPS has documented and preserved, for example, the incarceration of Japanese-Americans at the Manzanar National Historical Park, the enslavement of Black Americans at the plantations in Cane River Creole National Park, the killing of Indigenous peoples at the Sand Creek Massacre National Historic Site, and countless other instances of discrimination and marginalization throughout American history. See id. The NPS has also published "National Historic Landmarks Theme Studies" touching on "[d]iverse and [i]nclusive [h]istory," including the history of Asian American, Native Hawaiian, Desi American, Pacific Islander, Hispanic, Latino, Black, Indigenous, and LGBTQ+ communities. See id. Numerous NPS resources have also been dedicated to documenting climate change, environmental degradation, and the effects of industrialization and societal development on natural resources. See *Engaging with the Environment Featured Places*, Nat'l Park Serv. (May 6, 2021), https://www.nps.gov/subjects/tellingallamericansstories/transformingplaces.htm; see also *Climate Change and Your National Parks*, Nat'l Park Serv. (Jan. 13, 2025), http://nps.gov/subjects/climatechange/index.htm. Thus, the NPS has both in policy and in

conduct engaged in a prior practice of telling a whole history.[5]

The Secretary's Order directs the abandonment of these longstanding NPS practices without any reasoned justification. Under the Order, the NPS must review and reverse the installation of interpretive materials that the agency previously deemed relevant, accurate, useful, and informative, marking a shift from the NPS' prior approach of retaining and incorporating such content. As explained at length above, the Order provides no explanation for this change in policy. It does not acknowledge existing studies and polls documenting overwhelming, bipartisan support for telling the whole, unbiased history of this Nation. See, e.g., Pew Research Study. It does not explain whether public sentiment has changed such that certain interpretive materials or topics are now unpopular. It does not explain whether there is new evidence demonstrating that the research behind the interpretive materials is inaccurate. It does not explain whether the CIP and GMP process for creating interpretive materials is unsound. It does not provide or explain any other rational basis for removal.

Beyond failing to explain the departure, the Order fails to recognize or consider substantial reliance interests in the continued availability of interpretive materials at park sites. These interests are held by institutions and individuals; historians who chose to partner with the

[5] Defendants argue that there is no formal written policy that is inconsistent with the Order, and thus, there has been no departure from prior practice. However, an agency's actions may be established through any "past decisions," both formal and informal. Mich. Consol. Gas Co. v. FERC, 883 F.2d 117, 122 (D.C. Cir. 1989) (quoting Cross-Sound Ferry Servs., Inc. v. ICC, 873 F.2d 395, 398 (D.C. Cir. 1989)); see FCC v. Fox Television Stations, Inc., 556 U.S. 502, 517 (2009) (considering inconsistent "prior Commission and staff action"). Under this broad definition, previous decisions by the NPS to install interpretive materials on topics reflecting diverse viewpoints is sufficient to establish a prior agency practice. Cf. New York v. Trump, 811 F. Supp. 3d 215, 240 (D. Mass. 2025) (finding departure from prior practice where Department of Interior issued order to sub-agencies suspending permit issuance for wind energy projects); Washington v. U.S. Dep't of Homeland Sec., 614 F. Supp. 3d 863, 879-80 (W.D. Wash. 2020) (finding that Immigration and Customs Enforcement directive to detain people at courthouses was departure from prior practice of not doing so).

NPS with the understanding that they would be supported by grant funding and project opportunities; students and young adults who rely on park sites to learn about their and others' communities; professional designers and specialists whose careers and prior work will be upended as a result of Defendants' removal campaign; and millions of parents, educators, park visitors, and community groups who rely on the parks as a critical resource to learn and teach the most complete and accurate history and science possible.

To name just a few examples, NPCA alleges they rely on the materials for site visits, programs, and events that they regularly organize at park sites focusing on topics such as marginalized groups and civil rights. These include an annual trip for young adults to Alabama, Mississippi, and Tennessee to the Birmingham Civil Rights National Monument, the Medgar and Myrlie Evers Home, and the Emmett Till and Mamie Till-Mobley National Monument. NPCA's investment of resources in these trips, coupled with the expectation that they will be able to continue in the future, has been curtailed by Defendants' removal of relevant interpretive materials.

Similarly, NPCA member Jennifer Goepfert asserts that the Secretary's Order jeopardizes her ability to continue using park sites to educate her two home-schooled children on topics such as science and history. Goepfert alleges that she has visited dozens of park sites and that the NPS' interpretive materials are a key part of that learning. She poignantly explains:

> [I]t's important for my girls to hear the voices that are usually missing in traditional classrooms, despite our teachers doing their best. For the past five years, the national parks were essential to telling those narratives and educating my daughters. However, because of the recent orders by the administration, the national parks are no longer a reliable resource for educating my daughters.

Goepfert thus has invested resources into planning future visits and has structured her daughters' early education around the expectation that interpretive materials would continue to exist at park sites, which the Order disrupts. See Regents, 591 U.S. at 31 (holding agency failed to consider

individuals' reliance interests in Deferred Action for Childhood Arrivals program, noting that recipients, among other things, "enrolled in degree programs" in reliance on the program).

Moreover, the Order's effects extend beyond the physical removal of signs; the Order communicates that topics such as climate science and unbiased history are no longer fields approved internally by the agency. It thus signals a substantive shift in NPS' priorities that carries consequences for organizations that have structured their conduct in reliance on the agency's longstanding engagement with those topics, including for scientific expertise, technical guidance, and partnerships. For example, AASLH has relied on NPS staff as a key partner for dozens of prior collaborations, including to speak at summits and annual conferences involving environmental care and telling a complete history; to write articles in AASLH's magazine describing a display of the African American Civilian Conservation Corps at Appomattox Court House National Historic Park; to speak at a conference involving "enabl[ing] history organizations to dedicate financial resources to address marginalized communities, preservation efforts, community engagement, social justice, reinterpretation, and [diversity, equity, and inclusion] training"; to participate in panels on topics including #MeToo and #BlackLivesMatter; to serve on AASLH committees, including their climate and sustainability committee, women's history affinity committee, and more; and to contribute to AASLH's blog posts on topics such as LGBTQ+ communities in the United States and slavery at the Ulysses S. Grant National Historic Site. These examples illustrate the depth of the collaboration between the two entities and how, in reliance on this partnership, AASLH has invested substantial time and resources in developing a working relationship that would be costly and disruptive to replace. See Rhode Island v. Trump, 781 F. Supp. 3d 25, 47 (D.R.I. 2025) (finding substantial reliance interests where, among other things, state relied on mediation services provided by agency and would "not be able to

replace those services in the near or medium term").

UCS has similarly invested significant resources into building a relationship with the NPS and has long relied on NPS staff for invaluable input to their research projects. As UCS describes, NPS staff "serve[] as external reviewers who provide[] independent, expert scrutiny of UCS's methods, evidence, interpretations, conclusions, and recommendations." Similarly, NPS "scientists and experts have historically contributed to [UCS] studies," including those that "help inform interpretive materials at park sites," and have provided input on "how scientific phenomena affect American ecosystems and cultural sites, including those that are managed by [the NPS]." The Order directly undermines this relationship by casting doubt on the NPS' continued commitment to climate-related work.

Beyond organizations, thousands of individual historians, curators, educators, archivists, and historic preservationists rely in significant part on partnership with and funding from federal government agencies, including the NPS. For example, AASLH member Donna Graves claims that the Secretary's Order has jeopardized her career as a research historian specializing in, among other things, marginalized communities and climate change. Graves dedicated decades of her career to fields now disfavored by the Order, including through installing dozens of projects on these topics at National Parks such as the Rosie the Riveter World War II Home Front National Historic Park in California. In this manner, she structured major life decisions around the expectation of continued grant funding and support from the NPS. Indeed, according to Graves, this funding comprises forty to eighty percent of her annual income. The Order disrupts those longstanding expectations, not only undermining her portfolio and reputation but also threatening her livelihood. See Regents, 591 U.S. at 31 (finding substantial reliance interest where individuals "embarked on careers" in reliance on programs).

Defendants provide no indication that they weighed any of these substantial reliance interests in promulgating or implementing the Secretary's Order. The Order does not account for its broader impact on the park sites' ability to serve as public educational tools, nor does it contemplate the NPS' decades-long partnerships with private and public organizations who look to the agency for resources regarding inclusive history. It also fails to contemplate the lives, careers, and advancement that will be lost as entire fields of science and history are indiscriminately deemed "inappropriate."

The Court is not persuaded by Defendants' bare insistence that these alleged harms are insufficient to constitute reliance interests. As explained by the Supreme Court in Regents, there are no "such features automatically preclud[ing] reliance interests"; instead, consideration of the significance and seriousness of reliance interests "must be undertaken by the agency in the first instance, subject to normal APA review." 591 U.S. at 31. Here, the Secretary's Order fails to mention Plaintiffs' reliance interests at all, much less consider their significance or weigh their gravity against countervailing considerations.

In sum, an "unexplained change . . . that does not take account of legitimate reliance on prior interpretation may be 'arbitrary, capricious [or] an abuse of discretion.'" Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742 (1996) (quoting 5 U.S.C. § 706(2)(A)) (citing State Farm, 463 U.S. at 46-57; United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 670-75 (1973); NLRB v. Bell Aerospace Co., 416 U.S. 267, 295 (1974)). The Secretary's Order was issued without any indication of consideration of the substantial reliance interests at stake and is thus arbitrary and capricious.

**c. Failure to Consider Important Aspects of the Problem/Counter to Evidence**

Finally, Plaintiffs have demonstrated a likelihood of success in their claim that

Defendants failed to consider important aspects of the problem and acted counter to the evidence before them. Agency action may be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Melone v. Coit, 100 F.4th 21, 29 (1st Cir. 2024); see Regents, 591 U.S. at 16. Courts assess agency determinations "in light of the information [the agency] confronted." Bradley v. Weinberger, 483 F.2d 410, 415 (1st Cir. 1973).

Here, the Secretary's Order failed to consider the interests of the public before ordering the removals. The NPS' statutory mandate is to manage park sites in a manner that serves the public. See 54 U.S.C. § 100101(a) (directing the NPS to "promote and regulate the use of the National Park System by means and measures that . . . provide for the enjoyment of the scenery, natural and historic objects, and wild life" therein), (b)(1)(C) (mandating that park sites be managed "for the benefit and inspiration of all the people of the United States"); see also 16 U.S.C. § 21 (declaring that the purpose of Yellowstone, the country's first National Park, is "for the benefit and enjoyment of the people"). As such, the public's response to the Order is an important consideration that the federal government cannot unilaterally override without explanation. Cf. Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1460 (9th Cir. 1996) (concluding, based on statutory language that park be operated in a manner that "provide[s] for recreational and educational opportunities," that "failure by the NPS to address recreational concerns could be a basis for invalidating agency action" (quoting 16 U.S.C § 460bb)). Plaintiffs have provided evidence that the Secretary's Order is broadly unpopular with the public, alleging that the overwhelming majority of responses to the QR codes at park sites—numbering in the tens of thousands—denounces the Order, viewing it as an attempt to whitewash and erase

important aspects of this country's history. Moreover, as previously explained in detail, numerous recent studies and polls have demonstrated that the majority of Americans prefer that National Parks display a full and accurate history, including on the topics that have now been indiscriminately removed under the Order. See, e.g., Pew Research Study. Defendants provide no evidence that they meaningfully engaged with public sentiment about the interpretive materials prior to ordering their removal, nor do they explain why they continued with this course of action despite evidence that it is unpopular with the public. Congress specifically established the NPS and National Parks to serve the people, and the Government may not ignore that congressional directive by arbitrarily erasing, removing, and hiding historical truths in a manner that overrides the interests, experience, and use by the public.

Similarly, the Order acted counter to existing evidence that the interpretive materials are accurate and high quality. Plaintiffs provide evidence that the now-removed interpretive materials reflect thorough, peer-reviewed academic and scientific research, carefully developed over years of thought and care. As explained, the process for creating interpretive materials is carefully structured and designed to uphold rigorous academic standards. It involves a multitude of stakeholders, painstaking planning through GMPs and CIPs, years of iterative review, and the investment of substantial resources, both tangible and intangible. The Order provides no facts supporting its suggestion that the interpretive materials were created to promote a "false reconstruction of American history," such as evidence of a systemic breakdown in the planning process. Cf. Kravitz v. United States Dep't of Com., 366 F. Supp. 3d 681, 744 (D. Md. 2019) (finding agency acted counter to evidence in concluding that including a citizenship question in annual census survey would not "materially decrease response rates" because agency's own internal expert evidence showed opposite conclusion). Indeed, Defendants do not even attempt

to contend that any of the removed materials were historically inaccurate, in any sense. Thus, the overwhelming evidence supports that the interpretive materials and the processes for creating them are sound, and Defendants may not simply ignore such facts. As such, the Secretary's Order and Defendants' subsequent removal of interpretive materials are arbitrary and capricious.

**2. Contrary to Law/Exceeds Statutory Authority**

In Counts 2 through 4, Plaintiffs argue that the Secretary's Order is contrary to statutory directives in the Organic Act, Centennial Act, and the Omnibus Management Act. Under the APA, courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This is because an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." FEC v. Cruz, 596 U.S. 289, 301 (2022). While "contrary to law" and "in excess of statutory authority" are two separate provisions in the APA, courts have found they contain a "linguistic distinction without a practical difference." Victim Rts. L. Ctr. v. Cardona, 552 F. Supp. 3d 104, 127 (D. Mass. 2021). Thus, the Court assesses both provisions concurrently.

As a threshold matter, the parties dispute the applicable legal standard for Plaintiffs' claim. Defendants contend that, because Plaintiffs bring a facial challenge to the Secretary's Order, they must show that "no set of circumstances" exist such that the application of the Order would be lawful. Plaintiffs argue that the "no set of circumstances" test applies only to hypothetical applications of a challenged action, whereas here, the Secretary's Order has already been implemented. The Court agrees with Plaintiffs and concludes that the "no set of circumstances" test does not apply to this action.

The "no set of circumstances" rule that Defendants invoke originates in United States v.

Salerno, 481 U.S. 739 (1987). In that case, the Supreme Court held that a plaintiff bringing a facial—as opposed to an as-applied—challenge to a law must demonstrate that "no set of circumstances exists under which the [law] would be valid." Salerno, 481 U.S. at 745. Despite the seemingly broad language of Salerno's holding, courts have not extended the case beyond its narrow factual context, where the plaintiffs brought a constitutional challenge to a federal statute that had yet to be implemented at all. See Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 15 (D.D.C. 2009) (holding that Salerno did not apply to agency pattern-and-practice claim); Ohio Coal Ass'n v. Perez, 192 F. Supp. 3d 882, 903-04 (S.D. Ohio 2016) (collecting cases); e.g., Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 619 (1991); Sherley v. Sebelius, 644 F.3d 388, 397 (D.C. Cir. 2011); Reno v. Flores, 507 U.S. 292, 292 (1993); Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp., 613 F.3d 206, 213 (D.C. Cir. 2010). Indeed, courts have expressly declined to apply Salerno to APA claims, see Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 39-40 (D.D.C. 2003) (explaining that "neither the Supreme Court nor the D.C. Circuit has consistently utilized the Salerno standard to review statutory challenges to administrative rules."); Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin., 711 F.3d 662, 667 (6th Cir. 2013) (applying APA, not Salerno, to facial challenge to agency regulation), or to challenges involving existing applications of a law, as opposed to "hypothetical applications," Gen. Elec. Co., 595 F. Supp. 2d at 15.

In the absence of binding First Circuit case law, and because other persuasive authorities repeatedly decline to extend Salerno to similar claims, the Court concludes that Plaintiffs' claims are not governed by Salerno's no-set-of-circumstances test. Plaintiffs do not mount a constitutional challenge to a federal statute, instead challenging an agency action under the APA. See Mineral Policy Ctr., 292 F. Supp. 2d at 40; Nat'l Truck Equip. Ass'n, 771 F.3d at 667.

Moreover, Plaintiffs' claims do not involve speculative hypothetical applications; instead, Plaintiffs allege dozens of existing removals pursuant to the Secretary's Order. Thus, Salerno is not applicable, and Plaintiffs need not demonstrate that all applications of the Order are contrary to law.

Having concluded that Salerno does not apply, the Court turns to the merits of whether the Secretary's Order is contrary to the Organic Act, Centennial Act, and Omnibus Management Act under the APA. The analysis begins with "[a]n examination of the relevant statutes." New York v. Kennedy, 789 F. Supp. 3d 174, 210 (D.R.I. 2025) (citing West Virginia v. EPA, 597 U.S. 697, 721 (2022)), appeal dismissed, No. 25-1780, 2025 WL 4665781 (1st Cir. Oct. 30, 2025). Courts "exercise their independent judgment" and need not "defer to an agency interpretation of the law." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412-13 (2024). At the preliminary injunction stage, the court's construction of the statutory language is "only to determine [the plaintiff's] likelihood of success on the merits"; the court "do[es] not purpose to resolve the issue definitively." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 93 (1st Cir. 2020) (citing Ross-Simons, 102 F.3d at 16); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991) (cautioning that, at preliminary injunction stage, decisions "are to be understood as statements of probable outcomes" only). The Court proceeds with the Organic Act, the Centennial Act, and the Omnibus Management Act in turn.

**a. Organic Act**

Plaintiffs first contend that they are likely to succeed in their claim that the Secretary's Order contravenes the Organic Act. The Act requires the Department to "promote and regulate the use of the National Park System" in a manner that effects the "fundamental purpose" of park sites. 54 U.S.C. § 100101(a). That "fundamental purpose" is to "conserve the scenery, natural

and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Id. According to Plaintiffs, the Secretary's Order undermines this conservation mandate by directing the removal of interpretive materials related to environmental degradation.

The Court agrees and finds that Plaintiffs are likely to succeed on the merits of this claim. The Act contains an express and unambiguous directive that the NPS prioritize conservation of the environment. See Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 909 (D.D.C. 1986) ("In the Organic Act[,] Congress speaks of but a single purpose, namely, conservation."); Bluewater Network v. Salazar, 721 F. Supp. 2d 7, 21 (D.D.C. 2010) (highlighting that "the overriding aim" of the Act "is to conserve the natural wonders of our nation's parks for future generations"). The NPS has recognized this mandate in its Management Policies, which provides the agency's official interpretation of the Organic Act. See Management Policies § 1.4.1; Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior, No. CV 20-3706, 2024 WL 1344450 (D.D.C. Mar. 29, 2024), appeal dismissed, No. 24-5147, 2024 WL 4294879 (D.C. Cir. Sept. 25, 2024). The Policies provide that, consistent with the Act's conservation directive, the NPS "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."[6] Management Policies § 1.4.3. Moreover, the

[6] Defendants observe in a footnote that the Management Policies are guidance only and are thus not judicially enforceable. But Plaintiffs do not seek to enforce the Policies as independent sources of law. Rather, the Policies are relevant insofar as they provide evidence of the agency's own interpretation of the Organic Act and as context for interpreting the statutory text. See Alaska Wildlife All. v. Haaland, 632 F. Supp. 3d 974 (D. Alaska 2022), vacated on other grounds, No. 22-36001, 2024 WL 4890996 (9th Cir. Nov. 22, 2024); Greater Yellowstone, 577 F. Supp. 2d at 190 n.1 (noting the Policies are "enforceable" because they "serve[] as NPS's official interpretation of the Organic Act").

conservation mandate is binding on the agency. In 1978, Congress enacted the Redwood Amendment to the Organic Act, which provides that the "management" and "administration" of park sites "shall not be exercised in derogation of the values and purposes for which the [National Park] System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b)(2); see Act of Mar. 27, 1978, Pub. L. No. 95-250, § 101(b), 92 Stat. 163, 166, codified at 54 U.S.C. § 100101(b)(2); Wash. Area Bicyclist Ass'n, Inc. v. Burgum, No. CV 26-0988, 2026 WL 1078218 (D.D.C. Apr. 21, 2026). Taken together, the statutory text, subsequent amendments, and the NPS' own interpretation leave little doubt that Congress intended that the NPS prioritize environmental conservation.

Moreover, the meaning of "conservation" is sufficiently clear and well-established. The Management Policies repeatedly emphasize that "conservation" includes the avoidance of conduct that promotes or results in detrimental impacts to the environment, including climate change, pollution, and other forms of degradation. For example, in discussing resource management, the Policies explain that "Earth's climate has changed throughout history. Although national parks are intended to be naturally evolving places that conserve our natural and cultural heritage for generations to come, accelerated climate change may significantly alter park ecosystems." Management Policies § 4.7.2. Elsewhere, the Policies emphasize that park sites must educate visitors about "the influence of global climate change." Id. § 7.5.1. And in a separate section on air pollution, the Policies state that the NPS must "actively promote and pursue measures to protect these values from the adverse impacts of air pollution. In cases of doubt as to the impacts of existing or potential air pollution on park resources, the Service will err on the side of protecting air quality and related values for future generations." Id. § 4.7.1. Taken together, these statements reflect the NPS' understanding that the Organic Act prohibits

the agency from taking actions that actively undermine the prevention of environmental degradation.

The Secretary's Order directly conflicts with this conservation mandate. Pursuant to the Order's directive to remove interpretive materials that purportedly reflect "improper partisan ideology" or "inappropriately disparage[] Americans," Defendants have removed dozens of signs explaining, for example, climate change, glacial melt, and air pollution and how humans contribute to those effects. These climate-related interpretive materials further the Organic Act's conservation mandate by fostering public awareness and informing visitors about environmental degradation and the threats facing protected ecosystems, landscapes, and other park resources. Indeed, Plaintiffs describe the NPS as "a key partner in . . . provid[ing] accurate scientific information and increas[ing] scientific literacy and access." The Order nevertheless directs the removal of these materials without identifying any conservation-related justification. The Order thus ignores and defies the NPS' core duty to protect and conserve the Nation's natural resources.

Even in their briefing, Defendants offer no persuasive explanation as to how the Secretary's Order advances any countervailing conservation purpose. Defendants argue only that the Department has broad discretion on how to implement the Act. However, such discretion "is bounded by the terms of the Organic Act itself." Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 193 (D.D.C. 2008). Without adhering to statutory guardrails, executive discretion is ripe for abuse of authority. Defendants have only the powers delegated by Congress and no more. In failing to comply with the Organic Act's conservation mandate, the Order has exceeded the bounds of any discretion conferred by the statute.

Defendants also contend that the Management Policies require NPS to "contribut[e] to

the national dignity," and the Secretary's Order aligns with that directive because it directs the removal of materials that "disparage[] Americans." Management Policies § 1.4.6. Even if the Court were to adopt Defendants' questionable conception of "national dignity," the *sine qua non* of the Organic Act is conservation; any incidental objective of contributing to the Nation's "dignity" cannot supersede that core statutory purpose. Accordingly, Plaintiffs have shown a likelihood of success in their claim that the Secretary's Order contravenes the Organic Act.

**b. Centennial Act**

Plaintiffs next contend that they are likely to succeed on the merits of their claim that the Secretary's Order contravenes the Centennial Act. That statute directs the Secretary to "ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the system." Id. § 100801(1)(A). "Education," in turn, is defined as "enhancing public awareness, understanding, and appreciation of the resources of the [National Park] System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2). According to Plaintiffs, the Secretary's Order violates Defendants' duty to implement a program of the "highest quality education and interpretation," because such a program must include the topics now disfavored by the Order. Defendants contend that the phrase "highest quality education and interpretation" is ambiguous and, therefore, left to agency discretion. The Court agrees with Plaintiffs.

First, the Centennial Act unambiguously requires the NPS to incorporate diverse viewpoints into its interpretation and education program. Section 100802 mandates that the

program be "of the highest quality." Congress then provided clear instructions for what qualifies as "highest quality." Section 100803 of the Act explains that the Secretary may undertake a program of regular evaluation "to ensure that [interpretation and education programs] . . . reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs."[7] 54 U.S.C. § 100803(2). Consistent with this directive, the Management Policies explain that the program will accommodate an "increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations." Management Policies § 7.3.4; see also id. § 7.5.1 (explaining that the program should "provide opportunities for facilitation of civic dialogue to engage Americans in understanding past and current issues of importance on a local-to-global basis"). The Department's Director's Order #6, which supplements the Management Policies, likewise provides that, "[i]n a democratic society such as ours, it is important to understand the journey of liberty and justice, together with the economic, social, religious, and other forces that barred or opened the ways for our ancestors, and the distances yet to be covered. . . . The Park Service must ensure that the American story is told *faithfully, completely, and accurately*." Director's Order #6 at 1-2 n.2 (quoting Rethinking the National Parks for the 21st Century, Nat'l Park

[7] Defendants argue that Section 100803 is written in permissive language and therefore contains no enforceable duties. However, Plaintiffs do not seek to enforce Section 100803 as an independent obligation. Rather, Section 100803 provides Congress' direction on the meaning of the phrase "highest quality" in Section 100802. Statutes "should not be read as a series of unrelated and isolated provisions," and courts understand that "identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995) (quoting Dep't of Rev. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994). Here, both provisions use the same terms of "interpretation" and "education" program, address the same subject matter, and are located within the same title. Section 100803 thus provides persuasive evidence of how Congress understood the phrase "highest quality" with respect to the NPS' interpretation and education program—that is, Section 100803's four specific, enumerated statutory criteria.

System Advisory Bd. (2001)). The Director's Order further specifies that the program must "reflect and embrace different cultural backgrounds, ages, languages, abilities, and needs," and that "[t]he content of interpretive and educational services must be accurate, respect multiple points of view and be free of cultural, ethnic, and personal biases." Id. These sources reflect that the NPS' interpretation and education program must incorporate marginalized voices in telling a full history. In this manner, the National Parks fulfill their duty to unearth untold stories that have historically been missing in traditional classrooms.

The Centennial Act's legislative history reinforces this interpretation. While legislative history is not determinative, it can nevertheless be consulted in providing additional support for interpreting statutory language. See Strickland v. Comm'r, Maine Dep't of Hum. Servs., 48 F.3d 12, 17, 19 (1st Cir. 1995). During congressional debates over the Centennial Act, Massachusetts Representative Niki Tsongas, one of the bill's original co-sponsors and ranking member of the U.S. House of Representatives Natural Resources Subcommittee on Federal Lands, provided opening statements. Quoting Stephen Mather, the first Director of the NPS, she remarked that:

> "The parks do not belong to one State or to one section . . . ; they are national properties in which every citizen has a vested interest; they belong as much to the man"—and I would add, woman—"of Massachusetts, of Michigan, of Florida as they do to the people of California, of Wyoming, and of Arizona."
>
> Those words are a powerful reminder in this era of political division and disagreement: national parks are national. They cut across party lines and geographic boundaries. They enjoy broad support, and they bring people together—something we seem to need now more than ever.

162 Cong. Rec. H7207 (daily ed. Dec. 6, 2016) (statement of Rep. Nicola Tsongas). California Representative Tom McClintock, the chairman of the Federal Lands Subcommittee, reflected similar sentiments in his comments that followed, stating that the country's "most beautiful and historic lands should be set aside for the 'use, resort, and recreation' of the American people." Id. at H7208 (statement of Rep. Tom McClintock). Arizona Representative Adelita Grijalva, the

bill's original sponsor, provided the final comments of the debates. She further echoed the view that the purpose of the Centennial Act was to expand public access, stating: "In our democratic society, the park system is uniquely one of the most democratic public institutions because, after all, all Americans own the park system and it is for all Americans . . . ." Id. (statement of Rep. Adelita Grijalva). The bill was then approved by both chambers of Congress, with the Senate summarily adopting it without amendment and by unanimous consent. Id. at S7167. Together, this legislative history reflects an understanding that the Centennial Act requires park sites to serve all visitors. Implicit in this objective is that park sites and their resources must incorporate complete history—unvarnished history—including the views of those historically marginalized.

The Secretary's Order conflicts with this statutory mandate. The Order directs the removal of any "descriptions, depictions, or other content" that "disparage[s] Americans," crafting a narrative of American history that narrowly "focus[es] on the greatness of the achievements and progress of the American people" and the country's efforts to "advanc[e] liberty, prosperity, and human flourishing." By its language, this directive authorizes the suppression of information concerning actions that have undermined "liberty, prosperity, and human flourishing"—a phrase in which Defendants leave little doubt as to its meaning, having removed numerous interpretive materials related to abolition, eugenics, labor history, climate change, LGBTQ+ rights, women's suffrage, and Indigenous history. This erasure of the struggles, lives, and stories of various marginalized communities directly denies the importance of the Centennial Act's mandate that park sites reflect the voices of all Americans. Rather than encourage visitors of all backgrounds to "gain awareness, appreciation, and understanding" with park resources, as the Centennial Act requires, the Order instead, in the stroke of a pen, fosters alienation and disengagement by removing a source of potential connection that diverse

communities could form with park resources.

Second, beyond reflecting diverse viewpoints, the Centennial Act also requires the NPS' interpretation and education program to reflect current scientific research. Section 100803 states that the program may be regularly updated to "reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803(4). The Management Policies likewise declare that "[f]actual information presented [at park sites] will be current, accurate, [and] *based on current scholarship and science*." Management Policies at 90 (emphasis added); see also Director's Order #6 §§ 8.4.1 (stressing that "[a]cknowledging multiple points of view does not require interpretive and educational programs to . . . disregard the weight of scientific or historical evidence"), 8.4.2 (explaining that "the best scientific evidence available" is those "found in scholarly sources that have stood the test of scientific peer review and criticism"). The Policies further explain that "current science" includes "topics such as the civic experience of our country; the complex, diverse ecology of our nation and the world; and the influence of global climate change." Management Policies § 7.5.1; see also id. § 7.3.1.1 (specifying that curriculum-based programs should focus on, among other things "the threats to the condition of those resources" within the park sites). Together, this language indicates that a "broad program of the highest quality interpretation and education" includes incorporating topics such as climate change, biodiversity, pollution, and environmental degradation.

For similar reasons that the Order violates the Organic Act's conservation mandate, the Secretary's Order violates this directive from the Centennial Act. The Order's focus on "*human* flourishing" (emphasis added) and its prohibition on materials that "disparage[] Americans" at park sites effectively require Defendants to remove materials that highlight the Nation's historical contributions to environmental degradation. Indeed, Defendants have already taken

down signage across multiple park sites relating to glacier melt, carbon dioxide emissions, and climate change. In response, Defendants have provided no explanation—and the Court discerns none—for how the removals promote current scientific or academic research. For example, Defendants provide no evidence that the science reflected in the materials is inaccurate, outdated, or disputed; nor do Defendants provide any evidence that the interpretive materials somehow physically contribute to environmental degradation. Accordingly, Plaintiffs have demonstrated that the Order contravenes the Centennial Act.

In response, Defendants contend that the Centennial Act's only requirement is that a program of "highest quality interpretation and education" exist. They argue that the Management Policies, which set out NPS' framework for an interpretation and educational program, satisfy this requirement. The Court disagrees. The Centennial Act requires both the "availability" *and* "use" of such a program. 54 U.S.C. § 100802. Even if the Policies remain formally in effect, the Secretary's Order substantially undermines their "use." The Policies establish a defined process and structure for designing and implementing the program through GMPs and CIPs. Management Policies § 7.2. The Policies emphasize that "*[a]ll* interpretive and educational services . . . will be based on and coordinated with the comprehensive interpretive plan," and that CIPs must be used to determine "which stories to tell, how to tell them, and how to reach specific audiences." Id. (emphasis added). The Secretary's Order sidesteps this deliberative process and mandates expedited removals pursuant to an agenda that has little, if any, relationship with the priorities set forth in the Centennial Act or the Management Policies. In doing so, the Order effectively overwrites the CIPs, thus contravening the Centennial Act's requirement that the NPS "use" the interpretation and education program. Accordingly, Plaintiffs have demonstrated a likelihood of succeeding on their claim that the Secretary's Order

is contrary to the Centennial Act.

**c. Omnibus Management Act**

Plaintiffs next argue that the Secretary's Order is contrary to the Omnibus Management Act. That statute provides that the Secretary "shall continually improve the ability of the [NPS] to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the [National Park] System." 54 U.S.C. § 100701. The Act also states that the Secretary "shall ensure that management of [National Park] System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." Id. § 100702.

For substantially similar reasons that the Order is contrary to the Centennial Act, Plaintiffs have demonstrated a likelihood of success in this claim. The Omnibus Management Act's directive to the NPS to implement a "broad program" of the "highest quality science and information," and to provide "state-of-the-art . . . interpretation of" park resources, closely tracks the language used in the Centennial Act. Id. §§ 100701-100702. Moreover, like the Centennial Act, the Management Policies implement the Omnibus Management Act. Management Policies § 4.1 ("[I]n accordance with requirements of the National Parks Omnibus Management Act of 1998, the Service will use the findings of science and the analyses of scientifically trained resource specialists in decisionmaking."); see also id. ("The Service manages the natural resources of parks to maintain them in an unimpaired condition for present and future generations in accordance with NPS specific statutes, including . . . the National Parks Omnibus Management Act of 1998."). Thus, the Court's analysis of the terms "interpretation" and "education" in the Centennial Act informs interpretation of the Omnibus Management Act's corollary terms. Without repeating its analysis in full, the Court finds that the Omnibus

Management Act directs the NPS to incorporate contemporary scientific research into interpretive materials at park sites, including on climate change and environmental degradation. The Secretary's Order contravenes these requirements by mandating the removal of such topics. Thus, Plaintiffs have demonstrated a likelihood of success in their claims that the Secretary's Order is contrary to the statutory standards in the Organic Act, Centennial Act, and Omnibus Management Act. See State Farm, 463 U.S. at 59 n.* (Rehnquist, J., concurring in part and dissenting in part) ("[A] new administration may not . . . ignore statutory standards in carrying out its regulatory functions."). And more broadly, Plaintiffs have overwhelmingly demonstrated a likelihood of success on their claims that the Secretary's Order is both arbitrary and capricious and contrary to law.

The great irony of this case is that Defendants, and the Executive Order they purport to faithfully execute, decry the existing interpretive materials at National Parks as a "concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth." Yet, the Government's actions do exactly what they profess to counteract, dismantling objective historic truths and permanently damaging public memory. Behind the incendiary rhetoric lies little substance, lacking even a remote amount of scientific rigor, facts, legal authority, or discernible reasoning. Our democracy and system of governance demand more from the Executive. Agencies must grapple with important facts and considerations, respect the limits of statutory authority, provide reasoned justifications for their actions, and, above all else, follow the law. That was not done here.

### C. Irreparable Harm

The second requirement for a plaintiff to obtain a preliminary injunction is to show that he "is likely to suffer irreparable harm in the absence of preliminary relief." Winter v. Nat. Res.

Def. Council, Inc., 555 U.S. 7, 20 (2008). To demonstrate irreparable harm, a plaintiff must show "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, 102 F.3d at 19; Kmart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989) ("The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies."). Courts consider this factor in conjunction with likelihood of success on the merits, using a "sliding scale . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010). When "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (quoting E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 738, 743-44 (1st Cir. 1996)). Importantly, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Kmart, 875 F.2d at 915 (quoting Wagner v. Taylor, 836 F.2d 566, 575-76 (D.C. Cir. 1987)).

Plaintiffs have demonstrated that the risk of harm to them and their individual members as research institutions, historians, conservationists, and park visitors is immediate and irreparable. Many of Plaintiffs' alleged aesthetic, recreational, and informational harms are nonquantifiable by nature. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) ("Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." (internal quotation marks and citation omitted)), abrogated in part on other grounds, Winter, 555 U.S. 7. For example, NPCA member Jennifer Goepfert alleges that she uses interpretive materials at park sites as a primary

source of educational material for her school-aged children, including on topics such as civil rights, climate change, and slavery. Without the interpretive materials, Goepfert can no longer rely on the park sites for their pedagogical value. Indeed, courts have recognized loss of educational opportunity for children as incommensurable and immeasurable harm. See New York v. McMahon, 784 F. Supp. 3d 311, 362-63 (D. Mass. 2025) (finding schools were irreparably harmed by threats to their ability to educate children). The same is true for Plaintiffs' millions of other members and supporters who "regularly visit, study, work, photograph, or recreate" at park sites, who now, because of the Secretary's Order, no longer have access to the removed interpretive materials. Cf. City of Philadelphia v. Burgum, 820 F. Supp. 3d. 313, 342 (E.D. Pa. 2026) (granting preliminary injunction and finding irreparable harm in action challenging application of the Secretary's Order, noting that "[e]ach person who visits the President's House and does not learn of the realities of founding-era slavery receives a false account of this country's history").

Even if the harms could be quantified, the APA does not provide for monetary damages. Under 5 U.S.C. § 702, the APA provides for judicial review only for an "action in a Court of the United States seeking relief *other than money damages*." (emphasis added). Thus, for the claims Plaintiffs bring here, monetary damages would not be available, supporting the conclusion that any harm is irreparable, as the Court could not provide traditional legal remedies. See California v. Kennedy, 802 F. Supp. 3d 273, 283 (D. Mass. 2025) (citing Kentucky v. Biden, 23 F.4th 585, 611 (6th Cir. 2022)) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Defendants contend that the harm is not irreparable, highlighting that Plaintiffs did not move for preliminary injunctive relief for several months. Specifically, the Secretary's Order

was promulgated on May 20, 2025, whereas Plaintiffs initiated the suit on February 17, 2026, and moved for preliminary injunctive relief on March 18, 2026. Thus, since the issuance of the Order, Plaintiffs waited approximately nine months to file a complaint, and ten months to move for relief. Defendants argue that this delay undercuts Plaintiffs' argument that the harm is irreparable. Defendants are correct that in some circumstances, delay counsels against a finding of irreparable harm. See, e.g., Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004). However, courts in this district have nevertheless found irreparable harm in cases involving delays of comparable length or longer. See, e.g., Baillargeon v. CSX Transp. Corp., 463 F. Supp. 3d 76, 85 (D. Mass. 2020) (two-year delay); Boustany v. Bos. Dental Grp., Inc., 42 F. Supp. 2d 100, 112 (D. Mass. 1999) (eight-month delay); Whoop, Inc. v. Shenzhen Lexqi Elec. Tech. Co., 818 F. Supp. 3d 207, 223 (D. Mass. 2026) (eight-month delay). On the facts before it, the Court finds that Plaintiffs—while not acting with particular haste—were not unduly dilatory. Defendants significantly expanded removal efforts in early 2026, increasing both the magnitude of harm and urgency for relief. Moreover, the Order identifies "July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence" as a key upcoming milestone, which is mere weeks away. In any event, the touchstone of irreparable harm is that the injury is "not easily measured or fully compensable in damages," which, as explained, Plaintiffs have demonstrated. Ross-Simons, 102 F.3d at 18-19.

The weight of this harm bears emphasizing. These park sites are deeply meaningful for many people for multifaceted reasons. The now-removed materials were the product of years of care, stewardship, community collaboration, and public engagement. They commemorate the people who have lived, worked, and died in this Nation; serve as a tribute to their contributions to the ideals of freedom, democracy, and equity; and represent an enduring reminder of the

inherent contradictions in our Nation's history. See City of Philadelphia, 820 F. Supp. 3d. at 341-42. Their removal constitutes government-sanctioned erasure and rejection of their histories. It strips the sites of the context that gives them meaning. It degrades the public's trust in the government, as the Executive Order ignores congressional directives and carelessly razes decades of efforts in the pursuit of its unilateral agenda. These harms are, in all senses of the word, irreparable.

**D. Balance of the Equities/Public Interest**

Finally, the Court must balance the parties' relative hardships and consider the public interest. See Winter, 555 U.S. at 20. These last two factors "merge when the Government is the opposing party." Nken, 556 U.S. at 435. The relevant inquiry is whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Grant v. Trial Ct., 784 F. Supp. 3d 475, 490 (D. Mass. 2025) (quoting Dataphase Sys., Inc. v. C L Sys., Inc. 640 F.2d 109, 113 (8th Cir. 1981)). The court "explore[s] the relative harms to applicant and respondent, as well as the interests of the public at large" in the context of "the exigencies of that particular case." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (citing Barnes v. E-Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991)). Like the irreparable harm factor, the balance of hardships factor is weighed in light of the likelihood of success on the merits. Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612-13 (1st Cir. 1988).

Here, the balance of equities and public interest weigh in favor of an injunction. As explained above, Plaintiffs have demonstrated that the Secretary's Order likely contravenes the Organic Act, Centennial Act, and Omnibus Management Act. The public has a strong interest in ensuring the Government acts lawfully. As the Supreme Court explained, "our system does not

permit agencies to act unlawfully even in pursuit of desirable ends." Ala. Ass'n of Realtors v. Dep't Health & Hum. Servs., 594 U.S. 758, 766 (2021). Indeed, "[t]here is generally no public interest in the perpetuation of unlawful agency action," League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016), and the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013). As such, preliminary injunctive relief would serve the public interest by forcing Defendants to abide by their existing statutory duties.

It bears emphasizing that the public ultimately bears the brunt of Defendants' actions. Everyday park visitors—young, old, and from all backgrounds—look to the National Park system to learn and enhance their understanding of history, science, and this Nation. Defendants' continued censorship of interpretive materials disfavored by this Administration diminishes the public's collective ability to engage critically and thoughtfully with these topics. Cf. City of Philadelphia, 820 F. Supp. 3d. at 343 ("[T]here is a public interest in the preservation and exhibition of . . . history."). By its terms, the Order erases the history of countless people; alienates communities from public spaces; limits the availability of scientific information relevant to ensuring the long-term preservation of the parks themselves; and impairs the mission of the NPS to preserve the parks "for the enjoyment, education, and inspiration of this and future generations." The Executive Order, in fact, tarnishes the legacy of this great Nation by attempting to remove these items in time for, and in honor of, the 250th anniversary of our Nation's creation. The gravamen of these public interests cannot be overstated.

On the other side of the ledger, Defendants contend that, as a practical matter, the requested relief would impose administrative burdens on the Government by preventing the implementation of routine updates to park sites. However, the requested relief would not

prohibit Defendants from making all changes to the park sites; it would only prevent the implementation of Secretary Order 3431. The relief would not affect Defendants' ability to, for example, conduct repairs on park resources or prevent dilapidation.

Defendants also invoke a separation-of-powers argument, contending that injunctive relief would burden the President's interest in managing the Executive Branch, thereby undermining interbranch comity and democratic principles. However, the Constitution does not envision unyielding judicial deference to the President's will in the name of interbranch comity. Rather, separation of powers is paired with a system of checks and balances, and courts have never hesitated to assume their duty of constraining executive overreach when necessary. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582 (1952).

In sum, the Court finds that the balance of the equities and the public interest weigh in favor of Plaintiffs. Accordingly, Plaintiffs have met all the required factors for preliminary injunctive relief.

**E. Scope of Remedy**

Having concluded that Plaintiffs have met their burden of demonstrating the necessity of relief, the Court must now determine the appropriate scope of the remedy. The parties raise three disputes. First, Defendants argue that a stay under Section 705 is not an available remedy and that Plaintiffs' sole avenue for relief, if any, is a preliminary injunction. Second, Defendants argue that Section 5 should be severed from the remainder of the Secretary's Order, and that relief should apply only to that provision. Third, the parties dispute the date to which any restorative relief should relate back. The Court addresses each in turn.

As to the vehicle for relief, the Court finds that a stay pursuant to Section 705 is appropriate. Defendants' sole argument to the contrary is that the Secretary's Order has already

been implemented. However, "courts 'routinely stay already-effective agency action under Section 705.'" Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 182 (D. Mass. 2025) (quoting Haitian Evangelical Clergy Ass'n v. Trump, 789 F. Supp. 3d 255, 274 (E.D.N.Y. 2025)). Accordingly, because Plaintiffs have met the standard for a stay under Section 705, the Court grants one here.[8]

As to severability, the Court agrees that injunctive relief should be limited to Section 5, the only portion of the Secretary's Order materially disputed in this case. Entire agency actions should not be vacated if unchallenged portions can "function sensibly without the stricken provision." Sorenson Commc'ns Inc. v. FCC, 755 F.3d 702, 710 (D.C. Cir. 2014) (quoting MD/DC/DE Broad. Ass'n v. FCC, 236 F.3d 13, 22 (D.C. Cir. 2001)). Here, the remaining sections of the Secretary's Order do not materially affect Plaintiffs' claims and can function without Section 5. Sections 1 to 3 provide background on the Order's purpose, authority, and context, and do not authorize any specific agency action. Section 4 directs the NPS to identify infrastructure improvements and funding for the restoration of Independence Hall in Philadelphia, PA. Plaintiffs do not allege that the restoration of that site caused any of their injuries. Section 6 directs the Land Management Bureaus to post QR codes at park sites, and

---

[8] The Court declines to require that Plaintiffs post a bond to secure a stay. Unlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not require the movant to post a bond. See 5 U.S.C. § 705; Woonasquatucket River Watershed Council v. Dep't of Agric., 778 F. Supp. 3d 440, 477 (D.R.I. 2025) (noting district courts have "broad discretion . . . to determine the appropriate amount" of a bond for a stay, "including the discretion to require no bond at all"); see also Seafreeze Shoreside, Inc. v. DOI, No. 22-CV-11091, 2023 WL 3660689 (D. Mass. May 25, 2023). In "suits to enforce important federal rights or 'public interests,'" courts generally do "not require posting of a substantial bond." Maine v. Dep't of Agric., No. 25-CV-00131, 2025 WL 1088946, at *30 (D. Me. Apr. 11, 2025). As this case involves the NPS' statutory authority as a federal agency and the public's interest in National Park sites, the Court finds a bond is not appropriate. Defendants do not dispute this in their briefing.

Plaintiffs' Motion for Stay does not include their Paperwork Reduction Act claim, which is the only claim directly applicable to Section 6. Finally, Section 5's directive applies not only to the NPS but also to the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation. Plaintiffs move only pursuant to statutes that govern the NPS, and so any injunctive relief does not extend to these other agencies.

Finally, the parties dispute the date from which Defendants must restore the park sites. Plaintiffs request that Defendants restore the sites as they existed prior to the Order's issuance (i.e., May 20, 2025). Defendants contend that the appropriate date is when Plaintiffs' initial complaint was filed (i.e., February 17, 2026). The Court agrees with Plaintiffs and finds that restoring park sites to their state prior to the issuance of the Secretary's Order is the proper course of action to minimize injury. As the First Circuit has explained:

> If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, . . . by the issuance of a mandatory injunction, . . . or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. *The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo*.

Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers, 679 F.2d 978, 995-96 (1st Cir. 1982) (emphasis added) (quoting Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974)), rev'd on other grounds, 467 U.S. 526 (1984). As explained, by the time Plaintiffs initiated this action, Defendants had already removed dozens of interpretive materials across the country, thus causing concrete and irreparable injury to Plaintiffs even before the complaint was filed. Restoration of the sites is the only course of action that can remedy these existing injuries and prevent further harm.

## IV. CONCLUSION

Plaintiffs have demonstrated a likelihood that Defendants' efforts, ostensibly taken in the name of restoring dignity, instead seek to rewrite the Nation's history with a white-out pen. History cannot be faithfully told while excluding the experiences of communities whose contributions, struggles, and achievements form an important part of our Nation's story. Indeed, at a time of facts and alternative facts, the only thing we must be able to rely on as undeniable truth is history. And telling the full truths of our shared story helps our Nation heal from past wrongs, rather than prolonging us.

Because Defendants deemed it important to strip the parks of these undeniable truths in anticipation of the 250th Anniversary of our great Nation, it is equally important that our shared history be honestly told and fully restored by the 250th Anniversary to properly honor the remarkable achievements of the United States. Accordingly, it is hereby **ORDERED**:

1. Plaintiffs' Motion to Stay Under 5 U.S.C. § 705 is **GRANTED** forthwith.

2. Defendants are **ENJOINED** from taking any further action to implement Section 5 of Secretary's Order 3431, "Restoring Truth and Sanity to American History," at park sites managed by the NPS pending further litigation in this matter.

3. Defendants are **ORDERED** to take all necessary steps **<u>forthwith</u>** to restore and reinstall all interpretive materials at park sites managed by the NPS that, pursuant to the Secretary's Order, have been altered, removed, or damaged in the process of such removal since May 20, 2025, to be completed within **twenty-one (21) calendar days** of this Order. Defendants are further **ENJOINED** from making any further alterations to interpretive materials at NPS park sites pursuant to the Secretary's Order.

4. Within **five (5) calendar days** of this Order, and every **seven (7) calendar days**

thereafter until otherwise ordered by the Court, Defendants shall file a status report describing all steps they have taken to comply with the Court's Order, including a list of all interpretive materials that have been restored to their prior state as of May 19, 2025.

**SO ORDERED.**

Dated: June 12, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

## 5 U.S.C. § 551. Definitions

* * *

For the purpose of this subchapter –

* * *

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

* * *

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

* * *

## 5 U.S.C. § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

* * *

**5 U.S.C. § 705. Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

* * *

**5 U.S.C. § 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

* * *

**54 U.S.C. § 100101. Promotion and regulation**

(a) In general.--The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

* * *

**54 U.S.C. § 100701. Protection, interpretation, and research in System**

Recognizing the ever increasing societal pressures being placed upon America's unique natural and cultural resources contained in the System, the Secretary shall continually improve the ability of the Service to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the System.

* * *

**54 U.S.C. § 100702. Research mandate**

The Secretary shall ensure that management of System units is enhanced by the availability and utilization of a broad program of the highest quality science and information.

* * *

**54 U.S.C. § 100802. Interpretation and education authority**

The Secretary shall ensure that management of System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education.

*        *        *

**54 U.S.C. § 100803. Interpretation and education evaluation and quality improvement**

The Secretary may undertake a program of regular evaluation of interpretation and education programs to ensure that they—

(1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System;

(2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs;

(3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and

(4) reflect current scientific and academic research, content, methods, and audience analysis.

*        *        *