No. 26-1714

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS,
*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director,
*Federal Defendants-Appellants*

Appeal from the United States District Court for the District of Massachusetts
No. 1:26-cv-10877 (Hon. Angel Kelley)

# JOINT APPENDIX

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

ROBERT J. LUNDMAN
CHRISTOPHER C. HAIR
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-9583
christopher.hair@usdoj.gov

*Counsel for Federal Defendants-Appellants*

(See inside cover for additional appearances)

Brooke Menschel
Michael J. Torcello
Pablo A. Moraga
Mark B. Samburg
Steven Y. Bressler
Robin F. Thurston
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426
bmenschel@democracyforward.org
mtorcello@democracyforward.org
pmoraga@democracyforward.org
msamburg@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS


| Document Title | Date | District Court No. | Index Location |
|---|---|---|---|
| District Court Docket Sheet | | | 001 |
| Federal Defendants' Notice of Appeal | June 15, 2026 | 43 | 012 |
| Amended Complaint | March 18, 2026 | 28 | 015 |
| Plaintiffs' Exhibit 1: NPS Management Policies (excerpts) | March 18, 2026 | 29-3 | 079 |
| Plaintiffs' Exhibit 2: NPS Director's Order No. 6 | March 18, 2026 | 29-4 | 092 |
| Declaration of Jessica Bowron | April 8, 2026 | 31-3 | 110 |
| Executive Order 14253 | March 27, 2025 | 31-4 | 119 |
| Order No. 3431 | May 20, 2025 | 31-5 | 122 |
| Declaration of Alan Spears | March 11, 2026 | 29-5 | 127 |
| Declaration of Cybelle Jones | March 11, 2026 | 29-6 | 143 |
| Declaration of Donna Graves | March 11, 2026 | 29-7 | 155 |
| Declaration of Jennifer Goepfert | March 11, 2026 | 29-8 | 170 |
| Declaration of John Dichtl | March 11, 2026 | 29-9 | 185 |
| Declaration of Bill Wade | March 11, 2026 | 29-10 | 203 |
| Declaration of Emily Thompson | March 12, 2026 | 29-11 | 213 |
| Declaration of Jon Reyes | March 11, 2026 | 29-12 | 221 |
| District Court opinion denying motion to dismiss | June 4, 2026 | 37 | 233 |
| Plaintiffs' notice of factual development | June 4, 2026 | 40 | 263 |
| District Court opinion granting preliminary injunction | June 12, 2026 | 41 | 266 |
| Second Declaration of Jessica Bowron | June 15, 2026 | 44-2 | 329 |
| District Court order regarding Federal Defendants' motion to stay pending appeal | June 16, 2026 | 47 | 338 |
| Federal Defendants' status report, declaration of Joy Beasley, and NPS inventory | June 17, 2026 | 49; 49-1; and 49-2 | 340 |
| District Court order denying stay pending appeal | June 18, 2026 | 51 | 353 |

APPEAL

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:26−cv−10877−AK

National Parks Conservation Association et al v. Department of the Interior et al
Assigned to: District Judge Angel Kelley
Case in other court: 26−01714
Cause: 05:551 Administrative Procedure Act

Date Filed: 02/17/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2026 | 1 | COMPLAINT against Department of the Interior, National Park Service, Doug Burgum, Jessica Bowron Filing fee: $ 405, receipt number AMADC−11552572 (Fee Status: Filing Fee paid), filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 2 | MOTION for Leave to Appear Pro Hac Vice for admission of Brooke Menschel Filing fee: $ 125, receipt number AMADC−11552983 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Brooke Menschel)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 3 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael J. Torcello Filing fee: $ 125, receipt number AMADC−11553070 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Michael J. Torcello)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 4 | MOTION for Leave to Appear Pro Hac Vice for admission of Pablo A. Moraga Filing fee: $ 125, receipt number AMADC−11553090 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Pablo A. Moraga)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of Steven Y. Bressler Filing fee: $ 125, receipt number AMADC−11553113 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Steven Y. Bressler)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Robin F. Thurston Filing fee: $ 125, receipt number AMADC−11553126 by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Affidavit Declaration of Robin F. Thurston)(Samburg, Mark) (Entered: 02/17/2026) |
| 02/17/2026 | 7 | ELECTRONIC NOTICE of Case Assignment. District Judge Angel Kelley assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 8 | District Judge Angel Kelley: ORDER entered. Standing Order Regarding Motion Practice. (CEH) (Entered: 02/17/2026) |

| | | |
|---|---|---|
| 02/17/2026 | 9 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 2 Motion for Leave to Appear Pro Hac Vice Added Brooke Menschel.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 10 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 3 Motion for Leave to Appear Pro Hac Vice Added Michael J. Torcello.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 11 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 4 Motion for Leave to Appear Pro Hac Vice Added Pablo A. Moraga.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 12 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 5 Motion for Leave to Appear Pro Hac Vice Added Steven Y. Bressler.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 13 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 6 Motion for Leave to Appear Pro Hac Vice Added Robin F. Thurston. |

| | | |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(CEH) (Entered: 02/17/2026) |
| 02/17/2026 | 14 | NOTICE of Appearance by Steven Y. Bressler on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Bressler, Steven) (Entered: 02/17/2026) |
| 02/17/2026 | 15 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (MAL) (Entered: 02/17/2026) |
| 02/19/2026 | 16 | NOTICE of Appearance by Brooke Menschel on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Menschel, Brooke) (Entered: 02/19/2026) |
| 02/19/2026 | 17 | NOTICE of Appearance by Robin F. Thurston on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Thurston, Robin) (Entered: 02/19/2026) |
| 02/19/2026 | 18 | NOTICE of Appearance by Pablo Moraga on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Moraga, Pablo) (Entered: 02/19/2026) |
| 02/19/2026 | 19 | NOTICE of Appearance by Michael Torcello on behalf of American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists (Torcello, Michael) (Entered: 02/19/2026) |
| 03/03/2026 | 20 | SUMMONS Returned Executed as to US Attorney by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. All Defendants. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 21 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 22 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 23 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 24 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/03/2026 | 25 | SUMMONS Returned Executed by Union of Concerned Scientists, Association of National Park Rangers, American Association for State and Local History, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential |

| | | |
|---|---|---|
| | | Graphic Design. (Menschel, Brooke) (Entered: 03/03/2026) |
| 03/09/2026 | 26 | NOTICE of Appearance by Ian Swenson on behalf of Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service (Swenson, Ian) (Entered: 03/09/2026) |
| 03/18/2026 | 27 | Joint MOTION for Leave to File Excess Pages *and for Briefing Schedule* by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Text of Proposed Order)(Menschel, Brooke) (Entered: 03/18/2026) |
| 03/18/2026 | 28 | AMENDED COMPLAINT against Department of the Interior, National Park Service, Doug Burgum, Jessica Bowron, filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists.(Menschel, Brooke) (Entered: 03/18/2026) |
| 03/18/2026 | 29 | MOTION for Preliminary Injunction *and Stay pursuant to 5 U.S.C. 705* by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit 1 (Management Policies), # 4 Exhibit 2 (Director's Order #6), # 5 Exhibit 3 (Declaration of Alan Spears), # 6 Exhibit 4 (Declaration of Cybelle Jones), # 7 Exhibit 5 (Declaration of Donna Graves), # 8 Exhibit 6 (Declaration of Jennifer Goepfert), # 9 Exhibit 7 (Declaration of John Dichtl), # 10 Exhibit 8 (Declaration of Bill Wade), # 11 Exhibit 9 (Declaration of Emily Thompson), # 12 Exhibit 10 (Declaration of Julian Jon Reyes))(Menschel, Brooke) (Entered: 03/18/2026) |
| 03/19/2026 | 30 | District Judge Angel Kelley: ELECTRONIC ORDER entered ***GRANTING*** the Parties’ 27 Joint MOTION for Leave to File Excess Pages and for Briefing Schedule. The Court ***ADOPTS*** the Parties’ proposed page limits and briefing schedule, with minor modifications, as follows:<br><br>−Plaintiffs’ motion for a stay pursuant to 5 U.S.C. § 705 or preliminary injunction shall not exceed 35 pages;<br><br>−Defendants’ combined opposition to Plaintiffs’ motion, and their motion to dismiss, shall not exceed 35 pages, and shall be filed no later than 21 days after the filing of Plaintiffs’ motion;<br><br>−Plaintiffs’ combined reply in support of their motion and opposition to Defendants’ motion shall not exceed 20 pages and shall be filed no later than 14 days after the filing of Defendants opposition; and<br><br>−Defendants’ reply in support of their motion shall not exceed 20 pages and shall be filed no later than 14 days after the filing of Plaintiffs’ reply.<br><br>(CEH) (Entered: 03/19/2026) |
| 04/08/2026 | 31 | First MOTION to Dismiss *Amended Complaint* by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Motion to Dismiss, # 2 Proposed Order, # 3 Bowron Declaration, # 4 Executive Order 14253, # 5 Secretary's Order 3431, # 6 SEGD 2025 Strategic Plan)(Swenson, Ian) (Entered: 04/08/2026) |
| 04/13/2026 | 32 | ELECTRONIC NOTICE of Hearing. A Status Conference has been set for 5/12/2026 03:00 PM in Courtroom 8 (Remote only) before District Judge Angel Kelley.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: |

| | | |
|---|---|---|
| | | https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(MS) (Entered: 04/13/2026) |
| 04/22/2026 | 33 | REPLY to Response to 29 MOTION for Preliminary Injunction *and Stay pursuant to 5 U.S.C. 705*, 31 First MOTION to Dismiss *Amended Complaint* filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Torcello, Michael) (Entered: 04/22/2026) |
| 05/06/2026 | 34 | REPLY to Response to 31 First MOTION to Dismiss *Amended Complaint* filed by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Swenson, Ian) (Entered: 05/06/2026) |
| 05/12/2026 | 35 | Electronic Clerk's Notes for proceedings held before District Judge Angel Kelley: Status Conference held on 5/12/2026 by video conference.<br><br>The Court discussed next steps with the parties and set a tentative motion hearing date for June 26, 2026.<br><br>Motion Hearing set for 6/26/2026 11:00 AM in Courtroom 8 (In person only) before District Judge Angel Kelley.<br><br>(Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Swenson, Menschel) (MAL) (Entered: 05/12/2026) |
| 05/13/2026 | 36 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>Having conferred with the Parties during a Status Conference on May 12, 2026, the Court has determined to decide Defendants’ Motion to Dismiss Dkt. 31 on the papers. The Motion is hereby ***TAKEN UNDER ADVISEMENT***. Should a future hearing on Plaintiffs’ Motion for Preliminary Injunction and Stay Dkt. 29 be necessary, the Court will proceed on the currently scheduled hearing date of June 26, 2026, at 11:00 AM. [See Dkt. 35].<br><br>(CEH) (Entered: 05/13/2026) |
| 06/04/2026 | 37 | District Judge Angel Kelley: ORDER entered. MEMORANDUM AND ORDER. For the foregoing reasons, Defendants' Dkt. 31 Motion to Dismiss is **DENIED.** (CEH) (Entered: 06/04/2026) |
| 06/04/2026 | 38 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>The Court, having reviewed and become familiar with the facts and legal arguments presented in this action following its disposition of Defendants’ Motion to Dismiss [Dkt. 37], and having conferred with the parties, who have indicated no objection, has determined to decide Plaintiffs’ Motion for Stay, or, in the Alternative, Preliminary Injunction [Dkt. 29] on the papers, in the interest of expeditious resolution. The motion hearing currently set for June 26, 2026, is ***CANCELLED***, and the Motion is ***TAKEN UNDER ADVISEMENT***.<br><br>(CEH) (Entered: 06/04/2026) |
| 06/04/2026 | 39 | **ELECTRONIC NOTICE CANCELLING HEARING.**<br><br>Motion Hearing set for 6/26/2026 11:00 AM in Courtroom 8 (In person only) before District Judge Angel Kelley is **CANCELLED.** (CEH) (Entered: 06/04/2026) |
| 06/04/2026 | 40 | NOTICE by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists *of Factual Development* (Menschel, Brooke) (Entered: 06/04/2026) |

| | | |
|---|---|---|
| 06/12/2026 | 41 | District Judge Angel Kelley: ORDER entered. MEMORANDUM AND ORDER.<br><br>Plaintiffs' 29 MOTION for Preliminary Injunction and Stay pursuant to 5 U.S.C. 705 is **GRANTED.** (CEH)<br><br>(Main Document 41 replaced on 6/15/2026) (CEH).<br><br>Modified on 6/15/2026 to replace PDF. NEF regenerated to all parties. This corrected Memorandum and Order supersedes the Court's Memorandum and Order entered on June 12, 2026, which contained minor typographical errors. Specifically, on page 2, a sentence has been corrected to identify the location of Glacier National Park as Montana instead of Alaska (the Park's location was correctly noted as Montana elsewhere in the Order), and on page 10, an erroneous double period at the end of a citation has been corrected to a single period. The Court's Order otherwise remains unchanged, pursuant to Federal Rules of Civil Procedure 60(a), which allows a court to correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. (CEH). (Entered: 06/12/2026) |
| 06/15/2026 | 42 | NOTICE of Appearance by Romney Philpott on behalf of Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service (Philpott, Romney) (Entered: 06/15/2026) |
| 06/15/2026 | 43 | NOTICE OF APPEAL as to 37 Memorandum & ORDER, 41 Memorandum & ORDER,,,, by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/6/2026. (Philpott, Romney) (Entered: 06/15/2026)** |
| 06/15/2026 | 44 | MOTION to Stay *Pending Appeal on Expedited Basis* by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Memorandum in Support of Motion, # 2 Exhibit Exhibit 1: 2d Bowron Decl)(Philpott, Romney) (Entered: 06/15/2026) |
| 06/16/2026 | 45 | District Judge Angel Kelley: ELECTRONIC ORDER entered. Before the Court is Defendants' Expedited Motion for Stay Pending Appeal. [Dkt. 44]. If Plaintiffs intend to file a response to the Motion, they are directed to do so by June 17, 2026, at 10:00 AM EST.(CEH) (Entered: 06/16/2026) |
| 06/16/2026 | 46 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 43 Notice of Appeal (CEH) (Entered: 06/16/2026) |
| 06/16/2026 | 47 | District Judge Angel Kelley: ORDER entered. MEMORANDUM AND ORDER.<br><br>For the foregoing reasons, Defendants are ***DIRECTED*** to file by ***noon (12:00 PM) EST*** on ***June 17, 2026***:<br><br>−An inventory of each item removed, including (1) the reason(s) for removal; (2) the item’s medium (i.e., poster, paper, film, etc.); (3) the item’s current location, and if it has been moved or is in storage; (4) the item’s condition, including if the item has been damaged or destroyed; and (5) if the item has been destroyed, the expected process necessary for re−fabrication, such as reprinting as opposed to requiring an outside vendor.<br><br>−What actions, if any, Defendants have taken to−date to comply with the Court’s June 12, 2026, Order. This deadline aligns with the directive in the Court’s Order for Stay that Defendants provide an initial status report within five calendar days.<br><br>Defendants’ Emergency Motion for Stay Pending Appeal [Dkt. 44] is otherwise taken under advisement pending receipt of the requested information. |

| | | |
|---|---|---|
| | | (CEH) (Entered: 06/16/2026) |
| 06/17/2026 | 48 | Opposition re 44 MOTION to Stay *Pending Appeal on Expedited Basis* filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Menschel, Brooke) (Entered: 06/17/2026) |
| 06/17/2026 | 49 | STATUS REPORT by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Affidavit, # 2 Exhibit)(Philpott, Romney) (Entered: 06/17/2026) |
| 06/17/2026 | 50 | USCA Case Number 26−1714 for 43 Notice of Appeal, filed by Jessica Bowron, Department of the Interior, Doug Burgum, National Park Service. (CEH) (Entered: 06/17/2026) |
| 06/18/2026 | 51 | District Judge Angel Kelley: ORDER entered. MEMORANDUM AND ORDER.<br><br>Defendants’ [Dkt. 44] Motion for Stay Pending Appeal is ***DENIED***. Defendants are further ***DIRECTED*** to ensure that when the exhibits are reinstalled, they remain available and visible to the public, subject to lawful changes or modifications. Defendants may seek limited extensions or exemptions from the Injunction Order, as needed, for specific interpretive material that have already been destroyed or damaged.<br><br>(CEH) (Entered: 06/18/2026) |
| 06/18/2026 | 52 | Assented to MOTION for Extension of Time to June 25, 2026 to File Answer by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Text of Proposed Order)(Philpott, Romney) (Entered: 06/18/2026) |
| 06/18/2026 | 53 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 52 Assented to MOTION for Extension of Time to June 25, 2026 to File Answer (CEH) (Entered: 06/18/2026) |
| 06/24/2026 | 54 | STATUS REPORT by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: # 1 Exhibit Administrative Stay)(Swenson, Ian) (Entered: 06/24/2026) |
| 06/25/2026 | 55 | ANSWER to 28 Amended Complaint, by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service.(Philpott, Romney) (Entered: 06/25/2026) |
| 07/02/2026 | 56 | ORDER of USCA as to 43 Notice of Appeal, filed by Jessica Bowron, Department of the Interior, Doug Burgum, National Park Service (CEH) (Entered: 07/02/2026) |
| 07/10/2026 | 57 | District Judge Angel Kelley: ORDER entered.<br><br>The parties are directed to consult and submit an agreed−upon schedule outlining: (1) the time frame for Defendants production of the certified administrative record, (2) any disputes regarding the administrative record such as supplementing the record or propounding discovery, and (3) the filing of dispositive motions, no later than **seven (7) days** before the Scheduling Conference. The parties may follow the attached sample scheduling order, to the extent applicable. If the parties are unable to agree on a joint proposal, then separate proposed orders should be submitted. If the Court finds parties' proposed deadlines reasonable or requires only minor adjustments, it may enter a scheduling order in lieu of holding the scheduling conference. Otherwise, Scheduling Conference set for 8/18/2026 10:30 AM in Remote Proceeding : Boston before District Judge Angel Kelley. (CEH)<br><br>(Entered: 07/10/2026) |
| 07/10/2026 | 58 | ELECTRONIC NOTICE of Hearing.<br><br>Scheduling Conference set for 8/18/2026 10:30 AM in Remote Proceeding : Boston before District Judge Angel Kelley. (CEH) (Entered: 07/10/2026) |
| 07/22/2026 | 59 | MOTION to Stay *All Deadlines* by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (Attachments: ~~# 1 Memorandum in Support of Motion to Stay All Deadlines,~~ # 2 Text of Proposed Order)(Swenson, Ian) Modified on 7/23/2026 to Strike Memorandum and file in own entry (CEH). (Entered: 07/22/2026) |

| | | |
|---|---|---|
| 07/22/2026 | 60 | MEMORANDUM in Support re 59 MOTION to Stay *All Deadlines* filed by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service. (CEH) (Entered: 07/23/2026) |
| 08/05/2026 | 61 | Opposition re 59 MOTION to Stay *All Deadlines* filed by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. (Menschel, Brooke) (Entered: 08/05/2026) |
| 08/06/2026 | 62 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>Before the Court is Defendants’ Motion to Stay All Deadlines pending the First Circuit’s review of the Court’s June 12, 2026, preliminary injunction order. [Dkt. 59]. Plaintiffs oppose the Motion. [Dkt. 61]. For the following reasons, Defendants’ 59 Motion to Stay is ***DENIED***.<br><br>Ordinarily, “[a]n appeal from the grant or denial of a preliminary injunction does not divest the trial court of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending.” Contour Design, Inc. v. Chance Mold Steel Co., 649 F.3d 31, 34 (1st Cir. 2011) (quoting 11A Wright & Miller, Federal Practice and Procedure § 2962, at 438−39 (2d ed. 1995)). District courts have inherent discretionary authority to stay pending litigation “when the efficacious management of court dockets reasonably requires such intervention.” Marquis v. F.D.I.C., 965 F.2d 1148, 1154 (1st Cir. 1992) (citing, *inter alia*, Landis v. N. Am. Co., 299 U.S. 248, 254−55 (1936)). That said, “stays cannot be cavalierly dispensed: there must be good cause for their issuance; they must be reasonable in duration; and the court must ensure that competing equities are weighed and balanced.” Id. at 1155. The movant “bears the burden of establishing its need.” Clinton v. Jones, 520 U.S. 681, 708 (1997).<br><br>Defendants contend that there is good cause to stay proceedings while their appeal is pending. They argue that a stay “would conserve the parties’ resources and judicial resources” because the two proceedings present “overlapping” issues, including concerns relevant to irreparable harm, standing, and the merits of Plaintiffs’ claims.<br><br>Weighing the competing interests in this case, the Court finds that the harm to Plaintiffs in staying the proceedings outweighs any harm to Defendants from denying a stay. The First Circuit has already stayed this Court’s preliminary injunction order, reducing any harm to Defendants from the relief previously ordered. At the same time, Defendants may implement the Secretary’s Order pending appeal, and Plaintiffs therefore continue to suffer meaningful harm from its implementation—even if the First Circuit ultimately determines that such harm does not rise to the level of irreparable harm necessary for a preliminary injunction.<br><br>The only harm Defendants articulate is the burden of litigating this case. But merely “being required to defend a suit, without more, does not constitute a ‘clear case of hardship or inequity.’” Ctr. for Biological Diversity v. Ross, 419 F. Supp. 3d 16, 21 (D.D.C. 2019) (quoting Landis, 299 U.S. at 255). Moreover, the litigation remains at an early stage. The only pending obligation is for counsel to submit a proposed schedule for preparing the administrative record, extra−record discovery, if necessary, and summary judgment briefing. There is no imminent trial, final judgment, or other particularly burdensome procedural step in the immediate future. The Court thus declines to exercise its discretion to stay the proceedings at this time.<br><br>Defendants’ invocation of Coinbase, Inc. v. Bielski, 599 U.S. 736 (2023), does not alter this conclusion, as the Supreme Court’s holding in that case “reaches only arbitration appeals under § 16(a)” of the Federal Arbitration Act. Id. at 761 (Jackson, J., dissenting). That context is inapplicable here.<br><br>Accordingly, Defendants’ Motion to Stay All Deadlines is ***DENIED***.<br><br>(CEH) (Entered: 08/06/2026) |
| 08/11/2026 | 63 | Proposed Document(s) submitted by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, |

| | | |
|---|---|---|
| | | National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists. Document received: Proposed Scheduling Order. (Menschel, Brooke) (Entered: 08/11/2026) |
| 08/11/2026 | 64 | Recommendations for Scheduling Order . (Attachments: # 1 Text of Proposed Order)(Swenson, Ian) (Entered: 08/11/2026) |
| 08/12/2026 | 65 | NOTICE of Objection by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists re 63 Proposed Document(s) submitted, 64 Recommendations for Scheduling Order, 57 Order, (Menschel, Brooke) Modified on 8/13/2026 to modify docket text (CEH). (Entered: 08/12/2026) |
| 08/18/2026 | 66 | Electronic Clerk's Notes for proceedings held before District Judge Angel Kelley: Scheduling Conference held on 8/18/2026. The Court heard the parties' proposed scheduling order deadlines. Plaintiffs shall submit briefing on jurisdictional discovery issue no later than 8/26/2026. Further order regarding scheduling order deadlines to issue at a later date. (Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Menschel, Bressler, Torcello, Moraga, Samburg, Swenson) (MAL) (Entered: 08/18/2026) |
| 08/19/2026 | 67 | District Judge Angel Kelley: ORDER entered. Having reviewed and considered the parties' Proposed Scheduling Orders [Dkts. 63; 64], it is hereby **ORDERED** that the proposed deadlines be **ADOPTED IN PART** and set as follows:<br><br>**SCHEDULING ORDER DEADLINES:**<br><br>Defendants to file Administrative Record by September 17, 2026<br>Amendments to pleadings due no later than September 25, 2026<br>Motions to supplement Administrative Record, if any, due by September 30, 2026<br><br>Deadlines regarding fact discovery, if any, and dispositive motions to be determined following this Court's ruling on Plaintiffs' forthcoming briefing on jurisdictional discovery, as discussed with the parties during the August 18, 2026, Status Conference. [See Dkt. 66].<br><br>(MAL)<br><br>(Entered: 08/19/2026) |
| 08/21/2026 | 68 | Transcript of Scheduling Conference held on August 18, 2026, before Judge Angel Kelley. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com. Redaction Request due 9/11/2026. Redacted Transcript Deadline set for 9/21/2026. Release of Transcript Restriction set for 11/19/2026. (DRK) (Entered: 08/24/2026) |
| 08/21/2026 | 69 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 08/24/2026) |
| 08/26/2026 | 70 | Plaintiff's Memorandum in Opposition to Premature Jurisdictional Discovery by American Association for State and Local History, Association of National Park Rangers, Coalition to Protect America's National Parks, National Parks Conservation Association, Society for Experiential Graphic Design, Union of Concerned Scientists to 66 Scheduling Conference,. (Attachments: # 1 Exhibit 1 (Menschel Decl.), # 2 Exhibit 2 (Defendants' First Requests for Production), # 3 Exhibit 3 (Defendants' First Interrogatories), # 4 Exhibit 4 (Amica Hearing Transcript))(Menschel, Brooke) Modified on 9/9/2026 to modify docket text (CEH). (Entered: 08/26/2026) |
| 08/28/2026 | 71 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>As explained at the August 19, 2026, Scheduling Conference and in the Court’s Scheduling Order issued that same date, the Court has not yet determined whether to permit discovery on standing and therefore has not set relevant deadlines. [Dkt. 67]. Put another way, discovery has not started and may not be allowed. The Court permitted Plaintiffs to submit briefing on the propriety of permitting Defendants to engage in discovery. In |

| | | |
|---|---|---|
| | | Plaintiffs' briefing, they attached Defendants’ discovery requests. [Dkts. 70−2; 70−3]. Consequently, the Court clarifies its prior orders to avoid wasted time and efforts to respond to the broad requests and ***STAYS*** discovery pending this Court's ruling on Defendants’ request for jurisdictional discovery. If Defendants intend to file any briefing on the propriety of jurisdictional discovery, Defendants have seven (7) days from this order to do so.<br><br>(CEH) (Entered: 08/28/2026) |
| 09/04/2026 | 72 | Memorandum in Opposition re 70 Plaintiff's Memorandum in Opposition to Premature Jurisdictional Discovery by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service (Attachments: # 1 Exhibit Swenson Declaration)(Swenson, Ian) Modified on 9/9/2026 to modify docket text (CEH). (Entered: 09/04/2026) |
| 09/15/2026 | 73 | District Judge Angel Kelley: ELECTRONIC ORDER entered ***DENYING*** Defendants’ request for jurisdictional discovery. On the Court’s review, the timing and breadth of Defendants’ discovery requests raise substantial concerns about abuse of the discovery process. [E.g., Dkt. 70−2 ¶ 8 (requesting “All documents and communications related to any expenditure or donation to any federal or state political candidate or committee”); ¶ 14 (requesting “All documents and communications related to President Trump, the Trump Administration, or any of the Defendants”)]. Jurisdictional discovery is not a “fishing expedition,” nor may it be used to impose undue burdens or unnecessarily delay proceedings. Cf.Ryan v. Newark Grp., Inc., 814 F. Supp. 3d 7 (D. Mass. 2025).<br><br>Nevertheless, Plaintiffs bear the burden of establishing that this Court has jurisdiction at the summary judgment stage. To the extent necessary and appropriate, Defendants will have the opportunity to raise specific evidentiary challenges in their summary judgment briefing, including by seeking relief under Fed. R. Civ. P. 56(d). Any such requests under Rule 56(d) must be limited to jurisdictional facts about which Defendants have a specific, evidentiary basis for questioning their accuracy.<br><br>Revised scheduling order to follow.<br><br>(CEH) (Entered: 09/15/2026) |
| 09/15/2026 | 74 | District Judge Angel Kelley: ELECTRONIC ORDER entered.<br><br>Pursuant to the Courts Order on September 15, 2026 [Dkt. 73], it is hereby ***ORDERED*** that the scheduling order is revised and set as follows:<br><br>***REVISED SCHEDULING ORDER DEADLINES:***<br><br>Defendants to file Administrative Record by September 17, 2026<br><br>Amendments to pleadings due no later than September 25, 2026<br><br>Motions to supplement Administrative Record, if any, due by September 30, 2026<br><br>Plaintiffs motion for summary judgment due December 11, 2026<br><br>Defendants combined opposition and cross−motion for summary judgment due within 30 days of service of Plaintiffs motion<br><br>Plaintiffs combined reply and opposition due within 14 days of service of Defendants consolidated cross−motion and opposition<br><br>Defendants reply due within 14 days of service of Plaintiffs consolidated reply and opposition<br><br>(CEH) Modified on 9/16/2026 to correct date of deadline to File Motion for Summary Judgment. NEF Regenerated to all parties (CEH). (Entered: 09/15/2026) |
| 09/17/2026 | 75 | NOTICE by Jessica Bowron, Doug Burgum, Department of the Interior, National Park Service *of Filing of the Administrative Record* (Attachments: # 1 Certification of |

| | | |
|---|---|---|
| | | Administrative Record, # 2 Administrative Record Pt. 1, # 3 Administrative Record Pt. 2, # 4 Administrative Record Pt. 3, # 5 Administrative Record Pt. 4, # 6 Administrative Record Pt. 5, # 7 Administrative Record Pt. 6, # 8 Administrative Record Pt. 7, # 9 Administrative Record Pt. 8, # 10 Administrative Record Pt. 9, # 11 Administrative Record Pt. 10, # 12 Administrative Record Pt. 11, # 13 Administrative Record Pt. 12, # 14 Administrative Record Pt. 13, # 15 Administrative Record Pt. 14, # 16 Administrative Record Pt. 15)(Swenson, Ian) (Entered: 09/17/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director,<br><br>*Defendants*. | Civil Action No. 1:26-cv-10877-AK |

**<u>NOTICE OF APPEAL</u>**

Notice is hereby given that Defendants appeal the Court's June 12, 2026 Memorandum and Order on Plaintiffs' Motion for 5 U.S.C. § 705 Stay or, in the Alternative, Preliminary Injunction (ECF No. 41), and June 4, 2026 Memorandum and Order on Defendants' Motion to Dismiss (ECF No. 37). This appeal is taken to the United States Court of Appeals for the First Circuit.

Dated: June 15, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

*/s/ Romney S. Philpott*
Romney Philpott
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on June 15, 2026.

/s/ Romney S. Philpott
Romney S. Philpott

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director,

*Defendants*.

Case No. 26-cv-10877

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. For over 150 years, Congress has entrusted the federal government to operate the national parks—including natural wonders, battlefields, sacred Indigenous grounds, sites memorializing and commemorating this country's history of slavery and the Civil Rights movement, and other places of historical significance—"for the benefit and enjoyment of the people."[1] But the federal government has now betrayed that trust by mounting a sustained campaign to erase history and undermine science, so the parks no longer "reflect different cultural

[1] 16 U.S.C. § 21; *see also* 54 U.S.C. § 100101(b)(1)(C) (mandating that the parks be managed "for the benefit and inspiration of all the people of the United States").

backgrounds, ages, education, gender, abilities, ethnicity, and needs" or "reflect current scientific and academic research."[2]

2. That campaign escalated in recent weeks, as the National Park Service, implementing an order of the Secretary of the Interior, tore down the exhibit in Philadelphia's Independence National Historical Park memorializing the legacy of people enslaved by the country's first President; ripped away signage detailing climate threats at Fort Sumter, one of the country's most environmentally endangered parks; and wiped away descriptions of history and science at countless national parks throughout the United States.

3. The legacy of the national parks as a shared, invaluable, natural and cultural resource for all people goes back to their earliest days. Dedicating an arch to mark the entrance to the country's first national park in 1903, President Theodore Roosevelt recognized the parks' crucial role in democracy in the United States: "I cannot too often repeat that the essential feature in the present management of the Yellowstone Park, as in all similar places, is its essential democracy—it is the preservation of the scenery, of the forests, of the wilderness life and the wilderness game for the people as a whole, instead of leaving the enjoyment thereof to be confined to the very rich who can control private reserves."

4. Just over 30 years after the dedication at Yellowstone, President Franklin D. Roosevelt reiterated the same sentiment, noting: "There is nothing so American as our national parks.… The fundamental idea behind the parks … is that the country belongs to the people, that it is in the process of making for the enrichment of the lives of all of us."

5. Congress has reiterated these principles time and again, mandating that the parks be "managed for the benefit and inspiration of all the people of the United States"[3] and exist for

---

[2] 54 U.S.C. §§ 100803, 100802.
[3] *Id.* § 100101(b)(1)(C).

"the common benefit of all the people of the United States."[4] Just ten years ago, Congress affirmed that the parks play a critical role in the "shared heritage" of democracy in the United States; must "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs"; must "use … a broad program of the highest quality interpretation and education"; and must "reflect current scientific and academic research."[5] And Congress has been clear that no action may be taken "in derogation of" this purpose "except as directly and specifically provided by Congress."[6]

6. Yet the federal government is now ignoring these well-established principles and legal requirements as it seeks to erase from the national parks discussion of historic or scientific facts that this administration disfavors. President Trump explicitly acknowledged this goal—to remove "monuments, memorials, statues, markers, or similar properties" that do not adopt the administration's preferred perspective—in a March 2025 executive order.[7] Two months later, the Secretary of the Interior ordered that National Park Service employees should "immediately undertake" action to remove any such disfavored information by identifying and reporting it to the agency (the "Secretary's Order").[8]

7. In the months since the Secretary's Order was issued, the Park Service has ramped up efforts to implement and enforce it. Maine's Acadia National Park, the only National Park[9] in

---

[4] *Id.* § 100101(b)(2).
[5] *Id.* §§ 100803, 100802.
[6] *Id.* § 100101(b)(2).
[7] Exec. Order 14253, *Restoring Truth and Sanity to American History* § 4(iii) (Mar. 27, 2025), https://perma.cc/RZJ5-BA9M ("Exec. Order"); *Dep't of Interior, SO 3431 - Restoring Truth and Sanity to American History* (May 20, 2025), https://perma.cc/72F3-6BHY ("Sec. Order") (quoting Exec. Order).
[8] Sec. Order § 5(a)(3). "Flag," or "flaggings" are used throughout this complaint to refer to the identification and reporting to agency leadership of any material that is allegedly inconsistent with the Secretary's Order.
[9] The National Park System includes 433 units or sites, which can be parks, battlefields, sites, memorials, monuments, trails, or recreation areas. Only 63 of the 433 are National Parks. Acadia

New England, saw some of the earliest flaggings and removals of interpretive materials to comply with the Secretary's Order. The removed signs discussed the impact of climate change on the park and the importance of Cadillac Mountain—known as a centerpiece of Acadia—to the Wabanaki people.[10] At the end of January and the beginning of February 2026, a rash of removals stripped historic and scientific information from parks across the United States.

8. The orders and resulting implementation actions ignore Congress's mandate for how the parks must be managed; erase the history of countless people and communities from public spaces; limit the availability of scientific information relevant to ensuring the long-term preservation of the parks themselves; and impair the mission of the National Park Service to preserve the parks "for the enjoyment, education, and inspiration of this and future generations."[11]

9. In violation of the Administrative Procedure Act ("APA"), the Department of the Interior and National Park Service decided to adopt and implement the Secretary's Order relying on improper factors, and without considering Congress's clear instructions; the effect on constituencies that help operate, maintain and visit the parks; the consequences on communities;

---

is the only National Park in New England of the 63. Throughout the remainder of the complaint, the terms "parks" or "sites" are used interchangeably to refer to any type of unit of the national park system, regardless of their particular designation, unless otherwise noted. The National Park Service maintains a listing of units, divided by type. *See* Nat'l Park Serv., *National Park System*, https://perma.cc/3TZV-9AQG (last visited Feb. 16, 2026).

[10] Four federally recognized tribes—Mi'kmaq Nation, Houlton Band of Maliseet Indians, Passamaquoddy Tribe, and Penobscot Nation—are collectively referred to as the Wabanaki Nations, or the "People of the Dawnland." Acadia lies in the heart of the Wabanaki homeland, where the Wabanaki people have lived for millennia. *See generally* Wabanaki Alliance, https://perma.cc/X5Q2-VYU7 (last visited Feb. 15, 2026); Nat'l Park Serv., Wabanaki Nations, https://perma.cc/GCD4-PUVM (last visited Feb. 16, 2026).

[11] Nat'l Park Serv., *About Us*, https://perma.cc/U85B-3EWE (last visited Jan. 7, 2026); *see also* 54 U.S.C. § 100101(a) (providing that the purpose of the National Park System units is "to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations").

or the long-term impact on the ability to preserve the parks for the unimpaired "enjoyment of future generations."

10. Plaintiffs are organizations committed to protecting the national parks, preserving history, promoting access to high quality scientific information, and providing high quality interpretive materials—including exhibits, signs, brochures, and other educational materials—that bridge the gap between physical objects and human understanding for park visitors. They and their members—including avid users of America's national parks and historians whose research is being erased—have been injured by these actions and seek to ensure that the administration does not wash away history and science from what the National Park Service has recognized is "America's largest classroom." To prevent that result, Plaintiffs respectfully ask that this Court declare unlawful and vacate the Secretary's Order, require Defendants to cease all unlawful efforts to remove up-to-date and accurate historical or scientific information from the national parks, and order that interpretive materials that have been removed pursuant to the unlawful Order be restored.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, namely the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

12. This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

13. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency

sued in their official capacity, and Plaintiff Union of Concerned Scientists is headquartered in this judicial district.

**PARTIES**

14. Plaintiff the National Parks Conservation Association ("NPCA") is a national nonprofit membership organization headquartered in Washington, D.C. Since NPCA was established in 1919, it has been a leading voice of the American people in protecting and enhancing our National Park System. With more than 1.9 million members and supporters nationwide and a network of more than two dozen programmatic locations in 11 regions, NPCA and its members and supporters work to protect and preserve the country's most iconic and inspirational places for present and future generations. As part of its work, NPCA advocates to ensure the National Park Service tells stories of all Americans—that includes stories of triumph and of tragedies; stories to celebrate and ones that Americans have a duty to never forget. NPCA brings this challenge on behalf of itself and its members.

15. Plaintiff the American Association for State and Local History ("AASLH") is a 501(c)(3) organization whose mission is to provide leadership, resources, and advocacy to help the history community thrive and tell a shared history in which everyone belongs. For the better part of a century, AASLH has provided leadership and resources to its members who preserve and interpret American history, particularly state and local history, to make the past more meaningful to all people. Today, AASLH provides crucial resources, guidance, professional development, advocacy, new publications, field-wide research, and a sense of connectedness to more than 5,000 institutional and individual members, as well as leadership for history practitioners and history organizations nationally. It is the only comprehensive national organization dedicated to state and local history. AASLH is headquartered in Nashville, Tennessee. AASLH brings this challenge on

behalf of itself and its members.

16. Plaintiff Association of National Park Rangers ("ANPR") is a 501(c)(3) nonprofit membership organization made up of nearly 800 members who are park professionals, park volunteers, retirees, and allies. ANPR was created to advocate for the National Park Service employees of all disciplines; to promote and enhance the professions, competence, and spirit of the National Park Service employees and to provide a forum for professional enrichment for them; and to support the lawful mission and management and the perpetuation of the National Park Service and the National Park System. Since 1977, ANPR has worked to foster a communication network across National Park Service employees to address common issues and maintain an esprit de corps across the parks. ANPR is incorporated in Washington, D.C., and is currently headquartered in Marana, Arizona.

17. Plaintiff the Coalition to Protect America's National Parks ("Coalition") is a 501(c)(3) nonprofit organization made up of nearly 5,000 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, the Coalition's members have accumulated over 50,000 years of experience among them caring for America's most valuable natural and cultural resources. The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the National Park Service to ensure the survival of the park system for generations to come. The Coalition's members are regular and avid users of the National Park System and Park Service programs, as well as the national forests and other public lands, for recreation and conservation activities. The Coalition is incorporated in Arizona and headquartered in Washington, D.C.

18. Plaintiff Society for Experiential Graphic Design ("SEGD") is a 501(c)(3) nonprofit organization, founded in 1973, composed of approximately 2,000 graphic and exhibition

designers, fabricators, architects, media developers, creative technologists, students, and educators, who all share the common motivation of connecting people to place. SEGD's members interpret complex concepts into understandable language to create the wayfinding exhibits, interpretive panels, and other displays seen at national parks, museums, visitor centers, and countless other sites across the United States. Through its platform, core to its mission and values, SEGD strives to make spaces and environments more inclusive and intuitive, emotive and engaging, sustainable and shared. SEGD is headquartered in Washington, D.C.

19. Plaintiff Union of Concerned Scientists ("UCS") is a 501(c)(3) not-for-profit membership organization composed of 610,000 supporters, including 23,000 scientists, economists, engineers, public health specialists, and other technical experts in the UCS Science Network. UCS puts rigorous, independent science into action, developing solutions and advocating for a healthy, safe, and just future. UCS represents the interests of the scientific community in advancing science in public policy, and advocates for the role of science and scientists in federal policymaking and in civil society, including by combating misinformation about science through public education. Through the UCS Center for Science and Democracy, UCS works to highlight the role of impartial, best available science in solving the nation's most critical problems, and to strengthen the overall partnership between science and democracy, with a focus on federal government agencies. The UCS Climate and Energy Program works to safeguard people, communities, and landscapes from the consequences of climate change, including through policy-relevant science and resources and development of science-backed, equitable solutions. UCS is headquartered in Cambridge, Massachusetts.

20. Defendant Department of the Interior is an executive department of the United States and an agency within the meaning of the APA, headquartered in Washington, D.C.

21. Defendant National Park Service ("Park Service" or "NPS") is a component of the Department of the Interior and an agency within the meaning of the APA, headquartered in Washington, D.C.

22. Defendant Doug Burgum is the Secretary of the Interior. He is sued in his official capacity.

23. Defendant Jessica Bowron is the Comptroller of the National Park Service, who is exercising the Delegated Authority of the Director of the National Park Service. She is sued in her official capacity.

**LEGAL AND ADMINISTRATIVE FRAMEWORK**

24. In 1872, when Congress created the first national park—Yellowstone—it declared in unequivocal terms that it was "for the benefit and enjoyment of the people." 16 U.S.C. § 21.

25. The national parks system is organized into "units" ("parks" or "sites") either created by Congress through an implementing statute or via presidential proclamation pursuant to the Antiquities Act of 1906.

26. Parks each have their own "foundation documents" that answer five key questions about the individual park: (1) "What is the purpose of this park?" (2) "Why was it included in the national park system?" (3) "What makes it significant?" (4) "What are its fundamental resources and values?"; and (5) "What legal and policy requirements, special mandates, and administrative commitments apply to this park?"[12]

27. Through the Organic Act of 1916, Congress created the National Park Service and entrusted it to maintain these sites, "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such

---

[12] *Foundation Documents*, Park Planning, Nat'l Park Serv., https://perma.cc/LS7B-SV25 (last visited Mar. 10, 2026).

means as will leave them unimpaired for the enjoyment of future generations." An Act to establish a National Park Service, and for other purposes, Pub. L. No. 64-235, § 1, 39 Stat. 535, 535 (1916) (amended and recodified at 54 U.S.C. § 100101(a)).[13]

28. Congress codified the Park Service's role in education with the 1935 Historic Sites Act, which directed the Secretary of the Interior, acting through the Director of the Park Service, to develop "an educational program and service for the purpose of making available to the public facts and information pertaining to American historic and archeologic sites, buildings, and properties of national significance." An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, Pub. L. No. 74-292, § 2(j), 49 Stat. 666, 667 (1935) (amended and recodified at 54 U.S.C. § 320102(k)).

29. By 1970, Congress, in adopting the National Park Service General Authorities Act of 1970, emphasized that the park system is a "cumulative expression[] of a single national heritage" and that each individual site "derive[s] increased national dignity" by being included in a system that is "managed for the benefit and inspiration of all the people of the United States." An act to improve the administration of the national park system by the Secretary of the Interior, and to clarify the authorities applicable to the system, and for other purposes, Pub. L. No. 91-383, § 1, 84 Stat. 825, 825 (1970) (amended and recodified at 54 U.S.C. § 100101(b)(1)).

30. In 1978, Congress reaffirmed the broad mission of the Park Service and the national parks as detailed in the 1916 Organic Act, providing that "[t]he authorization of activities shall be

[13] "The Organic Act, originally codified at 16 U.S.C. § 1, was amended and recodified in 2014, although the core mandate remained the same." *Wesberry v. United States*, 304 F. Supp. 3d 30, 35 n.1 (D.D.C. 2018); *see also* National Park Service and Related Programs, Pub. L. No. 113-287, § 7, 128 Stat. 3094, 3272 (2014). The 2014 recodification mandates that the "Secretary [of the Interior], acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a).

construed and the protection, management, and administration of these area(s) shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as . . . directly and specifically provided by Congress." An Act to Amend the Act of October 2, 1968, an Act to establish a Redwood National Park in the State of California, and for other purposes, Pub. L. No. 95-250, § 101(6)(b), 92 Stat. 163, 166 (1978) (amended and recodified at 54 U.S.C. § 100101(b)(2) (internal quotation marks omitted)).

31. Twenty years later, Congress expressly acknowledged the importance of education in the parks in the National Parks Omnibus Management Act of 1998, imposing requirements that the Secretary "shall continually improve the ability of the National Park Service to provide state-of-the-art … interpretation of and research on the resources of the National Park System" and "assure that management of units of the National Park System is enhanced by the availability and utilization of a broad program of the highest quality science and information." Pub. L. No. 105-391, §§ 101, 202, 112 Stat. 3497, 3498–99, (amended and recodified at 54 U.S.C. §§ 100701, 100702).

32. In 2016, Congress once again reiterated the importance of the parks' role in an inclusive democracy in the National Park Service Centennial Act, providing that the Secretary of the Interior "shall ensure that management of System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." Pub. L. No. 114-289, § 301, 130 Stat. 1482, 1487 (2016) (codified at 54 U.S.C. § 100802). "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." *Id.* at 1486 (codified at 54 U.S.C. § 100801(1)(A)). "Education" means "enhancing

public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." *Id.* (codified at 54 U.S.C. § 100801(2)).

33. In the Centennial Act, Congress also authorized the Secretary to "undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis." *Id.* at 1487 (codified at 54 U.S.C. § 100803).

34. In addition to the statutory framework, the Park Service is also guided by Management Policies that "set a firm foundation for stewardship that will continue to earn the trust and confidence of the American people."[14] The Management Policies confirm that the parks "will be managed as places to demonstrate the principles of science, to illustrate the national experience as history, to engage learners throughout their lifetimes, and to do these things while challenging visitors in exciting and motivating settings." Management Policies § 7.3.1.1. The Policies also provide that the Park Service "will continually adjust to changing patterns of visitation and an increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations." *Id.* § 7.3.4. And the "unique qualities" of the national parks "will be used to advantage in educating Americans and visitors to America about topics such as the civic experience of our country; the complex [diverse]

[14] *Management Policies*, Nat'l Park Serv., https://perma.cc/LD22-RP25 (last visited Feb. 16, 2026).

ecology of our nation and the world; and the influence of global climate change." *Id.* § 7.5.1. To achieve those goals, the policies require the Park Service to "respectfully consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive programs and media relating to their cultures and histories." *Id.* § 7.5.6.

35. National Parks Director's Order #6 ("DO #6") requires that "[t]he content of interpretive and educational services must be accurate, respect multiple points of view and be free of cultural, ethnic, and personal biases." DO #6 at 8.4.1. DO #6 further requires:

> Superintendents, historians, scientists, and interpretive staff are responsible for ensuring that park interpretive and educational programs and media are accurate and reflect current scholarship. To accomplish this, an on-going dialogue must be established. Questions often arise round the presentation of geological, biological, and evolutionary processes. The interpretive and educational treatment used to explain the natural processes and history of the Earth must be based on the best scientific evidence available, as found in scholarly sources that have stood the test of scientific peer review and criticism. The facts, theories, and interpretations to be used will reflect the thinking of the scientific community in such fields as biology, geology, physics, astronomy, chemistry, and paleontology. Interpretive and educational programs must refrain from appearing to endorse religious beliefs explaining natural processes. Programs, however, may acknowledge or explain other explanations of natural processes and events.

*Id.* § 8.4.2.[15]

36. In order to achieve this accurate telling of history and science, DO #6 further mandates a meticulous consultation process:

> The NPS will present factual and balanced presentations of the many American cultures, heritages, and histories. Through civic engagement, consultation, and collaboration with various constituencies, the NPS fosters the development of effective and

[15] Dep't of Interior, *Director's Order #6: Interpretation and Education* (Jan. 19, 2005), https://perma.cc/YU55-PJ7B.

> meaningful interpretive and educational programs. Broad civic engagement ensures appropriate content and accuracy, and identifies multiple points of view and potentially sensitive issues. The [Park] Service will actively consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive and educational programs.

*Id.* § 8.5.

37. These procedures are critical for the ecosystem of non–Park Service stewards—including volunteers, guides, and concessioners—who are part of the learning experience in parks and who rely on high quality information. The Management Policies provide that the Park Service will pursue partnerships with compatible organizations such as historical societies and conservation groups, and that Park Service interpreters and educators "will provide the leadership, example, and standards for all partners to deliver effective interpretation and education services." Management Policies § 7.6. Similarly, the Policies state that Park Service "interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners." *Id.* § 7.4.

38. Today, the Park Service enlists approximately 13,000 permanent employees, and thousands of temporary and seasonal employees, who work at 433 park sites and help manage and provide assistance at more than 150 related areas, and numerous additional programs, to serve 332 million visitors each year and to preserve "unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations."[16]

[16] Nat'l Park Serv., *Our Mission*, https://perma.cc/U85B-3EWE (last visited Jan. 7, 2026).

## FACTUAL BACKGROUND

### I. The National Parks Are America's Largest Classroom.

39. The national parks established their reputation as "America's largest classroom" in their earliest days, when, in 1886, U.S. Army infantrymen deployed to protect Yellowstone Park began answering questions to visitors in what became known as "ranger talks" at Old Faithful and the Upper Geyser Basin.

40. In 1917, just one year after Congress created the national parks system, the first director of the Park Service, Stephen Mather, embraced his role as an educator for the nation, acknowledging that "one of the chief functions of the national parks and monuments is to serve educational purposes," and creating the National Parks Education Committee to "further the view of the national parks as classrooms and museums of nature."

41. The Park Service's understanding of its mission to educate expanded to include interpretation—that is, bridging the gap between physical objects and human understanding for park visitors—such that by 1929, the Park Service considered its role to include creating "simple, understandable interpretation of the major features of each park to the public by means of field trips, lectures, exhibits, and literature."[17]

42. Today, the Park Service furnishes this interpretation through exhibits, signs, brochures,[18] books, and other educational materials that provide details and context at each park

[17] Dwight T. Pitcaithley, *National Parks and Education: The First 20 Years*, National Park Service History Electronic Library and Archive (2002), https://perma.cc/65BK-HTV8.
[18] One of the most common types of brochures is the "Unigrid," a Park Service "agency institution" since the late 1970s. The Unigrid is a "comprehensive graphic design system" that allows "designers, writers, and cartographers to focus on content and creativity while conveying a strong visual identity for the National Park Service." Nat'l Park Serv., *A Brief History of the Unigrid*, https://perma.cc/LF36-HW6R (last visited Feb. 14, 2026). Unigrid brochures are customized by park site and are "on the front lines of storytelling in the National Park Service."

site and help visitors connect to their surroundings. According to the Park Service, "National parks are America's largest classrooms."[19]

43. These materials are created by teams, often led by experiential designers and specialized fabricators—many of whom are members of Plaintiff SEGD—who steward the perspective of park visitors and other end users through their design and fabrication expertise. Most experiential designers and specialized fabricators work as contracted professionals with the Park Service and other public institutions, while some are employed by those agencies. Their work to create an interpretive wayside sign or exhibition panels typically involves months—and often years—of collaboration with historians, scientists, subject-matter experts, community advocates, educators, interpretive specialists, and accessibility experts. This process is led by the Park Service or the relevant public entity and is governed by established review and approval procedures designed to uphold accuracy, accessibility, and public trust.

44. The Harpers Ferry Center manages contracts for exhibit planning and design, exhibit fabrication, and exhibit design-build contracts, and sometimes provides exhibit planning and design services directly for all parks across the country. It has also been creating the Park Service's iconic educational visitor brochures, known as Unigrid brochures, for over 50 years.

45. Pursuant to its mandate to "use a broad program of the highest quality interpretation and education," the Park Service prides itself on ensuring interpretive materials "reflect up-to-date information and research"[20] that can be used to add and explain details and context as knowledge about particular sites, history, or science expands.

---

[19] As of February 16, 2026, a page on the National Park Service website focused on educators included that headline. *See, e.g.*, Nat'l Park Serv., *Educators*, https://perma.cc/VAB5-A2QD (last visited Feb. 16, 2026).
[20] Nat'l Park Serv., *History Under Construction*, https://perma.cc/AQ5V-37E4 (last visited Feb. 16, 2026).

46. The Park Service has recognized that while it may need to supplement or update information to "tell a more holistic story" in order to advance its mission to preserve the parks "for the enjoyment, education, and inspiration of this and future generations," its role is not "to judge what history is worth telling." In its approach to interpretation and education, the Park Service has affirmed that, "[t]he facts are not 'under construction.'"[21]

47. The Park Service has acknowledged the need to "share an accurate and comprehensive history," even when that history extends to "the good, the bad, the ugly, and everything in between."[22] Telling history in this way, according to the Park Service, is the appropriate way to share "the stories of all Americans."[23]

## II. Defendants Have Embarked on a Campaign to Erase History and Science at the Country's Most Valuable Sites.

48. On March 27, 2025, President Trump issued an executive order titled "Restoring Truth and Sanity to American History," which claimed that "[o]ver the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth." Exec. Order § 1.

---

[21] *Id.* For example, a Muir Woods exhibit recounted a timeline of conservation events that was supplemented with previously untold stories of the role women played in local conservation efforts. *Id.* Likewise, a now-removed sign titled "Changing with the Times" at Glacier National Park acknowledged the developing nature of interpretive materials, providing information about the effect of $CO_2$ emissions and climate change on the glaciers that give the park its name.

[22] *Id.* In recognizing that "it's not our job to judge what history is worth telling," the Park Service has previously documented and preserved, for example, the incarceration of Japanese-Americans at the Manzanar National Historical Park, the enslavement of Black Americans at the plantations in Cane River Creole National Park, the killing of Native Americans at the Sand Creek Massacre National Historic Site, and countless other instances of discrimination and marginalization throughout American history.

[23] Nat'l Park Serv., *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, https://perma.cc/82JZ-VK7M (last visited Feb. 16, 2026). It has done so, in part, through the publication of several National Historic Landmarks Theme Studies touching on "[d]iverse and [i]nclusive [h]istory," including the history of Asian American and Pacific Islanders, Hispanics/Latinos, African Americans, American Indians, and Lesbian, Gay, and Bisexual populations.

49. The Executive Order described efforts to tell a more complete and accurate history as a "revisionist movement" and declared that the policy of the Trump administration would be "to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing." *Id.*

50. Through the Executive Order, President Trump directed the Secretary of the Interior to:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;
> (ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. 1451 et seq., 54 U.S.C. 100101 et seq., and other applicable law; and
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

*Id.* § 4.

51. On May 20, 2025, Secretary Burgum issued Secretary's Order 3431, "Restoring Truth and Sanity to American History," implementing the identically-named Executive Order. The Secretary's Order directed the Park Service to, within 30 days, review "any public monuments,

memorials, statues, markers, or similar properties (collectively: properties)" at park sites that had been "removed or changed" since January 1, 2020. Sec. Order § 5(a)(1).[24]

52. By its terms, the only purpose of the Secretary's Order is to implement the Executive Order:

> **Purpose.** This Order implements provisions of President Trump's March 27, 2025, Executive Order (EO) 14253, titled "Restoring Truth and Sanity to American History." EO 14253 directs the Secretary of the Interior (Secretary) to provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park and to complete such improvements by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence. It also directs the Secretary to review public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's (Department) jurisdiction and to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

*Id.* § 1.

53. The Secretary's Order mentions the National Park Service Organic Act and the Federal Land Policy and Management Act only as "Authority" and does not explain its relationship to the mandates of those statutes.

54. The Secretary's Order does not mention the National Park Centennial Act or the National Park Omnibus Management Act and does not provide any explanation for departing from the requirements of those statutes.

55. In the Order, the Secretary instructed the Park Service to, within 60 days, submit a report identifying any reviewed monuments, markers, or other similar properties and "concluding

---

[24] The Secretary's Order also applies to other subagencies, specifically the U.S. Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (referred to collectively in the Secretary's Order as "the land management Bureaus"). Sec. Order § 5.

whether the alteration or removal of each property was made to perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology." *Id.* § 5(a)(2).

56. According to the Order, the Park Service was required to "immediately undertake such actions as are necessary to reinstate" any properties it identified that had been altered for allegedly improper reasons. *Id.* § 5(a)(3).

57. The Secretary's Order also required the Park Service to, within 90 days, review "all public monuments, memorials, statues, markers, or similar properties" at park sites

> to identify whether any such properties contain images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature.

*Id.* § 5(b)(1).

58. The Secretary's Order demanded that, within 120 days, the Park Service "remove any content" that "inappropriately disparages Americans … [or] emphasizes matters unrelated to the beauty, abundance, or grandeur" of a "natural feature" or is otherwise "inconsistent with the purposes of" the Restoring Truth and Sanity Executive Order. *Id.* § 5(b)(2).

59. In its place, the Secretary's Order requires the Park Service to install "content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with" the Executive Order. *Id.* § 5(b)(2).

60. To "[e]ncourag[e] public participation," the Secretary's Order directed the Park Service to "post signage" at park sites that "allow for public input" through a QR code linked to a Park Service–managed website. *Id.* § 6.

61. The Secretary's Order required that the QR-code signs include the following language:

> (Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features.

*Id.*

62. Park Service staff were provided with a template sign, including a QR code, and instructed that it should be posted "by the order of the Secretary of the Interior," in support of the Restoring Truth and Sanity Executive Order at all national parks, monuments, and historic sites by June 13, 2025.




[25]

63. Signs containing the mandated language and QR code were posted in national parks throughout the country:

64. Defendants did not publish notice in the Federal Register or solicit input before collecting this information from the public, and the posted signs did not display an Office of Management and Budget control number.

---

[25] Chloe Veltman, *Asked to flag 'negative' National Park content, visitors gave their own 2 cents instead*, NPR (June 26, 2025), https://perma.cc/N5Y8-G697.

65. Agency leaders informed park superintendents they would be required to review public concerns about anything that "inappropriately disparages Americans past or living (including persons living in colonial times)" and remove or cover "all inappropriate content."

66. In June 2025, the Park Service began compiling a database identifying the date, topic, and park that were the subject of each comment, along with the specifics of the comment itself.

67. The public comments submitted via the QR code overwhelmingly denounced efforts to wash away discussion of history and science. National Public Radio reviewed dozens of comments submitted about the signs in parks around the country, none of which "suggest the parks need to change their descriptions of people or history."[26]

68. A Freedom of Information Act request submitted by the Sierra Club uncovered responses submitted to other Interior Department component agencies also bound by the Secretary's Order that "show that Americans overwhelmingly reject the Trump administration's attempt to sanitize history on public lands."[27]

69. In the summer of 2025, the Park Service instructed park officials to respond to queries by saying that the Trump administration is focused on "historical accuracy."

70. In order to implement the Secretary's Order, the Park Service deployed a system to flag, and ultimately remove, interpretive materials that contain the administration's disfavored views.

71. Interior and Park Service leadership instructed Park Service staff to review all interpretive materials for compliance with the Executive Order and Secretary's Order.

---

[26] Veltman, *Asked to flag 'negative' National Park content, visitors gave their own 2 cents instead*, https://perma.cc/N5Y8-G697.
[27] Sierra Club, *Latest Documents Uncovered by Sierra Club Reveal Americans Oppose Efforts to Whitewash History and Public Lands* (Dec. 11, 2025), https://perma.cc/P6B2-2ZNF.

72. Based on their reviews, in July 2025, Park Service staff at each park were required to submit reports describing each sign, exhibit, film, booklet, wayside, or material that they identified, including to describe changes they thought would be needed and to upload photos and links of the interpretive materials to be changed. On information and belief, Park Service staff were told that the Secretary's Order applies to "retail items" available in the parks, and that their reviews must include those items.[28]

73. On March 2, 2026, unnamed "civil servants on the front lines" posted, on two publicly available websites, a copy of the database of interpretive materials that have been flagged by park staff implementing the Secretary's Order.[29] In total, the database contains approximately 500 materials flagged based on the Secretary's Order.[30]

74. The entries in the database show that even when flagging materials based on the Secretary's Order, Park Service staff often emphasized the extensive research, consultation, and labor that went into creating the materials at their respective parks. In some instances, Park Service staff explicitly stated that while the materials may not comply with the Secretary's Order, they should not be removed.

75. The interpretive materials listed in these assessment reports were different from the database already containing those materials flagged in the QR code submissions.

---

[28] A separate order, signed by Defendant Bowron, issued in November 2025, purports to require Park Service staff to review all "retail items" for compliance with a different Secretary's Order, SO 3416, which implements Executive Orders 14151 and 14168. Despite the separate order, Park Staff were told that Secretary's Order 3431 applies to retail items.

[29] Karin Brulliard and Brady Dennis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://perma.cc/7TA8-NPXV (citing Internet Archive, *DOI Targets for Removal From National Parks under EO14253/SO3431*, (last visited Mar. 7, 2026) https://perma.cc/99YZ-PYGW; Sciop, *DOI Targets for Removal from National Parks under EO14253/SO3431*, (last visited Mar. 7, 2026), https://perma.cc/KYC9-7E8Z.

[30] *Id.*

76. On information and belief, in August and September 2025, Defendant Bowron sent letters to individual parks that notified them of alleged "non-compliance" with the Secretary's Order—but did not provide any information on next steps or how to come into compliance—and identified allegedly noncompliant materials only by a number without explaining how to connect those numbers to specific interpretive materials.

77. Park Service leadership provided staff with a "Park Action List" detailing content that leadership had determined was out of compliance with the Secretary's Order, and told staff to submit revisions or propose actions. On information and belief, Park Service staff were told to complete this work by early 2026.

78. On information and belief, Park Service staff understand that the Harpers Ferry Center will provide protocols for removing and replacing interpretive material that did not comply with the Secretary's Order.

79. Park Service staff were also informed that there would be another review by the Department of the Interior.

80. On information and belief, parks that did not submit a report detailing interpretive materials out of compliance with the Secretary's Order have been told that Park Service leadership is going to conduct the assessment themselves.

81. In January 2026, Park Service staff received an email instructing that "[i]f asked [by park visitors] about an altered/removed exhibit in your park related to [the Secretary's Order]," park staff should answer either that they were not aware of the reason for the change, or that the change was made to comply with the Secretary's Order.

82. In February 2026, Park Service staff were informed that all new public-facing content, such as new signs, exhibits, and brochures, must be submitted to the Department of Interior for review for compliance with the Secretary's Order.

### III. The Park Service Has Removed and Will Remove Interpretive Materials to Comply with the Secretary's Order.

83. On information and belief, as of March 13, 2026, the Park Service has identified for removal, and begun removing, hundreds of interpretive signs and other materials from national parks.

84. In order to comply with the Secretary's Order, Park Service staff reportedly began removing material in the summer of 2025.

85. At Acadia National Park in Maine, Park Service officials reportedly removed signs addressing both history and science. At least one now-removed sign discussed the Wabanaki people and the significance of the Cadillac Mountain—or what the Wabanaki call *Wapuwoc*—to their culture and heritage. Another removed sign described the effects of climate change on the surrounding environment and the resulting costly damage to the park.[31]

[31] The now-removed signs were part of a Park Service effort "intended to make those displays more accessible for people who have mobility, visual, and cognitive impairments." Nat'l Park Serv., *Changing Acadia: Summits*, https://perma.cc/T6TX-R5GQ (last visited Feb. 12, 2026). The website for the exhibit provides images of the signs, text explanations of some of the images for people who are visually impaired, and the complete text of the signs. Jake Spring, *National parks remove signs about climate, slavery, and Japanese detention*, Wash. Post (Sep. 20, 2025), https://perma.cc/2C5C-9FMH.





[32]

86. Park Service staff also reportedly altered a "History Under Construction" exhibit at Muir Woods in Golden Gate National Park in California. The now-removed 2021 installation annotated an existing sign with "sticky notes" that provided previously-omitted content on Indigenous history, the role of women in the Muir Woods conservation movement, and the historical role of Park Service staff in eugenics movements.

---

[32] *Erasure in Action*, Save Our Signs, University of Minnesota, https://perma.cc/6DHU-7A92 (last visited Feb. 14, 2026).





[33]

87. An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York concerning climate change, women's rights and liberty, and components of the country's history "we hope never to repeat—like slavery, massacres of Indians, or holding Japanese Americans in wartime camps"—was also reportedly removed in the early rash of changes.



[34]

88. At Rock Creek Park in Washington, D.C., the Park Service reportedly removed a sign describing the legacy of Francis G. Newlands—a congressman and senator from 1893 to 1917—including details about his White supremacist views.

---

[33] *Erasure in Action,* https://perma.cc/6DHU-7A92.
[34] Devry Becker Jones/Historical Marker Database, photograph *in* Dan Friedman, *Trump's War on National Park Signs is Even Dumber Than you Think*, MotherJones (Feb. 26, 2026), https://perma.cc/3XYA-6Z9W.

89. The Park Service escalated its implementation of the Secretary's Order in January 2026, with dozens of interpretive signs—detailing the contributions of historically marginalized populations, describing atrocities perpetuated against particular communities, and explaining the long-term impact of scientific developments—removed during the last ten days of the month into early February 2026.


[35]



[36]

90. For instance, at the President's House Site in Independence National Historical Park in Philadelphia, Park Service officials removed an exhibit that, according to the Park Service, "examin[ed] the paradox between slavery and freedom in the founding of the nation" and described the critical role that enslaved people played in the operation of the home during George Washington's presidency. One of the removed signs discussed Ona Judge, a woman the Park Service described as "a talented seamstress" who "became Martha Washington's personal maid as a teenager" and who escaped enslavement and evaded recapture.[37]

[35] Emma Lee, WHYY, photograph *in* Carmen Russell-Sluchansky, *Philadelphia slavery exhibit: Judge blasts federal lawyers over removal, calls their argument 'horrifying*,' WHYY (Jan. 31, 2026), https://perma.cc/8PMC-JE8X.
[36] Mijuel K. Johnson, photograph *in* Jake Spring, *Park Service removes slavery exhibit at Independence Park in Philadelphia*, Wash. Post (Jan. 22, 2025), https://perma.cc/2X8P-6BD6.
[37] Nat'l Park Serv., *President's House Site; Enslaved People in the Washington Household*, https://perma.cc/WU4K-LXA3 (last visited Jan. 23, 2026); Nat'l Park Serv., *Visiting the President's House Site*, https://perma.cc/F9GM-EWXH (last visited Feb. 15, 2026); Nat'l Park Serv., *Ona Judge Escapes to Freedom*, https://perma.cc/M6A6-HFCB (last visited Jan. 23, 2026). On February 16, 2026, the U.S. District Court for the Eastern District of Pennsylvania issued a preliminary injunction requiring the Interior Department and the Park Service to restore the President's House Site to its physical status as of January 21, 2026, and enjoined the



38


39

91. At Fort Sumter in South Carolina, the Park Service removed an interpretive display that previously described how the historic island fortress that sparked the beginning of the Civil War may be underwater by the end of the century due to climate change. The display was the product of extensive research by the Park Service and West Carolina University showing the effects of sea level rise, coastal erosion, flooding and storm surge on the park.

92. At Lowell National Historical Park in Massachusetts, Park Service officials stopped showing two films on labor history, reportedly "to ensure compliance with the Interior Secretary's order implementing Trump's executive order."

93. At Glacier National Park in Montana, Park Service officials reportedly removed or ordered the removal of several interpretive materials. Signs describing the concept of climate change, the effect it has had on the park, and its role in driving the disappearance of glaciers have been ordered removed. A season of the official podcast of the park, Headwaters, has already been

---

defendants from making any further changes to the site without mutual agreement of the City of Philadelphia or further action by the court. *See City of Philadelphia v. Burgum*, No. 26-cv-434 (E.D. Pa. Feb. 16, 2026), ECF No. 54. After restoration began but before it was completed, Judge Hardiman of the Third Circuit issued an administrative stay, ordering that the exhibit remain in the status quo as of the entry of that order on February 20, 2026. *City of Philadelphia v. Secretary U.S. Department of Interior*, No. 26-1348 (3d Cir. Feb. 20, 2026), ECF No. 11.

[38] Maxine Joselow, *Park Service Erases Climate Facts at Fort Sumter, Where the Civil War Began*, N.Y. Times (Jan. 22, 2026), https://perma.cc/HA4K-NFLG.

[39] *Erasure in Action*, https://perma.cc/6DHU-7A92 (capturing the spot where the sign previously existed).

taken down. A film about the park shown to visitors has been ordered removed or altered. Another sign that attributes the sharp increase in wildlife in the American west to "hotter and drier conditions" has been ordered removed, as well as a sign that describes the "controversy" over the hunting of wolves. Finally, a placard titled "Blame It on the Grain," which "describes the construction of a dam that created a reservoir in the eastern part of the park to support farming," has also been ordered replaced. In reporting these signs for review with the Secretary's Order, Park Service staff described the materials as "all well-researched, thoroughly reviewed by resource experts for accuracy, and are directly tied to Glacier National Park's resources and primary interpretive themes."

94. At Arizona's Grand Canyon National Park, Park Service staff removed portions of displays characterizing settlers, cattle ranchers, and tourists as negatively impacting the land for their own benefit and describing how federal officials claimed tribal land to establish the park.

95. At Sunset Crater Volcano National Monument in Arizona, a sign describing basalt bubbles was recently ordered removed, reportedly because the sign included an image of a visitor holding a Pride flag.

96. At Grand Teton National Park, the Park Service removed a sign explaining the complicated history of Gustavus Cheyney Doane, a key member of an early Yellowstone expedition who had participated in a massacre of Native Americans.

97. In addition to those interpretive materials that have already been removed, the Park Service has flagged hundreds more for potential removal because they allegedly do not comply with the Secretary's Order according to public reporting and the copy of the database made available on public websites.



[40]

98. For example, at Fort Pulaski National Park, flagged content included a reproduction of "The Scourged Back," an 1863 image of Peter Gordon, a man who was enslaved in Louisiana, with scars covering his back.

99. Other signs and exhibits detailing the history of people who were enslaved have also been flagged for removal. For instance, at Harpers Ferry National Historic Park in West Virginia, where abolitionist John Brown led a raid seeking to arm enslaved people for a revolt in 1859, Park Service officials flagged more than 30 signs. A sign describing a family's "ownership" of enslaved people was flagged at Bent's Old Fort National Historic Site. An exhibit entitled "Freedom Seekers of Timucuan Preserve" at the Kingsley Plantation in the Timucuan Ecological & Historic Preserve was flagged for removal. It describes stories of enslaved people who "illustrated the perseverance of the human spirit" as they navigated "sites of bondage and of escape." Park officials have also targeted interpretive materials at Virgin Islands National Park, where, as recently as 2022, Congress provided that a plaque be installed at Ram Head commemorating the "slave rebellion that began on St. John on November 23, 1733." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 621, 136 Stat. 4459, 5608 (2022) (codified at 16 U.S.C. § 398 note).[41] In flagging these signs, Park Service staff emphasized that

[40] McPherson & Oliver, *The Scourged Back* (c. 1863) (albumen print), National Gallery of Art, Washington, D.C., https://perma.cc/AS5Q-R2FL (last visited Feb. 14, 2026).
[41] *See also* Nat'l Park Serv., *1733 Akwamu Insurrection*, https://perma.cc/87JT-PK7J (last visited Feb. 16, 2026); Stacy Plaskett, *Congresswoman Plaskett Condemns Removal of Historical*

"Virgin Islands National Park already me[a]nt to refresh the waysides at Annaberg with a more []holistic explanation of the history." More information about slavery was flagged at Cane River Creole National Historic Park, including an exhibit about enslaved people who tried to escape but were captured and publicly whipped. Park officials explained that these materials were "designed to provide visitors with a deeper understanding of complex histories connected to the site." And park officials at Manassas National Battlefield in Virginia flagged a sign that criticized post–Civil War "Lost Cause" ideology, which denied the central role slavery played in the war.[42]

100. Likewise, the Park Service has flagged for removal interpretive materials describing key moments in the civil rights movement. At Emmett Till and Mamie Till-Mobley National Monument, Park officials flagged an exhibit that "tells the story of Emmett Till and his mother" and was created "in collaboration between the Emmett Till and Mamie Till-Mobley Institute, the Emmett Till Interpretive Center (ETIC), the Till family, and The Children's Museum of Indianapolis." In flagging this exhibit, Park officials explained that "[w]ithout this exhibit to share the difficult Till story, the new NPS site would be almost completely devoid of interpretation." At the Selma to Montgomery National Historic Trail in Alabama, the Park Service has flagged approximately 80 items for removal.[43] And the permanent exhibit at Brown v. Board of Education National Historical Park in Kansas has been flagged because it mentions "equity."

101. Similarly, interpretive materials explaining mistreatment of Indigenous groups have been flagged for removal at parks across the country. These include a display at Sitka National Historical Park referencing the mistreatment of Alaskan Natives by missionaries, a

---

*Markers in the Virgin Islands National Park*, Office U.S. House Representative Stacey E. Plaskett (Feb. 13, 2026), https://perma.cc/45AA-2M2D.

[42] Maxine Joselow, *Park Service is Ordered to Take Down Some Materials on Slavery and Tribes*, N.Y. Times (Sep. 16, 2025), https://perma.cc/9DKR-EPJR.

[43] Jason Laljee, *Trump's DEI Crackdown is Changing MLK Day*, Axios (Jan. 19, 2026), https://perma.cc/9HWC-D97W.

brochure and sign describing the mass slaughter of the Piegan Blackfeet people at Glacier National Park, a sign at Bent's Old Fort National Historic Site that described the forced removal of a Native tribe, and an exhibit at Little Bighorn Battlefield National Monument that described the United States being "hungry for gold and land" and breaking promises to Native Americans. At Castillo de San Marcos National Monument in Florida, the Park Service flagged language about the imprisonment of Native Americans inside the Spanish stone fortress. In reporting these signs, Park Service staff emphasized that these signs were "developed in collaboration with the Cheyenne and Arapaho Tribes." A panel at Hubbell Trading Post National Historic Site discussing Ganado Mucho, a Navajo leader known for settling disputes with ranchers, has also been flagged for removal. At Fort Laramie National Historic Site, a sign that references the persecution of Native Americans has also been flagged for removal. And at Death Valley National Park, the Timbisha Soshone tribe requested that a new exhibit be placed with the phrases "these are our homelands" and "we are still here" to commemorate the 25th anniversary of the Homeland Act—which transferred nearly 7,800 acres of land to the tribe. Timbisha Shoshone Homeland Act, Pub. L. No. 106-423, 114 Stat. 1875 (2000). However, this too has reportedly been placed under review pursuant to the Executive Order and Secretary's Order.

102. Likewise, signage and exhibits providing scientific information at parks across the country have also been targeted. So has a plaque at Great Smoky Mountains National Park explaining how fossil fuels cause air pollution, and a sign at Cape Hatteras National Seashore titled "The Air We Breathe" discussing the importance of clean air. At Everglades National Park, the Park Service flagged descriptions of industrialization's impact on the wetland ecosystem. The importance of fresh water is a "theme [that] can be found throughout the purpose, foundation, and enabling legislation of what established Everglades National Park," according to the Park Service

staff that submitted the interpretations for review. And at Organ Pipe Cactus National Monument, descriptions of destructive grazing practices and the accelerating rate of global warming since 1850, as well as a booklet that talks about endangered turtles and Sonoran pronghorn, have been flagged for removal.

103. Hundreds of other signs, exhibits, and unigrids have been flagged, altered, or rejected, but not yet removed, to comply with the Secretary's Order.[44] According to the Park Service database that was made public in March, at least 500 interpretive materials have been flagged based on the Secretary's Order.



[45]

104. Yet the administration has also acted arbitrarily in applying its own policy about not providing signage in national parks that "disparages Americans past or living." For example, the administration reportedly installed plaques in the White House—which is a national park site—that disparage former presidents, characterizing one as "the worst President in American History" and as allegedly responsible for bringing the country "to the

---

[44] For instance, a Junior Ranger pamphlet at Cape Hatteras in North Carolina has reportedly been flagged because it explains that "Women pirates like Anne Bonnie often dressed like men to hide amongst the crew." *Booklet,* Junior Seashore Ranger Program, Cape Hatteras Nat'l Seashore, Nat'l Park Serv., https://perma.cc/4R5K-MZ74 (last visited Feb. 14, 2026).

[45] Mark Schiefelbein, Photograph of Plaque beneath the space for President Joe Biden's portrait, Assoc. Press, *reprinted by* Sarah Dean, Garrett Haake, Alexandra Bacallao, and Rebecca Shabad, *White House installs plaques mocking former Presidents Barack Obama and Joe Biden*, NBC News (Dec. 17, 2025), https://perma.cc/J5NY-5KAX.

brink of destruction," and another of spying on a political adversary and presiding over "the worst political scandal in American History."

## IV. The Secretary's Order and Its Implementation Have and Will Continue to Irreparably Harm Plaintiff Organizations.

105. The Secretary's Order and its implementation have caused and will continue to impose irreparable harm on Plaintiffs and their members. The Order and its implementation directly undermine the missions and functions of the plaintiff organizations—all leaders in their respective fields—and have forced each organization to redirect significant time and resources away from other elements of their work. *See, e.g.*, *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, 788 F. Supp. 3d 70, 95 (D. Mass. 2025) (explaining that "[a]ctions by a defendant that 'make it more difficult for' an organization 'to accomplish [its] primary mission . . . provide injury for purposes [] of . . . irreparable harm.'" (alterations and omissions in original) (citation omitted)).

106. Each organization's mission involves ensuring access to high quality information, including on recent developments in science, history, or both. And each of the Plaintiffs' missions, either directly or indirectly, involves ensuring that the national parks are preserved and inclusive for visitors now and in the future. Defendants' actions have frustrated those missions: Because of the Secretary's Order and its implementation, Plaintiffs face inordinate burdens to supplement the resources lost or removed, or mitigate the ensuing harm, as a result of the sustained campaign to erase history and censor science through the Secretary's Order and its implementation. Because they have been forced to divert resources from other organizational efforts as a result of the Secretary's Order and its implementation, each Plaintiff has suffered harm that will only increase with each day that the Order remains in effect, and with each new removal Defendants undertake to implement the Order. Meanwhile, Plaintiffs' members who visit individual parks—often a literal once-in-a-lifetime experience—suffer informational, recreational, and aesthetic harms by

being deprived of valuable context about the parks. And those plaintiffs whose members have historically contracted with the parks have already suffered lost income, chilled expression, and reputational injuries. These harms to Plaintiffs and their members will only continue to grow absent relief.

**National Parks Conservation Association**

107. The mission of the National Parks Conservation Association is "protecting and enhancing America's National Park System" for present and future generations, a mission that is closely aligned with the mission of the Park Service itself but that the Secretary's Order ignores. Notably, the first Park Service Director himself founded NPCA just three years after the birth of the Park Service because he understood the need for an outside guardian of the parks to hold the agency accountable for fulfilling its mission. As part of NPCA's mission, the organization conducts independent research, develops and provides resources and other tools to support the Park Service, and "engag[es] advocates as diverse as the parks themselves" to defend the parks against environmental threats and ensure that the shared heritage of the parks is both protected and tells a more inclusive, complete story of the United States. As part of its effort to ensure future generations are equally committed to preserving the parks, NPCA aims to "bring people and parks together" by encouraging and facilitating visits to parks through partnerships with local communities, organized campaigns, one-time events, regular publications (including the National Parks Magazine[46]), and overviews and other materials on all individual parks. In recent years,

[46] The Winter 2026 issue of National Parks Magazine included a piece by NPCA's Senior Director of Cultural Resources in Government Affairs titled "To Tell the Truth," explaining some of the historical questions that are currently unanswered and describing some of the effects, thus far, of the implementation of the Secretary's Order. Alan Spears, *To Tell the Truth*, Nat'l Parks Magazine (Winter 2026), https://perma.cc/H6JY-R2H3.

NPCA has worked in particular to establish and highlight park sites that help enshrine a more complete American story, including by organizing educational trips to some of those sites.[47]

108. NPCA's most recent strategic plan, adopted in 2021, sets out the goal of ensuring that national parks tell the stories of all Americans. By enhancing park storytelling, NPCA seeks to ensure that national parks represent, welcome, and share a fuller American story with all visitors. This in turn helps create a new generation of park advocates who will continue to work towards protecting and enhancing the national park system. Park Service staff have made tremendous strides towards that reality in recent decades, sharing the facts about difficult topics like slavery, segregation, and climate change. The Secretary's Order impedes NPCA's years' long work in this area and instead moves the park system in the opposite direction. Moreover, the Order and its implementation will deprive visitors of the full picture of history and nature at the parks that they deserve.

109. In the past, NPCA has known that its members who visit park sites would be exposed to historical and scientific interpretation that reflects the diversity of the United States and its people, and the organization has strived to attract new audiences to national parks by showing them that they and their experiences are represented. As Defendants further implement the Secretary's Order and remove accurate information about our history and diverse populations, that becomes harder and harder.

110. As the country's largest organization with a mission squarely focused on preserving national parks, NPCA has frequently collaborated with the Park Service through formal programming and resource protection and as a thought partner considering how to ensure the parks

---

[47] One such trip, "On the Road to Freedom," covers Civil Rights history from Alabama to Mississippi and involves visiting multiple park sites, including some where interpretive materials have reportedly been flagged. *See, e.g.*, *supra*, ¶ 100.

tell a more complete history. But those collaborations are all in danger based on the Secretary's Order. For instance, in service of its mission to "enhance" the national parks, NPCA played an instrumental role in Congress's adopting, in the Centennial Act, the requirement that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "reflect current scientific and academic research, content, methods, and audience analysis." And since 2012 alone, NPCA has worked to help create and expand more than 25 national park sites focused on telling diverse stories, including the Stonewall National Monument honoring LGBTQ+ history, the Birmingham Civil Rights National Monument and Medgar and Myrlie Evers Home National Monument honoring the history of the civil rights movement and its leaders, and the Belmont-Paul Women's Equality National Monument honoring the history of women's suffrage. Implementation of the Secretary's Order now threatens the interpretive materials that explain the very reason NPCA fought to and succeeded at establishing these sites. Already, NPCA has diverted resources from other programs and efforts to address the effects of the Secretary's Order by tracking sign removals, educating members of Congress and other policymakers and partners about the fact and effect of censorship in the parks, and working to build awareness and transparency around the Secretary's Order and its implementation. Instead of being able to push to make the park system more inclusive and historically accurate, NPCA has had to pivot to prevent erasure of history and science that was reflected in the parks because of hard fought victories by NPCA and its partners.

111. NPCA's members regularly visit, study, work, photograph, or recreate at NPS sites. These members, many of whom visit national parks every year, seek honest, authentic experiences, information, and education—not censorship. They come to learn about accurate and more complete American history and science. They expect the parks to serve as a classroom for

themselves and their families. Removing educational materials and signage deeply harms their informational, recreational, scientific, and educational interests and ultimately degrades their park experiences.

**<u>American Association for State and Local History</u>**

112. The Secretary's Order and its implementation also hinder the ability of the American Association for State and Local History to perform its core functions and fulfill its mission. In order to serve its mission to "provide[] leadership, resources, and advocacy to help the history community thrive and tell a shared history in which everyone belongs," AASLH supports and provides resources for history practitioners and the country's 21,000 history organizations, which include National Park sites. These resources and programs help practitioners educate the public in a fashion that allows people to engage with a more complete and accurate understanding of history and to value history for its relevance to the present. As "America's classroom" in which the public engages with and learns about our nation's history, national parks are critical to fulfilling this core mission. Because of Defendants' actions, AASLH has had to divert resources from organizational needs that are centered around expanding its reach, including by improving membership development efforts, and engaging on other issues and program areas in which it would typically be active. Instead, AASLH has had to use the redirected resources to address an urgent need to develop strategies to respond to attacks on historical best practices and historical topics disfavored by Defendants, including attacks related to the national parks, and to assist history practitioners in carrying on their work in the challenging environment Defendants' actions have created.

113. AASLH has long been a leader in an effort to ensure that the public discourse around the history of the United States is expanded from prioritizing the perspectives and

experiences of primarily dominant groups to telling a more comprehensive and accurate history. The organization has done so through research, trainings, workshops, webinars, and written educational materials, including work that specifically highlights or focuses on national parks. In 2019, research done in conjunction with an AASLH study of visitation trends at history organizations, including National Park sites, suggested that Americans' interest in history had shifted such that the most recently-opened national parks, which largely focused on telling a more complete and accurate history, including that of African Americans, women, Indigenous people, Latinx people, LGBTQ+ people, and immigrants, might have attracted more visitors. Due to the significant role of the Park Service sites to the entire history sector, the Secretary's Order has impaired AASLH's efforts to continue to tell a more complete and honest history by literally seeking to erase evidence of history from the parks. As a result, AASLH must now shift its efforts from seeking to tell a more complete history to instead ensuring that people have access to at least what was available before the issuance and implementation of the Secretary's Order.

114. AASLH and its members have long partnered with the Park Service to aim to tell a whole history of the United States. The Secretary's Order endangers that relationship because it calls for cherry picking history in a fashion that directly contradicts the professional standards that AASLH advances. In the past, AASLH has had a mutually beneficial relationship with the Park Service. AASLH provided training and programs that included Park Service staff, worked with Park staff on committees and similar groups and connected the organization's members to Park Service sites, personnel, and offerings that provided models for the field aligned with best practices in history (including and especially for members who specialize in the history of those communities most affected by the Secretary's Order, particularly African American, Indigenous,

LGBTQ+, and women's history). The Secretary's Order has undermined that relationship and opportunities for collaboration.

115. The orders have created an environment in which AASLH has been forced to reconsider program and resource offerings, a crucial source of organizational revenue, to ensure that history practitioners—including any who may be employed by or contract with the federal government, generally, or the Park Service, specifically—can participate without fear of political backlash. AASLH understands from practitioners that declining to adjust such offerings could result in lowered participation, and therefore lower revenues in the long run.

116. AASLH is also a membership organization whose members include historians and other practitioners who work with the Park Service. This includes history practitioners who specialize in the history of communities that have been historically marginalized or entirely excluded, and who in the past have contracted with and provided research to the Park Service to ensure park visitors are exposed to a more complete and accurate understanding of the history of those sites. AASLH's membership includes history practitioners who have been harmed by the Secretary's Order and its implementation in a number of ways. First, some members have lost income because the Secretary's Order has effectively censored their specialties, which focus on communities that have been historically marginalized or entirely excluded, and whose stories the Park Service is now refusing to tell. Second, their own expression as practitioners of history has been chilled because the only way to continue to work with the Park Service and stay out of Defendants' crosshairs is to adopt the censored narrative and disregard a whole history by neglecting to discuss anything that Defendants, pursuant to the Secretary's Order, might consider "disparaging." Practicing history in this way is in direct contradiction to AASLH's mission and would require violating AASLH's Statement of Standards and Ethics. The Standards acknowledge

that "everyone makes history" and that history practitioners and organizations "must be attuned to issues and ideas reflective of the breadth of experience in their local communities and in the United States, and must include these varied perspectives in documentation, collections, preservation, and interpretation." They also note that interpretation should "recognize multiple perspectives, including community-based and descendant knowledge." Faced with a diametrically opposed approach to historical interpretation from the Park Service, AASLH members must choose between violating AASLH's professional ethics—and generally the ethics of the profession—or risk losing their livelihoods. Finally, the reputations of AASLH's members have been harmed because the Secretary's Order baselessly declares their work, which aims to tell a more complete history, to be no more than "improper partisan ideology" that is not appropriately considered part of the country's "extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing."

**Association of National Park Rangers**

117. The Association of National Park Rangers represents park professionals of all disciplines who help fulfill the lawful mission of the national parks and the Park Service, including that the national parks should be a vehicle for conveying accurate history and science to visitors. Its functions include providing mentorship, support, and professional enrichment to current and former Park Service staff as they work to protect the natural, cultural, and recreational resources of the national parks. In addition to ongoing programming and ad hoc opportunities, ANPR hosts an annual conference, entitled the Ranger Rendezvous, which features educational presentations, field trips, and opportunities for Park Service employees and alumni to discuss experiences and gather information and ideas in an effort to better allow them to contribute to fulfilling the mission

of the Park Service. Funds generated from the Ranger Rendezvous are critical to ensuring ANPR's continued viability.

118. A significant number of ANPR's members are Park Service employees whose job it is to interpret the resources and stories related to the parks where they work. Many of ANPR's members are retired from the Park Service but continue working in parks as volunteers. The Secretary's Order and its implementation has put ANPR in the impossible position of choosing which part of its mission to fully fulfill: whether to provide the type of guidance and support it traditionally has for current Park Service employees, or to continue to work to support the mission of the parks and the Park Service, including ensuring that the parks remain places where visitors can learn about uncensored history of the United States and the relationships between scientific evidence and the park sites. Defendants' actions now stand as an obstacle to simultaneously pursuing both parts of ANPR's mission. In an effort to support the mission to preserve the national parks for all people, ANPR has publicly denounced censorship of history and science at the parks, endangering its relationship with current Park Service employees. Indeed, at its Ranger Rendezvous in 2025, ANPR saw a drop off in attendance by current Park Service employees, depriving ANPR of the benefit of the perspectives of a significant segment of its membership and undermining its ability to later represent their interests. The organization understands this drop to be due to fear among current Park Service staff that attending this ANPR event would be seen as opposing the Park Service and, by extension, the Secretary's Order.

**Coalition to Protect America's National Parks**

119. The Coalition to Protect America's National Parks channels the experience of thousands of current and former Park Service employees and volunteers towards advancing the long-term mission of the Park Service and the National Park System. The Coalition's mission

includes building public awareness for issues affecting the national parks, particularly around applying "sound science." The organization uses its platform to educate policymakers and the public about issues affecting the national parks, including around park protection, biodiversity, climate change, and the need to ensure the parks reflect the breadth, diversity, and richness of communities and cultures within the United States, and has historically done so in partnership with the Park Service itself. The Coalition supports and promotes the use of peer-reviewed science to ensure these irreplaceable natural resources are properly stewarded, as required by law. As an organization of Park Service professionals of all levels, skill sets, and expertise, the Coalition is recognized by the public, park partners, Congress, and historically the Park Service itself as the "Voice of Experience."

120. The Secretary's Order and its implementation create a direct conflict for the Coalition: Either it refrains from supporting the Park Service in order to continue pursuing its mission to protect the parks for the enjoyment of all people in the United States, or it accepts censorship—thus abandoning its own mission—in order to continue supporting the Park Service in its current iteration. This conflict has a direct impact on the Coalition's relationship with its members. If the Coalition remains silent on the violation of the mission of the Park Service and the national park system by erasing history and science, it violates the trust of its members who have spent their careers pursuing that mission. By contrast, describing accurate history and science as crucial to protecting the parks means effectively denouncing the Park Service and effectively asking Coalition members to choose sides between the organization and their current or former employer. Even where Coalition members may prefer to remain loyal to the Park Service mission, and in turn the Coalition, there is widespread fear of retribution for being perceived as opposing the current campaign.

121. Further, because of the Secretary's Order, the Coalition has to reallocate its resources to develop resources and investigate claims about the removal of historical and scientific information. In order to continue to advance its mission and combat Defendants' attempts to erase history, the Coalition has also been forced to devote valuable staff time and resources to fielding questions about removals from members and partners, developing briefing papers, and collaborating with policymakers—including members of Congress—on how best to continue protecting the national parks despite Defendants' actions.

122. The Coalition has produced—and expects to continue to produce—materials that used to be more widely accessible through the Park Service. For example, the Coalition provides research, education, and resources to study and assess the effects of climate change on the parks, including a 2025 Report titled "America's Best Idea in Peril: Climate Change and the Future of Our National Parks,"[48] which proposes solutions to safeguard the parks from long-term harm. The report—produced entirely independently of the Park Service—includes the type of information that has historically either been produced, publicized, or relied upon by Park Service personnel.

123. Due to its continued engagement in fighting the removal of history and science in parks, the Coalition must take time and resources away from activities it would otherwise engage in. For example, the Coalition has been forced to divert resources away from core organizational activities and goals such as developing a new strategic plan in 2025, developing an annual work plan for 2026, hosting educational webinars, and building an internal process for donor outreach and development.

[48] SEEC Inst. & Coal. to Protect America's Nat'l Parks, *America's Best Idea in Peril: Climate Change & the Future of Our National Parks* (July 2025), https://perma.cc/FVT6-DXQM.

**Society for Experiential Graphic Design**

124. The Society for Experiential Graphic Design "connects people to place" by supporting experiential graphic designers as they work to ensure that design—including interpretive exhibits and wayfinding at national parks—helps people understand history, culture, science, and the environment in ways that are clear, inclusive, and truthful. Developing any one wayfinding sign or exhibit panel often takes months or even years of research, peer review, and coordination among historians, scientists, educators, interpretive planners, and accessibility experts. As a professional association for experiential and interpretive exhibition design, SEGD provides education, training, and professional standards that guide how complex stories are responsibly translated into accessible public experiences.

125. The Park Service has long established professional standards for research-based interpretive planning and public communication; its practices are closely aligned with SEGD's mission to enrich the human experience by making physical environments—including parks—more inclusive, accessible, and meaningful. SEGD has therefore relied on the Park Service's commitment to rigorous, scholarship-driven interpretation as consistent with its own professional values. To that end, SEGD's programming and resources benefit many of its members who provide the Park Service with interpretive wayfinding and exhibition design that fulfills the Congressional mandate that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "current scientific and academic research, content, and methods." But because of the Secretary's Order, the Park Service is censoring the very type of interpretive design that SEGD's mission demands. As a result, SEGD is caught between abandoning its mission and its vision and abandoning its members who rely on contracts with the Park Service for their livelihood. The Secretary's Order and its implementation dramatically undermine SEGD's work

to make the built environment more inclusive and intuitive, emotive and engaging, sustainable and shared.

126. SEGD spends substantial time and effort to develop best practices related to historic and scientific interpretation and to develop educational content and programming for its members that is geared toward the goal of ensuring interpretive wayfinding, signage, and exhibitions are welcoming to all people. SEGD gives its members tools to help them achieve that goal and advance their practice, including for members who work with the national parks. Those tools have included helping members become adept at the process of telling complete and accurate history when working on a project, consistent with the Park Service's statutory mandates. SEGD's efforts to provide members with that kind of professional development and programming, and to advance the progress of its profession through best practices around interpretation, have been frustrated by the Secretary's Order and its implementation.

**Union of Concerned Scientists**

127. The Union of Concerned Scientists endeavors to put rigorous, independent scientific principles into practice and to increase scientific literacy and access to support evidence-based decisionmaking. Through research, advocacy, engagement, and policy analysis, UCS works to ensure that federal agencies are held to the highest standards of scientific integrity in their production, use, and communication of scientific information, including the Park Service. UCS fights to combat inaccurate studies and claims that sow doubt about science by providing accurate, current scientific information through blog posts, campaigns, reports, and peer-reviewed scientific studies. Since 2016, UCS has published at least 267 reports, on average a little over 26 reports per year organizationwide. Producing any one scientific or analytical product takes hundreds of hours

of dedicated time for each scientist, analyst, or communication specialist, including research and production.

128. UCS's mission is frustrated by Defendants' efforts to censor peer-reviewed, scientific information and interpretations of the American landscape and its science in the national parks, especially around climate science and climate impacts, and by the fact that these moves run counter to the Department of the Interior Scientific Integrity Policy, which UCS sees as consistent with and critical for its mission and has long worked to advance. Because of the Secretary's Order and its implementation, UCS has delayed or put on hold several long term projects, and has had to redirect approximately 5% of staff resources and capacity away from other activities that are integral to its mission. UCS leaders have already spent considerable time responding to inquiries and strategizing about how best to ensure rigorous, independent scientific principles continue to be reflected in the national parks despite Defendants' actions. In 2025, UCS had to reduce the number of reports it published, dropping from 27 in 2024 to 18 in 2025. Producing additional scientific reports or other analytical materials to replace the science that Defendants have censored would require UCS to further cut back on other key elements of its work.

129. UCS will now need to expend additional resources to ensure scientific integrity is preserved at the National Park Service. For two decades, UCS has worked to advance scientific integrity and fight censorship at federal agencies, through conducting surveys of federal scientists, developing policy solutions, and advocating with federal agencies and Congress to instill a culture and practice of scientific integrity government wide. As just one example, in 2018, UCS surveyed more than 63,000 federal scientists across 16 agencies, including the Park Service, on scientific integrity, censorship, and public access to scientific information, in a report titled "Science Under Trump: Voices of Scientists across 16 Federal Agencies," and subsequently engaged the Park

Service to share its findings and implement solutions. Likewise, UCS' 2018 report, "Science Under Siege at the Department of the Interior: America's Health, Parks, and Wildlife at Risk" contains additional research and policy analysis relevant to the parks.[49] At the time, UCS recommended that "agency leaders could best improve scientific integrity at the NPS by reaffirming scientists' freedom to pursue and communicate openly about their scientific work without asking for permission, regardless of whether it is politically contentious"—a goal that has only been further hindered as a result of the Secretary's Order. Because of the Secretary's Order, UCS will have less access to Park Service officials to advance its goal of strengthening scientific integrity at federal agencies and will need to expend additional resources to ensure that science and scientists are not censored by the Park Service.

130. UCS has also lost a key partner in fulfilling its mission to provide accurate scientific information and increase scientific literacy and access. Prior to the Secretary's Order, UCS regularly collaborated with the Park Service. In previous UCS reports, Park Service employees served as external reviewers given the relevance of scientific information for national parks. Park Service scientists and experts have historically contributed to studies, and some are also members of UCS. Those studies, and the research behind them, help inform interpretive materials at national parks. Further, the Park Service has also provided its expertise when UCS publishes reports on how scientific phenomena affect American ecosystems and cultural sites, including those that are managed by the Park Service. In May 2014, for example, UCS published the "National Landmarks at Risk" study, which detailed how rising seas, floods, and wildfires are threatening several of the United States' most cherished historic sites, many of which are managed by the Park Service.[50] In

[49] Jacob Carter et al., *Science under Siege at the Department of Interior*, Union of Concerned Scientists (Dec. 2018), https://perma.cc/L4LH-J2JD.
[50] Debra Holtz et al., *National Landmarks at Risk*, Union of Concerned Scientists (May 2014), https://perma.cc/B65Y-RGUW.

conducting this study, a dozen Park Service staff collaborated with UCS to create the report, including Marcy Rockman, the then-Climate Change Adaptation Coordinator for Cultural Resources at the National Park Service. But the report discusses, for example, the rising sea levels around Fort Sumter—the very science-based interpretation that the Park Service just removed from Fort Sumter in January. Not only is UCS harmed because the very scientific research it helped develop has been pulled from the national parks, but the organization has also lost a trusted partner in its effort to advance scientific literacy and access and combat climate change through effective science communication. Because of the Secretary's Order, Park Service staff are no longer able to contribute to these reports either formally or informally if they discuss information that Defendants find "disparaging" or focus on natural features other than the "beauty, abundance, and grandeur of the American landscape." Without these contributions from the Park Service, UCS will not be able to produce the same quality and quantity of reports and studies relevant to national parks, and will have to expend its own resources to find relevant expertise that the Park Service previously filled.

## CLAIMS FOR RELIEF

### Count 1
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

131. The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

132. All Plaintiffs state this claim against all Defendants.

133. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

134. The Department of the Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

135. The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).

136. Agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (citation omitted). An agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"; it must instead "display awareness that it *is* changing position" and provide "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). Agency action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" it seeks to address. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation omitted). "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 30 (internal quotation marks and citation omitted).

137. The Secretary's Order is arbitrary and capricious in several ways.

138. The Secretary's Order fails to provide a reasoned explanation for mandating the removal of interpretive signs and exhibits that do not align with the administration's preferred historical and scientific narratives. The only alleged justification, contained in the stated "purpose"

of the Order—to "implement[] provisions of" EO 14253, *see* Sec. Order § 1—is not the type of reasoned explanation required by the APA.

139. In executing and implementing the Secretary's Order, Defendants failed to consider "important aspects of the problem" the Order purported to address, including: the unique role of the national parks in telling a full and accurate history of the United States; the importance of educating visitors on the impact of environmental developments on park land; the impact of erasing the history of certain people, communities, and ideas; the fundamental principle that the parks are for the benefit and enjoyment of all the people of the United States; the wastefulness of removing historical and scientific information and ignoring what the agency has learned; the impact on future generations of not having access to comprehensive historical and scientific information at national parks; and the harmful effects of erasing history and science on entities and municipalities that regularly partner with the national parks for educational and other purposes.

140. Additionally, the Secretary's Order failed to account for the reliance interests of organizations, like Plaintiffs, who focus on the preservation, protection, and long-term enjoyment of the parks or whose missions concern ensuring historical and scientific accuracy and completeness, and who have historically relied on the Park Service to help fulfill their goals. It also failed to account for the reliance interests of constituencies, including Indigenous communities, who have worked tirelessly to ensure their own history and ties to park sites and land are accurately and comprehensively reflected at those national parks. Nor did the Secretary's Order account for the reliance interests of educators, visitors, and other communities who depend on the parks to learn about the history of the United States in its entirety, and for accurate and complete scientific information. Defendants' complete failure to account for these reliance interests renders the Secretary's Order arbitrary and capricious.

141. The Secretary's Order also lacks support and contradicts facts before Defendants. The Order provided no factual basis whatsoever for its insinuations that existing signs and exhibits promoted a "false reconstruction of American history" or included "partisan ideology." Instead, the facts available to Defendants include reams of high-quality academic and scientific research developed over years if not decades that demonstrate the accuracy of the posted information, and hundreds of comments submitted by the public that overwhelmingly denounce the projected impact of the Secretary's Order.

142. The Secretary's Order also failed to offer any explanation, let alone a reasoned one, for its departure from the Park Service's longstanding practice of complying with its statutory and policy obligations. The Order provides no justification for disregarding the Park Service's statutory mandate that the parks be managed in such a fashion that they benefit and inspire "all people of the United States." And without any explanation, Defendants have chosen to depart from the Park Service's practice of explaining the "shared heritage" of the United States, and they have decided instead that some history is not worth telling. Nor did the Order explain the reason for ceasing to ensure that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "use . . . a broad program of the highest quality interpretation and education." This lack of awareness and failure to provide "good reasons" for the new policy renders the Order arbitrary and capricious.

143. Moreover, the Secretary's Order does not explain its failure to conform to the requirements set out in the implementing statutes and Foundation Documents of the parks, many of which require the specific park site to focus on particular history or science, or mandate that the particular park provide interpretation on specific topics that are now seen as non-compliant with the Secretary's Order.

144. Finally, the Secretary's Order is arbitrary and capricious because it fails to account for language in implementing statutes for certain parks and historic sites defining their specific purposes and goals.

145. For these and other failings, the Secretary's Order is arbitrary and capricious and must be set aside under 5 U.S.C. § 706(2)(A).

**Count 2**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**National Park Service Centennial Act, 54 U.S.C. §§ 100801–803**

146. The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

147. All Plaintiffs state this claim against all Defendants.

148. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

149. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

150. The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

151. The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

152. The Secretary's Order is contrary to the National Park Service Centennial Act, 54 U.S.C. §§ 100801–803.

153. The Centennial Act provides that the Secretary "shall ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802.

154. The statute defines "interpretation" as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." 54 U.S.C. § 100801(1)(A).

155. The statute defines "education" as "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." 54 U.S.C. § 100801(2).

156. The Centennial Act also authorizes the Secretary to "undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803.

157. The Secretary's Order violates these provisions of the Centennial Act because it does not enhance public awareness, understanding, or appreciation. Requiring the highest quality interpretation and education means telling full stories and providing full information, not only sharing content that puts the United States in a positive light.

158. Nor does the Order comport with the statute's directives that the parks must reflect different backgrounds and current scientific research, and use a broad program of the "highest quality" interpretation and education. Rather, the content being removed pursuant to the Secretary's Order overwhelmingly concerns environmental impacts on the parks and describing the history and experiences of Indigenous communities, African Americans, and other marginalized groups.

159. Because the Secretary's Order violates the Centennial Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 3**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**National Park Service Organic Act, 54 U.S.C. § 100101**

160. The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

161. All Plaintiffs state this claim against all Defendants.

162. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

163. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

164. The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

165. The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's]

decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

166. The Secretary's Order is contrary to the National Park Service Organic Act, 54 U.S.C. § 100101.

167. The Organic Act provides that the "Secretary [of the Interior], acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

168. The Secretary's Order directs the Park Service to remove "all public monuments, memorials, statues, markers, or similar properties" containing content that allegedly "inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature." Sec. Order § 5(b)(1).

169. The Secretary's Order also directs the Park Service to "remove any content . . . otherwise found to be inconsistent with the purposes of EO 14253." *Id.* § 5(b)(2).

170. Both of these directives contravene the Organic Act's requirement that the Secretary's management of the National Park System "shall conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a).

171. Similarly, the Secretary's Order violates the Organic Act's mandate that the Secretary manage the parks so as to "leave them unimpaired for the enjoyment of future generations." *Id.*

172. Because the Secretary's Order violates the Organic Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 4**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**National Parks Omnibus Management Act, 54 U.S.C. §§ 100701–702**

173. The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

174. All Plaintiffs state this claim against all Defendants.

175. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

176. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

177. The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

178. The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

179. The Secretary's Order is contrary to the National Parks Omnibus Management Act.

180. The Omnibus Management Act provides that the Secretary "shall continually improve the ability of the [Park] Service to provide state-of-the-art . . . interpretation of, and research on, the resources of the [Park] System." 54 U.S.C. § 100701.

181. The Omnibus Management Act also provides that the Secretary "shall ensure that management of System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." 54 U.S.C. § 100702.

182. The Secretary's Order does not improve the ability of the Park Service to provide state-of-the-art interpretation and resources. Instead, it does just the opposite by providing narrower interpretation that conforms only to the administration's preferred viewpoint.

183. The Secretary's Order also does not utilize the highest quality science and information. Instead, it directs the Park Service to remove or censor exhibits that reflect history or science, regardless of their accuracy.

184. Because the Secretary's Order violates the National Parks Omnibus Management Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 5**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**Federal Land Policy Management Act of 1976, 43 U.S.C. § 1701, *et seq.***

185. The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

186. All Plaintiffs state this claim against all Defendants.

187. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

188. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

189. The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

190. The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

191. The Secretary's Order is contrary to the Federal Land Policy Management Act of 1976, 43 U.S.C. § 1701, *et seq.*

192. There, Congress declared that it is the policy of the United States that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

193. The Secretary's Order directs the Park Service to remove "all public monuments, memorials, statues, markers, or similar properties" containing content that allegedly "inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature." Sec. Order § 5(b)(1).

194. The Secretary's Order also directs the Park Service to "remove any content . . . otherwise found to be inconsistent with the purposes of EO 14253." *Id.* § 5(b)(2).

195. These directives contravene the requirement that public lands be managed in a manner that will protect the quality of scientific and historical values. 43 U.S.C. § 1701(a)(8).

196. Because the Secretary's Order violates the Federal Land Policy Management Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 6**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)**
**Contrary to Law, Exceeds Statutory Authority, and Without Observance of Procedure Required by Law**
**Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq.***

197. The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

198. All Plaintiffs state this claim against all Defendants.

199. Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

200. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

201. The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

202. The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. 178 (internal quotation marks and citations omitted).

203. The Secretary's Order is contrary to the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.*, and Defendants did not observe the procedures required by the statute in implementing the Order.

204. The PRA sets out certain requirements for each "collection of information," which means "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format." 44 U.S.C. § 3502(3)(A); *see also* 5 C.F.R. § 1320.3(c) ("'Collection of information' includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.").

205. Those requirements include that the agency must ensure each information collection "is inventoried" and "displays a control number." 44 U.S.C. § 3506(c)(1)(B)(i).

206. The agency must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information." 44 U.S.C. § 3506(c)(2)(A).

207. The agency must solicit comments to, among other things, "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility," and "enhance the quality, utility, and clarity of the information to be collected." 44 U.S.C. § 3506(c)(2)(A)(i), (iii).

208. The agency must "ensure that the public has timely and equitable access to the agency's public information" and must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(1), (3).

209. The Park Service conducted an information collection when, in accordance with section 6 of the Secretary's Order, it asked the public to comment on different aspects of parks. In doing so, the Park Service did not comply with the requirements of the PRA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare unlawful, vacate, and set aside the Secretary's Order as arbitrary and capricious, contrary to law, and in excess of statutory authority, 5 U.S.C. § 706(2)(A), (C);

B. Grant preliminary and permanent injunctive relief, a stay under 5 U.S.C. § 705, and vacatur under 5 U.S.C. § 706, barring Defendants and all of their officers, employees, or agents from implementing, enforcing, or otherwise giving effect to the Secretary's Order, or any substantively similar order, mandate, guidance, or instruction, including by requiring Park Service staff to assess, flag, modify, remove, or submit for compliance reviews interpretive materials based on alleged compliance with or violation of the "Restoring Truth and Sanity to American History" Executive Order;

C. Grant preliminary and permanent injunctive relief to restore the status quo ante that existed prior to the unlawful Secretary's Order by ordering Defendants to preserve and not destroy or alter any and all interpretive materials removed pursuant to the Secretary's Order and restore all materials to their state as of May 19, 2025;

D. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

E. Grant other relief as the Court deems necessary, just, and proper.

Date: March 18, 2026

Respectfully submitted,

/s/ *Brooke Menschel*
Brooke Menschel* (NY Bar No. 5004692)
Michael J. Torcello* (DC Bar No. 90014480)
Pablo A. Moraga* (DC Bar No. 90037895)
Mark B. Samburg (Mass. BBO No. 680099)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426

*Counsel for the Plaintiffs*
*Admitted *pro hac vice*

# EXHIBIT 1

National Park Service Management Policies

# Management Policies 2006



U.S. Department of the Interior | National Park Service

conservation, recreation, education, and continued use through partnerships among public and private entities at the local or regional level. Either of these two alternatives (and others as well) would recognize an area's importance to the nation without requiring or implying management by the National Park Service.

*(See National Significance 1.3.1; Suitability 1.3.2)*

## 1.4 Park Management

### 1.4.1 The Laws Generally Governing Park Management

The most important statutory directive for the National Park Service is provided by interrelated provisions of the NPS Organic Act of 1916 and the NPS General Authorities Act of 1970, including amendments to the latter law enacted in 1978.

The key management-related provision of the Organic Act is as follows:

> [The National Park Service] shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified… by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations. (16 USC 1)

Congress supplemented and clarified these provisions through enactment of the General Authorities Act in 1970, and again through enactment of a 1978 amendment to that act (the "Redwood amendment," contained in a bill expanding Redwood National Park), which added the last two sentences in the following provision. The key part of that act, as amended, is as follows:

> Congress declares that the national park system, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States, its territories and island possessions; that these areas, though distinct in character, are united through their inter-related purposes and resources into one national park system as cumulative expressions of a single national heritage; that, individually and collectively, these areas derive increased national dignity and recognition of their superlative environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States; and that it is the purpose of this Act to include all such areas in the System and to clarify the authorities applicable to the system. Congress further reaffirms, declares, and directs that the promotion and regulation of the various areas of the National Park System, as defined in section 1c of this title, shall be consistent with and founded in the purpose established by section 1 of this title [the Organic Act provision quoted above], to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress. (16 USC 1a-1)

This section 1.4 of *Management Policies* represents the agency's interpretation of these key statutory provisions.

### 1.4.2 "Impairment" and "Derogation": One Standard

Congress intended the language of the Redwood amendment to the General Authorities Act to reiterate the provisions of the Organic Act, not create a substantively different management standard. The House committee report described the Redwood amendment as a "declaration by Congress" that the promotion and regulation of the national park system is to be consistent with the Organic Act. The Senate committee report stated that under the Redwood amendment, "The Secretary has an absolute duty, which is not to be compromised, to fulfill the mandate of the 1916 Act to take whatever actions and seek whatever relief as will safeguard the units of the national park system." So, although the Organic Act and the General Authorities Act, as amended by the Redwood amendment, use different wording ("unimpaired" and "derogation") to describe what the National Park Service must avoid, they define a single standard for the management of the national park system—not two different standards. For simplicity, *Management Policies* uses "impairment" (or a variation thereof), not both statutory phrases, to refer to that single standard.

### 1.4.3 The NPS Obligation to Conserve and Provide for Enjoyment of Park Resources and Values

The fundamental purpose of the national park system, established by the Organic Act and reaffirmed by the General Authorities Act, as amended, begins with a mandate to conserve park resources and values. This mandate is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values, even when there is no risk that any park resources or values may be impaired. NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values. However, the laws do give the Service the management discretion to allow impacts to park resources and values when necessary and appropriate to fulfill the purposes of a park, so long as the impact does not constitute impairment of the affected resources and values.

The fundamental purpose of all parks also includes providing for the enjoyment of park resources and values by the people of the United States. The enjoyment that is contemplated by the statute is broad; it is the enjoyment of all the people of the United States and includes enjoyment both by people who visit parks and by those who appreciate

them from afar. It also includes deriving benefit (including scientific knowledge) and inspiration from parks, as well as other forms of enjoyment and inspiration. Congress, recognizing that the enjoyment by future generations of the national parks can be ensured only if the superb quality of park resources and values is left unimpaired, has provided that when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant. This is how courts have consistently interpreted the Organic Act.

### 1.4.3.1 Park Purposes and Legislatively Authorized Uses

Park purposes are found in the general laws pertaining to the national park system, as well as the enabling legislation or proclamation establishing each unit. In addition to park purposes, in many cases the enabling legislation or proclamation for a park unit may also identify uses that are either mandated or authorized. In the administration of mandated uses, park managers must allow the use; however, they do have the authority to and must manage and regulate the use to ensure, to the extent possible, that impacts on park resources from that use are acceptable. In the administration of authorized uses, park managers have the discretionary authority to allow and manage the use, provided that the use will not cause impairment or unacceptable impacts. In determining whether or how to allow the use, park managers must consider the congressional or presidential interest, as expressed in the enabling legislation or proclamation, that the use or uses continue. Where there is strong public interest in a particular use, opportunities for civic engagement and cooperative conservation should be factored into the decision-making process.

*(See Unacceptable Impacts 1.4.7.1; Civic Engagement 1.7; Major Elements of NPS Park Planning and Decision-making 2.2; General 8.1)*

### 1.4.4 The Prohibition on Impairment of Park Resources and Values

While Congress has given the Service the management discretion to allow impacts within parks, that discretion is limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise. This, the cornerstone of the Organic Act, establishes the primary responsibility of the National Park Service. It ensures that park resources and values will continue to exist in a condition that will allow the American people to have present and future opportunities for enjoyment of them.

The impairment of park resources and values may not be allowed by the Service unless directly and specifically provided for by legislation or by the proclamation establishing the park. The relevant legislation or proclamation must provide explicitly (not by implication or inference) for the activity, in terms that keep the Service from having the authority to manage the activity so as to avoid the impairment.

### 1.4.5 What Constitutes Impairment of Park Resources and Values

The impairment that is prohibited by the Organic Act and the General Authorities Act is an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values. Whether an impact meets this definition depends on the particular resources and values that would be affected; the severity, duration, and timing of the impact; the direct and indirect effects of the impact; and the cumulative effects of the impact in question and other impacts.

An impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is

- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or
- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance.

An impact would be less likely to constitute an impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated.

An impact that may, but would not necessarily, lead to impairment may result from visitor activities; NPS administrative activities; or activities undertaken by concessioners, contractors, and others operating in the park. Impairment may also result from sources or activities outside the park. This will be addressed consistent with sections 1.6 and 1.7 on Cooperative Conservation and Civic Engagement.

*(See Unacceptable Impacts 1.4.7.1)*

### 1.4.6 What Constitutes Park Resources and Values

The "park resources and values" that are subject to the no-impairment standard include

- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

*(See introduction to chapter 4)*

### 1.4.7 Decision-making Requirements to Identify and Avoid Impairments

Before approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values. If there would be an impairment, the action must not be approved.

In making a determination of whether there would be an impairment, an NPS decision-maker must use his or her professional judgment. This means that the decision-maker must consider any environmental assessments or environmental impact statements required by the National Environmental Policy Act of 1969 (NEPA); consultations required under section 106 of the National Historic Preservation Act (NHPA), relevant scientific and scholarly studies; advice or insights offered by subject matter experts and others who have relevant knowledge or experience; and the results of civic engagement and public involvement activities relating to the decision. The same application of professional judgment applies when reaching conclusions about "unacceptable impacts."

When an NPS decision-maker becomes aware that an ongoing activity might have led or might be leading to an impairment of park resources or values, he or she must investigate and determine if there is or will be an impairment. This investigation and determination may be made independent of, or as part of, a park planning process undertaken for other purposes. If it is determined that there is, or will be, an impairment, the decision-maker must take appropriate action, to the extent possible within the Service's authorities and available resources, to eliminate the impairment. The action must eliminate the impairment as soon as reasonably possible, taking into consideration the nature, duration, magnitude, and other characteristics of the impacts on park resources and values, as well as the requirements of the National Environmental Policy Act, National Historic Preservation Act, the Administrative Procedure Act, and other applicable laws.

*(See Levels of Park Planning 2.3; Evaluating Impacts on Natural Resources 4.1.3; Planning 5.2; General 8.1; Visitor Use 8.2; General 9.1; Glossary definition of Professional Judgment. Also see Director's Order #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

#### 1.4.7.1 Unacceptable Impacts

The impact threshold at which impairment occurs is not always readily apparent. Therefore, the Service will apply a standard that offers greater assurance that impairment will not occur. The Service will do this by avoiding impacts that it determines to be unacceptable. These are impacts that fall short of impairment, but are still not acceptable within a particular park's environment. Park managers must not allow uses that would cause unacceptable impacts; they must evaluate existing or proposed uses and determine whether the associated impacts on park resources and values are acceptable.

Virtually every form of human activity that takes place within a park has some degree of effect on park resources or values, but that does not mean the impact is unacceptable or that a particular use must be disallowed. Therefore, for the purposes of these policies, unacceptable impacts are impacts that, individually or cumulatively, would

- be inconsistent with a park's purposes or values, or
- impede the attainment of a park's desired future conditions for natural and cultural resources as identified through the park's planning process, or
- create an unsafe or unhealthful environment for visitors or employees, or
- diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values, or
- unreasonably interfere with
  - park programs or activities, or
  - an appropriate use, or
  - the atmosphere of peace and tranquility, or the natural soundscape maintained in wilderness and natural, historic, or commemorative locations within the park.
  - NPS concessioner or contractor operations or services.

*The following graphic illustrates the relationship between appropriate use, unacceptable impacts and impairment.*

**Managing for Resource Conservation**




*(See Appropriate Use of the Parks 1.5; General 8.1)*

#### 1.4.7.2 Improving Resource Conditions within the Parks

The Service will also strive to ensure that park resources and values are passed on to future generations in a condition that is as good as, or better than, the conditions that exist today. In particular, the Service will strive to restore the integrity of park resources that have been damaged or

compromised in the past. Restoration activities will be guided by the natural and cultural resource-specific policies identified in chapters 4 and 5 of these *Management Policies.*

*(See Planning for Natural Resource Management 4.1.1; Restoration of Natural Systems 4.1.5; Compensation for Injuries to Natural Resources 4.1.6; Restoration of Native Plant and Animal Species 4.4.2.2; Restoration (of Cultural Landscapes) 5.3.5.2.3; Restoration (of Historic and Prehistoric Structures) 5.3.5.4.3; Restoration (of Museum Collections) 5.3.5.5.2. Also see Director's Order #12 and Handbook.)*

## 1.5 Appropriate Use of the Parks

The National Park Service embraces appropriate use of the parks because these uses are key to the enjoyment of the parks and the appreciation and inspiration derived from the resources. Park resources have profound effects on those who experience them through appropriate park uses. An "appropriate use" is a use that is suitable, proper, or fitting for a particular park, or to a particular location within a park. Not all uses are appropriate or allowable in units of the national park system, and what is appropriate may vary from one park to another and from one location to another within a park.

In its role as steward of park resources, the National Park Service must ensure that park uses that are allowed would not cause impairment of, or unacceptable impacts on, park resources and values. When proposed park uses and the protection of park resources and values come into conflict, the protection of resources and values must be predominant. A new form of park use may be allowed within a park only after a determination has been made in the professional judgment of the superintendent that it will not result in unacceptable impacts. The National Park Service will always consider allowing activities that are appropriate to the parks, although conditions may preclude certain activities or require that limitations be placed on them. Park superintendents must continually monitor all park uses to prevent unanticipated and unacceptable impacts. If unanticipated and unacceptable impacts emerge, the superintendent must engage in a thoughtful, deliberate process to further manage or constrain the use, or discontinue it.

Appropriate visitor enjoyment is often associated with the inspirational qualities of the parks. As a general matter, preferred forms of enjoyment are those that are uniquely suited to the superlative natural and cultural resources found in the parks and that (1) foster an understanding of and appreciation for park resources and values, or (2) promote enjoyment through a direct association with, interaction with, or relation to park resources.

These preferred forms of use contribute to the personal growth and well-being of visitors by taking advantage of the inherent educational value of parks. Equally important, many appropriate uses also contribute to the health and personal fitness of park visitors. These are the types of uses that the Service will actively promote, in accordance with the Organic Act. Other forms of park uses may be allowed within a park in accordance with the policies found in chapter 8.

*(See Park Purposes and Legislatively Authorized Uses 1.4.3.1; Chapter 2, Park System Planning; Process for Determining New Appropriate Uses 8.1.2. Also see Director's Order #17: National Park Service Tourism; 36 CFR 1.5)*

## 1.6 Cooperative Conservation Beyond Park Boundaries

Cooperative conservation beyond park boundaries is necessary as the National Park Service strives to fulfill its mandate to preserve the natural and cultural resources of parks unimpaired for future generations. Ecological processes cross park boundaries, and park boundaries may not incorporate all of the natural resources, cultural sites, and scenic vistas that relate to park resources or the quality of the visitor experience. Therefore, activities proposed for adjacent lands may significantly affect park programs, resources, and values. Conversely, NPS activities may have impacts outside park boundaries. Recognizing that parks are integral parts of larger regional environments, and to support its primary concern of protecting park resources and values, the Service will work cooperatively with others to

- anticipate, avoid, and resolve potential conflicts;
- protect park resources and values;
- provide for visitor enjoyment; and
- address mutual interests in the quality of life of community residents, including matters such as compatible economic development and resource and environmental protection.

Such local and regional cooperation may involve other federal agencies; tribal, state, and local governments; neighboring landowners; nongovernmental and private sector organizations; and all other concerned parties. The Service will do these things because cooperative conservation activities are a vital element in establishing relationships that will benefit the parks and in fostering decisions that are sustainable.

The Service will use all available tools to protect park resources and values from unacceptable impacts. The Service will also seek to advance opportunities for conservation partnerships. Superintendents will monitor land use proposals, changes to adjacent lands, and external activities for their potential impacts on park resources and values. It is appropriate for superintendents to engage constructively with the broader community in the same way that any good neighbor would. Superintendents will encourage compatible adjacent land uses and seek to avoid and mitigate potential adverse impacts on park resources and values by actively participating in the planning and regulatory processes of other federal agencies and tribal, state, and local governments having jurisdiction over property affecting, or affected by, the park. If a decision is

## 2.1 General Principles

### 2.1.1 Decision-making

The National Park Service will use planning to bring logic, analysis, public involvement, and accountability into the decision-making process. Park planning and decision-making will be conducted as a continuous, dynamic cycle, from broad visions shared with the public to individual, annual work assignments and evaluations. Each park will be able to demonstrate to decision-makers, staff, and the public how decisions relate to one another in terms of a comprehensive, logical, and trackable rationale.

### 2.1.2 Scientific, Technical, and Scholarly Analysis

Decision-makers and planners will use the best available scientific and technical information and scholarly analysis to identify appropriate management actions for protection and use of park resources. Analysis will be interdisciplinary and tiered. Tiering is a staged approach to environmental analysis that addresses broad programs and issues in initial or systems-level analyses. Site-specific proposals and impacts are analyzed in subsequent studies. The tiered process supports decision-making on issues that are ripe for decision and provides a means to sustain those decisions. The focus of analysis starts with the park as a whole (including its global, national, and regional contexts) and then moves to site-specific details. At key points of planning and decision-making, the Park Service will identify reasonable alternatives and analyze and compare their differences with respect to

- consistency with the park's purpose,
- the quality of visitor experiences,
- the impacts on park resources,
- short- and long-term costs, and
- environmental consequences that may extend beyond park boundaries.

### 2.1.3 Public Participation

Public participation in planning and decision-making will ensure that the Service fully understands and considers the public's interests in the parks, which are part of the public's national heritage, cultural traditions, and community surroundings. The Service will actively seek out and consult with existing and potential visitors, neighbors, American Indians, other people with traditional cultural ties to park lands, scientists and scholars, concessioners, cooperating associations, gateway communities, other partners, and government agencies. The Service will work cooperatively with others to improve the condition of parks; to enhance public service; and to integrate parks into sustainable ecological, cultural, and socioeconomic systems.

*(See Cooperative Conservation Beyond Park Boundaries 1.6; Civic Engagement 1.7; Public Involvement 2.3.1.5; Consultation 5.2.1. Also see Director's Order #75A: Civic Engagement and Public Involvement)*

### 2.1.4 Goal Orientation

Managers will be held accountable for identifying and accomplishing measurable long-term goals and annual goals that are incremental steps to carrying out the park mission. Such planning is a critical and essential part of the NPS performance management system that is designed to improve the Park Service's performance and results. Park staff will monitor resource conditions and visitor experiences and plan, track, and report performance. If goals are not being met, managers will seek to understand why and take appropriate action. The goals will be periodically reassessed, taking into account new knowledge or previously unforeseen circumstances, and then the planning cycle will be reinitiated at the appropriate point.

*(See Park Management 1.4)*

## 2.2 Major Elements of Park Planning and Decision-making

A documented, comprehensive, logical, trackable rationale for decisions will be created through several levels of planning that are complementary and become increasingly detailed. The process begins with determining why the park was established and what resource conditions and visitor experiences should exist there; the process will become increasingly focused on how resource conditions and visitor experiences should be achieved.

The following planning elements are part of an interrelated framework that will inform NPS decision-making:

- **Foundation Statement** — The planning process begins with the development of a foundation statement that is based on the park's enabling legislation or presidential proclamation and that documents the park purpose, significance, fundamental resources and values and primary interpretive themes. It also includes any relevant laws and executive orders that apply to the national park system or to the individual park unit. The foundation statement is generally developed (or reviewed and expanded or revised, if appropriate) early as part of the public and agency scoping and data collection for the general management plan (GMP). Once a park has developed a complete foundation statement, it should remain relatively stable from one GMP cycle to the next, although new scientific and scholarly information may require expansion and revision to reflect the most current knowledge about what is most important about the park. General management planning is the most appropriate context for developing or reviewing a foundation statement because of the comprehensive public involvement and NEPA analysis that occurs during general management planning. The foundation statement may be vetted within the agency and with the public, then formally adopted as part of the final general management plan, or may be produced as a stand-alone foundation document for the park unit.
- **General Management Plan** — This is a broad umbrella document that sets the long-term goals for the park based on the foundation statement. The general management plan (1) clearly defines the desired natural

and cultural resource conditions to be achieved and maintained over time; (2) clearly defines the necessary conditions for visitors to understand, enjoy, and appreciate the park's significant resources, and (3) identifies the kinds and levels of management activities, visitor use, and development that are appropriate for maintaining the desired conditions; and (4) identifies indicators and standards for maintaining the desired conditions. For wild and scenic rivers and national trails, the analogous documents are a comprehensive river management plan and comprehensive management plan, respectively. Each of these plans has requirements very similar to a general management plan, so units usually refer to these plans as GMPs. Additional requirements for river and trail studies are covered in the Wild and Scenic Rivers Act and the National Trails System Act.

- **Program Management Plans** — These more detailed documents follow the general management plan and provide program-specific information on strategies to achieve and maintain the desired resource conditions and visitor experiences, including identification of appropriate visitor use where applicable (for example, resource stewardship strategy and comprehensive interpretation plan).
- **Strategic Plans** — These plans provide 1- to 5-year direction and objective, measurable, long-term goals. The long-term goals will define the resource conditions and visitor experiences to be achieved in the near future, for which the superintendent will be held accountable. Results on progress towards these goals will be reported annually. These goals are based on the park's foundation statement; an assessment of the park's natural and cultural resources; park visitors' experiences; and the park's performance capability given available personnel, funding, and external factors.
- **Implementation Plans** — These plans provide project-specific details needed to implement an action in an area of a park and explain how the action(s) helps achieve long-term goals.
- **Annual Performance Plans** —Annual goals and an annual work plan that will guide park efforts for a fiscal year are in annual performance plans.
- **Annual Performance Reports** — These reports contain an accounting of annual results in relation to annual goals.

Park managers and regional directors are responsible for ensuring that planning is properly conducted within this planning framework and making management decisions that are supported by public involvement, the best available information, and analysis. However, many parks may initially lack one or more of these planning elements. In the interim, management will be guided by the park's foundation statement, strategic plan, and other current approved plans. No major new development or other major commitment of park land or natural or cultural resources will be authorized without an approved general management plan.

*(See Visitor Use 8.2)*

## 2.3 Levels of Park Planning

The order of plan development will generally flow from broad general management plans to progressively more specific implementation plans.

When determining a plan's scope, it will be important to distinguish which issues can most appropriately be addressed by general management planning, and which can be most appropriately addressed by more detailed strategic or implementation planning. Each level of planning has a distinct function, and all levels are designed to interrelate with a minimum of duplication and confusion. At each level, plans will be written to make the links and relationships among the planning levels apparent to readers.

Environmental analysis of alternatives and public involvement required under section 102(2)(C) of the National Environmental Policy Act (NEPA) (42 USC 4332(2)(C)) will be conducted at any level of planning in which the decisions to be made constitute a major federal action significantly affecting the quality of the human environment. Normally, NEPA analysis and public participation will be done at the general management planning level, when the overall direction for the park's future is decided, and again at the implementation planning level before funding and resources are committed to carry out specific actions (see 2.3.1 and 2.3.4, below). In keeping with the Council on Environmental Quality guidelines for NEPA compliance, environmental analysis for more specific programs or actions will follow, or flow from, earlier NEPA documents for the broader general management plan.

*(See Civic Engagement 1.7. Also see Director's Orders #2: Park Planning, and #12: Conservation Planning, Environmental Impact Analysis, and Decision-making)*

### 2.3.1 General Management Planning

The Park Service will maintain a general management plan for each unit of the national park system. The purpose of each general management plan, which will begin with the development of a foundation statement for the park unit, will be to ensure that the park has a clearly defined direction for resource preservation and visitor use. This basic foundation for decision-making will be developed by an interdisciplinary team, in consultation with relevant NPS offices, other federal and state agencies, local and tribal governments, other interested parties, and the general public. The management plans will be based on full and proper use of scientific and scholarly information related to existing and potential resource conditions, visitor experiences, environmental impacts, and relative costs of alternative courses of action.

The approved plan will create a realistic vision for the future, setting a direction for the park that takes into consideration the environmental and financial impact of proposed facilities and programs and ensures that the final plan is achievable and sustainable. The plan will take the long view, which may project many years into the future, when dealing with the time frames of natural and cultural

a thorough understanding of a park's resources in individual, regional, national, and global contexts and of the park's place within the national park system; and

- interpretive media that provide visitors with relevant park information and facilitate more in-depth understanding of—and personal connection with—park stories and resources. This media will be continually maintained for both quality of content and condition based upon established standards.

*(See Air Quality 4.7.1; Geologic Resource Management 4.8; Wilderness Interpretation and Education 6.4.2; Energy Management 9.1.7; Visitor Facilities 9.3. Also see Director's Order #6: Interpretation and Education)*

## 7.2 Interpretive Planning

General management plans and comprehensive interpretive plans (CIPs) will serve as the backbone of interpretive and educational program planning and direction. The CIP process will guide park staff in defining themes, determining desired visitor experience opportunities, identifying challenges, and recommending which stories to tell, how to tell them, and how to reach specific audiences. All interpretive and educational services, including personal services, interpretive media, and partnerships that work to support the delivery of interpretive and educational programs, will be based on and coordinated with the comprehensive interpretive plan. The resulting parkwide interpretation and education program will thus communicate park significance and meanings in the most effective and efficient way. Recognition that concessioners, cooperating associations, friends groups, and other partners may have an important role in providing interpretive and educational services will be most important in planning for the overall visitor services program, and such entities should be included where appropriate in the planning process.

The CIP process will be initiated by superintendents. The life span of a CIP will be seven to ten years. Superintendents and chiefs of interpretation will be accountable to ensure that their parks have a completed and current comprehensive interpretive plan as defined in Director's Order #6 and Reference Manual 6. Harpers Ferry Center and regional offices will provide support.

*(See also Director's Order #75A: Civic Engagement and Public Involvement)*

## 7.3 Personal and Nonpersonal Services

### 7.3.1 Personal Services+

Personal interpretive services feature contacts with visitors. Anyone who works in a park and makes contact with the public can and should provide an enjoyable, appropriate, and valuable visitor service. Superintendents and chiefs of interpretation will demand quality in the delivery of a multidimensional personal services program by park staff, volunteers, contractors, cooperating associations, concessioners, and other partners. In addition to basic information and orientation services, personal interpretive services can include walks, talks, tours, campfire programs, roving contacts, curriculum-based education programs, and Junior Ranger programs. These types of activities and programs will be designed to offer opportunities for greater enjoyment and in-depth understanding and appreciation of the park's resources.

Personal services will provide opportunities for all audiences to enjoy and connect to parks and nurture future stewards of America's national heritage. Park staff will help visitors have a safe, meaningful, and satisfying park experience; help them decide how to spend their time in the park, and inform them about the wonders that await their discovery. Personal services programs presented in parks will be recorded annually in the Service-wide interpretive report, which will document the number of programs offered, visitors served, and the costs associated with those programs. Park chiefs of interpretation will be responsible for submitting their park's portion of the report to the Washington Office Division of Interpretation and Education.

#### 7.3.1.1 Curriculum-based Education Programs

Parks will be managed as places to demonstrate the principles of science, to illustrate the national experience as history, to engage learners throughout their lifetimes, and to do these things while challenging visitors in exciting and motivating settings. Schools represent a microcosm of society and present myriad opportunities for the Service to foster stewardship in future generations. Therefore, curriculum-based programs will be designed to link classroom learning with experiences in the parks. Programs will complement school curricula by matching a group's educational objectives with park resources. Curriculum-based programs will focus on the stories and meanings attached to park resources; the threats to the condition of those resources; and conservation or preservation issues relevant to the park, the national park system, and the park's place within that system. To continue to meet the demand from schools for NPS programs, parks will identify, in cooperation with park partners, alternative means for program delivery, such as publications, Internet deliveries, and distance learning.

### 7.3.2 Nonpersonal Services

Nonpersonal services are interpretive media (publications such as a unigrid brochure or park newspaper, films, exhibits, web-based programs). They do not require the presence of staff. Nonpersonal services, which can reach large audiences, must maintain a consistent quality of presentation over time. Used in conjunction with personal services, they will provide opportunities for visitor information, orientation, and personal connections to park resources. The Center for Media Services will establish Service-wide standards for all NPS informational media.

Harpers Ferry Center will also provide guidance and assistance to parks for interpretive media planning, design and production for museum and visitor center exhibits,

wayside exhibits, audiovisual productions, publications, and directional signs. Plans or proposals to be accomplished by parks and regions, including privately funded projects, may be reviewed by the Center for Media Services for appropriateness and quality of design and execution. Proposals from concessioners, cooperating associations, and others may also be reviewed. To provide data for parks to maintain these assets, the condition of the NPS inventory of exhibits and interpretive trails (currently recorded in the Media Inventory Database System or MIDS) will be tracked through the Facilities Maintenance Management System.

Parks will be responsible for the conservation of historic furnishings and artifacts on exhibit in parks. They may obtain conservation services from the Center for Media Services or from outside contractors.

#### 7.3.2.1 Park Brochures

Official park brochures are an important part of the NPS identity and a valuable and desired part of the park experience. Each brochure should provide a map of the park, address critical safety and resource protection issues, introduce park interpretive themes, and describe significant park resources. The Service's goal will be that 100% of parks have an adequate allotment of park brochures to meet demands and ensure that adequate numbers of brochures are available in other languages as needed.

### 7.3.3 Technology and Interpretation

Innovative use of existing and emerging technology can maximize both the visitor experience and employee effectiveness. Parks should use technological communications, such as the Internet and distance learning, to enhance their informational, orientation, interpretive, and educational programs. The National Park Service will maintain a site on the World Wide Web (nps.gov) to provide an opportunity for all parks and programs to reach beyond their borders to a worldwide audience. Each park will maintain a home page for the purpose of reaching this audience. Parks should link from their home pages to web pages of entities that support the NPS mission. Park home pages will comply with Director's Order #11C: Web Publishing and Department of the Interior policy, particularly as relates to security.

*(See Managing Information 1.9.2)*

### 7.3.4 Interpretive and Educational Services Beyond Park Boundaries+

The Service will continually adjust to changing patterns of visitation and an increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations. Each park's interpretation and education program will reach out to park neighbors, those who are not visiting national parks, and community decision-makers to stimulate discussions about the park and its values in local, regional, and national contexts. Parks will use community programs and special events such as pageants, anniversaries, dedications, festivals, and other observances as opportunities to highlight meaningful connections between the park, its resources, the event, and the public. These activities, as well as other interpretive and educational services, support civic engagement and contribute to public understanding of the park's significance and the significance of the national park system.

National Park Service interpretive and educational programs must explore new and innovative approaches to inform a new and changing constituency, many of whom may never set foot inside a park's boundaries. A planned outreach program will be employed to firmly establish each park as part of the local, national, and global community. Outreach will be used to disseminate park information and interpretive and educational programs beyond park boundaries. Everyone should have the opportunity to connect to the parks through NPS outreach services.

## 7.4 Interpretive Competencies and Skills

All interpretive services should be provided by highly trained personnel who have access to a continual supply of current information from research programs and other sources. All employees who provide interpretive services will be required to meet the Service's national standards of interpretation and education. To support that effort, the Service will develop a web-based distance learning and credentialing platform based on the interpretive development program (IDP) to teach interpretive and educational skills and competencies and test for knowledge of those skills and competencies.

NPS interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners. Partners (including cooperating associations, contractors, and concessioners) will have access to and will be required to meet NPS national standards in the competency areas in which they work. Those who give formal programs will meet the appropriate national standards for such competencies. The cooperating association standard agreement, concession contracts, and other contracts that include interpretive services will require the demonstration of standards. Similarly, contractors for media projects will use the web-based distance learning and credentialing platform to both learn about NPS requirements and demonstrate their mastery of required standards. Permanent interpreters and seasonal interpreters will be required to certify in relevant and park-appropriate interpretive competencies of the interpretive development program. The certification will be designed to establish a consistent Service-wide professional standard and to fortify the full-performance interpretive ranger as a provider of interpretive services while also serving as standard bearer, coach, mentor, and facilitator for all others who provide those services.

Case 1:26-cv-10871-AK Document 29-2 Filed 03/16/26 Page 106 of 625





## 7.5 Requirements for All Interpretive and Educational Services

The following factors must be considered in the development and review of all personal and nonpersonal services.

### 7.5.1 Interpretation and 21st Century Relevancy+

Demographic trends in the United States show the nation's population is changing rapidly. The National Park Service must change its traditional approach of interpretation to improve relevancy in the 21st century to our visitors. To enact this change the National Park Service will implement new and innovative ways to reach out, engage, and cultivate the support of the increasingly varied array of visitors. The unique qualities of the national parks—qualities that highlight, for example, America's rich heritage and the principles of democracy—are what make them relevant. These qualities will be used to advantage in educating Americans and visitors to America about topics such as the civic experience of our country; the complex, diverse ecology of our nation and the world; and the influence of global climate change. Interpretation and education will seek to provide opportunities for more NPS audiences to have experiences that connect them to parks, so that they will come to value and enjoy these special places. The national park system and the Interpretation and Education program provide opportunities for facilitation of civic dialogue to engage Americans in understanding past and current issues of importance on a local-to-global basis. These opportunities should be pursued.

### 7.5.2 Access to Interpretive and Educational Opportunities

National parks belong to all of the nation's people and should have opportunities to enjoy them. Efforts will be made to ensure that interpretive and educational programs are available to all people and consider the special needs of children, senior citizens, non-English speaking visitors, and the economically disadvantaged. Foreign-language translations of park publications will be provided as needed in those parks visited by substantial numbers of non-English-speaking visitors.

The National Park Service will also ensure that persons with disabilities receive the same interpretive opportunities as those without disabilities. Interpretive and educational programs, exhibits, publications, and all other interpretive media will comply with Department of the Interior regulations at 43 CFR Part 17, subpart E, and with standards required by the Architectural Barriers Act. Accordingly, the Park Service will ensure that persons with disabilities have the opportunity to participate in all programs and activities in the most integrated setting appropriate. Additionally, the Service will take all feasible steps to ensure effective communication with individuals with hearing, visual, and cognitive disabilities. These steps should include but not be limited to providing sign language interpreters, audio/visual presentations, Braille, and large-print versions of printed materials.

*(See Physical Access for Persons with Disabilities 5.3.2; Accessibility for Persons with Disabilities 8.2.4; Accessibility for Persons with Disabilities 9.1.2; Accessibility of Commercial Services 10.2.6.2. Also see Director's Order #42; Reference Manual 41; 43 CFR 17.550)*

### 7.5.3 Resource Issue Interpretation and Education

Park managers are increasingly called upon to make difficult resource decisions, some of which may be highly controversial. Interpretation and education programs can provide opportunities for civic engagement with Indian tribes and residents and officials of gateway and neighboring communities, the region, and the state(s) surrounding a park and beyond. Such opportunities for civic dialogue about resource issues and broad initiatives are often the most effective means for eliminating resource threats and gaining input and feedback from stakeholder constituents. Therefore, parks should, in balanced and appropriate ways, thoroughly integrate resource issues and initiatives of local and Service-wide importance into their interpretive and educational programs. Whenever possible, the appropriate interpretive managers at the national, regional, or park level should be involved in the process.

In instances in which programming affects resources managed by other agencies, such agencies should be consulted during program planning. For interpretation of resource issues to be effective, frontline interpretive staff must be informed about the reasoning that guided the decision-making process, and interpreters must present balanced views. Acknowledging multiple points of view does not require interpretive and educational programs to provide equal time or disregard the weight of scientific or historical evidence. Resource issue interpretation should be integrated into both on- and off-site programs, as well as into printed and electronic media whenever deemed appropriate by the park manager.

### 7.5.4 Research and Scholarship

Interpretive and educational programs will be based on current scholarship and research about the history, science, and condition of park resources, and on research about the needs, expectations, and behavior of visitors. To accomplish this, a dialogue must be established and maintained among interpreters, education specialists, resource managers, scientists, archeologists, sociologists, ethnographers, historians, and other experts for the purpose of offering the most current and accurate programs to the public. When appropriate, parks are encouraged to use a master interpreter to foster, facilitate, and maintain this dialogue.

*(See Levels of Park Planning 2.3)*

### 7.5.5 Evaluation of Interpretation and Education Effectiveness

Evaluation is also critically important for continuous improvement of educational and interpretive programs that lead to achievement of the NPS mission. Evaluation, systematically applied, is necessary to ensure that the NPS interpretation and education program is cost-effective

and financially accountable. The Service will maintain an evaluation strategy that fosters a Service-wide commitment to program planning and reflection, information sharing, and application of research-based results.

#### 7.5.6 Consultation+

The National Park Service will present factual and balanced presentations of the many American cultures, heritages, and histories. Various constituencies will be consulted to (1) ensure appropriate content and accuracy, and (2) identify multiple points of view and potentially sensitive issues. When appropriate, state and local agencies involved in heritage tourism and history (such as state historic preservation officers) should be included in consultations to foster coordination and partnerships. Acknowledging multiple points of view does not require interpretive and educational programs to provide equal time or disregard the weight of scientific or historical evidence.

Park managers will take culturally sensitive steps to preserve the knowledge of American Indian tribes and other traditionally associated peoples and secure the benefit of their deep understanding of the nature and spirit of places within the parks by encouraging their participation in park activities. A related goal will be to ensure that irreplaceable connections such as place names, migration routes, harvesting practices, prayers, and songs are cataloged for use in current and future activities.

The Service will respectfully consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive programs and media relating to their cultures and histories. Cooperative programs will be developed with tribal governments and cultural groups to help the Service present accurate perspectives on their cultures. Ethnographic or cultural anthropological data and concepts will also be used in interpretive programs.

The Service will not display Native American human remains or photographs of those remains. Drawings, renderings, or casts of such remains will not be displayed without the consent of culturally affiliated Indian tribes, Alaska Natives, and Native Hawaiian organizations. The Service may exhibit non-Native American remains, photographs, drawings, renderings, or casts thereof, in consultation with appropriate traditionally associated peoples. The Service will consult with culturally affiliated or traditionally associated peoples to determine the religious status of any object whose sacred nature is suspected but not confirmed. These consultations will occur before an object is exhibited or any action is taken that may have an adverse effect on its religious qualities.

*(See Relationship with American Indian Tribes 1.11; Evaluation and Categorization 5.1.3.2; Stewardship of Human Remains and Burials 5.3.4; Ethnographic Resources 5.3.5.3; Museum Collections 5.3.5.5)*

#### 7.5.7 Cultural Demonstrators*

Cultural demonstrators can provide unique insights into their cultures. To facilitate their successful interaction with the public, parks may provide cultural demonstrators with training and direction. Cultural demonstrators (in parks outside the National Capital Area within Unified Region 1 - North Atlantic - Appalachian) who are not NPS employees may be permitted to sell self-made handcrafted items to park visitors, keeping the proceeds for themselves, where such handicrafts are related to the park's interpretive themes. This is allowed under 16 USC 1a-2(g), which authorizes the sale of products produced in the conduct of living exhibits, interpretive demonstrations, or park programs. When this practice is permitted, all materials used in creating such items must be the private property of the demonstrator, collected from outside the park. The superintendent may permit this practice through a cooperative agreement, special use permit, concession contract, or other legal instrument.

Titles 8 and 13 of the Alaska National Interest Lands Conservation Act regulate the taking of fish, wildlife, and other natural resources for subsistence and other purposes in the Alaska parks.

*(See Reenactments 7.5.9; Special Events 8.6.2; Collecting Natural Products 8.8; Merchandise 10.2.4.5. Also see 36 CFR 5.3; 60 FR 17639)*

#### 7.5.8 Historic Weapons

All uses of historic weapons in parks will strictly comply with the Historic Weapons Demonstrations Safety Standards contained in Reference Manual 6, and will follow the procedures specified therein for the particular weapon(s) being used.

Weapons firing demonstrations conducted in NPS-administered areas are restricted to reproduction black powder weapons only. Original NPS museum weapons will not be used. Requests by outside groups or individuals to use non-NPS original weapons will follow the exemption request procedure prescribed in Reference Manual 6, and will be granted or denied in writing by the superintendent.

#### 7.5.9 Reenactments

Battle reenactments and demonstrations of battle tactics that involve exchanges of fire between opposing lines, the taking of casualties, hand-to-hand combat, or any other form of simulated warfare are prohibited in all parks. Even the best-researched and most well-intentioned representation of combat cannot replicate the tragic complexity of real warfare. Respect for the memory of those whose lives were lost at these sites and whose unrecovered remains are often still interred in these grounds precludes the staging of inherently artificial battles at these memorial sites. Battle reenactments create an atmosphere that is inconsistent with the memorial qualities of the battlefi elds and other military sites placed in the Service's trust. The safety risks to participants and visitors, and the inevitable

damage to the physical resource that occurs during such events are also unacceptably high when seen in light of the NPS mandate to preserve and protect park resources and values.

## 7.6 Interpretive and Educational Partnerships

The National Park Service will increase the effectiveness and accountability of park interpretation and education activities by collaborating with volunteers, cooperating associations, concessioners, and other partners to provide interpretive and educational services that adhere to Service-wide standards. To be successful, this will require all NPS interpretation and education practitioners, employees and partners, personal service providers, and media professionals to have access to training, coaching, and program evaluation results that meet national standards. NPS interpreters and educators will provide the leadership, example, and standards for all partners to deliver effective interpretation and education services.

Interpretation and education operational capacity will be improved in parks by actively pursuing additional partnerships. Partnerships for this purpose will be sought with willing and able organizations with compatible purposes, such as historical societies, museums, colleges and universities, school districts, tourism commissions, conservation groups, health organizations, libraries, and others.

### 7.6.1 Volunteers in Parks (VIPs)

Interpretation and education operational capacity will be increased in parks by actively pursuing volunteers and dedicating NPS staff time to coordinate volunteer programs in parks. Although the bulk of volunteer hours support interpretation and education, volunteer services may be used in various aspects of park operation under the authority of the Volunteers in the Parks Act of 1969. Pursuant to this legislation, volunteers may be recruited without regard to civil service regulations, are covered for tort liability and work-injury compensation, and may be reimbursed for out-of-pocket expenses while participating in the program. Volunteers will be accepted without regard to race, creed, religion, age, sex, color, national origin, disability, or sexual orientation. Volunteers will not displace NPS employees. NPS housing may be used for volunteers. Director's Order #7 and Reference Manual 7 provide additional guidance for the volunteer program.

*(See Protection 5.3.5.1.4; Housing Management Plan 9.4.3.1. Also see Handbook 36 on Housing)*

### 7.6.2 Cooperating Associations

The National Park Service will continue to nurture its relationship with nonprofit organizations that support park programs. Cooperating associations may provide publications and other items that enhance the interpretive story, allow visitors to explore particular interests, and enable them to take the park story home through their purchases.

When appropriate, cooperating associations will join the National Park Service in presenting interpretive and educational programs and supporting research efforts as authorized in 16 USC 1-3, 6, and 17j-(2)e. In accordance with the standard, nonnegotiable cooperating association agreement, cooperating associations may, consistent with a park's scope-of-sales statement, purchase for resale, or produce for sale, interpretive and educational items that are directly related to the understanding and interpretation of the park or the national park system. Associations may offer appropriate and approved interpretive services that support but do not supplant interpretive and educational services offered by the Park Service. Associations may accept donations on behalf of the Service when appropriate and when conducted through approved fund-raising efforts. Service housing may be used for cooperating association employees only if available and not needed for NPS employees. Guidance for managing NPS partnerships with cooperating associations is included in Director's Order #32 and Reference Manual 32.

*(See Housing Management Plan 9.4.3.1. Also see Director's Order #21: Donations and Fundraising; Handbook 36 on Housing)*

*Section 7.5.7 amended by Memorandum dated August 31, 2020
Sections 7.3.1, 7.3.4, 7.5.1 and 7.5.6 amended by Memorandum dated March 3, 2025

# EXHIBIT 2

National Park Service Director's Order #6: Interpretation and Education

United States Department of the Interior

NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

[As amended by Memorandum dated March 3, 2025]

**DIRECTOR'S ORDER #6: INTERPRETATION AND EDUCATION**

**Approved:** Fran P. Mainella
Director

**Effective Date:** JAN 19 2005

**Sunset Date:** JAN 19 2011

NPS-6, "Interpretation and Visitor Services Guideline," (Release No. 3, December 1986), and any other conflicting instructions are superseded and replaced by this Director's Order and Reference Manual 6 (RM-6).

**TABLE OF CONTENTS**

1. Background and Purpose
2. Authority
3. Roles and Responsibilities
4. Interpretive and Educational Programs
5. Interpretive Planning
6. Personal and Non-personal Services
7. Interpretive Competencies and Skills
8. Requirements for All Interpretive and Educational Services
9. Interpretive and Educational Partnerships
10. Reporting Requirements
11. For Further Reference

## 1. BACKGROUND AND PURPOSE

The goal of National Park Service (NPS) interpretive and educational programs is to provide memorable and meaningful learning and recreational experiences, foster development of a personal stewardship ethic, and broaden public support for preserving park resources. Such programs will be successful when they forge emotional and intellectual connections among park resources, visitors, the community, and park management. The NPS will provide visitors[1] with an experience that is enjoyable and meaningful within the context of the park's resources and the values they represent. NPS interpretive and educational programs will strengthen public understanding of the full meaning and relevance of heritage resources, both cultural and natural, by creating public dialogue and fostering civic engagement.[2] In addition, visitors should be

---

[1] For purposes of this Director's Order, the term "visitor" is defined as anyone who uses a park's interpretive and educational services, regardless of where such use occurs.

[2] See Director's Order #75A: Civic Engagement and Public Involvement. As stated in the National Park System Advisory Board's August 2001 report, *Rethinking the National Parks for the 21st Century* (p. 14):

> The study of our nation's history, formal and informal, is an essential part of our civic education. In a democratic society such as ours, it is important to understand the journey of liberty and justice, together with the economic, social, religious, and other forces that barred or opened the ways for our ancestors, and the distances

made aware of the purposes and scope of the national park system. Interpretation and education is the key to preserving both the idea of national parks and the park resources themselves. In a world of rapidly changing demographics, it is essential that interpretive and educational programs reach beyond park boundaries to schools and the wider general public.

The purpose of this Director's Order is to supplement *Management Policies* with operational policies and procedures necessary to maintain effective, high-quality interpretive and educational programs. This Director's Order supports goal categories I and II of the NPS Strategic Plan, which calls for "Preserving Park Resources" and "Providing for the Public Enjoyment and

Visitor Experience of Parks." For further guidance, see the June 2003 report, *Renewing Our Education Mission*,[3] and RM-6.

## 2. AUTHORITY

Authority to issue this Director's Order is contained in the 1916 National Park Service Organic Act (16 USC 1 – 4) and delegations of authority contained in Part 245 of the Department of the Interior Manual.

Authority for NPS interpretive and educational programs is contained in the Organic Act; the 1935 Historic Sites, Buildings, and Antiquities Act (16 USC 462(j)); the National Environmental Policy Act of 1969 (42 USC 4332(G)); and the National Parks Omnibus Management Act of 1998 (16 USC 5911).

A number of parks have specific mandates or direction from Congress to provide interpretive and educational experiences to the public in their enabling legislation.

This Director's Order is intended only to improve the internal management of the NPS, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 General

See *Management Policies,* chapter 7, introduction.

---

yet to be covered. Visits to historic places, whether managed by the Park Service or by others, allow us to take the measure of our history in immediate ways. Parks should be not just recreational destinations but springboards for personal journeys of intellectual and cultural enrichment. The Park Service must ensure that the American story is told faithfully, completely, and accurately.

[3] Available at <http://inside.nps.gov/index.cfm?handler=WasoInDepthDetails&menuid=1407&div=43&page=home>.

**3.2 Associate Director for Partnerships, Interpretation and Education, Volunteers, and Outdoor Recreation**

The Associate Director for Partnerships, Interpretation and Education, Volunteers, and Outdoor Recreation, acting through the Washington Office, Division of Interpretation and Education, will oversee the NPS Interpretation and Education Program, and develop necessary standards and procedures. The Associate Director will issue, review, and revise as appropriate, RM-6, which will provide more detailed procedural guidance on administering the program.

**3.3 Interpretation and Education Program Manager will:**

- Oversee the NPS Interpretation and Education Program, and is responsible for day-to-day administration;
- Formulate Service-wide policies for planning and implementing interpretive and educational programs, and establish standards, evaluation criteria, and performance measures for individual park interpretive and educational programs;
- Identify and support Service-wide priorities and interpretive and educational initiatives;
- Serve as an advocate for interpretive and educational programs, media development, and comprehensive interpretive planning throughout the Service;
- Provide interdisciplinary coordination with other Service-wide programs relative to interpretation and education;
- Direct and support a national interpretive and educational training and development program to ensure a competent and motivated work force; and
- Manage the Cooperating Associations, Volunteers-in-Parks, Parks as Classrooms, Historic Weapons Demonstration Safety, and such other Service-wide programs that support the work of interpretation and education throughout the Service.

**3.4 Regional Offices will:**

- Serve as a resource to the parks in the region for all matters relating to interpretation and education;
- Serve as an advocate for interpretive and educational programs in the region;
- Manage interpretive and educational training and developmental opportunities;
- Manage comprehensive interpretive planning;
- Manage the regional Cooperating Associations, Volunteers-in-Parks, and Parks as Classrooms programs, and select the annual Freeman Tilden Award nominee;

- Provide guidance to Harpers Ferry Center in setting interpretive planning and media production priorities;
- Seek interdisciplinary coordination with other regional programs relative to interpretation and education in parks;
- Assist parks in using on-going civic engagement strategies, consultation, and collaboration to enhance interpretative and educational programs;
- Assist parks in compliance with Service-wide interpretive and educational policies and standards;
- Identify regional interpretive and educational priorities and initiatives; and
- Work with regional historic weapons points-of-contact to ensure regular safety inspections of park historic weapons programs and compliance with Service-wide guidelines and standards.

*(See RM-6)*

**3.5 Harpers Ferry Center (HFC) will:**

- Provide assistance with the development of interpretive media in the following areas: interpretive planning, museum and visitor center exhibits, historic furnishings, artifact conservation, wayside exhibits, audiovisual productions, publications, graphic identity, and directional signs.
- Provide a full spectrum of interpretive media developmental services for the use and benefit of national parks. This may include full in-house services for planning, design, and production oversight of interpretive media with maximum involvement of HFC. Or, it may include HFC's oversight of national contracts for interpretive planning, design, and production of interpretive media projects that are managed by park and/or regional staff with minimal direct HFC involvement. HFC will advise parks on the level of assistance necessary for a successful project based on park staff expertise, regional support, and HFC availability.
- Provide interpretive and visitor experience planning for General Management Plans, Long-Range Interpretive Plans and other National Park Service plans with visitor or interpretive components.
- Establish and maintain standards, evaluation criteria, and accountability for interpretive planning and interpretive media planning, design and production in consultation with field units across the Service. Plans or proposals to be accomplished by parks and regions, including privately funded projects, must comply with these standards and may be reviewed by HFC for appropriateness and quality of design and execution.
- Develop and update education design standards that provide guidance on learning styles and the production of teaching aids and interpretive media and serve as a clearinghouse for research in the field.

- Prepare all official park brochures in accordance with the established graphic system and priorities established by regions.

- Collaborate with Denver Service Center, architectural and engineering firms, and park chiefs to coordinate the planning, design, and installation of interpretive media in park facilities.

- Provide media consultation and evaluation, and support services to the Director and Washington Office as requested.

- Support the development of skills for park interpreters and managers to successfully manage interpretive media projects using standards, training, mentoring, and coaching of HFC staff consistent with the Interpretive Development Program.

- Develop and maintain comprehensive graphic identity standards for the National Park Service, and provide appropriate tools to agency personnel to facilitate the application of the standards to all visual communication materials.

- Develop and implement a Service-wide program for the planning, design, fabrication, and delivery of all park signs intended for identification, information, way finding and interpretation. AND

- On an annual basis, solicit and give careful consideration to field comments on HFC's services and priorities.

*(For more information on HFC, see RM-6. Also see section 10.3 below)*

**3.6 Superintendents will:**

- Manage and provide oversight of the interpretive and educational program through the development of the park strategic plan and the comprehensive interpretive plan, and use civic engagement to initiate and maintain a vibrant and meaningful program;

- Require NPS personnel, as well as non-NPS individuals who provide interpretive and educational services in units of the national park system on behalf of the NPS, to develop the knowledge, skills, and abilities necessary for effective delivery of interpretive and educational programs;

- Approve, implement, and maintain a current park comprehensive interpretive plan (CIP);

- Ensure park participation in the annual survey of park users, and incorporate the results into the NPS Performance Management Data System; and

- Ensure that annual reporting requirements are met.

*(See section 5.2, Comprehensive Interpretive Plan, and section 7.1, Interpretive Development Program)*

### 3.7 Park Chiefs of Interpretation will:

- Create, plan, and manage an interpretation and education program that fosters an on-going dialogue with the public to accomplish park objectives, supports regional and national goals, and relates directly to the primary themes and management strategies of the park as established in legislation and park plans;
- Make effective decisions about delivery of messages including the use and balance of personal and non-personal services and appropriate media;
- Create and prioritize an annual implementation plan to accomplish goals outlined in the parks comprehensive interpretive plan;
- Be responsible for day-to-day management of the park interpretive and educational program in accordance with the park strategic plan and comprehensive interpretive plan;
- Serve as a member of the park management team;
- Ensure that all NPS interpreters strive to achieve certification standards for their essential competencies identified in the Interpretive Development Program;
- Maximize efficiencies and make effective use of all the park's potential personnel resources, including partners, concessioners, cooperating associations, and volunteers, for the delivery of interpretive and educational programs;
- Provide an active outreach program; and
- Provide an on-going evaluation of all interpretive and educational services for the purpose of ascertaining effectiveness.

*(See Director's Order #75A: Civic Engagement and Public Involvement)*

## 4. INTERPRETIVE AND EDUCATIONAL PROGRAMS

In accordance with Section 7.1 of *Management Policies*, effective interpretive and educational programs will include a variety of services such as informational and orientation programs, interpretive programs, educational programs, and interpretive media. NPS educational programs are designed to enrich lives and enhance learning, nurturing people's appreciation for parks and other special places, therefore helping to preserve America's heritage. To accomplish this, the NPS will develop interpretive and educational programs according to the following principles:

- *NPS programs are place-based*. Programs use national parks and other places as dynamic classrooms where people interact with real places, landscapes, historic structures, and other tangible resources that help them understand meaning, concepts, stories, and relationships.

- *NPS programs are learner-centered*. Programs honor personal freedom and interests through a menu of life-long learning opportunities that serve a wide variety of learning styles, encourage personal inquiry, and provoke thought.

- *NPS programs are widely accessible*. Programs provide learning opportunities, reflect and embrace different cultural backgrounds, ages, languages, abilities, and needs. Programs are delivered through a variety of means, including distance learning, to increase opportunities to connect with and learn from the resources.

- *NPS programs are based on sound scholarship, content methods and audience analysis*. Programs are informed by the latest research related to natural and cultural heritage and incorporate contemporary education research and scholarship on effective interpretive and educational methods.

- *NPS programs help people understand and participate in our civil democratic society*. Programs highlight the experiences, lessons, knowledge, and ideas embodied in America's national parks and other special places and provide life-long opportunities to engage in civic dialogue.

- *NPS programs incorporate ongoing evaluation for continual program improvement and effectiveness*. Programs are regularly evaluated and improved to ensure that they meet program goals and audience needs.

- *NPS programs are collaborative*. Where it furthers the NPS mission and is otherwise appropriate, programs are created in partnership with other agencies and institutions to achieve common goals.

*(See Renewing Our Education Mission, and RM-6. Also see Director's Order #21: Donations and Fundraising)*

## 5. INTERPRETIVE PLANNING

### 5.1 General

Sound interpretive planning provides an organized method for making informed choices about a park's interpretive and educational program. It can provide solutions to management problems, with the goals of encouraging preservation of park resources, and fostering increased visitor understanding, appreciation, enjoyment, and stewardship. The comprehensive interpretive planning process provides an organized method to define the park story, and will be a collaborative effort, with on-going public involvement that includes subject-matter experts to incorporate new scholarship, and partners and other stakeholders as vital participants in its development.

*(See Director's Order #75A: Civic Engagement and Public Involvement)*

### 5.2 Comprehensive Interpretive Plan (CIP)

All parks will have a current CIP as required by *Management Policies*, chapter 7. The CIP will be initiated and approved by the superintendent and may be completed by field staff with guidance from the regional office, HFC, and/or a private sector planner. Superintendents must assure that the CIP receives a thorough review approximately every five years.

The CIP will include:

- The long-range interpretive plan defining a 5- to 10-year vision for the park's program that addresses all media and personal services;
- The annual implementation plan, charting the short-range actions which will achieve the long-range vision; and
- An interpretive database supporting the pursuit of that vision.

Other interpretive plans, such as education plans, exhibit plans, wayside exhibit plans, publications plans, historic furnishings plans, and scope of sales will be based on the Long-Range Interpretive Plan and become part of the interpretive database. The interpretive database contains resource material for the park's interpretive program, including bibliographies and studies as varied as General Management Plans and Historic Resource Studies.

For detailed information on the content, process, and responsible parties involved in the comprehensive interpretive planning process, please refer to the publication entitled, *Comprehensive Interpretive Planning* (NPS, Fall 2000).[4]

*(See RM-6 for details on the CIP process and components)*

## 6. PERSONAL AND NON-PERSONAL SERVICES

### 6.1 Personal Services

Personal services are those in which staffs (paid employees, VIPs, cooperating association employees and concession employees) facilitate opportunities for emotional and intellectual connections between resources and visitors. Each park will offer a variety of personal services, which could be in collaboration with partners, to inform and orient visitors, to increase understanding and appreciation of park values, to protect park resources, and to improve visitor safety. Personal services must take into consideration audience characteristics, multiple points of view, and the available time of the audience. They must be well research, pre-planned, and have a theme, goal, and objective with desired measurable outcomes.

Examples of personal services include:

[4] This document is available online via HFC's webpage, at <http://www.nps.gov/hfc/products/ip.htm#>.

**6.1.1** *Staffing of Visitor Centers and Contact Stations*. Public use facilities will operate during times that serve most visitors during the day. Staff will be thoroughly familiar with the site and provide high-quality information and orientation services.

**6.1.2** *Informal Interpretation*. An informal visitor contact is an encounter between a visitor and an interpreter in which the objectives are defined by the visitor's needs, rather than prepared by the interpreter in advance. Spontaneous interpretive contacts can also be initiated to provide opportunities to facilitate a connection between the interests of the visitors and the significance of parks. These encounters can take place at a variety of locations and can take a variety of forms, such as stationary and roving interpretation.

**6.1.3** *Formal Interpretation*. Formal interpretive programs facilitate a connection between the interests of the visitors and the significance of the park. They must reflect current scholarship, cohesively develop a relevant idea, and provide the audience with opportunities to make their own intellectual and emotional connections to the meaning and significance of the resources relevant to the program. Programs must provide a desired visitor experience with measurable outcomes. Included in this category are conducted activities, talks, campfire programs, hikes, horseback tours, boat tours, cave tours, lectures, power point presentations and seminars.

**6.1.4** *Performing Arts and Demonstrations*. Performing arts may include activities such as storytelling, poetry reading, dance, drama, music, concerts, art shows, or artists in parks. Demonstrations are pre-planned presentations designed to showcase a skilled process and include historical demonstrations, living history, scientific demonstrations, or recreation safety and skill demonstrations. Living history demonstrations use period reproduction clothing and objects to present impressions of the people, events, and practices of the past. Living history will not attempt literally to recreate the past, but will provide interpretive and educational impressions in as authentic a manner as possible.

*(See sections 8.6, Cultural Demonstrators and 8.7, Historic Weapons below, and RM-6)*

**6.1.5** *Junior Ranger Program*. This program generally engages young people in age-appropriate activities that (1) allow them to discover the significance of a specific site, and (2) introduce them to the national park system and the mission of the National Park Service in order to cultivate a new generation of park stewards. Junior Ranger programs invite interactive participation by young people and provide a tangible memento of the young person's participation.

### 6.2 Curriculum-based Educational Programs

A formal, curriculum-based educational program matches a group's educational objectives with park resources. The Service will provide programs based on national, state, and local content standards. The content of curriculum-based programs will be relevant to the resources of the park and the impacts endangering those resources, and conservation or preservation issues relevant to the park. Pursuant to 16 USC 17j-2(j), parks may provide transportation of children to and from interpretive and educational programs. Park curriculum-based programs will:

- Be relevant to park resources and interpretive themes;

- Enhance school curricula;
- Involve school teachers in planning and development of unit content and activities;
- Include pre- and post-visit materials or activities; and
- Have methods and criteria for evaluating the effectiveness of the program.

### 6.3 Parks as Classrooms Program

The Parks as Classrooms® grant program supports programs, activities, and products that allow students and the public to become involved in resource-based learning in such a way that they become better informed about scientific, historical, and cultural processes and research, and can apply this knowledge toward the formulation of their personal decision-making and stewardship ethic. Parks as Classrooms supports programs for youth groups, clubs, home school groups and others. The emphasis is not on designing individual projects, but rather aiding the development of a life-long stewardship and democratic ethic in the general public through participatory educational resource programs. The Washington Office, Division of Interpretation and Education administers the program. Parks choosing to compete for Parks as Classrooms grants must submit a proposal each year and follow the required application procedures. Parks as Classrooms funding from the Washington Office is not required for use of the Parks as Classrooms trademark or logo. Parks as Classrooms is a registered trademark designed to provide professional recognition for National Park Service education programs.

*(For more information on education programs, see RM-6)*

### 6.4 Special Events

**6.4.1** *In General*. Special events are allowed in accordance with 36 CFR 2.50 and 7.96(g), and section 8.6.2 of *Management Policies.* Special events such as pageants, anniversaries, dedications, festivals, and other observances are permitted when there is a meaningful connection between the park and the event; the observance contributes to public understanding of the park's significance or the significance of the national park system; and the event can be staged without unacceptable impact on the park's resources. Special events meeting these criteria generally enhance the relationship between the park and the community.

**6.4.2** *Food and Beverage at Special Events*. Special events and presentations involving food or beverage preparation will meet all applicable State and Federal public health service standards. All parks must contact the regional public health office when considering special events or presentations that will involve food or beverage preparation and delivery.

*(See Director's Order #53: Special Park Uses, for further information on special events)*

### 6.5 Non-Personal Services

**6.5.1** *In General*. Non-personal services are those that do not require the presence of staff. Non-personal services can address certain interpretive and educational opportunities more effectively than personal services. Media such as park brochures and other publications, museum and visitor center exhibits, wayside exhibits, and historic furnishings, web pages,

audiovisual presentations, and radio information systems are all examples of non-personal services.

**6.5.2** *Electronic Interpretation and Education*. The National Park Service has embraced the World Wide Web as a valuable and effective interactive tool for interpretation, education outreach, and worldwide distribution of National Park Service information. Each park will develop and maintain a park website to reach audiences outside the park. Park websites will comply with Director's Order #70: Internet and Intranet Publishing.

### 6.6 User Fees for Interpretive and Educational Services

The National Park Service has the authority to charge expanded activity fees, formerly known as use fees, for the use of facilities, equipment, or services that provide a direct benefit to the visitor beyond the benefit derived from the basic entrance fee.

Authority for the Service to charge these fees is contained in: (1) 16 USC 1a-2(g); (2) the Department of the Interior and Related Agencies Appropriation Act, 1996, 16 USC 460*l*-6a note (PL 104-134, title III, section 315) (Fee Demonstration); and (3) 16 USC 3a (for Special Park Uses). Each authority has different parameters associated with it concerning types of appropriate fee activities, retention of funds, expenditure of funds, year-end and no year-end requirements.

Before implementing interpretive fees, superintendents must:

- Review the total interpretive program to ensure that a fee for service is appropriate;
- Consider all other options and sources for the service such as existing concessioners, commercial operators, or cooperating associations;
- Develop clear guidelines and standards against which quality of performance will be measured; and
- Consult all applicable NPS guidance documents, and review all applicable fee authorities before choosing the appropriate one.

*(See RM-6; Director's Order #22: Fee Program, and Reference Manual 22; and Director's Order #53: Special Park Uses, for further information)*

## 7. INTERPRETIVE COMPETENCIES AND SKILLS

### 7.1 The Interpretive Development Program

The goal of the Interpretive Development Program (IDP) is employee development and understanding of the elements of interpretive and educational work. The quality of interpretive and educational programs presented to the public, and by extension the image and reputation of the National Park Service, are directly related to the skills, training, and professionalism of those who provide the service. The IDP identifies key skills for interpreters, standards for measuring

interpretive programs, and employee developmental opportunities. A competent, well-trained work force is essential to the delivery of high-quality interpretation and education.

Accordingly, all managers and supervisors have a responsibility to ensure that their employees develop the skills required to meet the established interpretive standards. All NPS interpreters will strive to achieve the certification standards for the interpretive certification benchmarks identified in the IDP. The same standards that apply to the NPS work force will also apply to cooperators, concessioners, contractors, and other partners who deliver interpretive and educational services in collaboration with or on behalf of the National Park Service.

Field employees developed the IDP as a comprehensive definition of the broad scope of duties, responsibilities, and services provided to serve the public and protect park resources. The knowledge, skills, and abilities contained within the program provide a philosophical and practical grounding for all who provide interpretation in NPS areas. The benchmark interpretive competencies described in the program support Ranger Careers positions, but as a development opportunity anyone is encourage to participate. Above all, the program provides guidance for individuals to achieve interpretive excellence.

*(For more information on the IDP, see RM-6)*

### 7.2 Professional Organizations

The National Park Service encourages membership and participation in professional organizations that support NPS goals, such as the American Association for State and Local History, the Association for Supervision and Curriculum Development, the George Wright Society, the National Association for Interpretation, the National Council for the Social Studies, the National Council on Public History, the National Council of Teachers of Mathematics, the National Science Teachers Association, the Organization of American Historians, and others. Employees who choose to belong to professional organizations must bear the cost of those memberships. NPS units may choose to pay for institutional memberships.

## 8. REQUIREMENTS FOR ALL INTERPRETIVE AND EDUCATIONAL SERVICES

### 8.1 Access to Interpretive and Educational Opportunities

The NPS will ensure, to the greatest extent possible, that persons with disabilities receive the same interpretive opportunities as non-disabled persons, in the most integrated setting possible.

*(See section 7.5.1 of Management Policies. Also see Director's Order #42: Accessibility for Visitors with Disabilities in National Park Service Programs and Services)*

### 8.2 Interpretive and Educational Services Beyond Park Boundaries

NPS and non-NPS sites are encouraged to identify potential common interests and develop and share resources and opportunities for appropriate interpretive and educational services. Opportunities could be on-site, off-site, or virtual.

*(See Section 7.5.2 of Management Policies)*

### 8.3 Resource Issue Interpretation and Education

Interpretive and educational programs can build public understanding of, and support for, resource management decisions, and for the NPS mission in general. Therefore, parks should thoroughly integrate resource issues and initiatives of local and Service-wide importance into their interpretive and educational programs.

*(See section 7.5.3 of Management Policies. Also see Director's Order #13A: Environmental Management Systems)*

### 8.4 Research

**8.4.1** *In General*. Quality interpretive programs and media require sound research. The content of interpretive and educational services must be accurate, respect multiple points of view and be free of cultural, ethnic, and personal biases. However, in accordance with section 7.5.5 of *Management Policies*, "[a]cknowledging multiple points of view does not require interpretive and educational programs to provide equal time, or to disregard the weight of scientific or historical evidence." Programs presented by cultural demonstrators should be introduced as clearly representing the particular culture being presented.

*(See section 8.5, Consultation below)*

**8.4.2** *Historical and Scientific Research*. Superintendents, historians, scientists, and interpretive staff are responsible for ensuring that park interpretive and educational programs and media are accurate and reflect current scholarship. To accomplish this, an on-going dialogue must be established. Questions often arise round the presentation of geological, biological, and evolutionary processes. The interpretive and educational treatment used to explain the natural processes and history of the Earth must be based on the best scientific evidence available, as found in scholarly sources that have stood the test of scientific peer review and criticism. The facts, theories, and interpretations to be used will reflect the thinking of the scientific community in such fields as biology, geology, physics, astronomy, chemistry, and paleontology. Interpretive and educational programs must refrain from appearing to endorse religious beliefs explaining natural processes. Programs, however, may acknowledge or explain other explanations of natural processes and events.

*(See section 7.5.4 of Management Policies. Also see Director's Order #11B: Ensuring Quality of Information Disseminated by the National Park Service)*

### 8.5 Consultation

The NPS will present factual and balanced presentations of the many American cultures, heritages, and histories. Through civic engagement, consultation, and collaboration with various constituencies, the NPS fosters the development of effective and meaningful interpretive and educational programs. Broad civic engagement ensures appropriate content and accuracy, and identifies multiple points of view and potentially sensitive issues. The Service will actively

consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive and educational programs.

*(See sections 5.2.1 and 7.5.5 of Management Policies. Also see Director's Order #75A: Civic Engagement and Public Involvement)*

### 8.6 Cultural Demonstrators

Cultural demonstrators can provide unique insights into different cultures. In order to facilitate successful interaction with the public, parks must provide cultural demonstrators with training and direction. It is essential that cultural demonstrators possess interpretive and educational skills in addition to expertise in demonstrating a craft or activity. The superintendent may authorize the use of cultural demonstrators through a cooperative agreement, special use permit, concession permit, or other appropriate instrument.

*(See section 7.5.6 of Management Policies)*

### 8.7 Historic Weapons

Historic weapons demonstrations are interpretive demonstrations and should meet the standards for interpretive programs found in this Director's Order and in RM-6. All uses of historic weapons in parks will strictly comply with the *Standards for Historic Weapons Firing in Areas Administered by the NPS*.

*(See section 7.5.7 of Management Policies)*

### 8.8 Re-enactments

Battle re-enactments and demonstrations of battle tactics that involve exchanges of fire between opposing lines, the taking of casualties, hand-to-hand combat, or any other form of simulated warfare, are prohibited in all parks. Battle re-enactments create an atmosphere inconsistent with the memorial qualities of the battlefields and other military sites placed in the Service's trust.

### 8.9 Museum Objects

Accessioned original museum objects will not be used in interpretive and educational programs or in other activities that could lead to loss or deterioration. Exemptions may be granted in accordance with the Museum Handbook. Reproductions used in place of original museum objects must be marked as such. These reproductions will be controlled and accounted for as required by the Museum Handbook.

*(See Director's Order #24: NPS Museum Collections Management)*

## 9. INTERPRETIVE AND EDUCATIONAL PARTNERSHIPS

### 9.1 General

In some cases, connections to the resource can be enhanced, and the visitor experience enriched, through the use of partnerships. Interpretive services provided to the NPS by partners will be in addition to, and not take the place of, a park's basic interpretive and educational services. To ensure quality control and appropriateness, NPS interpretive staff will be involved in the planning, approval, training, monitoring and evaluation of all interpretive services provided by others. Partners providing interpretive services will be given opportunities to participate in the Interpretive Development Program.

*(See section 7.6 of Management Policies. Also see Director's Order #7: Volunteers in Parks, Director's Order #20: Agreements, Director's Order #21: Donations and Fundraising, and Director's Order #32: Cooperating Associations)*

### 9.2 Cooperating Associations

Enabled by a standard, non-negotiable agreement, a cooperating association may, consistent with a park's scope-of-sales statement, purchase for re-sale or produce for sale, interpretive and educational items that are directly related to the understanding and interpretation of the park or the national park system. The cooperating association may also (1) support research efforts, (2) accept donations on behalf of the Service, when appropriate and when conducted through approved fund-raising efforts, and (3) offer appropriate and approved interpretive and educational services or programs that support but do not supplant those offered by the NPS. Cooperating association interpretive and educational services may be offered for a fee. Revenue from such fees is returned to the NPS through the cooperating association's regular donation process.

*(See section 7.6.2 of Management Policies. Also see Director's Order #32: Cooperating Associations and Reference Manual 32)*

### 9.3 Volunteers in Parks

Volunteers offering interpretive and educational services will be provided opportunities to demonstrate interpretive and educational skills, and will strive to meet the certification standards for the effective delivery of programs found in the IDP. They also will be provided necessary equipment and safety training. Volunteers will not displace NPS employees, and will be provided NPS housing only if available and not needed for NPS employees.

*(See section 7.1, Interpretive Development Program above. Also see section 7.6.1 of Management Policies; Director's Order #7: Volunteers in Parks, and Reference Manual 7; and Director's Order #36: Housing Management)*

### 9.4 Concessioners

The appropriate role of commercial operations in helping a park achieve the desired visitor experience will be identified in a commercial services plan. The plan may call on a park

concessioner to provide interpretive and educational services. Concessions employees providing such services will be trained, either by the concessioner or through participation in NPS training. Any fees for these services are collected by concessioners and are part of their revenue. The NPS will review concessions programs and written materials to ensure that the information they contain is accurate, appropriate, and related to park themes, applying the same standards used to evaluate NPS interpretive and educational services.

*(See sections 10.2.2 and 10.2.4.4 of Management Policies, Director's Order #48A: Concession Management, and Reference Manual #48A)*

### 9.5 Interpretive Services Provided for Fee by Other Individuals or Organizations

See Director's Order #48B: Commercial Use Authorizations.

## 10. REPORTING REQUIREMENTS

### 10.1 Service-wide Interpretive Report (10-769)

The Service-wide Interpretive Report (10-769) provides a Service-wide interpretive overview and describes how ONPS funds and certain other funding sources are used to provide a national program of interpretation and education. It is a useful tool for analyzing park interpretive and educational programs, but it is primarily a national report used to meet requirements of the Government Performance and Results Act of 1993 (GPRA)[5], the NPS Annual Report, and NPS budget requirements. Each park must submit its individual report, via the National Park Service website to the Washington Office, Division of Interpretation and Education, by October 31 each year.

### 10.2 Parks as Classrooms Report

Each park that receives a Parks as Classrooms grant will prepare an annual report on the project. The report will include: (1) a short narrative that describes the program; (2) an accounting of all funds used to support the project, including grant funds, matching funds, and in-kind donations; and (3) statistical information including the number of students and teachers served. Park reports are due in the Washington Office, Division of Interpretation and Education, by January 31.

### 10.3 Free Informational Publications – Semiannual Inventory Report (10-80)

The Free Informational Publications – Semiannual Inventory Report Form (10-80) is used to inventory the Harpers Ferry Center Department of Publications-produced "official map and guide" brochures only. The report must be submitted to Harpers Ferry Center twice a year, by March 30 and September 30.

---

[5] 31 USC 1115 et seq.; PL 103-62

### 10.4 VIP Program Activity and Expense Report (Form 10-150)

Each park that has a volunteer program must submit a VIP Program Activity and Expense Report (Form 10-150) for the fiscal year. The report will be submitted via the National Park Service website to the Washington Office, Division of Interpretation and Education, by October 31 each year.

*(See section 12.2 of Director's Order #7: Volunteers in Parks)*

### 10.5 Media Inventory Database System

The web-based Media Inventory Database System (MIDS) provides an inventory and quality assessment of the interpretive media in a park. Because MIDS information is useful in identifying the content and physical condition of interpretive media, each park should review its MIDS entries at least once a year, adding new media and revising the quality of existing entries as necessary.

## 11. FOR FURTHER REFERENCE

Greater detail and direction on many of the topics in this Director's Order can be found in RM-6, which will be issued by the Associate Director for Partnerships, Interpretation and Education, Volunteers, and Outdoor Recreation.

The following Director's Orders will be helpful in providing further guidance for developing and managing interpretive and educational programs.

| | |
|---|---|
| Director's Order #2: | Park Planning |
| Director's Order #7: | Volunteers in Parks |
| Director's Order #11B: | Ensuring Quality of Information Disseminated by the National Park Service |
| Director's Order #13A: | Environmental Management Systems |
| Director's Order #20: | Agreements |
| Director's Order #21: | Donations and Fundraising |
| Director's Order #22: | Recreation Fee Program |
| Director's Order #24: | NPS Museum Collections Management |
| Director's Order #26: | Youth Programs |
| Director's Order #32: | Cooperating Associations |
| Director's Order #42: | Accessibility for Visitors with Disabilities in National Park Service Programs and Services |
| Director's Order #48A: | Concession Management |
| Director's Order #48B: | Commercial Use Authorizations |
| Director's Order #50B: | Occupational Safety and Health Program |
| Director's Order #50C: | Public Risk Management Program |
| Director's Order #52A: | Communicating the National Park Service Mission |
| Director's Order #53: | Special Park Uses |
| Director's Order #70: | Internet and Intranet Publishing |
| Director's Order #75A: | Civic Engagement and Public Involvement |

[End of Document]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director,

*Defendants*,

Civil Action No. 1:26-cv-10877

**DECLARATION OF JESSICA BOWRON, COMPTROLLER OF THE NATIONAL PARK SERVICE, EXERCISING THE DELEGATED AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1. My name is Jessica Bowron. I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025, delegation of that authority from the Acting Secretary of the Interior, and subsequent extensions of that authority by the Secretary of the Interior. I have been employed by the NPS since 2007 and served as the NPS Comptroller since 2017.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System and its approximately 20,000 employees nationwide, as well as all NPS programs, NPS directorates, and regional offices. In this role, I oversee the NPS's Cultural Resources, Partnerships, and Science Directorate, the NPS's Natural Resources, Stewardship, and Science Directorate, as well as NPS's Interpretation, Education, and Volunteers Directorate.

4. The National Park System is comprised of four hundred and thirty-three (433) units, including sixty-three (63) National Parks, eighty-seven (87) National Monuments, seventy-six (76) National Historic Sites, sixty-four (64) National Historical Parks, thirty-one (31) National Memorials, and eighteen (18) National Recreation Areas, among others. NPS units are spread across all fifty states, the District of Columbia, and the U.S. territories

5. The NPS is a bureau of the Department of the Interior ("DOI"). DOI is a Cabinet-level agency, led by Secretary of the Interior Doug Burgum, that manages America's natural and cultural resources. DOI employs approximately seventy thousand (70,000) people, many of those in one of the eleven (11) technical bureaus: Bureau of Indian Affairs, Bureau of Indian Education, Bureau of Land Management, Bureau of Ocean Energy Management, Bureau of Reclamation, Bureau of Safety and Environmental Enforcement, Bureau of Trust Funds Administration, Office of Surface Mining Reclamation and Enforcement, U.S. Fish and Wildlife Service, U.S. Geological Survey, and the NPS. The NPS reports to the Secretary of the Interior through the Office of the Assistant Secretary for Fish and Wildlife and Parks.

6. Since its inception in 1916, the NPS has long offered educational and interpretive information to park visitors.

7. The NPS's policies for interpretation and education can be found in the National Park Service Management Policies (2006) and Director's Order #6: Interpretation and Education (as amended 2025). The NPS Management Policies are publicly available at https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf. Director's Order #6 is publicly available at https://www.nps.gov/subjects/policy/upload/DO_6_1-19-2005.pdf.

8. Director's Order #6 assigns most interpretive development and planning to the hundreds of dedicated interpretive staff across individual System units. The NPS's Interpretation, Education, and Volunteers Directorate provides support through the development of policy, guidance, and other resources, as well as overseeing the Harper's Ferry Center for Media Services. The sixty (60) employees at the Harper's Ferry Center provide direct support to many System units with graphics research, interpretive planning, media contracting, artifact conservation, revision and reprinting of publications, and replacement of wayside exhibits, as well as creation of a variety of interpretive tools, including audiovisual programs, historic furnishings, museum exhibits, publications, and wayside exhibits.

9. The NPS's interpretive media take many forms, including waysides and exhibits, park unigrid brochures (the iconic NPS park maps), program brochures, park newspapers, and educational handouts, audiovisual materials that play in NPS facilities such as visitor centers and museums, online content, and other information that is necessary to educate and inform the visitor experience. The NPS works closely with specialized non-profit partners known as Cooperating Associations that run retail bookstores in System units that enhance our interpretive goals by allowing visitors to purchase and take home relevant educational materials.

10. As of 2025, the NPS manages over seven hundred (700+) visitor centers and exhibits, over one thousand five hundred (1500+) films or audio/visual exhibits, over eight thousand (8,000+) interpretive waysides, over three hundred and fifty bookstores (350+) containing hundred to thousands of interpretive and educational products. In the last fiscal year, the NPS published around three thousand one hundred (~3,100) NPS publications and distributed around twenty-six million three hundred thousand (~26,300,000) copies of NPS publications to visitors.

11. The NPS regularly conducts cyclic maintenance and updates to its interpretive media assets to ensure they remain accurate, relevant, and useable. In the regular course of operations, on any given day, NPS staff may work on developing, revising, repairing, or retiring hundreds of interpretive media assets. The NPS's active management and constant maintenance, revision, replacement, and retirement of interpretive media assets are critical to providing relevant educational resources to visitors.

12. On March 27, 2025, President Trump issued Executive Order No. 14253, Restoring Truth and Sanity to American History. This order is publicly available at https://www.federalregister.gov/documents/2025/04/03/2025-05838/restoring-truth-and-sanity-to-american-history.

13. On May 20, 2025, the Secretary of the Interior issued Secretary's Order No. 3431, Restoring Truth and Sanity to American History ("SO 3431"), with the purpose to "implement[] provisions of President Trump's March 27, 2025 Executive Order [] 14253."

14. Section 5.b. of SO 3431, titled Review of properties for inappropriate content, instructed DOI bureaus as follows: "Within 90 days of the date of this Order, each land management Bureau shall conduct a review of all public monuments, memorials, statues,

markers, or similar properties on lands within its jurisdiction to identify whether any such properties contain images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature."

15. Section 5.b. of SO 3431 went on to instruct DOI bureaus as follows: "Within 120 days of the date of this Order, each land management Bureau shall remove any content meeting the criteria identified in paragraph 1 or otherwise found to be inconsistent with the purposes of [Executive Order] 14253. The relevant land management Bureau shall then take action to replace the removed content with content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with [Executive Order] 14253. In developing appropriate content, the land management Bureau shall coordinate with the Office of Communications within the Office of the Secretary."

16. Lastly, section 6 of SO 3431, titled Encouraging Public Participation, instructed DOI bureaus as follows: "Each land management Bureau shall post signage throughout each property, in as many locations within each property as necessary and appropriate to ensure public awareness, to allow for public input as to the state of the property, its management, and its compliance with this Order. Each such sign shall include a QR code that links to a website managed by the land management Bureau, allowing the user to provide a written entry. Each land management Bureau shall ensure that (1) precautions are taken to ensure the privacy and data security of respondents; (2) the webpage is actively monitored; and (3) any appropriate

public input is shared with the relevant official at each land management Bureau property. Each such sign shall include the following message:

> (Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features."

17. Consistent with the timelines established in SO 3431, I instructed System units on June 9, 2025 to submit their reviews of public monuments, memorials, statutes, markers, or similar properties to the review team by July 19, 2025.

18. On June 9, 2025, System units were also instructed to post signage consistent with the requirements of Section 6 of SO 3431 by June 13, 2025. Staff from the Interpretation, Education, and Volunteers Directorate coordinated with System units, the NPS Information Resource Management Directorate, and the NPS Information Collection Clearance Officer / NPS Forms Manager to implement the signage and quick response ("QR") codes required by Section 6 of SO 3431.

19. While staff at individual System units conducted their reviews for submission to the review team, the NPS began receiving feedback submissions from the public through the QR code submissions process displayed on signage in those System units.

20. A review team of NPS senior management, representing the Interpretation, Education, and Volunteers Directorate, the Cultural Resources, Partnerships, and Science Directorate, and Natural Resources, Stewardship, and Science Directorate, as well as representatives from the Department of the Interior Office of Communications and others began analyzing all System unit and public submissions for conformance with the requirements of SO

3431. The review team conducts this analysis case-by-case, taking into account the context of the submission, the mission and interpretive purpose of the System Unit or specified exhibit, and any relevant legal or policy considerations. The review team receives submissions for both existing interpretive media assets and newly developed or developing interpretive content. In some cases, the decisions made as a result of this review have also been informed by case- or category-specific policy clarification from DOI leadership.

21. The review process has differed for each submission. In many cases, content is found to conform with SO 3431 and no change is recommended. In other cases, content is found to not to conform with SO 3431. In such cases, the System unit is notified that the content was found to be nonconforming.

22. For example, the review team received a submission from Sleeping Bear Dunes National Lakeshore related to content that discusses the pressures from American settlers on Federal Indian removal policies, submitted because the content could be read to inappropriately disparage past individuals in its discussion of those pressures. However, the content was determined to be in conformance with SO 3431 as it was accurate in the context of that System unit.

23. Reviews have proceeded, and determinations have been made on a rolling basis. The review process will continue for the foreseeable future as part of the NPS's overall interpretive strategy. The review team continues to receive informal submissions from System units and the public. Determinations as to whether information is in conformance with SO 3431 will continue to be made on a case-by-case basis.

24. After receiving a determination that content in a System unit is not in conformance with SO 3431, the System unit implements next steps and can work with the review

team and appropriate staff within their directorates to determine the appropriate course of action. In some cases, interpretive content may be revised or temporarily covered or removed until replacement content is developed. In a small number of cases, interpretive content may be permanently removed. While this is sometimes due solely to nonconformance with SO 3431, permanent removal is often due to a confluence of other factors, such as the age or condition of the interpretive media, whether the entirety of that media asset meets modern interpretive standards, or whether its retirement was already part of a System unit's interpretive plan.

25. Despite resource and capacity constraints, the NPS worked diligently to implement SO 3431 and Executive Order 14253. The NPS has done so in part by coordinating this effort with its existing, continuous, and robust interpretation program. The NPS has traditionally exercised substantial discretion over its interpretive content, and thus was able to incorporate the requirements of SO 3431 into its many other considerations in managing an active interpretation program of this scale.

26. I have reviewed the Plaintiffs' proposed Order (Doc. No. 29-2). To attain an alleged "status quo" of interpretive materials, plaintiffs ask the court to order that the NPS cease any removal or alteration of interpretive content and restore all interpretive content as it existed on May 19, 2025, regardless of whether the reason for any removal or alteration is related to SO 3431. Foreclosing the NPS's ability to continue its ongoing interpretation responsibilities would prevent the NPS from serving the American public and System unit visitors. As noted above, implementation of SO 3431 is interwoven into the NPS's existing interpretive activities. Attempting to undo a year's worth of research, development, and design for thousands of interpretive media assets would stall the NPS's education efforts and freeze the efforts of the hundreds of NPS employees engaged in interpretive programming.

27. I understand that one of the Plaintiffs plans to visit Brown v. Board of Education National Historic Park, Hot Springs National Park, and Little Rock Central High School. Although each of those NPS sites submitted interpretive content materials for review under SO 3431, no changes have been made to date to any interpretive content under review.

28. I understand that one of the Plaintiffs is concerned that the LGBTQ+ exhibit she worked on at the Rosie the Riveter/WWII Home Front National Historic Park will be removed pursuant to the Secretary Order. To date, no interpretive content at Rosie the Riveter/WWII Home Front National Historic Park has been submitted for review under SO 3431. Thus, no interpretive content has been changed at this park as a result of the SO 3431 review process.

I declare under penalty of perjury that the foregoing is true and correct.

JESSICA BOWRON

Digitally signed by JESSICA BOWRON
Date: 2026.04.08
13:22:47 -04'00'

Washington, District of Columbia
Dated: April 8, 2026

Jessica Bowron

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

Federal Register / Vol. 90, No. 63 / Thursday, April 3, 2025 / Presidential Documents 14563

# Presidential Documents

**Executive Order 14253 of March 27, 2025**

## Restoring Truth and Sanity to American History

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light. Under this historical revision, our Nation's unparalleled legacy of advancing liberty, individual rights, and human happiness is reconstructed as inherently racist, sexist, oppressive, or otherwise irredeemably flawed. Rather than fostering unity and a deeper understanding of our shared past, the widespread effort to rewrite history deepens societal divides and fosters a sense of national shame, disregarding the progress America has made and the ideals that continue to inspire millions around the globe.

The prior administration advanced this corrosive ideology. At Independence National Historical Park in Philadelphia, Pennsylvania—where our Nation declared that all men are created equal—the prior administration sponsored training by an organization that advocates dismantling "Western foundations" and "interrogating institutional racism" and pressured National Historical Park rangers that their racial identity should dictate how they convey history to visiting Americans because America is purportedly racist.

Once widely respected as a symbol of American excellence and a global icon of cultural achievement, the Smithsonian Institution has, in recent years, come under the influence of a divisive, race-centered ideology. This shift has promoted narratives that portray American and Western values as inherently harmful and oppressive. For example, the Smithsonian American Art Museum today features "The Shape of Power: Stories of Race and American Sculpture," an exhibit representing that "[s]ocieties including the United States have used race to establish and maintain systems of power, privilege, and disenfranchisement." The exhibit further claims that "sculpture has been a powerful tool in promoting scientific racism" and promotes the view that race is not a biological reality but a social construct, stating "Race is a human invention."

The National Museum of African American History and Culture has proclaimed that "hard work," "individualism," and "the nuclear family" are aspects of "White culture." The forthcoming Smithsonian American Women's History Museum plans on celebrating the exploits of male athletes participating in women's sports. These are just a few examples.

It is the policy of my Administration to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing. Museums in our Nation's capital should be places where individuals go to learn—not to be subjected to ideological indoctrination or divisive narratives that distort our shared history.

To advance this policy, we will restore the Smithsonian Institution to its rightful place as a symbol of inspiration and American greatness—igniting

the imagination of young minds, honoring the richness of American history and innovation, and instilling pride in the hearts of all Americans.

**Sec. 2**. *Saving Our Smithsonian.* (a) The Vice President, in consultation with the Assistant to the President for Domestic Policy and the Special Assistant to the President and Senior Associate Staff Secretary, Lindsey Halligan, Esq., shall work to effectuate the policies of this order through his role on the Smithsonian Board of Regents with respect to the Smithsonian Institution and its museums, education and research centers, and the National Zoo, including by seeking to remove improper ideology from such properties, and shall recommend to the President any additional actions necessary to fully effectuate such policies.

(b) The Vice President and the Director of the Office of Management and Budget shall work with the Congress to ensure that future appropriations to the Smithsonian Institution:

(i) prohibit expenditure on exhibits or programs that degrade shared American values, divide Americans based on race, or promote programs or ideologies inconsistent with Federal law and policy; and

(ii) celebrate the achievements of women in the American Women's History Museum and do not recognize men as women in any respect in the Museum.

(c) The Director of the Office of Management and Budget and the Secretary of the Interior shall take any other measures within their authority to promote the policy of this order.

(d) As appropriate, the Vice President shall, in consultation with the Assistant to the President for Domestic Policy and Special Assistant to the President and Senior Associate Staff Secretary, Lindsey Halligan, Esq., work with the Speaker of the House of Representatives and the Senate Majority Leader, to seek the appointment of citizen members to the Smithsonian Board of Regents committed to advancing the policy of this order.

**Sec. 3**. *Restoring Independence Hall.* The Secretary of the Interior shall provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park, which shall be complete by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence.

**Sec. 4**. *Restoring Truth in American History.*

(a) The Secretary of the Interior shall:

(i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;

(ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. 1451 *et seq.*, 54 U.S.C. 100101 *et seq.*, and other applicable law; and

(iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 27, 2025.*

[FR Doc. 2025–05838
Filed 4–2–25; 8:45 am]
Billing code 3395–F4–P

THE SECRETARY OF THE INTERIOR
WASHINGTON

**ORDER NO. 3431**

**Subject:** Restoring Truth and Sanity to American History

Sec. 1. **Purpose.** This Order implements provisions of President Trump's March 27, 2025, Executive Order (EO) 14253, titled "Restoring Truth and Sanity to American History." EO 14253 directs the Secretary of the Interior (Secretary) to provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park and to complete such improvements by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence. It also directs the Secretary to review public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's (Department) jurisdiction and to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

Sec. 2. **Authority.** Among the authorities for this Order are 43 U.S.C. § 1451 *et seq.*; the National Park Service Organic Act, 54 U.S.C. § 100101 *et seq.*; the National Wildlife Refuge System Administration Act, 16 U.S.C. § 668dd *et seq.*; the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*; the Reclamation Act of 1902, 43 U.S.C. § 391 *et seq.*, as amended and supplemented; 25 U.S.C. §§ 2, 9; 43 U.S.C. § 1457; EO 14253; and section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended.

Sec. 3. **Background.** In EO 14253, President Trump set the policy of this administration to restore Federal sites dedicated to history to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

Established in 1948, Independence National Historical Park was created to protect the historic places associated with the birth of the American republic, standing as icons of freedom and democratic ideals for people around the world. The centerpiece of the park is Independence Hall, where the Declaration of Independence, the Articles of Confederation, and the United States Constitution were debated. The universal principles of freedom and democracy set forth in these documents are of fundamental importance to American history. Their profound impact on lawmakers around the world was recognized when Independence Hall was inscribed on the UNESCO World Heritage List in 1979. The anniversary of the signing of the Declaration of Independence on July 4, 1776, is celebrated annually as the Nation's birthday. July 4, 2026, will be the 250th anniversary of the signing of the Declaration of Independence.

Recognizing the significance of Independence National Historical Park, and specifically Independence Hall, to America's 250th birthday, in EO 14253, President Trump ordered that sufficient funding be provided, as available, to improve the infrastructure of Independence National Historical Park. He further ordered that these improvements be complete by July 4, 2026.

The Department protects and manages the Nation's natural resources and cultural heritage. Since 1916, the American people have entrusted the National Park Service (NPS) with the responsibility to conserve and interpret some of its most special places—our national parks. In addition to national parks, other Departmental Bureaus and Offices manage important natural and cultural resources contained within national wildlife refuges—managed by the U.S. Fish and Wildlife Service (FWS)—and a variety of important natural and cultural sites on other public lands or similar properties—managed by the Bureau of Land Management (BLM), Bureau of Indian Affairs (BIA), and Bureau of Reclamation (BOR). These areas include national historic landmarks, national scenic and historic trails, and national monuments, which encompass places of historic and cultural significance to America.

Recognizing that the natural and historical resources managed by the Department should accurately reflect American history and not partisan ideology, in EO 14253, President Trump further ordered that the Secretary shall:

a. determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology;

b. take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with applicable law; and

c. take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Sec. 4. **Restoring Independence Hall.** Consistent with EO 14253 and governing laws and regulations, I direct the Director of NPS to:

a. identify any infrastructure improvements, including deferred maintenance and restoration activities, necessary to improve the infrastructure of Independence National Historical Park, including Independence Hall;

b. identify funding needed to complete any such projects or activities; and

c. subject to available funding and consistent with applicable law and authorities, enter into any contracts or other agreements necessary to complete the projects or activities in such time as to allow for sufficient preparation for the celebration of the 250th anniversary of our Nation's birth on July 4, 2026.

Sec. 5. **Restoring Truth in American History.** Consistent with EO 14253 and governing laws and regulations, I direct the heads of NPS, FWS, BLM, BIA, and BOR (collectively: the land management Bureaus), and the relevant Assistant Secretaries, to implement section 4 of EO 14253 as follows:

a. **Review of changed or removed properties.**

1. Within 30 days of the date of this Order, each land management Bureau shall conduct a review to identify any public monuments, memorials, statues, markers, or similar properties (collectively: properties) on lands within its jurisdiction that have been removed or changed from January 1, 2020, through the date of this Order.

   i. The review required by this Order may be conducted by a Bureau-wide data call or other method determined by the relevant Bureau to be the most efficient and cost-effective way to identify properties that have been removed or changed since January 1, 2020.

   ii. This review shall not include properties located on lands held in trust by the United States for an individual Indian or Tribe, or lands held by an individual Indian or Tribe that are subject to Federal restrictions on alienation, except that, to the extent such lands are included within units of the national park system, it shall include NPS properties on such lands.

2. Within 60 days of the date of this Order, each land management Bureau shall provide a report to the relevant Assistant Secretary:

   i. identifying any properties on lands within its jurisdiction that were altered or removed since January 1, 2020, and the date of such alteration or removal;

   ii. describing the nature of the alteration or removal;

   iii. providing the Bureau's reason for the alteration or removal; and

   iv. concluding whether the alteration or removal of each property was made to perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology.

3. If alteration or removal was undertaken because of a reason described in subparagraph iv above, the land management Bureau with jurisdiction

over the property shall immediately undertake such actions as are necessary to reinstate such property, consistent with all applicable laws, regulations, and policies.

b. **Review of properties for inappropriate content.**

1. Within 90 days of the date of this Order, each land management Bureau shall conduct a review of all public monuments, memorials, statues, markers, or similar properties on lands within its jurisdiction to identify whether any such properties contain images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature.

   i. The review required by this Order shall be conducted by inspecting all public-facing content at each property within the jurisdiction of the land management Bureau and shall incorporate any information received from the public via the method described in section 6.

   ii. This review shall not include properties located on lands held in trust by the United States for an individual Indian or Tribe, or lands held by an individual Indian or Tribe that are subject to Federal restrictions on alienation, except that, to the extent such lands are included within units of the national park system, it shall include NPS properties on such lands.

2. Within 120 days of the date of this Order, each land management Bureau shall remove any content meeting the criteria identified in paragraph 1 or otherwise found to be inconsistent with the purposes of EO 14253. The relevant land management Bureau shall then take action to replace the removed content with content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with EO 14253. In developing appropriate content, the land management Bureau shall coordinate with the Office of Communications within the Office of the Secretary.

Sec. 6. **Encouraging Public Participation**. Each land management Bureau shall post signage throughout each property, in as many locations within each property as necessary and appropriate to ensure public awareness, to allow for public input as to the state of the property, its management, and its compliance with this Order. Each such sign shall include a QR code that links to a website managed by the land management Bureau, allowing the user to provide a written entry. Each land management Bureau shall ensure that (1) precautions are taken to ensure the privacy and data security of respondents; (2) the webpage is actively monitored; and (3) any appropriate public input is shared with the relevant official at each land management Bureau property. Each such sign shall include the following message:

(Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features.

Sec. 7. **Effect of the Order.** This Order is intended to improve the internal management of the Department and to ensure implementation of EO 14253. This Order and any resulting reports or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 8. **Expiration Date.** This Order is effective immediately and will remain in effect until it is amended, suspended, or revoked, whichever occurs first.

Secretary of the Interior

Date: MAY 20 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | ) | **Case No. 26-cv-10877** |

**DECLARATION OF ALAN SPEARS**

I, Alan Spears, declare as follows:

1. My name is Charles Alan Spears (but I go by Alan). I am over the age of eighteen. This declaration is based upon my personal knowledge and experience as a 26-year veteran of the National Parks Conservation Association ("NPCA") and the organization's current Senior Director of Cultural Resources. I have also been a member of NPCA for more than a decade. I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. My love of American history began as a youngster and was fostered in the early 1970s when my parents took me to American Civil War battlefields such as Antietam, Gettysburg, and Harpers Ferry. At the time, I was not aware that a federal agency called the National Park Service managed those places. I was simply fascinated by the history those landscapes represented and even then, at that early age, appreciative of the fact that people generations back had decided

to preserve this hallowed ground in perpetuity for the benefit, enjoyment, and inspiration of the public.

3. Gettysburg National Military Park became my favorite destination. After driving up from Washington, D.C., my parents and I would stop at the visitor centers, view the Electric Map, then tour the battlefield. The statues of the men in uniform and holding muskets thrilled me and I used an over-generous allowance to buy books by authors like Bruce Catton to learn more about the battle and the war.

4. Although I loved Gettysburg initially the way a teen boy does, fascinated by the bullets and bayonets, as I began growing up, I wasn't sure that the park was able or willing to accompany me on my journey. I was a young Black man just beginning to develop an understanding of the place and the impact of race in the American narrative. Those cannons and statues started to lose their appeal and relevance to me and my trips to Gettysburg became fewer and farther between.

5. I was fortunate, however, in that the interpretation that the park was offering about the American Civil War seemed to "grow up" with me. Throughout the 1990s the National Park Service, recognizing the need for history that was more accurate and inclusive, began to develop or enhance interpretation about the Civil War that went well beyond the standard weapons and tactics approach that had fascinated me as a child. At Gettysburg that resulted in interpretation that included the story of Abraham Brian, a free Black man whose house and barn were located at the northern end of Cemetery Ridge. Brian, his wife, and their three children left town in June 1863, when news spread that a large Confederate army was headed into south-central Pennsylvania. Brian's wife had made the perilous journey from slavery to freedom years before and both she and her husband well understood that if they remained at Gettysburg and were seen by southern forces,

they might be taken from their home and sold as slaves. After the battle, Brian returned to find his house and barn torn apart by shots and shells. Corpses were strewn across his small farmstead. He petitioned the federal government for a little more than one thousand dollars in compensation. After a lengthy review he received a payment of $15. This was, for one American family, their experience of the Battle of Gettysburg. And learning that a Black family had lived, worked, and thrived at Gettysburg, near the heart of that battlefield, rekindled my love for the park and for the breadth and depth of our history.

6. My love of history took me to Clark University in Massachusetts where I received a B.A. in American history with a concentration in Women's Studies. I followed that degree with production and successful defense of a master's thesis at Howard University in Washington, D.C., writing about the City's race riot of 1919.

7. I joined NPCA as an intern in the summer of 1999, hired by the manager of the organization's Enhancing Cultural Diversity program. I did not know much about national parks or park advocacy but as a student of history finishing up my studies at Howard, I was fascinated to learn that national parks played such a mighty role in the interpretation, management, and preservation of this nation's historic and cultural resources beyond the American Civil War.

8. From 1999 to 2003, I worked for NPCA's Enhancing Cultural Diversity Program, managing the National Parks Community Partners program. The purpose of this initiative was to strengthen the relationship between national park sites and diverse communities in Boston, Washington, D.C., Atlanta, Miami, Los Angeles, and San Francisco. We undertook this work because we understood to ensure the strength of America's national parks, they would need the broadest, most engaged, and active constituency possible. And when this work began in the late 1990s, far too many parks had almost no relationship to people of color including (often) those

who lived within the region or just across the street. The Community Partners held monthly meetings and conferences that brought together Park Service personnel with their peers. We hosted events that made communities more familiar with national parks and less fearful about venturing into them. We helped our Park Service colleagues gain a better understanding of what people of color were looking for in terms of access and relevancy. All this was done in the name of strengthening our national parks and the communities and people they served.

9. In 2004, I joined NPCA's Government Affairs Department. As a program associate and manager, I helped win introduction and passage of the National Park Service National Underground Railroad Network to Freedom Program ("NTF") in 2008. The bill raised the authorized funding limit for the program to $2.5 million per year. This allowed the Park Service staff running the NTF to expand the program and provide additional support to its members working to enhance public knowledge of the fight to resist enslavement through evasion and flight.

10. I also continued the work of connecting national parks to diverse audiences, trumpeting the agency's relevance to the African American experience to members of the Congressional Black Caucus, the NAACP, and the Association for the Study of African American Life & History ("ASALH"). All my contacts, once they learned of the Park Service's role in protecting and interpreting Black history, became more engaged in advocacy to protect national parks. And we were able thus to expand our constituency of park supporters and stewards.

11. I currently serve as the Senior Director for Cultural Resources, a position I've held for the last eight years. In that job I serve as NPCA's resident historian and manage the bulk of our work on new historic and cultural national park designations, our defense of the National Heritage

Area ("NHA") System,[1] and more recently our work opposing the erasure of American history from our national parks.

12. I have led or supported campaigns resulting in the designation of the Fort Monroe (VA), Charles Young-Buffalo Soldiers (OH), Harriet Tubman (MD), Pullman (IL), Birmingham Civil Rights, and Emmett Till and Mamie Till-Mobley (MS-IL) national monuments. In 2022, advocacy by NPCA—which I had the privilege of leading—culminated in the passage of the Heritage Area Act, a piece of bipartisan legislation that established the National Heritage Area System and secured federal funding authorization for all 62 NHAs through the year 2037.

13. Over the course of my 26-year career at NPCA, my writing on American history, cultural resource management, and national park advocacy has appeared in the Civil War Times, National Parks Magazine, Ranger Magazine, and the Park Stewardship Forum. I have presented or moderated panels on American history and national park cultural resource management issues at conferences hosted by the Association for the Study of African American Life & History, the African American Association of Museums ("AAAM"), Nature Forward, American University, Yale University, and the University of Colorado.

14. Awards recognizing my contributions as an advocate, writer, and historian have been numerous, with the most notable being the Robert G. Stanton Award (2022) for "sustained and innovative achievement in promoting racial or ethnic diversity in managing North America's natural, historic, and cultural heritage." Mr. Stanton was the first African American to serve as the director of the National Park Service.

---

[1] National Heritage Areas are "places where historic, cultural, and natural resources combine to form cohesive, nationally important landscapes." Entities in these areas "collaborate with communities to determine how to make heritage relevant to local interests and needs." *Community-Led Conservation and Development*, National Heritage Areas, Nat'l Park Serv., https://perma.cc/W4V4-X7NL (captured March 10, 2026).

15. I am currently a volunteer board member for the George Wright Society. I also serve on the advisory council for the National Women's Suffrage Memorial. I spent 17 years serving as the board chair for the Friends of Kenilworth Aquatic Gardens, a small NPCA site in northeast Washington, D.C., where we managed the site's volunteer recruitment and service process.

**NPCA's Background**

16. In 1919, three years after the Park Service was established by the Organic Act of 1916, a small group of scientists, artists, and civic leaders met at the Cosmos Club in Washington, D.C. They signed articles of incorporation forming a new organization—known then as the National Parks Association—with a mission to educate the American public about the nation's parks and to inspire them to experience and protect them. The association marked its first successful park defense in 1921, opposing and defeating a proposed dam on the Yellowstone River. Later, the association changed its name and became NPCA.

17. Over the years, NPCA has won numerous victories for parks. We have helped protect iconic places—including Glacier, Gettysburg, Great Smoky Mountains, and Grand Canyon—from mining, landfills, coal-fired power plants, and all manner of inappropriate development that threatened park air, water, and wildlife. We have also affirmed our founding principles while working to create a park system more accessible and relevant to all Americans. To that end, in recent years we have worked tirelessly for new park sites—including Pullman National Historic Park in Chicago, Stonewall National Monument in New York, and Belmont-Paul Women's Equality National Monument in Washington D.C.—that helped to tell and enshrine a more complete American story. This often starts by building public and governmental support by explaining the importance of the site and the history that should be preserved.

18. Today, NPCA is a national nonprofit membership organization headquartered in Washington, D.C. We are a leading voice of the American people in protecting and enhancing our National Park System. NPCA has more than 1.9 million members and supporters nationwide and a network of more than two dozen programmatic locations in 11 regions. NPCA and our members and supporters work to protect and preserve the country's most iconic and inspirational places for present and future generations. As part of our work, NPCA advocates to ensure the National Park Service tells stories of all Americans—stories of triumph and of tragedies; stories to celebrate and ones that we have a duty to never forget.

**NPCA's Mission**

19. NPCA's mission is protecting and enhancing America's National Park System for present and future generations, a mission that is closely aligned with the mission of the Park Service itself. The first Park Service Director founded NPCA just three years after the birth of the Park Service because he understood the need for an outside guardian of the parks to hold the agency accountable for fulfilling its mission.

20. To fulfill NPCA's mission, we conduct independent research and develop and provide resources and other tools to support the Park Service. We also engage advocates to defend the parks against environmental threats and ensure that the shared heritage of the parks is protected and tells a more inclusive, complete story of the United States.

21. As part of our effort to ensure future generations are equally committed to preserving the parks, NPCA aims to bring people and parks together by encouraging and facilitating visits to parks through partnerships with local communities, organized campaigns, one-time events, regular publications (including the National Parks Magazine), and overviews and other materials on all individual parks. For instance, NPCA has a Next Generation Advisory

Council that brings together a group of young adults to explore effective methods of engaging younger generations in national park advocacy and protection. There is an annual park trip as part of this program, so that these young advocates can experience new park sites. NPCA has also organized three trips to civil rights sites in Alabama, Mississippi, and Tennessee, where participants visit Park Service-managed sites such as Birmingham Civil Rights, the Medgar and Myrlie Evers Home, and the Emmett Till & Mamie Till-Mobley National Monument. Those trips were managed in collaboration between the senior director for cultural resources (me) and NPCA's southeast regional staff. The trips were designed to heighten public awareness about civil rights history and the role NPCA has played in designating new civil rights sites and fighting for funding to keep these parks in business.

22. NPCA devotes substantial time and resources to ensuring that parks tell the whole history and share accurate scientific information. The Park Service is one of our nation's largest repositories of American history, teaching millions of visitors about a wide variety of stories. The parks are also one of the largest practical science classrooms in the world, where visitors can see science happening before their eyes. There are more than 430 national park sites across the United States, and they all play a part in preserving our country's history and culture. While many Americans regard parks as large, natural landscapes—places such as Yellowstone or the Grand Canyon—in truth smaller historic and cultural sites outnumber their natural counterparts two to one. Further still, every unit in the National Park System has cultural and historic components that are central to its legacy. Simply put, America's national parks have been in the history business since Congress created the agency in 1916.

23. Students and scholars who want to learn about history and science rely on the Park Service's expertise and accurate information. The Park Service has long provided interpretive

materials that lend context to each park site and help visitors connect to their surroundings. In doing so, the Park Service has at its disposal high-quality academic and scientific research, carefully developed over years, to ensure that the information it shares is accurate.

24. In recent years, NPCA has worked to establish and highlight park sites that help enshrine a more complete American story, including by organizing educational trips to some of those sites. For instance, NPCA and its partners advocated for years for the establishment of a national park site to honor Emmett Till, a 14-year-old Chicago native murdered in Mississippi, and his mother, Mamie Till-Mobley, who became a civil rights icon after his death. Since its creation in 2023, I have taken several groups there to learn about the history of civil rights.

25. NPCA's most recent strategic plan, adopted in 2021, sets out our goal of ensuring that national parks tell the stories of all Americans. By enhancing storytelling in our parks, we seek to ensure that national parks represent, welcome, and share a fuller American story with all visitors. This provides greater opportunities for all visitors to enjoy the parks and see themselves represented in the stories told there. And it helps create a new generation of park advocates who will continue to work towards protecting and enhancing the national park system.

26. This strategic plan also sets a goal of ensuring that national parks are managed according to science-based standards for long-term ecological and climate resilience. We want to ensure that parks are managed in a way that allows them to be enjoyed by the public not just now but for generations from now.

27. In recent decades, the Park Service has made tremendous strides toward ensuring that the parks tell the stories of all Americans. Parks—through interpretive displays, multimedia presentations, Junior Ranger booklets, and more—have shared the facts about difficult topics including, among others, slavery, atrocities committed against Indigenous communities, and

climate change. Civil War battlefields have been joined by civil rights sites; space exploration has been tied to the advancement and recognition of women in the workplace; and our founding history has been rightfully linked to the challenges and injustices that the "Founding Fathers" failed to confront. We are all better for learning about the complex nature of our history, and for being able to consider how both our victories and our failures have shaped this country and influence us, and our neighbors, to this day. The parks are strengthened when we can help people understand that the Park System is relevant to them, their families, and their history—especially people who may not otherwise see their stories told. While this work is far from complete, the Park Service has increased the breadth, depth, and diversity of the stories it tells.

28. For example, the parks have made strides toward more fully telling Black stories and history. Newer site designations such as the Birmingham Civil Rights and Medgar and Myrlie Evers Home national monuments, and the creation of public-facing programs such as the National Underground Railroad Network to Freedom, were notable advancements toward capturing a more complete history of the United States, and in turn making our parks more relevant and enjoyable to a wider range of people. Telling this history provides opportunities to learn our nation's story in full context, promotes personal and national healing, and helps us better understand the present.

29. Other parks prioritize telling the stories of the forced removal of Indigenous people from their homelands, or highlight battles endured by Native people. Places such as Sand Creek Massacre National Historic Site in Colorado preserve and protect the cultural landscape of the massacre of the Cheyenne and Arapaho people and enhance public understanding of what took place there. These stories highlight our responsibility as a nation to reconcile with our past.

30. Other parks have emphasized important scientific developments, including by providing information about climate change. National parks are suffering from the devastating

effects of climate change, from melting glaciers to record flooding to disastrous wildfires. Parks are supposed to be protected spaces because of their unique features of natural and cultural history. In many cases, these unique natural features also make the sites uniquely vulnerable to impacts as the climate shifts. Sharing this information with park visitors keeps them informed about challenges facing the parks, and it helps ensure that these resources are protected for future generations.

**The Secretary's Order Impairs NPCA's Mission**

31. The Secretary's Order, and the censorship it imposes, threatens all this progress and frustrates NPCA's mission. After issuance of the Executive Order and the Secretary's Order, Park Service staff were required to submit reports in July 2025 describing interpretive materials that needed to be changed to come into compliance with the orders. In the following months, Park Service leaders notified certain parks of their "non-compliance" with the Secretary's Order—without explaining how to come into compliance. Park Service staff have also been informed that all new public-facing content must be submitted to the Interior Department for review.

32. Over the past several months, the Park Service has identified for removal and begun removing hundreds of signs and other interpretive materials pursuant to the Secretary's Order. These removals target materials that detail the historical contributions of historically marginalized groups, describe atrocities perpetrated against certain communities, and explain the long-term impact of scientific developments, including the effects of climate change. While some removals—such as the exhibit at the President's House in Philadelphia—have been widely reported, others have happened quietly and may be fully recognized only when the parks reopen for the summer season. In March 2026, the Washington Post ran an article explaining that hundreds of interpretive displays and materials have been flagged for removal since last summer. That

article, and others published in the New York Times and elsewhere, are consistent with my understanding about sign flaggings and especially removals.

33. We expect that the Park Service will continue to effectuate removals pursuant to the Secretary's Order, and that the same kinds of materials as those described in those articles will continue to be targeted.

34. The Secretary's Order impedes NPCA's years' long work in this area and instead moves the park system in the opposite direction. In the past, NPCA has known that its members who visit park sites would be exposed to historical and scientific interpretation that reflects the diversity of the United States and its people. We have made efforts to attract new audiences to national parks by showing them that they and their experiences are represented. As Defendants further implement the Secretary's Order and remove accurate information about our history and diverse populations, that will become increasingly difficult and eventually impossible.

35. As the country's largest organization with a mission squarely focused on preserving national parks, NPCA has also frequently collaborated with the Park Service through formal programming and resource protection and as a thought partner considering how to ensure the parks tell a more complete history. For instance, in service of its mission to "enhance" the national parks, NPCA played an instrumental role in Congress's adopting, in the Centennial Act, the requirement that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "reflect current scientific and academic research, content, methods, and audience analysis." And since 2012 alone, NPCA has worked to help create and expand more than 25 national park sites focused on telling diverse stories, including the Stonewall National Monument honoring LGBTQ+ history, the Birmingham Civil Rights National Monument and Medgar and Myrlie Evers Home National Monument honoring the history of the civil rights movement and its

leaders, and the Belmont-Paul Women's Equality National Monument honoring the history of women's suffrage.

36. NPCA's collaborations with the Park Service, and Friends groups, are now in danger based on the Secretary's Order. Implementation of the Order has directly threatened the interpretive materials that explain the very reason NPCA fought to and succeeded at establishing these sites. For instance, NPCA has worked with our partners at the Emmett Till Interpretive Center to ensure the legacies of Emmett Till and Mamie Till-Mobley are respectfully and appropriately preserved. According to reporting in the Washington Post article, exhibits from this site have been flagged, even though the park's staff correctly warned that removal of the exhibits would leave the site "completely devoid of interpretation."

37. The Secretary's Order and its implementation deprive visitors of the full picture of history and the natural landscape that they deserve at the parks. The censorship resulting from the Order makes it much more difficult for park visitors to form emotional, and intellectual, connections with their surroundings. It means there will be fewer opportunities for this generation, and future generations, to enjoy the parks and to access comprehensive historical and scientific information there. And it means that fewer people will see themselves represented in the parks, despite all of NPCA's efforts to make that happen.

38. The Secretary's Order and the resulting removals also undermine the Park Service's mission to share complete and accurate history. It is impossible to tell the full history of our country, and explain the relevance of specific park sites, if information is removed whenever it does not conform to the administration's preferred viewpoint.

39. Visitors also no longer have access to information about the effects of environmental developments on park land, including the effects of climate change. That

information is important because it informs the public about environmental challenges or risks that certain parks are facing.

40. Indeed, this censorship is deeply unpopular with the public. The Park Service received hundreds of comments from the public denouncing the Order's censorship. A poll commissioned by NPCA indicated that more than three in four Americans (78%) agree that national parks should not remove photos, signs, or other materials that tell factual aspects of America's history.[2]

41. Already, NPCA has diverted resources from other programs and efforts to address the effects of the Secretary's Order by tracking sign removals, educating members of Congress and other policymakers and partners about the fact and effect of censorship in the parks, and working to build awareness and transparency around the Secretary's Order and its implementation. I have personally devoted considerable time—including time I would otherwise spend working to make the parks more inclusive—to understanding the effects of the Secretary's Order and educating policymakers about it, and I have written several articles and testified before Congress on the subject.[3] For instance, we largely had to abandon a cultural resource challenge, which had the objective of getting Congress to appropriate $250 million for Park Service cultural resources. We have also had to divert time from new park designation campaigns, most notably for me the potential designation of the Julius Rosenwald and Rosenwald Schools National Historical Park to

---

[2] *Nobody Wants This: New Poll Finds Majority of Americans Oppose Attacks on National Parks and Park Staff*, Nat'l Parks Conservation Ass'n (Nov. 12, 2025), https://perma.cc/XVD3-MKLJ.
[3] See, for example, Alan Spears, *Hands Off Our History*, Nat'l Parks Conservation Ass'n, May 27, 2025, https://perma.cc/CHL3-5CK6; Alan Spears and Kristen Brengel, *Here Today, Gone Tomorrow*, Nat'l Parks Conservation Ass'n, Feb. 5, 2026, https://perma.cc/4DGH-8KB9; *Testimony of Alan Spears for the oversight hearing "All in for America250: Public-Private Partnerships Supporting America's Semiquincentennial on our Public Lands"* (Feb. 10, 2026), https://perma.cc/4SML-AF9X; Alan Spears, *To Tell the Truth* (Winter 2026), https://perma.cc/9F5H-4DQS;

focus on preventing erasure at existing sites. Instead of being able to push to make the park system more inclusive and historically accurate, NPCA has had to pivot to prevent erasure of history and science that was reflected in the parks because of hard fought victories by NPCA and our partners.

**The Secretary's Order Has Harmed NPCA's Members in a Number of Ways**

42. The Secretary's Order has harmed our members as well. Many of our members regularly visit, study, work, photograph, or recreate at Park Service sites. When they visit the parks, they seek honest, authentic experiences, information, and education—not censorship. They come to learn about accurate and more complete American history and science. They expect the parks to serve as a classroom for themselves and their families. For example, one of our members, Jennifer Goepfert, read an article in our award-winning National Parks magazine that inspired her to take her daughters on a yearlong, nationwide tour of the parks to enhance their education.

43. The censorship imposed by the Secretary's Order deeply harms our members' informational, recreational, scientific, and educational interests. The park experiences for our members are degraded by the removal of interpretive materials that previously provided complete and accurate historical and scientific information. I am aware from many of our members, including Jennifer, that they can no longer rely on the parks to provide the same kind of educational and recreational experiences they previously enjoyed there because of this censorship.

44. NPCA has worked diligently to assure the public, especially non-traditional constituents from diverse racial and ethnic backgrounds, that national parks are places where their stories will be reflected honestly and in accurate, inclusive, and respectful ways. The recent removals of interpretation—including about Indigenous history at Little Big Horn and the installation describing the stories of the enslaved men and women who served President George Washington—have substantially undermined public confidence in the Park Service's commitment

to interpreting history that reflects all of our stories. I am concerned it will lead to members and the general public being less interested in visiting certain sites, which in turn undermines our mission and our ability to preserve the parks for generations to come.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Washington, D.C.
Dated: March 11, 2026

Charles Alan Spears

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Case No. 26-cv-10877** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF CYBELLE JONES**

I, Cybelle Jones, declare as follows:

1. My name is Cybelle Jones. I am over the age of eighteen. This declaration is based upon my personal knowledge and experience as Chief Executive Officer of the Society for Experiential Graphic Design ("SEGD"). I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. I joined SEGD in 2006, served as a board member until 2012, and became its CEO in 2020. I first joined SEGD because I was looking for a community of peers working in exhibition and interpretive design. SEGD stood out as the only professional organization supporting individuals in this field and providing resources for design excellence—from research and inspiration to practical tools such as ADA white papers and best practices for interpretive signage, accessibility, and experience design.

3. Prior to becoming CEO, I spent more than 25 years at Gallagher & Associates as a Principal and Executive Director, leading exhibition and interpretive design projects for many of

the nation's most significant cultural institutions. My work includes projects for the Smithsonian National Museum of Natural History (Sant Ocean Hall and the Geology, Gems and Minerals Hall), the National Archives including the historic vaults, and multiple presidential libraries including the Ronald Reagan and Jimmy Carter Presidential Libraries. I also led projects for the National Park Service including Gettysburg National Military Park and Museum, the Flight 93 National Memorial Visitor Center, and the White House Visitor Center. Additional projects include the National WWII Museum, the International Spy Museum, the U.S. Olympic and Paralympic Museum, the National Center for Civil and Human Rights, the Capitol Visitor Center, and the Normandy American Cemetery Visitor Center for the American Battle Monuments Commission.

4. These projects reflect a career focused on translating complex history, science, and civic narratives into meaningful public experiences that connect people to place. Much of my professional work has involved collaborating with historians, scientists, educators, and federal cultural institutions to develop interpretive experiences grounded in rigorous research and public scholarship.

5. I currently serve on the board of the National Cold War Center. I received the SEGD Distinguished Member Award in 2014 and the Distinguished Star Award from the Fashion Institute of Technology's Graduate Exhibition Design program in 2015. My work on the International Spy Museum was also recognized by the American Institute of Architects.

6. I am a frequent speaker on museum innovation, visitor experience, and the role of design in shaping inclusive cultural spaces. I have presented at the American Alliance of Museums, the Victoria & Albert Museum, MuseumNext, and the Building Museums Symposium. I have also served as an adjunct professor at George Washington University and as a critic for the graduate Exhibition Design program at the Fashion Institute of Technology. I regularly contribute to

professional discussions on best practices in exhibition and interpretive design through podcasts and public forums, including *Making the Museum*, *Matters of Experience*, and *Branders Magazine*.

7. As CEO of SEGD, I lead the organization's strategy, operations, and advocacy efforts to advance the field of experiential graphic design. I oversee SEGD's membership community, conferences, research, publications, and professional development programs, many of which focus on best practices in exhibition design, interpretation, accessibility, visitor engagement, and public storytelling. SEGD also develops and disseminates professional guidance and research that inform best practices in interpretive and experiential design. I work closely with SEGD's board of directors, cultural institutions, and industry leaders to promote design practices that help museums, national parks, and other public institutions communicate history, science, and cultural narratives in ways that are accurate, accessible, and engaging for the public.

**SEGD's Background**

8. Founded in 1973, SEGD is a 501(c)(3) nonprofit organization composed of approximately 2,000 graphic and exhibition designers, fabricators, architects, media developers, creative technologists, students, and educators, who all share the common motivation of connecting people to place.

9. SEGD's members interpret complex concepts into understandable language to create, among other things, the wayfinding exhibits, interpretive panels, and other displays seen at national parks, museums, visitor centers, and countless other sites across the United States. Through our platform, core to our mission and values, SEGD strives to make spaces and environments more inclusive and intuitive, emotive and engaging, sustainable and shared. SEGD is headquartered in Washington, D.C.

10. Since SEGD's founding, we have represented the pinnacle of design for the built environment. For more than 50 years, the design work of SEGD's members has had an indelible influence on the ways that people move through and understand the world. Our members have contributed to and collaborated on a wide array of projects, including the 1984 Los Angeles Olympics, the Holocaust Memorial Museum, and the U.S. Olympic & Paralympic Museum. In 1993, SEGD published the first ADA White Paper on accessible wayfinding, setting the standard for understanding and interpreting federal guidelines for design that is inclusive of people with disabilities. In 2011, an SEGD member crafted a new wayfinding signage program for the National Mall in Washington, D.C., with more than 500 signs and maps guiding visitors to 50 museums, monuments, and memorials.

**SEGD's Mission**

11. SEGD's mission is to enrich the human experience by making physical environments more inclusive, accessible, and meaningful, and by connecting people to place. We do that by supporting experiential graphic designers as they work to ensure that design—including interpretive exhibits and wayfinding at national parks—helps people understand history, culture, science, and the environment in ways that are clear, inclusive, and truthful.

12. As a professional association for experiential and interpretive design, we provide networking opportunities, education, training, and professional standards that guide how complex stories are responsibly translated into accessible public experiences.

13. SEGD spends substantial time producing educational content and programming for our members, in order to give them tools to advance their practice and connect people to place. For example, we produce a weekly newsletter for our members. We also provide in person

symposiums, chapter events, online webinars, content via our website, white papers and professional development through case studies and our global design award publications.

14. Our content and programming emphasizes our core values, including the importance of diversity, sustainability, and accessibility. We provide our members with content that focuses on how to engage communities through design, and how to do so in ways that support people of all backgrounds and ethnicities, so that the design experience is open to everyone.

15. In 2020, for example, SEGD formed our first-ever Racial Justice Commission. The Commission's mission is to advance racial justice within both SEGD and the field of experiential graphic design. The Commission serves as an advisory group and provides guidance to committees, chapters, and staff. Its work recognizes that, for experiential designers, connecting people to place requires creating experiences that are inherently inclusive. Through the Commission, SEGD has worked to diversify the design profession and to reduce barriers to make content more accessible. The Commission is thus part of SEGD's broader efforts to help support members in telling complete stories and promoting core values of diversity and inclusion.

16. Through the Commission, SEGD has implemented several initiatives to expand representation and promote inclusive design practices across the organization and the profession. These efforts include a commitment to increase representation of BIPOC designers and projects in SEGD's outward-facing communication. SEGD has also produced content aligned with cultural observances such as Black History Month, Hispanic Heritage Month, and Women's History Month to elevate diverse voices within the design community. The Commission also helps guide SEGD's programming and events in the hope that presenters and moderators ultimately become more reflective of the diversity of the communities designers serve. In addition, the Commission has

encouraged programming and professional discussions that address racial equity and inclusion within the design field.

17. The Commission has supported the development of educational programming and professional discussions on these topics, including sessions such as *People and Ideas: Diversifying Design*, *Decolonizing Design*, and workshops focused on inclusive design practices and community engagement. More broadly, SEGD has incorporated discussions on inclusion, accessibility, and community representation into many of its conferences, symposiums, and educational webinars.

18. SEGD is extremely focused on whose history we are telling and how we are telling it. We offer talks and webinars that discuss how to bring the community with ties to a particular place into the storytelling process. These talks often focus on how to provide space and time when telling the history of a place, and how to decide what to devote attention to and prioritize. For example, SEGD has featured the award-winning project *Up From the People: Protest and Change in D.C.* as a case study in symposium talks and tours. The project explores the history of protest and civic change in Washington, D.C., and the programming highlighted how the design team worked with local stakeholders and historians to interpret history in the public realm.

19. SEGD has also highlighted and promoted the project *Destination Crenshaw: Immortalizing Black Los Angeles Along Crenshaw Boulevard*, a major community-centered public art and interpretive landscape initiative in Los Angeles. The project team was featured in SEGD programming and publications, including a presentation at SEGD's 2022 symposium in Santa Monica, where designers discussed how community engagement informed the interpretation of Black history and culture along this historic corridor.

20. In particular, SEGD members have played a critical role in shaping how visitors engage with and encounter history, science, and all messages across national parks. Developing any one exhibit panel or interpretive sign in a park often takes months or even years of research, peer review, and coordination among historians, scientists, educators, interpretive planners, and accessibility experts. Through careful and inclusive design choices, our members have helped communities tell difficult truths and share previously untold histories. These efforts help fulfill SEGD's mission to connect people to place.

21. Previously, the Park Service has been committed to telling the whole history and accurate science, which both are crucial to SEGD's mission of connecting people to place. As a result, our members engaged in extensive vetting of content that ultimately was shared in the parks to ensure it was as accurate as possible based on available high quality academic and scientific research. For example, I personally served as the lead creative director on the redevelopment of the Gettysburg National Military Park Museum and Visitor Center, which opened in 2008. As part of that project, we conducted public surveys, forums, and more than a dozen workshops with National Park Service rangers and interpreters, local educators, national historians, and specialists from the National Park Service's Harpers Ferry Center. That process revealed that many visitors did not connect the Battle of Gettysburg to the central role of slavery or to the broader consequences of the Civil War. The resulting interpretive approach broadened the narrative beyond battlefield tactics to address the causes of the war and examine both what the war resolved and what it did not. In developing the project, we worked closely with National Park Service staff and followed the Park Service's interpretive guidance, accessibility standards, and management policies to ensure the content was historically accurate and consistent with the Park Service's

mission. The project has since been widely cited as an example of the National Park Service's leadership in establishing rigorous standards for historically accurate public interpretation.

22. That project, and other similar ones that our members contribute to, focus on ensuring that as one of the main conduits for storytelling in the parks, we are expressing multiple points of view—rather than just a narrow conception of history—and that we are engaged with the communities whose own experiences we are trying to capture and chronicle. SEGD and its members have thus developed expertise in how to engage communities and tell the whole history, balancing the nuances of telling complex stories in an accessible way.

23. In addition, the Park Service has long established professional standards for research-based interpretive planning and public communication.[1] Processes that comply with these standards are generally highly collaborative, and may involve writers, historians, scientists, and curators, among others, all working toward the shared goal of design excellence and producing materials that are accessible and captivating for the audience. The Park Service's practices have been closely aligned with SEGD's mission to enrich the human experience by making physical environments—including parks—more inclusive, accessible, and meaningful.

**The Secretary's Order Impairs SEGD's Mission**

24. In the past, SEGD has been able to rely on the Park Service's commitment to rigorous, scholarship-driven interpretation as consistent with our own professional values. To that end, SEGD's programming and resources have benefited many of our members who provide the Park Service with interpretive wayfinding and exhibition design. These efforts fulfilled both our

---

[1] For some examples of Park Service guidance and standards, see *Wayside Exhibits: A Guide to Developing Outdoor Interpretive Exhibits*, Nat'l Park Serv. (Oct. 2009), https://perma.cc/GS86-2N8P; *Harpers Ferry Center for Media Services*, Nat'l Park Serv., https://perma.cc/7UN8-TXW9; *Planning for Interpretation and Visitor Experience*, Division of Interpretive Planning, Harpers Ferry Center (1998), https://perma.cc/5BTR-NSG4.

own mission and the Congressional mandate that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "current scientific and academic research, content, and methods."

25. SEGD has also devoted substantial time and effort to developing best practices related to historic and scientific interpretation. For decades, SEGD has convened designers, museum professionals, educators, interpreters and subject-matter experts to discuss how complex historical, cultural, and scientific information can be communicated clearly and responsibly in public environments. Through conferences, symposiums, professional practice groups, and publications, SEGD highlights case studies and research on interpretive design in settings such as museums, cultural institutions, parks, campuses, and other civic spaces.

26. Similarly, we develop educational content and programming for our members, all geared toward the goal of ensuring interpretive wayfinding, signage, and exhibitions are welcoming, accessible, and understandable to broad audiences. These efforts include:

- A weekly newsletter sharing research, case studies, and emerging ideas in experiential design;
- Four annual in-person symposiums focused on areas of practice such as wayfinding and placemaking, branded environments, exhibition and experience design, and digital media;
- An annual SEGD Conference Experience attended by more than 600 professionals;
- A two-day Academic Summit webinar series addressing issues such as racial justice, equity, sustainability, and evolving approaches to interpretation; and
- More than 100 chapter-led events each year that provide opportunities for peer learning, mentorship, and professional exchange.

SEGD also provides members with professional tools and resources to support their work in interpretive environments. These include the peer-reviewed *Communication + Place* academic journal, the annual SEGD Awards publication highlighting exemplary interpretive projects, white papers and best-practice guidelines on accessible wayfinding and inclusive environments, and three Professional Practice Groups focused on Wayfinding and Experiential Graphics, Museum Exhibition Design, and Digital and Interactive Media.

27. These educational programs and resources help SEGD members—including those who work on projects within the national parks and other cultural landmarks—develop the skills needed to communicate historical and scientific information accurately and responsibly. In professional discussions and educational programming, SEGD members frequently reference the National Park Service as an important model for high-quality public interpretation. Designers in our field have long looked to the National Park Service's interpretive standards, and the accessibility and interpretive guidelines developed by the Harpers Ferry Center, as leading examples of how interpretive signage and exhibits can responsibly connect visitors to the history, science, and cultural significance of place.

28. Now, however, the Secretary's Order has frustrated SEGD's mission. Because of the Order, the Park Service is censoring the very type of interpretive design—that is, design that is inclusive and accessible—that our mission demands. As a result, SEGD is caught between abandoning our mission and our vision and abandoning our members who rely on contracts with the Park Service for their livelihood. The Secretary's Order and its implementation have thus dramatically undermined and interfered with our work to make the built environment more inclusive and intuitive, emotive and engaging, sustainable and shared.

29. The Secretary's Order has also frustrated our efforts to advance the progress of our profession through best practices around interpretation. For decades, we have devoted our efforts to developing strategies for model historical and scientific interpretation. As a result of the Secretary's Order, the Park Service and the Department of Interior have disregarded those strategies altogether, and the Park Service has censored history and science without any regard for standards it is required by statute to follow. That directly harms our mission, not to mention the progress of our profession—the core values that we and our members embrace—and undoes the work SEGD and our members have put so much time toward.

30. In order to respond to and combat the Secretary's Order, SEGD has had to divert time and resources away from activities we would otherwise be pursuing. These efforts have included coordinating with partner organizations, communicating with members about the potential implications of the Order, and reviewing SEGD programming and educational materials to ensure that members can continue to participate safely in professional development activities. We have also had to devote staff and leadership time to responding to member concerns and adapting programming so that professionals working in government or federally affiliated institutions feel able to participate in professional development and volunteer activities. As a result, SEGD has had to spend less time on certain core activities, including the development of new educational programming, member services, and research initiatives related to experiential design and interpretation.

31. The Order has also had a chilling effect on participation in certain professional discussions within SEGD's community. Some members who work in public institutions have expressed concern about participating in programs related to topics such as equity, inclusion, sustainability, and interpretation. In response, SEGD has had to modify how certain educational

programs are framed, limit recording or public distribution of some discussions, and devote additional time to ensuring that members can participate in professional exchanges without fear that their participation could affect their employment.

32. SEGD has also received inquiries from members asking how the organization can support peers working in institutions most directly affected by the Order, including professionals working with or within the National Park Service, who may not feel able to speak publicly about these issues themselves. Responding to these concerns has required additional staff and leadership time and has further diverted SEGD's resources from its regular programming and educational activities.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Washington, D.C.
Dated: March 11, 2026

Cybelle Jones

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants. | ) | **Case No. 26-cv-10877** |

**<u>DECLARATION OF DONNA GRAVES</u>**

I, Donna Graves, declare as follows:

1. My name is Donna Graves. I am over the age of eighteen. This declaration is based upon my personal knowledge as a public historian and member of the American Association of State and Local History ("AASLH"). I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. I am an independent public historian and urban planner based in Berkeley, California. I hold an M.A. in Urban Planning from the University of California, Los Angeles, and a B.A. in American Studies from the University of California, Santa Cruz. In addition to being a member of AASLH, I am also an advisor to the National Trust for Historic Preservation and serve on the Board of Directors for the National Council for Public History. Throughout my career, I have received several awards and recognitions for my work, including a Fulbright Specialist Award, the Vernacular Architecture Forum's first Advocacy Award, the California Preservation

Foundation's Excellence in Historic Preservation Award, the California Governor's Historic Preservation Award, the Environmental Design Research/Places Research Award, the National Park Service's Home Front Award, and a Loeb Fellowship from Harvard University's Graduate School of Design. My work has been published in scholarly and professional journals and I have lectured widely on new approaches to documenting and interpreting places that matter to communities.

3. My passion has always been public history, a subset of the historical profession dedicated to sharing the past with broader audiences. Unlike traditional academic historians who focus their work on original research and publishing scholarly texts, public historians work to make history accessible and meaningful to the public at large. Just to name a few functions, public historians research and write the information on interpretive signs at public parks, produce exhibits at museums, archive historical materials for public access, organize public events and programs, and identify and nominate historical sites for preservation by local, state, or federal governments.

4. Public historians often specialize in particular kinds of history. My focus has been on public history projects that emphasize social equity and connecting people to places with rich stories. I am a mission-driven public historian, devoted to telling a fuller and more inclusive history of places that centers people and events that have been erased by dominant narratives in historical interpretation. Historical interpretation is not static; the field of history evolves, reflecting the themes and narratives that a given population finds important at the time. For too long, historians and historical institutions paid little, if any, attention to the histories of marginalized people, including women, workers, LGBTQ+, Black, Asian, Latinx, and Native American people. Over time, historians and historical institutions, including the National Park Service, began to account for these blind spots and to create a fuller and more inclusive record of our past. My specialty in

public history was particularly useful in documenting and telling these stories that were once omitted.

5. I was a public historian for nearly four decades and worked with the Park Service for over 25 years. But, because of the Secretary's Order, I was forced into early retirement in 2025.

**My Work for the National Park Service**

6. Public historians can work with the Park Service in a number of ways. In my experience, the Park Service will often put out a call for historians to work on historical research about specific topics or interpretation of specific park sites and public historians will contract with the Park Service directly. Other times, a nonprofit intermediary (such as the Organization of American Historians or the National Council on Public History) will contract with the Park Service, which provides partial or complete funding for the project, and will then subcontract with public historians like myself to generate the historical research that informs the Park Service. Sometimes projects are completely funded by third parties, like local governments and nonprofits, but are nevertheless accepted and utilized by the Park Service. Less often, public historians will develop a passion project on their own and propose it to the Park Service for eventual funding and implementation. Over my career, I have worked with the Park Service in all of the aforementioned ways.

7. The work public historians provide to the Park Service is also varied. Public historians can often be central to identifying a historical site to begin with, and then providing the research underlying a nomination to the National Register of Historic Places or a campaign to turn it into a park site via an act of Congress or a presidential proclamation. Public historians often contribute to National Historic Landmark Theme Studies, which are Park Service documents that examine a national historic context through specific topics in American history or prehistory so

that national significance may be evaluated for recognized historic properties.[1] Public historians are also often consulted on the "Foundation Document" for a park, which sets out the guiding principles and significance of the site, often including a section on "Interpretation" that will detail the historical lessons to be drawn from the park sites. Public historians also often supply the research and writing behind the interpretive materials at park sites—including brochures, signs, waysides, exhibits, and films—in coordination with other professionals and Park Service staff. Additionally, public historians can participate in producing interpretive materials, publications, and talks that the Park Service will host or display at events or on their websites. I have provided all of these kinds of services to the Park Service over my career.

8. In my work with the Park Service, I also often engaged in a rigorous consultation process for historical interpretation. For example, it was typical over the course of my work with the Park Service to consult with scholarly experts on a topic, to interview people who were affected and alive at the time of the historical events I wrote about, and to have public meetings with local affected communities for input and comment about new interpretive materials. These processes were essential to my work to provide the whole, accurate history of the people and places I study and to produce work that is meaningful and relevant to audiences. I adopted this collaborative approach across the 25 years I worked on projects with the Park Service.

9. From 1999 to 2009, I played an instrumental role in conceptualizing, initiating, and developing the Rosie the Riveter/WWII Home Front National Historic Park ("RORI")—a new national park dedicated to the diverse social history of the World War II home front in Richmond, California. I had served as the project director for the City of Richmond's Rosie the Riveter Memorial, the first national monument to women's contributions to the WWII home front. That

[1] National Park Service, *National Historic Landmark: Theme Studies*, https://perma.cc/G4V8-ZUA7 (captured Mar. 10, 2026).

project catalyzed Park Service planning staff to visit Richmond and to realize that there were no park units dedicated to this important part of U.S. history. I worked with Park Service and City staff to produce a "Feasibility Study" framing the new park that was used to gain congressional approval for RORI. The park tells the history of the diverse groups that converged in Richmond during the war to build ships for FDR's "Arsenal of Democracy," including women, Black, Latinx, Asian Americans, and LGBTQ+ people, and their long-term impact on the social fabric of the Bay Area. RORI has been my passion project for decades and, over the years, I have provided the planning and historical research underpinning many of the park's exhibits, films, and signs. This project has been funded by a variety of sources, including the Park Service.

10. From 2002 to 2004, I was responsible for securing a $500,000 grant to the City of Richmond that supported initial planning, development, research and interpretation for RORI. The funds allowed us to initiate a collaboration between the National Park Service and UC Berkeley Bancroft Library's Oral History Program that documented the home front through interviews that resulted in over 250 oral histories. The oral histories we collected are used in the National Park Service's Visitor Education Center at the Rosie the Riveter/World War II Homefront National Historic Park and the Bancroft Library and available online in transcript — and when possible — with videos synced to transcripts.

11. From 2002 to 2004, I directed research on a project documenting the experiences, during World War II, of Japanese Americans and Italian Americans, who were targeted by the United States government. Members of both communities in Richmond were affected by wartime policies that deemed those who were not yet U.S. citizens as "enemy aliens" and restricted their lives and civil rights. This research informed a permanent outdoor interpretive marker for RORI, a temporary exhibit with the City of Richmond, and later, a film, "Blossoms & Thorns: A

Community Uprooted," that has been, and still is as far as I know, screened regularly at the RORI visitor center. The research also informed the visitor center's permanent exhibits; during the exhibit development, a survey of potential visitors had revealed that the experiences of Japanese Americans during WWII was an area of high interest.

12. From 2003 to 2004, with National Park Service funding, I researched and wrote "Mapping Richmond's Home Front," a historical report to inform RORI planning and interpretation. This was a broad study that identified themes and sites that expanded the stories RORI could encompass beyond the former shipyards at the waterfront. It includes aspects of daily life such as schools, civil defense, housing, community organizations, municipal programs, religious and cultural practices. The findings of "Mapping Richmond's Home Front" helped to shape Park planning and interpretation and is still frequently consulted by Park Staff and researchers.

13. From 2003 to 2004, I initiated and served as a lead historian on a study of Japanese American flower nurseries in Richmond that has informed RORI planning and interpretation. This project documents the story of the Japanese American community in Richmond that cultivated flower nurseries for decades until their forced relocation and incarceration during World War II, and their efforts to rebuild their community and businesses after the war. This research informed Park interpretation as well as the location and content of a series of interpretive markers that are completed but have not yet been installed. These markers were funded by the City of Richmond and by a grant from the Park Service's Japanese American Confinement Sites program.

14. From 2003 to 2004, I was the lead historian and planner for a series of interpretive markers for RORI along the San Francisco Bay Trail. This project was designed as the first interpretive program for the new national park. Eight large sculptural markers positioned along the

Bay Trail share a variety of Home Front themes expanding on the history presented by the nearby Rosie the Riveter Memorial. Panels describe how the coastline was reshaped to support shipbuilding; the wartime migration of tens of thousands of Americans for defense work; unity, as well as segregation, on the home front; and forms of recreation workers found after their shifts. These markers are included, and labeled, as Park Service interpretation, and continue to provide interpretation for RORI to Richmond residents and visitors

15. From 2004 to 2005, I was the primary historian on a study of World War II worker housing in Richmond to inform RORI planning and interpretation. The project included oral history interviews and essays that describe the explosion of Richmond's population during the war, which created a housing crisis leading the city to partner with the federal government to build over 23,000 units of housing. Documentation of the planning, design, construction and implementation of this housing program illuminated many aspects of home front society that are reflected in interpretation at RORI.

16. From 2007 to 2009, I was the lead historian and planner for a series of interpretive markers for RORI along Richmond's historic main street. Themes included the experience of newcomers to Richmond, the importance of downtown commercial and gathering spaces, and the trajectory of Richmond's urban core, including instances of civil unrest and racial violence, in the aftermath of WWII. These markers are included, and labeled, as Park Service interpretation, and continue to provide interpretation for RORI to Richmond residents and visitors

17. From 2008 to 2011, I was the lead historian for a study of downtown Richmond to identify resources in the city's historic core, especially those that could expand preservation and interpretation for RORI. Project PRISM (Preserve Richmond to Interpret and Support Memories)

was funded by a Park Service Preserve America grant. The document has been an important guide to planning and preservation in Richmond.

18. In 2012, I organized a two-day symposium in San Francisco titled "Multiple Views: California's Diverse Heritage Honored, Revisited, and Reimagined." Hosted by the National Park Service, California Office of Historic Preservation, and the California Historical Society, this gathering brought national cultural heritage professionals, historians, and community leaders together to envision how the boundaries of historic preservation practice could be reshaped to create a more inclusive methodology and public narrative of place and memory. Our focus was on the continuing gap between California's remarkably diverse histories and our formal heritage programs.

19. From 2011 to 2013, I served as a content specialist on the exhibit design team for the RORI National Park Visitor Center, a 12,450 square foot historic building that reopened in 2014. This is the main point of contact for visitors to RORI and houses exhibits, films, and programs that convey the complex history of the WWII home front.

20. In 2013, I served on the advisory committee for the Asian American and Pacific Islander National Historic Landmarks Theme Study, funded by the National Park Service. Advisors helped the Park Service frame key topics and questions guiding the study and recommended authors for specific themes. The final theme study, "Finding a Path Forward: Asian American Pacific Islander National Historic Landmark Theme Study" (2017), compiles a collection of essays from various historians that advance the Park Service's ability to incorporate AAPI history into national park units and the national preservation program sites. The full report is still posted on the Park Service website.[2]

---

[2] National Park Service, *Asian and Pacific Islander Heritage Theme Studies*, https://perma.cc/C452-HXZS (captured Mar. 8, 2026).

21. From 2015 to 2016, I initiated and developed an exhibit on LGBTQ+ history at RORI using funding from the Park Service. I supplied the research and writing behind interpretive panels that detail the nexus between LGBTQ+ history and World War II. At that time, San Francisco became a welcoming place for many military members and others in the defense industry who settled here and helped make the Bay Area the "gay mecca" it's been ever since. I believe it is the first LGBTQ+ exhibit at a national park.

22. In 2016, I was the co-author for a chapter on San Francisco for the Park Service's LGBTQ+ National Theme Study. This essay drew from research I conducted for the City of San Francisco LGBTQ+ Historic Context Statement and focused on the history of the LGBTQ+ community in San Francisco from the Gold Rush to contemporary times. The full National Theme Study was published in 2016 and available on the Park Service website until it was removed in 2025.[3]

23. As a part of the Park Service's LGBTQ+ Theme Study, I researched and developed a nomination to the National Register of Historic Places for the San Francisco Women's Building. The cultural resource staff at the Park Service's Washington Office consulted with me on possible locations rich with LGBTQ+ history that could be nominated as National Historic Landmarks or to the National Register for Historic Places and be included in the LGBTQ+ Theme Study. Through my work on LGBTQ+ history in the Bay Area, I became acquainted with the San Francisco Women's Building: a four-story historic building in San Francisco's Mission District that was transformed in 1979 as a place where campaigns for women's rights were linked to

[3] National Park Service, *LGBTQ Heritage Theme Study*, https://web.archive.org/web/20250219030720/https://www.nps.gov/subjects/tellingallamericansstories/lgbtqthemestudy.htm (captured Feb. 19, 2025 by WayBackMachine prior to removal in February 2025); *see also* National Park Service, *LGBTQ America: A Theme Study on Lesbian, Gay, Bisexual, Transgender and Queer History*, (2016) https://perma.cc/FS7W-LX9R (original report preserved by the National Park Service History Electronic Library and Archive).

struggles by other marginalized communities. My work on a landmark nomination focused on highlighting its important role in Second-wave feminism and the LGBTQ+ movement and addressing the connections among and between the politics of gender, race, class, immigration, and sexuality from the 1970s to the present. Through my efforts, I was successful in securing its listing on the National Register and inclusion in the LGBTQ+ Theme Study.

24. From 2017 to 2019, I was the lead historian for the National Register for Historic Places nomination for the San Francisco Japanese Young Women's Christian Association ("YWCA") Building, which was fully funded by the Park Service's Underrepresented Communities Grant Fund. Earlier work for the City of San Francisco conducting a study of Japantown brought me into contact with community members who urged preservation of the YWCA. The building, also known as the Issei Women's Building, is a rare public emblem of the struggles and accomplishments of Japanese American women in the United States. Barred by segregationist policies from use of key facilities in the main YWCA chapter, in 1912 Issei (immigrant generation) women formed the first independent Japanese YWCA in the United States to address social and service needs of women and children. They lost control of the building when the community was forcibly removed and incarcerated, but decades later reclaimed it after a successful community campaign. My research was successful in having this place be listed on the National Register of Historic Places.

25. From 2018 to 2023, I was a historian on a team developing a statewide Asian Americans and Pacific Islanders in California, 1850-1995 National Register Multiple Property Document. This document is an important first step in establishing the framework to identify and designate places in California associated with Asian American and Pacific Islander ("AAPI")

communities. The project received funding from the Park Service's Underrepresented Communities Grant Fund.

26. From 2020 to 2024, I initiated and co-led a project to create "History & Hope for Climate Action: An Interpretive Toolkit" with funding from the Park Service and private funders. I had the idea to begin this project after witnessing the horrific and devastating wildfires in Northern California in 2017 and 2018 and contemplating how public history could play a larger role in helping people understand the roots of the climate crisis and be inspired to take action. RORI gave me an important catalyst for this work when I recognized that one of the park's major interpretive themes, "wartime total mobilization," was a rich entry point because it illustrated how the entire nation was reorganized at all levels very quickly—government, corporations, businesses, neighborhoods, households — to face an enormous challenge. The home front years were a period of incredible social, economic, and political change — just the kind of rapid transformation that is needed to address the threats of climate change now.

27. In coordination with the Park Service's Climate Change Response Program and Cultural Resources, Partnerships, and Science Directorate, an interpretive ranger and I created a toolkit to support Park Service rangers and educators in telling engaging, site-relevant stories about the historic roots of climate change to visitors across park sites. Our initial kick-off webinar in July 2024 confirmed our sense that people were hungry for new ways to talk about the climate crisis — it drew 862 registrants, including Park Service employees and leaders of cultural resource organizations around the country and abroad. We had planned to launch a systemwide implementation of the toolkit across park sites in 2025, but the opportunity to do so dried up, and based on the Secretary's Order, I understood that there would be no additional opportunities to conduct work that connected history and climate.

**The Secretary's Order Forced Me Into Retirement and is Undoing My Life's Work**

28. The administration's attacks on accurate historical interpretation in national parks, highlighted by the Secretary's Order, has cut my career short and begun to undo my 25 years of work with the Park Service. So long as the Trump administration continues to effectuate this new ideologically-motivated system of historical interpretation and removals, I do not have opportunities to continue using my expertise, and I fear that more removals will chip away at my legacy, but even more importantly, erode historical accuracy and community cohesion.

29. Never in my decades of experience as a public historian have I seen these kinds of attacks on historical interpretation, including removals and censorship, at this scale. Historical interpretation at the Park Service has always been an evolving enterprise. Before 2025, I had only ever seen interpretive materials supplemented with more information and have only seen interpretive materials removed when they were in physical disrepair or worn down by time, or replaced by newer, more complete and accurate, interpretive projects. For instance, I am aware that the Whitman Mission National Historic Site in Washington was created in 1930 and memorialized a group of missionaries who were killed by the local Cayuse tribe in the nineteenth century. Years later, interpretive materials at this park site were expanded and supplemented with the Cayuse Tribe's perspective by collaborating with the Confederated Tribes of the Umatilla Indian Reservation. New interpretation conveys the genesis of violence as retaliation for welcoming more settlers that spread measles and killed dozens of the Cayuse tribe members. This is how historical interpretation is supposed to be done: adding and revising information as we come to have new and deeper understandings, not wholesale censoring of information.

30. The Trump administration, through the Secretary's Order, has instilled a culture of fear and self-censorship across national park sites that threatens to remove several interpretive materials, including my own work.

31. For example, I am concerned that the LGBTQ+ exhibit at RORI that I spent years developing will be targeted and removed because of the Secretary's Order. I understand that this order, calling for the removal of interpretive materials that "disparage Americans past or living," has been taken to apply to many aspects of what might be called "non-dominant" history, i.e. the history of women, people with disabilities, immigrants, Asian, Black, Latinx, LGBTQ+ and working people that I have often studied throughout my career. I am aware of many reports about exhibits detailing the lives of marginalized people being removed because of the Secretary's Order, and I fear that the RORI LGBTQ+ exhibit and other components of the park's interpretation are in dire threat of removal because of the Secretary's Order, too.

32. The topics that I have devoted my career to—from women's history, LGBTQ+ history, to Asian American history and climate change—are being directly targeted by the Secretary's Order, and I fear many if not all of the projects that I have worked on will be seen as "non-compliant" with the Secretary's Order. This is my life's work and legacy, and it is disheartening to see it be erased.

33. Nor could I continue this work. Before 2025, the work that I provided the Park Service accounted for 40% to 80% of my annual income. Following the Secretary's Order, opportunities for public historians to work with the Park Service, especially public historians that focus on the history of marginalized communities or climate change, have completely evaporated. I understood that there would be no opportunities for me to continue work with the Park Service going forward. The Park Service, in other words, would account for near 0% of my income if I

tried to continue working. I made the decision to retire from my 40-year career in public history because I understood that my work was being defunded, devalued, and even denounced, by the Park Service.

34. The new Park Service focus damages my professional reputation by removing or threatening to remove the work that comprises my portfolio. It helps as a public historian to have publicly displayed interpretive materials to point to in seeking new contracts and jobs, and having them denounced as inappropriate harms my ability to secure work in the future if I so choose, and my reputation more generally within the public history field. The Secretary's Order delegitimizes my work, which focuses on expanding the ways that we understand U.S. history, by calling it "improper partisan ideology" and suggesting that it perpetuates a "false reconstruction of American history." As the Secretary's Order continues to be implemented, more of my work and the work of other public historians will continue to be erased and hurt their job prospects, even for entities other than the Park Service.

35. Even if I was able to continue work with the Park Service, I could not do so without censoring my own speech, contravening the ethical standards of AASLH, and the standards I uphold for myself in my work. I believe that sound historical scholarship and interpretation require robust community connection and a commitment to telling a diverse and inclusive range of stories, including those that hold tensions and conflicts alongside stories of beauty and achievement. History is a living pursuit and should be supplemented as new knowledge arises. My approach to history is entirely at odds with the Secretary's Order and if I were to continue work, I would have to change the way I study and speak about history to omit the kinds of history that the administration finds unsavory.

36. Finally, I believe the Secretary's Order will have serious consequences for the public at large, including American residents and visitors from abroad. Reducing historical interpretation to the achievements of those who fit a narrow, dominant narrative—most often powerful white men—erases the experiences and contributions of countless Americans. It signals to many people that they do not belong in our shared story. In my work with RORI, I saw firsthand how Black, Latinx, Asian, women, and LGBTQ+ visitors felt affirmed when they encountered their histories in the park. Just as powerfully, visitors outside those communities often left moved and newly connected to people whose experiences differed from their own. Inclusive history does not divide; it deepens understanding and strengthens empathy.

37. Recognizing the many individuals and communities who have shaped our nation reinforces a vital truth: we are all participants in history, with both the power and responsibility to shape its course. Providing that fuller, more honest story is central to the Park Service's mission and essential to fostering social cohesion and sustaining a healthy democracy.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Berkeley, California
Dated: March 11, 2026

/s/ Donna Graves
Donna Graves

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Case No. 26-cv-10877** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF JENNIFER GOEPFERT**

I, Jennifer Goepfert, declare as follows:

1. My name is Jennifer Goepfert. I am over the age of eighteen, and I reside in St. Paul, Minnesota. This declaration is based upon my personal knowledge, including from my experience as an education coach, teacher, and consultant. I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. I am a member of the National Parks Conservation Association ("NPCA"). I first joined in 2018 because I support national parks and want to keep them protected. I see the NPCA and the Park Service as interconnected organizations. NPCA allows park lovers, like me, to access, contribute, and participate in the parks in ways the Park Service cannot alone provide. National parks are dear to me: I have been visiting them my whole life and love experiencing them both personally and through my children's eyes.

3. I have been an educator for more than 20 years. I was a high school English teacher in Minneapolis, Minnesota for 10 years, and have worked in the public education system in several school districts in Minnesota for more than 20 years.

4. I founded Teacherly, LLC, in 2016, and I am currently an education coach and consultant working with schools throughout Minnesota, delivering equity-focused instructional coaching and professional development tailored to the unique needs of diverse students and educators.

5. I stay involved in NPCA because of the critical role it plays in protecting and supporting our national parks for present and future generations. I want to ensure that my children, my children's children, and all children can experience and learn from these iconic sites. The national park system represents both the breathtaking beauty of our natural landscapes and our complex history as a country. It preserves the things we are proud of and that we continue to celebrate, but also highlights some of the ugly and sometimes unspeakable parts of our history that we have a duty never to forget. As an educator, it is important to me to ensure that these places stay preserved and accessible for the public to learn from and enjoy.

6. From 2008 to 2012, I taught grades 10-12 at an outdoor education school, where we taught core subjects in the classroom but also brought kids outside to explore and follow their curiosity. I would guide my students in planning their own outdoor educational activities, including trips to national parks. My students researched the Park Service website, made reservations, looked up visitor center hours, planned our days, and booked ranger talks. Once we arrived at the park, the students would teach each other about the significance of the particular site, including providing information about who lived on the parkland and why the space is protected. We did

trips like this to the Mississippi River National River and Recreation Area, Mount Rushmore, Devil's Tower in Wyoming, Rocky Mountain National Park, and more.

7. As a parent, I also rely on the national parks as an educational resource and as a key element of, and supplement to, the curriculum in the education of my twin daughters. The parks capture stories that have been missing from our schools, and witnessing these sites firsthand is critical to their understanding and appreciation for history. I believe that it's important for my girls to hear the voices that are usually missing in traditional classrooms, despite our teachers doing their best. For the past five years, the national parks were essential to telling those narratives and educating my daughters. However, because of the recent orders by the administration, the national parks are no longer a reliable resource for educating my daughters.

**The National Parks Are Essential to My Approach to Educating My Children**

8. In 2018, I read an article entitled "Lessons in Motion" in NPCA's quarterly magazine, National Parks Magazine.[1] It was about a family that homeschooled their children using the national parks as their classroom. I was instantly inspired to adopt a similar approach to educating our daughters, who were then around three years old. I had already been sending my daughters to a school that centers on child curiosity and exploration. Place-based learning is essential to this approach, allowing children to plan their own educational adventures under the guidance of teachers. So, when I read the NPCA article, I felt like it was a perfect fit for educating my daughters. I shared the idea with my husband, and he was onboard.

9. We spent six years saving money, forgoing bigger purchases and vacations. We meticulously planned our route. I knew there were 63 national parks in the United States, and more than 400 sites — historic sites, recreation areas, and much more — managed by the National Park

---

[1] Kate Siber, *Lessons in Motion*, NPCA (Summer 2018), https://perma.cc/V3AV-VT47.

Service. The big parks were our North Star around the country, and then through research, we would uncover all the little gems, the battlefields and monuments, and would add those to our itinerary in between. We planned to travel like this in our RV for a year.

10. We mapped out our itinerary to stay in one place each week so that my husband could work in the RV, while my girls and I would go on park and museum trips, exploring and creating lesson plans around our experiences. On weekends, we planned to travel to the next spot and bring my husband along on their adventures. We also stayed in touch with my daughters' school, where they remained enrolled. We would check in around once a week, and my daughters would share updates with their friends about what they were learning across national park sites.

11. The focus of our planning was to ensure our daughters would be exposed to high-quality education on the road. As an educator, I've always been really interested in alternative ways to educate our students and my own kids as well. I developed my own curricula encompassing state education standards, drawing on my experience as an English teacher. I also relied heavily on NPCA and Park Service resources for ideas and regularly looked at their websites and NPCA articles about the unique history and science I could teach my daughters at different Park Service sites.

12. Park Service signs, exhibits, brochures, and films were essential to teaching my daughters. Often, I would take pictures of signs we'd see at different Park Service sites so we could discuss them more when we came back to the RV.[2] Having the signs right there as we explored and learned was critical to our place-based learning style.

13. The Junior Ranger program also provided a very helpful framework for our daughters. Across the national parks, Park Service rangers have educational activities planned for

[2] The pictures that I am including in this declaration are all pictures my husband or I took during our trip with our daughters.

children, leveled for the child's age. The programs consisted of a day full of 8 to 15 activities that the child must complete in order to obtain their "junior ranger badge," which is administered in an adorable "oath ceremony" with a park ranger.




These tasks include visiting specific sites within the park, attending ranger talks, participating in hands-on activities, and reading and reviewing signs and exhibits that teach about the park. Every park also has a junior ranger booklet that accompanies this program and helps children learn about the parks.

14. My plan was largely to teach my daughters math and English in the RV and learn social studies and science at and through the parks we visited. I believe we can learn so much more when our feet, bodies, hearts, and minds are physically present in and connected to the place we are studying. Place-based education highlights the idea that when a person immerses themselves

in a place's history, culture, heritage, landscape, and opportunities—and even more so when they serve local communities—learning goes deeper. Instead of just studying from books, we planned to learn about early colonization at the Jamestown National Historic Site, the founding of our country at Independence National Historical Park, the fight for civil rights at the Emmett Till and Mamie Till-Mobley National Monument, and so much more.

15. At every turn, the driving question for my daughters and me was, "*Whose voice is centered and whose voice is missing*?" As a White middle-class family, it is very important to me for my daughters to learn the histories of communities that may have been neglected or otherwise erased from dominant tellings of history. I want my daughters to understand that their experiences are not the same as other people's experiences. I need them to hear voices that are different from their own. These experiences and voices include not only descriptions of achievement and joy, but also of trauma and oppression. I wanted my daughters to know about past struggles so that they could have greater empathy for people who may come from different backgrounds. We talked about how it's okay to cry, but we cannot look away; we need to try to understand other people's pain.

16. In August 2024, we were ready to pack our RV and hit the road. Over the course of the next year, we visited 66 Park Service–managed sites across 37 states. We started from our home in St. Paul and slowly traveled clockwise around the outside of the continental United States.[3]

17. We reached our first Park Service site, Pictured Rocks National Lakeshore in Michigan, on September 4, 2024. From the moment we reached that first stop, I knew we had made the right decision. The girls learned about rock layers and stratification, a 4th-grade science

[3] Our full route can be found here: https://www.thebigfunrv.com/follow-our-route.

standard. Instead of just reading about it, they were exposed to and processed scientific concepts while looking out over a huge, beautiful cliff on the shore of Lake Michigan. They can both tell you that the color red on the cliff is there because of iron deposits, and the colors green and blue are there because of copper. At Pictured Rocks National Lakeshore, the girls earned their first Junior Ranger badge.

18. From there, we continued traveling east. We developed a rhythm: we would start each park visit by going to the visitor center and chatting with rangers. The girls would then engage in junior ranger work. Every park was a little different, but the junior ranger activities would often include attending at least one ranger-led program, hiking a trail, completing a scavenger hunt, interviewing a ranger, and visiting certain signs or interacting with an exhibit. The junior ranger programming often focused on various topics, including underrepresented histories and climate science. After the tasks were completed, the girls would give their completed books to a ranger, who would ask them questions about what they had learned and seen. Then they would take the oath and receive their badge. They were really proud every time they could add a badge to their vest. Other visitors often stopped them to ask questions about where each badge came from, and the girls were always happy to talk to folks about parks they had visited and the things they had learned. And with each new badge, I felt proud of my girls for opening up to each new experience, and I was incredibly grateful to our parks for providing them with such a rich, authentic learning experience.

19. On the way to the East Coast, we visited Sleeping Bear Dune National Shoreline in Michigan and Cuyahoga Valley National Park in Ohio. At Sleeping Bear Dunes, we heard from an Indigenous Historian who gave an incredibly insightful and moving talk on the Indian Removal Act and its impact on his people, the Odawa. He pointed over his shoulder out to an area in the

bay where his ancestors launched their canoes on the way to Washington to negotiate the treaty. This is the kind of place-based education and history that my girls could never get in a classroom. The Cuyahoga Boston Mills Visitor Center was incredible, and the girls learned about the Indigenous people, the area's settlement, the Cuyahoga River's pollution problem, and the clean-up efforts that brought back some of the threatened animal populations, such as osprey and river otters.

20. Eventually, we reached the Northeasternmost Park: Acadia National Park. During our visit, we talked about the importance of staying on the trail because of the impact humans are having on the environment. This was a common theme everywhere. So much so that my rule-following girl would get anxious and upset when she saw other visitors off-trail.

21. As we traveled down the East Coast, we visited many historic park sites, including Salem Maritime National Historic Park, First State National Historical Park, and Independence National Historic Park. Each park site has such a unique history to learn, and the junior ranger program and the interpretive signs and exhibits provided a great foundation for my daughters to learn and explore. They especially enjoyed interviewing rangers to learn firsthand about a park from an expert. For instance, at Saint-Gaudens National Historical Park, we learned about the artists in the Cornish Colony during a ranger-led walk through the property. I specifically remember the signs at the President's House in Independence Park as well. We spent a lot of time discussing the signs about the people President Washington enslaved. It was important to me that my daughters learn the entire story about our founding fathers.






They may have been heroes in some ways, but no person is one-dimensional, and their slaveholding practices, too, should be recognized and understood.

22. On Day 100 of our road trip, December 8, 2024, we visited our 19th and 20th national park sites – Cape Hatteras National Seashore and the Wright Brothers National Monument. At Cape Hatteras in particular, I remember spending a lot of time talking about and looking at the way the sands shift and how human development impacts the landscape, including climate change. My daughters saw firsthand how the sand was swallowing houses and roads. This was one of the first places the girls could physically see how the landscape and humans "clash" as humans try to build in delicate and fragile environments. Just a few days later, we also stopped by Fort Raleigh. While there, we read signs about The Lost Colony complex off Barrell Beach, where the remnants of an entire settlement are now underwater because of erosion.

23. In early December, we reached Florida, where we visited the Everglades and Biscayne National Parks. One distinct memory is watching my daughters talk to a Biscayne ranger all about the artifacts on display in the visitor center. He shared skulls and bones from different sea animals, such as sea turtles, and he patiently answered their questions about how these animals. They could have talked to him for hours. On our way out the door, we ran into another ranger giving a walk-and-talk. So we decided to do it. Our guide was from the area and had grown up fishing there with her father, and so she was able to give us a bit of immediate history about the folks who rely on the park for food and recreation.

24. Similarly, at the Everglades, we participated in a fascinating talk about Women in the Everglades. We talked a lot about how human use of the Everglades has altered the ecosystem and shaped the park. We took a boat ride, and the ranger told us that the canals we were riding through were man-made by humans who wanted to drain the wetlands in hopes of converting the "swampland" into profitable agricultural land and residential real estate. During and after the boat trip, we discussed how the canals created habitat loss for wildlife, how the carving of the swamps led to saltwater intrusion and disrupted natural water flow. As always, the rangers really brought each park to life, and my daughters learned so much earning their badges at each park unit.

25. We also stopped by Big Bend, where we spent a lot of time talking about prehistory. One of my daughters is incredibly interested in dinosaurs and was delighted to learn that there were once prehistoric creatures roaming in that very spot. Throughout the Southwest, we explored places where dinosaurs roamed, and this became a line of inquiry for her in that region of the United States.




26. We reached the Southwest in early spring and visited White Sands National Park, the Gila Cliff Dwellings, Grand Canyon National Park, Bryce Canyon National Park, Zion National Park, and more. At the Gila Cliff Dwellings, I remember seeing dozens of signs about

Indigenous life and culture that were very helpful in educating my daughters about the lives of people with very different practices and customs from theirs. At the Grand Canyon, we also learned a lot about early inhabitants of the area, including local Indigenous communities.

27. Eventually, we made it to the West Coast and made our way up through California and the Pacific Northwest. We stopped by Redwood National Park, where we learned about the different ecosystems within the forest, and the girls were amazed to learn that a whole ecosystem exists in the canopy of the gigantic trees, which supports a diversity of plants and animals high above the ground. We spent hours tidepooling at Endert's Beach, and the girls took photos of and researched their finds. At Lewis and Clark National Historic Park, my daughters learned about how the Corps of Discovery expedition (commonly known as the Lewis and Clark Expedition) relied heavily on Indigenous knowledge, generosity, hospitality, and trade. Last spring, I overheard my daughters teaching their class back in Minnesota about what they learned.

28. It was around this point in our trip that we started to notice signs with QR codes at national parks asking visitors to report "any signs or other information that are negative about either past or living Americans." My husband and I both scanned the QR code and submitted comments about the importance of the parks, including parts of history that are often untold or overlooked. I also had extended discussions about the QR code with my daughters, who did not initially understand why someone would report something as not beautiful. They started identifying things that might be reportable, and were upset that people would want to take away this history. These were hard conversations, but good ones. We work hard to ensure that we provide challenging information in an age-appropriate manner and that they know they are safe, while also being truthful that not everyone goes through the world the same way.

29. Finally, we began our way back home to Minnesota and stopped by several parks in the Great Plains, where we learned more about the region's science and history. At Glacier National Park, we learned about how the changing climate is affecting the landscape, with glacial retreat that impacts the ecosystem and habitats. Climate change was a central topic of conversation at Glacier, and I remember seeing great interpretive information about it in the junior ranger booklet and on the signage around the park as we looked for the glaciers, which seemed to be shrinking.




30. We returned home from our educational adventure in August 2025. The girls are back at a traditional school, but we are keeping the RV for future trips.

**The Secretary's Order Impairs My Ability to Educate My Children at National Parks**

31. I am aware that President Trump issued an executive order titled "Restoring Truth and Sanity," and that the Secretary of the Interior is implementing an order with the same name ("Secretary's Order") that directs the Park Service to remove signage that "disparages Americans past or living" or that perpetuates a so-called "false reconstruction of American history." I understand that many of the signs and exhibits being removed because of the order are the same descriptions of accurate science and history that I relied on to teach my daughters over the past year.

32. These changes jeopardize my future plans to continue using the parks to educate my daughters. In particular, this coming summer, we are planning to take our daughters on another trip for a couple of months to visit parks. We are planning to take them to the Brown v. Board of Education National Historical Park in Kansas to learn about the history of racial segregation in our schools. I am particularly interested in bringing my girls to the "Hall of Courage," which highlights the personal stories of students and families who challenged segregation. It is important to me that they have access to primary sources that highlight the work of the people who came before us, so they appreciate and understand how important it is to use our voices for change. I also want them to be able to reflect on the progress of racial equality and the work still ahead of us. We are also planning to take the RV to Hot Springs National Park and Little Rock Central High School in Arkansas, which represents a turning point in American history. As an educator, it is important to me that my girls are able to explore the history of desegregation through the place-based experiences these sites offer. We are also considering what other parks to visit—and what lessons to learn—during our upcoming trip.

33. Beyond this summer, I hope to bring my daughters to many more national parks down the line, especially in places we did not visit on our road trip, such as the interior of the United States and Alaska. I want to take my daughters to see more parks about women's history, like the Rosie the Riveter park in the Bay Area. We also missed out on Death Valley due to the heat, and hope to go back someday when conditions are better. I also want to take my daughters to the Great Smoky Mountains National Park, as we had to detour around it due to the devastating Hurricane Helene. This park is the most biodiverse park in our country, and we were excited to visit. Because of the impact of the hurricane, we had to reroute, but it is important to us to visit the park to learn about the flora and fauna, as well as to learn about the rich cultural history, and to

help reinvigorate the tourism that the local economy missed out on during and after the hurricane. There are countless other parks that I was not able to see on my first road trip with my daughters, and that I hope to get to someday.

34. These interpretive signs, films, brochures, and other materials are fundamental to my place-based approach to teaching my children. I can no longer dependably rely on the Park Service for accurate information about science and history to teach my children. I cannot have my children learn an inaccurate, sanitized version of history and science. "America's largest classroom" has essentially shut its doors to my children. I am rushing to visit parks before many of the signs and other interpretive materials are removed because I know that once they are taken away, my job will become much harder. My family relied heavily on interpretive signs, exhibits, and other materials, which I understand are now being removed. Those removals not only harm my daughters' educational opportunities but also create more work for me to replace the censored content. I do not think I could trust the junior ranger booklets anymore, as I am aware some have already been flagged or revised. This extra work will require much more time, research, and perhaps other resources. I worry that even if I do my best to replace what was there, it will still lack the type of historical and scientific expertise that went into these interpretive materials in the first place.

35. I also understand that Park Service staff are likely fearful and do not feel comfortable or safe sharing honest and accurate history and science. I feel angry and sad, especially for those Park Service employees who have made careers of sharing true stories at the parks, but I am afraid they may now fear saying the "wrong" thing. Going forward, I think I will have to take everything the rangers tell my daughter and me with a grain of salt.

36. I love the national parks, and they provided a great canvas for teaching my daughters about this country and the environment, its triumphs and tragedies. I hope to do so in the future, but I know the experience will not be the same because of the Secretary's Order.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

St. Paul, Minnesota
Dated: March 11, 2026

Jennifer Goepfert

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Case No. 26-cv-10877** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF JOHN DICHTL**

I, John Dichtl, declare as follows:

1. My name is John Dichtl. I am over the age of 18. This declaration is based upon my personal knowledge and experience as president and CEO of the American Association for State and Local History ("AASLH"). I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. I joined AASLH in 2002 and became its president and chief executive officer in 2015. I previously served as the executive director of the National Council on Public History for nine years, and before that I worked for the Organization of American Historians for 14 years as deputy director and in several other roles. I received my M.A. and Ph.D. in early American history from Indiana University, and from 2006 to 2015 I was an adjunct faculty member of the history department at Indiana University—Purdue University Indianapolis, where I taught a U.S. history survey course.

3. As president and CEO of AASLH, I provide leadership and vision-setting for the foremost professional association for the nation's 21,000 history organizations. This work entails defining and advancing strategies for furthering AASLH's mission, vision, and values; identifying, responding to, and anticipating fieldwide needs; and creating a broad and welcoming sense of community for history practitioners across the country. I also spearhead policies, communications, and other efforts related to AASLH's organizational health and growth, including staffing, budget stewardship, board relations, revenue development, and other activities related to our operations and resource allocation. A major area of focus is expanding, maintaining, and connecting our various committees, networks, and collaborative relationships involving hundreds of individuals and institutions. In addition, as president and CEO, I represent AASLH in various capacities, including as a guest speaker, advisory group member, and board member for adjacent organizations.

4. Founded in 1940, AASLH is a 501(c)(3) non-profit national membership association dedicated to helping the history community thrive and tell a shared history where everyone belongs. For the better part of a century, AASLH has provided leadership and resources to its members and fieldwide practitioners, who preserve and interpret American history, especially at the state and local levels, to make the past more meaningful to all people. Today, AASLH provides crucial resources, guidance, professional development, advocacy, new publications, fieldwide research, and a sense of connectedness to more than 5,000 institutional, individual, academic, and corporate members, as well as leadership for history practitioners and history organizations nationally. It is the only comprehensive national organization dedicated to state and local history.

5. AASLH has 12 full-time staff members and one part-time staff member that support day-to-day operations and the services we provide to our membership base, as well as the history field at large.

6. We have four classes of members. First, individual members who often consist of history practitioners who work across a variety of sectors. Second, institutional members, which can consist of any kind of history organization, such as a historical society, a museum, or a government agency. Third, academic members, which consist of undergraduate and graduate history departments, centers, and institutes. Fourth, corporate members, consisting of companies and consultants that do business with history organizations to connect with museums and historic sites across North America. Our membership numbers fluctuate slightly from week to week, but as of writing we have approximately 1,550 individual members; 3,500 institutional members; 32 academic members; and 13 corporate members.

7. Many of AASLH's members work for, in, or with the federal government. A large portion of AASLH's membership base, for example, consists of public historians—practitioners, such as historians, curators, archivists, educators, historic preservationists, and others, who develop interpretive content and programs that engage audiences beyond traditional academic settings. Many public historians, thousands of whom are AASLH members, contract (or subcontract or otherwise partner) with the federal government, including the National Park Service, for services including supplying the research and expertise needed to identify historic sites, creating or contributing to the interpretive materials that enhance understanding of those sites to the broader population, including students and visitors at museums and parks, and other categories of work. Additionally, some of AASLH's individual and institutional members consist of National Park sites or staff themselves.

**"Whole History" Is Central to AASLH's Mission**

8. AASLH's mission is to "provide[] leadership, resources, and advocacy to help the history community thrive and tell a shared history in which everyone belongs." Particularly, AASLH has long been a leader in an effort to ensure that the public discourse around the history of the United States is expanded from prioritizing the perspectives and experiences of primarily dominant groups to telling a more comprehensive and accurate history. AASLH's goal of promoting sound historical practice depends upon meticulous research of a wide array of sources, open-minded embrace of complexity and ambiguity, and a willingness to update understandings as new evidence arises. The organization is committed to a full, honest approach to our collective history, one that constantly strives for a more complete picture.

9. Moreover, AASLH sees its mission and goals promoting a full and accurate telling of history as essential to democracy. AASLH believes that telling more complete history promotes civic participation, feelings of belonging, bridge-building, and advances skills essential for the public to participate in a functioning democracy, such as critical thinking, information literacy, analysis and synthesis of evidence, and more. Further, as an organization representing historians and history-focused organizations, AASLH understands the dangerous effect of government censorship and sanitizing history on democratic stability. AASLH understands, from studying the past, that leaders rewriting history and erasing the stories of certain underrepresented groups or disfavored topics is a tell-tale sign of danger to democracy. Such government efforts to promote narrow, misleading visions of history remove crucial context that the public needs for a more honest and widely shared understanding of the past and its relevance to today. Tellingly, these sorts of government censorship efforts show no faith in the public's ability to think for itself and hamper the public's ability to address contemporary problems,

evaluate public policy, governmental actions, and the decisions of elected and other officials. AASLH strives for fuller and more accurate tellings of history—rather than histories that are censored and incomplete.

10. To advance its mission, AASLH provides resources to help practitioners educate the public in a fashion that allows people to engage with a more complete and accurate understanding of history and to value history for its relevance to the present. AASLH's services include professional development opportunities to members and nonmembers, including through in-person annual conferences and virtual summits, training webinars, workshops, and other programs on various historical practices and topics; fostering community by hosting various committees, topic-based groups, and key networks such as groups of state history administrators, field service providers, state 250th planning commissions, and affinity groups; advocating for pro-history policies in Congress and other arenas; and by publishing original research and training materials through books, reports, newsletters, and magazines.

11. For example, AASLH regularly hosts professional development webinars, workshops, online courses, and other programs that set standards and offer guidance for the field. These resources address various subjects, from practical topics such as project management and care of historical artifacts (such as those found at museums and parks) to navigating challenges such as disaster preparedness, engaging younger generations, and improving public understanding of what history is and why it matters, with an emphasis on whole history. We also run the nation's only standards program designed specifically for smaller and mid-sized history museums and related organizations. In addition, we run an annual in-person conference that typically sees approximately 1,000 practitioners from across the country, who gather for an opportunity to further best practices, share ideas, and connect with each other. In addition,

AASLH hosts virtual summits on pressing topics facing the history field, with past events including "Commemoration Reconsidered: Ethics, Justice, and America's 250th Anniversary," "Doing History in Polarized Times," and upcoming summits on the intersection between history and democracy. We also host a Research Lab that produces original research and synthesizes outside research related to the history field and the role of history in public life. One of the Lab's most significant outputs has been our Reframing History initiative, a multi-year research project that produced a report and toolkit identifying ways to more effectively convey the nature and relevance of history work, with an emphasis on explaining why a full approach to history matters for everyone. The Research Lab has also produced the first and only national census of history organizations as well as a national survey of history practitioners' compensation, demographics, and job satisfaction. Through the Lab and related efforts, we also provide vision-setting and leadership for practitioners nationwide, most recently by providing top-level goals and interpretive themes for the U.S. Semiquincentennial that have been employed broadly (even by a state legislature and state planning commissions), as well as by a soon-to-be-announced History & Democracy Initiative geared to uplifting the vital role the history sector plays in strengthening civic fabric. AASLH also regularly produces publications, such as our magazine *History News* and our technical leaflets, as well as books and blog posts on issues relevant to the field. AASLH also serves as a key convener for the field, building important networks such as a Field Services Alliance, a group consisting of each state's top history administrator, a network of state 250th commissions, committees and affinity communities, working groups, task forces, and more. We also host an awards program to spotlight institutions conducting innovative work aligned with best practices in history.

12. From 2019 to 2025, AASLH hosted the History in Our Parks Task Force, an effort intended to allow AASLH and partner organizations to better understand the needs of history practitioners operating within public parks agencies and help build community among that constituency. The History in Our Parks Task Force worked to understand who was conducting history work in parks agencies, including within the national parks, and the unique challenges they faced. Based on what it learned, the History in Our Parks Task Force recommended increased efforts to facilitate community-building and collaboration among history practitioners at public parks agencies.

13. Additionally, AASLH develops and distributes ethical standards and best practices for the history profession to advance its mission of telling whole history—one that allows for new questions, perspectives, and evidence to be integrated into our understanding of the past as we seek to tell an increasingly complete and honest history. This is because, to AASLH, approaching history in this way is not simply advocatory—it is the *only* way, in line with professional and ethical standards, to practice history accurately and effectively. We think of historical interpretation like detective work, requiring a rigorous process of evaluating evidence and employing varied methods, and revisiting stories we tell as we uncover more information. AASLH believes that when historical information is skewed, biased, or omitted in a misleading way, historical accuracy suffers and history practitioners fail both at achieving the goal of the profession and in their obligations to the public. Thus, AASLH considers historical interpretation that omits certain stories simply because they are deemed unappealing to not only be unethical but to be an inappropriate approach to achieving sound historical scholarship and interpretation.

14. AASLH's latest "Statement of Standards and Ethics" provides comprehensive ethical guidelines that members are expected to follow when practicing history.[1] For example, the standards have a section titled "History belongs to everyone, everyone makes history" that provides:

> *Everyone* means every individual, regardless of background, and their contribution to the fabric of our collective history. History organizations have a responsibility to demonstrate this idea through their staffing, training, collecting, programming, and marketing activities. History organizations must be attuned to issues and ideas reflective of the breadth of experience in their local communities and in the United States, and must include these varied perspectives in documentation, collections, preservation, and interpretation.

15. Another section, titled "Interpretation," sets forth the standards for historical interpretation:

> A. All interpretation must be grounded in rigorous, research-based scholarship. Such scholarship should recognize multiple perspectives, including community-based and descendant knowledge.
>
> B. History organizations should demonstrate respect for all cultures and peoples and work to be socially responsible and inclusive in their programming and interpretation. Content for or about specific groups of people will be developed in concert with advisors holding lived or academic experience.

16. We believe that telling a more complete and accurate history is not only good for society as a whole but is sought-after by a majority of Americans. According to a January 2026 Pew Research Center study, 66% of U.S. adults "say it is extremely or very important to publicly discuss the country's historical successes and strengths," and the *same* percentage (also 66%) "say the same about discussing the country's historical failures and flaws."[2] Another study

---

[1] AASLH, *AASLH Statement of Standards and Ethics* (2025), https://perma.cc/2PNW-HC5V.
[2] Andy Cerda, *Majorities of Americans say it's important to talk about the country's historical successes and failures*, Pew Research Center (Jan. 26, 2026), https://perma.cc/VPQ9-E36E.

corroborates this majority, finding that 63% of U.S. adults support or lean towards supporting inclusive content in museums.[3] Moreover, an overwhelming majority of U.S. adults—89%—see "receiving historical knowledge of others as just as important to know as receiving historical knowledge of [their] own racial or ethnic communities"; in addition, 73% of the public expressed a preference for history that challenges, rather than reinforces, their existing historical knowledge.[4] Other studies have shown that a majority of Americans across the political spectrum share common ground about our nation's history and how it should be taught—the fissure, rather, lies in the fact that they hold misperceptions about what the other side believes about history: "Americans of all political orientations want their children to learn a history that celebrates our strengths and also examines our failures. Americans overwhelmingly agree that the experiences of minority groups are an important part of that history."[5] AASLH strives to bridge this "perception gap" by reframing discussions of different viewpoints around the idea of critical thinking, i.e. the process of evaluating historical evidence, to help audiences assess the context and quality of information they encounter and to avoid the sense that historical narratives from trusted sources are nothing more than personal opinions or perspectives.[6]

17. The federal government itself, and especially the Park Service, has long been an essential partner to advancing AASLH's mission to tell the whole history. National parks, the so-called "America's classroom" in which the public engages with and learns about our nation's

---

[3] Susie Wilkening, *Inclusive Content in an Uncertain Time: A 2025 Annual Survey of Museum-Goers Data Story*, American Alliance of Museums (Sep. 26, 2025), https://perma.cc/3BVE-EQP6.
[4] Peter Burkholder and *Dana Schaffer, History, the Past, and Public Culture: Results from a National Survey*, American Historical Association 55 (2021), https://perma.cc/MRY6-M78Y.
[5] Hawkins et al., *Defusing the History Wars: Finding Common Ground in Teaching America's National Story*, More in Common (Dec. 2022), https://perma.cc/ZPL4-3AV4.
[6] Miller et al., *Making History Matter: From Abstract Truth to Critical Engagement*, AASLH (Feb. 2022), https://perma.cc/75L3-V8VJ.

history, are critical to fulfilling that core mission. For example, in 2019, research done in conjunction with an AASLH study of visitation trends at history organizations, including national park sites, suggested that Americans' interest in history had shifted such that the most recently-opened national parks, which largely focused on telling a more complete and accurate history, including that of African Americans, women, Indigenous people, Latinx people, LGBTQ+ people, and immigrants, might have attracted more visitors. For instance, many of the sites that had opened since 2000 focused on offering more inclusive history—including the Brown v. Board of Education National Historic Park, the Belmont-Paul Women's Equality National Monument, and the Rosie the Riveter WWII Home Front National Historic Park[7]—and also showed some of the strongest visitation growth of any period for which data was available as of 2019. We concluded that this trend suggests that as park sites and interpretation have grown more inclusive of a broader range of histories and more representative of the nation, an increasing number of Americans are visiting. These newer parks—and the Park Service's standards, before the "Restoring Truth and Sanity" Executive Order and Secretary's Order, for historical interpretation—produced more accurate historical information for the greater public, in alignment with AASLH's mission.

18. The Park Service, moreover, has long been an important partner for AASLH. It is our understanding that for many state and local history organizations, particularly the many thousands of small museums and historical societies dotting the country, Park Service practices, especially with regard to public history and historic preservation, are considered to be important

---

[7] W. Maclane Hule and John Garrison Marks, *National Park Service Visitation and American Engagement with History*, AASLH Blog (captured Mar. 6, 2026), https://perma.cc/QJ4K-RRDE. Other sites that followed the same trend include Little Rock Central High School National Historic Site; Martin Luther King Jr. Memorial; Tuskegee Airmen National Historic Site; Charles Young Buffalo Soldiers National Memorial, First Ladies National Historic Site; and Women's Rights National Historic Park.

standard bearers for the field. As a model for historical interpretation, AASLH often pointed to the Park Service as an exemplar for quality interpretation, potential partnerships, and grant and job opportunities. AASLH has provided trainings and programs that included Park Service staff, worked with the Park staff on committees and similar groups, and connected the organization's members to Park Service sites, personnel, and offerings that provided models for the field aligned with best practices in history (including for members who specialize in the history of those communities most affected by the Secretary's Order, particularly African American, Indigenous, LGBTQ+, and women's history).

19. Examples of AASLH's past collaborations with the Park Service include: Park Service staff, including from Guilford Courthouse National Military Park, participated in a February 2025 AASLH virtual summit featuring 250th planners; in 2024 and 2025, we partnered with the Park Service, American Conservation Experience, and others to offer online courses in project management for their Mellon Fellows (AASLH staff also offered a session on our Reframing History for the Park Service's Mellon Fellows); Park Service staff, including from Saint Croix National Scenic Riverway, spoke at a 2025 virtual summit on activating environmental care and strength at historic sites and museums; Park Service staff from Harpers Ferry spoke on a session called "Unfinished Revolution: Place, Environment, and Social Justice in the 250th" at our 2024 annual conference; the National Park Service senior advisor for commemorations and anniversaries served as a panelist at AASLH's 2023 virtual summit, "Commemoration Reconsidered: Ethics, Justice, and America's 250th Anniversary"; since 2022, Park Service Longfellow House-Washington's Headquarters National Historic Site has used our Reframing History report and toolkit to train their staff in developing skills in facilitation, framing issues productively, and having nuanced conversations about history; an article in a

2022 edition of our *History News* magazine was written by a Park Service staff member from Appomattox Court House National Historical Park on a new temporary display "illustrat[ing] one of the park's lesser-known stories," that of the African American Civilian Conservation Corps at Appomattox; Park Service staff spoke at a 2021 session from an AASLH online conference on insights and tips for successful applications to federal grant programs, including those of the Park Service, that "enable history organizations to dedicate financial resources to address marginalized communities, preservation efforts, community engagement, social justice, reinterpretation, and [DEIA] training"; Park Staff spoke on a panel at AASLH's 2020 annual conference on the topics including "#MeToo and #BlackLivesMatter: Black Women Leaders Overcoming the Double Burden," "Black Museums Matter: Agents of Change through Storytelling as Places of Healing," "The Power of Parks: Preserving Neglected Structures, Lands, Stories, and Voices of Change," and "Generations of Women: Complicating Traditional Timelines"; and a 2018 webinar featured a speaker from the Park Service's National Center for Preservation Technology and Training on the topic of caring for historic cemeteries.

20. Park Service staff have also served on AASLH committees and other groups, including our Climate and Sustainability Committee, Women's History Affinity Committee, National 250th Anniversary Coordinating Committee, and more. And Park staff have also contributed to AASLH's blog on topics including what public historians can learn from K–12 students (published 2017), tips for public historians working with confrontational visitors (published 2016), interpreting slavery at the Ulysses S. Grant National Historic Site (published 2016), and the Park Service's release of the "first federally commissioned document to openly validate and study the lives of gender and sexual minorities in the United States" (published 2016). Park Service staff have also served on AASLH's Council. All in all, this is just a sampling

of the many ways we have amplified and relied upon the expertise of Park Service staff, as our work together goes back decades.

**The Secretary's Order Impairs AASLH's Mission**

21. Due to the significant role of Park Service sites to the entire history sector, the Secretary's Order has impaired AASLH's efforts to continue to tell a more complete and honest history by literally seeking to erase evidence of history from the parks. Because of Defendants' actions, AASLH has had to divert resources from organizational needs that are centered around expanding its reach, including by improving membership development efforts, and engaging on other issues and program areas in which it would typically be active. Instead, AASLH has had to use the redirected resources to address an urgent need to develop strategies to respond to attacks on historical best practices and historical topics disfavored by Defendants, including attacks related to the national parks, and to assist history practitioners in carrying on their work in the challenging environment Defendants' actions have created.

22. The Park Service once stood as a model for historical education and interpretation for AASLH. The organization has had staff from the Park Service participate in programs and other efforts to provide guidance to its members time and time again. Now, though, the Secretary's Order directly contradicts the professional standards and mission of AASLH: to not cherry pick history but, rather, strive to tell the whole story. As a result, AASLH no longer feels it is as feasible to invite Park Service staff to speak or collaborate with the Park Service in the same manner, because Park staff have to comply with the Secretary's Order that prohibits them from advancing—or even speaking about—an accurate and complete interpretation of history.

23. In addition to upending a relationship with a key partner, AASLH has gained an adverse party in public discourse and understanding about history. Now, in part because the Park

Service has turned to providing an incomplete and misleading, version of history, AASLH has had to step in and ramp up its efforts to combat this historical misinformation and malpractice. For instance, AASLH has increased programming around the findings of its Reframing History initiative and other research related to improving public understanding of what history is, why it matters, and why a full approach to history benefits all of us; this includes workshops and webinars on strengthening history communication and webinars on doing history in polarized times.

24. AASLH has also been working for months to soon launch a History & Democracy Initiative, which aims to leverage the vital role that history organizations play in democracy and civic life and expand their impact. Launching the History & Democracy Initiative has become more urgent than ever, as the Secretary's Order (and other related efforts) seeks to diminish public access to whole and honest history and to render moot the types of critical thinking, information literacy, analysis and synthesis of evidence, and other historical skills the public needs in order to participate in a democracy. In a time of growing censorship, misinformation, disinformation, and polarization, we hope that the History & Democracy Initiative will offer inspiration, guidance, and connection from within and beyond the history sector to help repair and fortify American civic culture from the ground up.

25. AASLH has also had to devote significant resources to mitigating the harms that have affected our members as a result of the Secretary's Order. Approximately one third of AASLH's members and other constituents throughout the field works in organizations within federal, state, and local governments. Some of our individual members work at National Park sites, and some of our institutional members are made up of Park Sites themselves. Consequently, following the Secretary's Order that mandates direct conflict with AASLH's

mission, AASLH has had to spend time and resources to further understand and try to address complaints from members about a litany of challenges, such as: feeling pressure to defy fieldwide best practices, including AASLH's ethical standards for historical interpretation; self-censoring or being compelled to self-censor to comply with the order; fear of retaliation for telling the whole history; lost revenue and other capacity due to donors, board members, and other stakeholders frightened of political backlash; and plummeting staff morale in the face of attacks on their profession.

26. The Secretary's Order has also affected the reach of AASLH, as members, like other practitioners, self-censor and fear the risks of being associated with an organization dedicated to telling the whole history. AASLH has been forced to reconsider program and resource offerings, a crucial source of organizational revenue, to ensure that history practitioners—including any who may be employed by or contract with the federal government, generally, or the Park Service, specifically—can participate without fear of political backlash. We understand from practitioners that declining to adjust such offerings could result in lowered participation and lower revenues in the long run. For instance, we understand that using certain words in our resources and programmatic offerings, such as "equity," "justice," "inclusive," or "democracy," often risks making it difficult or impossible for practitioners—particularly those working for state or federal government—to participate given this administration's clear preferences as set forth in the Secretary's Order. Without compromising our mission or best practices, we have at times modified the titles or wording in our offerings either in anticipation of or in response to uncharacteristically low engagement by the field that we understand is tied to political pressure created by the Secretary's Order and other actions by this administration. Over the past year or so, AASLH has had to reallocate hundreds of hours from our core needs to

respond to the challenges created by the "Restoring Truth and Sanity" Executive Order and Secretary's Order.

**The Secretary's Order Has Harmed AASLH's Members in a Number of Ways**

27. AASLH is also a membership organization whose members include historians and other practitioners who work with the Park Service. This includes history practitioners who specialize in the history of communities that have been marginalized or entirely excluded, and who in the past have contracted with and provided research to the Park Service to ensure park visitors are exposed to a more complete and accurate understanding of the history of those sites. AASLH's membership includes history practitioners who have been harmed by the Secretary's Order and its implementation in a number of ways.

28. First, some members have lost income because the Secretary's Order has effectively censored their specialties, which focus on communities that have been historically marginalized or entirely excluded, and whose stories the Park Service is now refusing to tell. The Secretary's Order has diminished public history as a reputable and sustainable profession, as many of our members' expertise is being unduly painted as partisan and, as a result, may not have reliable income for the upcoming year or be forced to shift career paths away from public history.

29. Second, their own expression as practitioners of history has been chilled because the only way to continue to work with the Park Service and stay out of the agency's crosshairs is to adopt the censored narrative and disregard a whole history by neglecting to discuss anything that the Park Service, pursuant to the Secretary's Order, might consider "disparaging." Practicing history in this way is in direct contradiction to AASLH's mission and would require violating AASLH's Statement of Standards. Faced with a diametrically opposed approach to historical

interpretation from the Park Service, AASLH members must now choose between violating AASLH's professional ethics—and generally the ethics of the profession—or risk losing their livelihoods.

30. Finally, the reputations of our members have been harmed because the Secretary's Order baselessly declares their work, which aims to tell a more complete history, to be no more than "improper partisan ideology" that is not appropriately considered part of the country's "extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing."

31. As just one example, one of our members, Donna Graves, has been a public historian working with the Park Service for over 25 years. Ms. Graves has specialized in history projects that emphasize social equity for her entire career. However, as a result of the Secretary's Order, which treats these histories as disfavored, Ms. Graves has been pushed to retire early as she can no longer get contracts with the Park Service given her prior work. Moreover, even if Ms. Graves were able to get another contract, she could not complete the work without sacrificing AASLH's (and her own) ethical standards.

32. From speaking with our members, I know Ms. Graves's story is not unique. Many—likely hundreds—of other practitioners, including members of AASLH, have had similar experiences as they witness the integrity of their profession denigrated. All in all, the Secretary's Order has disrupted the careers of many of our constituents, including members, and has destabilized public history as a profession generally. AASLH is an organization by and for public history: dedicated to strengthening trust in the field, promoting historical best practices, and advancing a more accurate and effective telling of a fuller American history, one in which everyone can see themselves. The Secretary's Order, in seeking to erase and distort history,

directly sabotages this goal. AASLH will have to spend substantial resources in the years ahead to sustain the beleaguered history field and to help safeguard public reliance on the nation's history institutions, including Park sites, so that people can trust that the information they encounter is rooted in research, evidence, expertise, and community engagement, rather than an incomplete, sanitized version sanctioned by the current administration.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Nashville, Tennessee
Dated: March 11, 2026

John Dichtl

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Case No. 26-cv-10877** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF BILL WADE**

I, Bill Wade, declare as follows:

1. My name is Bill Wade. I am over the age of eighteen. This declaration is based upon my personal knowledge and experience as Executive Director of the Association of National Park Rangers ("ANPR"). I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. My appreciation for the national parks and the stories they tell began at a very early age. As a young child growing up in Mesa Verde National Park, where my father served as a ranger for his entire career, I used to "tag along" on ranger-led walks into the cliff dwellings and spent hours attending the summertime evening "campfire" programs—listening and learning from the stories told by the rangers. As a teenager, I spent four summers working on an archeological excavation project in the park. I saw firsthand the new evidence learned from these excavations about how the Ancient Puebloans lived and

thrived for hundreds of years and why later they were forced to abandon these dwellings. I saw how this new evidence contributed to making the stories told by rangers, by exhibits and by other media much more accurate and truthful. Without question, my experiences as a child and teen resulted in the career-altering decision to abandon a planned career in the U.S. Army and, instead, to join the National Park Service and eventually become involved with ANPR and other supportive organizations.

3. I have served as Executive Director of ANPR since 2023, but first joined the organization in 1978 when I was an employee of the National Park Service. I spent 30 years as a permanent employee in the Park Service from 1967 to 1997. Among other roles, I served as a park ranger at Mt. Rainier National Park; Assistant Chief Ranger at Great Smoky Mountains National Park; Park Specialist for the Organization of American States in Trinidad and Tobago; and Assistant Superintendent at Delaware Water Gap. In March 1984, I became Superintendent of the Stephen T. Mather Training Center in Harpers Ferry, West Virginia. In 1988, I transferred to Shenandoah National Park as Superintendent and remained in that position until my retirement from the Park Service in July 1997.

4. As a Park Service employee, I joined ANPR because I believed it offered an additional way I could contribute to the lawful mission of the Park Service and support its employees.

5. I have received the Department of the Interior Meritorious Service Award and the Distinguished Service Award, the NPS Director's Award for Natural Resources Stewardship, the Regional Director's Superintendent of the Year Award, and the National Parks Conservation Association's Stephen Mather Award for defense of park resources. Since retiring from the Park Service, I have remained active in leadership, teambuilding,

and performance management training, and I have taught courses in various park areas throughout the country. During my Park Service career and since retirement, I also served in 11 international assignments, primarily involved with park management planning and training park managers and park rangers.

6. In addition, I was one of the founders of the Coalition of National Park Service Retirees, now known as the Coalition to Protect America's National Parks. I was the first Chair of the Executive Council and served in that role for about 10 years, and am still a member and consultant to that organization.

7. During ANPR's early years, I served in various positions on its Board of Directors, including as regional representative and vice president. I have also attended several World Ranger Congresses and represented ANPR at the International Union for Conservation of Nature World Parks Congress in Durban, South Africa, in 2003. Now, as Executive Director of ANPR, I am responsible for managing the finances of ANPR, supervising our business manager and magazine editor, responding to media requests and distributing media releases, and managing our annual "Ranger Rendezvous" conference. I also serve as "point person" in coordinating with other like-minded organizations regarding our joint strategy and actions.

**ANPR's Background**

8. In the fall of 1977, a group of park rangers and technicians gathered in Jackson, Wyoming. They discussed the state of the National Park Service, including topics like seasonal evaluations, the service EMT program, and the law enforcement task force report. They also discussed the importance of providing a way for rangers and technicians in the field to share their concerns and expertise with those in leadership positions; to find

a method of communicating among themselves to share solutions to problems; and to maintain esprit de corps—a shared feeling of pride and fellowship—among themselves through periodic gatherings. They determined that a meeting the following year was necessary to address these important considerations.

9. The next meeting took place in 1978, and I attended this meeting, along with over 80 other rangers. Together, we determined that a loose confederation of rangers and technicians could help accomplish these goals. We voted unanimously to form the Association of National Park Rangers. We also adopted the following statement of purpose: "A service-wide organization to communicate for, about, and with Rangers; to identify, promote, and enhance our profession and its spirit; to support management and the perpetuation of the National Park Service and to provide a forum for social enrichment." I became a life member of ANPR that year and have continued to be directly involved to varying degrees in the actions of the Association since.

10. Today, ANPR is a 501(c)(3) nonprofit membership organization made up of nearly 800 members across the country. ANPR is incorporated in Washington, D.C., and is currently headquartered in Marana, Arizona.

11. ANPR's members include park professionals from all occupations and professions: maintenance, administration, visitor and resource protection, resource management, and interpretation. A significant number of ANPR's members are Park Service employees whose job it is to interpret the resources and stories related to the parks where they work. Many of ANPR's members are retired from the Park Service but continue working in parks as volunteers. Our members also include students and retirees, educators,

volunteers, and state and local park professionals. And our members include allies of our national parks, national park rangers, and all park professions.

12. ANPR members are entrusted with and committed to the care, study, explanation, and protection of the natural, cultural, and recreational resources included in the National Park System, and persons who support those efforts.

**ANPR's Mission**

13. ANPR's mission is to advocate for Park Service employees of all disciplines; to promote and enhance the professions, competence, and spirit of Park Service employees and to provide a forum for professional enrichment for them; and to support the lawful mission and management and the perpetuation of the Park Service and the Park System. Since its founding, ANPR has worked to foster a communication network across Park Service employees to address common issues and maintain an esprit de corps across the parks.

14. ANPR represents park professionals of all disciplines who help fulfill the lawful mission of the national parks and the Park Service, including that the national parks should be a vehicle for conveying accurate history and science to visitors. We pursue this goal by providing mentorship, support, and professional enrichment to current and former Park Service staff as they work to protect the natural, cultural, and recreational resources of the national parks.

15. ANPR has also provided education and other training to develop and improve knowledge and skills of park rangers and those interested in the profession. We provide a forum for discussion of common concerns of park rangers and provide information to the public.

16. ANPR pursues our mission through both regular programming and ad hoc opportunities for our members. We host an annual conference, called the Ranger Rendezvous ("RR"), and provide some scholarships for attendance. The Ranger Rendezvous generates funds that are critical to ensuring our organization's continued viability. The five-day event features educational presentations, field trips, and opportunities for Park Service employees and alumni to discuss experiences and gather information and ideas in an effort to better allow them to contribute to fulfilling the mission of the Park Service. To date, we have had 48 of these annual meetings in different venues around the country (although two of those during the COVID-19 epidemic were held virtually). Each year we select a theme for the RR that is relevant to an issue of current importance to the Park Service and its employees. Our RR this year will be in Tucson, Arizona, in October, and our program will focus on the current challenges facing the Park Service and its employees, including current attempts to erase history and remove many of the stories that are foundational for many park interpretive programs—and in some cases, foundational to the very purposes for which a number of parks were established.

17. ANPR offers a mentorship program that comes with membership in the organization. We support members by suggesting training courses and providing review of application materials for positions in the Park Service, in order to help increase their competitiveness. Over the years, we've had many employees assert that their careers were enhanced by their involvement in ANPR and what they learned by being a member, as well as having been able to meet many other employees, some of whom were in positions to hire them later in their careers.

18. In further support of our mission, ANPR provides financial relief to displaced members, including through our Ranger Emergency Relief Fund. We use this fund to support ANPR members displaced by fires, mudslides, hurricanes, and other forces of nature—including those affected by other forces outside their control, such as park staff whose positions have been eliminated by the current administration.

**The Secretary's Order Impairs ANPR's Mission**

19. Since its inception, the Park Service has prided itself on telling history and science accurately. The parks have been a place to provide enjoyment to all visitors, including by offering opportunities to learn about the natural and cultural history and science of the parks. That has meant fully and accurately sharing our country's history, warts and all, even where we might not be proud of some of that history today. Over the past several decades, we have been gratified to see parks, or sections of parks, established specifically to commemorate the historical contributions of, among others, African Americans, women, and LGBTQ people. Similarly, in many parks like those with receding alpine glaciers, parks with vegetation or wildlife being impacted by warming temperatures, or parks along the coasts that are being subjected to increasingly harsh weather or sea level changes, we have felt obligated to inform the American public about the consequences of these changes. Because of the Park Service's longstanding commitment to telling history and science accurately, ANPR has viewed the agency as a partner in efforts to help support the accomplishment of the lawful mission of the parks.

20. The Secretary's Order and its implementation now has put ANPR in the impossible position of choosing which part of our mission to fully fulfill. We are forced to choose between providing the type of guidance and support we traditionally have for

current Park Service employees, or continuing to work to support the mission of the parks and the Park Service, including ensuring that the parks remain places where visitors can learn about uncensored history of the United States and the relationships between scientific evidence and the park sites. The Secretary's Order presents a significant obstacle to simultaneously pursuing both parts of our mission, as it has required the Park Service to attempt to censor certain historical stories and scientific information, in derogation of the values for which the Park Service was established. Because we understand the lawful mission of the Park Service to include offering "the highest quality interpretation and education," we understand and empathize with park staff who are required to comply with the Secretary's Order—when they have much more important mission-related things to do—and we cannot support the leadership in the Park Service and the Department of the Interior who are requiring compliance with the Secretary's Order and other agency guidance that undermines or directly contradicts that mission.

21. In an effort to support the mission to preserve the national parks for all people, ANPR has publicly denounced censorship of history and science at the parks, distancing our relationship with some current Park Service employees who we know are feeling the impact but are also afraid for their jobs and are concerned about being seen as associating with us.

22. ANPR is committed to supporting the lawful mission and management of the Park Service and Park System, which includes providing "the highest quality interpretation and education." Because the Executive and Secretary's Orders have caused the Park Service to abandon that part of its duties, it has become harder for ANPR to fulfill our own mission. We have been compelled to denounce the effects of the "Restoring Truth

and Sanity" Executive Order and Secretary's Order, most concretely the censorship we have seen spreading through parks across the country. For example, in November 2025, we called attention to the administration's attacks on the national parks through a series of ANPR-branded ads placed in bus shelters across Washington, D.C. One of those ads condemned censorship at Acadia National Park in Maine, where information concerning carbon emissions and the impact of climate change was censored:




23. At our annual Ranger Rendezvous in 2025, we saw a drop off in attendance by current Park Service employees, depriving us of the benefit of the perspectives of a significant segment of our membership and undermining our ability to later represent their interests. We understand this drop to be due to fear among current Park Service staff that

attending this ANPR event would be seen as opposing the Park Service and, by extension, the Secretary's Order.

24. ANPR also understands that fewer people are now interested in applying to work for the Park Service. Fewer people joining the Park Service means fewer people joining our organization, which has contributed to lower attendance at and revenue from our events.

25. In order to respond to and combat the Secretary's Order, ANPR has had to divert time and resources away from activities we would otherwise be pursuing, including developing additional educational programs, encouraging new members to join ANPR, and developing campaigns to spread the values and benefits of belonging to ANPR.

26. Park Service employees have, for decades, prided themselves on telling truthful and accurate stories to visitors about the history and science in this country—even stories about past events that today we are not proud of. Current attempts to erase and "whitewash" those stories are unacceptable. The American public and visitors to national parks deserve unbiased and accurate information.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Marana, Arizona
Dated: March 11, 2026

/s/ Bill Wade
Bill Wade

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

Defendants.

**Case No. 26-cv-10877**

**DECLARATION OF EMILY THOMPSON**

I, Emily Thompson, declare as follows:

1. My name is Emily Thompson. I am over the age of eighteen. This declaration is based upon my personal knowledge and experience as Executive Director for the Coalition to Protect America's National Parks ("Coalition"). I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. I joined the Coalition in 2018, as the part-time Communications and Advocacy Coordinator. I served in this capacity for a little over a year, then accepted a full-time position and the title of Deputy Director. I became the executive director in 2025. Prior to my work with the Coalition, I spent six years with the National Park Service, working as an Interpretive Park Ranger and interacting with the public. I led tours, worked with education programs, helped to coordinate volunteers, developed special events, and researched and produced content for interpretive media such as brochures, exhibits, and waysides. As an interpreter, I worked in parks in Washington,

D.C. and Hawaii. I also completed numerous detail assignments, including time spent as a public affairs officer and strategic planner.

3. I was a double major in undergraduate school and hold a Bachelor of Arts in American Studies and Anthropology from the University of Notre Dame. I also hold a Master of Arts in History, with a concentration in Public History, from American University. After leaving the Park Service, I served as the executive director at a museum and historic site in Southern Indiana. During this time, I authored three books, including two silver medal winners in the Independent Publisher Book Awards.

4. As Executive Director of the Coalition, I oversee the daily operation of the organization. In my capacity, I am responsible for the development, implementation, and tracking of our annual budget, and the execution of projects and activities related to grant funding and specific deliverables. I supervise a team of contract employees, with oversight of all social media, organizational communications, and education and advocacy actions. I support the work of the Executive Council and committees, and work on numerous issue areas, including facilitating access to subject matter experts for engagement with media, the public, and decision-makers. I also work closely with the Executive Council on the long-term vision and direction of the organization. This involves fulfilling the strategic plan and updating as needed, in addition to developing and executing an annual work plan. I also lead our development and fundraising activities, build and maintain strategic partnerships, work to expand and support membership, and ensure that advocacy and communications efforts effectively help to protect national parks and public lands for future generations.

5. The roots of the Coalition trace back to 2002, when a number of retired National Park Service employees decided to use their Voices of Experience to speak out against challenges

facing the Park Service. They understood that fear of retribution could prevent current NPS employees from speaking out – and Park Service retirees would be able to speak more freely. Our members join the Coalition because they devoted their careers, and often significant parts of their personal lives, to the mission of the Park Service. And even if they are no longer employees, they still care deeply about the continued protection of our national parks and support for current Park Service employees. The Coalition—through our ability to pool resources and expertise and connect with stakeholders—provides our members with a path to stay engaged with national parks, and a way to shape Park Service policy and practices.

6. Our members continue to apply their credibility, integrity, and expertise in support of our national parks, and the programs and offices that support their work. We advocate for the National Park Service workforce and champion solutions for our national parks and public lands that uphold the law and are grounded in sound science and scholarship. To accomplish this work, we utilize our members' voices to educate policymakers and collaborate with those who have a voice in shaping Park Service policies and procedures.

7. The Coalition to Protect America's National Parks channels the experience of thousands of current and former Park Service employees and volunteers towards advancing the long-term mission of the Park Service and the National Park System. We have nearly 5,000 members, including current, former, and retired employees and volunteers of the National Park Service. The Coalition supports and promotes the use of peer-reviewed science and academic scholarship to ensure irreplaceable natural and cultural resources are properly stewarded, as required by law.

8. As an organization of Park Service professionals of all levels, skill sets, and expertise, the Coalition is recognized by the public, park partners, Congress, and historically the

Park Service itself as the "Voice of Experience." Collectively, we have amassed more than 50,000 years of experience in caring for America's irreplaceable and valuable natural and cultural resources. Outside of their work with the Coalition, our members possess a diverse range of skills and expertise acquired during their careers with the National Park Service. We are retirees or former employees – often with decades of experience — and we are active employees out on the front lines every day. We are protection rangers and interpreters, scientists and maintenance workers, managers and administrators, and specialists in the full spectrum of the parks' resources. Our membership includes former National Park Service directors, deputy directors, regional directors, park superintendents, program specialists, field staff, and many other dedicated career professionals

**The Coalition's Mission**

9. The Coalition's mission includes building public awareness for issues affecting the National Park System, and to advocate and support solutions that use "sound science." We use our platform to educate and work with decisionmakers and other constituents about issues affecting the national parks, including around park protection, biodiversity, climate change, and the need to ensure the parks reflect the breadth, diversity, and richness of communities and cultures within the United States. We have historically done this work in partnership with and in support of the actions of the National Park Service itself. The Coalition supports and promotes the use of peer-reviewed science, history, and academic scholarship to ensure these irreplaceable natural resources are protected for current and future generations

10. In pursuit of our mission, the Coalition has developed reports and resources highlighting issues such as the impact of climate change on national parks, threats to cultural

resources from energy development near parks, and the importance of tools such as the Antiquities Act in the history of the National Park System and the continued protection of our parks.[1]

11. In order to advance our mission, "The Coalition is an active and respectful partner with the National Park Service."[2] One of the greatest services we provide is to be informal advisors and supporters, sharing our perspectives, wisdom, and knowledge gained from years of experience and serving as a sounding board for some of the most difficult questions the Park Service, and its employees, have faced.

**The Secretary's Order Impairs the Coalition's Mission**

12. Our mission includes building support for and educating decision makers on issues affecting the National Park System, which naturally includes supporting the Park Service in advancing the congressionally authorized mission of the agency. We believe that national parks should provide accurate and as-complete-as-possible interpretive information about historical events and science. We see the Park Service as having the distinct honor and responsibility to protect and maintain our country's most important places, cultural sites, and historic properties for the long-term education and benefit of the American people and other citizens of the world. The Secretary's Order contravenes this responsibility by removing interpretations of history and science from the parks even though they have been informed and guided by professional historians, scientists, architects, archivists, curators, natural, and other cultural resources specialists, and Park Service staff. As a result, it impedes the Coalition's ability to accomplish its goal to support the Park Service in fulfilling its statutory mission and promoting sound science. The Secretary's Order

---

[1] The Coalition to Protect America's National Parks, *Advocacy Reports*, https://perma.cc/D7F5-HQ2B.

[2] The Coalition to Protect America's National Parks, *Our Mission* https://protectnps.org/our-mission/.

thus represents a dereliction of the Park Service's statutory duty, harms the Coalition's mission, and degrades the experience for park visitors.

13. The Secretary's Order and its implementation create a direct conflict for the Coalition: Either our organization refrains from supporting the Park Service in order to continue pursuing our goal to help protect the parks for the benefit and enjoyment of current and future generations, or we accept censorship—thus abandoning our own mission—in order to continue supporting the Park Service in its current iteration. This conflict has a direct impact on the Coalition's relationship with its members. If we remain silent on the violation of the mission of the Park Service and the National Park System by erasing history and science, we violate the trust of our members who have spent their careers pursuing that mission. By contrast, describing accurate history and science as crucial to protecting the parks means effectively denouncing the Park Service and effectively asking our members to choose sides between the Coalition and their current or former employer. Even where our members may prefer to remain loyal to the Park Service mission, and in turn the Coalition, there is fear of retribution for being perceived as opposing the current administration's policies, actions, or campaigns.

14. Further, because of the Secretary's Order, the Coalition has to reallocate its resources to develop informational materials and investigate claims about the removal of historical and scientific information. In order to continue to advance its mission and combat Defendants' attempts to erase history and science, the Coalition has also been forced to devote valuable staff time and resources to fielding questions about removals from members and partners, developing briefing papers, and collaborating with policymakers—including members of Congress—on how best to continue protecting the national parks despite Defendants' actions.

15. Due to our continued engagement in fighting the removal of history and science in parks, the Coalition must take time and resources away from activities it would otherwise engage in. For example, the Coalition has been forced to divert resources away from core organizational activities and goals such as developing a new strategic plan in 2025, developing an annual work plan for 2026, hosting educational webinars, building an internal process for donor outreach and development, and other efforts to build out our fundraising and development work, thus potentially hindering our financial stability and growth.

16. For example, in the Spring of 2025, we authored a report "America's Best Idea in Peril: Climate Change and the Future of Our National Parks,"[3] which proposes solutions to safeguard the parks from long-term harm due to climate change. The report—produced entirely independently of the Park Service—includes the type of information that has historically either been produced, publicized, or relied upon by Park Service personnel. We believe it's our role, as a Voice of Experience of the Park Service and with the National Park System, to contribute to filling this gap.

17. Moreover, our partnership with the Park Service and its employees has been irreparably damaged by the Secretary's Order. It is much more difficult for us to provide the type of advice and support that we have historically, as current Park Service employees are fearful of being seen as supporting an organization that has opposed the Secretary's Order and implementation. They fear that because we have spoken out against censorship due to the Secretary's Order, accepting our support or working with us will be tantamount to aligning with an enemy, and may result in negative professional consequences. In all my years as an employee

[3] SEEC Inst. & Coal. to Protect America's Nat'l Parks, *America's Best Idea in Peril: Climate Change & the Future of Our National Parks* (July 2025), https://perma.cc/FVT6-DXQM.

and supporter of the Park Service, this type of widespread fear is unprecedented, and it is hindering our ability to provide the type of informal partnership that is central to the Coalition's work.

18. National parks are beloved by the American people. The Park Service is one of the most popular federal agencies and there is a certain cache surrounding the role of the National Park Ranger. Our national parks truly represent the best of us. But the mission of the National Park Service – to preserve unimpaired the natural and cultural resources of the National Park System for the enjoyment, education and inspiration of this and future generations – is at risk. As a result, the Coalition's mission to support the work of the National Park System in achieving its mandate is also in jeopardy. The censorship of history and science that is occurring in parks across the country threatens to undermine the integrity and credibility of the National Park Service. Visitors continue to flock to our national parks for adventure, or reflection, or education. They come for the extraordinary scenery and to stand in the footprint of history. We cannot allow the truth that is protected by our parks – from the impacts of climate change to the terrible reality of slavery – to be erased. The Coalition exists to help ensure that national parks, their stories, and their landscapes are protected. Because of the Secretary's Order, our mission is also compromised.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dayton, Ohio
Dated: March 12, 2026

/s/ Emily Thompson
Emily Thompson

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

Defendants.

**Case No. 26-cv-10877**

**DECLARATION OF JULIAN JON REYES**

I, Julian Jon Reyes, declare as follows:

1. My name is Julian Reyes. I am over the age of eighteen. This declaration is based upon my personal knowledge and experience as Chief of Staff of the Union of Concerned Scientists ("UCS"). I provide this declaration in support of Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay.

2. My entire higher education and professional background is in science and engineering, with a particular focus on climate change impacts on natural resources and the environment. I hold a Bachelors of Science and PhD in civil engineering from Washington State University. As a Fulbright scholar in Germany, I conducted research on empirical modeling of nitrogen in grasslands. For my doctoral research, I modeled the impacts on

climate and management strategies in rangeland ecosystems, also engaging with stakeholders to craft relevant research results for land managers and decision makers. Immediately prior to joining UCS, I worked as a civil servant for nine years, serving in multiple roles—within the Departments of Agriculture, Interior, and State, at the White House, and in the interagency U.S. Global Change Research Program—implementing climate policies and programs and co-creating climate-informed resources. Most recently, as the acting branch chief and adaptive management lead at the Bureau of Land Management ("BLM"), I leveraged climate science and adaptation strategies from Interior subagencies including the National Park Service and their Climate Change Response Program to help BLM make climate-informed decisions. I worked closely with scientists in the Park Service Climate Change Response Program to share their work on climate scenario planning to inform BLM's own planning and regulatory processes. I also collaborated with the Park Service in better understanding available forward-looking climate data at scales relevant for BLM. Before BLM, I served as assistant director for climate services at the White House Office of Science and Technology Policy and U.S. Global Change Research Program, advancing a whole-of-government effort to cohesively and collaboratively advance actionable climate science and services. I also led conversations to increase consistency of climate data use across land management agencies including the Park Service, U.S. Forest Service, and U.S. Department of Agriculture. I also spent nearly seven years at the Department of Agriculture with their Climate Hubs program helping farmers, ranchers, and foresters understand their climate risks and co-produced useful and usable risk management data, tools, and resources. Through listening sessions with resource managers and the public, I helped to curate relevant climate science and tools for different audiences to maximize usefulness and impact.

3. I joined UCS earlier this year as the Chief of Staff. As Chief of Staff, I serve as the UCS President's principal strategic partner and central coordinator of executive-level decision making, information flow, and organizational priorities. I also engage in cross-programmatic and organizational-wide initiatives lifting up UCS programs in external-facing science policy dialogues and fora. This includes anticipating issues before they arise ("seeing around the corner") and understanding current science policy issues and resource needs so there are "no surprises." Finally, I ensure UCS leadership is aligned, prepared, and focused on the highest-impact work to meet the moment. Since 2013, I have been in the UCS Science Network, partnering with UCS to advance scientist-community partnerships and effective science communication to the public. Even before taking on this new role with UCS, I have worked directly with the UCS Science Network to create programming and shared spaces for scientists and technical experts to highlight their work with and in communities, highlighting best practices for community engagement and science communication.

4. UCS was founded in 1969 by faculty and students of the Massachusetts Institute of Technology to initiate a critical and continuing examination of governmental policy in areas where science and technology are of actual or potential significance. UCS puts rigorous, independent science into action, developing solutions and advocating for a healthy, safe, and just future. UCS represents the interests of the scientific community in advancing science in public policy, and advocates for the role of science and scientists in federal policymaking and in civil society, including by combating misinformation about science through public education.

5. UCS is a 501(c)(3) not-for-profit membership organization composed of 610,000 supporters, including 23,000 scientists, economists, engineers, public health

specialists, and other technical experts in the UCS Science Network. The UCS Science Network has participation from many federal scientists and technical experts across multiple agencies, including the Park Service.

6. UCS has dozens of full-time staff that provide services to or interact with our membership base. This includes UCS staff in our Development Department who provide members with information and resources regarding UCS' reports, research and other activities; staff across UCS programs who engage our members with education, policy campaigns and other actions; and staff in the UCS central programs office who provide issue education, skills trainings and other opportunities for the UCS Science Network

**UCS's Mission is to Promote the Use of Accurate Scientific Information and Combat Scientific Disinformation**

7. UCS endeavors to put rigorous, independent scientific principles into practice and to increase scientific literacy and access to support evidence-based decisionmaking. We believe that the key to a healthy, safe, and just future is having widespread and accurate scientific information. By mobilizing scientists and combining their voices with those of advocates, educators, business people, and other concerned citizens, UCS has built a reputation for fairness and accuracy in our advocacy and engagement with government officials and other policy makers.

8. UCS accomplishes its mission through research, advocacy, engagement, and policy analysis. We work to ensure that federal agencies are held to the highest standards of scientific integrity in their production, use, and communication of scientific information, including the Park Service. By providing accurate, current scientific information through blog posts, campaigns, reports, and peer-reviewed scientific studies, we fight to combat

inaccurate studies and claims that sow doubt about all forms of science, with particular focus on climate science. Since 2016, UCS has published at least 267 reports, on average a little over 26 reports per year organizationwide. The majority of our reports are related, either directly or indirectly, to climate science, and a substantial proportion—roughly 20%—concern the impacts of climate change, pollution in particular locales, farm waste, sustainable agriculture, and groundwater, i.e. the very type of material that often appears on interpretative signs in national parks. Producing any one scientific or analytical product takes hundreds of hours of dedicated time for each scientist, analyst, or communication specialist, including research and production. In addition, UCS devotes significant time to education related to our analytic products. Such activities include production and distribution of derivative products for targeted audiences, such as fact sheets and social media posts, meetings with government officials to advise and educate them on the contents of our written products, presentation of scientific findings at technical conferences and public events, engaging with journalists, and communicating with our network and supporters.

9. UCS also hosts a variety of programs dedicated, at least in part, to combating scientific misinformation. Through the UCS Center for Science and Democracy, we highlight the role of impartial, best available science in solving the nation's most critical problems. We devote hundreds of hours to tracking 'attacks on science', including disinformation and misinformation, disappearing data, silenced scientists, suppressed studies, and other impacts on science-based policy. Through its programs and resources, the Center works to strengthen the overall partnership between science and democracy, with a focus on federal government agencies. We work on creating fair access to public participation in government decisionmaking so that all people have the ability to impact and

influence policy. Fair access depends on people having accurate and timely information and data so as to provide meaningful input and hold decisionmakers accountable.[1] Additionally, the UCS Climate and Energy Program works to safeguard people, communities, and landscapes from the consequences of climate change, including through policy-relevant science and resources and development of science-backed, equitable solutions. UCS's Climate Accountability campaign has long documented the strategic efforts of fossil fuel companies to undermine public understanding and acceptance of climate change science.[2] UCS staff serve on the steering committee and policy working groups of the Climate Action Against Disinformation coalition (www.caad.info) and contribute to public and policymaker understanding on the issue. UCS staff train our own supporters, Science Network members, and members of scientific societies, such as the American Meteorological Society, to identify and block the spread of online disinformation.

10. Ensuring that public institutions distribute reliable, trustworthy, and sound information about scientific phenomena is central to UCS's mission. For two decades, UCS has worked to advance scientific integrity and fight censorship at federal agencies, through collaborating with federal scientists to promote their ability to work with scientific integrity and advocating with federal agencies and Congress to support a culture and practice of scientific integrity government wide. For example, UCS is an ardent advocate for the Department of the Interior's Scientific Integrity Policy, which seeks to "[r]ecognize the

---

[1] *See, e.g.,*Union of Concerned Scientists, *Attacks on Science* (updated March 2025), https://perma.cc/4SP5-VV6T; Union of Concerned Scientists, *Fair Access* (Sep. 9, 2025), https://perma.cc/5RQ3-8C8R.
[2] *See, e.g.,* Union of Concerned Scientists, *Smoke, Mirrors & Hot Air (*Jan. 2007), https://perma.cc/PCG9-X53K; Kathy Mulvey et al., *The Climate Deception Dossiers*, Union of Concerned Scientists (July 2015), https://perma.cc/F62X-EAPT; Kathy Mulvey et al., *Decades of Deceit*, Union of Concerned Scientists (May 2025), https://perma.cc/K9TS-K3WG.

importance of scientific information, science, and scholarship as methods for maintaining and enhancing our effectiveness and establishing credibility and value with all sectors of the public." Additionally, it requires that all Department of Interior employees attest to the following, which is consistent with, and helps advance, our mission:

> I will be responsible for the quality of the data I use or create and the integrity of the conclusions, interpretations, and applications I make. I will adhere to appropriate quality assurance and quality control standards, and not withhold information because it might not support the conclusions, interpretations, and applications I make.

11. We see the Policy as not only consistent with, but also critical to, our mission. UCS Center for Science and Democracy, and its predecessor the UCS Scientific Integrity Program, has conducted research and advocacy on federal scientific integrity policies and practice, including reports and advocacy focused on DOI, for nearly two decades. This work has included policy analysis of Interior draft scientific integrity policies, providing written and oral public comments in response to Federal Requests for Information on improving scientific integrity at Interior and across the government, publishing analysis in scientific journals, presenting at scientific meetings, holding webinars, convening stakeholders, educating members of Congress, and mobilizing the scientific community to meet with government officials in support of strengthening scientific integrity.

12. UCS works to assess—with a goal towards helping improve—compliance with the standards set out in the Scientific Integrity Policy across the Department of Interior, including at the Park Service. As just one example, in 2018, UCS detailed the perspectives of more than 63,000 federal scientists across 16 agencies, including the Park Service, on scientific integrity, censorship, and public access to scientific information, in a report titled "Science Under Trump: Voices of Scientists across 16 Federal Agencies," and subsequently

engaged the Park Service to share its findings with an eye towards collaboratively implementing improvements.[3] Likewise, UCS's 2018 report, "Science Under Siege at the Department of the Interior: America's Health, Parks, and Wildlife at Risk" contains additional research and policy analysis relevant to the parks.[4] As part of this work, UCS met with scientific integrity officers across the Department of the Interior, including the Park Service.

13. Collaboration with the Park Service has also proven essential to advancing UCS's mission. In previous UCS reports, Park Service employees served as external reviewers who provided independent, expert scrutiny of UCS's methods, evidence, interpretations, conclusions, and recommendations. External review also provides validation from respected experts outside of UCS, reinforcing the report's credibility with policymakers, practitioners, and the public. In reports such as National Landmarks at Risk, Park Service reviewers with direct, place-based expertise helped ensure that site specific descriptions, risk assessments, and interpretations accurately reflected on-the-ground conditions, management realities, and the state of the science relevant to each location.

14. Beyond external reviews, Park Service scientists and experts have historically contributed to studies, and some are also members of UCS. Those studies, and the research behind them, help inform interpretive materials at national parks. Further, the Park Service has also provided its expertise when UCS publishes reports on how scientific phenomena affect American ecosystems and cultural sites, including those that are managed by the Park Service. In May 2014, for example, UCS published the "National Landmarks at Risk" study,

---

[3] Union of Concerned Scientists, *Science Under Trump: Voices of Scientists across 16 Federal Agencies*, (Aug 7, 2018), https://perma.cc/F97A-E3R6.
[4] Jacob Carter et al., *Science under Siege at the Department of Interior*, Union of Concerned Scientists (Dec. 2018), https://perma.cc/L4LH-J2JD.

which detailed how rising seas, floods, and wildfires are threatening several of the United States' most cherished historic sites, many of which are managed by the Park Service.[5] In conducting this study, a dozen Park Service staff collaborated with UCS to create the report, including Marcy Rockman, the then-Climate Change Adaptation Coordinator for Cultural Resources at the National Park Service. In 2016, UCS also published a report titled "World Heritage and Tourism in a Changing Climate," also in collaboration with several Park Service staff.[6] This report detailed the risk climate change posed to heritage sites around the world, including locations managed by the Park Service such as Yellowstone National Park, Mesa Verde National Park, and the Statue of Liberty.

**The Secretary's Order Impairs UCS's Mission**

15. UCS's mission is frustrated by Defendants' efforts to censor peer-reviewed, scientific information at the national parks, especially around climate science and climate impacts. Historically, public facing content from Federal agencies, especially Interior, is significantly vetted for scientific accuracy, because it falls under the purview of DOI's strong scientific integrity and communications policies. The Secretary's Order to remove any interpretive materials that "emphasizes matters unrelated to the beauty, abundance, and grandeur of the American landscape" is leading to the removal of well-established scientific content, including content detailing the effects of climate change. This is completely antithetical to protecting the "beauty, abundance, and grandeur of the American landscape"

[5] Debra Holtz et al., *National Landmarks at Risk*, Union of Concerned Scientists (May 2014), https://perma.cc/B65Y-RGUW.
[6] A. Markham, et al., *World Heritage and Tourism in a Changing Climate*, Union of Concerned Scientists (2016), https://perma.cc/V8QW-GTZ8.

and contravenes our mission to increase scientific literacy and access, particularly as it relates to threats to national parks and the broader American landscape.

16. Because of the Secretary's Order and its implementation, UCS has delayed or put on hold several long-term projects, and has had to redirect approximately 5% of staff resources and capacity away from other activities that are integral to its mission. UCS leaders have already spent considerable time responding to inquiries and strategizing about how best to ensure rigorous, independent scientific principles continue to be reflected in the national parks despite Defendants' actions. In 2025, UCS had to reduce the number of reports it published, dropping from 27 in 2024 to 18 in 2025. Producing additional scientific reports or other analytical materials to replace the science that Defendants have censored would require UCS to further cut back on other key elements of its work.

17. UCS's goal of ensuring scientific integrity across federal agencies has also been thwarted. Our 2018 study of Park Service staff recommended that "agency leaders could best improve scientific integrity at the NPS by reaffirming scientists' freedom to pursue and communicate openly about their scientific work without asking for permission, regardless of whether it is politically contentious"—a goal that has only been further hindered as a result of the Secretary's Order. Because of the Secretary's Order, UCS will have less access to Park Service officials to advance its goal of strengthening scientific integrity at federal agencies and will need to expend additional resources to ensure that science and scientists are not censored by the Park Service.

18. UCS has also lost a key partner in fulfilling its mission to provide accurate scientific information and increase scientific literacy and access. We no longer believe it is feasible to partner with the Park Service on reports in the same manner it did before, because

the Secretary's Order requires an approach to science that is inconsistent with UCS's mission. For example, our 2014 report on climate change's impact on national park sites details how rising sea-levels are threatening Fort Sumter—a sign that describes this very threat of rising sea levels at Fort Sumter was removed pursuant to the Secretary's Order. The sign was the product of extensive research by the Park Service and West Carolina University showing the effects of sea level rise, coastal erosion, flooding and storm surge on the park.[7] Because of the Secretary's Order, Park Service staff are no longer able to contribute to these reports either formally or informally if they discuss information that Defendants find "disparaging" or focus on natural features other than the "beauty, abundance, and grandeur of the American landscape." Without these contributions from the Park Service, UCS will not be able to produce the same quality and quantity of reports and studies relevant to national parks, and will have to expend its own resources to find relevant expertise that the Park Service previously filled.

19. Appreciating the beauty and abundance of the American landscape depends on knowing the science behind it and, so long as the Secretary's Order censors that very science, that beauty and abundance will remain under threat. As both a national parks enthusiast and former civil servant at the Department of the Interior, it is both sad and maddening that critical scientific knowledge on climate science and basic U.S. history are being censored at national parks. Iconic American landscapes and cherished cultural heritage resources are to be enjoyed for both current and future generations. To meet that mission, a foundational scientific understanding of both past, current, and future changes in environmental conditions

[7] Katie Peek et al., *Fort Sumter National Monument Coastal Hazards & Sea-Level Rise Asset Vulnerability Assessment Protocol* (May 2016), Nat'l Park Serv., https://perma.cc/FH3Y-TWBA.

helps us appreciate the beauty and abundance of the American landscape, but also its fragility. As long as the Secretary's Order censors relevant climate science, among other relevant knowledge, our national parks remain under threat and destruction.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Boston, Massachusetts

Dated: March 11, 2026

Julian Jon Reyes

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director,<br><br>Defendants. | Civil Action No. 1:26-CV-10877-AK |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**ANGEL KELLEY, D.J.**

Six plaintiff organizations—National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks ("Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS")—filed this action under the Administrative Procedure Act ("APA") against Defendants Department of the Interior, Secretary of the Interior Doug Burgum, the National Park Service ("NPS"), and Director

of the Secretary of the Interior Jessica Bowron, claiming that Defendants' removal of certain displays at National Park sites is arbitrary and capricious, contrary to law, and in excess of statutory authority. Plaintiffs move for a stay under Section 705 of the APA or, in the alternative, a preliminary injunction to restore the sites as they existed prior to Defendants' actions. Defendants filed a consolidated Opposition and Motion to Dismiss, asserting challenges to standing, venue, ripeness, and APA reviewability, and arguing that Plaintiffs fail to state a claim. For the following reasons, Defendants' Motion to Dismiss is **DENIED**.

As for Plaintiffs' Motion for a Stay, the Court notes that motions to dismiss and for preliminary injunctive relief present distinct legal standards and involve different factual and equitable considerations. Accordingly, the Court will address the Motion for a Stay in a separate Order to ensure the application of the proper standard for each Motion.

## I. BACKGROUND

Unless stated otherwise, all facts are drawn from Plaintiffs' Amended Complaint. Along with their Motion to Stay, Plaintiffs submitted various declarations and exhibits, including standing affidavits from their individual members. Defendants do not contest the veracity or authenticity of Plaintiffs' attachments, and so the Court considers them merged into the pleadings for purposes of this Motion. See Watterson v. Page, 987 F.2d 1, 4 (1st Cir. 1993).

Established in 1916, NPS is a bureau within the Department of Interior that oversees the National Park system. Congress created NPS through the National Park Service Organic Act ("Organic Act"), with a statutory mandate to "conserve the scenery, the natural and historic objects, and wild life [in National Park sites] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Pursuant to this

mandate, NPS manages hundreds of parks, monuments, memorials, and recreation areas (collectively, "park sites") across the United States, which collectively host hundreds of millions of visitors each year. To enrich visitors' experience, the agency provides various educational and interpretive information providing details and context for each park site, including exhibits, interpretive waysides, bookstores, booklets, brochures, and other publications. The history, quality, and scale of these educational materials have established the National Parks system's reputation as "America's largest classroom."

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring Truth and Sanity to American History." The Executive Order directed the Secretary of the Interior to review all "public monuments, memorials, statues, markers, or similar properties" (collectively, "interpretive materials") at park sites and remove any that met certain characteristics. Specifically, the Executive Order states:

> Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light. Under this historical revision, our Nation's unparalleled legacy of advancing liberty, individual rights, and human happiness is reconstructed as inherently racist, sexist, oppressive, or otherwise irredeemably flawed. Rather than fostering unity and a deeper understanding of our shared past, the widespread effort to rewrite history deepens societal divides and fosters a sense of national shame, disregarding the progress America has made and the ideals that continue to inspire millions around the globe.

Exec. Order. No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

To effectuate this mission, the Executive Order directed the Secretary of the Interior to take three actions:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;

> (ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. § 1451 *et seq.*, 54 U.S.C. § 100101 *et seq.*, and other applicable law; and
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Id. § 4.

Two months later, on May 20, 2025, the Secretary of the Interior implemented these directives by issuing Secretary Order 3431, likewise titled "Restoring Truth and Sanity to American History" ("Secretary's Order"). Two sections of the Secretary's Order are relevant to this case. First, Section 5 directed NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, "Land Management Bureaus") to conduct the reviews mandated by the Executive Order. It established a two-step review plan. During the initial thirty-day phase, the Land Management Bureaus were to review and remove any interpretive materials that had been "removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology" since January 1, 2020. During the next phase, the scope of review broadened to all park sites, with the agencies directed to review and remove any interpretive material that "inappropriately disparages Americans past or living . . . or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature" or is otherwise "inconsistent with the purpose of" the Executive Order. This phase was to be completed within 120 days. In addition to the review process set out in Section 5, Section 6 of the Secretary's Order directed the Land Management Bureaus to post quick response ("QR")

codes at park sites soliciting help from visitors in identifying content that allegedly violated the Executive Order. NPS compiled a database of public comments submitted through the QR codes.

In Summer 2025, in compliance with the Secretary's Order, NPS staff began removing material. Defendants also instituted various internal efforts to speed up removals, leading to a significant escalation in early 2026. For example, in August and September 2025, Bowron sent letters to park sites that allegedly failed to remove signs as a notice of their "non-compliance," and in November 2025, Bowron issued a separate order to expand the scope of review to include retail items.

These efforts proved fruitful. By early 2026, NPS had removed or identified for removal hundreds of interpretive materials from park sites. By the date of the filing of this action, removed material included, *inter alia*, exhibits at California Golden Gate National Park describing NPS' historical role in eugenics movements and Indigenous history; exhibits at the New York Gateway National Recreation Area concerning climate change, women's rights, slavery, and Japanese internment during World War II; signs from Independence National Historical Park in Philadelphia explaining enslaved people's role in operating the house during George Washington's presidency; films on labor history at Lowell National Historical Park in Massachusetts; signs describing climate change and its impact on glaciers at Glacier National Park in Montana; and an image at Sunset Crater Volcano National Monument in Arizona of a visitor holding a Pride flag. In addition to materials that have already been removed, hundreds of others have been flagged for removal. This includes, *inter alia*, civil rights-related exhibits at the Emmett Till and Mamie Till-Mobley National Monument; over thirty plaques and signs at Harpers Ferry National Historic Park detailing the history of slavery and abolitionism;

interpretive materials across the country describing the mistreatment of Indigenous groups; and signs providing scientific information about air pollution, the effects of industrialization on wetlands, global warming, the dangers of grazing, and endangered species. According to an internal NPS database leaked by anonymous civil servants on March 2, 2026, over five hundred items have been identified for review.

Plaintiffs filed this action on February 17, 2026, arguing that Defendants' actions are arbitrary and capricious, contrary to law, and in excess of statutory authority under the APA, 5 U.S.C. § 706, and seeking declaratory and injunctive relief. For their APA claims, Plaintiffs allege violations of five statutes: the National Park Service Centennial Act ("Centennial Act"), 54 U.S.C. §§ 100801-100803, the Organic Act, 54 U.S.C. § 100801, the National Parks Omnibus Management Act ("Omnibus Management Act"), 54 U.S.C. §§ 100701-100702, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.* On March 18, 2026, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. On April 8, 2026, Defendants filed a consolidated Opposition and Motion to Dismiss, asserting that Plaintiffs lack standing, the claims are not ripe, venue is improper, the claims are not judicially reviewable under the APA, and that Plaintiffs fail to state a claim. The Court held a Status Conference with the parties on May 12, 2026. After conferring with the parties, the Court determined to decide the Motion to Dismiss on the papers and without oral argument.

## II. LEGAL STANDARD

Defendants bring both jurisdictional challenges to Plaintiffs' claims, which the Court construes as brought pursuant to Federal Rules of Civil Procedure 12(b)(1), and plausibility challenges under Rule 12(b)(6). "When faced with motions to dismiss under both 12(b)(1) and

12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) aff'd, 672 F.3d 64 (1st Cir. 2012). Whether evaluating a motion brought under Rule 12(b)(1) or 12(b)(6), the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2008)). A complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (internal citation omitted). A court may not disregard properly pleaded factual allegations even if "actual proof of those facts is improbable." Ocasio-Hernandez, 640 F.3d at 12 (quoting Twombly, 550 U.S. at 556). Rather, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Id. at 13. In making that determination, a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein, and facts susceptible to judicial notice. Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

## III. DISCUSSION

Defendants raise several threshold jurisdictional challenges, contending that: (1) Plaintiffs lack standing to bring their claims, (2) the claims are not ripe for review, (3) the Secretary's Order is not subject to judicial review under the APA because it is not a final agency

action and because it is committed to agency discretion, and (4) all non-Massachusetts-based Plaintiffs should be dismissed for improper venue. In addition, Defendants argue that Plaintiffs fail to state a claim under Rule 12(b)(6). The Court addresses each argument in turn, beginning with the jurisdictional challenges.

### A. Article III Standing

At the outset, Defendants contend that Plaintiffs have not established standing. To plead standing, a plaintiff must demonstrate (1) he has suffered "injury in fact," (2) the injury is "fairly traceable" to the actions of the defendant, and (3) the injury will likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). A plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 434 (2017). In a multi-plaintiff suit, only one plaintiff needs to meet the standing requirements for the case to proceed. Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Rumsfeld v. Forum for Acad. & Institutional Rts., Inc., 547 U.S. 47, 52, n.2 (2006)). An organization (as opposed to an individual) can establish standing in two ways: first, an organization can sue for harm to its own interests under a theory of organizational standing; and second, an organization may sue in a representative capacity for harm impacting its individual members under a theory of associational standing. See Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). Here, Plaintiffs assert they have standing under both theories.

#### 1. Organizational Standing

The standard for organizational standing is the same as "the usual standards for injury in fact, causation, and redressability that apply to individuals." FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 393-94 (2024). Defendants argue that Plaintiffs have failed to

demonstrate the first element of injury-in-fact because their only alleged harm is resource diversion, and, according to Defendants, the Supreme Court in Alliance for Hippocratic Medicine held that resource diversion can essentially never constitute injury-in-fact outside of the narrow factual circumstances recognized in Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). This Court disagrees.

For an organization to demonstrate injury-in-fact, the defendant's actions must have caused an injury to the organization's activities that is "more than simply a setback to the organization's abstract social interests." Nat'l Ass'n of Consumer Advocates v. Uejio, 521 F. Supp. 3d 130, 142 (D. Mass. 2021). This is "not a demanding standard," as "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." Id. Theories of harm based on diverting organizational resources to issue advocacy or lobbying activities are insufficient to establish standing. Alliance, 602 U.S. at 393-94; see also Equal Means Equal v. Ferriero, 3 F.4th 24, 30 (1st Cir. 2021).

Here, Plaintiffs allege concrete injuries to their core activities that extend beyond resource diversion. For example, NPCA alleges they have historically hosted site visits, educational programming, and events at park sites that focus on topics such as marginalized groups and civil rights. Because of the removal of interpretive materials related to these topics, it is plausible that NPCA can no longer host these events at the sites without sacrificing the quality of the programming. See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding organizational standing where agency "deprived [the organization] of key information that it relies on to educate the public"). Similarly, SEGD alleges that they use interpretive materials from park sites for internal training materials and as reference guides. As these materials are being removed, SEGD's ability to rely on them for

training is reduced. As another example, ANPR hosts activities and conferences for its members, who are primarily current and former National Park Rangers. ANPR alleges that because of the policies in the Secretary's Order, attendance at these events has decreased, thus also reducing their revenues. See Am. Ass'n of Univ. Professors v. Rubio, 780 F. Supp. 3d 350, 380 (D. Mass. 2025) (finding organizational standing where agency action deterred members from participating in organization's activities). Because these harms involve Plaintiffs' core organizational activities, Plaintiffs have plausibly alleged injury-in-fact.

Even to the extent Plaintiffs cite resource diversion as a basis for standing, their arguments are not foreclosed by Alliance. Defendants' reading—that Alliance essentially precludes *any* form of resource diversion as constituting injury-in-fact—is overly broad. The defect in the plaintiff-organizations' standing theory in Alliance was that the activities solely comprised issue advocacy and lobbying in opposition to the challenged agency action. See 602 U.S. at 394. These activities—including compiling pro-life studies, "drafting citizen petitions," and "engaging in public advocacy and public education" campaigns—arose only after, and directly in response to, the Food and Drug Administration's approval of an abortion medication. Id. The Supreme Court explained that recognizing such expenditures as an injury-in-fact would permit an organization "to challenge almost any federal policy that they dislike, provided they spend a single dollar opposing those policies." Id. at 395.

But the principle that a plaintiff may not "manufacture" standing by voluntarily expending resources opposing a governmental action through lobbying or advocacy does not extend to cases in which a plaintiff is compelled to divert resources to counteract the effects of a government action on its existing operations and members. See id. (discussing Havens Realty, 455 U.S. at 379, in which the Supreme Court found standing where organization diverted

resources to counteract discriminatory steering practices, detracting from their ability to provide affordable housing counseling and referral services). Indeed, other courts in this district assessing organizational standing have rejected the interpretation of Alliance that Defendants urge. See, e.g., Presidents' All. v. Noem, 2026 WL 788185, at *8-9 (quoting Town of Milton v. Fed. Aviation Admin., 87 F.4th 91, 99 (1st Cir. 2023)) (finding standing where organization diverted resources to respond to member questions regarding federal government visa revocations); Am. Acad. of Pediatrics v. Kennedy, 814 F. Supp. 3d 150, 159-60 (D. Mass. 2026) (same for member counseling regarding federal government's changes to COVID vaccine recommendations).

Here, unlike the organizations in Alliance, at least some of Plaintiffs' resource diversion is allegedly intended to address the Order's negative effects on existing activities and members. For example, Plaintiffs allege that they have diverted resources to respond to member concerns about the impact of the Secretary's Order on their careers and ethical standards for historical interpretation. Due to the time and resource investment required to respond to these inquiries, Plaintiffs' ability to pursue other core activities like organizing events, providing member services, and promoting research initiatives and reports has been stymied. Plaintiffs' allegations are thus distinguishable from the advocacy and lobbying activities in Alliance and are sufficient to establish injury-in-fact. See Kennedy, 814 F. Supp. 3d at 159 (holding that organization's "diver[sion of] resources away from its usual tasks and initiatives aimed at children's health" constituted "sufficient injury to [its] core business activities for the purposes of organizational standing").

In addition to their broader injury-in-fact challenges, Defendants independently argue that Plaintiffs' Paperwork Reduction Act claim should be dismissed for failure to demonstrate

injury-in-fact. According to Defendants, Plaintiffs have failed to allege any actual injury resulting from Defendants' purported failure to follow the statute's procedural requirements. However, at least one court has held that the federal government's failure to follow the Paperwork Reduction Act's procedures can cause informational injury. In Doctors for America v. Office of Personnel Management, 766 F. Supp. 3d 39 (D.D.C. 2025), a nonprofit organization representing health care professionals brought claims against the Office of Personnel Management under the Paperwork Reduction Act, contending that the agency failed to follow the statute's notice requirements prior to terminating public webpages hosted by the Centers for Disease Control ("CDC"), which contained certain medical information. Id. at 52. The court granted a preliminary injunction in favor of the plaintiff, finding that the organization's individual members had established standing. Id. at 47-49. Specifically, the court explained that the physician affiants "regularly rel[ied]" on information the CDC publishes and that "alternatives are limited." Id. at 48. As a result, "[t]he denial of 'information' these doctors 'wish[ed] to use in their routine' activities ha[d] 'inhibit[ed] . . . their daily operations' and thereby caused 'an injury both concrete and specific to the work in which they are engaged.'" Id. (quoting People for the Ethical Treatment of Animals, 797 F.3d at 1094).

Here, like the plaintiff in Doctors for America, Plaintiffs have plausibly alleged that Defendants have caused them informational injury by removing the interpretive materials without notice and depriving them of the content therein. As explained, Plaintiffs allege that historically, they regularly relied on interpretive materials at park sites for internal training, events, site visits, and education, and that the removal of these materials has disrupted such activities. Thus, Plaintiffs have adequately alleged injury-in-fact as to their Paperwork Reduction Act claims.

Accordingly, Plaintiffs have pleaded sufficient facts to meet the requirements of organizational standing. And because at least one Plaintiff has demonstrated standing, all Plaintiffs may proceed with the action.

**2. Associational Standing**

Having found that Plaintiffs have demonstrated organizational standing, the Court is not required to address associational standing. See, e.g., President & Fellows of Harvard Coll. v. U.S Dep't of Health & Hum. Servs., 798 F. Supp. 3d 77, 114 (D. Mass. 2025). But "[b]ecause the Plaintiffs' standing theories may affect the relief this Court can offer, this Court proceeds to analyze associational standing as well." Kennedy, 814 F. Supp. 3d at 161 (quoting Rubio, 780 F. Supp. 3d at 379).

Two Plaintiffs—NPCA and AASLH—claim associational standing in addition to organizational standing. To establish associational standing, an organization must demonstrate (1) at least one of its members "would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Council of Ins. Agents & Brokers v. Juarbe-Jimenez, 443 F.3d 103, 108 (1st Cir. 2006) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)). Defendants challenge only the first element, contending that the NPCA's and AASLH's members have failed to establish standing in their own right. As explained below, the Court finds otherwise.

First, NPCA member Jennifer Goepfert asserts that the Secretary's Order jeopardizes her ability to continue using park sites to educate her homeschooled children on topics such as science and history. She describes how she derived aesthetic value from the park sites as they existed before the Order, and that her future uses would be diminished by continued

implementation of the removal plan. Defendants contend that Goepfert has failed to demonstrate injury-in-fact because her alleged harms are insufficiently imminent.

To show injury-in-fact, a plaintiff must show the injury is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Sea Shore Corp. v. Sullivan, 158 F.3d 51, 55 (1st Cir. 1998) (quoting Lujan, 504 U.S. at 560). Defendants do not contest that the alleged harms are concrete and particularized, instead raising arguments primarily as to imminence. To show imminence in a case where equitable or declaratory relief is sought, as is the case here, a plaintiff must show "a real and immediate threat" that he will suffer a future injury; a prior injury will not suffice. Gray v. Cummings, 917 F.3d 1, 19 (1st Cir. 2019); Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (citing Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)). The threatened injury must be "certainly impending," or there must be a "substantial risk" that the alleged injury will occur. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014); see also Berner v. Delahanty, 129 F.3d 20, 24 (1st Cir. 1997) (concluding that plaintiff had standing to pursue injunctive relief where he "face[d] a realistic risk of future exposure to the challenged policy").

Here, Goepfert's alleged injuries are sufficiently imminent to constitute injury-in-fact. She alleges she has visited at least 66 park sites, and that these visits are a regular and significant part of her parenting method and lifestyle. Moreover, she alleges specific plans to take her children to visit various park sites in Summer 2026, including the Brown v. Board of Education National Historical Park, Hot Springs National Park, and Little Rock Central High School—sites where signs have been flagged for removal. While Defendants highlight that no interpretive materials have been removed from these three park sites to date, as implied by the word "imminent," a harm need not have already occurred to constitute injury-in-fact. See Gray, 917

F.3d at 19. It is reasonable to infer that removal could occur soon given these park sites are flagged, and similar materials have already been removed from dozens of other park sites over the past year. See Massachusetts v. HHS, 923 F.3d 209, 225 (1st Cir. 2019) ("[A] plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about'" (citation omitted)); cf. N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 50 (1st Cir. 2021) ("[H]istory of past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (citation omitted)). Thus, Goepfert's alleged injuries are sufficiently imminent to constitute injury-in-fact.

Defendants argue that Goepfert's summer plans are merely a "some day intention[]," citing the Supreme Court's opinion in Lujan. 504 U.S. at 564. However, Goepfert's stated intentions of future travel are a far cry from those found insufficient in Lujan. The Lujan affiant had traveled to Sri Lanka only once and merely "hope[d]" to observe endangered species without any actual or ongoing plans to do so. Id. at 563. By contrast, Goepfert has visited 66 out of 433 park sites and relies on them as a primary source of education for her daughters. See Drewniak v. U.S. Customs & Border Prot., 554 F. Supp. 3d 348, 363 (D.N.H. 2021) (finding standing for "avid outdoorsman who travels to the White Mountains virtually every week of the year to recreate"). She has also identified three specific locations that she plans to visit mere months after the filing of the Amended Complaint. Goepfert's intentions thus are not "vague plans," as Defendants assert. Goepfert has sufficiently demonstrated imminence, and NPCA accordingly has associational standing to sue on her behalf.

Second, AASLH member Donna Graves claims that the Secretary's Order has harmed her career as a research historian specializing in, among other things, marginalized communities and climate change. Graves alleges that dozens of her projects on these topics are installed at

park sites, and she fears that Defendants will remove these materials pursuant to the Secretary's Order, thereby undermining her portfolio and reputation. Moreover, she claims that the Order has "forced [her] into early retirement" because job opportunities and grant funding from NPS, which comprise 40% to 80% of her annual income, have "evaporated." Finally, she contends that the Order damages her professional reputation by labelling her work as "improper partisan ideology" and suggesting that it perpetuates a "false reconstruction of American history." Defendants contend that Graves' alleged harms are insufficiently imminent to constitute injury-in-fact, are not caused by the Secretary's Order, and are not redressable by the Court. The Court addresses each argument in turn.

As to imminence, Defendants argue that Graves has not identified a specific project that she has created that has been removed or flagged for removal. However, given Graves' specialty in marginalized communities and climate change, and the volume of similar works that have already been removed at other park sites, it is reasonable to infer that Graves' works are also at risk of removal. See Massachusetts v. HHS, 923 F.3d at 225 (noting that "recast[ing] the imminence requirement as one of near certainty does not comport with the law"). Indeed, while not installed at a park site, she alleges that one of her projects, an LGBTQ+ theme study, was removed from NPS' website in 2025, overlapping with the promulgation of the Executive Order and the Secretary's Order, thus providing at least some support for her fear that her projects could be removed in the near future.

As to causation, Defendants characterize Graves' retirement as "self-inflicted" rather than caused by the Secretary's Order. According to Defendants, Graves could continue receiving grant funding from NPS by changing specialties. This argument, however, is unpersuasive. Causation requires only that the plaintiff show that her injury is "fairly traceable to the

defendant's conduct, rather than the result of 'independent action' by some other party not before the court." Wiener v. MIB Grp., Inc., 86 F.4th 76, 84 (1st Cir. 2023) (quoting Lyman v. Baker, 954 F.3d 351, 361 (1st Cir. 2020)). The Supreme Court "ha[s] made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." Fed. Election Comm'n v. Cruz, 596 U.S. 289, 297 (2022). Under this broad conception of causation, courts have found lack of standing based on "self-inflicted" injuries only where a plaintiff incurs costs to counteract entirely speculative harms. See Wiener, 86 F.4th at 88 (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 402 (2013) (finding no injury where plaintiff expended resources to protect against fear, with little factual basis, that government will target and surveil him)). Here, Graves' harm is not speculative because she has a substantial number of projects at park sites, and those projects are similar to materials that have already been flagged or removed pursuant to the Secretary's Order. Whether she voluntarily continues to pursue the same type of work is irrelevant. Indeed, taking Defendants' argument to its logical conclusion, *any* plaintiff could change their mission, career, or business model to avoid being negatively affected by an agency action, even if completely counter to the plaintiff's original mission. But causation does not require Graves to pivot her lifelong career before being able to demonstrate harm.

Finally, as to redressability, Defendants argue that Graves' financial and reputational injuries are not redressable by the Court because staying the Secretary's Order will not retract Defendants' past allegedly derogatory statements about her field of work nor require Defendants to provide her with grant funding. However, to establish redressability, Graves need only show that a remedy "will at least lessen [her] injury," not that her "entire injury will be redressed by a

favorable judgment." In re Fin. Oversight & Mgmt. Bd. for P.R., 995 F.3d 18, 22 (1st Cir. 2021). If the Order were stayed or enjoined, NPS could not remove Graves' projects based on the Order's directive. A favorable judgment would thus at least lessen one potential source of injury, which is sufficient at this stage to establish standing.

In sum, both Goepfert and Graves have demonstrated individual standing to sue. Consequently, NPCA and AASLH maintain associational standing to sue in a representative capacity on their behalf.

**B. Reviewability Under the APA**

Defendants argue that the Court does not have jurisdiction to review Plaintiffs' APA claims because the Secretary's Order is not a final agency action and because the Order involves internal agency management, which is committed to agency discretion by law. For the reasons set forth below, the Court rejects both arguments.

**1. Final Agency Action/Ripeness**

First, Defendants argue that the Secretary's Order is not a final agency action, and, relatedly, that the case is not ripe for review. The First Circuit has explained that finality under the APA overlaps substantially with the doctrine of ripeness under Article III. See W.R. Grace & Co. Conn. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992) (citing Abbott Lab'ys v. Gardner, 387 U.S. 136, 149 (1967), abrogated by Califano v. Sanders, 430 U.S. 99 (1977); Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990)) ("Under the 'fitness for review' inquiry [of ripeness], we consider whether the issue presented is purely legal, as opposed to factual, and the degree to which any challenged agency action is final."). Because Defendants' arguments under the two doctrines overlap, the Court combines the analyses for efficiency.

The APA provides for judicial review only where there is "final agency action." 5 U.S.C.

§ 704. To qualify as final, the challenged action must (1) "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)). Importantly, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." Abbott Lab'ys, 387 U.S. at 149. Specifically, courts consider whether the action's "impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" Franklin v. Massachusetts, 505 U.S. 788, 796-97 (1992) (quoting Abbott Lab'ys, 387 U.S. at 152).

Plaintiffs have demonstrated that the Secretary's Order is a final agency action. First, the Order is the consummation of a decision-making process, not interlocutory or tentative. As the D.C. Circuit has explained, "[t]he consummation prong of the finality inquiry requires us to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" Nat'l Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting Soundboard Ass'n v. Fed. Trade Comm'n, 888 F.3d 1261, 1267 (D.C. Cir. 2018)). Actions that bind and direct subordinate agency personnel are final, even if what they authorize is an ongoing process.[1] See Biden v. Texas, 597 U.S. 785, 808-09, 793 (2022) (holding

---

[1] In challenging this conception of finality, Defendants raise a hypothetical example where the Secretary sends an email directing his assistant to schedule a meeting for Tuesday. Defendants argue that, under the proffered rule, such an email would constitute a final agency action, which Defendants imply would be an absurd result. However, this hypothetical is a red herring; the email may not constitute an "agency action" within the meaning of the APA, making finality an

internal memos were final because they "bound DHS staff" and "direct[ed] DHS personnel to take all appropriate actions"); Bowser v. Noem, No. 26-CV-10382, 2026 WL 555624, at *5 (D. Mass. Feb. 27, 2026) ("The issue before the Court is not if the decision regarding the benefits is final; it is if the Policy Memoranda themselves are final."). As a result, orders setting mandatory tasks and deadlines, even those articulating broad policy goals, have been found to be final agency actions. E.g., Drs. for Am. v. Off. of Pers. Mgmt., 793 F. Supp. 3d 112, 139 (D.D.C. 2025) (finding final agency action where agency memorandum was "replete with specific tasks and bolded and underlined deadlines"); Pub. Emps. for Env't Resp. v. Nat'l Park Serv., No. 19-CV-3629, 2021 WL 1198047, at *8-9 (D.D.C. Mar. 30, 2021) (finding final agency action where NPS directive used mandatory language and required park superintendents to take concrete steps).

Here, the Secretary's Order "speaks for the [Department], articulating the agency's overall policy and approach" with respect to interpretive materials at park sites. Id. at *8. It was issued by the Secretary, the highest-ranking official at the Department, rather than by subordinate staff. Id. The Order issues binding—not tentative—directives to the Land Management Bureaus, mandating that they "conduct a review" of interpretive materials at certain park sites, "immediately undertake such actions as are necessary to reinstate" properties altered in a manner disfavored by the Order, and post QR codes to solicit information from the public. It leaves little ambiguity over the type of interpretive materials to remove, targeting those that "inappropriately disparage Americans past or living," "perpetuate a false reconstruction of American history," "inappropriately minimize the value of certain historical events or figures,"

---

irrelevant inquiry. See 5 U.S.C. § 702 (defining "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof").

or "include any other improper partisan ideology." To implement the mandates, the Order sets near-term deadlines on a two-phase schedule for completion. Taken together, these factors indicate that the Order meets the first prong of the finality inquiry, and is not a preliminary step far upstream of any consequences, as Defendants suggest.

Second, the Secretary's Order are actions "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett, 520 U.S. at 178 (quoting Port of Bos., 400 U.S. at 71). The Order imposes legal obligations on Land Management Bureau personnel, who must review interpretive materials at park sites, post QR codes, and remove purportedly violative materials. See Pub. Emps., 2021 WL 1198047, at *9 (finding that directive "created legal consequences and obligations for park superintendents managing individual NPS Parks and for park patrons"); Bennett, 520 U.S. at 178 (finding final agency action where action would "alter the legal regime to which the action agency is subject"). Thus, the Order constitutes a final agency action subject to judicial review.

Defendants argue that Plaintiffs must challenge individual removal decisions rather than the Secretary's Order as a whole. However, multiple circuits, including the First Circuit, have explained that an agency's action in "applying some particular measure across the board . . . [can] of course [still] be challenged under the APA." Hisp. Affs. Project v. Acosta, 901 F.3d 378, 388 (D.C. Cir. 2018) (alteration in original) (quoting Nat'l Wildlife Fed'n, 497 U.S. at 890 n.2); accord New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."); Drs. for Am., 793 F. Supp. 3d at 141 (finding plaintiffs properly challenged "a cohesive directive . . . with a single set of commands for the entire agency"); Biden v. Texas, 597 U.S. at 793, 808 (2022); Pub. Emps., 2021 WL

1198047, at *8 (noting directive was final even though park superintendents retained ability to impose limits or conditions because "they were still required to first impose the overarching NPS policy"). Because the Secretary's Order itself constitutes a final agency action for the reasons explained above, Plaintiffs may challenge the Secretary's Order as a whole and need not pursue piecemeal litigation for each discrete removal.

Defendants also argue that this case is like Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), in which the Supreme Court held that a challenge to a logging plan developed by the U.S. Forest Service was not ripe for review. There, the plan set logging goals, identified areas of the forest suitable for timber production, and determined preferred harvesting methods, but did "not itself authorize the cutting of any trees." Id. at 729. Defendants contend that, like in Ohio Forestry, the Secretary's Order does not itself mandate any specific removal, instead only kickstarting a review plan for interpretive materials at park sites. However, this analogy is inapt. In Ohio Forestry, the Supreme Court emphasized that the agency had not yet begun implementing the challenged policy. 523 U.S. at 735-36. By contrast, here, pursuant to the Secretary's Order, the Land Management Bureaus have already commenced implementation, with dozens of interpretive materials removed to date and hundreds more flagged for removal. See California v. Trump, 786 F. Supp. 3d 359, 378-89 (D. Mass. 2025) (finding ripeness where agency had started implementing Executive Order). Ohio Forestry thus does not dictate dismissal here.

Accordingly, the Secretary's Order is both a final agency action and is ripe for review by this Court.

**2. Committed to Agency Discretion**

Defendants next argue that the Secretary's Order is not subject to judicial review because

it involves internal agency management decisions, which are inherently committed to agency discretion by law. The Court is unpersuaded.

Under APA Section 701(a)(2), a court does not have jurisdiction to review an agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An action is committed to agency discretion when the agency action is of a kind "traditionally regarded as committed to agency discretion," or when the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020) (quoting Lincoln v. Vigil, 508 U.S. 182, 191-92 (1993)). This exception is "quite narrow[]," Weyerhaeuser Co. v. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018), and there is "a strong presumption in favor of review, which is overcome only by 'clear and convincing evidence' that Congress intended to cut off review above the agency level," Hahn v. Gottlieb, 430 F.2d 1243, 1249 (1st Cir. 1970) (quoting Barlow v. Collins, 397 U.S. 159, 167 (1970)).

Here, the Secretary's Order is not committed to agency discretion by law. First, the Secretary's Order is not "of a kind traditionally regarded as committed to agency discretion." Vigil, 508 U.S. at 192. Few actions are recognized as falling under this category. They include "foreign affairs, the military," Dugan v. Ramsay, 727 F.2d 192, 195 (1st Cir. 1984), "decision[s] not to institute enforcement proceedings," and internal agency operations and management decisions, such as allocation of lump-sum appropriations or personnel and hiring decisions. Wheeler, 954 F.3d at 18 (citing Dep't of Com. v. New York, 588 U.S. 752, 771 (2019)); see, e.g., Ward v. Skinner, 943 F.2d 157 (1st Cir. 1991); Webster v. Doe, 486 U.S. 592, 601 (1988); Vigil, 508 U.S. at 193. The Secretary's Order does not clearly fall into any of these categories. It does not involve foreign affairs, military decisions, enforcement actions, financial or budgetary

decisions, or human resources. Nor do Defendants provide any cases that involve similar facts (i.e., the systematic removal of signage at park sites), undercutting their argument that such decisions are "traditionally" regarded as committed to agency discretion. See Wheeler, 954 F.3d at 18 ("[A]s to whether the make-up of agency advisory committees is an area traditionally left to agency discretion, the EPA has pointed us to nary a case that would suggest as much."); Am. Acad. of Pediatrics v. Kennedy, No. 25-CV-11916, 2026 WL 733828, at *9 (D. Mass. Mar. 16, 2026) ("Defendants point the Court to no cases, nor could the Court find any such case, suggesting that the kind of regulatory power at issue in this case has been 'traditionally' recognized as committed to agency discretion."). Instead, Defendants only quote the Order's conclusory statement that it is "intended only to improve the internal management of the Department." This characterization, however, is belied by the Order's directives, which are not merely internal, but instead have the express intention of shaping the public's experience at park sites. Thus, the Order is not of a type traditionally regarded as committed to agency discretion.

Second, the statutes at issue—the Centennial Act, the Organic Act, and the Omnibus Management Act[2]—provide "meaningful standard[s] against which to judge the agency's exercise of discretion." Wheeler, 954 F.3d at 17. "When determining whether a statute falls within [the no-meaningful-standards provision of the APA], 'careful examination of the statute' is required." Cowels v. Fed. Bureau of Investigation, 327 F. Supp. 3d 242, 249 (D. Mass. 2018) (quoting Webster, 486 U.S. at 600). Here, the language of each statute reflects environmental and conservation mandates that provide clear standards against which to assess the Secretary's Order. The Organic Act, for example, requires Defendants to "promote and regulate the use of

[2] Defendants do not expressly challenge Plaintiffs' FLPMA and Paperwork Reduction Act claims on this ground, so the Court does not address those statutes here.

the National Park System" in a manner that "conserve[s]," "provide[s] for the enjoyment of," and leaves "unimpaired for the enjoyment of future generations" the "scenery, natural and historic objects, and wild life" therein.[3] 54 U.S.C. § 100101(a). The Centennial Act, likewise, requires the Department of the Interior to enhance the management of park sites through a program of "the highest quality interpretation and education." Id. § 100802. While Defendants argue that this phrase is vague, the statute defines the terms and provides guiding context. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." Id. § 100801(1)(A). "Education" is defined as "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2). To further elucidate these terms, the Act provides that the educational program may be updated regularly to "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "reflect current scientific and academic research, content, methods, and audience analysis." Id. § 100803. The Omnibus Management Act provides similar directives, requiring the Department of the Interior to provide "state-of-the-art management, protection, and interpretation of, and research on, the resources" in the park site and to utilize "the highest quality science and information." Id. §§ 100701-100702.

This statutory language provides clear and manageable standards for judicial review. The concepts of public education, environmental conservation, intellectual discourse, scientific rigor,

[3] In response to Plaintiffs' Organic Act claim, Defendants cite a single First Circuit case for the proposition that the Act contains "incommensurable values such as safety and aesthetics, and the Judicial Branch is ill-equipped to rework that balance." Shansky v. United States, 164 F.3d 688, 694 (1st Cir. 1999). However, that case involved the discretionary-function exemption to the Federal Torts Claims Act, a different context than here.

and diversity are not foreign to courts and provide an intelligible guidepost for review. Indeed, courts have found meaningful standards where statutes use similarly broad and aspirational language. See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 411 (1971) (finding "prudent" provided meaningful standard); NAACP v. Sec'y of Hous. & Urb. Dev., 817 F.2d 149, 158 (1st Cir. 1987) (drawing standard from statutory requirement that agency administer its programs "in a manner affirmatively to further the policies" of "fair housing"); Kennedy, 2026 WL 733828, at *9-10 (holding that language concerning "prevention and suppression of communicable diseases" and "preservation and improvement of the public health" provided judicially manageable standards). Even if the statutory language contains some amount of ambiguity, that does not foreclose judicial review. See Dugan, 727 F.2d at 195; Wheeler, 954 F.3d at 18-19 (finding that courts can "enforce at least the outer boundaries" of a statutory mandate that an agency apply "fair balance and inappropriate influence"). Thus, the statutes provide meaningful standards for judicial review.

Accordingly, the Secretary's Order is not committed to agency discretion by law.

**C. Venue**

Defendants move the Court to dismiss the five non-Massachusetts-based Plaintiffs for improper venue. For suits against a federal agency, venue is proper "in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Defendants urge the Court to interpret the words "the plaintiff" to require *each* plaintiff to reside in this judicial district rather than *any* plaintiff.

The Court declines to adopt Defendants' reading. While the First Circuit has not yet interpreted how this statutory language applies in multi-plaintiff suits, persuasive authority in other circuits and the statute's legislative history instruct that the venue statute does not require

all plaintiffs to reside in the same district. "For over thirty years federal courts have conclusively and consistently held that the statutory language in 28 U.S.C. § 1391(e)(3) regarding the residency of 'the plaintiff' should be interpreted to mean *any* plaintiff rather than *all* plaintiffs." A.J. Taft Coal Co. v. Barnhart, 291 F. Supp. 2d 1290, 1301 (N.D. Ala. 2003) (emphases in original) (collecting cases). This interpretation makes sense; Defendants' reading would require plaintiffs residing in different districts to file a suit in their own states, resulting in multiple parallel lawsuits, piecemeal litigation for each plaintiff, and "unnecessary multiplicity of litigation." Exxon v. F.T.C., 588 F.2d 895, 898 (3d Cir. 1978), overruled on other grounds by Reifer v. Westport Ins. Corp., 751 F.3d 129 (3d Cir. 2014). Though plaintiffs could alternatively file a consolidated action in the District of Columbia, the purpose of the venue statute was to "make it possible to bring actions against Government officials and agencies in U.S. district courts *outside* the District of Columbia." Sidney Coal Co. v. Soc. Sec. Admin., 427 F.3d 336, 344 (6th Cir. 2005) (emphasis added) (quoting Stafford v. Briggs, 444 U.S. 527, 539-40 (1980)).

In response, Defendants cite no case law in support of their argument, instead merely insisting that all the cases discussed hereto were wrongly decided and contravene the plain text of the statute. However, this Court aligns with the weight of authority in finding that the legislative history and congressional intent point strongly in favor of an expansive interpretation of venue. Thus, the residency requirement of the venue statute is satisfied if at least one plaintiff—here, UCS—resides in Massachusetts. Accordingly, the Court declines to dismiss the non-Massachusetts-based Plaintiffs for improper venue.

**D. Merits**

Having determined that the Court maintains jurisdiction over this action, the Court proceeds with Defendants' 12(b)(6) arguments regarding Plaintiffs' arbitrary-or-capricious and

contrary-to-law claims. Notably, the First Circuit has instructed that the standard 12(b)(6) plausibility analysis "has no place in APA review" because "[t]he relevant inquiry is . . . not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013). The court explained that, in light of the unique procedures outlined in the APA's judicial review provision, APA claims "must proceed on the administrative record" and "involve[] neither discovery nor trial." Id. at 75-76. Accordingly, at the motion to dismiss stage, courts may not assess the factual plausibility of a complaint. Id. At most, courts may determine whether "the underlying premise of the complaint is legally flawed." Id. at 76 n.4. For example, a court can dismiss claims where the plaintiff fails to identify any regulatory or statutory authority with which the government action has allegedly failed to comply. See Roe v. Mayorkas, No. 22-CV-10808, 2023 WL 3466327, at *11 (D. Mass. May 12, 2023); e.g., Zixiang Li v. Kerry, 710 F.3d 995, 1000-01 (9th Cir. 2013) (concluding plaintiffs failed to state APA claim where statutory and regulatory provisions did not actually impose procedural requirements suggested by plaintiffs).

Applying Atieh, at this stage, the Court addresses only those arguments from Defendants that challenge the facial validity of Plaintiffs' legal arguments. Any remaining arguments that contest the plausibility of Plaintiffs' APA claims may not be assessed at the motion to dismiss stage and thus do not require extended analysis here. See Massachusetts v. Trump, 790 F. Supp. 3d 8, 29 (D. Mass. 2025) (applying Atieh and declining to dismiss, or analyze in detail, defendants' challenges to plaintiffs' arbitrary-or-capricious and contrary-to-law claims); Claudio Mendez v. Wolf, No. 20-CV-11598, 2021 WL 877886 (D. Mass. Mar. 9, 2021) (same).

First, Defendants contend that Count 1 (arbitrary or capricious) fails because Plaintiffs do

not cite a specific substantive statute, and the APA does not permit a free-standing arbitrary-or-capricious claim. However, it is sufficiently clear from the Amended Complaint that Plaintiffs' argument is that Defendants acted arbitrarily or capriciously by failing to adhere to the statutes cited in their other claims. Cf. Wheeler, 954 F.3d at 22 (interpreting standalone arbitrary-or-capricious claim as "subsumed" in other substantive statutory claims). Plaintiffs represent as much in their Opposition. The Amended Complaint provides sufficient notice to Defendants of the relevant challenged conduct and statutory standards, and the Court declines to dismiss on this pleading technicality. See Sisbarro v. Warden, 592 F.2d 1, 2 (1st Cir. 1979) ("[A] Rule 12(b)(6) motion to dismiss is not the proper remedy for inartful pleading." (citing Haines v. Kerner, 404 U.S. 519, 520 (1972))).

Next, Defendants contend that Plaintiffs fail to allege a violation of the FLPMA. They argue that Plaintiffs' allegations relate solely to lands managed by NPS, whereas the FLPMA applies to "public lands," which are separately managed by the Bureau of Land Management. 43 U.S.C. § 1702(e). The Court disagrees and finds that Plaintiffs have adequately identified a legal basis for their FLPMA claim. The Secretary's Order directs all Land Management Bureaus, including the Bureau of Land Management, to review interpretive materials for conflict with the Executive Order. Moreover, the Bureau of Land Management is an agency under the Department of Interior, a defendant in this action. Whether Defendants, in fact, removed any materials from public lands—as opposed to only from NPS park sites—is a question of fact to be reviewed at later stages of this action.

On the Court's review, Defendants' remaining arguments involve factual issues or mixed questions of fact and law. Pursuant to Atieh, these arguments may not be resolved on a motion to dismiss. Accordingly, Plaintiffs have sufficiently stated a claim for purposes of Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED**.

**SO ORDERED.**

Dated: June 4, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Case No. 26-cv-10877** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' NOTICE OF FACTUAL DEVELOPMENT**

Plaintiffs write to advise the Court of a factual development concerning implementation of the Secretary's Order and Executive Order at issue in this case. On June 4, 2026, the *Washington Post* reported that the National Park Service "ordered the removal of three quotes at the Bunker Hill National Monument in Boston" because "they have run afoul of President Donald Trump's policy seeking to scrub 'corrosive ideology' from federal institutions."[1]

According to the *Washington Post*, a visitor complained to park staff about a quote concerning women's suffrage "as being 'woke' feminist ideology," which prompted the Park Service to conduct a wider review of material at the site and order the removal of materials containing three quotes before the 251st anniversary of the monument on June 17, 2026.[2] Those quotes include: (1) a quote from "Vietnam War veterans against the glorification of war"; (2) a quote that "spoke in favor of foreign-born citizens"; and (3) a quote about how the monument "is

[1] Jake Spring, *Park Service orders removal of 'woke' quotes at Boston's Bunker Hill monument*, Wash. Post (June 4, 2026), https://perma.cc/XA4M-Z5LJ.

[2] *Id.*

a 'bitter mockery' to the millions of enslaved people who were held by people who claimed to love liberty."[3]

This development relates to Plaintiffs' motion for a 5 U.S.C. § 705 stay or preliminary injunction (Doc No. 29), and in particular Plaintiffs' description of ongoing, wide-ranging, and irreparable harm from implementation of the Secretary's Order.

Date: June 4, 2026

Respectfully submitted,

/s/ Brooke Menschel

Brooke Menschel* (NY Bar No. 5004692)
Michael J. Torcello* (DC Bar No. 90014480)
Pablo A. Moraga* (DC Bar No. 90037895)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
Mark B. Samburg (Mass. BBO No. 680099)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426

*Counsel for the Plaintiffs*
*Admitted *pro hac vice*

---

[3] *Id.*

**CERTIFICATE OF SERVICE**

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).

*<u>/s/ Brooke Menschel</u>*

Brooke Menschel

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director,<br><br>Defendants. | ) | Civil Action No. 1:26-CV-10877-AK |

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR 5 U.S.C. § 705 STAY OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

**ANGEL KELLEY, D.J.**

> *"The parks do not belong to one State or to one section . . . ; they are national properties in which every citizen has a vested interest; they belong as much to the man"—and I would add, woman—"of Massachusetts, of Michigan, of Florida as they do to the people of California, of Wyoming, and of Arizona."*
>
> *Those words are a powerful reminder in this era of political division and disagreement: national parks are national. They cut across party lines and geographic boundaries. They enjoy broad support, and they bring people together—something we seem to need now more than ever.*
>
> — U.S. Representative Nicola Tsongas, original co-sponsor of the National Park

> Service Centennial Act of 2016 (quoting Stephen Mather, first Director of the National Park Service)[1]

In 1872, Congress established Yellowstone National Park as the world's first national park, setting in motion the principle that natural wonders, historical sites, and cultural memory belong to and serve the public. With over 433 park sites across the United States today, the National Park system hosts millions of visitors each year seeking to enjoy the parks' iconic views, monuments to our Nation's history, and memorials recognizing the sacrifice of many. Beyond the scenic grandeur, the National Park system also serves as a cornerstone of public learning, providing rich and informative signs, exhibits, and interpretive waysides on topics ranging from civil rights to environmentalism. From the echoes of abolition in John Brown's Fort in Harpers Ferry, to the genesis of the modern LGBTQ+ civil rights movement at the Stonewall National Monument, to the retreating ice of Glacier National Park in Alaska, the National Parks preserve the multifaceted and multi-layered history of our Nation, including the good, the bad, and the ugly. Often referred to as "America's largest classroom," National Parks serve in that spirit by telling the stories both of those who write history and those who go unheard. The beauty of history is the unvarnished storytelling of a time gone by and the delivery of undeniable truths. The Government's stewardship of these park sites thus carries a responsibility to present history in full rather than in favored fragments.

Unfortunately, the Government has disregarded these principles. Under the guise of promoting American dignity, this Administration seeks to share a limited history by ordering the removal of all signs, displays, and interpretive exhibits at National Parks that do not align with its preferred narrative, thereby telling half-truths. In recent months, the Government has torn down exhibits in Philadelphia's Independence National Historical Park memorializing the legacy

[1] 162 Cong. Rec. H7207 (daily ed. Dec. 6, 2016).

of people enslaved by the country's first President;[2] removed signage detailing climate threats at Fort Sumter in South Carolina, one of the most environmentally endangered sites in the country; and wiped away descriptions of history and science at countless National Parks across the United States. Not only does this undermine the integrity of the National Parks; it sets a dangerous precedent of censorship and sanitization. The National Park Service Organic Act, the National Park Service Centennial Act, and the National Parks Omnibus Management Act, as well as the Administrative Procedure Act do not authorize such arbitrary and capricious action. The Court thus **GRANTS** Plaintiffs' Motion for a Stay Pursuant to 5 U.S.C. § 705.

## I. BACKGROUND

### A. The National Parks

Unless stated otherwise, all facts are drawn from Plaintiffs' Amended Complaint and the exhibits attached to the parties' briefing on Plaintiffs' Motion for a Stay. In establishing Yellowstone as the country's first National Park, Congress declared unequivocally that it was "for the benefit and enjoyment of the people." 16 U.S.C. § 21. In the years that followed, the federal government authorized the designation of hundreds of additional parks, monuments, memorials, and recreation areas (collectively, "park sites"). Today, National Parks comprise more than 400 areas covering more than 84 million acres in the United States, which house natural wonders, battlefields, sacred Indigenous grounds, and sites memorializing and commemorating this country's history of slavery and the Civil Rights movement. See *Quick History of the National Park Service*, Nat'l Park Serv. (Aug. 24, 2022), https://www.nps.gov/articles/quick-nps-history.htm. Each National Park is created by an Act of

---

[2] These exhibits were ordered to be reinstalled pursuant to a preliminary injunction in a parallel action in the U.S. District Court for the Eastern District of Pennsylvania. See City of Philadelphia v. Burgum, 820 F. Supp. 3d. 313 (E.D. Pa. 2026) (Rufe, J.).

Congress or a presidential proclamation pursuant to the Antiquities Act of 1906, and has an implementation plan that defines the sites' purpose and significance. *Foundation Documents*, Nat'l Park Serv. (Apr. 24, 2025), https://www.nps.gov/subjects/parkplanning/foundation-documents.htm.

From their inception, National Parks have occupied a dual role in both preserving places of extraordinary beauty and serving as "America's largest classroom" for visitors of all backgrounds. As far back as 1886, U.S. Army infantrymen deployed in Yellowstone answered visitors' questions in what became known as "ranger talks." Thirty years later, in 1903, in dedicating an arch marking the entrance of Yellowstone, President Theodore Roosevelt recognized the parks' crucial role in educating the Nation, stating:

> I cannot too often repeat that the essential feature in the present management of the Yellowstone Park, as in all similar places, is its essential democracy—it is the preservation of the scenery, of the forests, of the wilderness life and the wilderness game for the people as a whole, instead of leaving the enjoyment thereof to be confined to the very rich who can control private reserves.

Another thirty years later, President Franklin D. Roosevelt reiterated the sentiment, noting: "There is nothing so American as our national parks . . . . The fundamental idea behind the parks . . . is that the country belongs to the people, that it is in the process of making for the enrichment of the lives of all of us."

To oversee the National Parks and further their ability to provide for public learning, Congress established the National Park Service ("NPS") through the National Park Service Organic Act of 1916 ("Organic Act"), as a bureau within the Department of Interior. Congress entrusted the NPS with a statutory mandate to "conserve the scenery, the natural and historic objects, and wild life [in National Park sites] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

Pursuant to this mandate, the NPS has long honored its duty to ensure that the parks serve as a shared, natural, and cultural resource for all visitors. In 1917, the first Director of the NPS, Stephen Mather, acknowledged that "one of the chief functions of the national parks and monuments is to serve educational purposes." He established the National Parks Education Committee to "further the view of the national parks as classrooms and museums of nature." By 1929, the NPS created "simple, understandable interpretation[s] of the major features of each park to the public by means of field trips, lectures, exhibits, and literature." Congress then codified the NPS' educational role with the 1935 Historic Sites Act, which directs the NPS to develop "an educational program and service for the purpose of making available to the public facts and information pertaining to American historic and archeologic sites, buildings, and properties of national significance." See An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, Pub. L. No. 74-292, § 2(j), 49 Stat. 666, 667 (1935) (amended and recodified at 54 U.S.C. § 320102(k)). In 1970, Congress adopted the National Park Service General Authorities Act of 1970, which emphasized that the National Park system is a "cumulative expression[] of a single national heritage" and that each individual site "derive[s] increased national dignity" by being included in a system that is "managed for the benefit and inspiration of all the people of the United States." See An Act to improve the administration of the national park system by the Secretary of the Interior, and to clarify the authorities applicable to the system, and for other purposes, Pub. L. No. 91-383, § 1, 84 Stat. 825, 825 (1970) (amended and recodified at 54 U.S.C. § 100101(b)(1)).

Today, the NPS enlists approximately 13,000 permanent employees and thousands of temporary and seasonal employees, who work across the 433 park sites to serve 332 million

visitors each year. The agency has continued to provide rich educational and interpretive information with specific context for each park site, including exhibits, interpretive waysides, bookstores, booklets, brochures, and other publications. The process for creating these materials, governed by established review and approval procedures, often takes months to years—requiring collaboration and comprehensive evaluation by NPS professionals, historians, scientists, subject-matter experts, community advocates, educators, interpretive specialists, experiential graphic designers, and accessibility experts. Moreover, Plaintiffs report that the NPS constantly iterates and updates the materials to ensure that they reflect multiple viewpoints and the most current information and scientific research.

The NPS has recognized that "[h]istory has typically been presented from the perspective of the dominant group in power and can, intentionally or not, exclude details that tell a more holistic story," and the agency has affirmed its role in "expand[ing] ideas about power, science, gender, race, and more." *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://www.nps.gov/articles/history-under-construction.htm. In its efforts to enhance the parks' ability to allow visitors of all backgrounds to connect with park sites, the NPS "strives to tell the stories of all Americans," including "the historical experiences of those who have been underrepresented in traditional histories." *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), http://nps.gov/articles/publications-diverse.htm. In this manner, the NPS ensures that parks welcome all visitors and that narratives are not misrepresented through the omission of marginalized voices.

**B. Statutory and Regulatory Framework**

**1. Organic Act**

In addition to the previously described statutes, the NPS and the National Park system are governed by a series of statutory and regulatory authorities. As explained, the Organic Act of 1916 is the foundational statute establishing the NPS. Signed into law by President Wilson, it centralizes the management of the National Park system under the NPS. The statute provides:

> The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the [National Park] System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a). It further sets forth Congress' express intention for the parks, initially declared in 1970 and reaffirmed in 1978 through the Redwood Amendments:

> **1970 declarations.** — Congress declares that (A) the National Park System, which began with establishment of Yellowstone National Park in 1872, has since grown to include superlative natural, historic, and recreation areas in every major region of the United States and its territories and possessions; (B) these areas, though distinct in character, are united through their interrelated purposes and resources into one National Park System as cumulative expressions of a single national heritage; (C) individually and collectively, these areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one System preserved and managed for the benefit and inspiration of all the people of the United States; and (D) it is the purpose of this division to include all these areas in the [National Park] System and to clarify the authorities applicable to the [National Park] System.
>
> **1978 reaffirmation.** — Congress reaffirms, declares, and directs that the promotion and regulation of the various [National Park] System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the [National Park] System units shall be conducted in light of the high public value and integrity of the [National Park] System and shall not be exercised in derogation of the values and purposes for which the [National Park] System units have been established, except as directly and specifically provided by Congress.

Id. § 100101(b).

### 2. Omnibus Management Act

In 1998, Congress promulgated the National Parks Omnibus Management Act ("Omnibus Management Act"). The Act reformed the management of National Parks, refocusing the agency on scientific research and improving employee training. It provides:

> Recognizing the ever increasing societal pressures being placed upon America's unique natural and cultural resources contained in the [National Park] System, the Secretary shall continually improve the ability of the Service to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the [National Park] System.

54 U.S.C. § 100701. It further specifies that "[t]he Secretary shall ensure that management of [National Park] System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." Id. § 100702.

### 3. Centennial Act

In 2016, Congress passed the National Park Service Centennial Act ("Centennial Act") to prepare the NPS for its second century of operations. It sought to improve visitor facilities and support conservation efforts. Under the statute, the Secretary is required to "ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the [National Park] System." Id. § 100801(1)(A). "Education" means "enhancing public awareness, understanding, and appreciation of the resources of the [National Park] System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2)).

The Centennial Act also authorizes the Secretary to regularly update the education and

interpretation program based on four criteria:

> The Secretary may undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the [National Park] System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis.

Id. § 100803.

#### 4. NPS Directives System

To implement its statutory mandates, the NPS has established a Directives System, a triple-tiered, agency-wide set of policies, practices, and procedures. See *The NPS Directives System*, Nat'l Park Serv. (Aug. 29, 2023), https://www.nps.gov/subjects/policy/directives-system.htm. The highest level is the NPS' Management Policies, which set forth the agency's management and operations policies and provides the NPS' official interpretation of its statutory mandates. Id. The Policies articulate the agency's objectives and establish standards governing park system planning, land protection, natural and cultural resource management, wilderness preservation and management, implementation of the agency's interpretation and education program, public use of the parks and park facilities, and the operation of commercial visitor centers.

As relevant here, the Management Policies establish a process and structure for the agency's interpretation and education program. The agency, in partnership with individual park sites and public and private stakeholders such as historical societies and conservation groups, must create both a "general management plan" ("GMP") and "comprehensive interpretive plans" ("CIPs") to "serve as the backbone of interpretive and educational program planning and direction." Management Policies, Nat'l Park Serv. (2006), § 7.2 (hereinafter "Management

Policies"). A GMP is a broad policy document that establishes the long-term vision for a park's resource conditions and visitor use. Id. § 2.2. The CIPs are focused, short-term implementation plans that dictate how the park will tell its stories and connect visitors to its resources. Id. § 2.3. The Management Policies emphasize that "[a]ll interpretive and educational services . . . will be based on and coordinated with the comprehensive interpretive plan." Id. § 7.2 (emphasis added). Park staff are to utilize the CIPs to determine "which stories to tell, how to tell them, and how to reach specific audiences." Id.. The Policies further explain that NPS' "interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners." Id. § 7.4.

The second level of the NPS' Directives System is Director's Orders. These interpret the Management Policies, outline requirements for NPS functions, programs, and activities, delegate specific authorities and responsibilities to subordinate staff, and articulate new or revised policies between updates of the Management Policies. See *Director's Orders and Related Guidance*, Nat'l Park Serv. (May 12, 2026), https://www.nps.gov/subjects/policy/directors-orders.htm. As relevant here, National Parks Director's Order #6, titled "Interpretation and Education," supplements the Management Policies' directives regarding the NPS' interpretation and education program. See Director's Order #6: Interpretation and Education, Nat'l Park Serv. (Mar. 3, 2025) (hereinafter "Director's Order #6"). It articulates park staff's roles and responsibilities, the content and mission of educational programming, interpretive planning requirements, and reporting requirements. See id.

Finally, the third level of the NPS Directives System is policy memoranda and related guidance. These documents address time-sensitive issues and interim policy needs, and thus are

often narrow-in-scope. See *Policy Memoranda and Related Guidance*, Nat'l Park Serv. (Apr. 30, 2026), https://www.nps.gov/subjects/policy/policy-memos.htm.

**C. Executive Order and Secretary's Order**

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring Truth and Sanity to American History." The Executive Order directed the Secretary of the Interior to review all "public monuments, memorials, statues, markers, or similar properties" (collectively, "interpretive materials") at park sites and remove any that met certain characteristics. Specifically, the Executive Order states:

> Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light. Under this historical revision, our Nation's unparalleled legacy of advancing liberty, individual rights, and human happiness is reconstructed as inherently racist, sexist, oppressive, or otherwise irredeemably flawed. Rather than fostering unity and a deeper understanding of our shared past, the widespread effort to rewrite history deepens societal divides and fosters a sense of national shame, disregarding the progress America has made and the ideals that continue to inspire millions around the globe.

Exec. Order. No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

To effectuate this mission, the Executive Order directed the Secretary of the Interior to take three actions:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;
>
> (ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. § 1451 *et seq.*, 54 U.S.C. § 100101 *et seq.*, and other applicable law; and
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within

> the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Id. § 4.

Two months later, on May 20, 2025, the Secretary of the Interior implemented these directives by issuing Secretary Order 3431, likewise titled "Restoring Truth and Sanity to American History" ("Secretary's Order"). The Order announced an objective of implementing the Executive Order:

> **Purpose.** This Order implements provisions of President Trump's March 27, 2025, Executive Order (EO) 14253, titled "Restoring Truth and Sanity to American History." EO 14253 directs the Secretary of the Interior (Secretary) to provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park and to complete such improvements by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence. It also directs the Secretary to review public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's (Department) jurisdiction and to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

Restoring Truth and Sanity to American History, Order No. 3431, Doug Burgum, Sec. of the Interior, U.S. Dep't of the Interior (May 20, 2025).

Two sections of the Secretary's Order are relevant to this case. First, Section 5 directed NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, "Land Management Bureaus") to conduct the reviews mandated by the Executive Order. It established a two-step review plan. During the initial thirty-day phase, the Land Management Bureaus were to review and remove any interpretive materials that had been "removed or changed to perpetuate a false reconstruction of

American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology" since January 1, 2020. During the next phase, the scope of review broadened to all park sites, with the agencies directed to review and remove any interpretive material that "inappropriately disparages Americans past or living . . . or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature" or is otherwise "inconsistent with the purpose of" the Executive Order. This phase was to be completed within 120 days.

In addition to the review process set out in Section 5, Section 6 of the Secretary's Order directed the Land Management Bureaus to post quick response ("QR") codes at park sites soliciting help from visitors in identifying content that allegedly violated the Executive Order. The QR codes were to accompany the following language:

> (Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features.

NPS staff were provided with a template sign, including a QR code, and instructed that it should be posted "by the order of the Secretary of the Interior," in support of the Restoring Truth and Sanity Executive Order at all park sites by June 13, 2025. Signs containing the mandated language and QR code were posted in National Parks throughout the country. No notice was published in the *Federal Register*, nor was public input solicited, and the posted signs did not display an Office of Management and Budget control number. NPS compiled a database of public comments submitted through the QR codes.

**D. Timeline of Removals**

In Summer 2025, in compliance with the Secretary's Order, NPS staff began removing

material. Defendants also instituted various internal efforts to speed up removals, leading to a significant escalation in early 2026. For example, in August and September 2025, Director of the Secretary of the Interior Jessica Bowron sent letters to park sites that allegedly failed to remove signs as a notice of their "non-compliance," and in November 2025, Bowron issued a separate order to expand the scope of review to include retail items.

As a result of these efforts, by early 2026, NPS had removed or identified for removal hundreds of interpretive materials from park sites. By the date of the filing of this action, Defendants had removed dozens of signs related to climate change, civil rights, and diverse communities. The potpourri of items removed include those on environmental degradation, such as:

- Signs at Acadia National Park in Maine discussing the impact of climate change on the surrounding environment and its costs to the park's natural resources.
- An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York concerning climate change.
- Interpretive displays at Fort Sumter in South Carolina, describing how the historic island fortress that sparked the beginning of the Civil War may be underwater by the end of the century due to climate change. The display was the product of extensive research by the NPS and West Carolina University showing the effects of sea level rise, coastal erosion, flooding, and storm surge on the park.
- Multiple interpretive materials at Glacier National Park in Montana, including signs providing information about the effect of carbon dioxide emissions and climate change on glaciers; a sign attributing the sharp increase in wildlife in the American West to "hotter and drier conditions"; a sign describing the "controversy" regarding wolf hunting;

and a placard titled "Blame It on the Grain," which "describes the construction of a dam that created a reservoir in the eastern part of the park to support farming." Moreover, a season of the official podcast of Glacier National Park, "Headwaters," has been taken down, and a film about the park shown to visitors has been ordered to be stopped.

In addition, Defendants have removed multiple signs involving slavery, abolition, immigration, labor, women's suffrage, and civil rights, including:

- A "History Under Construction" exhibit at Muir Woods in Golden Gate National Park in California, which annotated an existing sign with content on Indigenous history, the role of women in the Muir Woods conservation movement, and the historical role of NPS staff in eugenics movements.
- Signs at Rock Creek Park in Washington, D.C., describing the legacy of Francis G. Newlands, a congressman and senator from 1893 to 1917, including details about his white supremacist views.
- Exhibits at the President's House Site in Independence National Historical Park in Philadelphia that "examin[ed] the paradox between slavery and freedom in the founding of the nation" and described the critical role that enslaved people played in the operation of the home during President Washington's presidency. One of the removed signs discussed Ona Judge, a woman the NPS described as "a talented seamstress" who "became Martha Washington's personal maid as a teenager" and who escaped enslavement and evaded recapture.
- Films on labor history at Lowell National Historical Park in Massachusetts.
- An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York describing women's rights and liberty, as well as a quote stating that there

are components of the country's history "we hope never to repeat—like slavery, massacres of Indians, or holding Japanese Americans in wartime camps."

- A sign at Sunset Crater Volcano National Monument in Arizona describing basalt bubbles because the sign included an image of a visitor holding a Pride flag.

Defendants have also removed multiple interpretive materials dedicated to Native Tribes and describing the atrocities committed to their communities, such as:

- A sign at Grand Teton National Park in Wyoming explaining the complicated history of Gustavus Cheyney Doane, a key member of an early Yellowstone expedition who had participated in a massacre of Native Americans.
- Signs at Acadia National Park in Maine describing the importance of Cadillac Mountain to the Wabanaki people to their culture and heritage.
- Portions of displays at Grand Canyon National Park in Arizona characterizing settlers, cattle ranchers, and tourists as negatively impacting the land for their own benefit and describing how the federal government claimed Tribal land to establish the park.

In addition to materials that have already been removed, hundreds of others have been flagged for removal. These include exhibits about slavery and civil rights, such as:

- A sign at Fort Pulaski National Park in Georgia reproducing "The Scourged Back," an 1863 image of Peter Gordon, a man who was enslaved in Louisiana, with heavy scars covering his back from whippings received in slavery.
- Over thirty signs at Harpers Ferry National Historic Park in West Virginia, where abolitionist John Brown led a raid seeking to arm enslaved people for a revolt in 1859.
- A sign at Bent's Old Fort National Historic Site in Colorado describing a family's "ownership" of enslaved people.

- Signs at the Bunker Hill Monument in Massachusetts regarding suffrage, abolition, immigration, and anti-war movements. These signs include quotes from an 1875 letter in the Archdiocese of Boston's newspaper stating, "citizens of foreign birth take no second place"; a 1925 statement from civil rights activist and newspaper editor William Monroe Trotter stating, "[c]olored Americans were here that day fighting with other patriots, our own ancestors, of whom we are justly proud and on whom we base our claim for full liberty and equality as citizens"; and an 1889 statement from abolitionist and suffragist Lucy Stone in the *Women's Journal* stating, "[t]he woman sufferance battle is like that of Bunker Hill—not won today, but sure to be later. Meantime, Bunker Hill Monument is our monument." See Katie Cole & Artemisia Luk, *National Park Service to Remove Quotes About Slavery, Immigration, and Suffrage from Bunker Hill Site*, W. Bos. Univ. Radio (June 5, 2026), https://www.wbur.org/news/2026/06/05/nps-bunker-hill-monument-boston-quote-removal.
- An exhibit at the Kingsley Plantation in the Timucuan Ecological and Historic Preserve in Florida titled "Freedom Seekers of Timucuan Preserve" that describes stories of enslaved people who "illustrated the perseverance of the human spirit" as they navigated "sites of bondage and of escape."
- A plaque at Virgin Islands National Park commemorating the "slave rebellion that began on St. John on November 23, 1733."
- Exhibits at Cane River Creole National Historic Park in Louisiana about enslaved people who tried to escape but were captured and publicly whipped.
- A sign at Manassas National Battlefield in Virginia that criticized post-Civil War "Lost Cause" ideology, which denied the central role slavery played in the war.

- Exhibits at Emmett Till and Mamie Till-Mobley National Monument in Sumner and Glendora, Mississippi and Chicago, Illinois, that "tell[] the story of Emmett Till and his mother" and were created "in collaboration between the Emmett Till and Mamie Till-Mobley Institute, the Emmett Till Interpretive Center (ETIC), the Till family, and The Children's Museum of Indianapolis."
- Approximately eighty items at the Selma to Montgomery National Historic Trail in Alabama that mark the historic 1965 Voting Rights March from Selma to Montgomery.
- A permanent exhibit at Brown v. Board of Education National Historical Park in Kansas because it mentions "equity."

The NPS has also flagged interpretive materials reporting on the stories of Indigenous communities, including:

- A brochure and sign at Glacier National Park in Montana describing the mass slaughter of the Piegan Blackfeet people.
- A sign at Bent's Old Fort National Historic Site in Colorado describing the forced removal of a Native Tribe.
- A display at Sitka National Historical Park in Alaska referencing the mistreatment of Alaskan Natives by missionaries.
- An exhibit at Little Bighorn Battlefield National Monument in Montana describing the United States being "hungry for gold and land" and breaking promises to Indigenous groups.
- Signs at Castillo de San Marcos National Monument in Florida about the imprisonment of Indigenous groups inside the Spanish stone fortress. In reporting these signs, NPS staff emphasized that these signs were "developed in collaboration with the Cheyenne

and Arapaho Tribes."

- A panel at Hubbell Trading Post National Historic Site in Arizona discussing Ganado Mucho, a Navajo leader known for settling disputes with ranchers.
- A sign at Fort Laramie National Historic Site in Wyoming that references the persecution of Native Americans.
- An exhibit at Death Valley National Park in Nevada requested by the Timbisha Soshone Tribe with the phrases "these are our homelands" and "we are still here" to commemorate the twenty-fifth anniversary of the Homeland Act, which transferred nearly 7,800 acres of land to the Tribe. Timbisha Shoshone Homeland Act, Pub. L. No. 106-423, 114 Stat. 1875 (2000).

Likewise, signage and exhibits providing scientific information at parks across the country have also been targeted, including:

- A plaque at Great Smoky Mountains National Park in North Carolina and Tennessee explaining how fossil fuels cause air pollution.
- A sign at Cape Hatteras National Seashore titled "The Air We Breathe" discussing the importance of clean air.
- Signs at Everglades National Park in Florida describing industrialization's impact on the wetland ecosystem.
- Signs at Organ Pipe Cactus National Monument in Arizona describing destructive grazing practices and the accelerating rate of global warming since 1850, as well as a booklet that talks about endangered turtles and Sonoran pronghorn.

According to an internal NPS database leaked by anonymous civil servants on March 2, 2026, over five hundred items have been identified for review.

### E. Procedural History

The Secretary's Order and the removals it authorized gave rise to the present action. Plaintiffs National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks ("Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS") filed this action against Defendants Department of the Interior (the "Department"), Secretary of the Interior Doug Burgum (the "Secretary"), the NPS, and Director of the Secretary of the Interior Jessica Bowron on February 17, 2026, arguing that Defendants' actions are arbitrary and capricious, contrary to law, and in excess of statutory authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and seeking declaratory and injunctive relief. Plaintiffs filed an Amended Complaint on March 18, 2026. Plaintiffs bring their claims pursuant to five statutes: the Centennial Act, 54 U.S.C. §§ 100801-100803, the Organic Act, 54 U.S.C. § 100801, the Omnibus Management Act, 54 U.S.C. §§ 100701-100702, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*

On March 18, 2026, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction, pursuant to the Organic Act, the Omnibus Management Act, and the Centennial Act. On April 8, 2026, Defendants filed a consolidated Opposition and Motion to Dismiss, asserting that Plaintiffs lack standing, the claims are not ripe, venue is improper, the claims are not judicially reviewable under the APA, and that Plaintiffs fail to state a claim. The Court held a Status Conference with the parties on May 12, 2026. After conferring with the parties, the Court decided to address the Motion to Dismiss on the papers and without oral argument.

On June 4, 2026, the Court denied Defendants' Motion to Dismiss. On the same day, following discussion with the parties, the Court determined to decide Plaintiffs' Motion for a Stay on the papers and without oral argument due to scheduling challenges. Plaintiffs subsequently filed a Notice detailing Defendants' removals of signage from Bunker Hill National Monument in Massachusetts on June 4, 2026.

## II. LEGAL STANDARD

Plaintiffs seek a stay of the Secretary's Order under the APA, 5 U.S.C. § 705, or a preliminary injunction. Section 705 of the APA authorizes a court reviewing agency action to stay "all necessary and appropriate process" and postpone the effective date of agency action or preserve the status quo pending judicial review "on such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Although a stay under the APA is distinct from a preliminary injunction, the same standard governs both forms of relief. See Nken v. Holder, 556 U.S. 418, 434 (2009). Specifically, the moving party must demonstrate four elements: (1) likelihood of success on the merits; (2) a likelihood of irreparable harm if injunctive relief is not granted; (3) a balance of the equities tips in the movant's favor; and (4) injunctive relief is in the public interest. Id. The most important of the four elements is the likelihood of success on the merits. Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020) (quoting New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). In general, preliminary injunctive relief is an "extraordinary and drastic" remedy that is granted sparingly. Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).

At the preliminary injunction stage, a court accepts as true well-pleaded allegations in the complaint and uncontroverted affidavits. Rohm & Haas Elec. Materials, LLC v. Elec. Circuits

Supplies, Inc., 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010) (citing Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)). The court may also rely upon otherwise inadmissible evidence, Howe v. U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr. Series 2016-CTT, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (citing Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986)), and may take judicial notice of information on official government websites, see Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (relying on the contents on government agency's website).

## III. DISCUSSION

Plaintiffs contend that they are likely to succeed on the merits of their claims that the Secretary's Order is arbitrary and capricious, contrary to law, and in excess of statutory authority. They move pursuant to three of the five statutes cited in the Amended Complaint—the Centennial Act, the Organic Act, and the Omnibus Management Act.[3] They seek a stay or preliminary injunction directing Defendants to restore all park sites to how they existed prior to the issuance of the Secretary's Order, as well as prohibiting Defendants from making any further alterations to interpretive materials pending the litigation of this matter. As explained below, the Court finds that Plaintiffs have demonstrated a likelihood of success in their claims that the Secretary's Order and Defendants' subsequent implementation actions are contrary to law and arbitrary and capricious, that relief is necessary to prevent irreparable harm, and that the balance of the equities and public interest weigh in favor of relief.

### A. Jurisdiction

As a threshold matter, Plaintiffs must establish a sufficient likelihood of success that the

[3] Plaintiffs do not include their FLPMA and Paperwork Reduction Act claims in their Motion, so the Court does not include those statutes in its analysis.

Court has jurisdiction to issue preliminary relief. Defendants raised objections related to standing, venue, ripeness, and reviewability under the APA in a consolidated filing that both opposed Plaintiffs' motion for preliminary injunctive relief and moved for dismissal. The Court addressed those arguments at length in its prior Order denying Defendants' Motion to Dismiss. Under the law of the case, the Court must apply its prior legal holdings to the extent issues were resolved in its prior Order. See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) ("[W]hen a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." (quoting Arizona v. California, 460 U.S. 605, 618 (1983))); Ellis v. United States, 313 F.3d 636, 646-48 (1st Cir. 2002). The parties have not submitted any additional briefing since Defendants' consolidated filing, and the factual record bearing on jurisdiction has changed only marginally. The only new materials beyond the Complaint that are before the Court are the Exhibits attached to Defendants' Opposition and Reply, which the Court could not consider at the motion to dismiss stage but can at the preliminary injunction stage, and an additional news article submitted by Plaintiffs regarding Defendants' order to remove three quotes regarding suffrage, abolition, immigration, and anti-war movements from the Bunker Hill Monument in Massachusetts. These additional filings do not materially alter the Court's prior analysis.[4] Accordingly, the Court finds that Plaintiffs have demonstrated a sufficient likelihood of success on the jurisdictional issues at this stage. The

[4] Defendants' Exhibits contain screenshots from Plaintiffs' website advertising merchandise opposing the Secretary's Order, which Defendants provide to support their argument that any injury suffered by Plaintiffs is self-inflicted and therefore insufficient to establish causation. The Court previously considered and rejected that argument, concluding that the alleged injuries were not so self-inflicted as to break the causal chain for purposes of standing. As for Plaintiffs' additional filing, the article described therein provides another example reinforcing the Court's conclusions that Defendants' removals of interpretive materials are imminent, actual, and ongoing.

Court therefore proceeds to the merits.

### B. Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, a plaintiff must show "more than mere possibility of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato P.R. de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Me. PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)). The court need not conclusively determine the merits of the movant's claim but should evaluate the likelihood that the movant will prevail on the merits. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). Courts place "particular emphasis" on this factor because, if the moving party cannot demonstrate they are likely to succeed, "the remaining factors become matters of idle curiosity." Get in Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 198 (D. Mass. 2016) (quoting New Comm. Wireless, 287 F.3d at 9). The court need only determine the "probable outcome[]" of the underlying claims; it need not resolve the issues presented with certainty. See id. (citing Me. Educ. Ass'n Benefits Tr. v. Cioppa, 695 F.3d 145, 158 (1st Cir. 2012)). Plaintiffs bring two challenges to the Secretary's Order under the APA: that the Order is arbitrary and capricious, and that it is contrary to law/in excess of statutory authority. The Court addresses each in turn.

#### 1. Arbitrary or Capricious

In Count 1, Plaintiffs argue that the Secretary's Order is arbitrary and capricious. Specifically, they contend that the Order lacks a reasoned explanation, is an unexplained departure from prior practice, and is unsupported by the evidentiary record/contrary to existing evidence. At this stage, the Court finds that Plaintiffs have made a preliminary showing that they are likely to succeed on the merits of each of these theories.

### a. Lack of Reasoned Explanation

Plaintiffs have shown a likelihood of success on the merits that the Secretary's Order is "not 'reasonable or reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). To meet this standard, an agency must "set forth its reasons for decision" in a manner that demonstrates a "rational connection between the facts found and the choice made." Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277 (D. Mass. 2025) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Amerijet Int'l Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014)), aff'd, 164 F.4th 1 (1st Cir. 2026). Merely pointing to a source of authority is not itself an explanation of the agency's reasoning; agencies must both cite a source of authority and explain their decisions. See New York v. Trump, 811 F. Supp. 3d 215, 237-40 (D. Mass. 2025). Likewise, "conclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" Amerijet, 753 F.3d at 1350 (quoting Butte County. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)) (emphasis in original). "[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 222 (2016) (citing 5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 42-43).

Here, the Secretary's Order fails to provide any reasoned justification for its directive to review and remove interpretive material. The sole explanation on the face of the Order is to "implement[] provisions" of the Executive Order. The Order then summarizes the content of the Executive Order but does not provide any commentary or explanation for its decision based on facts or on the Land Management Bureaus' statutory mandates. Defendants' briefing offers little more, merely stating in a conclusory fashion that the Order "implement[s] the EO." Reasoned

decisionmaking requires an agency to "both exhibit sufficient consideration of the relevant factors and pertinent aspects of the problem and demonstrate a rational connection between the facts and choice that was made." Nat'l Insts. of Health, 770 F. Supp. 3d at 305. The Order fundamentally fails at the first step of even identifying the relevant factual or legal context that it seeks to disrupt.

First, the Order does not grapple with the relevant legal authority or statutory frameworks that bind the Land Management Bureaus. The Order mentions the Organic Act and the FLPMA as "Authority" but does not explain its relationship to those statutes, such as how the removal of interpretive materials comports with the Organic Act's mandate to "conserve" and to "provide for the enjoyment" of park resources. 54 U.S.C. § 100101(a). The Order does not mention the Centennial Act or the Omnibus Management Act at all, much less any explanation regarding how the Order complies with, or why it departs from, the requirements of those statutes. The Centennial Act, for instance, requires the Secretary to ensure the "availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. The Order fails to explain how its expedited removal of interpretive materials affects the "availability and use" of the Centennial Act's mandated interpretation and education program at park sites. These mandates to conserve park resources, provide for the public's enjoyment, and ensure the use of a broad and high-quality interpretation and education program are binding on Defendants, but the Order fails to engage meaningfully with these authorities or provide any explanation. Cf. Rhode Island v. Trump, 810 F. Supp. 3d 283, 306 (D.R.I. 2025) (finding agency's elimination of "non-statutory components and functions" was arbitrary and capricious because agency failed to actually analyze or explain "which agency components and functions were statutorily required and which were not").

Second, the Order fails to provide any indication that Defendants considered relevant facts and evidence. For example, National Parks were established to serve the public, yet the Order does not point to any evidence regarding the public's reaction to signage at National Parks—let alone evidence that the public reacts negatively to representing diverse viewpoints and marginalized voices, or that existing interpretive materials are disfavored. Instead, tens of thousands of public comments submitted through QR codes at park sites have criticized Defendants' actions, demonstrating that these materials instead promote the public's ability to form stronger connections with park resources. Indeed, Plaintiffs provide a 2026 Pew Research Center survey reporting that sixty-six percent of all U.S. adults believe it is "extremely or very important to publicly discuss [both] the country's historical successes and strengths" as well as "the country's historical failures and flaws." See Andy Cerda, *Majorities of Americans Say It's Important to Talk About the Country's Historical Successes and Failures*, Pew Rsch. Ctr. (Jan. 26, 2026), https://www.pewresearch.org/short-reads/2026/01/26/majorities-of-americans-say-its-important-to-talk-about-the-countrys-historical-successes-and-failures (hereinafter "Pew Research Study"). This opinion cuts across race, age, and educational background, with the majority of each demographic group surveyed supporting the presentation of an unbiased history. See id. Plaintiffs report that another 2021 study by the American Historical Association, as well as a 2025 study by the American Alliance of Museums, further support that the public overwhelmingly prefers to "receiv[e] historical knowledge of others" and "history that challenges, rather than reinforces, their existing historical knowledge." Another 2022 study succinctly summarized: "Americans of all political orientations want their children to learn a history that celebrates our strengths and also examines our failures. Americans overwhelmingly agree that the experiences of minority groups are an important part of that history." The Order

entirely fails to grapple with this existing information, and its anemic contents are devoid of any countervailing data collected by the agency or other independent explanation. This is "grossly insufficient and falls far short of reasoned analysis." Widakuswara v. Lake, 773 F. Supp. 3d 46, 55 (S.D.N.Y. 2025).

The Order also identifies no expert reports or analyses reporting any deficiencies in the materials being targeted, such as that they are historically inaccurate or inconsistent with statutory obligations. The record instead reflects a structured, deliberate, meticulous process for creating factually accurate interpretive and educational materials, which the Order now seeks to unwind. The signs, films, and educational curricula targeted by the Order were developed over decades through GMPs and CIPs set forth at each individual park site. Management Policies §§ 2.2, 7.2. As part of these plans, public and private stakeholders—including subject matter experts, interpretive specialists, local community leaders, scientists, and professional historians—provided multiple rounds of feedback on which topics to include and how best to present them to the public, a process that can take up to years. Indeed, Plaintiffs report that "public historians . . . generate the historical research that informs" interpretive materials, that experiential designers "engaged in extensive vetting of content that ultimately was shared in the parks to ensure it was as accurate as possible based on available high quality academic and scientific research," and that the NPS' process "involve[s] writers, historians, scientists, and curators, among others, all working toward the shared goal of design excellence and producing materials that are accessible and captivating for the audience." Significant resources were invested to ensure that the quality of these materials is high and that the content therein is historically accurate and holistic, so much so that professional societies dedicated to producing academic and scientific research have long-used NPS' interpretive materials as "leading

examples" and "exemplars" of "how interpretive signage and exhibits can responsibly connect visitors to history, science, and cultural significance of place." Taken together, it is clear that NPS previously implemented a thoughtful and deliberative process for creating high quality and factually accurate interpretive materials. The Secretary's Order fails to explain why it believes that process is deficient, or how it resulted in interpretive materials that are "inappropriate[]," a "false reconstruction of American history," or "improper partisan ideology."

Third, the Order fails to rationally connect any facts to the action taken. It claims that the removals will "restore Federal sites . . . to solemn and uplifting public monuments that remind Americans of our extraordinary heritage." However, the Order fails to explain how unearthing and displaying the historical contributions of marginalized groups detracts from celebrating "our extraordinary heritage." Indeed, the NPS' purpose in installing these materials in the first instance was to attract new audiences to National Parks by celebrating diverse experiences. See *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://www.nps.gov/articles/publications-diverse.htm (listing NPS publications "touching on the historical experiences of those who have been underrepresented in traditional histories" as "part of an effort to provide an inclusive and honest look at American history"). This mission extends not only to interpretive displays—entire park sites have been established with the purpose of promoting inclusivity, such as the Stonewall National Monument honoring LGBTQ+ history; the Emmett Till and Mamie Till-Mobley National Monument memorializing the life of fourteen-year-old Emmett Till; the Birmingham Civil Rights National Monument and Medgar and Myrlie Evers Home National Monument honoring the history of the Civil Rights movement and its leaders; the Selma to Montgomery National Historic Trail commemorating the journey of the historic 1965 Voting Rights March in Alabama; and the Belmont-Paul Women's

Equality National Monument honoring the history of women's suffrage. These park sites and materials celebrate the Nation's heritage by commemorating the contributions of all members of the public, including those who have traditionally been excluded. The Secretary's Order is entirely silent as to how removing these materials fosters greater appreciation for and connection to park resources, or which groups are detrimentally impacted by their continued display. The Order's lack of any explanation connecting the facts to its directed action is insufficient to constitute reasoned decisionmaking.

The Court is not persuaded by Defendant's insistence that they may not simply disregard the President's directive. Agencies are duty-bound to presidential directives only "to the extent allowed by law." Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 32-33 (D.C. Cir. 2002). As the District of Columbia recently explained, "furthering the President's wishes cannot be a blank check for [an agency] to do as it pleases." Nat'l Council of Nonprofits, 763 F. Supp. 3d 36, 55 (D.D.C. 2025); see also Orr v. Trump, 778 F. Supp. 3d 394, 424 (D. Mass. 2025) (rejecting argument that following Executive Order is sufficient to satisfy reasoned decisionmaking requirement under APA), opinion vacated, appeal dismissed, No. 25-1579, 2026 WL 1642666 (1st Cir. June 5, 2026) (vacating preliminary injunction only because both parties requested vacatur); New York v. Trump, 811 F. Supp. 3d at 238 ("Insulating an agency action from arbitrary-and-capricious review [because the action implements an Executive Order] would undermine the APA and 'shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen.'") (quoting Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024)).

For the reasons explained above, the Secretary's Order's cursory and conclusory citation to the Executive Order is not, without more, sufficient to satisfy the APA's requirement of

"reasoned decisionmaking." Regents, 591 U.S. at 16 (quoting Michigan v. EPA, 576 U.S. 743, 750 (2015)). The Court must hold Defendants "accountable to the public." Franklin v. Massachusetts, 505 U.S. 788, 796 (1992). A unilateral, unreasoned, and lawless Executive Order of a President cannot be the sole justification for an agency's actions, lest the country be prepared to entrust its future to the whims of a single individual.

**b. Substantial Reliance Interests**

Second, Plaintiffs have shown that they are likely to succeed in their claim that the Secretary's Order was an arbitrary and capricious departure from prior practice. Under the "change-in-position" doctrine, agencies may change their existing policies, but only "as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." Doe v. Noem, 152 F.4th 272, 289 (1st Cir. 2025) (quoting FDA v. Wages & White Lion Invs., LLC, 604 U.S. 542, 568 (2025)). To satisfy this requirement, the agency must show that the new policy "is permissible under the [governing] statute, that there are good reasons for it, and that the agency believes it to be better" than its old policy. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Moreover, the agency "must consider the impact the policy change will have on any 'serious reliance interests,'" including "weigh[ing] any such interests against competing policy concerns." Doe v. Noem, 152 F.4th at 290 (quoting Wages & White Lion Invs., 604 U.S. at 568; Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020)).

Here, the Secretary's Order is an arbitrary and capricious departure from prior practice, jettisoning decades of efforts by advocates, community members, institutions, historians, and scientists without explanation. Pursuant to its statutory mandate to preserve history and educate the public, the NPS has historically embraced a mission to "tell a more holistic story," which

includes not "judg[ing] what history is worth telling." *History Under Construction*, Nat'l Park Serv. (Nov. 5, 2023), https://www.nps.gov/articles/history-under-construction.htm. The agency acknowledged the need to "share an accurate and comprehensive history," even when that history extends to "the good, the bad, the ugly, and everything in between." Id. Telling history in this way, according to the NPS, was the appropriate way to share "the stories of all Americans." *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, Nat'l Park Serv. (Feb. 20, 2025), https://www.nps.gov/articles/publications-diverse.htm. Indeed, sharing our collective history grounded in undeniable truths is an honest portrayal of our shared history. Putting this philosophy into practice, the NPS has documented and preserved, for example, the incarceration of Japanese-Americans at the Manzanar National Historical Park, the enslavement of Black Americans at the plantations in Cane River Creole National Park, the killing of Indigenous peoples at the Sand Creek Massacre National Historic Site, and countless other instances of discrimination and marginalization throughout American history. See id. The NPS has also published "National Historic Landmarks Theme Studies" touching on "[d]iverse and [i]nclusive [h]istory," including the history of Asian American, Native Hawaiian, Desi American, Pacific Islander, Hispanic, Latino, Black, Indigenous, and LGBTQ+ communities. See id. Numerous NPS resources have also been dedicated to documenting climate change, environmental degradation, and the effects of industrialization and societal development on natural resources. See *Engaging with the Environment Featured Places*, Nat'l Park Serv. (May 6, 2021), https://www.nps.gov/subjects/tellingallamericansstories/transformingplaces.htm; see also *Climate Change and Your National Parks*, Nat'l Park Serv. (Jan. 13, 2025), http://nps.gov/subjects/climatechange/index.htm. Thus, the NPS has both in policy and in

conduct engaged in a prior practice of telling a whole history.[5]

The Secretary's Order directs the abandonment of these longstanding NPS practices without any reasoned justification. Under the Order, the NPS must review and reverse the installation of interpretive materials that the agency previously deemed relevant, accurate, useful, and informative, marking a shift from the NPS' prior approach of retaining and incorporating such content. As explained at length above, the Order provides no explanation for this change in policy. It does not acknowledge existing studies and polls documenting overwhelming, bipartisan support for telling the whole, unbiased history of this Nation. See, e.g., Pew Research Study. It does not explain whether public sentiment has changed such that certain interpretive materials or topics are now unpopular. It does not explain whether there is new evidence demonstrating that the research behind the interpretive materials is inaccurate. It does not explain whether the CIP and GMP process for creating interpretive materials is unsound. It does not provide or explain any other rational basis for removal.

Beyond failing to explain the departure, the Order fails to recognize or consider substantial reliance interests in the continued availability of interpretive materials at park sites. These interests are held by institutions and individuals; historians who chose to partner with the

---

[5] Defendants argue that there is no formal written policy that is inconsistent with the Order, and thus, there has been no departure from prior practice. However, an agency's actions may be established through any "past decisions," both formal and informal. Mich. Consol. Gas Co. v. FERC, 883 F.2d 117, 122 (D.C. Cir. 1989) (quoting Cross-Sound Ferry Servs., Inc. v. ICC, 873 F.2d 395, 398 (D.C. Cir. 1989)); see FCC v. Fox Television Stations, Inc., 556 U.S. 502, 517 (2009) (considering inconsistent "prior Commission and staff action"). Under this broad definition, previous decisions by the NPS to install interpretive materials on topics reflecting diverse viewpoints is sufficient to establish a prior agency practice. Cf. New York v. Trump, 811 F. Supp. 3d 215, 240 (D. Mass. 2025) (finding departure from prior practice where Department of Interior issued order to sub-agencies suspending permit issuance for wind energy projects); Washington v. U.S. Dep't of Homeland Sec., 614 F. Supp. 3d 863, 879-80 (W.D. Wash. 2020) (finding that Immigration and Customs Enforcement directive to detain people at courthouses was departure from prior practice of not doing so).

NPS with the understanding that they would be supported by grant funding and project opportunities; students and young adults who rely on park sites to learn about their and others' communities; professional designers and specialists whose careers and prior work will be upended as a result of Defendants' removal campaign; and millions of parents, educators, park visitors, and community groups who rely on the parks as a critical resource to learn and teach the most complete and accurate history and science possible.

To name just a few examples, NPCA alleges they rely on the materials for site visits, programs, and events that they regularly organize at park sites focusing on topics such as marginalized groups and civil rights. These include an annual trip for young adults to Alabama, Mississippi, and Tennessee to the Birmingham Civil Rights National Monument, the Medgar and Myrlie Evers Home, and the Emmett Till and Mamie Till-Mobley National Monument. NPCA's investment of resources in these trips, coupled with the expectation that they will be able to continue in the future, has been curtailed by Defendants' removal of relevant interpretive materials.

Similarly, NPCA member Jennifer Goepfert asserts that the Secretary's Order jeopardizes her ability to continue using park sites to educate her two home-schooled children on topics such as science and history. Goepfert alleges that she has visited dozens of park sites and that the NPS' interpretive materials are a key part of that learning. She poignantly explains:

> [I]t's important for my girls to hear the voices that are usually missing in traditional classrooms, despite our teachers doing their best. For the past five years, the national parks were essential to telling those narratives and educating my daughters. However, because of the recent orders by the administration, the national parks are no longer a reliable resource for educating my daughters.

Goepfert thus has invested resources into planning future visits and has structured her daughters' early education around the expectation that interpretive materials would continue to exist at park sites, which the Order disrupts. See Regents, 591 U.S. at 31 (holding agency failed to consider

individuals' reliance interests in Deferred Action for Childhood Arrivals program, noting that recipients, among other things, "enrolled in degree programs" in reliance on the program).

Moreover, the Order's effects extend beyond the physical removal of signs; the Order communicates that topics such as climate science and unbiased history are no longer fields approved internally by the agency. It thus signals a substantive shift in NPS' priorities that carries consequences for organizations that have structured their conduct in reliance on the agency's longstanding engagement with those topics, including for scientific expertise, technical guidance, and partnerships. For example, AASLH has relied on NPS staff as a key partner for dozens of prior collaborations, including to speak at summits and annual conferences involving environmental care and telling a complete history; to write articles in AASLH's magazine describing a display of the African American Civilian Conservation Corps at Appomattox Court House National Historic Park; to speak at a conference involving "enabl[ing] history organizations to dedicate financial resources to address marginalized communities, preservation efforts, community engagement, social justice, reinterpretation, and [diversity, equity, and inclusion] training"; to participate in panels on topics including #MeToo and #BlackLivesMatter; to serve on AASLH committees, including their climate and sustainability committee, women's history affinity committee, and more; and to contribute to AASLH's blog posts on topics such as LGBTQ+ communities in the United States and slavery at the Ulysses S. Grant National Historic Site. These examples illustrate the depth of the collaboration between the two entities and how, in reliance on this partnership, AASLH has invested substantial time and resources in developing a working relationship that would be costly and disruptive to replace. See Rhode Island v. Trump, 781 F. Supp. 3d 25, 47 (D.R.I. 2025) (finding substantial reliance interests where, among other things, state relied on mediation services provided by agency and would "not be able to

replace those services in the near or medium term").

UCS has similarly invested significant resources into building a relationship with the NPS and has long relied on NPS staff for invaluable input to their research projects. As UCS describes, NPS staff "serve[] as external reviewers who provide[] independent, expert scrutiny of UCS's methods, evidence, interpretations, conclusions, and recommendations." Similarly, NPS "scientists and experts have historically contributed to [UCS] studies," including those that "help inform interpretive materials at park sites," and have provided input on "how scientific phenomena affect American ecosystems and cultural sites, including those that are managed by [the NPS]." The Order directly undermines this relationship by casting doubt on the NPS' continued commitment to climate-related work.

Beyond organizations, thousands of individual historians, curators, educators, archivists, and historic preservationists rely in significant part on partnership with and funding from federal government agencies, including the NPS. For example, AASLH member Donna Graves claims that the Secretary's Order has jeopardized her career as a research historian specializing in, among other things, marginalized communities and climate change. Graves dedicated decades of her career to fields now disfavored by the Order, including through installing dozens of projects on these topics at National Parks such as the Rosie the Riveter World War II Home Front National Historic Park in California. In this manner, she structured major life decisions around the expectation of continued grant funding and support from the NPS. Indeed, according to Graves, this funding comprises forty to eighty percent of her annual income. The Order disrupts those longstanding expectations, not only undermining her portfolio and reputation but also threatening her livelihood. See Regents, 591 U.S. at 31 (finding substantial reliance interest where individuals "embarked on careers" in reliance on programs).

Defendants provide no indication that they weighed any of these substantial reliance interests in promulgating or implementing the Secretary's Order. The Order does not account for its broader impact on the park sites' ability to serve as public educational tools, nor does it contemplate the NPS' decades-long partnerships with private and public organizations who look to the agency for resources regarding inclusive history. It also fails to contemplate the lives, careers, and advancement that will be lost as entire fields of science and history are indiscriminately deemed "inappropriate."

The Court is not persuaded by Defendants' bare insistence that these alleged harms are insufficient to constitute reliance interests. As explained by the Supreme Court in Regents, there are no "such features automatically preclud[ing] reliance interests"; instead, consideration of the significance and seriousness of reliance interests "must be undertaken by the agency in the first instance, subject to normal APA review." 591 U.S. at 31. Here, the Secretary's Order fails to mention Plaintiffs' reliance interests at all, much less consider their significance or weigh their gravity against countervailing considerations.

In sum, an "unexplained change . . . that does not take account of legitimate reliance on prior interpretation may be 'arbitrary, capricious [or] an abuse of discretion.'" Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742 (1996) (quoting 5 U.S.C. § 706(2)(A)) (citing State Farm, 463 U.S. at 46-57; United States v. Pa. Indus. Chem. Corp., 411 U.S. 655, 670-75 (1973); NLRB v. Bell Aerospace Co., 416 U.S. 267, 295 (1974)). The Secretary's Order was issued without any indication of consideration of the substantial reliance interests at stake and is thus arbitrary and capricious.

**c. Failure to Consider Important Aspects of the Problem/Counter to Evidence**

Finally, Plaintiffs have demonstrated a likelihood of success in their claim that

Defendants failed to consider important aspects of the problem and acted counter to the evidence before them. Agency action may be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Melone v. Coit, 100 F.4th 21, 29 (1st Cir. 2024); see Regents, 591 U.S. at 16. Courts assess agency determinations "in light of the information [the agency] confronted." Bradley v. Weinberger, 483 F.2d 410, 415 (1st Cir. 1973).

Here, the Secretary's Order failed to consider the interests of the public before ordering the removals. The NPS' statutory mandate is to manage park sites in a manner that serves the public. See 54 U.S.C. § 100101(a) (directing the NPS to "promote and regulate the use of the National Park System by means and measures that . . . provide for the enjoyment of the scenery, natural and historic objects, and wild life" therein), (b)(1)(C) (mandating that park sites be managed "for the benefit and inspiration of all the people of the United States"); see also 16 U.S.C. § 21 (declaring that the purpose of Yellowstone, the country's first National Park, is "for the benefit and enjoyment of the people"). As such, the public's response to the Order is an important consideration that the federal government cannot unilaterally override without explanation. Cf. Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1460 (9th Cir. 1996) (concluding, based on statutory language that park be operated in a manner that "provide[s] for recreational and educational opportunities," that "failure by the NPS to address recreational concerns could be a basis for invalidating agency action" (quoting 16 U.S.C § 460bb)). Plaintiffs have provided evidence that the Secretary's Order is broadly unpopular with the public, alleging that the overwhelming majority of responses to the QR codes at park sites—numbering in the tens of thousands—denounces the Order, viewing it as an attempt to whitewash and erase

important aspects of this country's history. Moreover, as previously explained in detail, numerous recent studies and polls have demonstrated that the majority of Americans prefer that National Parks display a full and accurate history, including on the topics that have now been indiscriminately removed under the Order. See, e.g., Pew Research Study. Defendants provide no evidence that they meaningfully engaged with public sentiment about the interpretive materials prior to ordering their removal, nor do they explain why they continued with this course of action despite evidence that it is unpopular with the public. Congress specifically established the NPS and National Parks to serve the people, and the Government may not ignore that congressional directive by arbitrarily erasing, removing, and hiding historical truths in a manner that overrides the interests, experience, and use by the public.

Similarly, the Order acted counter to existing evidence that the interpretive materials are accurate and high quality. Plaintiffs provide evidence that the now-removed interpretive materials reflect thorough, peer-reviewed academic and scientific research, carefully developed over years of thought and care. As explained, the process for creating interpretive materials is carefully structured and designed to uphold rigorous academic standards. It involves a multitude of stakeholders, painstaking planning through GMPs and CIPs, years of iterative review, and the investment of substantial resources, both tangible and intangible. The Order provides no facts supporting its suggestion that the interpretive materials were created to promote a "false reconstruction of American history," such as evidence of a systemic breakdown in the planning process. Cf. Kravitz v. United States Dep't of Com., 366 F. Supp. 3d 681, 744 (D. Md. 2019) (finding agency acted counter to evidence in concluding that including a citizenship question in annual census survey would not "materially decrease response rates" because agency's own internal expert evidence showed opposite conclusion). Indeed, Defendants do not even attempt

to contend that any of the removed materials were historically inaccurate, in any sense. Thus, the overwhelming evidence supports that the interpretive materials and the processes for creating them are sound, and Defendants may not simply ignore such facts. As such, the Secretary's Order and Defendants' subsequent removal of interpretive materials are arbitrary and capricious.

**2. Contrary to Law/Exceeds Statutory Authority**

In Counts 2 through 4, Plaintiffs argue that the Secretary's Order is contrary to statutory directives in the Organic Act, Centennial Act, and the Omnibus Management Act. Under the APA, courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This is because an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute." FEC v. Cruz, 596 U.S. 289, 301 (2022). While "contrary to law" and "in excess of statutory authority" are two separate provisions in the APA, courts have found they contain a "linguistic distinction without a practical difference." Victim Rts. L. Ctr. v. Cardona, 552 F. Supp. 3d 104, 127 (D. Mass. 2021). Thus, the Court assesses both provisions concurrently.

As a threshold matter, the parties dispute the applicable legal standard for Plaintiffs' claim. Defendants contend that, because Plaintiffs bring a facial challenge to the Secretary's Order, they must show that "no set of circumstances" exist such that the application of the Order would be lawful. Plaintiffs argue that the "no set of circumstances" test applies only to hypothetical applications of a challenged action, whereas here, the Secretary's Order has already been implemented. The Court agrees with Plaintiffs and concludes that the "no set of circumstances" test does not apply to this action.

The "no set of circumstances" rule that Defendants invoke originates in United States v.

Salerno, 481 U.S. 739 (1987). In that case, the Supreme Court held that a plaintiff bringing a facial—as opposed to an as-applied—challenge to a law must demonstrate that "no set of circumstances exists under which the [law] would be valid." Salerno, 481 U.S. at 745. Despite the seemingly broad language of Salerno's holding, courts have not extended the case beyond its narrow factual context, where the plaintiffs brought a constitutional challenge to a federal statute that had yet to be implemented at all. See Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 15 (D.D.C. 2009) (holding that Salerno did not apply to agency pattern-and-practice claim); Ohio Coal Ass'n v. Perez, 192 F. Supp. 3d 882, 903-04 (S.D. Ohio 2016) (collecting cases); e.g., Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 619 (1991); Sherley v. Sebelius, 644 F.3d 388, 397 (D.C. Cir. 2011); Reno v. Flores, 507 U.S. 292, 292 (1993); Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp., 613 F.3d 206, 213 (D.C. Cir. 2010). Indeed, courts have expressly declined to apply Salerno to APA claims, see Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 39-40 (D.D.C. 2003) (explaining that "neither the Supreme Court nor the D.C. Circuit has consistently utilized the Salerno standard to review statutory challenges to administrative rules."); Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin., 711 F.3d 662, 667 (6th Cir. 2013) (applying APA, not Salerno, to facial challenge to agency regulation), or to challenges involving existing applications of a law, as opposed to "hypothetical applications," Gen. Elec. Co., 595 F. Supp. 2d at 15.

In the absence of binding First Circuit case law, and because other persuasive authorities repeatedly decline to extend Salerno to similar claims, the Court concludes that Plaintiffs' claims are not governed by Salerno's no-set-of-circumstances test. Plaintiffs do not mount a constitutional challenge to a federal statute, instead challenging an agency action under the APA. See Mineral Policy Ctr., 292 F. Supp. 2d at 40; Nat'l Truck Equip. Ass'n, 771 F.3d at 667.

Moreover, Plaintiffs' claims do not involve speculative hypothetical applications; instead, Plaintiffs allege dozens of existing removals pursuant to the Secretary's Order. Thus, Salerno is not applicable, and Plaintiffs need not demonstrate that all applications of the Order are contrary to law.

Having concluded that Salerno does not apply, the Court turns to the merits of whether the Secretary's Order is contrary to the Organic Act, Centennial Act, and Omnibus Management Act under the APA. The analysis begins with "[a]n examination of the relevant statutes." New York v. Kennedy, 789 F. Supp. 3d 174, 210 (D.R.I. 2025) (citing West Virginia v. EPA, 597 U.S. 697, 721 (2022)), appeal dismissed, No. 25-1780, 2025 WL 4665781 (1st Cir. Oct. 30, 2025). Courts "exercise their independent judgment" and need not "defer to an agency interpretation of the law." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412-13 (2024). At the preliminary injunction stage, the court's construction of the statutory language is "only to determine [the plaintiff's] likelihood of success on the merits"; the court "do[es] not purpose to resolve the issue definitively." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 93 (1st Cir. 2020) (citing Ross-Simons, 102 F.3d at 16); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991) (cautioning that, at preliminary injunction stage, decisions "are to be understood as statements of probable outcomes" only). The Court proceeds with the Organic Act, the Centennial Act, and the Omnibus Management Act in turn.

**a. Organic Act**

Plaintiffs first contend that they are likely to succeed in their claim that the Secretary's Order contravenes the Organic Act. The Act requires the Department to "promote and regulate the use of the National Park System" in a manner that effects the "fundamental purpose" of park sites. 54 U.S.C. § 100101(a). That "fundamental purpose" is to "conserve the scenery, natural

and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Id. According to Plaintiffs, the Secretary's Order undermines this conservation mandate by directing the removal of interpretive materials related to environmental degradation.

The Court agrees and finds that Plaintiffs are likely to succeed on the merits of this claim. The Act contains an express and unambiguous directive that the NPS prioritize conservation of the environment. See Nat'l Rifle Ass'n of Am. v. Potter, 628 F. Supp. 903, 909 (D.D.C. 1986) ("In the Organic Act[,] Congress speaks of but a single purpose, namely, conservation."); Bluewater Network v. Salazar, 721 F. Supp. 2d 7, 21 (D.D.C. 2010) (highlighting that "the overriding aim" of the Act "is to conserve the natural wonders of our nation's parks for future generations"). The NPS has recognized this mandate in its Management Policies, which provides the agency's official interpretation of the Organic Act. See Management Policies § 1.4.1; Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior, No. CV 20-3706, 2024 WL 1344450 (D.D.C. Mar. 29, 2024), appeal dismissed, No. 24-5147, 2024 WL 4294879 (D.C. Cir. Sept. 25, 2024). The Policies provide that, consistent with the Act's conservation directive, the NPS "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."[6] Management Policies § 1.4.3. Moreover, the

[6] Defendants observe in a footnote that the Management Policies are guidance only and are thus not judicially enforceable. But Plaintiffs do not seek to enforce the Policies as independent sources of law. Rather, the Policies are relevant insofar as they provide evidence of the agency's own interpretation of the Organic Act and as context for interpreting the statutory text. See Alaska Wildlife All. v. Haaland, 632 F. Supp. 3d 974 (D. Alaska 2022), vacated on other grounds, No. 22-36001, 2024 WL 4890996 (9th Cir. Nov. 22, 2024); Greater Yellowstone, 577 F. Supp. 2d at 190 n.1 (noting the Policies are "enforceable" because they "serve[] as NPS's official interpretation of the Organic Act").

conservation mandate is binding on the agency. In 1978, Congress enacted the Redwood Amendment to the Organic Act, which provides that the "management" and "administration" of park sites "shall not be exercised in derogation of the values and purposes for which the [National Park] System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b)(2); see Act of Mar. 27, 1978, Pub. L. No. 95-250, § 101(b), 92 Stat. 163, 166, codified at 54 U.S.C. § 100101(b)(2); Wash. Area Bicyclist Ass'n, Inc. v. Burgum, No. CV 26-0988, 2026 WL 1078218 (D.D.C. Apr. 21, 2026). Taken together, the statutory text, subsequent amendments, and the NPS' own interpretation leave little doubt that Congress intended that the NPS prioritize environmental conservation.

Moreover, the meaning of "conservation" is sufficiently clear and well-established. The Management Policies repeatedly emphasize that "conservation" includes the avoidance of conduct that promotes or results in detrimental impacts to the environment, including climate change, pollution, and other forms of degradation. For example, in discussing resource management, the Policies explain that "Earth's climate has changed throughout history. Although national parks are intended to be naturally evolving places that conserve our natural and cultural heritage for generations to come, accelerated climate change may significantly alter park ecosystems." Management Policies § 4.7.2. Elsewhere, the Policies emphasize that park sites must educate visitors about "the influence of global climate change." Id. § 7.5.1. And in a separate section on air pollution, the Policies state that the NPS must "actively promote and pursue measures to protect these values from the adverse impacts of air pollution. In cases of doubt as to the impacts of existing or potential air pollution on park resources, the Service will err on the side of protecting air quality and related values for future generations." Id. § 4.7.1. Taken together, these statements reflect the NPS' understanding that the Organic Act prohibits

the agency from taking actions that actively undermine the prevention of environmental degradation.

The Secretary's Order directly conflicts with this conservation mandate. Pursuant to the Order's directive to remove interpretive materials that purportedly reflect "improper partisan ideology" or "inappropriately disparage[] Americans," Defendants have removed dozens of signs explaining, for example, climate change, glacial melt, and air pollution and how humans contribute to those effects. These climate-related interpretive materials further the Organic Act's conservation mandate by fostering public awareness and informing visitors about environmental degradation and the threats facing protected ecosystems, landscapes, and other park resources. Indeed, Plaintiffs describe the NPS as "a key partner in . . . provid[ing] accurate scientific information and increas[ing] scientific literacy and access." The Order nevertheless directs the removal of these materials without identifying any conservation-related justification. The Order thus ignores and defies the NPS' core duty to protect and conserve the Nation's natural resources.

Even in their briefing, Defendants offer no persuasive explanation as to how the Secretary's Order advances any countervailing conservation purpose. Defendants argue only that the Department has broad discretion on how to implement the Act. However, such discretion "is bounded by the terms of the Organic Act itself." Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 193 (D.D.C. 2008). Without adhering to statutory guardrails, executive discretion is ripe for abuse of authority. Defendants have only the powers delegated by Congress and no more. In failing to comply with the Organic Act's conservation mandate, the Order has exceeded the bounds of any discretion conferred by the statute.

Defendants also contend that the Management Policies require NPS to "contribut[e] to

the national dignity," and the Secretary's Order aligns with that directive because it directs the removal of materials that "disparage[] Americans." Management Policies § 1.4.6. Even if the Court were to adopt Defendants' questionable conception of "national dignity," the *sine qua non* of the Organic Act is conservation; any incidental objective of contributing to the Nation's "dignity" cannot supersede that core statutory purpose. Accordingly, Plaintiffs have shown a likelihood of success in their claim that the Secretary's Order contravenes the Organic Act.

**b. Centennial Act**

Plaintiffs next contend that they are likely to succeed on the merits of their claim that the Secretary's Order contravenes the Centennial Act. That statute directs the Secretary to "ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the system." Id. § 100801(1)(A). "Education," in turn, is defined as "enhancing public awareness, understanding, and appreciation of the resources of the [National Park] System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2). According to Plaintiffs, the Secretary's Order violates Defendants' duty to implement a program of the "highest quality education and interpretation," because such a program must include the topics now disfavored by the Order. Defendants contend that the phrase "highest quality education and interpretation" is ambiguous and, therefore, left to agency discretion. The Court agrees with Plaintiffs.

First, the Centennial Act unambiguously requires the NPS to incorporate diverse viewpoints into its interpretation and education program. Section 100802 mandates that the

program be "of the highest quality." Congress then provided clear instructions for what qualifies as "highest quality." Section 100803 of the Act explains that the Secretary may undertake a program of regular evaluation "to ensure that [interpretation and education programs] . . . reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs."[7] 54 U.S.C. § 100803(2). Consistent with this directive, the Management Policies explain that the program will accommodate an "increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations." Management Policies § 7.3.4; see also id. § 7.5.1 (explaining that the program should "provide opportunities for facilitation of civic dialogue to engage Americans in understanding past and current issues of importance on a local-to-global basis"). The Department's Director's Order #6, which supplements the Management Policies, likewise provides that, "[i]n a democratic society such as ours, it is important to understand the journey of liberty and justice, together with the economic, social, religious, and other forces that barred or opened the ways for our ancestors, and the distances yet to be covered. . . . The Park Service must ensure that the American story is told *faithfully, completely, and accurately*." Director's Order #6 at 1-2 n.2 (quoting Rethinking the National Parks for the 21st Century, Nat'l Park

---

[7] Defendants argue that Section 100803 is written in permissive language and therefore contains no enforceable duties. However, Plaintiffs do not seek to enforce Section 100803 as an independent obligation. Rather, Section 100803 provides Congress' direction on the meaning of the phrase "highest quality" in Section 100802. Statutes "should not be read as a series of unrelated and isolated provisions," and courts understand that "identical words used in different parts of the same act are intended to have the same meaning." Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995) (quoting Dep't of Rev. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994). Here, both provisions use the same terms of "interpretation" and "education" program, address the same subject matter, and are located within the same title. Section 100803 thus provides persuasive evidence of how Congress understood the phrase "highest quality" with respect to the NPS' interpretation and education program—that is, Section 100803's four specific, enumerated statutory criteria.

System Advisory Bd. (2001)). The Director's Order further specifies that the program must "reflect and embrace different cultural backgrounds, ages, languages, abilities, and needs," and that "[t]he content of interpretive and educational services must be accurate, respect multiple points of view and be free of cultural, ethnic, and personal biases." Id. These sources reflect that the NPS' interpretation and education program must incorporate marginalized voices in telling a full history. In this manner, the National Parks fulfill their duty to unearth untold stories that have historically been missing in traditional classrooms.

The Centennial Act's legislative history reinforces this interpretation. While legislative history is not determinative, it can nevertheless be consulted in providing additional support for interpreting statutory language. See Strickland v. Comm'r, Maine Dep't of Hum. Servs., 48 F.3d 12, 17, 19 (1st Cir. 1995). During congressional debates over the Centennial Act, Massachusetts Representative Niki Tsongas, one of the bill's original co-sponsors and ranking member of the U.S. House of Representatives Natural Resources Subcommittee on Federal Lands, provided opening statements. Quoting Stephen Mather, the first Director of the NPS, she remarked that:

> "The parks do not belong to one State or to one section . . . ; they are national properties in which every citizen has a vested interest; they belong as much to the man"—and I would add, woman—"of Massachusetts, of Michigan, of Florida as they do to the people of California, of Wyoming, and of Arizona."
>
> Those words are a powerful reminder in this era of political division and disagreement: national parks are national. They cut across party lines and geographic boundaries. They enjoy broad support, and they bring people together—something we seem to need now more than ever.

162 Cong. Rec. H7207 (daily ed. Dec. 6, 2016) (statement of Rep. Nicola Tsongas). California Representative Tom McClintock, the chairman of the Federal Lands Subcommittee, reflected similar sentiments in his comments that followed, stating that the country's "most beautiful and historic lands should be set aside for the 'use, resort, and recreation' of the American people." Id. at H7208 (statement of Rep. Tom McClintock). Arizona Representative Adelita Grijalva, the

bill's original sponsor, provided the final comments of the debates. She further echoed the view that the purpose of the Centennial Act was to expand public access, stating: "In our democratic society, the park system is uniquely one of the most democratic public institutions because, after all, all Americans own the park system and it is for all Americans . . . ." Id. (statement of Rep. Adelita Grijalva). The bill was then approved by both chambers of Congress, with the Senate summarily adopting it without amendment and by unanimous consent. Id. at S7167. Together, this legislative history reflects an understanding that the Centennial Act requires park sites to serve all visitors. Implicit in this objective is that park sites and their resources must incorporate complete history—unvarnished history—including the views of those historically marginalized.

The Secretary's Order conflicts with this statutory mandate. The Order directs the removal of any "descriptions, depictions, or other content" that "disparage[s] Americans," crafting a narrative of American history that narrowly "focus[es] on the greatness of the achievements and progress of the American people" and the country's efforts to "advanc[e] liberty, prosperity, and human flourishing." By its language, this directive authorizes the suppression of information concerning actions that have undermined "liberty, prosperity, and human flourishing"—a phrase in which Defendants leave little doubt as to its meaning, having removed numerous interpretive materials related to abolition, eugenics, labor history, climate change, LGBTQ+ rights, women's suffrage, and Indigenous history. This erasure of the struggles, lives, and stories of various marginalized communities directly denies the importance of the Centennial Act's mandate that park sites reflect the voices of all Americans. Rather than encourage visitors of all backgrounds to "gain awareness, appreciation, and understanding" with park resources, as the Centennial Act requires, the Order instead, in the stroke of a pen, fosters alienation and disengagement by removing a source of potential connection that diverse

communities could form with park resources.

Second, beyond reflecting diverse viewpoints, the Centennial Act also requires the NPS' interpretation and education program to reflect current scientific research. Section 100803 states that the program may be regularly updated to "reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803(4). The Management Policies likewise declare that "[f]actual information presented [at park sites] will be current, accurate, [and] *based on current scholarship and science*." Management Policies at 90 (emphasis added); see also Director's Order #6 §§ 8.4.1 (stressing that "[a]cknowledging multiple points of view does not require interpretive and educational programs to . . . disregard the weight of scientific or historical evidence"), 8.4.2 (explaining that "the best scientific evidence available" is those "found in scholarly sources that have stood the test of scientific peer review and criticism"). The Policies further explain that "current science" includes "topics such as the civic experience of our country; the complex, diverse ecology of our nation and the world; and the influence of global climate change." Management Policies § 7.5.1; see also id. § 7.3.1.1 (specifying that curriculum-based programs should focus on, among other things "the threats to the condition of those resources" within the park sites). Together, this language indicates that a "broad program of the highest quality interpretation and education" includes incorporating topics such as climate change, biodiversity, pollution, and environmental degradation.

For similar reasons that the Order violates the Organic Act's conservation mandate, the Secretary's Order violates this directive from the Centennial Act. The Order's focus on "*human* flourishing" (emphasis added) and its prohibition on materials that "disparage[] Americans" at park sites effectively require Defendants to remove materials that highlight the Nation's historical contributions to environmental degradation. Indeed, Defendants have already taken

down signage across multiple park sites relating to glacier melt, carbon dioxide emissions, and climate change. In response, Defendants have provided no explanation—and the Court discerns none—for how the removals promote current scientific or academic research. For example, Defendants provide no evidence that the science reflected in the materials is inaccurate, outdated, or disputed; nor do Defendants provide any evidence that the interpretive materials somehow physically contribute to environmental degradation. Accordingly, Plaintiffs have demonstrated that the Order contravenes the Centennial Act.

In response, Defendants contend that the Centennial Act's only requirement is that a program of "highest quality interpretation and education" exist. They argue that the Management Policies, which set out NPS' framework for an interpretation and educational program, satisfy this requirement. The Court disagrees. The Centennial Act requires both the "availability" *and* "use" of such a program. 54 U.S.C. § 100802. Even if the Policies remain formally in effect, the Secretary's Order substantially undermines their "use." The Policies establish a defined process and structure for designing and implementing the program through GMPs and CIPs. Management Policies § 7.2. The Policies emphasize that "*[a]ll* interpretive and educational services . . . will be based on and coordinated with the comprehensive interpretive plan," and that CIPs must be used to determine "which stories to tell, how to tell them, and how to reach specific audiences." Id. (emphasis added). The Secretary's Order sidesteps this deliberative process and mandates expedited removals pursuant to an agenda that has little, if any, relationship with the priorities set forth in the Centennial Act or the Management Policies. In doing so, the Order effectively overwrites the CIPs, thus contravening the Centennial Act's requirement that the NPS "use" the interpretation and education program. Accordingly, Plaintiffs have demonstrated a likelihood of succeeding on their claim that the Secretary's Order

is contrary to the Centennial Act.

**c. Omnibus Management Act**

Plaintiffs next argue that the Secretary's Order is contrary to the Omnibus Management Act. That statute provides that the Secretary "shall continually improve the ability of the [NPS] to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the [National Park] System." 54 U.S.C. § 100701. The Act also states that the Secretary "shall ensure that management of [National Park] System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." Id. § 100702.

For substantially similar reasons that the Order is contrary to the Centennial Act, Plaintiffs have demonstrated a likelihood of success in this claim. The Omnibus Management Act's directive to the NPS to implement a "broad program" of the "highest quality science and information," and to provide "state-of-the-art . . . interpretation of" park resources, closely tracks the language used in the Centennial Act. Id. §§ 100701-100702. Moreover, like the Centennial Act, the Management Policies implement the Omnibus Management Act. Management Policies § 4.1 ("[I]n accordance with requirements of the National Parks Omnibus Management Act of 1998, the Service will use the findings of science and the analyses of scientifically trained resource specialists in decisionmaking."); see also id. ("The Service manages the natural resources of parks to maintain them in an unimpaired condition for present and future generations in accordance with NPS specific statutes, including . . . the National Parks Omnibus Management Act of 1998."). Thus, the Court's analysis of the terms "interpretation" and "education" in the Centennial Act informs interpretation of the Omnibus Management Act's corollary terms. Without repeating its analysis in full, the Court finds that the Omnibus

Management Act directs the NPS to incorporate contemporary scientific research into interpretive materials at park sites, including on climate change and environmental degradation. The Secretary's Order contravenes these requirements by mandating the removal of such topics. Thus, Plaintiffs have demonstrated a likelihood of success in their claims that the Secretary's Order is contrary to the statutory standards in the Organic Act, Centennial Act, and Omnibus Management Act. See State Farm, 463 U.S. at 59 n.* (Rehnquist, J., concurring in part and dissenting in part) ("[A] new administration may not . . . ignore statutory standards in carrying out its regulatory functions."). And more broadly, Plaintiffs have overwhelmingly demonstrated a likelihood of success on their claims that the Secretary's Order is both arbitrary and capricious and contrary to law.

The great irony of this case is that Defendants, and the Executive Order they purport to faithfully execute, decry the existing interpretive materials at National Parks as a "concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth." Yet, the Government's actions do exactly what they profess to counteract, dismantling objective historic truths and permanently damaging public memory. Behind the incendiary rhetoric lies little substance, lacking even a remote amount of scientific rigor, facts, legal authority, or discernible reasoning. Our democracy and system of governance demand more from the Executive. Agencies must grapple with important facts and considerations, respect the limits of statutory authority, provide reasoned justifications for their actions, and, above all else, follow the law. That was not done here.

**C. Irreparable Harm**

The second requirement for a plaintiff to obtain a preliminary injunction is to show that he "is likely to suffer irreparable harm in the absence of preliminary relief." Winter v. Nat. Res.

Def. Council, Inc., 555 U.S. 7, 20 (2008). To demonstrate irreparable harm, a plaintiff must show "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, 102 F.3d at 19; Kmart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989) ("The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies."). Courts consider this factor in conjunction with likelihood of success on the merits, using a "sliding scale . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010). When "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (quoting E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 738, 743-44 (1st Cir. 1996)). Importantly, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Kmart, 875 F.2d at 915 (quoting Wagner v. Taylor, 836 F.2d 566, 575-76 (D.C. Cir. 1987)).

Plaintiffs have demonstrated that the risk of harm to them and their individual members as research institutions, historians, conservationists, and park visitors is immediate and irreparable. Many of Plaintiffs' alleged aesthetic, recreational, and informational harms are nonquantifiable by nature. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) ("Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." (internal quotation marks and citation omitted)), abrogated in part on other grounds, Winter, 555 U.S. 7. For example, NPCA member Jennifer Goepfert alleges that she uses interpretive materials at park sites as a primary

source of educational material for her school-aged children, including on topics such as civil rights, climate change, and slavery. Without the interpretive materials, Goepfert can no longer rely on the park sites for their pedagogical value. Indeed, courts have recognized loss of educational opportunity for children as incommensurable and immeasurable harm. See New York v. McMahon, 784 F. Supp. 3d 311, 362-63 (D. Mass. 2025) (finding schools were irreparably harmed by threats to their ability to educate children). The same is true for Plaintiffs' millions of other members and supporters who "regularly visit, study, work, photograph, or recreate" at park sites, who now, because of the Secretary's Order, no longer have access to the removed interpretive materials. Cf. City of Philadelphia v. Burgum, 820 F. Supp. 3d. 313, 342 (E.D. Pa. 2026) (granting preliminary injunction and finding irreparable harm in action challenging application of the Secretary's Order, noting that "[e]ach person who visits the President's House and does not learn of the realities of founding-era slavery receives a false account of this country's history").

Even if the harms could be quantified, the APA does not provide for monetary damages. Under 5 U.S.C. § 702, the APA provides for judicial review only for an "action in a Court of the United States seeking relief *other than money damages*." (emphasis added). Thus, for the claims Plaintiffs bring here, monetary damages would not be available, supporting the conclusion that any harm is irreparable, as the Court could not provide traditional legal remedies. See California v. Kennedy, 802 F. Supp. 3d 273, 283 (D. Mass. 2025) (citing Kentucky v. Biden, 23 F.4th 585, 611 (6th Cir. 2022)) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Defendants contend that the harm is not irreparable, highlighting that Plaintiffs did not move for preliminary injunctive relief for several months. Specifically, the Secretary's Order

was promulgated on May 20, 2025, whereas Plaintiffs initiated the suit on February 17, 2026, and moved for preliminary injunctive relief on March 18, 2026. Thus, since the issuance of the Order, Plaintiffs waited approximately nine months to file a complaint, and ten months to move for relief. Defendants argue that this delay undercuts Plaintiffs' argument that the harm is irreparable. Defendants are correct that in some circumstances, delay counsels against a finding of irreparable harm. See, e.g., Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004). However, courts in this district have nevertheless found irreparable harm in cases involving delays of comparable length or longer. See, e.g., Baillargeon v. CSX Transp. Corp., 463 F. Supp. 3d 76, 85 (D. Mass. 2020) (two-year delay); Boustany v. Bos. Dental Grp., Inc., 42 F. Supp. 2d 100, 112 (D. Mass. 1999) (eight-month delay); Whoop, Inc. v. Shenzhen Lexqi Elec. Tech. Co., 818 F. Supp. 3d 207, 223 (D. Mass. 2026) (eight-month delay). On the facts before it, the Court finds that Plaintiffs—while not acting with particular haste—were not unduly dilatory. Defendants significantly expanded removal efforts in early 2026, increasing both the magnitude of harm and urgency for relief. Moreover, the Order identifies "July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence" as a key upcoming milestone, which is mere weeks away. In any event, the touchstone of irreparable harm is that the injury is "not easily measured or fully compensable in damages," which, as explained, Plaintiffs have demonstrated. Ross-Simons, 102 F.3d at 18-19.

The weight of this harm bears emphasizing. These park sites are deeply meaningful for many people for multifaceted reasons. The now-removed materials were the product of years of care, stewardship, community collaboration, and public engagement. They commemorate the people who have lived, worked, and died in this Nation; serve as a tribute to their contributions to the ideals of freedom, democracy, and equity; and represent an enduring reminder of the

inherent contradictions in our Nation's history. See City of Philadelphia, 820 F. Supp. 3d. at 341-42. Their removal constitutes government-sanctioned erasure and rejection of their histories. It strips the sites of the context that gives them meaning. It degrades the public's trust in the government, as the Executive Order ignores congressional directives and carelessly razes decades of efforts in the pursuit of its unilateral agenda. These harms are, in all senses of the word, irreparable.

**D. Balance of the Equities/Public Interest**

Finally, the Court must balance the parties' relative hardships and consider the public interest. See Winter, 555 U.S. at 20. These last two factors "merge when the Government is the opposing party." Nken, 556 U.S. at 435. The relevant inquiry is whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Grant v. Trial Ct., 784 F. Supp. 3d 475, 490 (D. Mass. 2025) (quoting Dataphase Sys., Inc. v. C L Sys., Inc. 640 F.2d 109, 113 (8th Cir. 1981)). The court "explore[s] the relative harms to applicant and respondent, as well as the interests of the public at large" in the context of "the exigencies of that particular case." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (citing Barnes v. E-Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991)). Like the irreparable harm factor, the balance of hardships factor is weighed in light of the likelihood of success on the merits. Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612-13 (1st Cir. 1988).

Here, the balance of equities and public interest weigh in favor of an injunction. As explained above, Plaintiffs have demonstrated that the Secretary's Order likely contravenes the Organic Act, Centennial Act, and Omnibus Management Act. The public has a strong interest in ensuring the Government acts lawfully. As the Supreme Court explained, "our system does not

permit agencies to act unlawfully even in pursuit of desirable ends." Ala. Ass'n of Realtors v. Dep't Health & Hum. Servs., 594 U.S. 758, 766 (2021). Indeed, "[t]here is generally no public interest in the perpetuation of unlawful agency action," League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016), and the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013). As such, preliminary injunctive relief would serve the public interest by forcing Defendants to abide by their existing statutory duties.

It bears emphasizing that the public ultimately bears the brunt of Defendants' actions. Everyday park visitors—young, old, and from all backgrounds—look to the National Park system to learn and enhance their understanding of history, science, and this Nation. Defendants' continued censorship of interpretive materials disfavored by this Administration diminishes the public's collective ability to engage critically and thoughtfully with these topics. Cf. City of Philadelphia, 820 F. Supp. 3d. at 343 ("[T]here is a public interest in the preservation and exhibition of . . . history."). By its terms, the Order erases the history of countless people; alienates communities from public spaces; limits the availability of scientific information relevant to ensuring the long-term preservation of the parks themselves; and impairs the mission of the NPS to preserve the parks "for the enjoyment, education, and inspiration of this and future generations." The Executive Order, in fact, tarnishes the legacy of this great Nation by attempting to remove these items in time for, and in honor of, the 250th anniversary of our Nation's creation. The gravamen of these public interests cannot be overstated.

On the other side of the ledger, Defendants contend that, as a practical matter, the requested relief would impose administrative burdens on the Government by preventing the implementation of routine updates to park sites. However, the requested relief would not

prohibit Defendants from making all changes to the park sites; it would only prevent the implementation of Secretary Order 3431. The relief would not affect Defendants' ability to, for example, conduct repairs on park resources or prevent dilapidation.

Defendants also invoke a separation-of-powers argument, contending that injunctive relief would burden the President's interest in managing the Executive Branch, thereby undermining interbranch comity and democratic principles. However, the Constitution does not envision unyielding judicial deference to the President's will in the name of interbranch comity. Rather, separation of powers is paired with a system of checks and balances, and courts have never hesitated to assume their duty of constraining executive overreach when necessary. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582 (1952).

In sum, the Court finds that the balance of the equities and the public interest weigh in favor of Plaintiffs. Accordingly, Plaintiffs have met all the required factors for preliminary injunctive relief.

**E. Scope of Remedy**

Having concluded that Plaintiffs have met their burden of demonstrating the necessity of relief, the Court must now determine the appropriate scope of the remedy. The parties raise three disputes. First, Defendants argue that a stay under Section 705 is not an available remedy and that Plaintiffs' sole avenue for relief, if any, is a preliminary injunction. Second, Defendants argue that Section 5 should be severed from the remainder of the Secretary's Order, and that relief should apply only to that provision. Third, the parties dispute the date to which any restorative relief should relate back. The Court addresses each in turn.

As to the vehicle for relief, the Court finds that a stay pursuant to Section 705 is appropriate. Defendants' sole argument to the contrary is that the Secretary's Order has already

been implemented. However, "courts 'routinely stay already-effective agency action under Section 705.'" Ass'n of Am. Univs. v. Dep't of Def., 792 F. Supp. 3d 143, 182 (D. Mass. 2025) (quoting Haitian Evangelical Clergy Ass'n v. Trump, 789 F. Supp. 3d 255, 274 (E.D.N.Y. 2025)). Accordingly, because Plaintiffs have met the standard for a stay under Section 705, the Court grants one here.[8]

As to severability, the Court agrees that injunctive relief should be limited to Section 5, the only portion of the Secretary's Order materially disputed in this case. Entire agency actions should not be vacated if unchallenged portions can "function sensibly without the stricken provision." Sorenson Commc'ns Inc. v. FCC, 755 F.3d 702, 710 (D.C. Cir. 2014) (quoting MD/DC/DE Broad. Ass'n v. FCC, 236 F.3d 13, 22 (D.C. Cir. 2001)). Here, the remaining sections of the Secretary's Order do not materially affect Plaintiffs' claims and can function without Section 5. Sections 1 to 3 provide background on the Order's purpose, authority, and context, and do not authorize any specific agency action. Section 4 directs the NPS to identify infrastructure improvements and funding for the restoration of Independence Hall in Philadelphia, PA. Plaintiffs do not allege that the restoration of that site caused any of their injuries. Section 6 directs the Land Management Bureaus to post QR codes at park sites, and

[8] The Court declines to require that Plaintiffs post a bond to secure a stay. Unlike a preliminary injunction, a stay under 5 U.S.C. § 705 does not require the movant to post a bond. See 5 U.S.C. § 705; Woonasquatucket River Watershed Council v. Dep't of Agric., 778 F. Supp. 3d 440, 477 (D.R.I. 2025) (noting district courts have "broad discretion . . . to determine the appropriate amount" of a bond for a stay, "including the discretion to require no bond at all"); see also Seafreeze Shoreside, Inc. v. DOI, No. 22-CV-11091, 2023 WL 3660689 (D. Mass. May 25, 2023). In "suits to enforce important federal rights or 'public interests,'" courts generally do "not require posting of a substantial bond." Maine v. Dep't of Agric., No. 25-CV-00131, 2025 WL 1088946, at *30 (D. Me. Apr. 11, 2025). As this case involves the NPS' statutory authority as a federal agency and the public's interest in National Park sites, the Court finds a bond is not appropriate. Defendants do not dispute this in their briefing.

Plaintiffs' Motion for Stay does not include their Paperwork Reduction Act claim, which is the only claim directly applicable to Section 6. Finally, Section 5's directive applies not only to the NPS but also to the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation. Plaintiffs move only pursuant to statutes that govern the NPS, and so any injunctive relief does not extend to these other agencies.

Finally, the parties dispute the date from which Defendants must restore the park sites. Plaintiffs request that Defendants restore the sites as they existed prior to the Order's issuance (i.e., May 20, 2025). Defendants contend that the appropriate date is when Plaintiffs' initial complaint was filed (i.e., February 17, 2026). The Court agrees with Plaintiffs and finds that restoring park sites to their state prior to the issuance of the Secretary's Order is the proper course of action to minimize injury. As the First Circuit has explained:

> If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, . . . by the issuance of a mandatory injunction, . . . or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. *The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo*.

Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers, 679 F.2d 978, 995-96 (1st Cir. 1982) (emphasis added) (quoting Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974)), rev'd on other grounds, 467 U.S. 526 (1984). As explained, by the time Plaintiffs initiated this action, Defendants had already removed dozens of interpretive materials across the country, thus causing concrete and irreparable injury to Plaintiffs even before the complaint was filed. Restoration of the sites is the only course of action that can remedy these existing injuries and prevent further harm.

## IV. CONCLUSION

Plaintiffs have demonstrated a likelihood that Defendants' efforts, ostensibly taken in the name of restoring dignity, instead seek to rewrite the Nation's history with a white-out pen. History cannot be faithfully told while excluding the experiences of communities whose contributions, struggles, and achievements form an important part of our Nation's story. Indeed, at a time of facts and alternative facts, the only thing we must be able to rely on as undeniable truth is history. And telling the full truths of our shared story helps our Nation heal from past wrongs, rather than prolonging us.

Because Defendants deemed it important to strip the parks of these undeniable truths in anticipation of the 250th Anniversary of our great Nation, it is equally important that our shared history be honestly told and fully restored by the 250th Anniversary to properly honor the remarkable achievements of the United States. Accordingly, it is hereby **ORDERED**:

1. Plaintiffs' Motion to Stay Under 5 U.S.C. § 705 is **GRANTED** forthwith.

2. Defendants are **ENJOINED** from taking any further action to implement Section 5 of Secretary's Order 3431, "Restoring Truth and Sanity to American History," at park sites managed by the NPS pending further litigation in this matter.

3. Defendants are **ORDERED** to take all necessary steps **<u>forthwith</u>** to restore and reinstall all interpretive materials at park sites managed by the NPS that, pursuant to the Secretary's Order, have been altered, removed, or damaged in the process of such removal since May 20, 2025, to be completed within **twenty-one (21) calendar days** of this Order. Defendants are further **ENJOINED** from making any further alterations to interpretive materials at NPS park sites pursuant to the Secretary's Order.

4. Within **five (5) calendar days** of this Order, and every **seven (7) calendar days**

thereafter until otherwise ordered by the Court, Defendants shall file a status report describing all steps they have taken to comply with the Court's Order, including a list of all interpretive materials that have been restored to their prior state as of May 19, 2025.

**SO ORDERED.**

Dated: June 12, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director,<br><br>*Defendants*, | Civil Action No. 1:26-cv-10877 |

**SECOND DECLARATION OF JESSICA BOWRON, COMPTROLLER OF THE NATIONAL PARK SERVICE, EXERCISING THE DELEGATED AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1. My name is Jessica Bowron. I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025, delegation of that authority from the Acting Secretary of the Interior, and subsequent extensions of that authority by the Secretary of the Interior. I have been employed by the NPS since 2007 and have served as the NPS Comptroller since 2017.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System and its approximately 20,000 employees nationwide, as well as all NPS programs, NPS directorates, and regional offices. In this role, I oversee the NPS's Cultural Resources, Partnerships, and Science Directorate, the NPS's Natural Resources, Stewardship, and Science Directorate, as well as NPS's Interpretation, Education, and Volunteers Directorate.

4. The National Park System is comprised of four hundred and thirty-three (433) units, including sixty-three (63) National Parks, eighty-seven (87) National Monuments, seventy-six (76) National Historic Sites, sixty-four (64) National Historical Parks, thirty-one (31) National Memorials, and eighteen (18) National Recreation Areas, among others. NPS units are spread across all fifty states, the District of Columbia, and the U.S. territories

5. As explained in my April 4, 2026 declaration in this matter ("First Declaration"), the NPS's interpretive media take many forms, including waysides and exhibits, park unigrid brochures (the iconic NPS park brochures/maps), program brochures, park newspapers, and educational handouts, audiovisual materials that play in NPS facilities such as visitor centers and museums, online content, and other information that is necessary to educate and inform the visitor experience. The NPS works closely with specialized non-profit partners known as Cooperating Associations that operate retail bookstores in System

units that enhance our interpretive goals by allowing visitors to purchase and take home relevant educational materials.

6. I understand that the District Court has ordered the NPS to "reinstall all interpretive materials at park sites managed by the NPS" that have been "altered, removed, or damaged" as a result of the NPS's implementation of Secretary's Order (or "SO") 3431. This will be exceedingly burdensome to the NPS. As I described in my First Declaration, the NPS undertook substantial efforts to ensure compliance with Secretary's Order (SO) 3431, commencing approximately a year ago. The review process was performed on a case-by-case basis by a team of NPS senior leadership and Departmental officials, and decisions (particularly as to removing materials) were also made, not just on the basis of SO 3431, but also on a confluence of other factors (including age or condition of the materials; consistency with modern interpretive standards; and whether retirement was already part of a System unit's interpretive plan).

7. The NPS maintains three types of interpretive materials that it has altered or is in the process of altering consistent with the Secretary's Order: exhibits that existed at the time the order was issued that have been reviewed for consistency with the Secretary's Order and subsequently altered, removed or replaced as a result of that review process; written materials that have been reviewed for consistency with the Secretary's Order and that were subsequently revised and replaced; and, recently developed exhibits that have also been reviewed for consistency with the Secretary's Order as existing materials.

8. For NPS exhibits that were on display at the time of the Secretary's Order that have been replaced, some of these are likely still stored at or near the park. Others have likely been destroyed as they may have been made of disposable materials (paper or cardboard) or

were old and weathered and/or also included information that needed updating. For example, of approximately 100 completed revision projects reported under SO 3431, around 14 prior exhibits were destroyed as part of their removal.

9. To replace destroyed exhibits, park staff would need to locate the graphic file for the exhibit or, if it could not be located, recreate the graphic file based on available information and memory. If the exhibit was designed by the Harper's Ferry Center and the graphic file is readily accessible, it would take a minimum of 7 to 10 business days to re-fabricate and, depending on the number of exhibits, the material needed, and other workload, could take longer. There are only a limited number of exhibit fabricators available for the NPS to contract with, and, in our experience, these fabrication projects take longer during the summer season due to increased and unpredictable contractor workloads.

10. As examples, at the National Mall, park staff estimate that replacing waysides related to President Franklin Roosevelt will cost $3000 and take at least 90 days. At First State National Historical Park, park staff estimate that replacing interior exhibits will cost $1000 and take at least 30 days. At Charles Pinckney National Historic Site, park staff estimate that replacing a small sign will cost $300 and take at least 30 days. At Gateway National Recreation Area, park staff estimate replacing two exhibit panels will cost $7000, but the amount of time is uncertain.

11. Once the exhibits are re-fabricated by the fabricator, they would then need to be sent to the park. Many parks are in remote locations, including some of those discussed (e.g., Glacier National Park) in the District Court's order. As a result, the exhibits could take several business days for the park to receive.

12. Reinstalling re-fabricated or stored exhibits would require the diversion of NPS staff resources at the relevant parks while parks are already experiencing staffing constraints. This is particularly difficult during the summer season, which is the busiest time of year at most parks. Moreover, many parks are also preparing for their own Semiquincentennial activities this year in addition to their regular summer duties. These activities include intensive special exhibits, displays, interpretive and educational activities, as well as complex commemorative events for America's 250th birthday. The NPS anticipates increased visitation to many System units around the Semiquincentennial, but this Order would likely cause impacts to visitors through limited closures and disruption of visitor services to facilitate the onsite reinstallations during such a uniquely busy time period for the NPS.

13. And in some instances, park staff have communicated considerations beyond the scope of SO 3431 for retaining revised interpretive content. As examples, at Virgin Island National Park, three waysides flagged for removal under SO 3431 had also received complaints from local community members, which the park sought to address with its revisions. At Great Smoky Mountains, a visitor center panel was removed in response to SO 3431, and the space has been more optimally allocated to other park needs.

14. The printed interpretive materials affected by the District Court's order include the iconic unigrid brochures, park newsletters, park-specific junior ranger handbooks, interpretive pamphlets, and other printed materials such as trail guides. I understand the District Court's order to require the NPS to revert back to the previous versions of these interpretive materials.

15. Many park newsletters and interpretive pamphlets are often designed and printed in-house by the park or through a local vendor. Replacing these types of materials will generally be easier to implement than replacing other types of materials, depending on the complexity of the brochure and whether the park has residual stocks of the previous version.
16. The unigrid brochures are developed through the Harper's Ferry Center for Media Services. It often takes several months to develop a new version of a park's unigrid brochure, and this publication office has lost significant capacity in recent years. In some cases, the park may still have on hand printed copies of the old version that they can use to provide to visitors while the order is placed to print additional copies for use at the park. In other cases, the park may not have any printed copies of the old version on hand to distribute to visitors while it awaits reprints of the previous version of the brochure. It would likely take several weeks for the NPS to finalize an order and for the Government Printing Office to print and deliver new unigrid brochures that visitors could use, depending on the Government Printing Office's capacity constraints.
17. If there are cases in which the park must cease using its current unigrid brochure and does not have copies of the prior version on hand, or does not have sufficient copies to cover visitor demand, this would deprive visitors of the use of these brochures until replacement brochures can be made available. Unigrid brochures are critically important sources of information provided to, and relied upon, park visitors. In addition to providing maps of the park that identify resources, ranger stations, visitor centers and provide other wayfinding information, these brochures provide safety information, educate visitors about park resources and safety considerations, and provide general

orientation material about park to visitors. Costs to print the unigrids can vary depending on the size and complexity of the brochure, but a recent estimate for a small park was $7,000 for 20,000 brochures. A larger park would require a larger print run at a higher overall cost. For example, an order for Yellowstone National Park of 650,000 brochures cost approximately $112,000. Printing times are generally 30 to 45 days depending on volume.

18. Junior ranger booklets are park specific interpretive materials that take months to develop. The process for replacing current versions of junior ranger booklets with previous versions would be similar to the process for replacing the unigrid brochures. At Buck Island Reef National Monument in the Virgin Islands, park staff estimate the replacement of the junior ranger book to cost $2000 and take around 60 days.

19. In addition to pre-existing interpretive content, the NPS has been working to create new materials to interpret areas that are newly opened or have undergone substantial renovation in preparation for the Semiquincentennial, including the Lincoln Memorial Undercroft, the First Bank of the United States, and the Independence Hall West Wing. These materials did not replace existing interpretive content but were developed over the course of multiple years and underwent the same review for consistency with SO 3431 as existing materials. The NPS does not consider new interpretive materials that did not replace existing materials, such as the materials at these sites, to fall within the District Court's order.

20. As I described in my First Declaration, the NPS is constantly developing, reviewing, and updating interpretive materials—even *prior* to the issuance of SO 3431. As noted in my First Declaration and addressed above, implementation of SO 3431 has been interwoven

into the NPS's existing interpretive activities. Enjoining the NPS from taking any action to implement SO 3431 and requiring the NPS to cease any removal or alteration of interpretive content and restore all interpretive content as it existed on May 19, 2025—even where SO 3431 is only one of many factors that resulted in the revision or removal of a particular exhibit or other NPS interpretive material—will impact the NPS's ability to undertake its continual efforts to review and update interpretive materials and continue its ongoing interpretation responsibilities to the American public and System unit visitors.

21. And, as I indicated in my First Declaration, these reviews help ensure that interpretive media assets remain accurate, relevant and timely. As a governmental entity, our interpretive programming generally reacts to societal trends, political activities, and similar historical events. The considerations included in SO 3431 have been and can continue to be implemented consistent with the existing legal and policy standards that the NPS applies to its interpretive programming.

22. Finally, the NPS not understand the District Court's order to affect the updating or replacement (due to age or wear and tear) of materials conducted by the NPS in the regular course of business. As explained in my April 8, 2026 declaration, the NPS regularly conducts cyclic maintenance and updates to its interpretive media assets to ensure they remain accurate, relevant, and useable. In the regular course of operations, on any given day, NPS staff may work on developing, revising, repairing, or retiring hundreds of interpretive media assets. The NPS's active management and constant maintenance, revision, replacement, and retirement of interpretive media assets are critical to providing relevant educational resources to visitors.

I declare under penalty of perjury that the foregoing is true and correct.

Washington, District of Columbia
Dated: June 15, 2026

JESSICA BOWRON Digitally signed by JESSICA BOWRON Date: 2026.06.15 18:14:22 -04'00'

Jessica Bowron

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR et al.,<br><br>Defendants. | Civil Action No. 1:26-CV-10877-AK |

**MEMORANDUM AND ORDER ON DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

**ANGEL KELLEY, D.J.**

On June 15, 2026, Defendants Department of the Interior, Doug Burgum in his official capacity as Secretary of the Interior, National Park Service ("NPS"), and Jessica Bowron in her official capacity as Director of the Department of the Interior (collectively, "Defendants") filed an Emergency Motion for Stay Pending Appeal, requesting that the Court stay its June 12, 2026, Order granting Plaintiffs' Motion for Stay Pursuant to 5 U.S.C. § 705 or, in the alternative, a Preliminary Injunction ("Order for Stay"). [Dkt. 44]. Defendants request that the Court issue a ruling on the Motion by close of business on June 17, 2026.

At this juncture, the Court requires additional information to adequately assess Defendants' assertions, particularly regarding irreparable harm. Defendants contend that the Order for Stay "presents severe logistical difficulties and monetary costs by requiring the government to comply in full within 21 days" and "imposes a herculean and unmanageable task on NPS that will irreparably harm it and its programming in many practical ways." The present

record, however, does not provide sufficient information for the Court to evaluate the nature, extent, imminence, or likelihood of the alleged harm, as the Court does not yet have details about the total number of materials removed, how many items have been destroyed and need to be re-fabricated, or where removed items are currently located or stored. Additional information concerning the removed materials is therefore necessary to permit meaningful review of Defendants' claim that irreparable injury will result absent the requested relief.

Accordingly, Defendants are **DIRECTED** to file by **noon (12:00 PM) EST** on **June 17, 2026**:

1. An inventory of each item removed, including (1) the reason(s) for removal; (2) the item's medium (i.e., poster, paper, film, etc.); (3) the item's current location, and if it has been moved or is in storage; (4) the item's condition, including if the item has been damaged or destroyed; and (5) if the item has been destroyed, the expected process necessary for re-fabrication, such as reprinting as opposed to requiring an outside vendor.
2. What actions, if any, Defendants have taken to-date to comply with the Court's June 12, 2026, Order. This deadline aligns with the directive in the Court's Order for Stay that Defendants provide an initial status report within five calendar days.

Defendants' Motion is otherwise **TAKEN UNDER ADVISEMENT** pending receipt of the requested information.

**SO ORDERED.**

Dated: June 16, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director,<br><br>*Defendants*. | Civil Action No. 1:26-cv-10877-AK |

**DEFENDANTS' CONSOLIDATED STATUS REPORT AND INVENTORY OF ITEMS REMOVED**

On June 12, 2026 the Court issued its Memorandum and Order on Plaintiffs' Motion for 5 U.S.C. § 705 Stay or, in the Alternative, Preliminary Injunction ("Injunction Order"). (Doc. No. 41). Among other things, the Injunction Order requires Defendants: (1) within 21 days, to (1) "restore and reinstall all interpretive materials at park sites managed by the NPS [National Park Service] that, pursuant to" the Secretary of the Interior's Order 3431, "Restoring Truth and Sanity to American History," "have been altered, removed, or damaged in the process of such removal since May 20, 2025," when the Secretary issued the order; and (2) within 5 calendar days and every 7 days thereafter until otherwise ordered by the Court, to file status reports

"describing all steps they have taken to comply with the Court's Order, including a list of all interpretive materials that have been restored to their prior state as of May 19, 2025." (Doc. No. 41) at 62-63.

On June 16, 2026, Defendants noticed an appeal of the Injunction Order (Doc. No. 43) and filed an expedited motion for a stay of the Injunction Order pending appeal, with a request for a ruling on the stay motion by 5:00 P.M. on Wednesday, June 17, 2026. (Doc. No. 44). The memorandum in support of the stay motion and its supporting declaration stated that some of the removed interpretive materials at issue "may have been disposed of, thus requiring re-fabrication and reprinting, in some cases by outside vendors or the Government Printing Office, and subsequent distribution to individual park units" before they could be reinstalled and distributed. (Doc. No. 44-1) at 12; *see also* (Doc. No. 44-2) at ¶¶ 7-18. Where re-fabrication or reprinting is required, the Government's stated that the time it will take to reinstall the materials "is likely to extend well beyond 21 days." (Doc. 44-1) at 12. In light of these and other difficulties, the Government contended that the Injunction Order "presents severe logistical difficulties and monetary costs by requiring the government to comply in full within 21 days." *Id.*

On June 17, 2026, the Court issued a Memorandum and Order on Defendants' Emergency Motion for Stay Pending Appeal ("June 17 Order"). (Doc. No. 47). The June 17 Order stated that the present record "does not provide sufficient information for the Court to evaluate the nature, extent, imminence, or likelihood of the alleged harm, as the Court does not yet have details about the total number of materials removed, how many items have been destroyed and need to be refabricated, or where removed items are currently located or stored." (Doc. No. 47) at 1-2. The June 17 Order concluded that "[a]dditional information concerning the removed materials is therefore necessary to permit meaningful review of Defendants' claim that

irreparable injury will result absent the requested relief." *Id*. at 2. The Court therefore ordered Defendants to file by noon (12:00 PM) EST on June 17, 2026:

1. An inventory of each item removed, including (1) the reason(s) for removal; (2) the item's medium (i.e., poster, paper, film, etc.); (3) the item's current location, and if it has been moved or is in storage; (4) the item's condition, including if the item has been damaged or destroyed; and (5) if the item has been destroyed, the expected process necessary for re-fabrication, such as reprinting as opposed to requiring an outside vendor.
2. What actions, if any, Defendants have taken to-date to comply with the Court's June 12, 2026, Order. This deadline aligns with the directive in the Court's Order for Stay that Defendants provide an initial status report within five calendar days.

*Id*.

In accordance with the Injunction Order and the June 17 Order, Defendants hereby submit the attached Declaration of Joyce Beasley, Associate Director for Cultural Resources, Partnerships, and Science, and Acting Associate Director for Natural Resource Stewardship and Science ("Declaration") and accompanying spreadsheet. The Declaration describes the steps NPS has taken to comply with the 21-day deadline in the Injunction Order. The spreadsheet attached to the Declaration provides an inventory of the information ordered by the Court in the June 17 Order, based on the best information presently available to NPS. This information in the spreadsheet includes columns for information that remains to be determined ("TBD") for the reasons described in the Declaration, including the lack of reported information from the relevant park unit within the short time available for this filing. The Declaration further describes the diligent and good faith efforts NPS will continue to make to gather additional information so long as the Injunction Order remains in effect.

Dated: June 17, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

*<u>/s/ Romney Philpott</u>*
Romney Philpott
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on June 17, 2026.

*/s/ Romney S. Philpott*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director,<br><br>*Defendants*, | Civil Action No. 1:26-cv-10877 |

**DECLARATION OF JOY BEASLEY, ASSOCIATE DIRECTOR FOR CULTURAL RESOURCES, PARTNERSHIPS, AND SCIENCE, AND ACTING ASSOCIATE DIRECTOR FOR NATURAL RESOURCE STEWARDSHIP AND SCIENCE**

I, Joy Beasley, declare the following to be true and correct:

1. I am the National Park Service (NPS) Associate Director for Cultural Resources, Partnerships, and Science. I have been the Associate Director for Cultural Resources, Partnerships and Science since late August 2020. Prior to that time, I served in this position in an acting role beginning May 2017. Since April 2025, I have also served as the Acting Associate Director for Natural Resource Stewardship and Science.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.
3. As Associate Director, I oversee programs and offices within the NPS's Washington office and had been assigned to a review team of NPS senior management, representing the Interpretation, Education, and Volunteers Directorate, the Cultural Resources, Partnerships, and Science Directorate, and Natural Resource Stewardship and Science Directorate, as well as representatives from the Department of the Interior Office of Communications and others, that analyzed each System unit and public submission for conformance with the requirements of Secretary's Order ("SO") 3431.
4. The review process occurred on a case-by-case basis. In some cases, interpretive content was found to conform with SO 3431 and no change was recommended. In other cases, content was found not to conform with SO 3431, and the relevant park unit and region was provided notification.
5. After the relevant park unit and region were notified of the non-conformance, the review team would wait for status updates and next steps as they became available from that park unit and regional office. In cases where interpretive material was determined to be non-conforming, park staff would then work to bring the material into conformance. This ordinarily involved the development of replacement material in consultation with the review team. Once the replacement material was developed, and depending on the medium, it would need to be ordered and either printed or fabricated. The Second Declaration of Jessica Bowron, Comptroller exercising the authority of the NPS Director (Second Bowron Declaration), (Doc. 44-2), describes these processes at paragraphs 7

through 18. The Comptroller is currently unavailable to provide a third declaration by noon on June 17, 2026, due to official travel to NPS Semiquincentennial events.

6. The NPS has a decentralized structure that houses substantial resources for implementation and reporting in the field. While the Washington office receives and consolidates data provided from the field, the regional offices and park units themselves have the most up-to-date information on the status of individual items determined to be non-conforming. Prior to June 15, 2026, regional offices and park units would provide these status updates on a rolling basis.

7. With respect to actions NPS has taken to comply with the District Court's Memorandum and Order on Plaintiffs' Motion for 5 U.S.C. § 705 Stay or, in the Alternative, Preliminary Injunction ("Injunction Order"), the NPS received the Injunction Order in the evening of June 12, 2026. Later that evening, the Comptroller informed NPS Regional Directors, Deputy Regional Directors, Associate Directors, and Assistant Directors of the Injunction Order and instructed them to halt any further action to implement SO 3431.

8. On Monday June 15, 2026, the Washington office-based review team coordinated with available regional and park staff to obtain additional information on items already reported to the Washington office as having been removed, revised, or replaced pursuant to SO 3431, and to identify obstacles to the restoration of any such interpretative materials, within the Court's 21-day deadline, to their prior state as of May 19, 2025.

9. On Tuesday, June 16, 2026, the same review team coordinated with NPS and Departmental leadership to outline initial restoration plans. The NPS anticipates being able to implement some restorations starting the week of June 22, 2026, but the NPS does not believe it can restore all removed, revised, or replaced items by the Court's current

July 3 deadline. This is for reasons previously described in the Second Bowron Declaration as well as the additional obstacles described below. When the review team received the District Court's order dated June 16, 2026 (Doc. No. 47), it pivoted to responding to that order's requests for information.

10. The review team compiled a spreadsheet containing information on each item that has been reported to the Washington office as being removed, revised, or replaced as of June 15, 2026. The spreadsheet lists each of these items and, if currently reported, its park unit, reason for removal, medium, current location, condition, and, if the item has been destroyed, the expected reproduction process. Where specific information has not yet been reported, we note its absence as "TBD," and plan to follow up with the relevant regional or park staff as described below. A copy of this spreadsheet is attached as Exhibit A.

11. Exhibit A includes a listing, based on information available to the review team, of reported removals, revisions, or replacements that occurred as a result of the review process for implementing SO 3431. However, at this time, Exhibit A is unlikely to capture every removal, revision, or replacement that may have been made pursuant to SO 3431. Because the process for developing, printing, and fabricating replacement materials can be time intensive, weeks or months may pass between notification of a park unit of non-conformance and the actual revision or replacement of existing interpretive materials. Thus, in many cases, the review team does not expect interpretive material to have yet been removed, revised, or replaced at this time. But, in other cases, interpretive materials may have been removed, revised, or replaced, but the completion of that process has not yet been reported to the Washington office. The review team has not yet

had time to conduct the necessary inquiries to determine the status of all items that were determined to be in non-conformance, but whose status was not subsequently reported to the Washington office. For these reasons, the spreadsheet attached today as Exhibit A does not yet include an entry for each item that was determined by the review team to be in non-conformance.

12. Given the NPS's structure, as described above, and the time of year, we anticipate that it may be difficult to timely communicate with certain park staff that have knowledge of specific removed, revised, or replaced items. The summer season is the busiest time of year at most parks, with park staff often assigned to visitor-facing positions in remote areas that limit their access to communication technologies. This year in particular, many parks must meet additional demands on staff time to support Semiquincentennial activities. These activities include coordinating intensive special exhibits, displays, interpretive and educational activities, as well as complex commemorative events for America's 250th birthday. Moreover, the NPS anticipates increased visitation to many park units around the Semiquincentennial, which will likely require even more park staff hours be transferred into visitor-facing roles between mid-June and mid-July 2026.

13. Regardless of these constraints, the NPS is currently preparing a data call to request status updates from regional offices and individual park units on all items that were determined non-conforming. The NPS anticipates that the majority of relevant park staff will be able to respond to this request, and it will compile the information received for the Court in time for its second status report required by the Injunction Order, on Wednesday, June 24, 2026. To the extent that relevant park staff cannot respond in this timeframe, or

to the extent that additional follow-up is needed with the park units, the NPS will provide the Court with updated information in its subsequent status reports.

14. Exhibit A includes information regarding interpretive materials at Natchez Trace Parkway that were submitted for review as part of the process to implement SO 3431 and subsequently revised for reasons unrelated to conformance with the SO. Revisions for these materials were determined to be outside the scope of SO 3431 but were made for compliance with separate legal and policy directives on the renaming of the "Gulf of America." However, for full transparency, we have included these materials near the end of the current Exhibit A and listed their reason for removal as out of scope of SO 3431.

15. Exhibit A also includes information regarding interpretive materials at Independence National Historical Park involved in City of Philadelphia v. Burgum et al., No. 2:26cv434 (E.D. Pa.); ECF No. 54, Preliminary Injunction Order, 820 F. Supp. 3d 313 (Feb. 16, 2026). These materials are bolded in the final line of Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

JOY BEASLEY Digitally signed by JOY BEASLEY Date: 2026.06.17 11:45:39 -04'00'

Washington, District of Columbia
Dated: June 17, 2026

Joy Beasley

Case: 26-1714 Document: 00118527473 Page: 354 Date Filed: 10/24/2026 Entry ID: 6854452

| Park Name | Item Description | Reason for Removal | Media Type | Item Current Location | Item Condition | If item not available, necessary process to recreate |
|---|---|---|---|---|---|---|
| Delaware Water Gap National Recreation Area | "Guide to the Gap" park brochure | Disparages Americans past or living | Publications | Discarded | N/A | TBD |
| Gateway National Recreation Area | Jamaica Bay Wildlife Refuge VC exhibit | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides | Discarded | N/A | Refabricate using external vendor, install with in-house staff |
| Colonial National Historical Park | General Assembly wayside | Disparages Americans past or living | Signs and Waysides | In the park | Ok | N/A |
| Acadia National Park | Exhbits in the Nature Center | Unrelated to beauty, abundance, and grandeur of the natural landscape | Interior Exhibits | In the park | Ok | N/A |
| Acadia National Park | Tripods at Cadillac Mountain | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides | In the park | Ok | N/A |
| Acadia National Park | Tripods at Great Meadows | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides | In the park | Ok | N/A |
| Acadia National Park | Exhibit at Schoodic Institute | Unrelated to beauty, abundance, and grandeur of the natural landscape | Interior Exhibits | In the park | Ok | N/A |
| Independence National Historical Park | Portrait description | Disparages Americans past or living | Interior / Exterior Exhibits | In the park | Ok | N/A |
| Cape Cod National Seashore | Four waysides | Unrelated to beauty, abundance, and grandeur of the natural landscape; also waysides outdated and/or in poor condition | Signs and Waysides | In the park | 2 in poor condition; 1 part of a project that has ended; 1 ok | TBD |
| First State National Historical Park | Caesar Rodney exhibit | Disparages Americans past or living | Interior / Exterior Exhibits | Discarded | N/A | Refabricate using external vendor |
| George Washington Memorial Parkway | Tribal land acknowledgement posting | Disparages Americans past or living | Signs and Waysides | In the park | Ok | N/A |
| National Mall and Memorial Parks | George Mason Wayside | Disparages Americans past or living | Signs and Waysides | In the park | Ok | N/A |
| National Mall and Memorial Parks | African American Civil War Memorial Wayside | Disparages Americans past or living | Signs and Waysides | In the park | Ok | N/A |
| National Mall and Memorial Parks | FDR Memorial Exhibit Panel | Disparages Americans past or living | Interior / Exterior Exhibits | Discarded | N/A | Refabricate using external vendor |
| George Washington Memorial Parkway | Sign at Great Falls | Disparages Americans past or living | Signs and Waysides | In the park | Ok | Re-post or internal re-print |
| Belmont-Paul Women's Equality National Monun | Informational wayside | Disparages Americans past or living | Signs and Waysides | Discarded | N/A | Refabricate using external vendor |
| Carter G. Woodson HomeNational Historic Site | Short video | Disparages Americans past or living | Film | At the park | Ok | N/A - available |
| Carter G. Woodson HomeNational Historic Site | Video | Disparages Americans past or living | Film | At the park | Ok | N/A - available |
| Big Cypress National Preserve | Mangroves wayside | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides | At the park | Ok | N/A - available |
| Blue Ridge Parkway | Wayside | Disparages Americans past or living | Signs and Waysides | At the park | Poor | Sign needs to be refabricated using an external vendor |
| Buck Island Reef National Monument | Junior Ranger book | Disparages Americans past or living | Publication | Discarded | N/A | Books would need to be reprinted |
| Cane River Creole National Historical Park | Temporary exhibits in Visitor Center | Disparages Americans past or living | Signs and Waysides | At the park | Ok | N/A - available |
| Cane River Creole National Historical Park | Exhibit panels | Disparages Americans past or living | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Castillo de San Marcos National Monument | Exhibit panels | Disparages Americans past or living | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Castillo de San Marcos National Monument | Exhibit panels | Disparages Americans past or living | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Charles Pinckney National Historic Site | Sign | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides | At the park | TBD | TBD |
| Christiansted National Historic Site | Film | Disparages Americans past or living | Film | At the park | Ok | N/A - available |
| Christiansted National Historic Site | Film | Disparages Americans past or living | Film | At the park | Ok | N/A - available |
| Cumberland Gap National Historical Park | Publication | Unrelated to beauty, abundance, and grandeur of the natural landscape; disparages Americans past or living | Publications | Discarded | N/A | Park would reprint in-house |
| Fort Raleigh National Historic Site | Junior Ranger book | Disparages Americans past or living | Publications | At the park | Ok | Some existing stock; would need to reorder |
| Fort Raleigh National Historic Site | Waysides | Disparages Americans past or living | Signs and Waysides | At the park | Ok | N/A - available |
| Fort Sumter and Fort Moultrie National Historical Park | Bottle fill signs | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs | Discarded | N/A | Sign would need to be redesigned and installed, TBD if in-house or external vendor |
| Fort Sumter and Fort Moultrie National Historical Park | Wayside | Unrelated to beauty, abundance, and grandeur of the natural landscape | Wayside | Discarded | N/A | Sign needs to be refabricated using an external vendor |
| Great Smoky Mountains National Park | Interior exhibit | Unrelated to beauty, abundance, and grandeur of the natural landscape | Interior / Exterior Exhibits | At the park | Poor | Custom exhibit that was in disrepair; park has repurposed the space and would be difficult to restore in kind |
| Guilford Courthouse National Military Park | Exhibit panels in Visitor Center | Disparages Americans past or living | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Gulf Islands National Seashore | Exhibits | Disparages Americans past or living | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Jean Lafitte National Historical Park and Preserve | Waysides | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides | Discarded | N/A | Sign needs to be refabricated using an external vendor |
| Mammoth Cave National Park | Exhibit panels in Visitor Center | Unrelated to beauty, abundance, and grandeur of the natural landscape; disparages American past or living | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Medgar and Myrlie Evers Home National Historic Monument | Junior Ranger book | Disparages Americans past or living | Publications | Discarded | N/A | Park would need to reprint through GPO |
| Natchez Trace Parkway | Waysides | Disparages Americans past or living; out of conformance with EO 14172 | Signs and Waysides | At the park | Out of compliance with EO 14172 | TBD |
| Ocmulgee Mounds National Historical Park | Site bulletin | Disparages Americans past or living; not developed in consultation with Tribes | Publications | At the park | Outdated | N/A - available |
| Timucuan Ecological and Historic Preserve | Exhibit panels in Visitor Center | Unrelated to beauty, abundance, and grandeur of the natural landscape | Interior / Exterior Exhibits | At the park | Ok | N/A - available |
| Virgin Islands National Park | Waysides | Disparages Americans past or living | Signs and Waysides | At the park | Ok | N/A - available |
| Virgin Islands National Park | Waysides | Disparages Americans past or living | Signs and Waysides | At the park | Ok | N/A - available |
| Muir Woods National Monument | Sign | Disparages Americans past or living | Signs and Waysides | At the park | Ok | N/A - available |

Case: 26-1714 Document: 00118527473 Page: 355 Date Filed: 10/24/2026 Entry ID: 6854452

| | | | | | | |
|---|---|---|---|---|---|---|
| Muir Woods National Monument | Sign | Unrelated to beauty, abundance, and grandeur of the natural landscape | Signs and Waysides;#Signs and Waysides | At the park | Ok | N/A - available |
| Wrangell-St. Elias National Park & Preserve | Exhibit panels | Disparages Americans past or living | Interior / Exterior Exhibits | TBD | TBD | TBD |
| Pictured Rocks National Lakeshore | Wayside | Disparages Americans past or living | Signs and Waysides | At the park | Ok | N/A - available |
| Grand Teton National Park | Exhibit panel | Disparages Americans past or living | Interior / Exterior Exhibits | Discarded | N/A | Park would reprint and install in-house |
| Sunset Crater National Monument | Exhibit panel | Unrelated to beauty, abundance, and grandeur of the natural landscape | Interior / Exterior Exhibits | Discarded | N/A | Park would reprint and install in-house |
| Rock Creek Park | Wayside | Disparages Americans past or living | Wayside | TBD | TBD | TBD |
| Natchez Trace Parkway | Exhibit panels | Revisions made for reasons outside of the scope of SO 3431; out of conformance with EO 14172 | Interior / Exterior Exhibits | Discarded | N/A | TBD |
| Natchez Trace Parkway | Wayside | Revisions made for reasons outside of the scope of SO 3431; out of conformance with EO 14172 | Signs and Waysides | Discarded | N/A | TBD |
| Natchez Trace Parkway | Wayside/sign | Revisions made for reasons outside of the scope of SO 3431; out of conformance with EO 14172 | Signs and Waysides | Discarded | N/A | TBD |
| Natchez Trace Parkway | Waysides | Revisions made for reasons outside of the scope of SO 3431; out of conformance with EO 14172 and poor condition | Signs and Waysides | Discarded | N/A | TBD |
| Natchez Trace Parkway | Site bulletin | Revisions made for reasons outside of the scope of SO 3431; out of conformance with EO 14172 | Publications | Discarded | N/A | TBD |
| **Independence National Historic Site*** | **President's House Site exhibit panels** | **Disparages Americans past or living** | **Exterior Exhibits** | **Most glass panels restored; large format metal panels were damaged and not restored, pending active litigation** | **Mixed** | **TBD** |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION et al., Plaintiffs, v. UNITED STATES DEPARTMENT OF THE INTERIOR et al., Defendants. | Civil Action No. 1:26-CV-10877-AK |

**MEMORANDUM AND ORDER ON DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

**ANGEL KELLEY, D.J.**

On June 15, 2026, Defendants filed an Emergency Motion for Stay Pending Appeal, requesting that the Court stay its June 12, 2026, Order ("Injunction Order"), which required Defendants to halt implementation of Secretary Order 3431 ("Secretary's Order") pursuant to 5 U.S.C. § 705. [Dkt. 44]. Plaintiffs opposed the Motion. [Dkt. 48]. For the following reasons, Defendants' Motion for Stay Pending Appeal is **DENIED** and Defendants are further **DIRECTED** to ensure that when the exhibits are reinstalled, they remain available and visible to the public, subject to lawful changes or modifications.

## I. LEGAL STANDARD

Pursuant to the Federal Rules of Appellate Procedure, a party appealing the entry of a preliminary injunction by the district court may seek a stay of the injunction pending appeal. Fed. R. App. P. 8(a). Ordinarily, the party must first request such relief from the district court before moving for a stay with the court of appeals. Fed. R. App. P. 8(a)(1)(A). A motion for a

stay pending appeal "requires an exercise of the court's equitable discretion." Ark. Tchr. Ret. Sys. v. State St. Bank & Tr. Co., 527 F. Supp. 3d 40, 58 (D. Mass. 2021) (citing Common Cause R.I. v. Gorbea, 970 F.3d 11, 15-16 (1st Cir. 2020)). The court must consider the following factors, which are substantially similar to those considered on a motion for preliminary injunction: "(1) whether the applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent relief; (3) whether issuance of relief will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Respect Me. PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010) (citing Nken v. Holder, 556 U.S. 418 (2009)). The first factor, likelihood of success on the merits, is the most important element. See Acevedo-García v. Vera-Monroig, 296 F.3d 13, 16 (1st Cir. 2002) (describing likelihood of success as the "sine qua non" for a stay pending appeal). Notably, "[a] stay pending appeal is an 'intrusion into the ordinary processes of administration and judicial review' and relief is not granted as 'a matter of right.'" Rhode Island v. Trump, 155 F.4th 35, 41 (1st Cir. 2025) (quoting New York v. Trump, 133 F.4th 51, 65 (1st Cir. 2025)). The movant "bear[s] the burden of demonstrating that they are entitled to the 'extraordinary' relief that they seek." Id. (quoting Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 68 (1st Cir. 2025)).

## II. DISCUSSION

As set forth below, the Court determines that Defendants have failed to establish the elements necessary to justify a stay. Defendants bear the burden of proof and persuasion but have not shown a likelihood of success in challenging the Court's prior analysis nor presented sufficient evidence to establish irreparable harm. Instead, Defendants largely rehash arguments the Court has already thoroughly considered and rejected, or they advance for the first time new

legal theories in support of dismissal. Neither provides a basis for the extraordinary relief of a stay.

**A. Likelihood of Success on the Merits**

To establish a likelihood of success on the merits, Defendants must do more than express disagreement with the Court's prior ruling; they must make a *strong* showing that they are likely to prevail on appeal. See Nken, 556 U.S. at 434. They have not done so here. As Defendants themselves acknowledge, much of their current Motion simply repackages arguments the Court has already considered and rejected in its Injunction Order. [See Dkt. 44-1 at 4-5 (submitting that Defendants' arguments rest on the same as those "explained in their brief in support of their motion to dismiss and in their brief in opposition to Plaintiffs' motion for a stay or preliminary injunction," and that the present Motion "incorporate[s] [those arguments] by reference")]. Specifically, Defendants reiterate a panoply of arguments that the Secretary's Order is not a final agency action, is not contrary to law, and is not arbitrary or capricious. Defendants do not identify any intervening authority, overlooked factual matter, or clear error that would call the Court's reasoning into question. Nor do Defendants engage substantively with the Court's analysis regarding, for example, the inapplicability of United States v. Salerno, 481 U.S. 739 (1987), the variety of factual evidence in the record underlying Plaintiffs' arbitrary-and-capricious claims, or the Court's textual analysis of the Organic Act, Centennial Act, and Omnibus Management Act. Instead, Defendants largely express disagreement with the Court's conclusions. Disagreement alone is insufficient to demonstrate a likelihood of success on the merits, and certainly not a strong likelihood of success. See Afr. Cmtys. Together v. Noem, No. 25-CV-13939, 2026 WL 961900, at *1 (D. Mass. Apr. 9, 2026) (denying motion for stay pending appeal where defendants largely "repeat[ed] the arguments they already raised in

opposing Plaintiffs' motion"); United States v. Reynoso, 778 F. Supp. 3d 433, 437 (D.P.R. 2025) (same); In re Fin. Oversight & Mgmt. Bd. for P.R., 588 F. Supp. 3d 191, 203 (D.P.R. 2022) (same).

The only new argument on the merits that Defendants advance—raised for the first time in their Motion for Stay—is that Plaintiffs cannot proceed under the Administrative Procedure Act's ("APA") contrary-to-law provision and instead must satisfy the higher standard for an *ultra vires* claim. As a threshold matter, Defendants offer no explanation for why this theory was not raised in their prior briefing. The Court finds it waived at this juncture, as a motion for stay is not a vehicle for presenting new legal theories or issues. Cf. Acevedo-García, 296 F.3d at 18 (declining to consider arguments raised for first time in support of motion for stay pending appeal of preliminary injunction); New Jersey v. Trump, 131 F.4th 27, 43 (1st Cir. 2025). In any event, even if the Court were to consider this new argument on the merits, it is unpersuasive. Plaintiffs do not assert an *ultra vires* challenge to the Secretary's Order, making the requirements for establishing such a claim irrelevant to this case.[1] *Ultra vires* claims arise under the Constitution and are doctrinally distinct from Plaintiffs' APA challenges. See New York v. McMahon, 784 F. Supp. 3d 311, 352 (D. Mass. 2025) (assessing *ultra vires* claim separately and independently from contrary-to-law claim under the APA); cf. Council for Opportunity in Educ. v. U.S. Dep't of Educ., No. 25-CV-03491, 2026 WL 120984, at n.5 (D.D.C. Jan. 16, 2026) (describing statutory jurisdictional limits on APA review as separate from analysis of constitutional *ultra vires* claims). Because Defendants' argument rests on a legal standard that

[1] Defendants' argument that Plaintiffs must meet the *ultra vires* standard appears to rely on the assumption that Plaintiffs fail to state a cognizable APA claim, and so Plaintiffs are limited to bringing an *ultra vires* claim. According to Defendants, this is because the Secretary's Order is not a final agency action. However, the Court has concluded that the Secretary's Order is a final agency action subject to review under the APA.

does not govern the claims before the Court, Defendants do not demonstrate a likelihood of success on this ground. Accordingly, Defendants have not made a sufficiently strong showing under the first stay factor.

**B. Irreparable Harm**

To establish irreparable harm, Defendants bear the burden of demonstrating that, absent a stay, they will suffer irreparable injury that is substantial, certain, and inadequately remedied by monetary damages or later appellate relief. See Nken, 556 U.S. at 434-35. "[S]peculative and conclusory statement[s]" of future harm do not suffice. New York v. Trump, 133 F.4th at 72. Here, Defendants raise three theories: (1) the Injunction Order hampers government speech by preventing the National Park Service ("NPS") from proffering its preferred narrative at National Parks; (2) implementation of the Injunction Order is practically infeasible and costly; and (3) the Injunction Order conflicts with a recent order issued by the U.S. Court of Appeals for the Third Circuit regarding Independence National Historical Park in Philadelphia, PA, thus subjecting Defendants to inconsistent obligations with respect to that site. The Court is unpersuaded by these arguments and explains why.

First, as to government speech (setting aside the fact that Defendants never raised this argument in their motion to dismiss nor their opposition to Plaintiffs' request for a preliminary injunction, but once again, raise new arguments for the first time in their Motion for Stay pending appeal), Plaintiffs do not assert any First Amendment claim, making the issue of government speech irrelevant to this action and Defendants' claim of injury unconvincing. The government-speech doctrine emanates from the First Amendment and operates as a defense to claims alleging that the government violated a plaintiff's free speech rights. See Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009); e.g., Shurtleff v. City of Boston, 596 U.S. 243, 258-

59 (2022) (applying government-speech doctrine to assess whether city's refusal to raise flag constituted viewpoint discrimination under the First Amendment); Satanic Temple, Inc. v. City of Boston, No. 21-CV-10102, 2021 WL 3079868, at *5 (D. Mass. July 21, 2021) (assessing government-speech doctrine in context of First Amendment Establishment Clause claim). As such, its function is to foreclose a plaintiff's argument that the government must include or provide a particular type of expressive speech. It does not create a freestanding, substantive governmental right to speech that is insulated from ordinary APA review.

The case Defendants rely on, Pleasant Grove City v. Summum, 555 U.S. 460 (2009), indeed involved a private group's First Amendment challenge alleging that a municipality engaged in viewpoint discrimination by declining to erect the plaintiff's proposed religious monument in a public park. The Supreme Court held that "the Government's own speech . . . is exempt from First Amendment scrutiny." Id. at 467. As Justice Alito explained, the doctrine is rooted in a practical concern of burdens on government functioning imposed by *private* interests. Id. at 467-68. Nothing in Summum suggests that the government's exemption from certain First Amendment claims broadly renders government speech immune from otherwise applicable statutory constraints or APA review. See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 329-31 & n.9 (1st Cir. 2009) (explaining that, under Summum, government speech may still be limited "by law, regulation, or practice"). As the U.S. District Court for the District of Columbia recently explained, "[t]he government is free to say what it wants," but it still "must abide by the bounds of authority and the procedures that Congress has prescribed, through the APA and otherwise." Drs. for Am. v. OPM, 793 F. Supp. 3d 112, 150 (D.D.C. 2025) (vacating agency directive to remove content regarding gender affirming care and ordering government to restore censored information). The APA exists precisely to ensure agency accountability under statutory

authority, and the government-speech doctrine does not supplant that framework.

This principle applies with equal force to Plaintiffs' APA claims. The Court has determined that Congress, through the Organic Act, Centennial Act, and Omnibus Management Act, has required the NPS to provide the "highest quality" interpretive materials, which includes telling the full history of this Nation. The NPS has no interest in declining to convey speech that Congress itself has required it to express and that the public has a corresponding right to receive. The federal government cannot disregard congressional directives merely by characterizing its conduct as "speech." Accordingly, Defendants' reliance on the government-speech doctrine does not support a showing of irreparable harm.

Second, as to Defendants' purported practical difficulties in implementing the Court's Injunction Order, the Court is unpersuaded that the task is as infeasible as Defendants describe. Defendants contend that timely compliance would be impossible because certain materials have allegedly been destroyed, and re-fabrication would be expensive, would in some instances require coordination with outside vendors, and would proceed on an uncertain timeline, particularly given that the summer months are the busiest period of the year for many park sites. However, based on the Court's review of Defendants' Status Report, Defendants' arguments are an overstatement, and their evidence does not illustrate a situation where compliance is impossible as opposed to merely burdensome. Pursuant to the Court's Injunction Order, Defendants provided a Status Report with a preliminary list of removed materials. [See Dkts. 47; 49]. The list contains 52 total items.[2] [See Dkt. 49-2]. At least 30 of the identified items are

[2] The list includes 5 additional items at Natchez Trace Parkway that were removed only for compliance with Executive Order 14172 ("Restoring Names that Honor American Greatness") rather than the Secretary's Order. The Court does not consider those materials here because they are outside the scope of the Injunction Order.

reported to be in "Ok" condition and remain stored onsite, or otherwise can be replaced from existing surplus inventory, such as for booklets and brochures. [See id.]. Defendants provide no persuasive explanation for why these items cannot be restored immediately. Indeed, Defendants submit that the NPS is "able to implement some restorations starting the week of June 22, 2026." [Dkt. 49-1 ¶ 9]. Another 6 items are reported to be capable of reprinting, including at least 4 that can be reprinted in-house. [See Dkt. 49-2]. While Defendants identify 8 destroyed items that would require external vendors to recreate, Defendants do not clearly establish that doing so would be infeasible within the Court's deadlines or with limited, case-by-case extensions or exemptions.[3] [See id.]. As for cost, Defendants provide estimates for 5 of the discarded or altered exhibits, totaling only $13,300. [See Dkt. 44-2 ¶¶ 10, 18]. This is hardly a financial burden to Defendants and is a small fraction of one percent of the NPS' $3.267 billion discretionary appropriation for fiscal year 2026. [Dkt. 48 at 13 n.4]. Finally, at this stage, the Court acknowledges the apparent good faith compliance efforts that individual NPS park sites and employees have already instituted to meet the deadlines set forth by this Court. Based on Defendants' representations, the Court finds that if Defendants move promptly to restore the interpretive materials, they can meaningfully comply with the Court's Order. Thus, the Court cannot conclude that Defendants face the sort of irreparable injury necessary to justify a stay on this ground.

Finally, the Court is unpersuaded by Defendants' argument that the Injunction Order conflicts with a stay pending appeal issued by the Third Circuit in City of Philadelphia v. Sec'y U.S. Dep't of Interior, No. 26-1348 (3d Cir. Apr. 9, 2026) [Dkt. 39]. That case involved

[3] Such case-by-case extensions or exemptions could also address any public safety-related concerns or programming disruptions raised by Defendants. [See Dkt. 44-1 at 13, 15].

different legal claims and different parties. There, the City of Philadelphia raised contractual, *ultra vires*, and APA claims over Defendants' removal of a slavery exhibit at the President's House at Independence National Historical Park. The APA claims were brought under the National Underground Network to Freedom Act, 54 U.S.C. §§ 308301-308304, the statute creating Independence National Historical Park, 16 U.S.C. §§ 407m, 407n, and the park's foundation document. The Third Circuit stayed a portion of the district court's preliminary injunction that required Defendants to reinstall material at the site pending resolution on appeal. The stay order was not a final adjudication on the merits of the underlying claims, involved different plaintiffs, and raised different legal theories. As such, that decision does not have any preclusive effect on this matter. See Airframe Sys., Inc. v. Raytheon Co., 601 F.3d 9, 14 (1st Cir. 2010) (explaining that claim preclusion applies "if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related"); Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012) (explaining that issue preclusion applies where, among other thing, "the issue was determined by a valid and binding final judgment"). The fact that both cases concern the same interpretive materials at an individual park site does not alter that conclusion. Defendants may be subject to obligations regarding the same property where those obligations arise from distinct legal violations. In any event, the Third Circuit's order did not affect that district court's mandate that Defendants preserve the interpretive materials, thereby making the displays available for reinstallation.

Moreover, decisions from the Third Circuit are given persuasive rather than binding effect. Cf. In re Korean Air Lines Disaster of Sep. 1, 1983, 829 F. 2d 1171, 1176 (D.D.C. 1987) ("The federal courts spread across the country owe respect to each other's efforts and should

drive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court . . . ."); Iverson v. United States, 973 F.3d 843, 847 (8th. Cir. 2020) (noting that two sister circuits had already addressed the legal issue at hand, but that "[t]hese decisions provide persuasive authority only"); Hearring v. Sliwowski, 712 F.3d 275, 282 (6th Cir. 2013) ("[O]ut-of-circuit precedent clearly establishes rights only in 'extraordinary case[s]' when the out-of-circuit decisions 'both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.'" (quoting Ohio Civil Serv. Emps. Ass'n v. Seiter, 858 F.2d 1171, 1177 (6th Cir. 1988)). Accordingly, the Court finds that Defendants have not established irreparable harm absent a stay.

**C. Harm to Other Parties/Public Interest**

Finally, the undeniable harm to others and the public interest weigh in favor of maintaining the relief previously ordered with slight modification. The Court explained at length in its Injunction Order that the harms to Plaintiffs and the broader public, absent preliminary relief, would be not only cognizable but severe, expansive, and irreparable. As the Court explained, "[t]he [Secretary's] Order erases the history of countless people; alienates communities from public spaces; limits the availability of scientific information relevant to ensuring the long-term preservation of the parks themselves; and impairs the mission of the NPS to preserve the parks 'for the enjoyment, education, and inspiration of this and future generations.'" [Dkt. 41 at 58]. As millions of visitors arrive at the park sites this summer, the harm arising from the continued deprivation of interpretive materials is compounded. Plaintiffs and the public have already been harmed by Defendants' attempts to censor undeniable and

uncomfortable historical and scientific truths through removing interpretive materials. Particularly as the Nation celebrates its first 250 years, the full, honest, and complex history that includes its triumphs, painful chapters, and evolution are even more important. Truthful history belongs to everyone. Restoration now is the only true means to "restore truth and sanity to American history."

Defendants underestimate the public by suggesting that they cannot handle the complicated and uncomfortable, yet undeniable American story. But credit must be given to the public, who are more than capable of being critical thinkers and viewing facts with a realistic lens in confronting America's complete national history. The overwhelming majority of public comments submitted through the QR codes Defendants posted at the park sites denounce the Secretary's Order, instead expressing a desire to learn all sides of history. [See Dkt. 28 ¶ 67]. These facts give further reason to celebrate our 250 years. An informed public is better equipped to learn from history and avoid repeating the mistakes of our past.

The federal government itself has historically commemorated this philosophy. The NPS extolled the virtue of looking to history for lessons of the past in its interpretive text associated with the African Burial Ground National Monument in New York, which is the oldest and largest known excavated burial site in North America for both free and enslaved Africans. See *A Sacred Space in Manhattan*, Nat'l Park Serv. (May 18, 2026), https://www.nps.gov/afbg/index.htm. The following image appears at the site:



This is the Ghanaian symbol of "Sankofa," also depicted by the following image of "a bird which appears to be moving forward while looking back, supporting the idea of incorporating the aspects of the past into the future." *SANKOFA – Learn from the Past*, Nat'l Park Serv. (Nov. 10, 2015), https://www.nps.gov/afbg/learn/historyculture/sankofa.htm.



The term "Sankofa" "literally translates to 'look to the past to inform the future'" and represents the idea that history "should be acknowledged rather than forgotten in order to move forward productively." Id. There is great wisdom in this West African symbol. It reflects the principle that by sharing the full story—with the full historical narrative, including perspectives and experiences that have traditionally been stifled—future generations of our country will be empowered to make more informed choices, thereby making our Nation stronger and better. Defendants' removal of interpretive materials directly undermines this compelling public interest.

## III. CONCLUSION

Accordingly, Defendants' Motion for Stay Pending Appeal is **DENIED**. Defendants are further **DIRECTED** to ensure that when the exhibits are reinstalled, they remain available and visible to the public, subject to lawful changes or modifications. Defendants may seek limited extensions or exemptions from the Injunction Order, as needed, for specific interpretive material that have already been destroyed or damaged.

**SO ORDERED.**

Dated: June 18, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge